7-22-05

cmb

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

EUCLIDES SOTO, LOUIS A. MARTINEZ, )
JOSE RAMIREZ, CLEMENTE HERNANDEZ, )
CESAR PIZARO, ELISON PENA, )
JUAN COLON, JOSE ORTIZ, RAFAEL TORRES, )
ANGEL BAEZ, ANTONIO MARTINEZ, )
WILFREDO ORTIZ, EULOGIO ORTIZ, )
MIRRAIN MIRANDA, RAFAEL MORENO, )
NELSON ACEVEDO, and )
RAMON RODRIQUEZ, )
                                        )    Civil Action No.
            Plaintiffs,                 )    04-10892-JLT
                                        )
v.                                      )
                                        )
SHERMAN-FEINBERG CORPORATION, )
FARNSWORTH FIBRE CORPORATION, )
UNITED STEELWORKERS OF AMERICA, )
LOCAL 421-U, and UNITED STEELWORKERS )
OF AMERICA, )
                                        )
            Defendants.                 )
_____)

## MEMORANDUM OF LAW IN SUPPORT OF THE MOTION OF THE DEFENDANTS UNITED STEELWORKERS, LOCAL 421-U AND UNITED STEELWORKERS FOR SUMMARY JUDGMENT

### I.    INTRODUCTION

The Defendants, United Steelworkers, Local 421-U (the Local) and United

Steelworkers (the International) – collectively, the Union – hereby submit their

Memorandum of Law in Support of their Motion for Summary Judgment. Factual

assertions are supported by a Statement of Material Facts Not in Dispute ("SOF"), infra

part II.

1

The Defendants contend that the allegations raised by the Plaintiffs in this matter, including the allegations regarding the union's duty of fair representation raised under section 301 of the Labor Management Relations Act and the state and federal discrimination allegations, must be dismissed in their entirety.  As is discussed herein, the duty of fair representation claims are nearly entirely time barred, and those that are not time barred must fail as a matter of law.  Moreover, the state law discrimination claims are preempted by section 301 as well as under the doctrine of Garmon preemption, and any state and/or federal law discrimination claims that are not preempted also either are time-barred or must fail as a matter of law.

The Defendants therefore respectfully request that the Court grant judgment it their favor, dismissing all of the claims.

## II.    DEFENDANTS' STATEMENT OF MATERIAL FACTS THAT ARE NOT IN DISPUTE

1.      The non-supervisory employees at Farnsworth Fibre have been unionized for more than 25 years.  Originally, the employees were part of the Upholstery Workers Union.  However, in 1985, the Upholstery Workers Union merged with the United Steelworkers of America (United Steelworkers).  [See Affidavit of Lowell Alexander, attached hereto as Exhibit A.]

2.      Up until it closed in November of 2003, Farnsworth Fibre Company made cotton batting.  The company's plant was located in Boston, Massachusetts, at 185 Old Colony Avenue.  [See Exhibit A, ¶ 3.]

3.      After the Upholstery Workers Union merged with the United Steelworkers, the workers at Farnsworth Fibre became part of Local 421-U which is an amalgamated

2

local union of the United Steelworkers. [See Exhibit A, ¶ 4.] One of those units, Local 421-6, was comprised of approximately 25 employees at Farnsworth Fibre. Id.

4.      The company and the union entered into a number of collective bargaining agreements over the years, the most recent of which was effective from November 1, 2002, to October 31, 2006. The contract contained no provision preventing the plant from shutting down. [Exhibit A, ¶ 5; Exhibit 1.] In addition, the contract contained no provision for severance pay in the event of a plant shutdown. Id.

5.      The structure of representation for the employees at Farnsworth Fibre is quite similar to that of other amalgamated Steelworker unions. First, the United Steelworkers assigns one of its International representatives to service the employees of that unit. In this case, from January 2002 on, Lowell Alexander, an African-American, was appointed to service the employees of the Farnsworth Fibre unit. [See Exhibit A, ¶ 6; Exhibit 2.] His duties were, inter alia, to serve as the liaison between the shop steward (whose duties are described below) and the International and to assist in enforcing and negotiating the union contract. Id.

6.      Pursuant to the USW constitution and bylaws of Local 421-U, the workers at Farnsworth Fibre held elections every 3 years to elect a shop steward, who would also hold the title of "Unit Chair" and serve as the chief representative of Unit 6 of Local 421-U. In addition, the unit also selected a "Local Union Committee Representative" who had responsibilities for negotiating the collective bargaining agreement. At relevant times during 2002-2003, Jose Ortiz, one of the plaintiffs in this case, was selected by his fellow employees to serve as unit chair/shop steward. Miguel DeJesus (who is not a plaintiff in the case) served as Local Union Committee Representative. [See Exhibit A,

¶ 7; Exhibit B (Deposition of Jose Ortiz) at 11-12.] Both individuals were selected by their fellow employees for these positions. Both Mr. Ortiz and Mr. DeJesus are Hispanic. Id.

7.      Pursuant to Article 16 of the collective bargaining agreement, the only duly authorized agents of the union for the purposes of enforcing the terms of the contract were the Staff Representative assigned by the United Steelworkers of America, Mr. Alexander, and for the purposes of filing and adjusting grievances, the shop steward, Mr. Ortiz. [See Exhibit A, ¶ 8; Exhibit 1 at 12.] Pursuant to Article 18 of the collective bargaining agreement, the shop steward is responsible for initiating grievances that arise at the facility. [Exh. 1 at 13].

8.      When employees Farnsworth Fibre had concerns or grievances relating to their working conditions or the terms of the collective bargaining agreement, the proper route was to take that concern to Mr. Ortiz, the unit chair and union steward. [See Exhibit A, ¶ 9; Exhibit 1 at 13.] In fact, a number of employees brought such concerns or grievances to Mr. Ortiz. [See Exhibit B at 25-28.] Mr. Ortiz would then try to resolve the matter by talking to management. Id.; [see Exhibit 1 at 13.]

9.      In addition, if individuals had concerns or questions about the contract or their working conditions, they were free to contact Mr. Alexander at the Steelworkers' office in Milford, Massachusetts, and he would attempt to address their concerns. [Exhibit A, ¶ 10.] Since at least 2001, Masiel DaSilva has been one of the secretary/receptionists at the Steelworkers' office. Ms. DaSilva is herself Hispanic and speaks fluent Spanish. Hence, inability to speak the English language would not be a bar to calling the Steelworkers' office. Id.

4

10.     Beginning in the fall of 2002, Mr. Alexander had significant contact with both Jose Ortiz, the selected union steward, and Miguel DeJesus, the local committee representative. [Exhibit A, ¶ 11.] He was in touch with Mr. Ortiz and Mr. DeJesus because the collective bargaining agreement between Farnsworth Fibre and Local 421-U was set to expire on November 1, 2002, and had to be renegotiated. Id.

11.     Negotiations took place over a six-week period during September and October of 2002. [Exhibit A, ¶ 12.] At each negotiating session, Mr. Alexander would come to Farnsworth Fibre, meet with Mr. Ortiz and Mr. DeJesus, and then together they would go into negotiations with company officials. Id. The Steelworkers paid for any time in excess of the regular work hours that Mr. Ortiz and Mr. DeJesus had to attend bargaining negotiations. [See Exhibit 3.]

12.     The proposed new collective bargaining agreement, which contained pay increases of one dollar per hour over several years and retention of company contributions to the union's pension fund, was presented to the employees for their consideration and vote. [Exhibit A, ¶ 13; Exhibit 1.] Mr. Alexander attended the meeting of the employees in which they were considering ratifying the new contract, along with Mr. Ortiz and Mr. DeJesus, who all recommended approval. [Exhibit A, ¶ 13.] The workers voted to approve the new contract. Id.

13.     Having gotten to know Mr. Ortiz during contract negotiations, Mr. Alexander encouraged Mr. Ortiz to participate and learn more about the union process. [Exhibit A, ¶ 14.] In that regard, Mr. Alexander encouraged Mr. Ortiz to attend a special training seminar being put on by the United Steelworkers at the Holiday Inn in Braintree in January 2003, which was entitled "Union Stewards Training in Spanish." [Id.; Exhibit

5

4.] In order to encourage Mr. Ortiz to attend, Mr. Alexander secured the Steelworkers International's agreement to let Mr. Ortiz attend at the International's expense (the International would pay his tuition). [Exhibit A, ¶ 14.] In his deposition, Mr. Ortiz acknowledged that he was told about this training but declined to attend. [Exhibit B at 23-24.] In any event, the Steelworkers did put on this training on January 3, 2003, and it did pay for a number of Spanish-speaking union representatives to attend. [Exhibit 5.]

14.     In addition, Mr. Alexander encouraged Mr. Ortiz to attend the monthly meetings of Local 421-U, of which Farnsworth Fibre was one unit. [Exhibit A, ¶ 15.] Mr. Ortiz testified that he did not attend because he did not have appropriate transportation to these meetings. [Exhibit B at 64-65.]

15.     After the contract was approved and ratified, Mr. Alexander arranged to have Masiel DaSilva translate the contract into Spanish, and a copy of the contract in Spanish was distributed to Mr. Ortiz and the other employees at Farnsworth Fibre in early 2003. [Exhibit A, ¶ 16; Exhibit 6; Exhibit B at 20; Exhibit C (Nelson Acevedo Dep.) at 9; Exhibit E (Clemente Hernandez Dep.) at 12; Exhibit H (Eulogio Ortiz Dep.) at 17; Exhibit I (Juan Colon Ortiz Dep.) at 16; Exhibit L (Cesar Pizarro Dep.) at 16; Exhibit O (Euclides Soto) at 34.]

16.     Sometime in the summer of 2003, Mr. Ortiz called Mr. Alexander and informed him that some of the employees at Farnsworth Fibre were concerned that they did not know who their International representative was or what the union was doing for them. [Exhibit A, ¶ 17.] In response, Mr. Alexander told Mr. Ortiz that he would come out and meet with the workers. Id. Mr. Alexander arranged to meet with the workers at Farnsworth Fibre on the shop floor, with the machines turned off. Id. In addition, Mr.

Alexander brought with him Masiel DaSilva to translate. Id. [See also Exhibit B at 30-31.]

17.    Mr. Alexander and Ms. DaSilva attended this meeting sometime in the summer of 2003. At that meeting, Mr. Alexander explained to the employees that he had only recently taken over responsibility for their local in January 2002 and that he was dedicated to serving their needs. [Exhibit A, ¶ 18.] He explained that if anyone had a concern or question, they were free to call him, Ms. DaSilva, or Mr. Ortiz, who could, in turn, call Mr. Alexander. Id. Ms. DaSilva translated at this meeting. Id.

18.    Prior to this meeting in the summer of 2003, neither Mr. Ortiz, Mr. DeJesus, nor any other employee at Farnsworth Fibre had contacted Mr. Alexander or anyone else at the Steelworkers' office in Milford, Massachusetts to inform them of any grievance, problem, safety issue, or any other workplace problem. [Exhibit A, ¶ 19; Exhibit B (Ortiz Dep.) at 30, 31, 39, 40; Exhibit F (Antonio Martinez Depo) at 12; Exhibit G (Luis Martinez Dep.) at 10; Exhibit H (Eulogio Ortiz Dep.) at 13-14; Exhibit I (Juan Colon Ortiz Dep.) at 14; Exhibit J (Wilfredo Ortiz Dep.) at 15-16; Exhibit K (Elison Pena Dep.) at 10; Exhibit L (Cesar Pizarro Dep.) at 12; Exhibit M (Jose Ramirez Dep.) at 22-24; Exhibit O (Euclides Soto Dep.) at 9; Exhibit P (Rafael Torres Dep.) at 30.]

19.    Specifically, Mr. Ortiz, in his deposition, stated that he never contacted Mr. Alexander requesting the filing of any grievance, or ever informed him of any safety or health problems at the plant. [Exhibit B at 30-31, 38-39.]

20.    If Mr. Ortiz or any other employee at Farnsworth Fibre had contacted Mr. Alexander to complain about a workplace problem which could be addressed under the

collective bargaining agreement, Mr. Alexander would have filed an appropriate grievance and followed up on the matter. [Exhibit A, ¶ 20.]

21. In October of 2003, the company, Farnsworth Fibre, announced that it was shutting down its facility completely. [Exhibit 7.] Mr. Ortiz contacted Mr. Alexander, and Mr. Alexander promptly set up a meeting with both the company and the workers to discuss the situation. [Exhibit A, ¶ 21; Exhibit B at 40-42.] That meeting took place in mid-October of 2003. Id. Mr. Alexander and Ms. DaSilva came to the plant, met with the workers and Mr. Ortiz, then went with Mr. Ortiz to the company's management to discuss the matter with them, and then returned to report back to the workers. Id. Ms. DaSilva was present to translate for the workers. [See, e.g., Exhibit B (Jose Ortiz Dep. at 41; Exhibit C (Nelson Acevedo Dep.) at 12; Exhibit D (Angel Baez Dep.) at 16-17.]

22. At the initial meeting with the workers, at least several employees expressed concerns over their pensions. [Exhibit A, ¶ 22; Exhibit B at 43-44.] A number of workers expressed other concerns about vacation and severance pay, among other issues. Id. Mr. Alexander, Ms. DaSilva, and Mr. Ortiz then went directly from the meeting with the workers to meet with management. Id. They met with the owner, Lawrence Feinberg, and the plant manager, Kenneth Doucette. Id. At this meeting, the company informed the union representatives that the company was closing in several weeks, that the decision was final, that the company wasn't making any money, and that it was not in a position to pay any severance pay. [Exhibit A, ¶ 22; Exhibit B at 47-48.]

23. Based upon his research and his meeting with company officials, Mr. Alexander and Ms. DaSilva left the first meeting with company officials and went back to

8

meet with the members. [Exhibit A, ¶ 23; Exhibit B at 50.] At that time, Mr. Alexander informed the members that there was not a great deal that the union could do about the closing. [Exhibit A, ¶ 23.] Mr. Alexander had made inquiries of the company regarding vacation pay, and he received assurances about this pay, which he transmitted to the employees. At the meeting there were again some questions about vested pension benefits, and Mr. Alexander promised to gather information about each person's pension and provide a toll-free telephone number they could call for further information regarding their pension. Id. In fact, Mr. Alexander obtained this information. Ms. DaSilva called back at least one of the bargaining unit members who was of retirement age, and gave him a phone number to call for further information. Id. [See also Exhibit 8.] This individual did retire on a Steelworker pension. Id. In addition, Plaintiff Ramon Rodriguez admitted in his deposition that he collects a Steelworkers pension. [Exhibit N at 6.]

24.    Later, after conferring with Mr. Ortiz and the workers, Mr. Alexander filed three grievances relating to the plant shutdown. [Exhibit A, ¶ 24; Exhibits 9-11; Exhibit B at 53-56.] The first was that the company attempted to stop health insurance coverage for employees at the time of the shutdown, and not providing such benefits until the end of the month. [Exhibit 9.] In addition, Mr. Alexander filed a grievance relating to the fact that the second shift was terminated before the first shift without affording senior individuals on the second shift the right to bump to the first shift. [Exhibit 10.] In addition, Mr. Alexander filed a grievance relating to report pay, when employees on the second shift showed up for work but were told that the shift had

already been disbanded. [Exhibit 11.] Mr. Ortiz participated in preparing those grievances and signed them. [Exhibit A, ¶ 24; Exhibits 9-11; Exhibit B at 53.]

25.    Mr. Alexander set up a meeting with company officials to go over each of the three grievances. Mr. Alexander informed Mr. Ortiz of the time and place of the grievance meeting; however, on the date of such meeting, November 19, 2003, Mr. Ortiz did not show up. [Exhibit A, ¶ 24; Exhibit B at 60-62.] Mr. Alexander actually called Mr. Ortiz from management's office, only to be informed by Mr. Ortiz that he was working another job and was not going to attend. Id.

26.    During the grievance meeting on November 19, 2003, Mr. Alexander settled each of the three grievances, receiving monetary compensation for the affected employees. [See Exhibit A, ¶ 26.]

27.    Prior to the company announcing the shutdown of the plant, neither Mr. Alexander nor any other representative of the United Steelworkers was informed of any safety or other violations of the collective bargaining agreement, nor were they asked by anyone at Farnsworth Fibre, including the union steward, Mr. Ortiz, to file any grievances. [Exhibit A, ¶ 27; see supra ¶ 18.] Mr. Alexander was not aware of any safety issues at the plant. [Exhibit A, ¶ 27.]

28.    At no time did the national origin of the employees at Farnsworth Fibre play any role or affect any decision made by Mr. Alexander with respect to his representation of the Farnsworth Fibre employees. [Exhibit A, ¶ 28.]

29.    Recognizing that the employees at Farnsworth Fibre were mainly Hispanic, and that many did not speak English, Mr. Alexander took extraordinary steps to include Farnsworth Fibre members in the affairs of the union. As stated above, after

10

negotiating the collective bargaining agreement in November of 2002, he had the

contract printed in Spanish and provided copies to Farnsworth Fibre employees. [See

supra ¶ 15.] In addition, the United Steelworkers arranged for Steelworkers union

steward training entirely in Spanish, and such training seminar occurred on January 3,

2003. [See supra ¶ 13.] In addition, Mr. Alexander secured a commitment from the

International to pay the cost of attending such training for Mr. Ortiz, but Mr. Ortiz

declined to go. Id. Finally, on two occasions, in the summer of 2003 and October of

2003, Mr. Alexander brought United Steelworkers employee Masiel DaSilva to both

meetings to interpret. [See supra ¶¶ 16-17, 21-23.] In addition, Ms. DaSilva telephoned

at least one bargaining unit member, after announcement of the shutdown, to give him

information about his pension. [See supra ¶ 24.]

30.    Prior to 2003, Mr. Alexander had also represented the employees at Sealy

Mattress in Randolph, Massachusetts, and, there too, most of the factory employees

were Hispanic. [Exhibit A, ¶ 29; Exhibit 18 (roster of employees at the time of the plant

closing).] That plant shut down in 2004. Id. No one filed a claim of unfair

representation with respect to the shutdown of that plant; and, indeed, Mr. Alexander

negotiated severance pay upon the plant shutdown because the contract so provided.

[Exhibits 12 & 13.]

31.    In addition, since 1999, Mr. Alexander was the International representative

for two other bargaining units where there was a total plant shutdown — Beebe Rubber

in New Hampshire and Cone Blanchard in Vermont. [Exhibit A, ¶ 30.] In both

instances, the plants closed and the only severance paid, if any, was that which was

provided in the contract. Id. In both plants, the employees were predominantly non-

minority. Id. In Beebe Rubber, the agreement only provided for a severance benefit in lieu of pension – a so-called pension buyout – for employees with more than 10 years of service. [See Exhibit 14 (Beebe contract) at 36.] In Cone Blanchard, no severance benefits were provided under the collective bargaining agreement. [See Exhibit 15 (Cone Blanchard contract) at 36.]

32. In addition, Mr. Alexander represented the predominantly Hispanic employees at Rosboro Plastics when that plant shut down in 1998. [Exhibit A, ¶ 31.] Mr. Alexander was able to negotiate severance pay there, despite the lack of severance language in the contract, because the company wanted to keep the plant open for a short while after announcing the closing and needed to provide an incentive for employees to stay through the plant closing date. [Exhibit A, ¶ 31; Exhibits 16 &17.]

## III. ARGUMENT

### A. STANDARD OF REVIEW

Summary judgment is appropriate when the moving party has met its burden of proof and established that there is no genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Aponte-Santiago v. Lopez Rivera, 957 F.2d 40, 41 (1st Cir. 1992); Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 7-8 (1st Cir. 1990). A motion for summary judgment will be granted if the pleadings, depositions, answers or interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The record should be viewed in the light most favorable to the non-moving party. Aponte-Santiago v. Lopez Rivera, 957 F.2d 40, 41 (1st Cir. 1992). The mere existence of a scintilla of evidence in

support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

Although the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the non-moving party, U.S. v. Diebold, 369 U.S. 654, 655 (1962), the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts... In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (emphasis in original) (citing Fed.R.Civ.P. 56(e)).

In this case, the pleadings together with the deposition testimony and record evidence make clear that there is no genuine issue as to any material fact. Therefore, for the reasons argued in this Memorandum, the union is entitled to judgment as a matter of law and plaintiffs' claims against the union should be dismissed in their entirety.

## B.   PLAINTIFFS HAVE PRODUCED NO EVIDENCE SUFFICIENT TO PERMIT THE DUTY OF FAIR REPRESENTATION CLAIMS TO PROCEED TO TRIAL

In the present case, taking the allegations together with deposition testimony and other record evidence, plaintiffs cannot satisfy their burden that the union breached its duty of fair representation.

According to plaintiffs' amended complaint, the union allegedly breached its duty of fair representation as follows:

11.   Before the terminations, on or about November 12, 2003, Lowell Alexander of the Union met with Kenneth Doucette of the Employers. Alexander told Jose Ortiz that the Union could do nothing.

12.   Lowell Alexander failed to communicate with the employees in Spanish. No client recalls a Spanish interpreter being available at the Company. Thus, the collective bargaining agreement itself does not amount to fair representation. The union's failure to bargain about the effect of the layoffs violates the law.

13.   The dispute of the discharge of all of the (Hispanic) employees was not submitted in writing by the Union to the Employers and presented for adjustments.

14.   Therefore, the plaintiffs demanded in writing that a grievance be filed and a complaint lodged about the interpretation, application, or compliance with the terms of the Agreement with respect to the terminations and the Union failed to do so.

15.   The failure to do so will be considered an action predicated upon racially discriminatory motivation, which is a breach of the duty of fair representation and breach by the Employers of the labor contract.

16.   …. The Shop Steward, Jose Ortiz, was not provided with a draft of the Agreement before it was signed or with the Union Constitution.

17.   The Agreement does not provide for the effects of the terminations of said employees. Nor does the Agreement reflect any effects bargaining.

18.   While the Union purported to represent the plaintiffs, two of the members lost two fingers at the Company plant and there have been two fires at the Company plant. The Union has not provided apprenticeship, educational, or safety programs.

19.   …. The Local and the corporate defendants acted in bad faith, intentionally failing to represent the plaintiffs properly for reasons unrelated to legitimate union objectives….

Inasmuch as plaintiffs allege that the union breached the duty of fair

representation by discriminating against them because they are Hispanic, the union will

demonstrate below, infra part III(C), that plaintiffs failed to prove that the union

14

discriminated against them on the basis of their national origin and race.[1]  Inasmuch as

plaintiffs allege that the union breached its duty by representing former Farnsworth

Fibre employees arbitrarily, in bad faith or discriminatorily on any basis, those claims

are without basis and must be dismissed, as discussed herein.

### 1. Plaintiffs' Duty Of Fair Representation Claims Are Time-Barred And So Must Be Dismissed.

The six-month statute of limitations bars consideration of any incidents alleged by

plaintiffs prior to November 5, 2003,[2] including open-ended allegations that the union

failed to address safety concerns or failed to provide employees with privileges

accorded to non-Hispanic employees. DelCostello v. Teamsters, 462 U.S. 151 (1983)

(a claim charging breach of the duty of fair representation must be brought within a six

month statute of limitations); Goulet v. Carpenters District Council of Boston, 884

F.Supp. 17, 24 (D.Mass. 1994) (claims accrued at least one year prior to bringing action

barred under statute of limitations).

Indeed, most of plaintiffs' allegations are time-barred because they concern

safety and health claims and other matters, such as the alleged failure to provide

apprenticeship and training programs, that allegedly arose before November 2003. In

their complaint, plaintiffs allege that "[w]hile the union purported to represent the

plaintiffs, two of the members lost two fingers at the Company plant and there have

been two fires at the Company plant." However, in their deposition testimony, plaintiffs

state that the alleged injury of fingers and incidence of fires occurred well before

November 2003 and the shutdown. [See, e.g., Exhibit D (Angel Baez Dep.) at 6-7.]

---

[1]    See Amended Complaint ¶ 15.

[2]    Plaintiffs filed their original complaint on May 5, 2004.

Some plaintiffs testified that they could not even remember when the fires or injuries occurred. [See, e.g., Exhibit E (Clemente Hernandez Dep.) at 8.]

Thus such claims are time-barred.

Although the consideration of plaintiffs' safety and health claims should end there, the union will demonstrate below that even if plaintiffs' allegations were not time-barred, such claims must be dismissed as a matter of substantive law.

> ## 2. The Plaintiffs Did Not Breach the Duty of Fair Representation as Alleged.
>
> ### a. Overview of the Law of the Duty of Fair Representation

A union breaches its duty of fair representation only when its conduct is arbitrary, discriminatory, or in bad faith. Vaca v. Sipes, 386 U.S. 171, 190(1967); Air Line Pilots Ass'n Int'l v. O'Neill, 499 U.S. 65, 67 (1991) (Air Line Pilots); MacKnight v. Leonard Morse Hospital, 828 F.2d 48, 51 (1st Cir. 1987); Condon v. Local 2944, United Steelworkers of America, 683 F.2d 590, 594 (1st Cir. 1982).

An employee cannot prevail against a union for breach of the duty of fair representation merely on grounds that he does not approve of the outcome of negotiations between the union and the company. Air Line Pilots, 499 U.S. at 67, 79 (finding no breach of the duty of fair representation even assuming a union's negotiated strike settlement was less favorable than a complete surrender and return to work after the strike, where the settlement was not irrational). Rather, the final product of the bargaining process may constitute evidence of a breach of duty "only if it can be fairly characterized as so far outside a wide range of reasonableness … that it is wholly irrational or arbitrary." Id. at 67, 78 (citations omitted).

Even conduct amounting to negligence or poor judgment does not violate the

duty of fair representation. See e.g., USWA v. Rawson, 495 U.S. 362, 376 (1990);

MacKnight v. Leonard Morse Hospital, 828 F.2d 48, 51 (1st Cir. 1987); Condon v. Local

2944, United Steelworkers of America, 683 F.2d 590, 594 (1st Cir. 1982) ("[B]ecause

due care has not been incorporated into the unions' duty of fair representation, mere

negligence does not generally constitute a breach of this duty."). Plaintiffs must show

that the union was guilty of far worse, variously described as "malfeasance,"

"dishonesty," "bad faith," or "discriminatory treatment," or acting in a "perfunctory" or

"arbitrary fashion." Id.; Sear v. Cadillac Automobile Co. of Boston, 654 F.2d 4, 7 (1st

Cir. 1981).

Plaintiffs contend that the union breached its duty of fair representation by (1)

failing to preserve their jobs upon the closure of Farnsworth Fibre, (2) failing to grieve

safety infractions or otherwise maintain the safety of the plant, and (3) failing to offer

apprenticeship, educational and safety programs. We consider each argument in turn.

> b.    The Union Did Not Breach the Duty of Fair Representation
>        by Failing to Prevent Plaintiffs' Terminations Due to the Plant
>        Closure.

Plaintiffs complain that the union breached its duty of fair representation by failing

to prevent job terminations or otherwise negotiate provisions in the contract regarding

the effects of plant closure. (Complaint at ¶¶ 11, 13, 17). That is nonsense.

There is no contractual obligation on the part of the union to prevent plant

closures or terminations or to provide severance benefits, and none is required under

federal labor law. A company has a duty to bargain only over the effects on employees

of a shutdown of operations, and not the decision itself. See First National Maintenance

17

Corp. v. NLRB, 452 U.S. 666, 677, 681-82 (1981); Textile Workers V. Darlington Mg.

Co., 380 U.S. 263, 274 (1985) (employer has right to close its entire business, thereby

ending employer-employee relationship); Magic Fraser v. Magic Chef-Food Giant

Markets, Inc., 324 F.2d 853, 855-56 (6th Cir. 1963) (an employer has right to cease

operations even when business is discontinued during the life of a collective bargaining

agreement). Similarly, it was not a breach of the union's duty in this case to fail to

bargain shutdown or severance benefits, and the contract does not require the parties

to negotiate over the employer's decision to close the plant.[3]

The record makes clear that the union fairly and rationally represented plaintiffs

with respect to the closing, including effects bargaining and the resolution of grievances.

In or around October 16, 2003, shortly after Steelworkers Staff Representative Lowell

Alexander learned of the planned shutdown, Alexander and Ortiz met with union

members to answer their questions about the closing and its effect on their benefits, and

met separately with the Company to discuss the pending shutdown. See Statement of

Material Facts (SOF), supra, ¶¶ 21-23. The Union even provided an interpreter at the

meetings with members, which plaintiffs admit in their depositions. Id.

In a meeting with the Company on October 16, 2003, which Ortiz also attended,

Alexander inquired about whether the facility would be kept open, requested that

---

[3] It is without dispute that employee representatives Jose Ortiz and Miguel
DeJesus helped negotiate the 2002 collective bargaining agreement, which the
membership ratified and which did not include provisions for severance benefits.
[Exhibit B (Ortiz Dep.) at 17-19.] Claims that the Union breached its duty of fair
representation by not negotiating better benefits or a plant closure provision do not
comprise a breach of the duty of fair representation and, nevertheless, would be barred
by the six-month statute of limitations, which would have begun to run when the
employees ratified their collective bargaining agreement in November 2002. Knickle v.
Tecumseh Products Co. and UAW, 818 F.2d 866 (6th Cir. 1987).

employees be paid severance pay, and raised other issues brought to his attention by employees. See SOF ¶¶ 22-24. The Company refused to pay severance, asserting that severance was not required under the contract (which it was not). Yet, as a result of these meetings, Alexander ensured that employees obtained the benefits they were entitled to under the contract. Id.

In order to secure benefits owed under the collective bargaining agreement (CBA), Mr. Alexander and Mr. Ortiz filed three grievances on or about November 14, 2003, regarding issues and events related to the shutdown of the facility. The grievances concerned the Company's obligations to abide by provisions of the collective bargaining agreement dealing with bumping rights on the basis of seniority, report pay, and medical insurance coverage.[4] The grievances were signed by Ortiz. [Exhibits 9-11.] The Company and Alexander settled those grievances on November 19, 2003, with the Company agreeing to compensate affected employees as a remedy for bumping, report pay, and medical insurance grievances. See SOF ¶ 26. Plaintiff Ortiz was scheduled to attend the grievance resolution meeting of November 19, but failed to attend despite Alexander calling him to remind him of the meeting. SOF ¶ 25. Significantly, plaintiffs do not contend that the union breached its duty in representing them with respect to those grievances.

There is no breach of the duty of fair representation or bad faith conduct where a union does not file grievances of which it is unaware. Significantly, plaintiffs testified that they did not approach Alexander or a Steelworkers representative with regard to filing

---

[4]     The Company laid off first shift employees on November 14, 2003, and second shift employees a week prior to that. One of the grievances dealt with the bumping rights of the second shift employees who had been laid off before the first shift employees with less seniority.

19

additional grievances over the closing or any other matter or that Steelworkers representatives declined to file grievances. [See, e.g., Exhibit B (Ortiz Dep.) at 30, 31, 39, 40; Exhibit F (Antonio Martinez Dep.) at 12; Exhibit G (Luis Martinez Dep.) at 10; Exhibit H (Eulogio Ortiz Dep.) at 13-14; Exhibit O (Euclides Soto) at 9, Exhibit M (Jose Ramirez Dep.) at 22-24; Exhibit K (Elison Pena Dep.) at 10; Exhibit P (Rafael Torres Dep.) at 30; Exhibit L (Cesar Pizarro Dep.) at 12; Exhibit I (Juan Colon Ortiz Dep.) at 14; Exhibit J (Wilfredo Ortiz Dep.) at 15-16.] Plaintiff Jose Ortiz, who was responsible for initiating and filing grievances under the CBA, failed to file any grievances over the shutdown except the three discussed above, and did not ask Alexander to file other grievances or complaints. [Exhibit 1, Art. 18.] Thus, the union cannot be held liable for failing to file grievances over matters of which it was unaware.

Plaintiffs' allegations that the CBA does not "reflect" or discuss effects bargaining present no liability to the union even if true. (Complaint at ¶ 17). Effects bargaining is an obligation of an employer under federal labor law, and a CBA need not delineate such duty in order for a union to invoke effects bargaining. See First National Maintenance Corp. v. NLRB, 452 U.S. 666, 677, 681-82 (1981).

> ### c.   The Union Had No Duty to Ensure the Safety of the Plant.

Plaintiffs contend that the union breached the duty of fair representation because "two of the members lost two fingers at the Company plant and there have been two fires at the Company plant" and because the union "has not provided apprenticeship, educational, or safety programs." [Complaint at ¶ 18.]

Plaintiffs' safety allegations involve Company conduct, not Union conduct, and must be dismissed on that basis alone. There is no general far-reaching duty of a union

to provide employees with a safe working environment.  USWA v. Rawson, 495 U.S.

362 (1990); Condon v. Local 2944, United Steelworkers of America, 683 F.2d 590 (1st

Cir. 1982); Goulet v. Carpenters District Council of Boston, 884 F.Supp. 17, 23 (D.Mass.

1994).  To the extent that a union assumes any obligations of care towards its

members, they derive from the collective bargaining agreement.  In Rawson, the

Supreme Court held that

> While a union may assume a responsibility toward employees by
> accepting a duty of care through a collective bargaining agreement, if an
> employee claims that a union owes him a more far-reaching duty, he must
> be able to point to language in the agreement specifically indicating an
> intent to create obligations enforceable against the union by the individual
> employees.  Nothing in the agreement at issue suggests that it creates
> such obligations, since the pertinent part of the agreement consists of
> agreements between the Union and the employer and is enforceable only
> by them.

495 U.S. at 396 (syllabus).  In Rawson, employees' claims against the union for

negligence in conducting safety inspections on behalf of employees were preempted, as

they required interpreting the union's duties and rights under the collective bargaining

agreement.  495 U.S. at 368-372.  The Court held that respondents' allegation of mere

negligence would not state a claim for the violation of the duty of fair representation.  Id.

at 376.  See Goulet, 884 F.Supp. at 24 (the Massachusetts District Court dismissed

claims against union where employee claimed that union defendants were negligent in

asking to have drywall lift removed from employee's work site).

In Condon, an employee sued the union alleging breach in tort or contract of a

duty arising out of the collective bargaining agreement; plaintiff argued that the union

failed to implement a health and safety committee provision contained in the CBA.  The

First Circuit found that the union could not be "held liable for the negligent performance

21

of a duty it assumed that arose inextricably, as here, from the safety and health provisions of a collective bargaining agreement." 683 F.2d at 594-95.

In this case, plaintiffs allege that the union somehow violated the duty of fair representation because two members lost two fingers and there were two fires at the plant. [Complaint at ¶ 18.] First, as discussed above, such claims must fail because they are barred by the six-month statute of limitations. DelCostello v. Teamsters, 462 U.S. 151 (1983) (a claim charging breach of the duty of fair representation must be brought within a six month statute of limitations). Second, even if taken as true, such claims do not establish union liability. The Union has no statutory obligation to prevent safety infractions by employers, and no such duty was assumed by the Union in the CBA. Rawson, 495 U.S. 362; Condon, 683 F.2d 590; Goulet, 884 F.Supp. 23. The contract does not provide that the Union ensure the safety of equipment or otherwise monitor the workplace with respect to safety, much less make such promises enforceable by employees. And there is no allegation that the Union failed to enforce provisions of the CBA with respect to safety. Therefore, plaintiffs' allegations that the Union failed to preserve workplace safety must be dismissed. See Goulet, 884 F.Supp. 17 (obligations of union to preserve safety of a facility derives only from collective bargaining agreement).

Significantly, there is no allegation that the union intentionally failed to grieve safety matters brought to its attention by plaintiffs. Indeed, as demonstrated in the deposition testimony of plaintiffs, no bargaining unit member brought safety concerns to the attention of Mr. Alexander, the International's only authorized agent for the unit. [See, e.g., Exhibit B (Ortiz Dep.) at 30, 31, 39, 40; Exhibit F (Antonio Martinez Dep.) at

12; Exhibit G (Luis Martinez Dep.) at 10; Exhibit H (Eulogio Ortiz Dep.) at 13-14; Exhibit O (Euclides Soto Dep.) at 9, Exhibit M (Jose Ramirez Dep.) at 22-24; Exhibit K (Elison Pena Dep.) at 10; Exhibit P (Rafael Torres Dep.) at 30, Exhibit L (Cesar Pizarro Dep.) at 12; Exhibit I (Juan Colon Ortiz Dep.) at 14; Exhibit J (Wilfredo Ortiz Dep.) at 15-16.] Mr. Alexander was unaware of any grievable safety violations because none were brought to his attention, and he was personally unaware of them. SOF ¶ 18. There can be no discrimination and no duty to file a grievance by a union where employees never requested the union's assistance in filing a grievance.

Further, under the union's collective bargaining agreement, Ortiz was responsible for initiating grievances in his role as union steward. [Exhibit 1 at 13). The contract states that the first step of the grievance procedure is for the grievance to be taken up with the company representative by "the shop steward selected by the employees." Id. While Ortiz had signed several grievances regarding the plant shutdown, and was familiar with the grievance machinery, he did not file grievances over safety of which the union is aware. [Exhibit B at 39-40.] It stretches credulity that in the instant case, Plaintiff Ortiz charges the union with breaching the duty of fair representation by failing to grieve or challenge conduct that he himself did not bring to the union's attention.

For these reasons, the plaintiffs fail to demonstrate that the union undertook a duty of care to maintain a safe workplace under the CBA, and otherwise fail to demonstrate that any material factual issues exist that would preclude dismissal of their claims.

> d.    The Union Did Not Breach the Duty of Fair Representation
>        Regarding the Remaining Claims

A union does not breach the duty of fair representation if it provides services and publications in English and does not provide a Spanish-speaking interpreter to employees. Lebron v. International Brotherhood of Electrical Workers, 1992 U.S. Dist. LEXIS 8887 (D. Mass. June 9, 1992) (no breach of duty of fair representation for failure of union to employ interpreter during arbitration hearing). In that case, the Massachusetts District Court held that the collective bargaining agreement imposed no duty to provide an interpreter and that, at worst, the union acted negligently in a tactical decision to proceed without an interpreter, which is insufficient to create liability. Id. Also, the Court found that the union's personnel understood plaintiff employee and that he rendered intelligible responses during the arbitration. Id.

Even though a union has no obligation to provide translation services, the union did provide such services in this case. Plaintiffs' allegation that "no client recalls a Spanish interpreter being available at the Company" is contradicted by plaintiffs' own testimony. SOF ¶ 21. [See, e.g., Exhibit B (Ortiz Dep.) at 41; Exhibit C (Nelson Acevedo Dep.) at 12; Exhibit D (Angel Baez Dep.) at 16-17.] Thus, in this case, unlike Lebron, plaintiffs admit that the union did provide a Spanish-speaking interpreter to meetings with employees of Farnsworth Fibre and even translated the 2002 collective bargaining agreement into Spanish and forwarded to Ortiz. SOF ¶¶ 15-16. [See Exhibit B (Ortiz Dep.) at 20, 41; Exhibit H (Eulogio Ortiz Dep.) at 17; Exhibit I (Juan Colon Ortiz Dep.) at 16.] Masiel DaSilva, a secretary for the International Union working in the District 4 office in Milford, Massachusetts, served as interpreter at a meeting in mid-October 2003 led by Lowell Alexander to discuss members' concerns and issues surrounding the plant shutdown. DaSilva also interpreted at a union meeting attended

by Alexander and Farnsworth Fibre employees held in September 2003 to discuss and resolve employee questions and concerns.[5]

Additional evidence that the union provided for the needs of Spanish-speaking members was its provision of steward training in Spanish on January 4, 2003, in Braintree, Massachusetts, available to Ortiz and other representatives of 421-U and paid for by the union. Notice of that training was distributed to Local 421-U, and Alexander himself invited Ortiz to attend the stewards training, which Ortiz declined because he lacked transportation. [Exhibit B (Ortiz Dep.) at 23-24.]

Vague allegations that the union "has not provided apprenticeship, educational, or safety programs" are also without merit. Complaint at ¶18. First, a union has no duty under state or federal law to provide apprenticeship, educational or safety programs. USWA v. Rawson, 495 U.S. 362, 376 (1990) (to the extent that a union assumes any obligations of care towards its members, they derive from the collective bargaining agreement). Nor have plaintiffs provided evidence identifying programs or privileges withheld from Farnsworth Fibre employees on the basis of their Hispanic heritage that were provided to non-Hispanic Steelworkers members employed at other facilities. As already discussed, the union provided stewardship training to its Spanish-speaking

---

[5]    Plaintiffs' allegation that the Union somehow breached its duty of fair representation because Ortiz was not provided a draft of the collective bargaining agreement before it was signed or provided with a copy of the Union Constitution is also baseless. Ortiz was a member of the Union negotiating committee, assisted the Union in bargaining contract provisions, and had every opportunity to review the CBA before signing it. In fact, Ortiz testified that he did review the contract with Alexander and Miguel DeJesus prior to signing it to ensure it was correct, and the Union even compensated him for additional time spent for reviewing or "proofing" the contract. [Exhibit 3; Exhibit B (Ortiz Dep.) at 16-19.] He also had the opportunity to obtain a Union Constitution on his own by asking Alexander or other International Union representatives.