representatives in January 2003 and even personally invited Jose Ortiz to such training. That Ortiz did not take advantage of such training, for reasons of transportation or whatever personal reason, does not create Union liability for breach of the duty of fair representation.

Farnsworth Fibre closed its doors and terminated plaintiffs in November 2003 due to financial considerations. Plaintiffs' lack of skills training before or after the closure provides no basis for a cause of action against the union.

### e.     USW Treated Plaintiffs Fairly Compared With Other USW Employees

There is no evidence that the union discriminated against Hispanic employees of Farnsworth Fibre compared to USW employees at other facilities. Allegations that Hispanic employees at Farnsworth Fibre were discriminated against because the union failed to negotiate severance or other shutdown benefits are without foundation, especially in light of the union's negotiation of such benefits for the predominately Hispanic employees at Sealy Mattress. SOF ¶ 30. The predominately Hispanic employees at Sealy Mattress received a severance package when the Company closed in 2003, provisions which the company and Union previously negotiated in the collective bargaining agreement. Id.; Exhibits 12 & 13.

At Rosboro Plastics, which employed a majority of Hispanic employees, the union and the employer bargained a closing agreement in which the Company agreed to make severance payments and pay other benefits. Mr. Alexander was able to negotiate that severance agreement only because the employer needed to provide an incentive for the employees to remain at work until the plant actually closed. SOF ¶ 30. Finally, at Beebe Rubber and Cone Blanchard, where there were relatively fewer

minorities, the union did not negotiate a closing agreement. SOF ¶ 31. At the time of closing, employees received no more benefits than those negotiated under the parties' collective bargaining agreement, which did not include benefits for general severance pay. These examples demonstrate that upon closure of a facility, the Steelworkers ensured that employees — including Farnsworth Fibre employees – received at least those benefits that were negotiated under the CBA, regardless of race or other classification, and that it did not negotiate more favorable severance packages for non-Hispanic employees.

Therefore, the Plaintiffs have failed to aver facts which would constitute a breach of the duty of fair representation, contrary to their obligations under Matsushita Electric Industrial Company, 475 U.S. 574 (1986).

In sum, the union resolved grievances over the plant shutdown, engaged in effects bargaining, and even provided translation services for employees. There is no evidence that the contract and its application by the union discriminated against plaintiffs or that the union treated employees in an arbitrary, discriminatory or bad faith manner by withholding representation on the basis of race or national origin or on any other basis.

> 3.   Plaintiffs' Claims Fail Because They Fail to Demonstrate that the Employer Breached any Provisions of the Collective Bargaining Agreement.

Plaintiffs' claims against the union for breach of the duty of fair representation must also fail because Plaintiffs do not allege or otherwise demonstrate that Farnsworth Fibre violated the collective bargaining agreement when it terminated them or otherwise failed to maintain the safety of the facility. To succeed in a hybrid breach of contract

and fair representation claim under section 301 plaintiffs must establish both that the union breached a duty of fair representation and that the employer breached the CBA. See Teamsters v. Terry, 494 U.S. 558, 564 (1990); Miller v. U.S. Postal Service, 958 F.2d 9 (1st Cir. 1993). These claims are "inextricably linked," and failure to prove either one results in a failure of the entire action. DelCostello v. Teamsters, 462 U.S. 151, 164-65 (1983); Demars v. General Dynamics Corp., 779 F.2d 95, 97 (1st Cir. 1985).

In this case, plaintiffs complain that the employer did not bargain over the decision to lay off employees or the effects of that decision "in violation of their fiduciary duty." [Complaint at ¶ 10.] They also alleged that the failure of the union to grieve employees' terminations "will be considered an action predicated upon racially discriminatory motivation, which is a breach of the duty of fair representation and breach by the Employers of the labor contract." [Complaint at ¶ 15.] Significantly, plaintiffs fail to identify any provision of the CBA that the employer breached. Indeed, there are no provisions of the contract that would limit the employer's right to close the plant or prevent job terminations as a result thereof. Indeed, plaintiffs admit that the CBA does not include provisions for plant closure or effects bargaining. [Complaint at ¶ 17.] Nor does the failure of a union to grieve a matter comprise a breach of a collective bargaining agreement by an employer.

Therefore, because plaintiffs have provided no facts or allegations that the Company breached specific provisions of the CBA — and indeed, plaintiffs argue that the CBA lacked necessary provisions — they cannot demonstrate that the Company is liable for such breach. Thus, the case against the union for breach of the duty of fair representation must also fail.

28

### C.   PLAINTIFFS HAVE PRODUCED NO EVIDENCE SUFFICIENT TO PERMIT THE DISCRIMINATION CLAIMS TO PROCEED TO TRIAL.

The plaintiffs make the same discrimination claims under both state law, Mass.

Gen. Laws ch.151B, § 4,and federal law, Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000(e).  According to the plaintiffs' complaint, the discrimination alleged is as

follows:

24.    The Steelworker's union has engaged in a pattern and practice of continuous discrimination against its Hispanic membership at the Farnsworth Fibre Corporation. . . .

25.    Various plaintiffs lost fingers and suffered burns of their bodies at Farnsworth while the Steelworker's were their union.  Each plaintiff is Hispanic, who worked for Farnsworth. . . .

26.    During the entire course of their employment, the union failed to provide them with the privileges accorded to non-Hispanic union members.

27.    Although the entire work force at his job site was Hispanic, the union local failed to provide a Spanish-speaking interpreter to keep the membership appraised of issues.

28.    The union failed to engage management in any way (including failing to file grievances) to address the issues of an unsafe workplace.  The union failed to put in place any apprentice, training, or educational program at his work site.

29.    On November 7 and 14, 2003, the first and second shifts, respectively, were laid off and shop closed. . . . The union did nothing to address the lay off issue, although the contract gives it the right to grieve the closing.  The membership attempted to enlist the aid of the International Steelworkers Union regarding the local's complete failure to represent the membership.

30.    The International did nothing.  The terms of collective bargaining agreement and the failure to bargain about the effects of the layoff were unlawful.

31.    The claims, thus, have no bearing on the collective bargaining agreement (CBA).  In essence, the union is being called to task for taking

29

dues from Hispanic members in a sweat-shop where fingers were lost and bodies incinerated.

The above are the charges in the complaint that allegedly constitute the discrimination claim.

It is clear, both from the complaint and subsequent discovery, that the plaintiffs do not assert that the union ever said anything indicating it harbored animosity against employees because they were Hispanic, nor does the complaint allege that the International representative assigned to the local ever did or did not do anything because the bargaining unit employees were Hispanic. Rather, the complaint alleges generally that because all of the employees were Hispanic, the union did not assert the rights of the bargaining unit members to the same extent it would in other bargaining units where the employees were not predominantly Hispanic. However, as set forth below, such claims must fail as a matter of law, entitling the Defendants to summary judgment in their favor.

> 1.     The State Claims Under Chapter 151B Must Be Dismissed As They are Preempted by the NLRA.

As set forth below, because the plaintiffs essentially claim violations of the National Labor Relations Act, their claims are completely preempted under the so-called Garmon preemption doctrine. San Diego Building Trades Council v. Garmon, 359 U.S. 236 (1959) (forbidding state and local regulation of activities that are protected by § 7 of the NLRA or constitute unfair labor practices under § 8 of the Act). Further, because the claims asserted by the plaintiffs require interpretation of the collective bargaining agreement as an integral part of such claim, such claims are completely preempted under Section 301 of the Labor Management Relations Act.

Generally, where a state law claim concerns conduct that is actually or arguably either protected or prohibited by the National Labor Relations Act, the state law claim is presumptively preempted and must be dismissed. See Chaulk Services, Inc. v. Massachusetts Commission Against Discrimination, 70 F.3d 1361 (1st Cir. 1965); see also Local 12004, United Steelworkers of America v. Massachusetts Commission Against Discrimination, 377 F.3d 64 (1st Cir. 2004).

In the present case, it is simply undeniable that the claims asserted by the plaintiffs allege conduct by the union which is arguably prohibited under the National Labor Relations Act. The claims, fairly construed, assert that the union failed to properly represent the Farnsworth Fibre employees and that there were claims that the union could have made on behalf of the employees, both before the shutdown and at that time, which it did not make as a result of the bargaining unit being comprised of Hispanic employees. As demonstrated below, if the plaintiffs are correct, then the conduct of the local union and the International is prohibited under the National Labor Relations Act, and, hence, the state law discrimination claims are preempted.

It is beyond dispute that when a union fails to properly represent a member or group of members for some arbitrary or discriminatory reason, such conduct is a violation of the National Labor Relations Act, Sections 8(b)(1)(A) and 8(b)(2). The National Labor Relations Board has continually held that the union's obligation under Section 9 of the Act is to represent

> all employees fairly and impartially, giving rise to a right of the employees under Section 7 [of the Act] to fair representation by the union. Any unfair representation in the union's performance of its Section 9 duty is an infringement of a Section 7 right and is thereby a violation of Section 8(b)(1)(A).

31

The Developing Labor Law at 1884(Patrick Hardin and John E. Higgins, Jr., eds., 4th ed. 2001). See also Miranda Fuel Co., 140 NLRB 181 (1962).

In addition, a union's breach of its fair representation duty is also deemed a violation of Section 8(b)(2) of the Act because any arbitrary union action would tend to discourage union membership even if its motivating consideration does not specifically involve union membership. The Developing Labor Law at 1885.

More specifically, in Independent Metal Workers, Local 1 and 2 and the Hughes Tool Co., 147 NLRB 1573 (1964), the National Labor Relations Board held squarely that a union's failure to process an employee grievance because of race was an unfair labor practice under Sections 8(b)(1)(A) and 8(b)(2) and 8(b)(3) of the Act. In addition, the Board has held that a union breaches its duty of fair representation and, therefore, violates the National Labor Relations Act, when it administers the collective bargaining agreement in a bad faith or racially "discriminatory" manner. See Rubber Workers, Local 12, 150 NLRB 312, enforced 730 F.2d 768 (2d Cir. 1984).

Recently, the Third Circuit has held in a preemption context that state law discrimination claims against a union are "presumptively preempted" by the NLRA when they concern conduct that is actually or arguably prohibited under the NLRA. See Scott v. Graphic Communications Union, 2004 W.L. 516164 (3d Cir. 2004), citing Pennsylvania Nurses Association v. Pennsylvania State Education Association, 90 F.3d 797 (3d Cir. 1996).

Based on the above, the claims asserted by the individual plaintiffs here are clearly preempted under established federal case law because it is beyond dispute that the conduct alleged to have been committed by the union constitutes a breach of the

32

duty of fair representation and, therefore, enjoys complete preemption from any state law claim. Recent decisions of the First Circuit involving MCAD claims make clear that the First Circuit would find the state discrimination claims here preempted. First, in Chaulk Services, 70 F.3d 1361, the First Circuit held that because the complainant's allegations against the company (in that case, sex discrimination) were arguably prohibited and/or protected under the National Labor Relations Act, the case before the Commission was completely preempted and could not proceed. That holding was reinforced more recently in Local 12004, 377 F.3d 64. In both cases, the touchstone was that the discriminatory conduct complained of by the plaintiffs also involved conduct which was arguably prohibited or protected by the National Labor Relations Act.

In the present case there is even more reason to invoke the doctrine of Garmon preemption. The alleged discriminatory conduct by the union relates to how it administered its collective bargaining agreement with the employer and its alleged failure to properly negotiate on behalf of the bargaining unit members when Farnsworth Fibre closed. The plaintiffs' claims fall into two categories; first, that the union failed to properly present grievances alleging violations of the collective bargaining agreement and failed to properly negotiate a contract because the plaintiffs were Hispanic, and second, that it failed to take appropriate action when the Farnsworth Fibre announced that it was closing. These claims are issues which are clearly governed by decisions of the National Labor Relations Board, and, if the conduct actually occurred for discriminatory reasons, is prohibited by the Act. (See above.) In order to assess whether the plaintiffs' claims have any merit, this Court would have no choice but to interpret the rights and obligations of the union during plant closing situations, an

33

analysis which the National Labor Relations Board, and not this Court, is authorized to make in the first instance. For example, the question of whether an employer and a union have appropriately bargained the effects of a plant closing, and what remedies flow from the failure to bargain in good faith over such closing, are quintessential issues governed by the National Labor Relations Act. See generally NLRB v. Waymouth Farms, Inc., 172 F.3d 598 (8th Cir. 1999); Fabian v. Cooper Industries, Inc., 1993 W.L. 332629 (E.D. Mich. 1993); Burklow v. Baskin-Robbins, 274 F.Supp.2d 899 (W.D. Ky. 2003). Since the substance of the plaintiffs' main complaint here is that the union failed to grieve or prevent the plant closing of Farnsworth Fibre, or to properly bargain over the effects of this closure, this Court cannot address or resolve these issues without attempting to resolve questions exclusively reserved to the National Labor Relations Board.

Accordingly, to the extent that the plaintiffs have asserted state law claims of discrimination under Mass. Gen. Laws ch.151B, which are so integrally tied to conduct governed by the National Labor Relations Act, the doctrine of Garmon preemption demands that the state law claims be dismissed.

### 2. Alternatively, the State Law Discrimination Claims Here Are Preempted Under Section 301 of the Labor Management Relations Act.

As set forth above, when a plaintiff alleges conduct that is arguably prohibited by the National Labor Relations Act, such state law claim is preempted under so-called Garmon Preemption. In addition, where the state law claim would require interpretation of the collective bargaining agreement, the claim is also completely preempted under Section 301 of the Labor Management Relations Act. See Martin v. Shaw's

Supermarkets, 105 F.3d 40 (1st Cir. 1997). Section 301 preemption exists "whenever a

court in passing upon the asserted state law claim would be required to interpret a

plausibly disputed provision of the collective bargaining agreement." Id. at 42. See also

Lingle v. Norge Division of Magic Chef, 486 U.S. 399 (1988). Simply stated, if the state

law claim requires interpretation of the contract, it is preempted. Thus, the first question

in such a case is "whether resolution of plaintiffs' claims would require an interpretation

of a collective bargaining agreement." Martin, 105 F.3d at 42.

In the present case, although styled as a discrimination claim, the plaintiffs allege

in main part that the union failed to pursue to successful resolution a number of

grievances which should have been filed and which would have protected bargaining

unit members' rights, both in terms of "safety" and with regard to the plant shutdown of

Farnsworth Fibre. Implicit in the plaintiffs' assertions is their contention that had the

union not discriminated against them based upon their national origin, the union would

have successfully won grievances regarding these matters. For example, the plaintiffs

allege in their complaint that "the union failed to engage management in any way,

including failing to file grievances to address the issues of an unsafe workplace."

[Complaint ¶ 28.] Additionally, the plaintiffs assert that:

> . . . the union did nothing to address the layoff issue, although the contract
> gives it the right to grieve the closing. The membership attempted to enlist
> the aid of the International Steelworkers Union regarding the local's
> complete failure to represent the membership. The International did
> nothing. The terms of collective bargaining agreement and the failure to
> bargain about the effects of the layoff were unlawful.

[See Complaint ¶¶ 5-6.] Whatever the above is intended to mean, it is clear that this

Court cannot resolve the discrimination claims without resorting to and interpreting key

35

provisions of the collective bargaining agreement in order to determine whether or not there were meritorious grievances which the union could have but did not file because the plaintiffs were Hispanic.

A grievance is simply a claim that the employer has violated a provision of the collective bargaining agreement. [See Exhibit A (CBA) at 13.] Thus, for this Court to decide whether or not plaintiffs' assertions have merit, this Court could not avoid interpreting the collective bargaining agreement to determine whether or not, as the plaintiffs assert, the union failed to pursue meritorious grievances. Given these facts, it is clear that the plaintiffs' state law discrimination claims are preempted under Section 301. See Reece v. Houston Lighting and Power Company, 79 F.3d 45 (5th Cir. 1996) (preempting race discrimination claims); Martin, 105 F.3d 40 (preempting handicap discrimination claims).

Undoubtedly, there are many discrimination claims involving a unionized employer which do not directly involve an interpretation of a collective bargaining agreement, and such state law claims can proceed independently in court. See, e.g., Ralph v. Lucent Technologies, 135 F.3d 166 (1st Cir. 1998). For example, a claim that someone was fired or not hired because of his or her race would not directly require the interpretation of a collective bargaining agreement; thus, these claims are not preempted under Section 301 preemption. But where such state law claims are allowed to proceed, they are allowed to proceed because their claims do not involve any significant interpretation of the collective bargaining agreement. Id. at 171. This is not such a case. It is impossible to address the merits of the plaintiffs' claims here without first interpreting the collective bargaining agreement. This is so because if the union

failed to pursue grievances under the collective bargaining agreement that had no merit, it is obviously not guilty of discrimination for not filing them. Conversely, if the union failed to pursue claims that were meritorious under the contract, including alleged safety issues and the plant closing, , this would be some evidence of discrimination. The court cannot determine either of these points without addressing the collective bargaining agreement as a core, not peripheral, part of this case. For all of these reasons, the discrimination claim is preempted under Section 301.

Finally, the Massachusetts Commission Against Discrimination, whose interpretations are entitled to some deference, also concluded that the plaintiffs' discrimination claims here, when they were filed at the MCAD, were preempted and, therefore, the MCAD dismissed the claims. [See Exhibits Q & R (union's motion to dismiss and order granting the motion).]

  3. The Plaintiffs Have Produced No Evidence Sufficient to Permit Plaintiffs' Federal and State Discrimination Claims to Proceed to Trial.

    a. Overview of the Law and Time Bar Issues

As argued above, the plaintiffs' state law discrimination claims are preempted under the doctrine of Garmon and Section 301 preemption. With respect to plaintiffs' federal discrimination claim under Title VII of the Civil Rights Act of 1964, while the doctrine of Garmon preemption is applicable to a federal statutory claim involving a matter over which the National Labor Relations Board would have jurisdiction, see Tamburello v. Comm-Tract Corporation, 67 F.3d 973 (1st Cir. 1995), Section 301 preemption is generally not applicable where the plaintiffs assert a federal (not state)

discrimination claim. See also Iowa Beef Processors, Inc. v. Gorman, 476 F.Supp. 1382 (N.D. Iowa 1979).

Where a plaintiff charges his or her union with discrimination based upon race or ethnic origin, there is essentially no difference between a Title VII claim and a claim of discrimination in violation of the duty of fair representation. Several courts have recognized that the applicable legal standards are essentially the same. See EEOC v. Pipe Fitters Assoc., Local Union 597, 334 F.3d 656 (7th Cir. 2003) (Pipe Fitters Assoc.) (citing McDonald v. Santa Fe Trail Transportation Co., 421 U.S. 273 (1976); Goodman v. Lukens Steel Company, 482 U.S. 656 (1987)). Accordingly, the discussion in this section as to why the plaintiffs cannot and do not make out a claim of discrimination under Title VII is equally applicable to that part of their claim which apparently alleges discrimination with respect to the union's duty of fair representation.

Section 703(c) of Title VII provides that a "labor organization" may not "exclude or expel from its membership, or otherwise discriminate against any individual because of his race, color, or national origin." See 42 U.S.C. § 2000e-2(c).

While the legal obligations of a union under Title VII are similar to those of an employer, there are differences in the way Title VII treats each. As Judge Posner has stated for the Seventh Circuit:

The duties of nondiscrimination imposed by Section 703(a) and (c) have reference to the respective roles of company and union in the workplace. The company, not the union controls the workplace. . . . The union is not the company, but the workers' agent in dealing with the company. If it discriminates in the performance of its agency function, it violates Title VII, but not otherwise. Thus, a union that refuses to accept blacks as members, or refuses to press their grievances, is guilty of discrimination. But if it merely fails to effectuate changes in the workplace – if, for example, it urges the company to take steps to prevent harassment and

the company fails to do so – the union is not guilty of discrimination,
though the company is. . . .

Pipe Fitters Assoc., 334 F.3d at 659.

In Pipe Fitters Assoc., the Seventh Circuit went on to hold that while a union is

clearly liable for intentionally refusing to take action on behalf of a group of employees

because of their race or ethnic origin, mere passivity, that is not taking action to prevent

the employer from discriminating, does not rise to the level of actionable discrimination

against a union unless it can be proven that the union intentionally did not take such

action specifically because the employees involved were in a protected group. Id. at

658-659.  The court held:

> But inaction, unless invidious, is not discrimination in any accepted sense
> of the term.  People don't take active measures to combat discrimination,
> their inaction does not condemn them as discriminators.  Suppose that a
> union is lackluster, and while it will file a grievance if pressed to do so by a
> member of the collective bargaining unit, it will do nothing on its own
> initiative.  We do not understand how such passivity, though it means the
> union will not take measures to prevent racial harassment on its own
> initiative, could be thought to be a form of racial discrimination.

Id. at 660.

Thus, under the standard for union liability under Section 703(c) of Title VII, "in

order for a plaintiff to stymie summary judgment, she must show that there is evidence

in the record that the union intentionally discriminated against her because of her [ethnic

origin]."  Rainey v. Town of Warren, 80 F.Supp.2d 5, 14-15 (D.R.I. 2000).  That burden

may be satisfied by either producing direct or circumstantial evidence which would

prove intentional discrimination.  Absent direct evidence of intentional discrimination,

plaintiffs must demonstrate that the union's asserted reasons for not taking the action

complained of in the complaint was a "pretext" and that the real reason was because of

intentional discrimination. Id. at 16-17. The general rules for proving such intentional discrimination are the same for union liability as they are for establishing discrimination by employers. At bottom, the plaintiffs must offer proof that the "defendant acted with the specific intent of discriminating against the plaintiff." Barbour v. Dynamics Research Corp., 63 F.3d 32, 39 (1st Cir. 1995).

Of course, the plaintiffs cannot prevail simply by showing that the local union's decision was wrong or mistaken, since the disputed issue is whether plaintiffs' protected class status "motivated the local union, not whether it was wise or competent." Rainey, 80 F.Supp.2d at 16; see also Villanueva v. Wellesley College, 930 F.2d 124, 131 (1st Cir. 1991). While the question remains one of intentional conduct, at the summary judgment stage, proof sufficient to survive would include evidence that plaintiffs were subjected to "disparate treatment" by the local in that it failed to process their grievances while, at the same time, processed the grievances of similar situated non-protected status members in the union. Rainey, 80 F.Supp.2d at 14; see also Woodman v. Haemonetics Corp., 51 F.3d 1087, 1093 (1st Cir. 1995).

Moreover, Plaintiffs' discrimination claims must fail because they are time-barred. The evidence is unquestioned that within 300 days of their filing with the MCAD/EEOC, which would be necessary for a timely charge of discrimination, no plaintiff ever sought to file a grievance for which they were refused by the union or Mr. Alexander. In addition, the deposition testimony of Plaintiffs reveals that the specific allegations of safety incidents occurred outside the 300-day statute of limitations.

b.    There Is Insufficient Evidence of Discrimination.

In the present case, taking all of the allegations which have at least some factual support in the record as true, still the plaintiffs cannot satisfy their burden of demonstrating a trialworthy issue. The court must assume the following facts asserted by the plaintiffs to be true:

1. that neither the Local nor the International inspected Farnsworth Fibre for safety violations;

2. that no grievances were filed by the union over safety violations;

3. that the union did not provide apprentice or retraining programs to the workers at Farnsworth Fibre;

4. that when the company announced it was closing its plant, the union failed to stop the closing, or to obtain severance pay for the workforce at Farnsworth Fibre; and

5. that after the plant closing and layoff, the union did nothing to find other jobs for the laid-off workers at Farnsworth Fibre.

The problem with the plaintiffs' assertions is that there is absolutely no evidence to support or permit a conclusion that whatever action or inaction the union took was because of the ethnic origin of the plaintiffs.

Certainly, there is no direct evidence of discrimination. In this regard, a couple of significant points set the framework. First, all of the union officials involved in this case were minorities. Lowell Alexander, the International representative of the Steelworkers assigned to service Local 421-U, including Unit 421-6 (the employees at Farnsworth Fibre), is African-American. The other representative from the Steelworkers' regional office, Masiel DaSilva, who acted as an interpreter on several occasions, is herself

Hispanic. In addition, the employees of Farnsworth Fibre elected their own shop steward who was responsible for filing grievances and policing the contract, and he, too, was Hispanic. The other local union committee representative, Miguel DeJesus, was also Hispanic.

In this case, after deposing almost all of the plaintiffs, including Mr. Ortiz, the plaintiffs can point to no direct evidence of discrimination. That is, nothing was ever said by any union official or representative suggesting that the defendants were treating the plaintiffs differently and less favorably because they were Hispanic workers.

In addition, there is not one shred of evidence to suggest that the defendants ever failed to file a grievance that had contractual support on the plaintiffs' behalf. All the plaintiffs were asked in their depositions whether they had ever asked the Steelworkers or Mr. Alexander to file a grievance on their behalf, and not one employee indicated that the Steelworkers or Mr. Alexander ever declined to do so.[6] See SOF ¶¶ 18, 27.

In addition, the evidence demonstrates conclusively that Mr. Alexander did take appropriate non-discriminatory action with respect to the workers. For example, beginning in 2002, when he took over representing the workers, he spent at least five or six days negotiating a new collective bargaining agreement in the fall of 2002. The agreement was also negotiated by Jose Ortiz and Miguel DeJesus who, along with Mr. Alexander, constituted the union's negotiating team. After five or six negotiating sessions, the union achieved a wage increase. It should be noted that the agreement

---

[6]    Certainly, the evidence is unquestioned that within 300 days of their filing with the MCAD/EEOC, which would be necessary for a timely charge of discrimination, no plaintiff ever sought to file a grievance for which they were refused by the union or Mr. Alexander.

42

achieved not only wage increases, but preserved health insurance and the pension contributions on behalf of each employee.[7]  [See Exhibit 1.]

Some time after Mr. Alexander negotiated the contract with Messrs. Ortiz and DeJesus, he attempted to foster good relations with the elected Hispanic union representative at Farnsworth Fibre, Jose Ortiz.  For example, encouraged Mr. Ortiz to attend a union steward training session for stewards that was being put on by the Steelworkers in Spanish.  Mr. Alexander invited Mr. Ortiz to attend, but Mr. Ortiz declined.  At other times, Mr. Alexander invited Mr. Ortiz to come to the unit meetings of Local 421-U, and on each occasion Mr. Ortiz declined to come.  When Mr. Ortiz called Mr. Alexander in September 2003 and asked him to come to the plant to speak to the workers, Mr. Alexander did so, and he brought Masiel DaSilva with him as an interpreter.  The meeting was an open meeting on the plant floor.  The machines were turned off and employees were allowed to address any questions or concerns they had to Mr. Alexander.  He heard their concerns and told them that notwithstanding what they may have perceived about their representation in the past, they could expect him to be responsive.

Notwithstanding all of this, at no time prior to the announcement of the plant closing did Mr. Alexander ever receive one complaint from anyone about the working conditions at Farnsworth Fibre.  Specifically, he was never informed by anyone,

---

[7]     Although not directly at the core of this case, the fact is that the employees at Farnsworth Fibre, while receiving modest wages of between $9.00 and $13.00 per hour, received the dignity of health insurance paid mainly by the employer, as well as a pension plan in which two percent (2%) of an employee's wages were contributed to the Steelworkers' pension fund.  Indeed, some of the plaintiffs in this case have retired on Steelworker pensions which supplement their social security by as much as almost $500.00 per month.  [See, e.g., Exhibit N (Rodriguez Dep.) at 6.]

including Mr. Ortiz, of safety problems at the plant, of injuries, or of grievances that needed to be filed. Mr. Alexander simply could not file grievances of which he was unaware. Indeed, in his testimony, Mr. Ortiz, who ironically is a plaintiff in this case, conceded that he could think of no time that he asked Mr. Alexander to file a grievance or that Mr. Alexander ever declined to do so.

In fact, the testimony reveals just the opposite. When Mr. Ortiz and the other workers learned that the plant was set to close, they contacted Mr. Alexander and Mr. Alexander immediately came to the workplace and held a meeting with all of the workers. He then met with management to see what could be done to stop the plant from closing. Ultimately, it was determined that the union could do nothing to stop the plant from closing. As described in the section on duty of fair representation, supra part III(B), a union has no right or obligation to stop a plant from closing. In addition, the contract had no plant-closing or severance language that would give the employees anything to bargain about. Nevertheless, Mr. Alexander did immediately file three grievances, all of which he believed had merit, relating to the plant closing. First, he grieved the fact that the second shift was laid off before the first shift (a week earlier) without affording the senior employees on the second shift bumping rights to the first. Second, he grieved the fact that health insurance benefits were being cut off mid-month. He also filed a third grievance relating to report pay. On a later date, he met with the company to discuss each of the grievances and he resolved them on a favorable basis. Thus, Mr. Alexander filed the three grievances that he determined had merit. He was not asked to file any other grievances and there were, in fact, no other grievances he knows of that could have properly been filed to stop the closing. While even the union's

44

refusal to file grievances would not be grounds to allow the case to go to trial on a discrimination charge, here, there is no evidence that the union ever failed to file a grievance requested to be filed by one of the members, let alone that such decision was made for discriminatory reasons.

The plaintiffs fare no better on their other claims relating to safety. The plaintiffs have failed to demonstrate that Mr. Alexander or the International were aware of the several injuries that occurred to Farnsworth employees, or the small fires in the plant, nor is there evidence that the Local or International was aware of them. Of course, even if the union had been aware of them, it is not clear exactly what it is that the union could have done to address such issues. But, again, in any event, since there is no evidence that the union knew of any of these safety concerns, certainly there is no evidence that the union failed to take action because the employees were Hispanic. Indeed, the main union representative in the plant, Mr. Ortiz, was himself Hispanic.

Finally, the plaintiffs make an assortment of odd claims involving the failure to provide apprentice programs, training programs, or other programs that could afford the plaintiffs other good jobs when they were laid-off from Farnsworth Fibre. Here, again, there is not one shred of evidence to suggest that the union provides such programs in the New England area, let alone any evidence that the failure to provide such programs to the plaintiffs was the result of the workers at Farnsworth Fibre being Hispanic. Indeed, the plaintiffs have presented not one shred of evidence to suggest that other predominantly non-minority Steelworker locals had such programs in the New England area. Indeed, Mr. Alexander invited Mr. Ortiz to stewardship training given in Spanish, but Mr. Ortiz declined to attend.

What small amount of evidence there is in the record relating to how Mr. Alexander and the Steelworkers treated other unionized employees in other small plants where the plants closed provides no evidence to support a claim of discrimination. For example, during Mr. Alexander's term as an International representative, he was involved in four other plant closings. The first involved Sealy Mattress, which, ironically, was part of Local 421-U. Sealy Mattress was made up of predominantly Hispanic employees. SOF ¶ 30. [See also Exhibit 18 (roster of Sealy employees demonstrating it was a largely Hispanic workforce).] The contract at issue had a provision for severance in the event of plant closing. Presumably, Sealy Mattress, as a nation-wide corporation, had the ability to pay severance pay, and the Steelworkers Union did negotiate a severance pay plan in case of plant closure. In another plant closing with a largely Hispanic workforce, Rosboro Plastics, Mr. Alexander was able to negotiate a severance package, despite the lack of contract language, because the employer needed to provide the employees an incentive to stay at work until the plant closed. SOF ¶ 32. Of course, the union was unable to stop the plant closing in either case. The point is, however, that to the extent the Court would look at evidence of how similarly situated unionized employees were treated by the Steelworkers and Mr. Alexander, the evidence is that at two other predominantly Hispanic plants, Mr. Alexander negotiated a severance package but was unable to stop the plant from closing. Thus, there is no evidence that he negotiated less favorable deals for employee units that were mainly Hispanic.

The two other plants that closed that Mr. Alexander was involved in, Beebe Rubber and Cone Blanchard, were plants in New Hampshire and Vermont, respectively,

where the vast majority of employees were non-minority. There, too, the plants closed, the Steelworkers were unable to prevent the plant closing, and the only separation pay paid to laid off employees was that which was already contained in the existing collective bargaining agreement. Mr. Alexander was unable to negotiate any specific plant closing benefits other than what was in the contract. Thus, there is simply no evidence that the union treated non-minority plants differently than where the employees were predominantly Hispanic.

Moreover, as the Affidavit of Mr. Alexander makes clear, the structure at Sealy Mattress, as well as these other unions, was the same. The workers would get together and elect their shop steward, and the shop steward would bring to Mr. Alexander's attention any grievances which needed to be filed. SOF ¶¶ 15-16. The fact is that Mr. Alexander never refused to file any grievance that had any support in the contract and that was brought to his attention by a steward at any plant for which he was responsible. Accordingly, there is simply no evidence of disparate treatment, that is, that the plaintiffs were treated differently and less favorably in terms of grievance filing or anything else, because they were Hispanic. Compare Rainey v. Town of Warren, 80 F.Supp.2d at 5.

As the courts have made clear, a union cannot be held liable for discrimination simply because of inaction unless and until it is demonstrated that that inaction was the result of intentional discrimination. The intent can be threefold: first, the failure to take a grievance because it involves a minority group is unlawful. See Lukens Steel, 482 U.S. at 667-669. Second, a showing that grievances were filed regularly on behalf of non-minorities, but not on behalf of minorities, can be circumstantial evidence of intentional discrimination. Rainey v. Town of Warren, 80 F.Supp.2d 5. Finally, evidence that the

47

union specifically harbored animus against minorities and, therefore, treated them differently and less favorably is actionable discrimination. But, as Judge Posner has pointed out, mere inaction by a union, orhe union not making strong enough efforts to protect against the loss of rights, does not prove anything unlawful under Title VII, or the corresponding duty of fair representation. See Pipe Fitters Assoc., 334 F.3d 656.

Plaintiffs assert a vague, overarching theory that the Steelworkers permitted Farnsworth Fibre to be a sweatshop because the workers were Hispanic. But the Steelworkers had no ability to stop the fact that the factory at Farnsworth Fibre was old and could be eliminated due to outdated production. Small mattress stuffing plants like Farnsworth Fibre close and business goes overseas, and it is, of course, sad. But the defendants would point out that many of the employees at Farnsworth Fibre were there for many years, some over 20 years. They received a modest wage, but, still, somewhat higher than one would see at a non-unionized plant. They received health insurance and they received a pension benefit. The Steelworkers brought about all of these benefits. Plaintiffs have failed to show that Defendants acted with specific intent to discriminate against them. There is simply no evidence of discrimination in this case.

## IV.   CONCLUSION

For the foregoing reasons, the Defendants respectfully request that the Court grant them judgment in their favor and dismiss all of the Plaintiffs' claims, with prejudice.

Respectfully submitted,

Dated:  July 20, 2005

Harold L. Lichten, BBO # 549689
Alfred Gordon, BBO # 630456
Pyle, Rome, Lichten, Ehrenberg
        & Liss-Riordan, P.C.
18 Tremont St., Ste. 500
Boston, MA  02108
(617) 367-7200

Theresa Merrill
Assistant General Counsel
United Steelworkers of America
Five Gateway Center
Pittsburgh, PA  15222
(412) 562-2533

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served by hand delivery on the attorney of record for each party on July 20, 2005.

Alfred Gordon