UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| EUCLIDES SOTO, LOUIS A. MARTINEZ, JOSE RAMIREZ, CLEMENTE HERNANDEZ, CESAR PIZARO, ELISON PENA, JUAN COLON, JOSE ORTIZ, RAFAEL TORRES, ANGEL BAEZ, ANTONIO MARTINEZ, WILFREDO ORTIZ, EULOGIO ORTIZ, MIRRAIN MIRANDA, RAFAEL MORENO, NELSON ACEVEDO, And RAMON RODRIGUEZ, Plaintiffs, <br><br> V. <br><br> SHERMAN-FEINBERG CORPORATION, FARNSWORTH FIBRE CORPORATION, UNITED STEELWORKERS OF AMERICA, LOCAL 421-U AND UNITED STEELWORKERS OF AMERICA, Defendants. | CIVIL ACTION NO.: 04-10892-JLT |

## OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

There are three sound, irrefutable grounds for denying the motion for summary judgment of the United Steelworkers of America and its Local 421-U.[1]

First, with respect to the prima facie case, the plaintiffs' burden of proof in establishing a prima facie case under Title VII is de minimis. Here, each plaintiff established that national origin was a motivating factor for an employment practice of the union when the plant closed and the union failed to grieve and/or arbitrate discharges and

---

[1] The U signifies upholstery workers and the workers in this case made mattresses.

severance, and each is entitled to damages. See *Rainey v. Warren and United Steelworkers of America*, 80 F. Supp. 2d 5 (D.R.I. 2000) (holding in favor of employees against the United Steelworkers Union on very similar facts.). The defendant's nondiscriminatory explanation, i.e. that every single misstep in protecting the employees was the fault of shop steward Jose Ortiz, was false. The Supreme Court has determined that a mixed motive case can proceed on circumstantial evidence alone. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 93-95 (2003). See *Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 429-30 (1st Cir. 2000) ("In fact, one might question whether these bright lines [between direct and indirect evidence] are so helpful in the end… In appeals after trial, this and other courts have recognized the need for flexibility and have sometimes bypassed these approaches and instead looked at whether the totality of the evidence permits a finding of discrimination." [citations omitted]). In any case, this case has much express and circumstantial evidence of discrimination.

Second, the factual inquiry in this case as to equitable tolling must begin with an examination of the failure of the union to post notices, process grievances and arbitration about discharge and severance at an all Latino plant, invite the Hispanic membership to meetings, and to address safety issues. *Mercado v. The Ritz Carlton San Juan Hotel, Spa & Casino*, 410 F.3d 41 (1st Cir. 2005). Therefore, there was lack of actual notice of the filing requirement. The record does not suggest that the membership had constructive knowledge of the filing requirement. The plaintiffs showed diligence in pursuing their rights once they hired a lawyer listed in civil rights law and labor law with an AV peer rating by demanding that the union file discharge grievances based on race in March 2004, and filing the instant lawsuit within six months of the plant closing. *Fernandes v.*

*Costa Brothers Masonry, Inc.*, 199 F.3d 572 (1st Cir. 1999). As the union and local received two demand letters and did nothing to help the membership in March 2004 and April 2004, there is no prejudice to the union and local. The plaintiffs' remaining ignorant of the filing requirement should come as no surprise as none of them was raised in the United States, and few, if any, had more than a grade school education. No court in the nature of equity could fail to entertain case-specific factors: the severed fingers, plant fires, no grievances of discharges, which counsel in favor of tolling.

Third, the record indicates that: "(1) at least one discriminatory act occurred within the 300 day limitations period"-- here, a) each of the plaintiffs suffered adverse work impact where there was the failure by the union and its local to negotiate or grieve discharges and severance in an all Latino workforce when the plant closed in November 2003, or b) there was no negotiation about the effects of the plant closing for severance when the plant closed in November, 2003; or c) there was a fire at the plant in November, 2003; or d) there was no posting of union notices at the time the plant closed in November, 2003; or e) the union was unaware of safety hazards at the plant even though its representative visited the plant in November, 2003 ; or f) or the union did not know whether employer kept material data safety slips in November, 2003; or g) there was no hazard safety program or health and safety officer at the plant in November, 2003; or f) in March and April 2004, the plaintiffs (including the union steward) requested the filing of discrimination grievances and the defendant unions refused to do so; (2) "the alleged timely discriminatory acts have a substantial relationship to the alleged untimely discriminatory acts" (the union only points to its long history of neglect to prove that there was discrimination then and now); (3) earlier violations outside the 300 day

limitations period did not trigger each plaintiff's awareness and duty to assert his rights, i.e., that plaintiffs could not have formed a reasonable belief at the time the employment actions occurred that they were discriminatory until the plant closed. The union defendants failed to establish that no material facts are in controversy or that each defendant is entitled to judgment, where the claims fall within the six month deadline for the duty of fair representation claims and the 300 day deadline. Indeed all of these independent actionable actions (no severance bargaining, no discharge bargaining for a Latino plant, no posting of labor or safety notices, one fire, etc.) occurred within 300 days for the discrimination claim. In addition, the defendants cited a case involving the failure of the United Steelworkers of America to file grievances for minority workers, which gives a state tort statute of limitations, i.e., 3 years in Massachusetts, to the plaintiffs for this kind of claim. See Defendant's Brief in Support of Motion for Summary Judgment, at p. 38, citing *Goodman v. Lukens Steel Company*, 482 U. S. 656 (1987).

The summary judgment standard is high. The Court is to view the evidence from the entire summary judgment record in the light most favorable to the plaintiffs as the non-moving parties, give the plaintiffs the benefit of every inference, avoid credibility determinations, and not use summary judgment as a docket-clearing device, to determine whether a material fact is in controversy, and the United Steelworkers of America and its Local 421 U are entitled to judgment as a matter of law. In *Fernandes v. Costa Brothers Masonry, Inc.*, 199 F.3d 572 (1st Cir. 1999), the First Circuit vacated the entry of an order awarding summary judgment to the defendants in a national origin discrimination case due to both the failure to review the whole record and apply the inferences correctly. And in *Cargill v. Harvard University*, 60 Mass. App. Ct. 585 (2004), the Massachusetts

Appeals Court rejected the nearly universal practice of using summary judgment as a docket-clearing device for discrimination cases because of the basic problem that state of mind is the key consideration in a discrimination case. Nevertheless, the union, two work days before trial, filed a motion for summary judgment, arguing the complete absence of a prima facie case, the total barring of every single claim by the statute of limitations, and the inapplicability of the equitable tolling doctrine to these types of claims. Against this backdrop, viewing the evidence in the light most favorable to each plaintiff as the nonmoving party, all material facts have not been established and the moving parties have not shown themselves to be entitled to judgment as a matter of law. Accordingly, the Court should deny the motion for summary judgment, and restore the case to the trial list.

## FACTS

### A. Testimony of Membership

In discovery, in their own words, the plaintiffs testified:

**Deposition of Eulogio Ortiz of March 23, 2005 (Exhibit 1)**

EXAMINATION BY MR. BERGER:

| (P20) | Q | ... Did the union ever tell you or notify you in any way about quarterly meetings? |
| | A | No. |
| (P21, 22) | Q | Do you believe it was because you are Hispanic that the union did not invite you to meetings or otherwise protect you? |
| | | MR. LICHTEN: Objection. |
| | A | Yes. |

|       |   |                                                                      |
|-------|---|----------------------------------------------------------------------|
|       | Q | During this period of time, have you been suffering emotionally?     |
|       | A | Yes.                                                                 |
| (P22) | Q | Do you feel humiliated about being on welfare?                       |
|       | A | Yes, exactly.                                                        |

(P23)　　A　　...Yes, because every time they [the union] would come over, they would go straight only to their office. And then they would send someone to tell us, stop all the machines and make sure that everybody comes down, and then a guy from the union would come down. They would stop the machines, make us come all the way down. Then when we went down, the people from the union would go in there, and they would be speaking to them.

**Deposition of Antonio Martinez of March 23, 2005 (Exhibit 2)**

|           |   |                                                                      |
|-----------|---|----------------------------------------------------------------------|
| (P15, 16) | Q | Now, in the plant were there fires constantly?                       |
|           | A | Oh, yes.                                                             |
|           | Q | And in the plant, was there dust flying around?                      |
|           | A | Too much, a lot.                                                     |
|           | Q | In the plant, did people lose fingers?                               |
|           | A | Yes.                                                                 |
|           | Q | Well what safety -- what did the union -- well, strike that.<br>Did the union have a bulletin board for posting notices? |
|           | A | No.                                                                  |
|           | Q | Did the union ever give you any notices of meetings?                 |
|           | A | No.                                                                  |

(P16)　　A　　I think that they discriminated against us because first of all, they didn't help us. Also, we were not -- they didn't tell us when the company was going to close. And every time there was some sort of a-- we had to draw up a contract or some sort of complication, they would always go to the office, their office, and spend a long time there. And then afterwards when they would come to us, they would say, "Oh, you know what? Whatever the company says."

**Deposition of Wilfredo Ortiz of March 23, 2005 (Exhibit 3)**

(P24)    A.    No. I don't think so, but since we all have rights, the fact that we're Hispanics and we didn't speak the language, they would take vengeance on us because of that.

Q    Take advantage of you?

        THE INTERPRETER: Vengeance.

Q    Okay, But do you mean take advantage of you?

A    Yes, like discriminating me.

(P25-26)    Q    Now, did the union ever put up bulletin board for you to give you information about anything?

A    No.

Q    Did the union provide any assistance to you about the people who had suffered injuries like loss of fingers, cutting of the face, and this kind thing?

        MR. LICHTEN: Objection.

(P26)    A    No.

Q    Tell me, is there any doubt in your mind whether they know about people who had lost their fingers and people who had been cut on their face?

        MR. LICHTEN: Objection.

A    Yes, I know I've seen them. There have been many accidents there.

        MR. LICHTEN: Move to strike. Not responsive.

Q    Can you tell us about what you observed.

A    There was the accident with Jose Ortiz. I was present then when the machine cracked [verbatim] his finger.

(P27)    A    He was cleaning the machine, and afterwards, the machine was still running, and then the machine cracked his finger, cut it.

Q    And how old was that machine?

        MR. LICHTEN: Objection.

A    An antique.

Q    A hundred years; do you think?

A    Yeah.

Q    Did the union ever look at any of machines like this one where this accident happened?

A    No.

| | | |
|---|---|---|
| | Q | You were going to describe other injures that happened there? |
| | A | Yes. There were people there too. |
| | Q | Now, did the union ever make sure that the plant complied with federal laws like the Occupational Safety Act? |
| | | MR. LICHTEN: Objection. |
| | A | I don't know. I don't know. |
| (P28) | Q | Did they ever come to see whether any of the you were protected from the fires? |
| | | MR. LICHTEN: Objection. |
| | A | No. |
| | Q | And how about for the handling of paints and chemicals? |
| | A | No. |
| | Q | Did, in your opinion, the union care about what happened to the safety of the people in this plant that consisted solely of Hispanics? |
| | | MR. LICHTEN: Objection. |
| | A | No. They never cared for anything, no. |
| | Q | And you're not a member of the Upholstery Workers Union, are you? You're a member of the Steelworkers union? |
| | | MR. LICHTEN: Objection. |
| | A | Yes. |
| (P29) | Q | Were there some grinder machines there? |
| | A | Yes. |
| | Q | How old were they? |
| | A | They're old. They're antique. They're so old they don't even have replacement parts or pieces for those machines. |
| (P37) | A | ...Because on certain occasions, I was obligated -- we were obligated to work overtime. And sometimes, they would make us -- make me extinguish fires by ourselves. Sometimes I would have to get on top of a room myself to extinguish a fire on top of a machine, and all of that smoke, I was inhaling. |

**Deposition of Rafael Torres of March 23, 2005 (Exhibit 4)**

EXAMINATION BY MR. LICHTEN:

8

| (P14) | Q | You said that you believed that someone with less seniority that you got a job, a daytime job, that you have should have gotten; is that right? |
| | A | Yes. |
| | | |
| (P21-22) | Q | Okay. Did you ever attempt to call the Steelworkers union office about a problem or a concern that you were having at work? |
| | A | No, because they wouldn't allow us to call them personally. |
| | | |
| (P22) | A | The representative, the person that goes to the company or whatever company. Whenever there's a problem, the person that comes from their office. |

EXAMINATION BY MR. BERGER:

| (P31) | Q | Was everybody at Farnsworth Hispanic? |
| | A | Yes. |
| | Q | Did they tell you about their [the union and its local] meetings four times a year? |
| | A | No. |
| | Q | So they didn't' invite you to any of them? |
| | A | No. |
| | | |
| (P32-33) | A | ...My opinion is that the union didn't back us up, did not give us any support in reality the way they should have done that the moment when we needed them the most. |
| | Q | And do you think that was connected to the fact that all of the workers were Hispanic? |
| | | MR. LICHTEN: Objection. |
| | A | I would think that, yes. |

**Deposition of Nelson Acevedo of March 24, 2005 (Exhibit 5)**

EXAMINATION BY MR. BERGER:

| (P17) | Q | Did you ever get invited to the quarterly meetings of the Steelworkers? |
| | A | No, never. |

**Deposition of Juan R. Colon Ortiz of March 23, 2005 (Exhibit 6)**

EXAMINATION BY MR. LICHTEN:

| (P10) | A | ...Different tanks, I would take paint from one tank and put it in another tank. |
| | A | Yes. I left that place for a while because a problem that I have with my lung or my lungs, and     they gave me some sort of pills, medication, to see if it would clear them up, but -- |
| (P11) | A | I prepared these tanks. |
| | A | It's paint, prepare the paint. |
| | A | To paint the material. |
| (P19) | Q | No, how many years did you work with the paint? |
| | A | 18 years. |
| | Q | And what are you problems with your lungs? |
| | A | Sometimes I don't breathe at all, and I cough or spit blood. |
| | Q | How much blood do you spit? |
| (P20) | A | Sometimes two or three times a week.  Now, I don't spit as much blood as I used to before because I'm taking the pills and I'm not there. |

**Deposition of Miriam Caminero of March 24, 2005 (Exhibit 7)**

| (P17) | Q | Now, were you ever invited to any meetings of Local 421 of the United Steelworkers of America? |
| | A | No, I never received anything. |
| | Q | Did they have a place where they posted notices at the plant at Sherman-Feinberg? |
| | Q | Now, what protections did you have for the closing of the plant? |
| | A. | None. |
| (P21-22) | Q | And do you think that the people who worked there were treated fairly by the union? |
| | | MR. LICHTEN: Objection |
| | A | No. |

**Deposition of Jose Enrique Ortiz of March 22, 2005 (Exhibit 8)**
EXAMINATION BY MR. BERGER

| (P70) | Q | Did Kenny [the company representative] ever talk to you about inserting plant-closing language into the agreement? |
| | | THE INTERPRETER: I'm sorry, I didn't hear that. Did Kenny ever talk to you -- |
| | Q | Did Kenny ever talk to you about inserting plant-closing language into the agreement? |
| | A | (Through the Interpreter) No, he never said anything. |
| | Q | Never during those 42 hours [of negotiations]? |
| | A | (Through the Interpreter) No. |
| | | |
| (P73) | Q | The very final agreement, was it in English or Spanish? |
| | A | (Through the Interpreter) In English. Everything was done in English. And then afterwards, translated in Spanish. |

EXAMINATION BY MR. DIAZ:

| (P95-96) | Q | So is it fair to say you didn't really understand what the proper procedure was, other that what your own interpretation was as to what process to follow; is that correct? |
| | A | (Through the Interpreter) Yes. |
| | Q | And is it fair to say that no one from the United Steelworkers of America and/or Local 421-U ever came to you to find out what your proficiency in English was, correct? |
| | A | (Through the Interpreter) No, they didn't. |
| | Q | And I'm changing gears to another area. Whenever Mr. Lowell Alexander told you about any meetings and you didn't have a vehicle, was there any other form of transportation or was there any other offer from the union as to how to get you to a meeting or make sure hat you understood where the meetings were in advance so that you could have made appropriate arrangements? |
| | A | (Through the Interpreter) No. |

**Deposition of Elison Pena March 23, 2005 (Exhibit 9)**

## EXAMINATION BY MR. LICHTEN:

| (P17) | A | (Through the Interpreter) They didn't protect me. They didn't protect us. |

| (P18) | A | (Through the Interpreter) They closed the factory, and we were not -- we were not notified in any way that they were going to close. They didn't do anything to protect us. |
| | A | (Through the Interpreter) They didn't help us in any way. I would pay the union dues there for nothing. |

| (P23) | Q | Are you aware of any instance in which someone -- in which an employee at Farnsworth complained about working conditions or that the workplace was unsafe? |
| | A | (Through the Interpreter) No. Almost at any time, we have to -- |
| | | THE INTERPRETER: Verbatim. |
| | A | --flee[t] the place, because all of a sudden, something could catch fire often, and all of us would have to just flee the place all the time. |

| (P25) | A | (Through the Interpreter) When she [the union interpreter] spoke, she was sort of like pedantic, repugnant. |
| | A | (Through the Interpreter) She spoke in a bad way. |

| (P26) | A | (Through the Interpreter) ...She wouldn't answer our questions properly. She wouldn't use an appropriate answer, and she was leaning -- she would take their side of it. |

| (P29) | Q | Do you ever recall him [the union representative] saying or doing anything that made you think that he was biased against Hispanics? |
| | A | (Through the Interpreter) Because -- I don't know, because he would never get together with me. |

## EXAMINATION BY MR. BERGER:

| (P36) | A | (Through the Interpreter) When the union would go there, first they would go to their office first. |
| | Q | Now, what equipment did the union ensure was available for you? |
| | A | (Through the Interpreter) None. |
| | Q | So that we can make this clear, did you say there were fires often in the plant? |

12

| | | |
|---|---|---|
| (P37-38) | Q | Describe to us in detail the nature of the fires in the plant. |
| | A | (Through the Interpreter) Because there were a lot of machines, machinery that was on, that was turned on. And because of that, the temperature was very, very hot. |
| | Q | And there were fires during the entire time that you were employed at the plant, correct? |
| | A | (Through the Interpreter) Yes. |
| | Q | Right until November of 2003? |
| | A | (Through the Interpreter) Yes. |
| | Q | Did they provide any protection for your breathing when there were constant fires at this plant? |
| (P38) | A | (Through the Interpreter) No. We had to take the water ourselves with all the smoke and everything, we had to take everything outside. |
| | Q | Did the Union help you in any way about this continuing fire situation? |
| | A | (Through the Interpreter) No. |
| | Q | Okay |
| (P39) | A | (Through the Interpreter) Because they didn't pay attention to whatever was said there. |

EXAMINATION BY MR. DIAZ:

| | | |
|---|---|---|
| (P41) | Q | For example, was there a work area where employees could have posting so that they could have something in Spanish saying contact the Steelworkers at this number, we have a complaint, or contact Local 421-U if you have a complaint, something in Spanish with a phone number so that you can contact someone directly? |
| | A | (Through the Interpreter) No. |
| | Q | Have you prior to November of 2003 known individuals who are members of other unions? |
| | A | (Through the Interpreter) No. |
| (P45) | Q | Did they ever offer you at any time prior to your being notified of the plant closings any opportunity |

|   |   |
|---|---|
|   | for job training, for advancement or to move somewhere else where the union may have had jobs, let's say, Cleveland, Ohio, or any other part of the country? |
| A | (Through the Interpreter) No. |
| Q | --Do you remember the fires? |
| A | (Through the Interpreter) Yes. |
| Q | Okay. And that would be within a few weeks before that incident? |
| A | (Through the Interpreter) Yes, a couple of weeks before that. |
| Q | Okay. And that was fire in the ceiling? |
| A | (Through the Interpreter) It wasn't on the ceiling. It was through the -- the exhaust that would come out, that comes out of the oven. |
| Q | All right. So certainly in the month of November there were fires? |
| A | (Through the Interpreter) There were fires there all the time. |

## B. THE UNION

The union's conduct disclosed in discovery. The union never grieved any discharges. Deposition of Lowell Alexander, p. 24. (Exhibit 10) The hourly wage at this plant starts off at $7.00. The union dues of all Steelworkers are 1.3% of the wage. Id. 21. With respect to other plants, Alexander answered that Sealy Mattress, Bee-Bee Rubber; Rosboro Plastics had plant closing severance language in the collective bargaining agreements. The instant plant did not, nor was it requested in negotiations, Id. 94-95. Furthermore, there was no negotiation of the effects of closing the plant, only bumping rights and medical benefits, id. at 100. (Bumping rights involve intra-union seniority.) There was no right to severance here but there was at the Sealy Mattress, Bee-Bee Rubber, Rosboro Plastics plants. Id. The union provided all drafts of the collective bargaining agreement in English and only the binding one was in Spanish. Id. at 14.

There was no provision for severance or plant closing in this agreement. Id. at 11 and 28. The prospect of a plant closing was not even an issue in the collective bargaining at this plant. Id. 15. For, the Union had not checked the books of Farnsworth Fibre and Sherman-Feinberg to find out their financial picture although the union wrote the companies in 2002 to request them. Alexander heard scuttlebutt about them taking the money and converting the building into a condominium at one of the meetings prior to the company closing. Id. at 18. The plant had no apprenticeship or training program. Id. at 54. Although there were fires until the closing of the plant, the union was unaware of ,ires at the plant even though its representative visited the plant. Id. at 84. The union did not know whether employer kept material data safety slips. Id. at 76. There was no hazard safety program or health and safety officer at the plant. Id. at 77 and 81. Alexander had been a Steelworker union steward for the gas company; he learned when there was catastrophic injury in his steward capacity; and he simply does not know why he never learned of catastrophic injury at this entirely Latino plant when he was union representative. Id. at 85.


D. Defendant's Purported Undisputed Facts

1.      Disputed because the plaintiffs have been unionized for 25 years when the low paid Upholstery Workers Union merged with the high paid United Steelworkers of America (United Steelworkers). Plaintiffs dispute the allegation that they were members of the Defendant Union, their particular Unit, Unit 6 of Local 421-U, was not treated like members because they did not receive benefits, such as invitation to meetings, safety

compliance visits by safety officers, and training that other members of the Defendant

Unions received.   See Plaintiff's Statement of Undisputed Facts, ¶¶33-95.


2.      Undisputed but irrelevant.


3.      Disputed, technically members of the Defendant Union, their particular Unit, Unit

6 of Local 421-U, did not receive the benefits, such as invitation to meetings, job training

that other members of the Defendant Unions received. See Plaintiff's Statement of

Undisputed Facts, ¶¶33-95.


4.      Undisputed.


5.      Disputed to the extent that Lowell Alexander was assigned to plaintiffs' Unit as

the International Representative.  The plaintiffs dispute that Lowell Alexander carried out

his duties with respect to representing and assisting plaintiffs.  Additionally, the plaintiffs

move to strike the reference to Lowell Alexander's race as irrelevant.


6.      Undisputed.


7.      Undisputed.

8. Disputed to the extent that Jose Ortiz was able to help the Plaintiffs. Several Plaintiffs testified that Jose Ortiz was ignored by the Defendant Unions when he called them for help. See Plaintiffs' Statement of Additional Facts, Nos. 37-42.

9. Disputed. The plaintiffs were never educated or informed about the process of filing complaints or grievances. Elison Pena Deposition at p. 41 (Exhibit 11). The Defendant Union never posted notices informing the plaintiffs of their rights or invited them to meetings in order be educated as to their rights. See Plaintiffs' Statement of Undisputed Material Facts, No. 75-77.

10. Disputed. Lowell Alexander had contact with Jose Ortiz. Lowell Alexander's contact with Jose Ortiz or Miguel DeJesus, however, raises a material question of fact since Mr. Alexander does not speak Spanish, and Mr. Ortiz and Mr. DeJesus do not speak or understand English, but they were to negotiate an agreement. Lowell Alexander made no attempt to make sure that Mr. Ortiz and Mr. DeJesus understood terms and procedures of the negotiation. Deposition of Lowell Alexander page 64-68, 103-104 (Exhibit 12).

11. Disputed. Negotiations took place during September and October, 2002 and the Defendant Union paid Mr. Ortiz and Mr. DeJesus to attend these sessions, but Mr. Ortiz and Mr. DeJesus could not help during these negotiations because they did not understand them. Jose Ortiz Deposition at pp. 88-90 (Exhibit 13). The negotiations were conducted completely in English and no interpreter was available to Mr. Ortiz and Mr. DeJesus. Jose Ortiz Deposition at p. 90 (Exhibit 14). During the negotiation of the CBA,

Mr. Alexander never requested plant-closing provisions to be inserted into the CBA. Alexander Deposition at 56 (Exhibit 15). According to Mr. Alexander, plant closing language was "not an issue." Alexander Deposition at 15 (Exhibit 16). *Lowell Alexander never inquired into job security or plant closing measures.* Jose Ortiz Deposition at p. 92 (Exhibit 17). *However, there was no discussion between the Union and the employer about the viability of the plant and the possibility of it closing.* Deposition of Jose Ortiz pp. 91-92 (Exhibit 18). Mr. Alexander did not audit or review the employer's financial records at any time prior to or during the CBA negotiation or at the time of the plant closing. Alexander Deposition at 15 (Exhibit 19). This audit did not take place even though the union requested all payroll records, balance sheets, cash flow statements. Berger Aff. Ex. 21. He made a request to audit the employer's books but never followed up upon the request. Alexander Deposition at 15 (Exhibit 20).

12.    Disputed. The proposed pay raise provision was meaningless: Mr. Alexander did not audit the books to determine the viability of the employer so that the employees, whatever the pay raise, had no assurance that they would receive it. Alexander Deposition at 15 (Exhibit 21).

13.    Disputed. Jose Ortiz did not decline to attend. He wanted to go but he did not have transportation. He asked Lowell Alexander for a ride or if he could arrange transportation but Lowell Alexander did not help him. Jose Ortiz Deposition, p. 24 (Exhibit 22).

14. Disputed. Jose Ortiz would have liked to attend, but he did not have transportation. He asked Lowell Alexander for a ride or if he could arrange transportation but Lowell Alexander did not help him. Jose Ortiz Deposition p. 64-66 (Exhibit 23).

15. Disputed. The Plaintiffs did not receive a copy of the new CBA (in English or Spanish) until after the collective bargaining agreement (CBA) was executed.

16. Undisputed.

17. Disputed. The workers expressed unhappiness with the Union and Lowell Alexander said that "they couldn't do anything." Nelson Acevedo Deposition at p. 15 (Exhibit 24). Furthermore, the workers did not recall Lowell Alexander explaining to them that they could call him with a complaint. Deposition of Jose Ramirez at pp. 27-28 (Exhibit 25).

18. Disputed. The Plaintiffs complained to Jose Ortiz, the shop steward, on several occasions, but Jose Ortiz's calls to the Defendant Union were ignored. See Plaintiffs' Statement of Additional Facts, Nos. 75-77. Additionally, the Plaintiffs were never informed that they were permitted to contact the Defendant Union directly. They believed their only avenue was through the shop steward. See Response to No. 17 and Plaintiffs' Statement of Additional Facts, Nos. 47, 75-77.

19. Disputed. Lowell Alexander came to the plant and personally observed the conditions of the plant. He somehow failed to observe the conditions of the plant, and could have taken steps to rectify the safety problems (OSHA complaint, negotiations, bargaining, etc.) in the absence of a formal complaint. Deposition of Lowell Alexander, p. 58 (Exhibit 26).

20. Disputed. Jose Ortiz contacted the Union representative with a complaint; and no one from the Union responded to it. See Plaintiffs' Statement of Additional Facts, No. 37-43.

21. Disputed. Lowell Alexander came to the plant.

22. Disputed. This will be a material fact in controversy in the trial. *In October, 2003 Lowell Alexander simply told them that the only benefits the Plaintiffs were entitled to were unemployment benefits.* Plaintiffs' Statement of Additional Facts, Nos. 79-85. *The plaintiffs' position is that Lowell Alexander did not even attempt to engage in effects bargaining (severance, grievance about 100% Latino layoff, etc.) to secure the Plaintiffs some plant closing benefits.* Id.

23. Disputed. Lowell Alexander did nothing to secure the Plaintiffs plant closing benefits. Lowell Alexander's overtures to help with pension, especially as there was a multiemployer pension plan for the steelworkers, and vacation pay for a closed plant, are irrelevant to the issue of plant closing. Additionally, Lowell Alexander acknowledged

that in the past practice he has "grieved" issues that were not in the CBA although the union now hangs its hat on the claim that the union is shackled to the terms of the CBA, which is malarkey. Plaintiffs' Statement of Additional Facts, No. 59.

24.     Disputed.    Intra-union bumping grievances had nothing to do with the plant closing. The real issue is severance, which was not bargained for or negotiated for at this plant unlike the other plants represented by the United Steelworkers of America.

25.     Disputed. These grievances had nothing to do with the plant closing.

26.     Disputed. These grievances had nothing to do with the plant closing.

27.     Disputed.  See Responses Nos. 9 and 17.

28.     Disputed.  The treatment the membership received from the Defendant Union was due to their race and the fact that they did not speak English. See Plaintiffs' Statement of Additional Facts No. 68; Wilfredo Ortiz Deposition at p. 24 (Exhibit 27).

29.     Disputed.  There is no doubt that there was no interpreter available for Jose Ortiz and Miguel DeJesus during the CBA negotiations.  The Plaintiffs were not provided with copies of the CBA in Spanish prior to the vote.  The Defendant Union never posted any notices in Spanish or English.

30.     Disputed. The whole point is that at Sherman-Feinberg, the union neglected to ask for severance benefits in negotiations or at the plant closing; but Rosboro Plastics, Chardon Plastics, and Sealy Mattress provided them, Berger Affidavit at Ex. 28, Memorandum of Agreement, id. at Ex. 29, Benefit Continuation Following Plant Shut Down, id. at Ex. 30 Article 27 of CBA with Sealy Mattress.

31.     Disputed. The whole point is that at Sherman-Feinberg, the union neglected to ask for severance benefits in negotiations or at the plant closing; but Rosboro Plastics, Chardon Plastics, and Sealy Mattress provided them, Berger Aff. at Ex. 28, Memorandum of Agreement, id. at Ex. 29, Benefit Continuation Following Plant Shut Down, id. at Ex. 30 Article 27 of CBA with Sealy Mattress.

32.     Disputed. The whole point is that at Sherman-Feinberg, the union neglected to ask for severance benefits in negotiations or at the plant closing; but Rosboro Plastics, Chardon Plastics, and Sealy Mattress provided them. See Berger Aff. at Ex. 28, Memorandum of Agreement; Id. at Ex. 29, Benefit Continuation Following Plant Shut Down; Id. at Ex. 30 Article 27 of CBA with Sealy Mattress.

E.  Plaintiffs' Statement of Additional Material Facts.

33.     All of the plaintiffs originally came to Boston from either Puerto Rico or Dominican Republic. Nelson Acevedo Deposition at p. 6 (Exhibit 28); Miriam Caminero Deposition at p. 15 (Exhibit 29); Clemente Hernandez Deposition at p. 16 (Exhibit 30); Antonio Martinez Deposition at p. 16 (Exhibit 31); Luis Martinez Deposition at p. 27

(Exhibit 32); Deposition of Eulogio Ortiz Deposition at p. 14 (Exhibit 33); Jose Ramirez Deposition at p. 38 (Exhibit 34); Euclides Soto Deposition at p. 28 (Exhibit 35) ; Rafael Torres Deposition at p. 30 (Exhibit 36).

34.    It is undisputed that most do not speak or read English.  Many have only a grade school education that they received outside the United States.  Eulogio Ortiz Deposition at 14 (Exhibit 37).

35.    For many, their job at the plant was the first job they obtained upon coming to this country.  Eulogio Ortiz Deposition at p. 8, 18 (Exhibit 38).

36.    Jose Ortiz was chosen to be the Shop Steward primarily because his English was better than the other workers and essentially, there was no vote because the employer told the workers to pick him.  Miriam Caminero Deposition at p. 8 (Exhibit 39);  Eulogio Ortiz Deposition at 12 (Exhibit 40).

37.    Clemente Hernandez stated that he believed Jose Ortiz to be a "tremendous person" and a "great work colleague."  Clemente Hernandez Deposition at 14 (Exhibit 41).  He believed that Jose Ortiz tried to help the plaintiffs as shop steward.  He stated that Jose Ortiz would call the Union with their complaints and either the Union Representatives would not show up or they would come to the plant and go straight to the office and never come and talk to the workers.  Clemente Hernandez Deposition at 13-14 (Exhibit 42).

23

38.     Wilfredo Ortiz stated that Jose Ortiz has a good reputation for being honest and truthful and he had no reason to doubt that Jose Ortiz did not call the Defendant Union with their complaint. Rather, whenever the Defendant Union representatives would come to the plant, they would go straight to the office and then tell the workers that they had to do whatever the employer told them to do. Wilfredo Ortiz felt that the employer and the Defendant Union took advantage of the plaintiffs because they were Hispanic and did not speak English. Wilfredo Ortiz Deposition at 23-24 (Exhibit 43).

39.     Several other plaintiffs stated that the union representatives would never observe the plant or talk to the workers but always went straight to the "bosses' office." Luis Martinez Deposition at 30 (Exhibit 44); Eulogio Ortiz Deposition at 23 (Exhibit 45).

40.     Miriam Caminero stated that she complained to Jose Ortiz to call the Union and he told her that the Union was "not in favor with the workers, they side with the factory." Miriam Caminero Deposition at 11 (Exhibit 46).

41.     The union would go straight to the office of the employer and then tell the workers that they had to do whatever the employer told them to do. Wilfredo Deposition at p. 35 (Exhibit 47).

42.     Nobody helped them and whatever the employer said, the workers had to do. Jose Ramirez Deposition at p. 10, 13, 27, 30-31 (Exhibit 48).

43.     At contract negotiation time, the Union Representatives would come over and go directly to the owner's office and spend a long time with them.     Then the Union Representative would come out and speak to the workers, telling them "oh you know what, whatever the company says." Antonio Martinez Deposition at p. 16 (Exhibit 49).

45.     The owners treated the workers very differently "if you got sick or needed a day off."  The Defendant Union did nothing to stop this treatment.   Antonio Martinez Deposition at p. 17 (Exhibit 50).

46.     Plaintiffs did not contact the Defendant Union directly because they had no idea that was their right.  No one ever explained to them that they could by-pass the shop steward and call the Union Representative directly.   There were no notices posted detailing that right (or any other right).  In fact, at one meeting with Lowell Alexander, he told the plaintiffs that they could not call him personally; that they had to contact the shop steward and shop steward would then call him.   Jose Ramirez Deposition at pp. 27-28 (Exhibit 51); Rafael Torres Deposition at pp. 22-23 (Exhibit 52); Nelson Acevedo Deposition at p. 15 (Exhibit 53).

47.     Eulogio Ortiz lost two fingers at the plant. Eulogio Ortiz Deposition at p. 19-20 (Exhibit 54).

48.     Ramon Rodriquez fell and hurt his back while at work.  He was out 4-5 days and the employer did not pay him for that time.  He told the shop steward that he was not paid

but nothing came of it. There were no notices posted informing him he could contact the Defendant Union directly about his complaint. Ramon Rodriguez Deposition at p. 26-27 (Exhibit 55).

49. Euclides Soto cut his face on a broken machine. Prior to his injury, he had spoken to Jose Ortiz about the broken machine. Jose Ortiz told him he would speak to the owners about it but the machine was not fixed until after his injury. Euclides Soto Deposition at 12 (Exhibit 56).

50. Plaintiffs made between $10 and $13 per hour at the time of the plant's closing, Angel Baez Deposition at p. 15 (Exhibit 57).

51. Most would rather still work under the horrible conditions, which they did because it was a job and jobs are hard to get. Angel Baez Deposition at p. 19 (Exhibit 58); Rafael Torres Deposition at 29 (Exhibit 59); Ramon Rodriguez Deposition at 30 (Exhibit 60); and Euclides Soto Deposition at p. 33 (Exhibit 61).

52. At the plant, Juan Colon Ortiz worked with the paint which was used on the mattress material. He testified that the paint smelled very strong and he was given only a little mask to wear. He would change his clothes into work clothes at the beginning of his shift although there was no changing station nor were there any showers to use at the end of his shift. While working at the plant he developed a lung problem in which he had

trouble breathing and would cough up blood two to three times a week. He had to stop working for a while because of his lung problem.


53.     The conditions of the plant made it such that fires were constantly breaking out right up until the plant's closing. Clemente Hernandez Deposition at 6-7 (Exhibit 62); Wilfredo Ortiz Deposition at p. 30-31 (Exhibit 63);  Jose Ramirez Deposition at p. 34 (Exhibit 64);   Ramon Rodriguez Deposition at 33 (Exhibit 65);   Antonio Martinez Deposition at 15 (Exhibit 66);  Luis Martinez Deposition at p. 30 (Exhibit 67);  Ortiz Deposition at 24 (Exhibit 68). Elison Pena recalls that the last fire occurred in November 2003.  Elison Pena Deposition at p. 55-56 (Exhibit 69).  The plaintiffs were told by the employer to extinguish the fires themselves and that they were not given any protection against the smoke they inhaled and that the fire department was rarely called.  Clemente Hernandez Deposition at 6-7 (Exhibit 70); Wilfredo Ortiz Deposition at p. 31 (Exhibit 71); Elison Pena Deposition at 37-38 (Exhibit 72).  Wilfredo Ortiz recalls having to get on top of the machine to put out a fire, all the while inhaling the smoke from the fire. Wilfredo Ortiz Deposition at p. 37 (Exhibit 73).  Clemente Hernandez can only recall one time when the fire department was called to respond to a fire at the plant.  Clemente Hernandez Deposition at p. 7 (Exhibit 74).  He also recalls that he inhaled a lot of smoke from the fires. Clemente Hernandez Deposition at p. 7 (Exhibit 75).  Clemente Hernandez asked Jose Ortiz to speak to the Union about the fires but that the Union did nothing about the situation. Clemente Hernandez Deposition at p. 8 (Exhibit 76); Elison Pena Deposition at 38-39 (Exhibit 77).

54.     Lowell Alexander acknowledged that as Union Representative, it was his obligation to make sure that the employer followed health and safety policies although he never checked to determine what, if any, policies were in place. Deposition of Lowell Alexander at p. 73-74 (Exhibit 78).

55.     The machinery with which the Plaintiffs worked was heavy and antiquated. Miriam Caminero Deposition at p. 18 (Exhibit 79); Euclides Soto Deposition at 26-27 (Exhibit 80). Some machinery was so old that the employer could not get replacement parts in the event a machine broke. Wilfredo C. Ortiz Deposition at 29 (Exhibit 81). Even Mr. Alexander acknowledged that the machinery in the plant was old. Lowell Alexander Deposition at 40 (Exhibit 82). Despite the fact that the plaintiffs were working with heavy very old machinery, Mr. Alexander never did anything to ensure that the employer developed a written hazard program. Lowell Alexander Deposition at 75 (Exhibit 83). He never checked if the employer kept material safety data sheets. Id.

56.     According to Mr. Alexander, the Defendant Union would address safety concerns if they became aware of them, even in the absence of a formal complaint. Lowell Alexander Deposition at 45, 84-85 (Exhibit 84). Several plaintiffs stated that dust was flying all over the place all the time. Clemente Hernandez Deposition at p. 15 (Exhibit 85); Antonio Martinez Deposition at p. 15 (Exhibit 86); Luis Martinez Deposition at p. 30 (Exhibit 87). Mr. Alexander was on-site of the plant on more than one occasion. He had the opportunity to see the dust flying all over the place, yet he never took any steps to ensure that the employer had proper ventilation for the plant. Lowell Alexander

Deposition, at 83-84. (Exhibit 88) He or anyone else from the Defendant Union never walked around the plant to examine whether the plaintiffs were protected from fire, dust or chemicals. Wilfredo C. Ortiz Deposition at 28 (Exhibit 89); Euclides Soto Deposition at 27 (Exhibit 90).

57.    Mr. Alexander acknowledged that he has "in past practice" grieved things that were not within the specific terms of the collective bargaining agreement. Lowell Alexander Deposition at p. 28 (Exhibit 91).

58.    At the meeting with the plaintiffs at which they were to vote whether to accept or reject the new CBA, the plaintiffs were not given copies of the CBA in Spanish prior to the vote. The new CBA was not explained to them. At the meeting to accept or reject the last CBA, there was no Spanish interpreter present to explain the terms of the CBA. Antonio Martinez Deposition at p. 9-10 (Exhibit 92). ("…majority decided to accept it because they didn't know how to read the fine print very well.")

59.    However, to call it a "vote" is misleading because the plaintiffs were given no alternative but to accept the CBA. Antonio Martinez Deposition at 9 (Exhibit 93). Generally, when it came to accepting or rejecting the proposed CBA, the plaintiffs were told that by the Defendant Union representatives that they had to accept the new CBA, telling them "Look you have to accept it and that's all there is." Antonio Martinez Deposition at 9-10 (Exhibit 94). Wilfredo Ortiz stated that when it came to voting for the 2002 CBA, even though they tried to tell the Defendant Union what they wanted, the

Defendant Union represented that they had to take whatever the company was offering. Wilfred Ortiz Deposition at p. 8-9. (Exhibit 95)

60. Clemente Hernandez agreed with the description the condition of the plant was "like hell" and that the employer and union treated the workers "like dogs." It was the worst place he has ever worked in. Clemente Hernandez at 15-16 (Exhibit 96). Euclides Soto stated that the plant reminded him of hell because it was extremely hot because the ovens were on all the time and there was a lot of smoke and dust and no ventilation. Euclides Soto Deposition at p. 27 (Exhibit 97); Jose Ramirez agreed that the plant was "like hell." Jose Ramirez Deposition at p. 31 (Exhibit 98).

61. Luis Martinez felt he was discriminated against by the Defendant Union. He said "[t]hey treated us like garbage. They treated us like nobody. We paid our union dues for so many years and they never gave us any sort of support, any help, and they didn't represent us in any way." Luis Martinez Deposition at p. 14 (Exhibit 99).

62. Euclides Soto felt that the union "left us like dogs" when the plant closed because they did nothing to help them. Euclides Soto Deposition at 9 (Exhibit 100).

63. Since the plant's closing, Miriam Caminero has been depressed because she has had difficulty finding a new job and she has three children to support and has to pay rent. The unemployment benefits she received were not enough to make ends meet. Miriam Caminero Deposition at p. 23 (Exhibit 101).

64.     For Luis Martinez, after the unemployment benefits ran out, he went through "a lot of troubles and hunger for almost a year."   He was very nervous because he did not have money for food or rent.  He wanted to go home to Puerto Rico but he did not have the money.  Additionally, he had no money to send to his family in Puerto Rico whom he supports. Luis Martinez Deposition at 15, 27. (Exhibit 102)

65.     For Eulogio Ortiz, since the plant's closing, he does not sleep well anymore and he does not feel well.  He feels humiliated because he has to receive welfare benefits. Eulogio Ortiz Deposition at 22. (Exhibit 103)

66.     For Ramon Martinez who is in his sixties and worked at the plant for 25 years liked his job at the plant and wanted to keep working.  Since the plant's closing, he has felt very bad to the extent that he could not bear to pass by the plant so he moved to Florida.  Ramon Rodriguez Deposition at p. 7, 30, 31. (Exhibit 104)

67.     For Euclides Soto, since the plant's closing, he has felt bad because he paid his union dues thinking that the Defendant Union would assist him but in the end, the Defendant Union did nothing for him when the plant closed.  Furthermore, he has lost sleep and is depressed since the plant's closing because he does not make enough money to support his five children and pay his bills which are overdue.   Euclides Soto Deposition at 28, 30-31. (Exhibit 105)

68.    The plaintiffs stated that there was no bulletin board hung where notices could be posted informing workers of union news, worker's compensation, OSHA notices etc. Clemente Hernandez Deposition at p. 12-13 (Exhibit 106); Antonio Martinez Deposition at p. 15 (Exhibit 107); Elison Pena Deposition at p. 53 (Exhibit 108); Juan Ortiz Deposition at p. 17 (Exhibit 109), Wilfredo C. Ortiz Deposition at 25 (Exhibit 110); Euclides Soto Deposition at p. 25 (Exhibit 111) . If any notices were posted, however, they were not noticed, as they never were in Spanish, always in English.    Nelson Acevedo Deposition at p. 16 (Exhibit 112); Miriam Caminero Deposition at p. 17 (Exhibit 113). In fact, there were no notices anywhere in the plant that indicated that the plaintiffs were represented by the Defendant Union. Ramon Rodriguez Deposition at 23 (Exhibit 114).

69.    Plaintiffs were never invited to the quarterly meetings of the Defendant Union. In fact, most did not even know that the Defendant conducted such quarterly meetings. Plaintiffs never received any notice, literature or invitation of any sort to attend these meetings.    Nelson Acevedo Deposition at p. 17 (Exhibit 115); Miriam Caminero Deposition at p. 17 (Exhibit 116); Clemente Hernandez Deposition at p. 12 (Exhibit 117);    Rafael Torres Deposition at p. 31 (Exhibit 118); Euclides Soto Deposition at 16 (Exhibit 119); Juan Ortiz Deposition at 20 (Exhibit 120); Eulogio Ortiz Deposition at p. 20 (Exhibit 121); Wilfredo Ortiz Deposition at p. 25 (Exhibit 122); Cesar Pizarro Deposition at 17 (Exhibit 123) , and Jose Ramirez Deposition at p. 28, 33 (Exhibit 124); Ramon Rodriguez Deposition at 32 (Exhibit 125).   At least one plaintiff believed he was

not invited to the meetings because he was Hispanic. Eulogio Ortiz Deposition at 21 (Exhibit 126).

70. Prior to the closing, plaintiffs were never notified of or offered the opportunity to train for another job, to advance or move to another job within the Defendant Union. Elison Pena Deposition at 45 (Exhibit 127).

71. Upon learning that the plant was closing, Jose Ortiz called Lowell Alexander to inform him of the announcement and asked him to come down. Lowell Alexander met with the plaintiffs. The plaintiffs were upset about the lack of notice by the employer. Miriam Caminero Deposition at p. 24 (Exhibit 128); Clemente Hernandez Deposition at p. 13 (Exhibit 129); Luis Martinez Deposition at p. 16 (Exhibit 130). Lowell Alexander told them there was not much the Defendant Union could do about it because the owners could do whatever they wanted. Cesar Pizarro Deposition at 13, 15 (Exhibit 131); Luis Martinez Deposition at p. 13 (Exhibit 132); Rafael Torres Deposition at p. 27 (Exhibit 133). They also inquired about any benefits the Union could secure for them. Lowell Alexander told them the only benefits they would be getting were unemployment benefits.

72. From the time of the announcement of the plant closing to the commencement of this action, none of the plaintiffs have been offered another job within the Defendant Union. Deposition of Jose Ortiz at 97 (Exhibit 134); Cesar Pizarro Deposition at p. 17 (Exhibit 135).

73.    Additionally, there has been no attempt by the Defendant Union to assist the plaintiffs in securing new jobs within the Defendant Union.   Jose Ortiz Deposition at p. 97 (Exhibit 136); Deposition of Miriam Caminero at p. 14, 22 (Exhibit 137); Luis Martinez Deposition at p. 22 (Exhibit 138). Antonio Martinez Deposition at p. 14-15 (Exhibit 139).  At least two plaintiffs would have relocated if the Defendant Union has helped secure a new union job elsewhere.  Miriam Caminero Deposition at 22 (Exhibit 140); Elison Pena Deposition at 45 (Exhibit 141).

74.    The Defendant Union did not even say they would even try to help them find new jobs.  Luis Martinez Deposition at p. 23 (Exhibit 142); Euclides Soto Deposition at p. 35 (Exhibit 143).  The Defendant Union made no mention whatsoever about the availability of any other jobs.   Jose Ramirez Deposition at p. 38 (Exhibit 144).

75.    Upon the announcement of the plant's closing, the Defendant Union made no offer to train them for another job within the Union or even indicated that training was available.    Miriam Caminero Deposition at p. 19 (Exhibit 145);   Luis Martinez Deposition at p. 28 (Exhibit 146)  ; Antonio Martinez Deposition at 14 (Exhibit 147); Elison Pena Deposition at 44 (Exhibit 148).

76.    Upon the plant's closing, Mr. Alexander did not stay in touch with any of the plaintiffs to find out if any of them secured new jobs.  Lowell Alexander Deposition at 30

(Exhibit 149). In fact, plaintiffs never heard from the Defendant Union again after the plant's closing. Luis Martinez Deposition at p. 28 (Exhibit 150).

77.     However, after their unemployment benefits expired, many of the plaintiffs have not obtained new full time jobs. Nelson Acevedo Deposition at 6 (Exhibit 151); Antonio Martinez Deposition at 4 (Exhibit 152) . Eulogio Ortiz Deposition at 6 (Exhibit 153). Mr. Nelson Acevedo who worked at the plant for approximately 16 years has not worked since the plant closed. He has been forced to live with an aunt and does odd jobs to get by. Nelson Acevedo Deposition at 6 (Exhibit 154). Mr. Luiz Martinez has only worked sporadically. Luis Martinez Deposition at p. 5-6 (Exhibit 155). Mr. Eulogio Ortiz who worked at the plant for approximately 25 years has been forced to go on welfare to make ends meet. Eulogio Ortiz Deposition at 7-8 (Exhibit 156). Mr. Antonio Martinez has looked for a job since the plant's closing but has not found anything. Antonio Martinez Deposition at 5 (Exhibit 157). Cesar Pizarro has only worked odd jobs since the plant's closing. Cesar Pizarro Deposition at p. 5 (Exhibit 158).

78.     Ms. Miriam Caminero who worked at the plant for 8 years and has three children to support has only been able to obtain a part-time job cleaning. Miriam Caminero Deposition at 6-7 (Exhibit 159). Similarly, Mr. Euclides Soto has only been able to secure part-time employment and as a result, he is not entitled to health insurance or pension benefits. Euclides Soto Deposition at p. 32 (Exhibit 160).

79. Mr. Juan Colon Ortiz who worked at the plant for approximately 19 years has not worked since the plant closed despite looking for work. Juan Colon Ortiz receives social security benefits because of a heart and lung condition he developed. Despite his medical problems, he has looked for another job but has not found one. Juan Colon Ortiz Deposition at p. 4, 7-8 (Exhibit 161).

80. Mr. Jose Ramirez who is 66 years of age and worked at the plant for 22 years has not worked since the plant closed. He receives social security benefits and also receives his pension from the Defendant Union. Despite these sources of income and his age, Jose Ramirez does not consider himself retired and is looking for work because his income is insufficient to pay his rent. Jose Ramirez Deposition at 6-7 (Exhibit 162).

81. Mr. Ramon Rodriguez who is 68 years of age and worked at the plant for 25 years has not worked since the plant's closing. Although he collects retirement and social security benefits, he has looked for work but cannot find a job because of his age. Ramon Rodriguez Deposition at 6-7 (Exhibit 163).

82. Only four of the plaintiffs, Angel Baez, Wilfredo Ortiz, Elison Pena and Rafael Torres have secured full time employment. Angel Baez Deposition at 4 (Exhibit 164); Wilfredo Ortiz Deposition at p. 5 (Exhibit 165). Elison Pena Deposition at p. 5-6 (Exhibit 166) ; Rafael Torres Deposition at p. 5 (Exhibit 167).

83. On March 4, 2004, the plaintiffs wrote the defendants (Berger Aff. Ex. 17),

requesting,

    ...under the provisions of the November 1,2002-October 31,2006 Agreement between Sherman-Feinberg Corporation and the Farnsworth Fibre Corporation ("Employers"), and U.S.W.A. Local 421-U ("Union"), the National Labor Relations Act, state and federal antidiscrimination laws, and the constitution of the United Steel Workers of America. All of the above-mentioned individuals in the bargaining unit are Hispanic, employed by said Employers, and members of said Union.

    Shop Steward, Jose Ortiz, took up the question of the protection of said individuals under the Agreement with Kenneth J. Doucette, agent of the Employers. No adjustment was reached within forty-eight (48) hours. The Employers gave notice of termination to second-shift employees on November 7, 2003, and to first-shift employees on November 14, 2003.

    Before the terminations, on or about November 12, 2003, Lowell Alexander of the Union met with Kenneth Doucette of the Employers. Next, Ortiz met with Alexander; Alexander told him that the Union could do nothing. The dispute was not submitted in writing by the Union or the Employers and presented for adjustments to the company's representative and the Union's representative. Therefore, the individuals hereby demand that a grievance be filed and a complaint lodged about the interpretation, application, or compliance with the terms of the Agreement with respect to the terminations. The failure to do so will be considered an action predicated upon racially discriminatory motivation, which is a breach of the duty of fair representation and breach by the Employers of the labor contract. The above-referenced employees demand that there be adjustment or grievance of the terminations of said employees to the extent that the Agreement provides relief.

    The above-referenced individuals also assert that their rights have been violated as set forth under the provisions of M.G.L. c. 151B, §4(2) and the federal laws regarding employment discrimination. The individuals are in a protected class due to their national heritage and have been treated in a disparate manner. They will assert their rights for remedies beyond the scope of the National Labor Relations Act, including but not limited to: front wages, punitive damages, interest, costs, and attorneys' fees. Above all, there is no overlap between the Employers' and Unions' labor practices and discriminatory conduct. For example, the Shop Steward, Jose Ortiz, was not provided with the Union Constitution. Significantly, the Agreement does not provide for the effects of the terminations of said employees. Nor does the Agreement reflect effects bargaining. We submit that the Union and the companies are liable for all remedies available under the state and the federal anti-discrimination laws.

    Kindly within fourteen (14) days respond adequately to this demand for relief to the extent that you, and/or your agents, have engaged in unfair labor practices

and/or breached the duty of fair representation within the meaning of the National Labor Relations Act. Furthermore, the above-referenced individuals expressly reserve the right to pursue claims under state and federal antidiscrimination laws.

Emphasis added.

84. However, the union offered to do nothing for them by letter dated March 18, 2004. See Ex. 18.

85. On April 1, 2004, the plaintiffs again wrote the defendants,

I also informed you that, although grievances were filed on behalf of a number of employees, they certainly were not filed on behalf of all of the employees who lost their jobs. Ex. 19.

86. However, the union offered to do nothing for them by letter dated April 7, 2004. See Ex. 20.

87. On May 5, 2004 the plaintiffs filed a complaint and the plaintiffs filed an amended complaint. The plaintiffs have exhausted their administrative remedies and received an EEOC right to sue letter. The individuals are in a protected class due to their national heritage and have been treated in a disparate manner. MCAD Charge (Exhibit 20A)

88. Binding Admissions

In discovery, the union made the following binding admissions. The most significant admission is that the union never grieved any discharges. Deposition of Lowell Alexander, p. 24. The hourly wage at this plant starts off at $7.00. The union dues of all Steelworkers are 1.3% of the wage. Id. 21. With respect to other plants, Alexander answered that Sealy Mattress, Bee-Bee Rubber; Rosboro Plastics had plant