closing severance language in the collective bargaining agreements. The instant plant did not, nor was it requested in negotiations, Id. 94-95. Furthermore, there was no negotiation of the effects of closing the plant, only bumping rights and medical benefits, id. At 100. (Bumping rights involve intra-union seniority.) There was no right to severance here but there was at the Sealy Mattress, Bee-Bee Rubber, Rosboro Plastics plants. The union provided all drafts of the collective bargaining agreement in English and only the binding one was in Spanish. Id. at 14. There was no provision for severance or plant closing in this agreement. Id. at 11 and 28. The prospect of a plant closing was not even an issue in the collective bargaining at this plant. Id. 15. For, the Union had not checked the books of Farnsworth Fibre and Sherman-Feinberg to find out their financial picture although the union wrote the companies in 2002 to request them. Alexander heard scuttlebutt about them taking the money and converting the building into a condominium at one of the meetings prior to the company closing. Id. at 18. The plant had no apprenticeship or training program. Id. at 54. Although there were fires until the closing of the plant, the union was unaware of fires at the plant even though its representative visited the plant. Id. at 84. The union did not know whether employer kept material data safety slips. Id. at 76. There was no hazard safety program or health and safety officer at the plant. Id. at 77 and 81. Alexander had been a Steelworker union steward for the gas company; he learned when there was catastrophic injury in his steward capacity; and he simply does not know why he never learned of catastrophic injury at this entirely Latino plant when he was union representative. Id. at 85.

89. On May 7, 2004 the discrimination charge was filed; and on May 5, 2004 this lawsuit was filed and later amended after administrative exhaustion of remedies.

## Legal Standard

The Court is to view evidence from the entire summary judgment record, in the light most favorable to plaintiffs as the non-moving parties, and give them the benefit of every inference, and avoid credibility determinations, to determine whether any material fact is in controversy, and whether the defendant union establishes its entitlement to judgment as a matter of law, and not use summary judgment as a docket clearing device. *Fernandes v. Costa Brothers Masonry, Inc.,* 199 F.3d 572 (1st Cir. 1999) (vacating summary judgment order involving national origin case). See also *Cargill v. Harvard University,* 60 Mass. App. Ct. 585 (2004) (rejecting the nearly universal practice of using summary judgment as a docket-clearing device for discrimination cases).

## Legal Discussion

The key concept of the case is described by the senior judge of the United States District Court in Rhode Island. See *Rainey v. Warren and United Steelworkers of America,* 80 F. Supp. 2d 5 (D.R.I. 2000) (holding in favor of employees against the United Steelworkers Union on very similar facts.) [2]

> To ensure that discrimination and harassment are rooted out of the workplace, Title VII makes both employers and labor organizations

---

[2] This is not a union bashing case. As Andrew Stern of the Service Employees International Union stated: "There are problems for manufacturing unions who have to organize industries that are going to stay in this country, but for Steelworkers... [g]oing after *all kinds of workers is not a successful strategy.*" See, e.g., Janice Fine, ed., "Debating Labor's Future," The Nation, August 1-8, 2005. This is an understatement in the context of this discrimination case. A Steelworker like Mr. Alexander worked at the phone company for $40.00 an hour, and there were protections in place like safety programs and grievances. Mr. Soto, also a Steelworker, worked for $13.00 an hour, and there were no grievances, safety committees, invitations to meetings, etc.

accountable for their discriminatory acts. If Title VII only included the former it would often fail in its mission. This is because labor organizations stand as a firewall, as protection for its members, in the face of employer discrimination. Labor organizations therefore occupy a critical battle-line position in fighting discrimination and harassment. As a result, labor organizations can either choose to fight the good fight or tacitly encourage employer discrimination and harassment by intentionally failing to stand their guard. Id. at 8.

Under § 703(c) of Title VII, a "labor organization," such as the Union, may not discriminate. See *42 U.S.C. § 2000e-2*(c) and 2(m) ("an unlawful employment practice is established when the complaining party demonstrates that...national origin was a motivating factor for an employment practice, even though other factors also motivated the practice.") *Fernades*, op cit. 199 F.3d 572,580 (1999). The Supreme Court has determined that a mixed motive case can proceed on circumstantial evidence alone. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 93-95 (2003). See *Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 429-30 (1st Cir. 2000) ("In fact, one might question whether these bright lines [between direct and indirect evidence] are so helpful in the end... In appeals after trial, this and other courts have recognized the need for flexibility and have sometimes bypassed these approaches and instead looked at whether the totality of the evidence permits a finding of discrimination." (citations omitted)). This case has much express and circumstantial evidence of discrimination.

1. There is Material Evidence of Circumstantial Evidence in the Totality of the Evidence

The plaintiffs easily meet the burden shifting framework set forth in *Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254-256 (1981)* and *McDonnell Douglas*

*Corp. v. Green, 411 U.S. 792, 802 (1973).* It is clear that the disparate treatment claim is a "pretext" claim. *Hazen Paper Co. v. Biggins, 507 U.S. 604 (1993)..* In an employer pretext case, a plaintiff will submit evidence which casts doubt on the legitimate reasons offered by the employer, or would allow a fact finder to infer that discrimination was more likely than not a motivating cause for the decision made by the employer. In other words, because the fact finder may infer from the combination of the plaintiff's prima facie case and its own rejection of the employer's non-discriminatory reasons that it unlawfully discriminated against the plaintiff and was merely trying to conceal its act with the articulated reasons, see id., a plaintiff who has established a prima facie case may defeat a motion for summary judgment by pointing to circumstantial or direct evidence that discrimination was more likely than not a motivating factor for the action taken. These same rules apply when the defendant is a labor union. Proof patterns for establishing union liability in disparate treatment claims where the union is alleged to have discriminated actively will not differ from the pattern in cases involving an employer's discriminatory hiring or promotion policies. See, e.g., *Lucas v. Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, 741 F. Supp. 136 (N.D.Ohio 1989),* aff'd., *904 F.2d 707 (6th Cir. 1990); Pennsylvania v. Local 542, Int'l Union of Operating Engineers, 469 F. Supp. 329 (E.D.Pa. 1978),* aff'd, *648 F.2d 922* (3rd Cir.), rev'd on other grounds, *458 U.S. 375 (1981);* Larson, 2 *Employment Discrimination, § 37.04* (2nd ed. 1999). *Fuentes v. Perskie, 32 F.3d 759, 764 (3rd Cir. 1994)* ("holding that a plaintiff can avoid summary judgment by pointing to some evidence from which a fact finder could reasonably conclude that defendant's proffered reasons were fabricated"). It may only be a coincidence that each Plaintiff is a member of a protected class, industrial fire hazards

at the plant were ignored, the plant closed without any negotiations for the protections of effects bargaining, there were no grievance of terminations at any time including when requested by the plaintiffs through their lawyer, no collective bargaining agreement was translated into Spanish until negotiations were over and, thus, the horse was out of the barn, no safety or union rights notices in English or Spanish were placed in the plant, and no audits by the union of the company were done. Moreover, it may only be a coincidence that every other Steelworker plant agreement had severance benefits be a subject of negotiations, and had severance benefits language in the agreement, but not at this plant. The plaintiffs' burden of proof in establishing a prima facie case under Title VII is de minimis. *See Theater of Barbour v. Dynamic Research*, 63 F.3d 32, 38(1st Cir. 1995).

It is met here. There was no negotiation about the effects of the plant closing for severance when the plant closed in November, 2003 for the Latino workforce. There was a fire at the plant in November, 2003. There was no posting of union notices at the time the plant closed in November, 2003. The union was unaware of safety hazards at the plant even though its representative visited the plant in November, 2003. The union did not know whether employer kept material data safety slips in November, 2003. There was no hazard safety program or health and safety officer at the plant in November, 2003. In March and April 2004, the plaintiffs requested national origin grievances, and the defendant unions refused to process them. With respect to other plants, Alexander answered that Sealy Mattress, Bee-Bee Rubber; Rosboro Plastics had plant closing severance language in the collective bargaining agreements. The instant plant did not, nor was it requested in negotiations. Furthermore, there was no negotiation of the effects of

43

closing the plant, only bumping rights and medical benefits. (Bumping rights involve intra-union seniority.)

Several plaintiffs stated that the felt that the treatment they received from the employer and the Defendant Union was due to their race and the fact that they did not speak English. There is no doubt that there was no interpreter available for Jose Ortiz and Miguel DeJesus during the CBA negotiations. There is no dispute that the Plaintiffs were not provided with copies of the CBA in Spanish prior to the vote. There is no dispute that the Defendant Union never posted any notices in Spanish or English. Eulogio Ortiz lost two fingers at the plant. Ramon Rodriquez fell and hurt his back while at work. He was out 4-5 days and the employer did not pay him for that time. He told the shop steward that he was not paid but nothing came of it. There were no notices posted informing him he could contact the Defendant Union directly about his complaint. Euclides Soto cut his face on a broken machine. Prior to his injury, he had spoken to Jose Ortiz about the broken machine. Jose Ortiz told him he would speak to the owners about it but the machine was not fixed until after his injury. At the plant, Juan Colon Ortiz worked with the paint which was used on the mattress material. He testified that the paint smelled very strong and he was given only a little mask to wear. He would change his clothes into work clothes at the beginning of his shift although there was no changing station nor were there any showers to use at the end of his shift. While working at the plant he developed a lung problem in which he had trouble breathing and would cough up blood two to three times a week. He had to stop working for a while because of his lung problem. The Defendant Union did nothing to help him with his problem.

The conditions of the plant made it such that a fire broke out at the time of the plant's closing. The plaintiffs were told by the employer to extinguish the fires themselves and that they were not given any protection against the smoke they inhaled and that the fire department was rarely called. Wilfredo Ortiz recalls having to get on top of the room to put out a fire, all the while inhaling the smoke from the fire. Clemente Hernandez can only recall one time when the fire department was called to respond to a fire at the plant. He also recalls that he inhaled a lot of smoke from the fires. Clemente Hernandez asked Jose Ortiz to speak to the Union about the fires but that the Union did nothing about the situation.

Lowell Alexander acknowledged that as Union Representative, it was his obligation to make sure that the employer followed health and safety policies although he never checked to determine what, if any, policies were in place. The machinery with which the Plaintiffs worked was heavy and antiquated. Some machinery was so old that the employer could not get replacement parts in the event a machine broke. Even Mr. Alexander acknowledged that the machinery in the plant was old. Despite the fact that the plaintiffs were working with heavy very old machinery, Mr. Alexander never did anything to ensure that the employer developed a written hazard program. He never checked if the employer kept material safety data sheets.

According to Mr. Alexander, the Defendant Union would address safety concerns if they became aware of them, even in the absence of a formal complaint. Several plaintiffs stated that dust was flying all over the place all the time. Mr. Alexander was on-site of the plant on more than one occasion. He had the opportunity to see the dust flying all over the place, yet he never took any steps to ensure that the employer had

proper ventilation for the plant. He or anyone else from the Defendant Union never walked around the plant to examine whether the plaintiffs were protected from fire, dust or chemicals. Mr. Alexander acknowledged that he has "in past practice" grieved things that were not within the specific terms of the collective bargaining agreement. Only studied obtuseness would designate these 26 factors, separate and/or together, to coincidence and not discrimination.

The non-discriminatory reason proffered by the Unions for not protecting the plaintiffs, i.e., Ortiz was a lousy steward, is untenable. In discovery, the union made the following binding admissions. The most significant admission is that the union never grieved any discharges. The hourly wage at this plant starts off at $7.00. The union dues of all Steelworkers are 1.3% of the wage. There was no bargaining before or after the plant closing for severance here but there was at the Sealy Mattress, Bee-Bee Rubber, Rosboro Plastics plants. The union provided all drafts of the collective bargaining agreement in English and only the binding one was in Spanish. There was no provision for severance or plant closing in this agreement. The prospect of a plant closing was not even an issue in the collective bargaining at this plant. For, the Union had not checked the books of Farnsworth Fibre and Sherman-Feinberg to find out their financial picture although the union wrote the companies in 2002 to request them. Alexander heard scuttlebutt about them taking the money and converting the building into a condominium at one of the meetings prior to the company closing. The plant had no apprenticeship or training program. Although there were fires until the closing of the plant, the union was unaware of fires at the plant even though its representative visited the plant. The union did not know whether employer kept material data safety slips. There was no hazard

safety program or health and safety officer at the plant. Alexander had been a Steelworker union steward for the gas company; he learned when there was catastrophic injury in his steward capacity; and he simply does not know why he never learned of catastrophic injury at this entirely Latino plant when he was union representative.

As the First Circuit has recently held in a "pretext" Title VII case, at this stage in the summary judgment analysis, "an inquiring court does not ask whether the plaintiff has adduced direct evidence of discrimination, but asks instead whether the evidence presented, regardless of its character, suffices to raise a genuine issue about the pretextuality of the employer's explanation for" its challenged acts." *Fernandes v. Costa Brothers Masonry, Inc.*, 199 F.3d 572 (1st Cir. 1999). See also *Rainey, supra.;* and *Draft[updated 5/12/05] Pattern Jury Instructions for Employment Discrimination for the District Courts of the United States Court of Appeals for the First Circuit.*

The defendants misconceived the evidentiary burden borne by plaintiffs who attempt to prove discrimination through indirect evidence. In *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 511 (1993), the Court stated that, because the fact finder's disbelief of the reasons put forward by the defendant, together with the elements of the prima facie case, may suffice to show intentional discrimination, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination. Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it can be quite persuasive. See *id.,* at 517. In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the union is dissembling to cover up a discriminatory purpose. See, *e. g., Wright v. West,* 505 U.S. 277, 296 (1992).

Moreover, once the union's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the union is in the best position to put forth the actual reason for its decision. Cf. *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978). Such a showing by the plaintiff will not *always* be adequate to sustain a jury's liability finding but is sufficient to defeat a motion for summary judgment. Certainly there will be instances where, although the plaintiff has established a prima facie case and introduced sufficient evidence to reject the employer's explanation, no rational fact finder could conclude that discrimination had occurred. This Court need not—and could not—resolve all such circumstances here on the summary judgment record. In this case, it suffices to say that a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated for purposes of judgment. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 141-149 (2000); see also *Seymore v. Shawver & Sons, Inc.*, 111 F.3d 794, 798 (10th Cir.), cert. denied, *522 U.S. 935, 139 L. Ed. 2d 266, 118 S. Ct. 342 (1997)* (stating that a union "cannot acquiesce in a company's prohibited employment discrimination and expect to evade Title VII liability . . .")[3]. In light of the severe and constant harassment endured by plaintiff, of which the union was aware, it is reasonable to infer, for purposes of this motion, that the Local Union failed to file grievances because of some

---

[3] In *E.E.O.C. v. Regency Architectural Metals Corp., 896 F. Supp. 260, 269 (D.Conn.1995)*, despite the union official's stated reason for not processing the grievance, the "contradictory explanations for failing to help . . . require[d the court] to look deeper for actual motivation." See also *Durko v. Oi-Neg TV Products, Inc., 870 F. Supp. 1268, 1277 (M.D.Pa.1994.)*

discriminatory motive or attitude which pervaded the Union, especially as every inference is to be read in favor of the plaintiffs.

## 2. There is Material Evidence of Direct Evidence

Several plaintiffs stated that the felt that the treatment they received from the Defendant Union was due to their race and the fact that they did not speak English. See Plaintiffs' Statement of Additional Facts No. 68. First, the union would never get together with members alone. Second, when the union interpreter spoke, she was pedantic, repugnant; and she spoke in a bad way. Third, none of the membership ever was invited to the quarterly meetings of the Steelworkers. Fourth, one worker observed that since all union members have rights, the fact that the plant was all Hispanics, and they did not speak the language, the union would take *"vengeance"* on them because of that. These hardly are "stray comments." The fact-finder does not have the luxury of simply marginalizing these comments, because these parties are poor, uneducated factory workers. The opposite is more likely to be true: these statements have the ring of truth to them: they show express discrimination. In *Fernandes v. Costa Brothers Masonry, Inc.,* 199 F.3d 572 (1st Cir. 1999), the First Circuit found it difficult in the subtle nuances of discrimination to tell express evidence of discrimination from pretextuality. This is true on this record, too. How can these disturbing observations, four in number, be packaged for legal analysis as the neat boxes of express or circumstantial evidence? On the limited record, however, of a summary judgment motion, reading this record with every inference leant to the plaintiffs, there is at least one material fact in controversy, even on the issue of express evidence of discrimination, making this a mixed-motive case, and

nixing the entry of summary judgment. This also seems to be a case for mixed motive analysis. Here, there is direct evidence of discrimination.

3. The *Goodman* analysis.

In *Goodman v. Lukens Steel Co.*, 482 U.S. 656 (1987), individual employees of Lukens Steel Company (Lukens) brought suit , asserting racial discrimination claims against their collective-bargaining agents, the United Steelworkers of America, which is the same defendant as this defendant, and two of its local unions (Unions). The District Court concluded that the Unions were guilty of discriminatory practices, specifically in failing to challenge discriminatory discharges of probationary employees, failing and refusing to assert instances of racial discrimination as grievances, and in tolerating and tacitly encouraging racial harassment. Here, the claims are very similar, and overlap with respect to failing to assert instances of racial discrimination as grievances despite express requests, and in tolerating and tacitly encouraging racial harassment. Competence and capacity to contract shall not depend upon race. It is thus part of a federal law barring racial discrimination, which, as the Court of Appeals said, is a fundamental injury to the individual rights of a person with far-reaching economic consequences that does not change this conclusion, since such impact flows from guaranteeing the personal right to engage in economically significant activity free from racially discriminatory interference." Id. at 660-662.

The *Goodman* case was tried for 32 days in 1980 and was not disposed of on summary judgment. One-hundred fifty-seven witnesses testified and over 2,000 exhibits were introduced. The District Court proceeded found the Unions to have discriminated on

racial grounds in certain ways: failing to challenge discriminatory discharges of probationary employees; failure and refusal to assert racial discrimination as a ground for grievances; and toleration and tacit encouragement of racial harassment. Id. at 665.

The Steelworkers Union contended (in *Goodman* and now) "that any judgment against them rests on the erroneous legal premise that discrimination laws are violated if a union passively sits by and does not affirmatively oppose the employer's racially discriminatory employment practices." This abstract notion is not at play in this case. It is true, however, that the District Court in *Goodman* declared that mere union passivity in the face of employer discrimination renders the union liable if racial animus is properly inferable. The evidence in *Goodman* and this case proves 'far more' than mere passivity. In *Goodman* and this case, the collective-bargaining contract contained an express clause binding both the employer and the Unions not to discriminate on racial grounds; that the employer was discriminating against blacks and Latinos in discharging probationary employees, which the Unions were aware of but refused to do anything about by way of filing proffered grievances or otherwise; that the Unions had ignored grievances based on instances of harassment which were racial in nature; and that the Unions had refused to include assertions of racial discrimination in grievances that also asserted other contract violations (i.e., bumping and vacation rights while 100% Latino discharge). Id. at 666. In affirming the District Court's findings against the Unions, the Court of Appeals also appeared to hold that the Unions had an affirmative duty to combat employer discrimination in the workplace. But it, too, held that the case against the Unions was much stronger than one of mere acquiescence in that the Unions deliberately chose not to assert claims of racial discrimination by the employer as is the case in the instant action.

51

It was the Court of Appeals' view that these intentional and knowing refusals discriminated against the victims who were entitled to have their grievances heard. The Unions insisted that it was error to hold them liable for not including racial discrimination claims in grievances claiming other violations of the contract. The Unions followed this practice, it was urged, because these grievances could be resolved without making racial allegations and because the employer would "get its back up" if racial bias was charged, thereby making it much more difficult to prevail. The trial judge, although initially impressed by this seemingly neutral reason for failing to press race discrimination claims, ultimately found the explanation "unacceptable" because the Unions also ignored grievances which involved racial harassment violating the contract covenant against racial discrimination but which did not also violate another provision just like the case now before the court. In the judgment of the District Court, the virtual failure by the Unions to file any race-bias grievances until after this lawsuit started, knowing that the employer was practicing what the contract prevented, rendered the Unions' explanation for their conduct unconvincing. A collective-bargaining agent could not, without violating discrimination laws, follow a policy of refusing to file grievable racial discrimination claims however strong they might be and however sure the agent was that the employer was discriminating against blacks. The Unions, in effect, categorized racial grievances as unworthy of pursuit and, while pursuing other legitimate grievances, ignored racial discrimination claims on behalf of blacks and Latinos, knowing that the employer was discriminating in violation of the contract. Such conduct, the courts below concluded, intentionally discriminated against blacks seeking a remedy for disparate treatment based on their race and violated the discrimination laws.

## B. Given the Poverty and Remarkable Suffering, Equitable Tolling Applies

All of the plaintiffs originally came to Boston from either Puerto Rico or the Dominican Republic. It is undisputed that most do not speak or read English. Many have only a grade school education that they received outside the United States.

Significantly, the First Circuit has ruled that an employer's failure to post statutory notices informing employees of their legal rights provides an affirmative basis for applying equitable tolling in the context of a Title VII suit and established six separate equitable grounds for tolling. *Mercado v. The Ritz Carlton San Juan Hotel, Spa & Casino*, 410 F.3d 41 (1st Cir. 2005)(where the employees have asserted that no informational notices were posted and that they had no knowledge of their legal rights until informed by their attorney, they have met the threshold requirements for avoiding dismissal of their suit). No informational notices were posted by the union or employer. The union did not bargain for, or even notice, that no informational notices were posted, and that the membership had no knowledge of their legal rights.

> Here, where appellants have asserted that no informational notices were posted and that they had no knowledge of their legal rights until informed by their attorney, they have met the threshold requirements for avoiding dismissal of their Title VII suit. *See Kale*, 861 F.2d at 753 ("If . . . the employee has no knowledge of his rights and his ignorance is due to misleading conduct by the defendant *or* failure of the defendant to post the required EEOC notices, then an initial case for equitable tolling has been made.") (emphasis added). The viability of their claims beyond that preliminary stage will depend, however, upon facts that have yet to be developed. Courts generally weigh five factors when considering whether to allow equitable tolling in a particular case: "'(1) lack of actual notice of the filing requirement; (2) lack of constructive knowledge of the filing requirement; (3) diligence in pursuing one's rights; (4) absence of prejudice to the defendant; and (5) a plaintiff's reasonableness in remaining ignorant of the [filing] requirement.'" *Kelley v. N.L.R.B.*, 79 F.3d 1238, 1248 (1st Cir. 1996) (quoting *Kale*, 861 F.2d at 752). These factors are not exhaustive, however; "[i]t is in the nature of equity to entertain case-specific factors that may counsel in favor of tolling."

The First Circuit emphasized that "the doctrine of equitable tolling is **_not_** to be exercised sparingly". Id.

The factual inquiry in this case thus must begin with an examination of the failure of the union to post notices, process grievances, invite the Hispanic membership to meetings and only appearing for contract negotiations. Therefore, there was lack of actual notice of the filing requirement. There is nothing in the way of this overwhelmingly poor and underserved membership suggesting lack of constructive knowledge of the filing requirement. Once the membership contacted a labor lawyer with 27 years experience representing trade unions and public sector unions, they showed diligence in pursuing one's rights by demanding bargaining in March 2004, and filing a lawsuit within four months of the plant closing. The union received the demand letter and did nothing to help the membership so there is no prejudice to the union. Even the most callow young lawyer or hardened trial lawyer would see reasonableness in their remaining ignorant of the filing requirement. No court in the nature of equity could fail to entertain case-specific factors expressed in severed fingers, constant plant fires, no discharge negotiations that may counsel in favor of tolling. Eulogio Ortiz lost two fingers at the plant. Ramon Rodriquez fell and hurt his back while at work. He was out 4-5 days and the employer did not pay him for that time. He told the shop steward that he was not paid but nothing came of it. There were no notices posted informing him he could contact the Defendant Union directly about his complaint. Euclides Soto cut his face on a broken machine. Prior to his injury, he had spoken to Jose Ortiz about the broken machine. Jose Ortiz told him he would speak to the owners about it but the machine was not fixed until after his

54

injury. Plaintiffs made between $10 and $14 per hour at the time of the plant's closing, Angel Baez Deposition at p. 15; Most would rather still work under the horrible conditions which they did because it was a job and jobs are hard to get. At the plant, Juan Colon Ortiz worked with the paint which was used on the mattress material. He testified that the paint smelled very strong and he was given only a little mask to wear. He would change his clothes into work clothes at the beginning of his shift although there was no changing station nor were there any showers to use at the end of his shift. While working at the plant he developed a lung problem in which he had trouble breathing and would cough up blood two to three times a week. He had to stop working for a while because of his lung problem. The Defendant Union did nothing to help him with his problem.

The conditions of the plant made it such that fires were constantly breaking out right up until the plant's closing. Elison Pena recalls that the last fire occurred in November, 2003. The plaintiffs were told by the employer to extinguish the fires themselves and that they were not given any protection against the smoke they inhaled and that the fire department was rarely called. Wilfredo Ortiz recalls having to get on top of the room to put out a fire, all the while inhaling the smoke from the fire. Clemente Hernandez can only recall one time when the fire department was called to respond to a fire at the plant. He also recalls that he inhaled a lot of smoke from the fires. Clemente Hernandez asked Jose Ortiz to speak to the Union about the fires but that the Union did nothing about the situation.

Lowell Alexander acknowledged that as Union Representative, it was his obligation to make sure that the employer followed health and safety policies although he

never checked to determine what, if any, policies were in place. The machinery with which the Plaintiffs worked was heavy and antiquated. Some machinery was so old that the employer could not get replacement parts in the event a machine broke. Even Mr. Alexander acknowledged that the machinery in the plant was old. Despite the fact that the plaintiffs were working with heavy very old machinery, Mr. Alexander never did anything to ensure that the employer developed a written hazard program. He never checked if the employer kept material safety data sheets. According to Mr. Alexander, the Defendant Union would address safety concerns if they became aware of them, even in the absence of a formal complaint. Several plaintiffs stated that dust was flying all over the place all the time. Mr. Alexander was on-site of the plant on more than one occasion. He had the opportunity to see the dust flying all over the place, yet he never took any steps to ensure that the employer had proper ventilation for the plant. He or anyone else from the Defendant Union never walked around the plant to examine whether the plaintiffs were protected from fire, dust or chemicals. Mr. Alexander acknowledged that he has "in past practice" grieved things that were not within the specific terms of the collective bargaining agreement. Clemente Hernandez agreed with the description the condition of the plant was "like hell" and that the employer and union treated the workers "like dogs." It was the worst place he has ever worked in. Euclides Soto stated that the plant reminded him of hell because it was extremely hot because the ovens were on all the time and there was a lot of smoke and dust and no ventilation. Luis Martinez felt he was discriminated against by the Defendant Union. He said "[t]hey treated us like garbage. They treated us like nobody. We paid our union dues for so many years and they never gave us any sort of support, any help, and they didn't

represent us in any way." Euclides Soto felt that the union "left us like dogs" when the plant closed because they did nothing to help them. Since the plant's closing, Miriam Caminero has been depressed because she has had difficulty finding a new job and she has three children to support and to pay rent. . The unemployment benefits she received was not enough to make ends meet. For Luis Martinez, after the unemployment benefits ran out, he went through "a lot of troubles and hunger for almost a year." He was very nervous because he did not have money for food or rent. He wanted to go home to Puerto Rico but he did not have the money. Additionally, he had no money to send to his family in Puerto Rico whom he supports. For Eulogio Ortiz, since the plant's closing, he does not sleep well anymore and he does not feel well. He feels humiliated because he has to receive welfare benefits. For Ramon Martinez who is in his sixties and worked at the plant for 25 years liked his job at the plant and wanted to keep working. Since the plant's closing, he has felt very bad to the extent that he could not bear to pass by the plant so he moved to Florida. For Euclides Soto, since the plant's closing, he has felt bad because he paid his union dues thinking that the Defendant Union would assist him but in the end, the Defendant Union did nothing for him when the plant closed. Furthermore, he has lost sleep and is depressed since the plant's closing because he does not make enough money to support his five children and pay his bills which are overdue.

## C. The Statute of Limitations Does Not Bar Action

### 1. Notice of Claim

Whether the union's actions (or inactions) were sufficient either to make the plaintiff aware of the discrimination, or to enable him to form a reasonable belief thereof, is a

factual issue for trial. The membership had no notice of the claim for discrimination until the plant closed, nor were they aware of a claim until then for a duty of fair representation claim. The Court is to view evidence about the notice of the claim from the entire summary judgment record, in the light most favorable to plaintiffs as the non-moving parties, and give them the benefit of every inference, and avoid credibility determinations, to determine whether any material fact is in controversy with respect to whether the notice of claim occurred prior to the plant closing when they lost their jobs. It is also consistent with the rule applied in tort cases concerning when the statutorily provided three-year limitations period begins to run. See, e.g., *Olsen v. Bell Tel. Labs., Inc.*, 388 Mass. 171, 175 (1983) ("cause of action [for negligence resulting in an insidious occupational disease] did not accrue before [plaintiff] knew or should reasonably have known that he had contracted [the disease] as a result of conduct of the defendants"). The defendants have not shown, or shown the complete absence of material facts in controversy, that the cause of action for discrimination resulting in an insidious adverse employment situation did not accrue before the plaintiffs knew or should reasonably have known that they had suffered discrimination as a result of conduct of the defendants. There simply is no flagging of the claim evident on this summary judgment record, coalescing harm and knowledge of the union's discrimination until the plant closing. See, e.g., *Ocean Spray Cranberries, Inc. v. Massachusetts Commission Against Discrimination*, 441 Mass. 632, 686 N.E. 2d 1303 (2004) (adopts liberal limitations standard requiring harm and awareness of harm for acts to be measured within filing period in an employment discharge case).

## 2. There is Material Evidence of Continuing Violation

In *National Railroad v. Morgan*, 536 U.S. 101 at 115-118 (2002), the Supreme Court defined the continuing violation doctrine.

The unlawful employment practice therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts... Such claims are based on the cumulative affect of individual acts...Workplace conduct is not measured in isolation . . . . , we look to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. To assess whether a court may, for the purposes of determining liability, review all such conduct, including those acts that occur outside the filing period, we again look to the statute. It provides that a charge must be filed within 180 or 300 days after the alleged unlawful employment practice occurred. A hostile work environment claim is comprised of a series of separate acts that collectively constitute one "unlawful employment practice. The timely filing provision only requires that a plaintiff file a charge within a certain number of days after the unlawful practice happened. It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability. That act need not, however, be the last act. As long as the employer has engaged in enough activity to make out an actionable hostile environment claim, an unlawful employment practice has occurred, even if it is still occurring. Subsequent events, however, may still be part of the one hostile work environment claim and a charge may be filed at a later date and still encompass the whole.

It is precisely because the entire hostile work environment encompasses a single unlawful employment practice that we do not hold, as have some of the Circuits, that the plaintiff may not base a suit on individual acts that occurred outside the statute of limitations unless it would have been unreasonable to expect the plaintiff to sue before the statute ran on such conduct. The statute does not separate individual acts that are part of the hostile environment claim from the whole for the purposes of timely filing and liability. And the statute does not contain a requirement that the employee file a charge prior to 180 or 300 days after the single unlawful practice occurred. Given, therefore, that the incidents comprising a hostile work environment are part of one unlawful employment practice, the employer may be liable for all acts that are part of this single claim. In order for the charge to be timely, the employee need only file a charge within

180 or 300 days of any act that is part of the hostile work environment. (Case and statute citations and internal quotations omitted.)[4]

As to serial misconduct, the most significant admission is that the union never grieved any discharges. The membership never was invited to the union meetings. Furthermore, there was no negotiation of the effects of closing the plant, only bumping rights and medical benefits. There was no right to severance negotiated here at the plant closing, but there was at the Sealy Mattress, Bee-Bee Rubber, Rosboro Plastics plants. Alexander heard scuttlebutt about them taking the money and converting the building into a condominium at one of the meetings prior to the company closing. The plant had no apprenticeship or training program. Although there were fires until the closing of the plant, the union was unaware of fires at the plant even though its representative visited the plant. The union did not know whether employer kept material data safety slips. There was no hazard safety program or health and safety officer at the plant. Alexander had been a Steelworker union steward for the gas company; he learned when there was catastrophic injury in his steward capacity; and he simply does not know why he never

---

[4] This issue was also addressed in *Lynn Teachers Union, Local 1037 v. Massachusetts Commission against Discrimination*, 406 Mass. 515 (1990). That case arose because the school committee of Lynn had a rule in the 1960's and 1970's requiring teachers to resign if they became pregnant. Id. at 517. Several teachers who had become pregnant, had been forced to resign, and subsequently had returned to teaching challenged their union's seniority system, id. at 517-518, which gave credit only for "consecutive years" of experience teaching in Lynn, id. at 518. The teachers who had been forced to resign during pregnancy lost seniority credit for all of the years that they taught before being forced to resign. Id. The court upheld the commission's application of the continuing violation doctrine, reasoning that a "seniority system which is so 'facially neutral' that it ignores prior discriminatory acts against its members, to the detriment of those members, presents a ready vehicle for application of the continuing violation rule." Id. at 522.

learned of catastrophic injury at this entirely Latino plant when he was union representative. In March and April 2004, the plaintiffs requested grievances and the defendant unions refused to process them. If this workplace conduct is not measured in isolation, the great frequency of the discriminatory conduct; its palpable severity; where it is physically threatening and humiliating, over and above merely offensive utterances and it unreasonably interferes with an employee's work performance.

This exception for violations of a continuing nature "recognizes that some claims of discrimination involve a series of related events that have to be viewed in their totality in order to assess adequately their discriminatory nature and impact." *Cuddyer v. Stop & Shop Supermarket Co.*, 434 Mass. 521, 531 (2001). For the continuing violation doctrine to apply, a complainant must ordinarily prove that: "(1) at least one discriminatory act occurred within the 300 day limitations period (here, 1) there was no negotiation about the effects of the plant closing for severance when the plant closed in November, 2003; or 2) there was a fire at the plant in November, 2003; or 3) there was no posting of union notices at the time the plant closed in November, 2003; or 4) the union was unaware of safety hazards at the plant even though its representative visited the plant in November, 2003 ; or 5) or the union did not know whether employer kept material data safety slips in November, 2003; or 6) there was no hazard safety program or health and safety officer at the plant in November, 2003; or, finally, 7) in March and April 2004, the plaintiffs requested grievances and the defendant unions refused to process them.); (2) the alleged timely discriminatory acts have a substantial relationship to the alleged untimely discriminatory acts (the union only points to its long history of neglect to prove that there was discrimination then and now, which is unpleasant and cynical); (3) earlier violations

outside the 300 day limitations period did not trigger each plaintiff's awareness and duty to assert his rights, i.e., that plaintiff could not have formed a reasonable belief at the time the employment actions occurred that they were discriminatory.

### 3. The *Morgan* Doctrine if there are discreet discriminatory acts

Alternatively, as Justice Thomas opined[5] "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the 180- or 300-day time period after the discrete discriminatory act occurred. The existence of past acts and the employee's prior knowledge of their occurrence, however, do not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed. Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim. The statute of limitations requirement is still met if at least one act falls within the 300-day period. Here there was at least one independently discriminatory act in the three hundred day period: 1) there was no negotiation about the effects of the plant closing for severance when the plant closed in November, 2003; or 2) there was a fire at the plant in November, 2003; or 3) there was no posting of union notices at the time the plant closed in November, 2003; or 4) the union was unaware of safety hazards at the plant even though its representative visited the plant in November, 2003 ; or 5) or the union did not know whether employer kept material data safety slips in November, 2003; or 6) there

---

[5] See also the equitable tolling remedies in *Mercado v. The Ritz Carlton San Juan Hotel, Spa & Casino*, 410 F.3d 41 (1st Cir. 2005).

was no hazard safety program or health and safety officer at the plant in November, 2003; or, finally, 7) in March and April 2004, the plaintiffs requested grievances and the defendant unions refused to process them.[6] The law of continuing violations is composed of a number of discriminatory acts emanating from the same discriminatory animus, each act constituting a separate wrong actionable under Title VII. In the case at hand, there is at least one allegedly discriminatory material act that occurred within the limitations period of 300 days.

### 4. The *Goodman* Doctrine

In Defendant's Brief in Support of Motion for Summary Judgment, at p. 38, Defendants cite *Goodman v. Lukens Steel Company*, 482 U. S. 656 (1987) to argue that the case applies to this one. The plaintiffs agree. In *Goodman v. Lukens Steel Co.*, 482 U.S. 656 (1987), the Supreme Court adopted  a three year statute of limitations for discriminatory practices in failing to process discharges, in failing to assert instances of racial discrimination as grievances, and in tolerating and tacitly encouraging racial harassment. Here, the claims, after discovery, involve Title II, Title VII and 42 U.S.C. §§ 1981, 1982, 1983, G. L. Ch. 151 B § 4 and 42 U.S.C. § 2000e-2(c) and 2(m) Labor Management Act, § 301, 29 U.S.C. § 185, and defenses under 29 U.S.C. § 159(a) and  29 U.S.C. § 157.  Under the liberal pleadings requirements of the First Circuit, "a complaint need not point to the appropriate statute or law in order to raise a claim for relief... [a] complaint  sufficiently raises a claim even if it points to the wrong legal theory as a basis

---

[6] Combined, this makes 5,040 possible outcomes if these facts are calculated together in geometric or algebraic progression. It really makes it hard to say any one of these facts, or any of them in combination, does not make a material fact in controversy. The other out is that none of these facts is discriminatory, but it would be a great leap in logic to say that none of them are, where the workforce is Latino, and there was, inter alia, no effects bargaining after the plant closing, and no grieving of the lay off of this workforce, and a combination of 5040 possible discriminatory factors.

for that claim, as long as relief is possible under any set of facts that could be established consistent with the allegations." *Morales-Vallellanes v. Potter*, 339 F. 3d 9 (2003) (reversing entry of summary judgment).The defendants cited the *Goodman* precedent so it presumably applies to this case; and all of the acts complained of here occurred within three years of discovery of the claims. The court here would be correct in selecting the Massachusetts 3-year limitations period governing personal injury actions or six-year period for contract actions.

## D. Miscellaneous Other Defenses About State Law and Duty of Fair Representation

The Title VII claim is simply not pre-empted by federal labor law. Defendant admits it and it is true. So this case goes forward on Title VII grounds.

The presumption, of course, is against preemption for the 151 B claim. Preemption analysis relies of the assumption that 'the historic police powers of the States [are] not to be superseded by [a] Federal Act unless that was clear and manifest purpose of Congress.'" *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67, S.Ct. 1146, 91 L.Ed 1447 (1947). The burden is on the party seeking preemption to establish that enforcement of the state laws would frustrate and interfere with the purpose of the Federal Act. *See Abdu-Brisson v. Delta Air Lines, Inc.*, 128 F.3d 77, 83 (2nd Cir.1997) (citing *New York State Conf. Of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654 (1995); *Gade v. National Solid Wastes Management Ass'n* 505 U.S. 88, 98 (1992). *LaRosa v. UPS*, 23 F. Supp.2d 136 (D. Mass. 1998). The defendant's first preemption argument is that the plaintiff's claim is preempted by the collective bargaining agreement between the union and the employer which, among other things,

provides a grievance and arbitration procedure. Labor Management Act, § 301, 29 U.S.C. § 185. The argument fails, however, because the present controversy concerns the plaintiff's rights under state and federal statutes which exist independently of the collective bargaining agreement and do not require interpretation of that agreement. *Livadas v. Bradshaw*, 512 U.S. 107, 123-124 (1994); *Hawaiian Airlines v. Norris*, 512 U.S. 246, 261 (1994). *Ralph v Lucent Tech.*, 135 F.3d 166, 171 (1st Cir. 1998) (applying federal law to MCAD proceeding).

The second pre-emption argument is a purely factual inquiry which likewise does not turn on the meaning of any provision of a collective-bargaining agreement. Thus, the state-law remedy in this case is "independent" of the collective bargaining agreement in the sense of "independent" that matters for § 301 pre-emption purposes: resolution of the state-law claim does not require construing the collective-bargaining agreement. *Lingle v. Norge Division of Magic Chef*, 413 U. S. 399,413(1988). ("In the typical case a state tribunal could resolve either a discriminatory or retaliatory discharge claim without interpreting the just cause language of a collective bargaining agreement.").

This case does not involve discrimination during a union job action. Compare *Local 12004 v. Massachusetts Commission Against Discrimination*, 377 F.3d 64 (1st Cir. 2004). The First Circuit reasoned as follows: "Most notably, there is no question that the insults and epithets that union members directed towards McGrath while they were picketing are, at the very least, arguably protected by § 7 of the NLRA. The NLRA clearly protects the right of picketing workers to use a variety of harsh and insulting speech -- including racial, ethnic, and homophobic slurs -- in furtherance of their § 7 right to engage in 'concerted activities for the purpose of collective bargaining or other mutual

aid or protection.' 29 U.S.C. § 157. *See, e.g., Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers, AFL-CIO v. Austin*, 418 U.S. 264, 283 (1974) ('[F]ederal law gives a union license to use intemperate, abusive, or insulting language without fear of restraint or penalty if it believes such rhetoric to be an effective means to make its point.'); *Milk Wagon Drivers Union of Chi., Local 753 v. Meadowmoor Dairies, Inc.*, 312 U.S. 287, 293 (1941) (peaceful picketing is protected despite 'moment[s] of animal exuberance'); *Nat'l Council of Young Israel*, 276 N.L.R.B. 1123, 1136 & n.14 (1985) (calling replacement workers '[n]iggers' was protected conduct under § 7); *Ben Pekin Corp.*, 181 N.L.R.B. 1025, 1028 (1970) ('[O]ffensive, vulgar, defamatory, or opprobrious remarks uttered during the course of protected, concerted activities will not automatically destroy the right conferred by the Act to engage in conduct otherwise safeguarded by its text.'). At the same time, it also may be 'facially conclusive' that at least the alleged instances in which union members made credible threats of violence against McGrath are arguably prohibited by § 8 of the NLRA. *See* 29 U.S.C. § 158(b)(1)(A)." The First Circuit only said this much. The Court did not uphold a finding of pre-emption. The Court only said that the case could go forward on preemption grounds in the District Court, for "arguably" there may be a violation of labor law. This case is the opposite. As the Supreme Court has said "a collective-bargaining agreement may, of course, contain information such as rate of pay and other economic benefits that might be helpful in determining the damages to which a worker prevailing in state-law is entitled. *See Baldrachhi v. Pratt & Whitney Aircraft Div, United Technologies Corp.*, 814 F.2d, at 106. Although federal law would govern the interpretation of the agreement to determine proper damages, the underlying state-law claim, not otherwise pre-empted, would stand.

Thus, as a general proposition, a state-law claim may depend for its resolution upon both the interpretation of a collective-bargaining agreement and separate state-law analysis that does not turn on the agreement. In such a case, federal law would govern the interpretation of the agreement, but the separate state-law analysis would not be thereby pre-empted. As we said in *Allis Chalmers Corp. v. Lueck*, U.S., at 211, "not every dispute...tangentially involving a collective-bargaining agreement, is pre-empted by §301...." *Lingle*, 486 U.S. at 399, 413, n.12. Nor does this case involve discrimination while an NLRB claim was pending, compare *Chalk Services v. Massachusetts Commission Against Discrimination*, 70 F.3d 1361 (1st Cir. 1995).

The preemption defense does not establish the elements of dismissal. All reasonable inferences which may be drawn from the complaint and which are favorable to the complainant establish a claim that is not pre-empted by the NLRA, the LRMA, an interpretation of the CBA, or a pending unfair labor charge (there is none). At worst, the state-law claim may depend for its resolution upon both the interpretation of a collective-bargaining agreement and separate state-law analysis that does not turn on the agreement. In such a case, federal law would govern the interpretation of the agreement, but the separate state-law analysis would not be thereby pre-empted. *Lingle*, 486 U.S. at 413, n. 12. If the judgment exceeds the Title VII cap on damages, the issue can be revisited but there is no substantive difference between the state and federal claims. When a labor organization has been selected as the exclusive representative of the employees in a bargaining unit, it has a duty, implied from its status under § 9(a) of the NLRA as the exclusive representative of the employees in the unit, to represent all members fairly. See, *e. g., Ford Motor Co. v. Huffman,* 345 U.S.330, 337 (1953); *Vaca v. Sipes,* 386 U.S.171,

177 (1967).In *Vaca v. Sipes,* the duty of fair representation requires a union "to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Ibid.* In other words, a union breaches the duty of fair representation when its conduct toward a member of the bargaining unit is arbitrary, discriminatory, or in bad faith. *Id.,* at 190. See also *Air Line Pilots v. O'Neill,* 499 U.S.65, 67 (1991) (reaffirming this tripartite standard). The court should also consider whether the union's conduct was arbitrary or in bad faith. The statutory duty of fair representation was first developed in cases involving allegations of racial discrimination by unions. See *Steele v. Louisville & Nashville Railroad, 323 U.S. 192 (1944 and Turnstall v. Brotherhood of Locomotive, Firemen and Enginemen,* 323 U.S. 210 (1944). As enunciated by the Supreme Court, the doctrine requires a union "to serve the interests of all members without hostility or discrimination toward any, to exercise discretion with complete good faith and honesty and to avoid arbitrary conduct." See *Vaca v. Sipes,* 386 U.S. 171, 177 (1967). Here,the prima facie case, described above in Part A, establishes enough material facts in controversy for the *Vaca* standand. Here, there was a duty on the part of the employer to negotiate the plant closing, and no such thing occurred, and the union failed to file a grievance about it, no matter what excuse it offered about being in or out of the collective bargaining agreement, as Alexander admitted. At the very least, Alexander could have asked for effects bargaining items like the severance benefits for people already making only $7.00-$14.00 an hour. It is a triable issue whether the union is correct when it contends that even though it failed to get protective plant closing language and it did not ask for it,

68

the union escapes liability. For, in March, 2004, every plaintiff asked in writing for the union to process grievances for termination, that is, for help, and got attacked.

Plaintiffs argue that work safety was arbitrarily omitted from this process. However, the union has a duty to negotiate over safety to conform to OSHA and should have asked for a safety officer or safety committee at this plant. The union collected fees and dues from bargaining unit employees under its statutory grant of authority to serve as the exclusive bargaining representative. But then it used that money for purposes wholly unrelated to the grant of authority that gave it the right to collect that money, and in ways that were antithetical to the interests of some of the workers that it was required to serve. This aspect of the union's conduct, and not just the fact that the conduct violated the statute, made the union's actions a breach of the duty of fair representation. Above all, the Plaintiffs (including the shop steward) demanded arbitration by the union in March and April 2004 and the defendant union refused to do anything for them. Therefore, there was a written request within the six months and there was a failure to enter any grievances for the layoff. *Montgomery v. City of Armore*, 365 F. 3d 926 (10th Cir. 2004); *Bakers v. IBP, Inc.*, 357 F. 3d 685 (7th Cir. 2004); and *Fiori v. Truck Drivers, Local 170*, 354 F. 3d 84 (1st Cir. 2004). The union's duty of fair representation is implied from its status as the exclusive bargaining representative of the bargaining unit workers. As such, the union is empowered to bargain collectively with the employer on behalf of all employees in the bargaining unit over wages, hours, and other terms and conditions of employment, § 9(a), 29 U.S.C. § 159(a), and it accordingly enjoys "broad authority . . . in the negotiation and administration of [the] collective bargaining contract." *Humphrey v. Moore*, 375 U.S. 335, 342 (1964). This broad authority, however, is tempered by the

union's "statutory obligation to serve the interests of all members without hostility or discrimination toward any," *Vaca v. Sipes*, 386 U.S. 171, 177 (1967), a duty that extends not only to the negotiation of the collective-bargaining agreement itself but also to the subsequent enforcement of that agreement, including the administration of any grievance procedure the agreement may establish. *Ibid.* The plaintiffs simply requested that the defendant Unions process their grievances in a simple straightforward letters in March and April 2004, but the Unions refused to grieve their claims. As a result, this is a classic and timely duty of fair representation claim brought to the federal court because the Unions would not comply with their duties under the federal labor law.

## E.  Correction of Misstatement of Law

When the union representing the employee in the grievance/arbitration procedure acts in such a discriminatory, dishonest, arbitrary, or perfunctory fashion as to breach its duty of fair representation . . . an employee may bring suit *either against* the employer and the union, or both. *DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151, 164 (1983). (Note the union misstated the United States Supreme Court holding in its submission).

With respect to the Duty of Fair Representation claim, the First circuit limned the cause of action in *Achilli v. John J. Nissen Baking Co.*, 989 F.2d 561 (1st Cir. 1993) in upholding a verdict for a union member against his union but not his employer, where the employer's violation of the law was minimal, and in the instant case the employer did not bargain about severance, but the primary violator, the union, is liable for the damages of a duty of fair representation claim. Here, the court could reasonably conclude that the

employer was not at fault. Hence, the district court's apportionment of all the damages to the union in *Nissen* is "reasonable and lawful." The evidence supported the district court's finding that the union failed to fulfill its legal obligation to represent its member Achilli fairly. See *Vaca*, 386 U.S. at 190. This obligation is a "judicially developed as a necessary corollary to the [union's] status of exclusive representative." The Developing Labor Law 1409 (Patrick Hardin ed., 3d ed. 1992), and perhaps does not require perfect representation, or even representation free of any negligence. *United Steelworkers of America, etc. v. Rawson,* 495 U.S. 362, 372-73 (1990). It does mean, however, that a labor organization will be liable if it significantly harms its members through actions that are arbitrary, reckless, or in bad faith. *Vaca*, 386 U.S. at 190. And, the evidence here, like Achilli, supports a finding that the union acted in bad faith, intentionally failing to represent the membership properly for reasons unrelated to legitimate union objectives. *Amalgamated Ass'n of Street, etc. v. Lockridge,* 403 U.S. 274, 301 (1971). The evidence shows no legitimate reason for the union's choice, and it does not show that a contrary choice would have hurt the union.

Although a breach of the duty of fair representation under the National Labor Relations Act can result in a violation of Title VII, it is not a necessary element of plaintiff's case to establish a union's violation of Title VII. See, e.g., *Farmer v. Local 1064, United Catering Workers, 1978 U.S. Dist. LEXIS 16407, 21 Fair Empl. Prac. Cas. (BNA) 1599, 1619-1621 (E.D.Mich.1978),* aff'd sub nom., *Farmer v. ARA Serv. Inc., 660 F.2d 1096, 1104 (6th Cir.1981)* ("In fact, it is almost axiomatic that a union's breach of the duty of fair representation also subjects it to liability under Title VII . . ."). Clearly, a union can violate Title VII absent a breach of its duty of fair representation. Id. It is

axiomatic that a union's failure to adequately represent union members in the face of employer discrimination may subject the union to liability under either Title VII or its duty of fair representation. See 2 Larson, *Employment Discrimination, § 37.05* (2nd ed. 1999) (although the two theories overlap great deal they are not identical since there are different standards that apply to each).

## F. Conclusion

This motion should be denied, and the case returned to the trial list forthwith, as each plaintiff has a presumptive right to a speedy trial, see, e.g., G.L. c. 151B, § 4, and many plaintiffs are homelessness and hungry.

Respectfully Submitted,

/s/ John Lee Diaz and Robert O. Berger
John Lee Diaz, Esq.
Robert O. Berger, BBO #: 038900
11 Beacon Street, Suite 1210
Boston, MA 02108
Tel (617) 423-7575
Attorney for Plaintiffs