# EXHIBIT 1

Eulogio Ortiz 3-24-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

20

1        my hand and took my hand away.

2    Q.  And is it fair to say that you are missing

3        one of your digits at a halfway point?

4    A.  Yes, and this one other next to it attached

5        to the side.

6    Q.  It was sewed back on?

7    A.  Yes.

8    Q.  And you wouldn't mind if we took a

9        photograph at some point, would you?

10               MR. LICHTEN:  Objection.

11   A.  Fine.

12   Q.  Now, you had indicated that you liked the

13       job and you wanted to stay.  What did the

14       union do to help you stay at your job?

15   A.  No, they didn't do anything.  And they left

16       other people working there that had been

17       there less time than I was.

18   Q.  Did the union ever let you know they were

19       having meetings of other members of --

20       strike that.  Did the union ever tell you or

21       notify you in any way about quarterly

22       meetings?

23   A.  No.

24   Q.  When you were supervising the ten people,

Eulogio Ortiz 3-24-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

21

1      did the union ever provide you with any

2      information about proper supervision?

3              MR. LICHTEN:  Objection.

4   A.  No.

5   Q.  Now, there appears to be some disagreement

6      here about whether Riquito Ortiz did his job

7      properly.

8              MR. LICHTEN:  Objection.

9   Q.  Do you have an opinion about that?

10  A.  He was a good worker.

11  Q.  And did he do the best he could to protect

12      your interests with the union?

13              MR. LICHTEN:  Objection.

14  A.  Yes, sir.

15  Q.  Do you believe it was because you are

16      Hispanic that the union did not invite you

17      to meetings or otherwise protect you?

18              MR. LICHTEN:  Objection.

19  A.  Yes.

20  Q.  Now, you have been out of work since the

21      plant closing; is that correct?

22  A.  Yes.

23  Q.  During this period of time, have you been

24      suffering emotionally?

Eulogio Ortiz 3-24-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

22

1    A.    Yes.

2    Q.    Please explain to us how.

3    A.    I can't sleep at night.  Things are not the

4          same.  I don't feel well.

5    Q.    Do you feel humiliated about being on

6          welfare?

7    A.    Yes, exactly.

8    Q.    Now, during, basically, your entire work

9          life, you have been a member of the union,

10         haven't you?

11   A.    Yes.

12   Q.    That union is the Steelworkers; is that

13         correct?

14   A.    Yes.

15   Q.    And is it your opinion that the union failed

16         you because you are Hispanic?

17               MR. LICHTEN:  Objection.

18   A.    Yes.

19   Q.    And one of your colleagues said that you

20         were treated like dogs.  Do you agree with

21         that characterization?

22               MR. LICHTEN:  Objection.

23   A.    Yes.

24   Q.    During the entire period that you worked at

Eulogio Ortiz 3-24-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

23



1        the plant, did the union ever observe your

2        workplace?

3   A.   No, not that I know of.

4   Q.   They would just go into the headquarters

5        where the bosses were?

6            MR. LICHTEN:  Objection.

7   A.   Yes, to the office.

8   Q.   Did you form an opinion as to whether you

9        thought, to use the parlance, the union was

10       in the pocket of the company?

11           MR. LICHTEN:  Objection.

12  A.   Yes.

13  Q.   What was your opinion?

14          MR. LICHTEN:  Objection.

15  A.   Yes, because every time they would come

16       over, they would go straight only to their

17       office.  And then they would send someone to

18       tell us, stop all the machines and make sure

19       that everybody comes down, and then a guy

20       from the union would come down.  They would

21       stop the machines, make us come all the way

22       down.  Then when we went down, the people

23       from the union would go in there, and they

24       would be speaking to them.

# EXHIBIT 2

Antonio Martinez 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

15

1    A.    No.

2    Q.    Now, in the plant were there fires constantly?

3    A.    Oh, yes.

4    Q.    And in the plant, was there dust flying around?

5    A.    Too much, a lot.

6    Q.    In the plant, did people lose fingers?

7    A.    Yes.

8    Q.    And how many fingers were lost in this plant?

9               MR. LICHTEN:  Objection.

10    A.    I just remember one person that lost two fingers.

11    Q.    And how many faces were cut and scarred?

12               MR. LICHTEN:  Objection.

13    A.    I don't remember.

14    Q.    Do you have any reason to believe that the union was

15          not aware of the fires or the cuts or the people who

16          lost fingers?

17               MR. LICHTEN:  Objection.

18    A.    I'm not sure.

19    Q.    Well, what safety -- what did the union -- well,

20          strike that.

21               Did the union have a bulletin board

22          for posting notices?

23    A.    No.

24    Q.    Did the union ever give you any notices of meetings?

Antonio Martinez 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

16

1    A.    No.

2    Q.    Did the union -- let me just ask it this way:  Do

3          you believe that the union discriminated against

4          you?

5                        MR. LICHTEN:  Objection.

6    A.    Absolutely.

7    Q.    When and how?

8    A.    I think that they discriminated against us because

9          first of all, they didn't help us.  Also, we were

10         not -- they didn't tell us when the company was

11         going to close.  And every time there was some sort

12         of a -- we had to draw up a contract or some sort of

13         complication, they would always go to the office,

14         their office, and spend a long time there.  And then

15         afterwards when they would come to us, they would

16         say, "Oh, you know what?  Whatever the company

17         says."

18   Q.    Now, where were you born and raised?

19   A.    Puerto Rico.

20   Q.    Where in Puerto Rico?

21   A.    Yabucco, Puerto Rico.

22   Q.    Were you treated differently there than you were in

23         this plant?

24                        MR. LICHTEN:  Objection.

# EXHIBIT 3

Wilfredo Ortiz 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

23

| | | |
|---|---|---|
| 1 | | MR. LICHTEN:   Objection. |
| 2 | A. | I thought that well, like I said before, that before |
| 3 | | the union would speak to him, that first, they would |
| 4 | | go to their office. |
| 5 | Q. | Now, do you think that their going to the office |
| 6 | | instead of dealing with you was discriminatory with |
| 7 | | respect to you and with respect to the workforce? |
| 8 | | MR. LICHTEN:   Objection. |
| 9 | A. | Yes. |
| 10 | Q. | Could you explain why. |
| 11 | | MR. LICHTEN:   Objection. |
| 12 | A. | Because he would go to the office and whatever the |
| 13 | | office would say, that's what they would tell us |
| 14 | | that's what -- us do. |
| 15 | Q. | Is it safe to say that you and the other Hispanic |
| 16 | | workers were denied a voice in the process? |
| 17 | | MR. LICHTEN:   Objection. |
| 18 | A. | Yes. |
| 19 | Q. | And do you believe that the motive for doing that |
| 20 | | was to keep your wages as Hispanics very, very low? |
| 21 | | MR. LICHTEN:   Objection. |
| 22 | A. | Yes. |
| 23 | Q. | And do you see the attorney laughing? |
| 24 | A. | Yes. |

Wilfredo Ortiz 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

24

1    Q.    Does that seem insulting to you?

2    A.    Yes.

3    Q.    Is it a form of intimidation or humiliation being

4          expressed --

5                        MR. LICHTEN:  Mr. Berger, you're

6          getting a little out of control here.

7    A.    Yes.

8                        MR. BERGER:  Could I get the last

9          question before the laughter.

10                       (Question read)

11   Q.    Can you answer that, please.

12   A.    No.  I don't think so, but since we all have rights,

13         the fact that we're Hispanics and we didn't speak

14         the language, they would take vengeance on us

15         because of that.

16   Q.    Take advantage of you?

17                       THE INTERPRETER:  Vengeance.

18   Q.    Okay.  But do you mean take advantage of you?

19   A.    Yes, like discriminating me.

20   Q.    Now, did the union similarly act in a way that was

21         motivated to get your union contributions without

22         shaking the boat with the employer at this point?

23                       MR. LICHTEN:  Objection.

24   A.    No.  The first thing they would do is they would go

Wilfredo Ortiz 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

25

```
1          to the office first and would talk to the people in

2          the office.  And for instance, we would ask for,

3          like, a dollar raise or something like that, they

4          would say no, no.  We'll give them 15, 20 cents.

5    Q.    Okay.  And do you think this was as a result of the

6          fact that the workforce was entirely Hispanic?

7                    MR. LICHTEN:  Objection.

8    A.    Yes.

9    Q.    Now, at any time, did the union invite any of you

10         Hispanic workers to their quarterly -- excuse me.

11                   Did the union ever invite you or any

12         of your Spanish coworkers to their quarterly

13         meetings?

14   A.    No.

15   Q.    Why not?

16   A.    That I know of, because they would negotiate amongst

17         themselves.

18   Q.    Now, did the union ever put up bulletin board for

19         you to give you information about anything?

20   A.    No.

21   Q.    Did the union provide any assistance to you about

22         the people who had suffered injuries like loss of

23         fingers, cutting of the face, and this kind of

24         thing?
```

Wilfredo Ortiz 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

26

1                    MR. LICHTEN:  Objection.

2    A.   No.

3    Q.   Tell me, is there any doubt in your mind whether

4         they know about people who had lost their fingers

5         and people who had been cut on their face?

6                    MR. LICHTEN:  Objection.

7    A.   Yes, I know I've seen them.  There have been many

8         accidents there.

9                    MR. LICHTEN:  Move to strike.  Not

10        responsive.

11   Q.   So you observed many accidents?

12                   MR. LICHTEN:  Objection.

13   A.   Yes.

14   Q.   Can you tell us about what you observed.

15   A.   There was the accident with Jose Ortiz.  I was

16        present then when the machine cracked [verbatim]

17        his finger.

18   Q.   And did he scream?

19   A.   No.  He didn't scream, but he was, like, holding it

20        in.

21   Q.   In fact, didn't the employer make him work an extra

22        15 minutes before he was relieved?

23                   MR. LICHTEN:  Objection.

24   A.   No, no.

Wilfredo Ortiz 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

27

1   Q.   How did it work?  What happened?

2   A.   He was cleaning the machine, and afterwards, the

3        machine was still running, and then the machine

4        cracked his finger, cut it.

5   Q.   And how old was that machine?

6                   MR. LICHTEN:  Objection.

7   A.   An antique.

8   Q.   A hundred years; do you think?

9   A.   Yeah.

10   Q.   Did the union ever look at any of machines like this

11        one where this accident happened?

12   A.   No.

13   Q.   You were going to describe other injures that

14        happened there?

15   A.   Yes.  There were people there too.

16   Q.   Now, did the union ever make sure that the plant

17        complied with federal laws like the Occupational

18        Safety Act?

19                   MR. LICHTEN:  Objection.

20   A.   I don't know.  I don't know.

21   Q.   Okay.  Well, did the union make sure that the

22        federal safety laws were complied with?

23                   MR. LICHTEN:  Objection.

24   A.   No.

Wilfredo Ortiz 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

28

1   Q.   Did they ever come to see whether any of you were

2        protected from the fires?

3                    MR. LICHTEN:   Objection.

4   A.   No.

5   Q.   And how about for the handling of paints and

6        chemicals?

7   A.   No.

8   Q.   Did, in your opinion, the union care about what

9        happened to the safety of the people in this plant

10       that consisted solely of Hispanics?

11                   MR. LICHTEN:   Objection.

12  A.   No.  They never cared for anything, no.

13  Q.   And you're not a member of the Upholstery Workers

14       Union, are you?  You're a member of the Steelworkers

15       union?

16                   MR. LICHTEN:   Objection.

17  A.   Yes.

18  Q.   You were in the Steelworkers union; right?

19  A.   Yes.

20  Q.   At any time, did the Steelworkers union provide you

21       any training, especially someone like you, who had

22       been the supervisor so that you could have more

23       skills in the workplace?

24                   MR. LICHTEN:   Objection.

Wilfredo Ortiz 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

29

1    A.    No.

2    Q.    Now, some individual was cut by a grinder and cut

3          three fingers -- were cut.  I think it was an

4          earlier testimony.  It was Jose Ortiz's uncle?

5                        MR. LICHTEN:  Objection.  Move to

6          strike.

7    Q.    Do you know anything about that?

8    A.    No.  I knew of Jose Ortiz, that he cut his finger.

9    Q.    And how about Mr. Baez; did you know about his

10         accident?

11                       MR. LICHTEN:  Objection.

12   A.    No.

13   Q.    Were there some grinder machines there?

14   A.    Yes.

15   Q.    How old were they?

16   A.    They're old.  They're antique.  They're so old they

17         don't even have replacement parts or pieces for

18         those machines.

19   Q.    And would you be surprised that somebody cut three

20         of their fingers on a machine like that?

21                       MR. LICHTEN:  Objection.

22   Q.    Is this gentleman laughing at you?

23                       MR. LICHTEN:  Again, I'm smiling at

24         your question that you would ask someone to engage

Wilfredo Ortiz 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

37

1    A.    Because they would never help us.

2    Q.    Please explain what you mean.

3    A.    Because on certain occasions, I was obligated -- we

4          were obligated to work overtime.  And sometimes,

5          they would make us -- make me extinguish fires by

6          ourselves.  Sometimes I would have to get on top of

7          a room myself to extinguish a fire on top of a

8          machine, and all of that smoke, I was inhaling.

9    Q.    In effect, did the union exploit you the way

10         employers exploit Hispanic workers?

11                     MR. LICHTEN:  Again, I think your

12         questions are completely --

13                     MR. BERGER:  You cannot put the sock

14         in someone's mouth.  Please let the man answer.

15                     MR. LICHTEN:  For the record, I think

16         your questions are inappropriate.  They're out of

17         bounds and sanctionable.

18                     MR. BERGER:  I think everything that

19         you did in the hallway borders on the ridiculous.

20         Screaming at another lawyer in the hallway.  I was

21         embarrassed for you.  So don't preach at me.

22                     THE INTERPRETER:  I'm sorry.  Could

23         you repeat the question, please.

24                     (Question read)

# EXHIBIT 4

Rafael Torres 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

14



1        and there's no time frame so I object to it.

2    A.   Exactly.

3    Q.   Okay.

4             MR. LICHTEN:  Let the record reflect

5        that Mr. Berger has called his client out into the

6        hallway.

7                  (Brief pause)

8             MR. LICHTEN:  Let the record reflect

9        that the witness is back in the room, having

10       conferred with his legal counsel.

11   Q.   Do you recall what your seniority date was at the

12       company -- what seniority date you were assigned at

13       Farnsworth Fibre?

14   A.   I don't understand the question.

15   Q.   You said that you believed that someone with less

16       seniority than you got a job, a daytime job, that

17       you have should have gotten; is that right?

18   A.   Yes.

19   Q.   Okay.  And do you know what the company was using as

20       your seniority date, that is, you know, what the

21       company was using as your seniority date?

22   A.   The initial date, the first day when I started my

23       job.

24   Q.   Which was in 1990?

Rafael Torres 3-23-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

21

1       know?

2    A.   Yes.

3    Q.   And did you vote for him to be the union steward?

4    A.   Yes.

5    Q.   Okay.  Did you ever bring any complaints or

6       grievances or concerns to him from the time he

7       became the union steward to the time the plant

8       closed?

9    A.   I don't remember.

10   Q.   Okay.  Did you ever attempt to call the Steelworkers

11      union office about a problem or a concern that you

12      were having at work?

13   A.   No, because they wouldn't allow us to call them

14      personally.  Instead, they would have to hear it

15      from our union representative.

16   Q.   And who told you that?

17   A.   The same president from the union.

18   Q.   Who was that?

19   A.   The president before that and the one that is

20      president now, but I don't remember their names.

21   Q.   Okay.  And when you say "president," do you mean the

22      representative from the Steelworkers union, or -- do

23      you mean the representative?

24   A.   The representative, the person that goes to the

Rafael Torres 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

22

1       company or whatever company. Whenever there's a

2       problem, the person that comes from their office.

3  Q.  I see. And when did they tell you this?

4  A.  The next one, I don't remember, the last one, but

5       the one that is there now.

6  Q.  That is -- he's a black man?

7  A.  Because at that moment, they had switched presidents

8       or representatives. At the time when they switched

9       them, we didn't know who the person was. We only

10      found out that there was another person assigned to

11      that post when they renewed, when there was some

12      sort of renewal. So we called him so we can get to

13      know who he was.

14  Q.  Okay.

15  A.  So that's when he told us that instant that we

16      couldn't call him personally, but instead, we should

17      refer our problem to the person in charge in our

18      factory so that he would call him.

19  Q.  "Him," being the union representative?

20  A.  Exactly.

21  Q.  I see. And were you at a meeting when -- do you

22      understand that the union rep that you're talking to

23      was Mr. Alexander who happens to be black?

24  A.  He's the union representative.

Rafael Torres 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

23

1   Q.   Okay.  And if I understand it, you were at a meeting

2        where he said words to the effect, If any of you

3        have a problem, you should contact the union

4        steward, and he'll contact me?

5   A.   Yes.

6                  MR. BERGER:  Can I hear that question

7        again before you answer.  Can I hear the question

8        and answer.

9                  (Question and answer read)

10                 MR. BERGER:  Objection.  Move to

11       strike.

12  Q.   And do you recall when that meeting was?

13  A.   I don't remember the date exactly, but I do remember

14       that it might have been the second visit that he

15       made.

16  Q.   Okay.  And did he have someone with him at the time?

17  A.   I don't remember quite well if he came alone.

18  Q.   Do you recall if he had a woman with him that helped

19       him translate?

20  A.   He came over to our place with her on two occasions,

21       but I don't remember the dates, which one of the

22       two.

23  Q.   And do I understand the first time he came over was

24       because he was contacted by the employees and asked

# EXHIBIT 5

Nelson Acevedo 3-24-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

17

```
 1    A.    I couldn't tell you.  I am not clear on
 2          that.
 3    Q.    Was it a notice from the workers'
 4          compensation board?
 5    A.    It was something similar, but I am not clear
 6          about it.
 7    Q.    Did you ever get invited to the quarterly
 8          meetings of the Steelworkers?
 9    A.    No, never.
10                MR. BERGER:  No further questions.
11                MR. LICHTEN:  Nothing further.
12          Thank you.
13                (Whereupon the deposition was
14                concluded at 11:57 a.m.)
15
16
17
18
19
20
21
22
23
24
```

# EXHIBIT 6

Juan R. Colon Ortiz 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

10

1          heart condition?

2   A.   When I went to the hospital, they gave me a checkup,

3          but I don't remember the date.

4   Q.   Was it before or after you stopped working at

5          Farnsworth Fibre?

6               THE INTERPRETER:  I mean, that he

7          went to the hospital?

8               MR. LICHTEN:  Yes, exactly.

9   A.   When I stopped working, yes.

10  Q.   So if I understand what you're saying, you believe

11         that your work at Farnsworth Fibre caused you to

12         have this heart condition; is that right?

13  A.   Yes, because my job was really hard.  They exploited

14         me there, and I used to work with all this different

15         [verbatim] tanks.  Different tanks, I would take

16         paint from one tank and put it in another tank.

17  Q.   Have any of your doctors told you that your heart

18         condition was caused by your work at Farnsworth

19         Fibre?

20  A.   Yes.  I left that place for a while because a

21         problem that I have with my lung or my lungs, and

22         they gave me some sort of pills, medication, to see

23         if it would clear them up, but --

24  Q.   Let me ask you:  Have any of your doctors told you

Juan R. Colon Ortiz 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

11

| | | |
|---|---|---|
| 1 | | that your medical condition was caused by the work |
| 2 | | at Farnsworth Fibre? |
| 3 | A. | No. The doctors haven't said that to me. |
| 4 | Q. | Have you filed any Workers' Compensation claim as a |
| 5 | | result of your -- the medical condition that you |
| 6 | | believe was caused by Farnsworth Fibre? |
| 7 | A. | No. |
| 8 | Q. | What was your job at Farnsworth Fibre for the last |
| 9 | | couple of years? |
| 10 | A. | I prepared these tanks. |
| 11 | Q. | What was in the tanks? |
| 12 | A. | It's paint, prepare the paint. |
| 13 | Q. | What was the paint used for? |
| 14 | A. | To paint the material. |
| 15 | Q. | How much were you getting paid when you stopped |
| 16 | | working at Farnsworth Fibre? |
| 17 | A. | I used to make 10.85 an hour. |
| 18 | Q. | And was there overtime work -- did you work overtime |
| 19 | | at Farnsworth Fibre? |
| 20 | A. | Yes. |
| 21 | Q. | And did you work a lot of -- in the last several |
| 22 | | years before you stopped working at Farnsworth |
| 23 | | Fibre, about how much overtime would you estimate |
| 24 | | you worked on average each week? |

Juan R. Colon Ortiz 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

19

| | | |
|---|---|---|
| 1 | Q. | So did you wear the same uniform every day? |
| 2 | A. | No.  It wasn't a uniform.  It was like -- |
| 3 | Q. | There was no uniform? |
| 4 | A. | Plain clothes. |
| 5 | Q. | Did you take any shower after you did your job? |
| 6 | A. | No.  Not there, no. |
| 7 | Q. | How often -- |
| 8 | A. | There were no showers there. |
| 9 | Q. | And how often did you change your clothes? |
| 10 | A. | I would bring my own clothes to work. |
| 11 | Q. | Was there a changing station? |
| 12 | A. | No. |
| 13 | Q. | So what did the chemicals smell like? |
| 14 | A. | It smelled like paint, like strong paint. |
| 15 | Q. | And do you know what was in the paint? |
| 16 | A. | No, I don't know. |
| 17 | Q. | Now, how many years did you work with the paint? |
| 18 | A. | 18 years. |
| 19 | Q. | And what are your problems with your lungs? |
| 20 | A. | Sometimes I don't breathe at all, and I cough or |
| 21 | | spit blood. |
| 22 | Q. | How much blood do you spit? |
| 23 | A. | Sometimes two or three times a week.  Now, I don't |
| 24 | | spit as much blood as I used to before because I'm |

Juan R. Colon Ortiz 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

20

1        taking the pills and I'm not there.

2   Q.   Did you go to the doctor because you were spitting

3        blood?

4   A.   Yes.

5   Q.   And who is your doctor?

6   A.   Manfio, M-A-N-F-I-O.

7   Q.   Now, when you were working there, did the union ever

8        supervise -- did the union even look at where you

9        worked?

10  A.   No.

11  Q.   Were you aware that they had meetings four times a

12       year?

13  A.   No, because I was working the night shift.  And if

14       they would come, they would come in the morning at

15       10.

16  Q.   Do you have any other friends who spit blood?

17            MR. LICHTEN:  Objection.

18  A.   No.  On the second floor, they would do some testing

19       for people's lungs with some sort of pump on the

20       second floor.  To the people upstairs, they would do

21       this testing, but they wouldn't test me.

22  Q.   Why not?

23  A.   I don't know.

24  Q.   Now, during the entire period you were there, did

# EXHIBIT 7

Miriam Caminero 3-24-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

17

1    Q.    Now, did he recruit you?

2    A.    Yes.  He told me that they needed people to

3          work there.

4    Q.    When you first arrived, did you fill out any

5          paperwork for the United Steelworkers?

6    A.    Yes.

7    Q.    Were those pension forms?

8    A.    Yes.  We would fill out, yes.

9    Q.    And do you recall that those pension forms

10         went to Pittsburgh, Pennsylvania?

11   A.    I don't know.

12   Q.    Now, were you ever invited to any meetings

13         of Local 421 of the United Steelworkers of

14         America?

15   A.    No, I never received anything.

16   Q.    Did they have a place where they posted

17         notices at the plant at Sherman-Feinberg?

18   A.    If they put any papers there, I don't know.

19         Since I don't speak English, I never

20         actually checked.

21   Q.    There was nothing in Spanish?

22   A.    No.

23   Q.    In 1995, what kind of work did you do?

24   A.    This thing with the machinery, the same

Miriam Caminero 3-24-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

21

1          MR. LICHTEN:  Objection.

2   A.   They said nothing.  They didn't say anything

3        to us about it, and they didn't protect us.

4        It is, like I said, they just abandoned us.

5        We have a family, and we just ended up in

6        midair practically.

7   Q.   So let me come back to midair in just one

8        minute.  Were you aware of anything in the

9        agreement to protect you when the plant

10       closed?

11  A.   No.

12  Q.   Now, do you believe that the union treated

13       you differently because you are Hispanic?

14          MR. LICHTEN:  Objection.

15  Q.   I will rephrase it.  Was everybody in the

16       plant Hispanic?

17  A.   Almost all.  All of them.

18  Q.   And do you think that the people who worked

19       there were treated fairly by the union?

20          MR. LICHTEN:  Objection.

21  A.   No.

22  Q.   Why do you say that?

23  A.   Because they were supposed to, when they

24       closed the factory, they were supposed to

Miriam Caminero 3-24-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

22

```
1        offer us something, some type of a job in a

2        another state or something.  But, for

3        instance, if they said, we have another job

4        that you can go to, for instance, in

5        Providence, then you go.  Okay.  In

6        Providence there is a job, then I would move

7        there with my family.

8    Q.  Did the union ever tell you that they had

9        gotten protections for people for plant

10       closings in other places?

11             MR. LICHTEN:  Objection.

12   A.  No.

13   Q.  Let me go through some things to refresh

14       your recollection.  They didn't mention to

15       you BB Rubber?

16             MR. LICHTEN:  Objection.

17   A.  No.

18   Q.  Did they mention to you Roseboro Plastics?

19             MR. LICHTEN:  Objection.

20   A.  No.

21   Q.  Did they mention Sealy Mattresses?

22   A.  No.

23   Q.  Now, can you tell us what happened to you

24       emotionally after you lost your job at the
```

# EXHIBIT 8

Page 70

1  questions.
2        MR. BERGER: I have some questions.
3
4        EXAMINATION
5  BY MR. BERGER:
6      Q   You worked for, according to this form,
7  around 42 hours on the negotiation of the contract
8  proofing; is that correct?
9      A   (Through the Interpreter) Yes, because I
10  could do this after I was finished with my -- after
11  I was finished working. And then we spent a little
12  time afterwards with Kenny and everything talking
13  about it.
14     Q   Did Kenny ever talk to you about
15  inserting plant-closing language into the
16  agreement?
17        THE INTERPRETER: I'm sorry, I didn't
18  hear that. Did Kenny ever talk to you --
19     Q   Did Kenny ever talk to you about
20  inserting plant-closing language into the
21  agreement?
22     A   (Through the Interpreter) No, he never
23  said anything.
24     Q   Never during those 42 hours?

Page 71

1      A   (Through the Interpreter) No.
2      Q   Did he ever mention the plant closings at
3  Sealy mattress?
4      A   (Through the Interpreter) No, no. I just
5  remember that day, the owner got us all together,
6  and they told us they were going to close the
7  factory.
8      Q   Did he ever -- did he ever talk to you
9  about BB Rubber?
10        THE INTERPRETER: I know BB Rubber,
11  but when you say "he," "he" who?
12  BY MR. BERGER:
13     Q   Did Mr. Alexander ever talk to you about
14  BB Rubber?
15     A   (Through the Interpreter) What is that?
16     Q   So you never heard of it?
17     A   (Through the Interpreter) No.
18     Q   And where is the workforce in your plant
19  from?
20     A   (Through the Interpreter) From Puerto
21  Rico.
22     Q   Now, are you a member of the Steelworkers
23  Union?
24     A   (Through the Interpreter) Well, from

Page 72

1  that, yes, that's what the union is.
2      Q   Okay.
3        So you're not a member of the --
4  you're a member of the Steelworkers, and you're a
5  member of Local 421-U?
6      A   Yes. The card says Steelworkers. It
7  also says 421-U.
8      Q   Did you know that you were in an
9  Upholstery Workers Union and not the Steelworkers?
10     A   (Through the Interpreter) No, that we
11  didn't know until now is I get to find out about
12  it.
13     Q   So the letters that you got were -- there
14  must be some letter in here from the Steelworkers,
15  one of these exhibits?
16        MR. DIAZ: Here.
17     Q   Will you look at this letter real
18  carefully and see if there's any reference
19  anyplace -- with the translator -- that refers to
20  you being an upholstery worker in connection with
21  this letter?
22     A   (Through the Interpreter) No, it doesn't
23  say. What it says is steelworker.
24     Q   Did you ever during this 42 hours that

Page 73

1  you were working on the negotiations, did you ever
2  discuss something called the Roseboro Plastics?
3      A   (Through the Interpreter) No, they never
4  mentioned that.
5      Q   Now, the final agreement -- the very
6  final agreement that was signed by everybody, was
7  there one set in English and one set in Spanish?
8        Did you get the final draft --
9        MR. LICHTEN: I'm sorry, was there an
10  answer?
11        THE INTERPRETER: I didn't hear an
12  answer. I just translated. He didn't answer.
13        MR. LICHTEN: Well, I --
14     A   (Through the Interpreter) Are we talking
15  about the contract that was written in Spanish?
16        Are we talking about the signatures
17  on the back?
18     Q   Yes.
19        The very final agreement, was it in
20  English or Spanish?
21     A   (Through the Interpreter) In English.
22  Everything was done in English. And then
23  afterwards, translated in Spanish.
24     Q   Okay.

19 (Pages 70 to 73)

O'Brien & Levine Court Reporting Services
888.825.DEPO(3376) * www.court-reporting.com
fb8531b1-6b0a-4e58-8542-b159acd0b1a9

## Page 94

1  union you used to deal with, correct?
2     A  (Through the Interpreter) Yes.
3     Q  But we understand that he retired on or
4  about 1999?
5     A  (Through the Interpreter) If not -- if
6  not, there was another guy, another guy there after
7  Dominic, but he was also kind of chubby and fat,
8  and he was --
9     Q  Now, do me a favor. You've got money on
10 you? You're going to have to pay a dollar each
11 time you cut somebody off, okay?
12      MR. DIAZ: Translate that to him. I
13 can do it in Spanish, but --
14    A  (Through the Interpreter) Okay.
15    Q  Each time you do it, you've got to pay a
16 dollar, okay?
17    A  (Through the Interpreter) That's fine.
18    Q  So after Dominic but before Lowell
19 Alexander, there was an individual you described as
20 a chubby, bald-headed guy, correct?
21    A  (Through the Interpreter) Yes.
22    Q  You don't know his name?
23    A  (Through the Interpreter) No, I don't
24 remember.

## Page 95

1     Q  He didn't speak Spanish, to the best of
2  your ability?
3     A  (Through the Interpreter) No, he was like
4  Italian.
5     Q  Did he have any meetings? Did he come to
6  the company to express what the union was there to
7  protect and serve?
8     A  (Through the Interpreter) He came over
9  once, like him, only the first time.
10    Q  So when Santiago Perez left and you
11 became the head union representative --
12      Correct?
13    A  (Through the Interpreter) Yes.
14    Q  -- did you receive any training from
15 anyone at the union as to what the proper grievance
16 procedure or what the proper procedure was to
17 communicate with which parties at any time?
18    A  (Through the Interpreter) No.
19    Q  So is it fair to say you didn't really
20 understand what the proper procedure was, other
21 than what your own interpretation was as to what
22 process to follow; is that correct?
23    A  (Through the Interpreter) Yes.
24    Q  And is it fair to say that no one from

## Page 96

1  the United Steelworkers of America and/or Local
2  421-U ever came to you to find out what your
3  proficiency in English was, correct?
4     A  (Through the Interpreter) No, they
5  didn't.
6     Q  And I'm changing gears to another area.
7       Whenever Mr. Lowell Alexander told
8  you about any meetings and you didn't have a
9  vehicle, was there any other form of transportation
10 or was there any other offer from the union as to
11 how to get you to a meeting or make sure that you
12 understood where the meetings were in advance so
13 that you could have made appropriate arrangements?
14    A  (Through the Interpreter) No.
15    Q  Changing gears to the last area of
16 questions I'm asking you, is it fair to say that
17 prior to the two weeks prior to the plant closing,
18 that Kenny told you the plant was closing, it came
19 as a surprise to you and the other workers that the
20 plant was closing?
21    A  (Through the Interpreter) Yes.
22    Q  And when you told Mr. Lowell Alexander
23 about it immediately, he came to the plant,
24 correct?

## Page 97

1     A  (Through the Interpreter) No. At that
2  time, no, because he was in negotiations with
3  something else, and I let the girl know.
4     Q  And the girl meaning the young lady who
5  was the interpreter?
6     A  (Through the Interpreter) Yes.
7     Q  But then at some point, Mr. Lowell
8  Alexander showed up, correct?
9     A  (Through the Interpreter) Yes.
10    Q  From the time that Lowell Alexander was
11 aware of the plant closing up to the present day,
12 have you and/or any of the other coworkers you had
13 at Farnsworth Fibre ever been offered another
14 position within the union or has the union ever
15 offered to help find you employment within the
16 United Steelworkers of America?
17    A  (Through the Interpreter) No.
18      MR. DIAZ: No further questions.
19 Thank you.
20      MR. LICHTEN: I just have one
21 question.
22      FURTHER EXAMINATION
23 BY MR. LICHTEN:
24    Q  You mentioned a while ago that some union

25 (Pages 94 to 97)

O'Brien & Levine Court Reporting Services
888.825.DEPO(3376) * www.court-reporting.com
fb8531b1-6b0a-4e58-8542-b159acd0b1a9



# EXHIBIT 9

Elison Pena 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

17

1          MR. LICHTEN:  I'll stick with the

2    question.

3          THE INTERPRETER:  Could you repeat

4    the question, please?

5          MR. LICHTEN:  Yes.  You can repeat

6    the question?

7          MR. BERGER:  In addition, it's asked

8    and answered.  He said he doesn't remember.

9          MR. LICHTEN:  I'll stick with the

10   question.

11         MR. BERGER:  Can you tell him what I

12   said?

13         THE INTERPRETER:  Okay.

14         MR. LICHTEN:  Can you read back the

15   question now?  Thank you.

16         (Record read as requested.)

17         MR. BERGER:  Objection.  Move to

18   strike.

19     A     (Through the Interpreter) They didn't

20   protect me.  They didn't protect us.

21   BY MR. LICHTEN:

22     Q     Okay.  Can you tell me what specifically

23   you believe the union should have done to protect

24   you that they did not do?

Elison Peña 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

18

1    A    (Through the Interpreter) They closed the

2    factory, and we were not -- we were not notified in

3    any way that they were going to close.

4              They didn't do anything to protect

5    us.

6    Q    And are there specific things that you

7    believe the United Steelworkers of America could

8    have done that they did not do to protect you

9    against the closing of this plant?

10             MR. BERGER:  Objection.  Move to

11   strike.

12             Request another question since that

13   really is a very speculative question for him.

14   He's not a union official.

15             MR. LICHTEN:  I'll stay with the

16   question, if you want to read it back.

17             (Record read as requested.)

18             MR. BERGER:  Objection.  Move to

19   strike.

20   A    (Through the Interpreter) They didn't

21   help us in any way.  I would pay the union dues

22   there for nothing.

23   Q    And, again, my question is are there

24   specific things that you believe they should have

Elison Pena 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

23

1    A    (Through the Interpreter) No, I don't

2   remember right now.

3    Q    Okay.

4        Do you remember anything -- did you

5   say anything at the meeting that you attended?

6    A    (Through the Interpreter) No, I would

7   always let myself to hear, to listen.

8    Q    Okay.

9        Are you aware of any instance in

10  which someone -- in which an employee at Farnsworth

11  complained about working conditions or that the

12  workplace was unsafe?

13   A    (Through the Interpreter) No.  Almost at

14  any time, we have to --

15        THE INTERPRETER:  Verbatim.

16   A    -- flee the place, because all of a

17  sudden, something could catch fire often, and all

18  of us would have to just flee the place all the

19  time.

20   Q    My question is do you know or anyone that

21  you know or anyone that you're aware of, did anyone

22  complain to Mr. Ortiz or to the Steelworkers about

23  any of these unsafe conditions?

24   A    (Through the Interpreter) I don't

Elison Pena 3-22-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation, et al.

25

1    the last question.

2            MR. BERGER:   In the view of the

3    threat of sanctions, I feel it's in my client's

4    best interest to withdraw the question.

5            Any further threats seem to me to be

6    subprofessional.   I would like you to rephrase it.

7            MR. LICHTEN:   Could you just read

8    back the question, please?

9            (Record read as requested.)

10    A     (Through the Interpreter) When she spoke,

11    she was sort of like pedantic, repugnant.

12            MR. DIAZ:   If I may, arrogant?   Is

13    that what you --

14            THE INTERPRETER:   "Repugnante" is

15    repugnant.

16            MR. DIAZ:   Obnoxious.

17            THE INTERPRETER:   "Repugnante" is

18    repugnant.   That's the word, and the synonym is

19    pedantic.   They're both the same word.

20            MR. DIAZ:   I defer to my brother.

21    A     (Through the Interpreter) She spoke in a

22    bad way.

23    Q     And when you say she spoke in a bad way,

24    what does that mean, she spoke in a bad way?

Elison Peña 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

26

1     A    (Through the Interpreter) Like she was

2  like -- like she was in favor of the person she was

3  with, that she didn't --

4         She wouldn't answer our questions

5  properly.  She wouldn't use an appropriate answer,

6  and she was leaning -- she would take their side of

7  it.

8     Q    Just so I'm clear, was she interpreting

9  what others were saying, or was she giving

10  information and making statements on her own and

11  not interpreting?

12         MR. DIAZ:  Let me object to the form,

13  Harold, because -- and if I may just make a

14  commentary, because if you establish that he knew

15  English, then he could know if she's making

16  commentary or interpreting.

17         So with that in mind, he can answer

18  it if he knows --

19         MR. LICHTEN:  Yes, that's right.

20         MR. DIAZ:  If he understands.

21         MR. LICHTEN:  That's a fair

22  statement.

23     A    (Through the Interpreter) No, no.

24     Q    Did she say anything to make you believe

Elison Pena 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

29

1  many times did you meet Mr. Alexander, the person

2  sitting next to me?

3  　　A　　(Through the Interpreter) I don't

4  remember.

5  　　Q　　Do you ever recall him saying or doing

6  anything that made you think that he was biased

7  against Hispanics?

8  　　A　　(Through the Interpreter) Because -- I

9  don't know, because he would never get together

10  with me.

11  　　Q　　When you say he would never get together

12  with you, did you ever ask to meet with him?

13  　　　　Did you ever ask to meet with him?

14  　　A　　(Through the Interpreter) I don't

15  remember.

16  　　Q　　Okay.

17  　　　　Did you ever ask Mr. Ortiz, the union

18  steward, to arrange a meeting with the Steelworkers

19  so that you could make any complaints or express

20  any grievances?

21  　　A　　(Through the Interpreter) I don't

22  remember.

23  　　Q　　Other than the plant closing, are there

24  any wages or benefits or other monetary things that

Elison Peña 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

36

1    for you?

2        A    (Through the Interpreter) None.

3        Q    What training program did the union have?

4        A    (Through the Interpreter) When the union

5    would go there, first they would go to their office

6    first.

7        Q    Okay.

8             Now, what equipment did the union

9    ensure was available for you?

10        A    (Through the Interpreter) None.

11        Q    So that we can make this clear, did you

12    say there were fires often in the plant?

13        A    (Through the Interpreter) Because of the

14    bad stuff, the conditions, the bad conditions the

15    factory was in.

16        Q    Okay.

17             MR. LICHTEN:  Objection.  Move to

18    strike.  Nonresponsive to the question.

19             MR. BERGER:  What's nonresponsive to

20    the question?

21             MR. LICHTEN:  It was a yes or no

22    question.

23             MR. BERGER:  Okay.  Fair enough.

24    BY MR. BERGER:

Elison Pena 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

37

1      Q    First thing is did you say there were

2 fires often in the plant earlier?

3      A    (Through the Interpreter) Yes.

4      Q   Okay.

5          Describe to us in detail the nature

6 of the fires in the plant.

7      A    (Through the Interpreter) Because there

8 were a lot of machines, machinery that was on, that

9 was turned on. And because of that, the

10 temperature was very, very hot.

11      Q    And there were fires during the entire

12 time that you were employed at the plant, correct?

13      A    (Through the Interpreter) Yes.

14      Q    Right until November of 2003?

15      A    (Through the Interpreter) Yes.

16      Q    How many people were hurt as a result of

17 these fires?

18      A    (Through the Interpreter) No, because if

19 we didn't call the fire department, we would sort

20 of extinguish the fire with fire extinguishers.

21      Q   Okay.

22          Did they provide any protection for

23 your breathing when there were constant fires at

24 this plant?

Elison Pena 3-22-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

38

1           MR. LICHTEN:  Who is "they"?

2           Objection to the form of the

3   question.

4           MR. BERGER:  Go ahead.  Answer it.

5   Obviously you know what I mean.

6       A    (Through the Interpreter) No.  We had to

7   take the water ourselves with all the smoke and

8   everything, we had to take everything outside.

9       Q    Did the union help you in any way about

10  this continuing fire situation?

11      A    (Through the Interpreter) No.

12      Q    Okay.

13           Could you tell us what you mean when

14  you said that the union left you like dogs?

15           MR. LICHTEN:  Objection to the form.

16           MR. BERGER:  Okay, I'll rephrase it.

17      Q    Did you use the phrase the union "left

18  you like dogs"?

19           MR. LICHTEN:  Objection to the form.

20      A    (Through the Interpreter) Yes.

21      Q    What did you mean?

22           MR. LICHTEN:  Objection.

23           MR. BERGER:  What's your objection

24  now?  It's a term he used.  What does it -- I mean

Elison Pena 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

39

```
1    this is getting ridiculous.

2              MR. DIAZ:  Let's keep on with the

3    questioning.

4              MR. BERGER:  It's ridiculous.

5      Q    Go ahead.

6              MR. DIAZ:  He objected, but he's not

7    telling him not to answer.  He objected because he

8    wants to preserve his rights.

9              If I misunderstand, let me know.

10             MR. BERGER:  Let me start it again.

11   BY MR. BERGER:

12     Q    Did you use the term that the union "left

13   you like dogs"?

14             MR. LICHTEN:  Objection.

15     A    (Through the Interpreter) Yes.

16     Q    What did you mean?

17             MR. LICHTEN:  Objection.

18     A    (Through the Interpreter) Because they

19   didn't pay attention to whatever was said there.

20     Q    Do you also have strong feelings about

21   the role of the union in the fires?

22             MR. LICHTEN:  Objection.

23     A    (Through the Interpreter) They never did

24   anything about it.
```

Elison Pena 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

41

1    very irresponsible.

2        Q    Okay.

3             Well, let me concentrate on during

4    the time that you were at Farnsworth Fibre.

5             Other than Jose Ortiz, were there

6    any -- was there anything in place for you as a

7    worker to know what process to follow in case

8    Mr. Ortiz was not at the job, was not doing his

9    job, or if you needed to contact someone directly

10   at either Local 421-U and/or United Steelworkers of

11   America?

12       A    (Through the Interpreter) No, they didn't

13   tell me anything.

14       Q    For example, was there a work area where

15   employees could have a posting so that they could

16   have something in Spanish saying contact the

17   Steelworkers at this number, we have a complaint,

18   or contact Local 421-U if you have a complaint,

19   something in Spanish with a phone number so that

20   you can contact someone directly?

21       A    (Through the Interpreter) No.

22       Q    Have you prior to November of 2003 known

23   individuals who are members of other unions?

24       A    (Through the Interpreter) No.

Elison Pena 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

45

1        A       (Through the Interpreter) No.

2        Q       Did they ever offer you at any time prior

3    to your being notified of the plant closings any

4    opportunity for job training, for advancement or to

5    move somewhere else where the union may have had

6    jobs, let's say, Cleveland, Ohio, or any other part

7    of the country?

8        A       (Through the Interpreter) No.

9        Q       Okay.

10               I suppose the next question may not

11   be allowed, but let me ask it anyway.

12               Were you in a position where if the

13   United Steelworkers of America had notified you

14   when the plant was closing that there was work in

15   another place, were you able to relocate?

16       A       (Through the Interpreter) Yes.

17       Q       Okay.

18               MR. DIAZ:  No further questions.

19               MR. LICHTEN:  I have a few more

20   questions, just to follow up.

21

22               FURTHER EXAMINATION

23   BY MR. LICHTEN:

24       Q       What training are you claiming the

# EXHIBIT 10

Lowell F. Alexander
Vol. 1, February 18, 2005

Euclides Soto, et al.   v.
Sherman-Feinberg Corporation, et al.

Page 21

[1]   **Q:** What are the union dues for the guys in
[2] Farnsworth and Sherman-Feinberg?
[3]   **A:** 1.3 percent or two and a half hour max for
[4] the —
[5]   **Q:** And what's the — what kind of income do
[6] these guys make, an average? Okay. I know there
[7] are varieties of seniority.
[8]   **A:** Right.
[9]   **Q:** But these guys make about 25 grand, right?
[10]   **A:** I couldn't tell you. I really don't know.
[11] I know what the hourly wage is in the contract.
[12]   **Q:** Okay. What's the hourly wage?
[13]   **A:** I believe it starts off at — I'm trying to
[14] think — 7 something.
[15]   **Q:** So let's figure it out.
[16]   **A:** That's entry, entry level.
[17]   **Q:** So what percentage of that 7 bucks goes
[18] into union dues?
[19]   **A:** It would be 1.3.
[20]   **Q:** And then at the high end, if somebody's
[21] making 20 bucks an hour?
[22]   **A:** The 1.3.
[23]   **Q:** Pardon me?
[24]   **A:** 1.3 percent.

Page 22

[1]   **Q:** Okay. And the paycheck they have has a
[2] dues checkoff — I mean, a number of things, right,
[3] their paycheck?
[4]   **A:** I don't know. I've never seen their
[5] paycheck.
[6]   **Q:** Oh, okay. The thing you get from the
[7] international has some withholding for your union
[8] pension fund, right?
[9]   **A:** I don't receive any of that. It all goes
[10] to Pittsburgh.
[11]   **Q:** No, I understand. When you get a paycheck
[12] face itself, okay, it has some checkoffs, right, for
[13] your pension fund or —
[14]   **A:** For my personal?
[15]   **Q:** Yeah.
[16]   **A:** Okay.
[17]   **Q:** I mean, it's not written by —
[18]   **A:** Yes.
[19]   **Q:** Okay.
[20]   **A:** Okay.
[21]   **Q:** So, it has — it's broken down. Now, what
[22] areas is it broken down in? We have pension
[23] contribution, right?
[24]   **A:** On mine, no. I don't believe mine has

Page 23

[1] pension.
[2]   **Q:** Health and welfare?
[3]   **A:** You mean medical?
[4]   **Q:** Uh-huh.
[5]   **A:** Yes, mine does.
[6]   **Q:** Okay. And does it have political action
[7] committee?
[8]   **A:** I believe so, yes.
[9]   **Q:** And do you have any reason to believe that
[10] their paycheck would look any different from yours?
[11] Maybe if you'd just compare them. In fact, would
[12] you mind giving me a copy of your paycheck through
[13] your counsel?
[14]   **MR. LICHTEN:** Yes, I mind.
[15]   **MR. BERGER:** Well, then, I'll make a
[16] request for it on the record under Rule 26, whatever
[17] it is.
[18]   **MR. LICHTEN:** Okay.
[19]   **Q:** Now, what were the mechanics here? You
[20] prepared the agreement in English. You prepared the
[21] agreement in Spanish. When did you get the
[22] agreement in Spanish to the two men who worked in
[23] the plant, the two representatives?
[24]   **A:** I don't recall.

Page 24

[1]   **Q:** All right. In other words, did they get
[2] the agreement in Spanish before the signing of the
[3] agreement?
[4]   **A:** I honestly don't recall. No. No. It was
[5] not before the signing. Wait a minute. They may
[6] have. They may have gotten it before the signing.
[7] Now that I'm thinking about the process, they may
[8] have.
[9]   **Q:** In mid October did you talk to Jose Ortiz
[10] about the pending shutdown of the facility?
[11]   **A:** Yes.
[12]   **Q:** What did you say?
[13]   **A:** That I had received the letter from the
[14] company notifying us that they were going to be
[15] closing October 31st, and we had a meeting with the
[16] membership.
[17]   **Q:** Now, did you ask for legal advice about
[18] what to do there?
[19]   **A:** Yes.
[20]   **Q:** I mean, talk to a lawyer about it?
[21]   **A:** Yes.
[22]   **Q:** Who did you talk to?
[23]   **A:** Our attorneys in Pittsburgh.
[24]   **Q:** All right. Did you talk to Theresa Merrill

# EXHIBIT 11

Elison Pena 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

17

1          MR. LICHTEN:  I'll stick with the

2    question.

3          THE INTERPRETER:  Could you repeat

4    the question, please?

5          MR. LICHTEN:  Yes.  You can repeat

6    the question?

7          MR. BERGER:  In addition, it's asked

8    and answered.  He said he doesn't remember.

9          MR. LICHTEN:  I'll stick with the

10   question.

11         MR. BERGER:  Can you tell him what I

12   said?

13         THE INTERPRETER:  Okay.

14         MR. LICHTEN:  Can you read back the

15   question now?  Thank you.

16         (Record read as requested.)

17         MR. BERGER:  Objection.  Move to

18   strike.

19   A    (Through the Interpreter) They didn't

20   protect me.  They didn't protect us.

21   BY MR. LICHTEN:

22   Q    Okay.  Can you tell me what specifically

23   you believe the union should have done to protect

24   you that they did not do?

Elison Peña 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

18

1    A    (Through the Interpreter) They closed the

2   factory, and we were not -- we were not notified in

3   any way that they were going to close.

4              They didn't do anything to protect

5   us.

6    Q    And are there specific things that you

7   believe the United Steelworkers of America could

8   have done that they did not do to protect you

9   against the closing of this plant?

10             MR. BERGER:  Objection.  Move to

11  strike.

12             Request another question since that

13  really is a very speculative question for him.

14  He's not a union official.

15             MR. LICHTEN:  I'll stay with the

16  question, if you want to read it back.

17             (Record read as requested.)

18             MR. BERGER:  Objection.  Move to

19  strike.

20   A    (Through the Interpreter) They didn't

21  help us in any way.  I would pay the union dues

22  there for nothing.

23   Q    And, again, my question is are there

24  specific things that you believe they should have

Elison Pena 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

23

1     A    (Through the Interpreter) No, I don't

2  remember right now.

3     Q   Okay.

4           Do you remember anything -- did you

5  say anything at the meeting that you attended?

6     A    (Through the Interpreter) No, I would

7  always let myself to hear, to listen.

8     Q   Okay.

9           Are you aware of any instance in

10  which someone -- in which an employee at Farnsworth

11  complained about working conditions or that the

12  workplace was unsafe?

13     A    (Through the Interpreter) No.  Almost at

14  any time, we have to --

15           THE INTERPRETER:  Verbatim.

16     A    -- flee the place, because all of a

17  sudden, something could catch fire often, and all

18  of us would have to just flee the place all the

19  time.

20     Q   My question is do you know or anyone that

21  you know or anyone that you're aware of, did anyone

22  complain to Mr. Ortiz or to the Steelworkers about

23  any of these unsafe conditions?

24     A    (Through the Interpreter) I don't

Elison Pena 3-22-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

25

1    the last question.

2              MR. BERGER:  In the view of the

3    threat of sanctions, I feel it's in my client's

4    best interest to withdraw the question.

5              Any further threats seem to me to be

6    subprofessional.  I would like you to rephrase it.

7              MR. LICHTEN:  Could you just read

8    back the question, please?

9              (Record read as requested.)

10       A    (Through the Interpreter) When she spoke,

11   she was sort of like pedantic, repugnant.

12              MR. DIAZ:  If I may, arrogant?  Is

13   that what you --

14              THE INTERPRETER:  "Repugnante" is

15   repugnant.

16              MR. DIAZ:  Obnoxious.

17              THE INTERPRETER:  "Repugnante" is

18   repugnant.  That's the word, and the synonym is

19   pedantic.  They're both the same word.

20              MR. DIAZ:  I defer to my brother.

21       A    (Through the Interpreter) She spoke in a

22   bad way.

23       Q    And when you say she spoke in a bad way,

24   what does that mean, she spoke in a bad way?

Elison Peña 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

26

1    A    (Through the Interpreter) Like she was

2  like -- like she was in favor of the person she was

3  with, that she didn't --

4           She wouldn't answer our questions

5  properly.  She wouldn't use an appropriate answer,

6  and she was leaning -- she would take their side of

7  it.

8    Q    Just so I'm clear, was she interpreting

9  what others were saying, or was she giving

10  information and making statements on her own and

11  not interpreting?

12           MR. DIAZ:  Let me object to the form,

13  Harold, because -- and if I may just make a

14  commentary, because if you establish that he knew

15  English, then he could know if she's making

16  commentary or interpreting.

17           So with that in mind, he can answer

18  it if he knows --

19           MR. LICHTEN:  Yes, that's right.

20           MR. DIAZ:  If he understands.

21           MR. LICHTEN:  That's a fair

22  statement.

23    A    (Through the Interpreter) No, no.

24    Q    Did she say anything to make you believe

Elison Pena 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation. et al.

29

1  many times did you meet Mr. Alexander, the person

2  sitting next to me?

3      A    (Through the Interpreter) I don't

4  remember.

5      Q    Do you ever recall him saying or doing

6  anything that made you think that he was biased

7  against Hispanics?

8      A    (Through the Interpreter) Because -- I

9  don't know, because he would never get together

10  with me.

11      Q    When you say he would never get together

12  with you, did you ever ask to meet with him?

13          Did you ever ask to meet with him?

14      A    (Through the Interpreter) I don't

15  remember.

16      Q    Okay.

17          Did you ever ask Mr. Ortiz, the union

18  steward, to arrange a meeting with the Steelworkers

19  so that you could make any complaints or express

20  any grievances?

21      A    (Through the Interpreter) I don't

22  remember.

23      Q    Other than the plant closing, are there

24  any wages or benefits or other monetary things that

Elison Peña 3-22-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

36

1    for you?

2         A    (Through the Interpreter) None.

3         Q    What training program did the union have?

4         A    (Through the Interpreter) When the union

5    would go there, first they would go to their office

6    first.

7         Q    Okay.

8              Now, what equipment did the union

9    ensure was available for you?

10        A    (Through the Interpreter) None.

11        Q    So that we can make this clear, did you

12   say there were fires often in the plant?

13        A    (Through the Interpreter) Because of the

14   bad stuff, the conditions, the bad conditions the

15   factory was in.

16        Q    Okay.

17             MR. LICHTEN:   Objection.   Move to

18   strike.   Nonresponsive to the question.

19             MR. BERGER:   What's nonresponsive to

20   the question?

21             MR. LICHTEN:   It was a yes or no

22   question.

23             MR. BERGER:   Okay.   Fair enough.

24   BY MR. BERGER:

Elison Pena 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

37

1      Q      First thing is did you say there were

2    fires often in the plant earlier?

3          A      (Through the Interpreter) Yes.

4          Q      Okay.

5                  Describe to us in detail the nature

6    of the fires in the plant.

7          A      (Through the Interpreter) Because there

8    were a lot of machines, machinery that was on, that

9    was turned on.  And because of that, the

10   temperature was very, very hot.

11         Q      And there were fires during the entire

12   time that you were employed at the plant, correct?

13         A      (Through the Interpreter) Yes.

14         Q      Right until November of 2003?

15         A      (Through the Interpreter) Yes.

16         Q      How many people were hurt as a result of

17   these fires?

18         A      (Through the Interpreter) No, because if

19   we didn't call the fire department, we would sort

20   of extinguish the fire with fire extinguishers.

21         Q      Okay.

22                 Did they provide any protection for

23   your breathing when there were constant fires at

24   this plant?

Elison Peña 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

38

```
 1              MR. LICHTEN:  Who is "they"?

 2              Objection to the form of the

 3   question.

 4              MR. BERGER:  Go ahead.  Answer it.

 5   Obviously you know what I mean.

 6      A     (Through the Interpreter) No.  We had to

 7   take the water ourselves with all the smoke and

 8   everything, we had to take everything outside.

 9      Q     Did the union help you in any way about

10   this continuing fire situation?

11      A     (Through the Interpreter) No.

12      Q     Okay.

13              Could you tell us what you mean when

14   you said that the union left you like dogs?

15              MR. LICHTEN:  Objection to the form.

16              MR. BERGER:  Okay, I'll rephrase it.

17      Q     Did you use the phrase the union "left

18   you like dogs"?

19              MR. LICHTEN:  Objection to the form.

20      A     (Through the Interpreter) Yes.

21      Q     What did you mean?

22              MR. LICHTEN:  Objection.

23              MR. BERGER:  What's your objection

24   now?  It's a term he used.  What does it -- I mean
```

Elison Pena 3-22-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

39

1    this is getting ridiculous.

2                MR. DIAZ:  Let's keep on with the

3    questioning.

4                MR. BERGER:  It's ridiculous.

5        Q     Go ahead.

6                MR. DIAZ:  He objected, but he's not

7    telling him not to answer.  He objected because he

8    wants to preserve his rights.

9                If I misunderstand, let me know.

10               MR. BERGER:  Let me start it again.

11   BY MR. BERGER:

12       Q     Did you use the term that the union "left

13   you like dogs"?

14               MR. LICHTEN:  Objection.

15       A     (Through the Interpreter) Yes.

16       Q     What did you mean?

17               MR. LICHTEN:  Objection.

18       A     (Through the Interpreter) Because they

19   didn't pay attention to whatever was said there.

20       Q     Do you also have strong feelings about

21   the role of the union in the fires?

22               MR. LICHTEN:  Objection.

23       A     (Through the Interpreter) They never did

24   anything about it.

Elison Pena 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation. et al.

41

1    very irresponsible.

2         Q    Okay.

3              Well, let me concentrate on during

4    the time that you were at Farnsworth Fibre.

5              Other than Jose Ortiz, were there

6    any -- was there anything in place for you as a

7    worker to know what process to follow in case

8    Mr. Ortiz was not at the job, was not doing his

9    job, or if you needed to contact someone directly

10   at either Local 421-U and/or United Steelworkers of

11   America?

12        A    (Through the Interpreter) No, they didn't

13   tell me anything.

14        Q    For example, was there a work area where

15   employees could have a posting so that they could

16   have something in Spanish saying contact the

17   Steelworkers at this number, we have a complaint,

18   or contact Local 421-U if you have a complaint,

19   something in Spanish with a phone number so that

20   you can contact someone directly?

21        A    (Through the Interpreter) No.

22        Q    Have you prior to November of 2003 known

23   individuals who are members of other unions?

24        A    (Through the Interpreter) No.

Elison Pena 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

45

1      A      (Through the Interpreter) No.

2      Q      Did they ever offer you at any time prior

3  to your being notified of the plant closings any

4  opportunity for job training, for advancement or to

5  move somewhere else where the union may have had

6  jobs, let's say, Cleveland, Ohio, or any other part

7  of the country?

8      A      (Through the Interpreter) No.

9      Q      Okay.

10            I suppose the next question may not

11  be allowed, but let me ask it anyway.

12            Were you in a position where if the

13  United Steelworkers of America had notified you

14  when the plant was closing that there was work in

15  another place, were you able to relocate?

16      A      (Through the Interpreter) Yes.

17      Q      Okay.

18            MR. DIAZ:  No further questions.

19            MR. LICHTEN:  I have a few more

20  questions, just to follow up.

21

22            FURTHER EXAMINATION

23  BY MR. LICHTEN:

24      Q      What training are you claiming the

# EXHIBIT 12

Lowell F. Alexander
Vol. 1, February 18, 2005

Euclides Soto, et al.  v.
Sherman-Feinberg Corporation, et al.

Page 61

[1] version to work with? He worked with the English
[2] version?
[3] **A:** Yes.
[4] **Q:** And so he had reviewed an English version
[5] of the agreement?
[6] **A:** Yes.
[7] **Q:** Okay. Does he have more than an elementary
[8] school education, if you know?
[9] **A:** I don't know.
[10] **Q:** Do you know whether English is his second
[11] language?
[12] **A:** I don't know. I'd be making any assumption
[13] if I said I did.
[14] **Q:** Okay. Isn't it — I mean, is it legal to
[15] give a collective bargaining agreement to someone to
[16] review when it's not in his or her language under
[17] the law?
[18] **MR. LICHTEN:** Objection. I instruct the
[19] witness not to answer.
[20] **Q:** You can answer.
[21] **MR. LICHTEN:** I instructed him not to
[22] answer.
[23] **Q:** Go ahead.
[24] **MR. BERGER:** I heard you.

Page 62

[1] **Q:** Do you know whether it's legal?
[2] **MR. LICHTEN:** I instruct the witness not to
[3] answer.
[4] **MR. BERGER:** And why is that?
[5] **MR. LICHTEN:** Because he's not here to give
[6] legal opinions.
[7] **MR. BERGER:** I don't know how that's
[8] possible. Do you want to enlighten us on that
[9] before we waste a lot of time?
[10] **MR. LICHTEN:** No, you can — I've
[11] instructed the witness not to answer.
[12] **Q:** Anyway, go through the process here.
[13] **Q:** What process?
[14] **Q:** The agreement was drafted by the company?
[15] **A:** Yes.
[16] **Q:** It goes to your office?
[17] **A:** A copy goes to me. A copy goes to the
[18] committee.
[19] **Q:** All right. Did you translate it then into
[20] Spanish?
[21] **A:** No.
[22] **Q:** The committee is composed of whom?
[23] **A:** Jose and Miguel.
[24] **Q:** What do they do?

Page 63

[1] **A:** They proofread it, the changes that are
[2] made. I —
[3] **Q:** But it's —
[4] **A:** — proofread the changes —
[5] **Q:** — in English, correct?
[6] **A:** — that are made.
[7] **Q:** All right. Is there a draft of their
[8] edited version?
[9] **A:** I don't have it.
[10] **Q:** All right. Isn't it the truth that they
[11] didn't put in any edits?
[12] **A:** Not that I'm aware of.
[13] **Q:** But, I mean, could they have even put in
[14] any edits in the document in English?
[15] **MR. LICHTEN:** Objection to the form.
[16] **Q:** You know them.
[17] **A:** I don't know.
[18] **Q:** Okay. Let me just ask you. When you're
[19] dealing with Jose, is his accent pronounced?
[20] **A:** He has an accent, yes.
[21] **Q:** Have you ever seen anything written by him?
[22] **A:** No.
[23] **Q:** In your conversations with him, does he
[24] have a working knowledge of grammar, language

Page 64

[1] syntax, verb tense, et cetera, of English?
[2] **A:** I don't know.
[3] **Q:** Well, how many times have you met with him?
[4] **A:** Several.
[5] **Q:** Have you ever socialized with him?
[6] **A:** No.
[7] **Q:** How about the other union steward, how much
[8] education does he have?
[9] **A:** I don't know.
[10] **Q:** How about his use of language, does he
[11] speak with an accent?
[12] **A:** Yes, he does.
[13] **Q:** Has he had more than an elementary school
[14] education?
[15] **A:** I do not know.
[16] **Q:** Okay. How is his use of English language
[17] in terms of syntax, verb coordination, abstract
[18] words like "bargaining agreement"? Does he
[19] understand those things?
[20] **A:** He understood what we were doing.
[21] **Q:** Did you explain what you were doing with
[22] him? Did you go through and explain what
[23] arbitration means —
[24] **A:** No.

Euclides Soto, et al. v.
Sherman-Feinberg Corporation, et al.

Lowell F. Alexander
Vol. 1, February 18, 2005

[1] **Q:** — to these two guys? I mean, no
[2] grievances have been generated by this plant ever.
[3] Correct? We agree about that?
[4] **A:** None that I'm aware of. None during the
[5] time that I serviced.
[6] **Q:** Understood. And I suppose we could check
[7] the file to see whether any grievances had ever been
[8] filed, but did you explain to them what arbitration
[9] means?
[10] **A:** No.
[11] **Q:** How about authorized agent?
[12] **A:** No.
[13] **Q:** How about bulletin board?
[14] **A:** No.
[15] **Q:** Check and pay?
[16] **A:** No.
[17] **Q:** Check off?
[18] **A:** No.
[19] **Q:** Delinquent contributions?
[20] **A:** No.
[21] **Q:** Discharge?
[22] **A:** No.
[23] **Q:** Employees covered?
[24] **A:** No.

[1] **Q:** Grievance and arbitration?
[2] **A:** No.
[3] **Q:** Guilt clause?
[4] **A:** No.
[5] **Q:** Health and sanitation?
[6] **A:** No.
[7] **Q:** Health, life and disability insurance?
[8] **A:** No.
[9] **Q:** Holidays?
[10] **A:** No.
[11] **Q:** Hours?
[12] **A:** No.
[13] **Q:** Layoff?
[14] **A:** No.
[15] **Q:** Management?
[16] **A:** No.
[17] **Q:** Military service?
[18] **A:** No.
[19] **Q:** No discrimination?
[20] **A:** No.
[21] **Q:** No strikes or lockouts?
[22] **A:** No.
[23] **Q:** Overtime?
[24] **A:** No.

[1] **Q:** Overtime work?
[2] **A:** No.
[3] **Q:** Pyramiding?
[4] **A:** No.
[5] **Q:** Seniority?
[6] **A:** No.
[7] **Q:** Seniority list?
[8] **A:** No.
[9] **Q:** Termination and renewal?
[10] **A:** No.
[11] **Q:** Trial period?
[12] **A:** No.
[13] **Q:** UIU pension trust?
[14] **A:** No.
[15] **Q:** Unauthorized strikes?
[16] **A:** No.
[17] **Q:** Union security?
[18] **A:** No.
[19] **Q:** Vacations?
[20] **A:** No.
[21] **Q:** Visits of staff representative?
[22] **A:** No.
[23] **Q:** Wages?
[24] **A:** No.

[1] **Q:** How did you establish for your own
[2] satisfaction that they understood those things?
[3] **A:** The contract's in place. We were
[4] doing a renewal. You make the assumption that
[5] people are already aware of what's in the
[6] agreement.
[7] **Q:** What is the grievance and arbitration
[8] process for this plant?
[9] **A:** I don't know it off the top of my head.
[10] I'd have to look at the agreement.
[11] **Q:** Did you explain the grievance and
[12] arbitration process to Jose Ortiz?
[13] **A:** No, I didn't.
[14] **Q:** How about to the other shop steward?
[15] **A:** No, I did not.
[16] **Q:** How were they to know that the complaint or
[17] grievance shall be first taken up with the company
[18] representative and the shop steward selected by the
[19] employees?
[20] **A:** It's in the agreement.
[21] **Q:** So when did you translate the agreement
[22] into Spanish?
[23] **A:** I didn't translate it. It was —
[24] **Q:** I mean, who translated it for you?

Lowell F. Alexander
Vol. 1, February 18, 2005

Euclides Soto, et al.   v.
Sherman-Feinberg Corporation, et al.

Page 101

[1] **A:** It was the middle of the month when some
[2] people got — when the first — when the second
[3] shift got laid off, and on the 14th, my
[4] understanding, was the last day that anyone worked
[5] there.
[6] **Q:** Right.
[7] **A:** That left two more weeks of the month.
[8] **Q:** And they got medical for that two-week
[9] period?
[10] **A:** And they were supposed to get medical for
[11] those two — for the additional two weeks.
[12] **A:** Everybody wasn't completely laid off yet;
[13] is that right?
[14] **A:** Some people got laid off a week prior.
[15] **Q:** Right.
[16] **A:** On —
[17] *Q. So this would make sure that everybody who
[18] was still there and some of the early ones would
[19] have medical until the end of all of the layoffs?
[20] Did I say that right? I think I did.
[21] **MR. BERGER:** You want to read that back to
[22] me?
[23] **Q:** I might have said it a little fast, but I
[24] think I got it.

Page 102

[1] *(Question read)
[2] **A:** Until the end of the month.
[3] **Q:** Got it.
[4] **MR. BERGER:** I'm all through, but I will be
[5] seeking some clarification from the court on some
[6] assertions and some objections.
[7] **MR. LICHTEN:** How long do you have for
[8] questioning?
[9] **MR. DIAZ:** Not that long. I just have a
[10] small number of questions.
[11] **MR. LICHTEN:** Okay.
[12] **MR. DIAZ:** And obviously until — I'll ask
[13] the questions and if not clarified you can always
[14] have them stricken at some point.
[15] **MR. LICHTEN:** Okay. Well, you can ask
[16] them.
[17] **MR. DIAZ:** Okay. Attorney Diaz asking
[18] questions.
[19] **CROSS EXAMINATION**
[20] **BY MR. DIAZ:**
[21] **Q:** Sir, how many shop stewards did you deal
[22] with at Farnsworth during the time that you dealt
[23] with the shop stewards there?
[24] **A:** Two.

Page 103

[1] **Q:** And what are their names?
[2] **A:** Jose Ortiz and Miguel DeJesus.
[3] **Q:** And did they speak English?
[4] (Mr. Berger exits the room)
[5] **A:** Jose's English was better than Miguel's.
[6] **Q:** Now, I take it — what's your Spanish like?
[7] **A:** I don't speak Spanish.
[8] **Q:** Okay. And when you say Jose's English is
[9] better than Miguel's, is that to say that Jose is
[10] proficient in English, he's bilingual, or he has a
[11] very limited amount of English that he speaks?
[12] **A:** Jose didn't have as much of a problem
[13] understanding — understanding me when I spoke with
[14] him as Miguel. Some — I'll say that he didn't have
[15] as much of a problem, and Jose was the one that
[16] generally called.
[17] **Q:** And when you say Jose is the one who
[18] generally called, called you or you generally
[19] called —
[20] **A:** Right. He generally called me.
[21] **Q:** And did you ever go through any checks and
[22] balances to find out how much of what you
[23] communicated with him he actually understood?
[24] **A:** No.

Page 104

[1] (Mr. Berger enters the room)
[2] **Q:** And other than you speaking to him, was
[3] there another party that you would utilize to
[4] communicate with Jose?
[5] **A:** Not as a rule.
[6] **Q:** Okay. And at Farnsworth, most of the
[7] workers you're speaking of, are they predominantly
[8] Hispanic?
[9] **A:** Yes. The ones that I dealt with, yes.
[10] **Q:** And how many employees are we talking of,
[11] if you recall it, at the highest point or at the
[12] lowest point?
[13] **A:** About 25, 26 at the highest.
[14] **Q:** And other than that group, how many
[15] non-Hispanics were there?
[16] **A:** I only met three non-Hispanic, but they
[17] were not part of the bargaining unit, though.
[18] **Q:** Okay. And from the time that you received
[19] notice that the plant was going to close, how much
[20] notice was given to the employees that they had to
[21] secure the benefits and then secure the jobs?
[22] **A:** I don't know how much notice they were
[23] given, but they knew when I went down.
[24] **Q:** Okay. And what, if any, role did Jose

# EXHIBIT 13

Page 86

1    A    (Through the Interpreter) No.
2    Q    And you never were -- you never went to a
3  Spanish stewards training?
4    A    (Through the Interpreter) No.
5        The only thing I know, someone --
6  some lady came over from the employment. She gave
7  us a card. And then some guy that came over from
8  supposedly the Steelworkers or something, they gave
9  us some sort of purple-violet pamphlet.
10        MR. BERGER: I just respectfully
11  request that the union provide some evidence that
12  this isn't a fraud.
13        MR. LICHTEN: Objection. Move to
14  strike.
15        MR. BERGER: Especially in view of
16  the fact that it was used as affirmative evidence
17  in a Commission hearing already.
18        MR. LICHTEN: Objection. Move to
19  strike.
20        MR. BERGER: Thank you.
21        MR. DIAZ: I've got some questions.
22
23        EXAMINATION
24  BY MR. DIAZ:

Page 87

1    Q    Mr. Ortiz, when the Steelworkers and
2  Mr. Lowell specifically brought someone to a
3  meeting we heard in September and maybe in October
4  2003, they brought an interpreter, correct?
5    A    (Through the Interpreter) Okay. Are you
6  talking about -- are you talking about the
7  little -- the little girl that he brought over, the
8  woman that he brought over?
9    Q    The brown-skinned girl that he mentioned,
10  okay?
11    A    (Through the Interpreter) Yes.
12    Q    You remember the individual being brought
13  as an interpreter, correct?
14    A    (Through the Interpreter) Yes.
15    Q    And you remember her name?
16    A    (Through the Interpreter) No, I have it
17  in one of my cards.
18    Q    You referred to the name before --
19        MR. DIAZ: Harold, what's her name?
20        MR. LICHTEN: Masiel, M-A-S-I-E-L.
21  That's her first name.
22  BY MR. DIAZ:
23    Q    Masiel is her first name.
24        Do you recall that?

Page 88

1    A    Yes.
2    Q    And it's your understanding why was she
3  brought, as an interpreter or some other reason?
4    A    (Through the Interpreter) Like he said,
5  was for an interpret of it.
6    Q    Before that September 2003 time that the
7  young lady came, was there any concern that
8  Mr. Lowell Alexander had expressed to you about
9  your ability to understand English or interpret
10  correctly?
11    A    (Through the Interpreter) No, he never
12  said anything to me. I know that she came over
13  that day.
14    Q    Okay.
15        Now, Miguel DeJesus, you knew him
16  prior to November of 2002, correct?
17    A    (Through the Interpreter) Yes, because he
18  worked there for a number of years.
19    Q    Was he fluent in English or just Spanish,
20  or did he know a little English?
21    A    (Through the Interpreter) He speak the
22  English a little bit. He could get stuck a little
23  bit, but he could be understood.
24    Q    Do you know if he read English?

Page 89

1    A    (Through the Interpreter) That I couldn't
2  tell you.
3    Q    You really don't read much English, do
4  you?
5    A    (Through the Interpreter) I read a little
6  bit.
7    Q    Now, going to the meetings that took
8  place prior to November 2002 in the contract, we've
9  talked about there were meetings October 15th
10  through November 13th; do you recall that?
11    A    (Through the Interpreter) Yes.
12    Q    Were you an active participant in those
13  meetings, meaning that you were in actual
14  negotiations, or were you just there in body trying
15  to understand some things or not an active
16  participant?
17        Can you explain that?
18    A    (Through the Interpreter) I would also
19  speak there.
20    Q    And what were you -- you know, were you
21  negotiating terms or were you just saying things?
22        Were any of the things that you were
23  trying to get implemented or incorporated --
24        (Telephone interruption.)

23 (Pages 86 to 89)

O'Brien & Levine Court Reporting Services
888.825.DEPO(3376) * www.court-reporting.com
fb8531b1-6b0a-4e58-8542-b159acd0b1a9

Page 90

1    Q   Could you turn that off, please?
2        THE INTERPRETER: Could you repeat
3  the question, please?
4    Q   Were any things that you were concerned
5  about implemented? Were any of the things that you
6  were concerned about incorporated or --
7    A   (Through the Interpreter) Okay. We would
8  put these things in the contract, but then Kenny
9  would take this to the owner. He would say no,
10  that he couldn't do that.
11   Q   Now, was there an interpreter or
12  translator at the meetings of October 15th through
13  October -- strike that. Let me start the question
14  over.
15       Were there any interpreters or
16  translators at any meetings that occurred between
17  October 13th and November 15th?
18   A   (Through the Interpreter) No. The only
19  people that were there were Miguel DeJesus, Lowell,
20  Kenny and I, for that contract.
21   Q   So the two Hispanic representatives were
22  individuals whose English was not too good; is that
23  correct?
24   A   (Through the Interpreter) It wasn't that

Page 91

1  good, like you said.
2    Q   Now, this took place -- this contract was
3  signed on November 21, 2002, according to Exhibit
4  No. 1, correct?
5        THE INTERPRETER: What was the date
6  again, please?
7    Q   November 21, 2001.
8    A   (Through the Interpreter) Yes, because
9  they set it up for that, the 21st.
10   Q   Did I say 2001? I apologize. I said
11  2001. It should have been 2002.
12   A   (Through the Interpreter) Yes, the
13  closing.
14   Q   So this is less than a year prior to the
15  closing of the plant, correct?
16   A   (Through the Interpreter) Mm-hmm, yes,
17  because the contract supposedly wasn't until, like,
18  2006, and look what happened.
19   Q   At any of the meetings that you went to
20  between October 15th and prior to November 21st,
21  was there any discussion about the viability, the
22  healthiness, the closing of the plant, anything of
23  that nature, was it expressed, as you understood
24  it?

Page 92

1    A   (Through the Interpreter) That they were
2  going to close the plant?
3    Q   That's my question. I need an answer.
4    A   (Through the Interpreter) No.
5    Q   Was there union representation that you
6  understood that basically inquired into this,
7  inquired into saving jobs, protecting jobs, or any
8  plant closing?
9    A   (Through the Interpreter) No.
10   Q   Let me jump into a different area.
11       Who is Santiago Perez?
12   A   (Through the Interpreter) This is the
13  person that was there first, and then since he was
14  fired --
15   Q   I'm sorry, I cut you off. If I cut you
16  off, I don't mean to. Please continue.
17   A   (Through the Interpreter) This was --
18  this was in the old contract, before 2002, that
19  Santiago was there.
20   Q   Okay.
21       Now, I think we're making -- Santiago
22  Perez was the shop steward or the union
23  representative prior to you, sir?
24   A   (Through the Interpreter) 2001, Santiago

Page 93

1  was there. I was the other one, but I think he was
2  sent more, more. He was more important.
3    Q   When was he terminated; do you know?
4    A   (Through the Interpreter) He had some
5  sort of discussion, disagreement with another guy,
6  and he was fired.
7    Q   Now, at least as of January 2002, he was
8  there, correct?
9    A   (Through the Interpreter) I don't
10  remember if he was there until 2002. I know
11  that -- I know that he was fired.
12   Q   Well, Exhibit 6, you have it in front of
13  you, has the letter from the United Steelworkers of
14  America, and you looked at that earlier.
15       It's addressed to Santiago Perez?
16   A   Yes.
17   Q   So that was addressed to Santiago Perez.
18       Do you know if you ever received that
19  letter or not?
20   A   (Through the Interpreter) That I can't
21  remember, I don't know.
22   Q   Now, you mentioned that your recollection
23  is before Lowell Alexander, there was an individual
24  named Dominic who was the representative from the

# EXHIBIT 14

Page 86

1    A .(Through the Interpreter) No.
2    Q   And you never were -- you never went to a
3  Spanish stewards training?
4    A   (Through the Interpreter) No.
5      The only thing I know, someone --
6  some lady came over from the employment. She gave
7  us a card. And then some guy that came over from
8  supposedly the Steelworkers or something, they gave
9  us some sort of purple-violet pamphlet.
10      MR. BERGER:  I just respectfully
11  request that the union provide some evidence that
12  this isn't a fraud.
13      MR. LICHTEN:  Objection. Move to
14  strike.
15      MR. BERGER:  Especially in view of
16  the fact that it was used as affirmative evidence
17  in a Commission hearing already.
18      MR. LICHTEN:  Objection. Move to
19  strike.
20      MR. BERGER:  Thank you.
21      MR. DIAZ:  I've got some questions.
22
23      EXAMINATION
24  BY MR. DIAZ:

Page 87

1    Q   Mr. Ortiz, when the Steelworkers and
2  Mr. Lowell specifically brought someone to a
3  meeting we heard in September and maybe in October
4  2003, they brought an interpreter, correct?
5    A   (Through the Interpreter) Okay. Are you
6  talking about -- are you talking about the
7  little -- the little girl that he brought over, the
8  woman that he brought over?
9    Q   The brown-skinned girl that he mentioned,
10  okay?
11    A   (Through the Interpreter) Yes.
12    Q   You remember the individual being brought
13  as an interpreter, correct?
14    A   (Through the Interpreter) Yes.
15    Q   And you remember her name?
16    A   (Through the Interpreter) No, I have it
17  in one of my cards.
18    Q   You referred to the name before --
19      MR. DIAZ:  Harold, what's her name?
20      MR. LICHTEN:  Masiel, M-A-S-I-E-L.
21  That's her first name.
22  BY MR. DIAZ:
23    Q   Masiel is her first name.
24      Do you recall that?

Page 88

1    A   Yes.
2    Q   And it's your understanding why was she
3  brought, as an interpreter or some other reason?
4    A   (Through the Interpreter) Like he said,
5  was for an interpret of it.
6    Q   Before that September 2003 time that the
7  young lady came, was there any concern that
8  Mr. Lowell Alexander had expressed to you about
9  your ability to understand English or interpret
10  correctly?
11    A   (Through the Interpreter) No, he never
12  said anything to me. I know that she came over
13  that day.
14    Q   Okay.
15      Now, Miguel DeJesus, you knew him
16  prior to November of 2002, correct?
17    A   (Through the Interpreter) Yes, because he
18  worked there for a number of years.
19    Q   Was he fluent in English or just Spanish,
20  or did he know a little English?
21    A   (Through the Interpreter) He speak the
22  English a little bit. He could get stuck a little
23  bit, but he could be understood.
24    Q   Do you know if he read English?

Page 89

1    A   (Through the Interpreter) That I couldn't
2  tell you.
3    Q   You really don't read much English, do
4  you?
5    A   (Through the Interpreter) I read a little
6  bit.
7    Q   Now, going to the meetings that took
8  place prior to November 2002 in the contract, we've
9  talked about there were meetings October 15th
10  through November 13th; do you recall that?
11    A   (Through the Interpreter) Yes.
12    Q   Were you an active participant in those
13  meetings, meaning that you were in actual
14  negotiations, or were you just there in body trying
15  to understand some things or not an active
16  participant?
17      Can you explain that?
18    A   (Through the Interpreter) I would also
19  speak there.
20    Q   And what were you -- you know, were you
21  negotiating terms or were you just saying things?
22      Were any of the things that you were
23  trying to get implemented or incorporated --
24      (Telephone interruption.)

23  (Pages 86 to 89)

fb8531b1-6b0a-4e58-8542-b159acd0b1a9

Page 90

1  Q   Could you turn that off, please?
2      THE INTERPRETER: Could you repeat
3  the question, please?
4  Q   Were any things that you were concerned
5  about implemented? Were any of the things that you
6  were concerned about incorporated or --
7  A   (Through the Interpreter) Okay. We would
8  put these things in the contract, but then Kenny
9  would take this to the owner. He would say no,
10 that he couldn't do that.
11 Q   Now, was there an interpreter or
12 translator at the meetings of October 15th through
13 October -- strike that. Let me start the question
14 over.
15     Were there any interpreters or
16 translators at any meetings that occurred between
17 October 13th and November 15th?
18 A   (Through the Interpreter) No. The only
19 people that were there were Miguel DeJesus, Lowell,
20 Kenny and I, for that contract.
21 Q   So the two Hispanic representatives were
22 individuals whose English was not too good; is that
23 correct?
24 A   (Through the Interpreter) It wasn't that

Page 91

1  good, like you said.
2  Q   Now, this took place -- this contract was
3  signed on November 21, 2002, according to Exhibit
4  No. 1, correct?
5      THE INTERPRETER: What was the date
6  again, please?
7  Q   November 21, 2001.
8  A   (Through the Interpreter) Yes, because
9  they set it up for that, the 21st.
10 Q   Did I say 2001? I apologize. I said
11 2001. It should have been 2002.
12 A   (Through the Interpreter) Yes, the
13 closing.
14 Q   So this is less than a year prior to the
15 closing of the plant, correct?
16 A   (Through the Interpreter) Mm-hmm, yes,
17 because the contract supposedly wasn't until, like,
18 2006, and look what happened.
19 Q   At any of the meetings that you went to
20 between October 15th and prior to November 21st,
21 was there any discussion about the viability, the
22 healthiness, the closing of the plant, anything of
23 that nature, was it expressed, as you understood
24 it?

Page 92

1  A   (Through the Interpreter) That they were
2  going to close the plant?
3  Q   That's my question. I need an answer.
4  A   (Through the Interpreter) No.
5  Q   Was there union representation that you
6  understood that basically inquired into this,
7  inquired into saving jobs, protecting jobs, or any
8  plant closing?
9  A   (Through the Interpreter) No.
10 Q   Let me jump into a different area.
11     Who is Santiago Perez?
12 A   (Through the Interpreter) This is the
13 person that was there first, and then since he was
14 fired --
15 Q   I'm sorry, I cut you off. If I cut you
16 off, I don't mean to. Please continue.
17 A   (Through the Interpreter) This was --
18 this was in the old contract, before 2002, that
19 Santiago was there.
20 Q   Okay.
21     Now, I think we're making -- Santiago
22 Perez was the shop steward or the union
23 representative prior to you, sir?
24 A   (Through the Interpreter) 2001, Santiago

Page 93

1  was there. I was the other one, but I think he was
2  sent more, more. He was more important.
3  Q   When was he terminated; do you know?
4  A   (Through the Interpreter) He had some
5  sort of discussion, disagreement with another guy,
6  and he was fired.
7  Q   Now, at least as of January 2002, he was
8  there, correct?
9  A   (Through the Interpreter) I don't
10 remember if he was there until 2002. I know
11 that -- I know that he was fired.
12 Q   Well, Exhibit 6, you have it in front of
13 you, has the letter from the United Steelworkers of
14 America, and you looked at that earlier.
15     It's addressed to Santiago Perez?
16 A   Yes.
17 Q   So that was addressed to Santiago Perez.
18     Do you know if you ever received that
19 letter or not?
20 A   (Through the Interpreter) That I can't
21 remember, I don't know.
22 Q   Now, you mentioned that your recollection
23 is before Lowell Alexander, there was an individual
24 named Dominic who was the representative from the

24 (Pages 90 to 93)

fb8531b1-6b0a-4e58-8542-b159acd0b1a9

# EXHIBIT 15

Lowell F. Alexander
Vol. 1, February 18, 2005

Euclides Soto, et al. v.
Sherman-Feinberg Corporation, et al.

Page 53

[1] **Q:** Who is Miguel DeJesus or Miguel DeJesus, if
[2] you will?
[3] **A:** I think Miguel was on the committee.
[4] **Q:** Pardon me?
[5] **A:** I think he was on the committee.
[6] **Q:** And who is Jose Montenez?
[7] **A:** I'm not aware. I'm assuming he works
[8] there.
[9] **Q:** Who is Louis Martinez?
[10] **A:** I'm assuming he works there also.
[11] **Q:** Okay. Now, they — did all three of them
[12] work for Farnsworth Fibre Corporation?
[13] **A:** I assume they did.
[14] **Q:** Do all three of them work for a company in
[15] Foxborough engaged in the same business as
[16] Farnsworth Fibre Corporation and Sherman-Feinberg
[17] Corporation?
[18] **A:** I don't know.
[19] **Q:** Do you know whether Jose Ortiz was supplied
[20] with the union constitution?
[21] **A:** No, I don't.
[22] **Q:** Do you know whether Jose Ortiz was supplied
[23] with any books, tapes, CDs or any of those kinds of
[24] things about how properly to be a steward?

Page 54

[1] **A:** I don't know.
[2] **Q:** How did you secure — how did you — strike
[3] that. Were there apprenticeship programs for any of
[4] the employees of Farnsworth Fibre and
[5] Sherman-Feinberg?
[6] **A:** In terms of apprenticeships for what?
[7] **Q:** Apprenticeship or training programs for the
[8] employees?
[9] **A:** Not that I'm aware of, no.
[10] **Q:** Were there ever any safety meetings for the
[11] employees of Farnsworth Fibre and Sherman-Feinberg?
[12] **A:** I don't know.
[13] **Q:** Now, who was the person that you did your
[14] negotiations with at Farnsworth Fibre Corporation?
[15] **Q:** For the company?
[16] **Q:** Yes.
[17] **A:** The company rep was Kenneth Doucette.
[18] **Q:** Okay. Now, have you ever eaten a meal with
[19] Kenneth Doucette?
[20] **A:** No.
[21] **Q:** Have you ever socialized with Kenneth
[22] Doucette?
[23] **A:** No.
[24] **Q:** Have you ever spoken alone with Kenneth

Page 55

[1] Doucette?
[2] **A:** When I first went to the company to
[3] introduce myself, yes.
[4] **Q:** When was that?
[5] **A:** It would have been sometime in 2002.
[6] **Q:** Tell me about all the conversations you've
[7] had with Kenneth Doucette.
[8] **A:** At that conversation I had a conversation
[9] with Jose and Kenneth. We had contract negotiations
[10] and with — the closing, plant closing with Jose and
[11] Miguel on the grievances.
[12] **Q:** Okay. What did you say to Mr. Doucette on
[13] each and every conversation you had with him?
[14] **A:** I wouldn't be — I don't recall every
[15] single thing that was said.
[16] **Q:** What's your best recollection?
[17] **A:** My best recollection, I introduced myself.
[18] We chatted for a few minutes, and I was asked —
[19] actually, I asked for Santiago Perez.
[20] **Q:** All right. How many conversation did you
[21] have with him with Mr. Santiago being present?
[22] **A:** None, because I never met.
[23] **Q:** So are you telling me during the entire
[24] negotiations you only spoke to him for a few

Page 56

[1] moments, Kenneth Doucette?
[2] **A:** No.
[3] **Q:** How much time did you spend negotiating
[4] with him?
[5] **A:** It's hard to put a number on the time, how
[6] much time. We had a number of sessions, though,
[7] with Miguel —
[8] **Q:** During that —
[9] **A:** — Jose and myself.
[10] **Q:** During that whole negotiation process, did
[11] you ask him for plant closing provisions?
[12] **A:** I don't remember if I did or not.
[13] *Q. Well, did you bargain with Farnsworth Fibre
[14] Corporation concerning the effects of a possible
[15] closing of the corporation?
[16] **A:** During negotiations?
[17] **MR. BERGER:** Could you just read the
[18] question back. I think it was fairly
[19] straightforward.
[20] *(Question read)
[21] **MR. BERGER:** Do I have a yes or a no?
[22] **MR. LICHTEN:** He asked you to clarify
[23] whether you meant during contract negotiations or
[24] some other time.

# EXHIBIT 16

Euclides Soto, et al.   v.
Sherman-Feinberg Corporation, et al.

Lowell F. Alexander
Vol. 1, February 18, 2005

[1] local at Commonwealth Gas?
[2]   A: Three years — two years. No. Two years.
[3]   Q: And who did you get your paycheck from, the
[4] international or the local?
[5]   A: Now?
[6]   Q: Yes, right now.
[7]   A: From the international.
[8]   Q: Okay. Now, my question involves a safety
[9] problem, okay. What are you supposed to do in your
[10] job when there's an injury in the workplace and the
[11] person who's injured is in the union, in your union?
[12]   A: Is it reported to me?
[13]   Q: Just tell me what the drill is. What I
[14] mean by drill is the practice, the procedure, the
[15] written policy as you understand it, what you're
[16] supposed to do.
[17]   A: The union represents and assists if a
[18] person reports something to us that hasn't been
[19] addressed.
[20]   Q: Okay. So the obligation of reporting is
[21] solely on the union member?
[22]   A: Yes, from the plant.
[23]   Q: What if there's a job place injury in which
[24] someone is killed?

[1]   A: I don't handle that.
[2]   Q: You've never dealt with that problem?
[3]   A: No.
[4]   Q: Now, have you ever worked with OSHA? Do
[5] you know what OSHA is?
[6]   A: Yes.
[7]   Q: Have you ever worked with OSHA in your job
[8] now?
[9]   A: Never directly with OSHA, no.
[10]   Q: In this particular plant, the
[11] Sherman-Feinberg Corporation plant —
[12]   A: Okay. Yes.
[13]   Q: — do you know the members of the union
[14] there?
[15]   A: Not all.
[16]   Q: Do you speak Spanish?
[17]   A: No, I do not.
[18]   Q: Do all of the members speak Spanish?
[19]   A: I don't know.
[20]   Q: Do any of them speak English?
[21]   A: Yes.
[22]   Q: Who speaks English?
[23]   A: I'm aware that — of one person — I'm
[24] aware that Jose speaks English.

[1]   Q: You mean Jose Ortiz?
[2]   A: Yes, Jose Ortiz. I'm aware that Miguel
[3] speaks some English, and there are other people that
[4] speak English, but I don't know their names.
[5]   Q: Now, how many of the members in that plant
[6] have suffered the loss of fingers or suffered burns
[7] to their extremities?
[8]   A: I don't know.
[9]   Q: Are there any?
[10]   A: Not that I'm aware of.
[11]   Q: Now, what were the protections in place for
[12] the members of Sherman-Feinberg, for the plant
[13] closing?
[14]   MR. LICHTEN: Objection to the form.
[15]     (Interruption)
[16]   A: Protection in place? There is no language
[17] in the contract that specifies plant closure.
[18]   Q: Now, how many years have you been in the
[19] Steelworkers union?
[20]   A: Since 1978.
[21]   Q: '70?
[22]   A: '78.
[23]   Q: '78. And have you gone to national
[24] meetings involving the Steelworkers since '78?

[1]   A: Yes, I have.
[2]   Q: And have you read the literature that the
[3] Steelworkers sends you as a member and as an officer
[4] and now as a representative?
[5]   A: Yes.
[6]   Q: Is it fair to say that plant closings has
[7] been a very large issue for the Steelworkers in a
[8] nationwide sweep but especially like places like
[9] Cleveland and Pittsburgh?
[10]   A: It's been an issue.
[11]   Q: And the plant closings issue, in the
[12] literature on all of those things that I just
[13] mentioned to you, how have you been advised to deal
[14] with the topic of plant closings by the
[15] international union?
[16]   A: We've been advised to do your best to
[17] negotiate as best you can.
[18]   Q: Now, who's on your negotiating team with
[19] Sherman-Feinberg or was? Sorry.
[20]   A: Jose Ortiz, Miguel DeJesus and myself.
[21]   Q: Okay. Now, tell me the process. Did you
[22] go — tell me the process — over the years I guess
[23] you had an agreement that went out another three
[24] years. Tell me the process of getting the latest

Lowell F. Alexander
Vol. 1, February 18, 2005

Euclides Soto, et al. v.
Sherman-Feinberg Corporation, et al.

Page 13

[1] agreement from this point. Let me explain the
[2] context. Let me just give you a date.
[3]     The agreement was executed November 21,
[4] 2002. Could you tell me what you did before
[5] November 21st in connection with this agreement
[6] between the Steelworkers of America,
[7] Sherman-Feinberg and Farnsworth Fibre? And if you
[8] can, what is it?
[9]     **A:** Met with Jose, met with the company.
[10]     **Q:** How many months before the execution of the
[11] agreement?
[12]     **A:** I really don't remember. I don't know.
[13]     **Q:** A couple months before, three months?
[14] Would that be long?
[15]     **A:** That's usually a long time prior.
[16]     **Q:** Okay. So your first stop was with Jose?
[17]     **A:** My first meeting was with Jose.
[18]     **Q:** Okay. And do you remember what you and
[19] Jose said, what you said and what he said?
[20]     **A:** Talked about proposals and meeting with his
[21] membership and find out what they were going to
[22] request for proposals.
[23]     **Q:** Do you have drafts of those agreements, of
[24] the proposals somewhere?

Page 14

[1]     **A:** I may. I don't know for sure.
[2]     **Q:** Could you look for them through your
[3] counsel?
[4]     **A:** Sure.
[5]     **Q:** Now, were those proposals in English or
[6] Spanish?
[7]     **A:** English.
[8]     **Q:** Now, when you met with Jose, did you bring
[9] along a translator?
[10]     **A:** No, I did not.
[11]     **Q:** Okay. Did you have trouble communicating
[12] with him?
[13]     **A:** No, I did not.
[14]     **Q:** With Jose?
[15]     **A:** No.
[16]     **Q:** How about the other fellow, the other guy?
[17]     **A:** Miguel came in for negotiations.
[18]     **Q:** Miguel's English is good?
[19]     **A:** It's fairly good.
[20]     **Q:** How does it compare to Jose's?
[21]     **A:** Miguel didn't have any trouble
[22] understanding what the proposals were.
[23]     **Q:** Okay. What were you guys trying to get? I
[24] take it you were of one mind about what you wanted

Page 15

[1] to do?
[2]     **A:** Yes, we learned — without proposals in
[3] front of me, I can imagine — without those specific
[4] proposals in front of me, I couldn't tell you
[5] exactly what was requested.
[6]     **Q:** Okay. Let's focus on the things that are
[7] the problems now. What did you have in mind about
[8] plant closings when you were kicking it around?
[9]     **A:** It wasn't an issue.
[10]     **Q:** It wasn't?
[11]     **A:** No.
[12]     **Q:** Had you checked the books of Farnsworth
[13] Fibre and Sherman-Feinberg to find out what their
[14] financial picture was?
[15]     **A:** No, I hadn't.
[16]     **Q:** Have you ever checked the books for that?
[17]     **A:** I believe we made a request.
[18]     **Q:** When was that?
[19]     **A:** I don't know a specific date.
[20]     **Q:** Did you follow up on the request?
[21]     **A:** I believe — I don't remember, to be honest
[22] with you.
[23]     **Q:** You guys have a multi-employer pension
[24] plan, right?

Page 16

[1]     **A:** Yes.
[2]     **Q:** Who's the person who does the collections
[3] for your multi-employer pension plan? Who gets the
[4] money in for defaulting companies?
[5]     **A:** The international.
[6]     **Q:** Who's the local person in that? Where is
[7] your pension fund office? You know, the letter you
[8] get and all that, what does it come out of?
[9]     **A:** It comes out of Pittsburgh.
[10]     **Q:** Out of Pittsburgh, that's right. Is there
[11] a local person for purposes of collections at
[12] meetings and all that stuff?
[13]     **A:** Not that I'm aware of, no.
[14]     **Q:** All right. Where do you meet when you have
[15] pension meetings or meetings just about pensions?
[16]     **A:** I don't attend those, so I don't know.
[17]     **Q:** Well, did you ever get any correspondence
[18] from the union that said that these guys might be
[19] going under? "These guys" being Farnsworth Fibre
[20] and Sherman-Feinberg.
[21]     **A:** I don't recall.
[22]     **Q:** So you don't recall getting something
[23] saying, "Hey, watch out for these guys"?
[24]     **A:** No.

# EXHIBIT 17

Page 86

```
 1    A   .(Through the Interpreter) No.
 2    Q   And you never were -- you never went to a
 3  Spanish stewards training?
 4    A   (Through the Interpreter) No.
 5         The only thing I know, someone --
 6  some lady came over from the employment.  She gave
 7  us a card.  And then some guy that came over from
 8  supposedly the Steelworkers or something, they gave
 9  us some sort of purple-violet pamphlet.
10         MR. BERGER:  I just respectfully
11  request that the union provide some evidence that
12  this isn't a fraud.
13         MR. LICHTEN:  Objection.  Move to
14  strike.
15         MR. BERGER:  Especially in view of
16  the fact that it was used as affirmative evidence
17  in a Commission hearing already.
18         MR. LICHTEN:  Objection.  Move to
19  strike.
20         MR. BERGER:  Thank you.
21         MR. DIAZ:  I've got some questions.
22
23              EXAMINATION
24  BY MR. DIAZ:
```

Page 87

```
 1    Q   Mr. Ortiz, when the Steelworkers and
 2  Mr. Lowell specifically brought someone to a
 3  meeting we heard in September and maybe in October
 4  2003, they brought an interpreter, correct?
 5    A   (Through the Interpreter) Okay.  Are you
 6  talking about -- are you talking about the
 7  little -- the little girl that he brought over, the
 8  woman that he brought over?
 9    Q   The brown-skinned girl that he mentioned,
10  okay?
11    A   (Through the Interpreter) Yes.
12    Q   You remember the individual being brought
13  as an interpreter, correct?
14    A   (Through the Interpreter) Yes.
15    Q   And you remember her name?
16    A   (Through the Interpreter) No, I have it
17  in one of my cards.
18    Q   You referred to the name before --
19         MR. DIAZ:  Harold, what's her name?
20         MR. LICHTEN:  Masiel, M-A-S-I-E-L.
21  That's her first name.
22  BY MR. DIAZ:
23    Q   Masiel is her first name.
24         Do you recall that?
```

Page 88

```
 1    A   Yes.
 2    Q   And it's your understanding why was she
 3  brought, as an interpreter or some other reason?
 4    A   (Through the Interpreter) Like he said,
 5  was for an interpret of it.
 6    Q   Before that September 2003 time that the
 7  young lady came, was there any concern that
 8  Mr. Lowell Alexander had expressed to you about
 9  your ability to understand English or interpret
10  correctly?
11    A   (Through the Interpreter) No, he never
12  said anything to me.  I know that she came over
13  that day.
14    Q   Okay.
15         Now, Miguel DeJesus, you knew him
16  prior to November of 2002, correct?
17    A   (Through the Interpreter) Yes, because he
18  worked there for a number of years.
19    Q   Was he fluent in English or just Spanish,
20  or did he know a little English?
21    A   (Through the Interpreter) He speak the
22  English a little bit.  He could get stuck a little
23  bit, but he could be understood.
24    Q   Do you know if he read English?
```

Page 89

```
 1    A   (Through the Interpreter) That I couldn't
 2  tell you.
 3    Q   You really don't read much English, do
 4  you?
 5    A   (Through the Interpreter) I read a little
 6  bit.
 7    Q   Now, going to the meetings that took
 8  place prior to November 2002 in the contract, we've
 9  talked about there were meetings October 15th
10  through November 13th; do you recall that?
11    A   (Through the Interpreter) Yes.
12    Q   Were you an active participant in those
13  meetings, meaning that you were in actual
14  negotiations, or were you just there in body trying
15  to understand some things or not an active
16  participant?
17         Can you explain that?
18    A   (Through the Interpreter) I would also
19  speak there.
20    Q   And what were you -- you know, were you
21  negotiating terms or were you just saying things?
22         Were any of the things that you were
23  trying to get implemented or incorporated --
24         (Telephone interruption.)
```

23 (Pages 86 to 89)

O'Brien & Levine Court Reporting Services
888.825.DEPO(3376)  *  www.court-reporting.com
fb8531b1-6b0a-4e58-8542-b159acd0b1a9

Page 90

```
 1    Q   Could you turn that off, please?
 2        THE INTERPRETER: Could you repeat
 3   the question, please?
 4    Q   Were any things that you were concerned
 5   about implemented?  Were any of the things that you
 6   were concerned about incorporated or --
 7    A   (Through the Interpreter) Okay.  We would
 8   put these things in the contract, but then Kenny
 9   would take this to the owner.  He would say no,
10   that he couldn't do that.
11    Q   Now, was there an interpreter or
12   translator at the meetings of October 15th through
13   October -- strike that.  Let me start the question
14   over.
15        Were there any interpreters or
16   translators at any meetings that occurred between
17   October 13th and November 15th?
18    A   (Through the Interpreter) No.  The only
19   people that were there were Miguel DeJesus, Lowell,
20   Kenny and I, for that contract.
21    Q   So the two Hispanic representatives were
22   individuals whose English was not too good; is that
23   correct?
24    A   (Through the Interpreter) It wasn't that
```

Page 91

```
 1   good, like you said.
 2    Q   Now, this took place -- this contract was
 3   signed on November 21, 2002, according to Exhibit
 4   No. 1, correct?
 5        THE INTERPRETER: What was the date
 6   again, please?
 7    Q   November 21, 2001.
 8    A   (Through the Interpreter) Yes, because
 9   they set it up for that, the 21st.
10    Q   Did I say 2001?  I apologize.  I said
11   2001.  It should have been 2002.
12    A   (Through the Interpreter) Yes, the
13   closing.
14    Q   So this is less than a year prior to the
15   closing of the plant, correct?
16    A   (Through the Interpreter) Mm-hmm, yes,
17   because the contract supposedly wasn't until, like,
18   2006, and look what happened.
19    Q   At any of the meetings that you went to
20   between October 15th and prior to November 21st,
21   was there any discussion about the viability, the
22   healthiness, the closing of the plant, anything of
23   that nature, was it expressed, as you understood
24   it?
```

Page 92

```
 1    A   (Through the Interpreter) That they were
 2   going to close the plant?
 3    Q   That's my question.  I need an answer.
 4    A   (Through the Interpreter) No.
 5    Q   Was there union representation that you
 6   understood that basically inquired into this,
 7   inquired into saving jobs, protecting jobs, or any
 8   plant closing?
 9    A   (Through the Interpreter) No.
10    Q   Let me jump into a different area.
11        Who is Santiago Perez?
12    A   (Through the Interpreter) This is the
13   person that was there first, and then since he was
14   fired --
15    Q   I'm sorry, I cut you off.  If I cut you
16   off, I don't mean to.  Please continue.
17    A   (Through the Interpreter) This was --
18   this was in the old contract, before 2002, that
19   Santiago was there.
20    Q   Okay.
21        Now, I think we're making -- Santiago
22   Perez was the shop steward or the union
23   representative prior to you, sir?
24    A   (Through the Interpreter) 2001, Santiago
```

Page 93

```
 1   was there.  I was the other one, but I think he was
 2   sent more, more.  He was more important.
 3    Q   When was he terminated; do you know?
 4    A   (Through the Interpreter) He had some
 5   sort of discussion, disagreement with another guy,
 6   and he was fired.
 7    Q   Now, at least as of January 2002, he was
 8   there, correct?
 9    A   (Through the Interpreter) I don't
10   remember if he was there until 2002.  I know
11   that -- I know that he was fired.
12    Q   Well, Exhibit 6, you have it in front of
13   you, has the letter from the United Steelworkers of
14   America, and you looked at that earlier.
15        It's addressed to Santiago Perez?
16    A   Yes.
17    Q   So that was addressed to Santiago Perez.
18        Do you know if you ever received that
19   letter or not?
20    A   (Through the Interpreter) That I can't
21   remember, I don't know.
22    Q   Now, you mentioned that your recollection
23   is before Lowell Alexander, there was an individual
24   named Dominic who was the representative from the
```

24  (Pages 90 to 93)

# EXHIBIT 18

Page 86

1    A .(Through the Interpreter) No.
2    Q    And you never were -- you never went to a
3 Spanish stewards training?
4    A    (Through the Interpreter) No.
5        The only thing I know, someone --
6 some lady came over from the employment. She gave
7 us a card. And then some guy that came over from
8 supposedly the Steelworkers or something, they gave
9 us some sort of purple-violet pamphlet.
10       MR. BERGER: I just respectfully
11 request that the union provide some evidence that
12 this isn't a fraud.
13       MR. LICHTEN: Objection. Move to
14 strike.
15       MR. BERGER: Especially in view of
16 the fact that it was used as affirmative evidence
17 in a Commission hearing already.
18       MR. LICHTEN: Objection. Move to
19 strike.
20       MR. BERGER: Thank you.
21       MR. DIAZ: I've got some questions.
22
23       EXAMINATION
24 BY MR. DIAZ:

Page 87

1    Q    Mr. Ortiz, when the Steelworkers and
2 Mr. Lowell specifically brought someone to a
3 meeting we heard in September and maybe in October
4 2003, they brought an interpreter, correct?
5    A    (Through the Interpreter) Okay. Are you
6 talking about -- are you talking about the
7 little -- the little girl that he brought over, the
8 woman that he brought over?
9    Q    The brown-skinned girl that he mentioned,
10 okay?
11   A    (Through the Interpreter) Yes.
12   Q    You remember the individual being brought
13 as an interpreter, correct?
14   A    (Through the Interpreter) Yes.
15   Q    And you remember her name?
16   A    (Through the Interpreter) No, I have it
17 in one of my cards.
18   Q    You referred to the name before --
19       MR. DIAZ: Harold, what's her name?
20       MR. LICHTEN: Masiel, M-A-S-I-E-L.
21 That's her first name.
22 BY MR. DIAZ:
23   Q    Masiel is her first name.
24       Do you recall that?

Page 88

1    A    Yes.
2    Q    And it's your understanding why was she
3 brought, as an interpreter or some other reason?
4    A    (Through the Interpreter) Like he said,
5 was for an interpret of it.
6    Q    Before that September 2003 time that the
7 young lady came, was there any concern that
8 Mr. Lowell Alexander had expressed to you about
9 your ability to understand English or interpret
10 correctly?
11   A    (Through the Interpreter) No, he never
12 said anything to me. I know that she came over
13 that day.
14   Q    Okay.
15       Now, Miguel DeJesus, you knew him
16 prior to November of 2002, correct?
17   A    (Through the Interpreter) Yes, because he
18 worked there for a number of years.
19   Q    Was he fluent in English or just Spanish,
20 or did he know a little English?
21   A    (Through the Interpreter) He speak the
22 English a little bit. He could get stuck a little
23 bit, but he could be understood.
24   Q    Do you know if he read English?

Page 89

1    A    (Through the Interpreter) That I couldn't
2 tell you.
3    Q    You really don't read much English, do
4 you?
5    A    (Through the Interpreter) I read a little
6 bit.
7    Q    Now, going to the meetings that took
8 place prior to November 2002 in the contract, we've
9 talked about there were meetings October 15th
10 through November 13th; do you recall that?
11   A    (Through the Interpreter) Yes.
12   Q    Were you an active participant in those
13 meetings, meaning that you were in actual
14 negotiations, or were you just there in body trying
15 to understand some things or not an active
16 participant?
17       Can you explain that?
18   A    (Through the Interpreter) I would also
19 speak there.
20   Q    And what were you -- you know, were you
21 negotiating terms or were you just saying things?
22       Were any of the things that you were
23 trying to get implemented or incorporated --
24       (Telephone interruption.)

23 (Pages 86 to 89)

O'Brien & Levine Court Reporting Services
888.825.DEPO(3376) * www.court-reporting.com
fb8531b1-6b0a-4e58-8542-b159acd0b1a9

## Page 90

1    Q    Could you turn that off, please?
2         THE INTERPRETER: Could you repeat
3    the question, please?
4    Q    Were any things that you were concerned
5    about implemented? Were any of the things that you
6    were concerned about incorporated or --
7    A    (Through the Interpreter) Okay. We would
8    put these things in the contract, but then Kenny
9    would take this to the owner. He would say no,
10   that he couldn't do that.
11   Q    Now, was there an interpreter or
12   translator at the meetings of October 15th through
13   October -- strike that. Let me start the question
14   over.
15        Were there any interpreters or
16   translators at any meetings that occurred between
17   October 13th and November 15th?
18   A    (Through the Interpreter) No. The only
19   people that were there were Miguel DeJesus, Lowell,
20   Kenny and I, for that contract.
21   Q    So the two Hispanic representatives were
22   individuals whose English was not too good; is that
23   correct?
24   A    (Through the Interpreter) It wasn't that

## Page 91

1    good, like you said.
2    Q    Now, this took place -- this contract was
3    signed on November 21, 2002, according to Exhibit
4    No. 1, correct?
5         THE INTERPRETER: What was the date
6    again, please?
7    Q    November 21, 2001.
8    A    (Through the Interpreter) Yes, because
9    they set it up for that, the 21st.
10   Q    Did I say 2001? I apologize. I said
11   2001. It should have been 2002.
12   A    (Through the Interpreter) Yes, the
13   closing.
14   Q    So this is less than a year prior to the
15   closing of the plant, correct?
16   A    (Through the Interpreter) Mm-hmm, yes,
17   because the contract supposedly wasn't until, like,
18   2006, and look what happened.
19   Q    At any of the meetings that you went to
20   between October 15th and prior to November 21st,
21   was there any discussion about the viability, the
22   healthiness, the closing of the plant, anything of
23   that nature, was it expressed, as you understood
24   it?

## Page 92

1    A    (Through the Interpreter) That they were
2    going to close the plant?
3    Q    That's my question. I need an answer.
4    A    (Through the Interpreter) No.
5    Q    Was there union representation that you
6    understood that basically inquired into this,
7    inquired into saving jobs, protecting jobs, or any
8    plant closing?
9    A    (Through the Interpreter) No.
10   Q    Let me jump into a different area.
11        Who is Santiago Perez?
12   A    (Through the Interpreter) This is the
13   person that was there first, and then since he was
14   fired --
15   Q    I'm sorry, I cut you off. If I cut you
16   off, I don't mean to. Please continue.
17   A    (Through the Interpreter) This was --
18   this was in the old contract, before 2002, that
19   Santiago was there.
20   Q    Okay.
21        Now, I think we're making -- Santiago
22   Perez was the shop steward or the union
23   representative prior to you, sir?
24   A    (Through the Interpreter) 2001, Santiago

## Page 93

1    was there. I was the other one, but I think he was
2    sent more, more. He was more important.
3    Q    When was he terminated; do you know?
4    A    (Through the Interpreter) He had some
5    sort of discussion, disagreement with another guy,
6    and he was fired.
7    Q    Now, at least as of January 2002, he was
8    there, correct?
9    A    (Through the Interpreter) I don't
10   remember if he was there until 2002. I know
11   that -- I know that he was fired.
12   Q    Well, Exhibit 6, you have it in front of
13   you, has the letter from the United Steelworkers of
14   America, and you looked at that earlier.
15        It's addressed to Santiago Perez?
16   A    Yes.
17   Q    So that was addressed to Santiago Perez.
18        Do you know if you ever received that
19   letter or not?
20   A    (Through the Interpreter) That I can't
21   remember, I don't know.
22   Q    Now, you mentioned that your recollection
23   is before Lowell Alexander, there was an individual
24   named Dominic who was the representative from the

24 (Pages 90 to 93)

O'Brien & Levine Court Reporting Services
888.825.DEPO(3376) * www.court-reporting.com
fb8531b1-6b0a-4e58-8542-b159acd0b1a9

**EXHIBIT 19**

Euclides Soto, et al.   v.
Sherman-Feinberg Corporation, et al.

Lowell F. Alexander
Vol. 1, February 18, 2005

Page 9

[1] local at Commonwealth Gas?
[2]   A: Three years — two years. No. Two years.
[3]   Q: And who did you get your paycheck from, the
[4] international or the local?
[5]   A: Now?
[6]   Q: Yes, right now.
[7]   A: From the international.
[8]   Q: Okay. Now, my question involves a safety
[9] problem, okay. What are you supposed to do in your
[10] job when there's an injury in the workplace and the
[11] person who's injured is in the union, in your union?
[12]   A: Is it reported to me?
[13]   Q: Just tell me what the drill is. What I
[14] mean by drill is the practice, the procedure, the
[15] written policy as you understand it, what you're
[16] supposed to do.
[17]   A: The union represents and assists if a
[18] person reports something to us that hasn't been
[19] addressed.
[20]   Q: Okay. So the obligation of reporting is
[21] solely on the union member?
[22]   A: Yes, from the plant.
[23]   Q: What if there's a job place injury in which
[24] someone is killed?

Page 10

[1]   A: I don't handle that.
[2]   Q: You've never dealt with that problem?
[3]   A: No.
[4]   Q: Now, have you ever worked with OSHA? Do
[5] you know what OSHA is?
[6]   A: Yes.
[7]   Q: Have you ever worked with OSHA in your job
[8] now?
[9]   A: Never directly with OSHA, no.
[10]   Q: In this particular plant, the
[11] Sherman-Feinberg Corporation plant —
[12]   A: Okay. Yes.
[13]   Q: — do you know the members of the union
[14] there?
[15]   A: Not all.
[16]   Q: Do you speak Spanish?
[17]   A: No, I do not.
[18]   Q: Do all of the members speak Spanish?
[19]   A: I don't know.
[20]   Q: Do any of them speak English?
[21]   A: Yes.
[22]   Q: Who speaks English?
[23]   A: I'm aware that — of one person — I'm
[24] aware that Jose speaks English.

Page 11

[1]   Q: You mean Jose Ortiz?
[2]   A: Yes, Jose Ortiz. I'm aware that Miguel
[3] speaks some English, and there are other people that
[4] speak English, but I don't know their names.
[5]   Q: Now, how many of the members in that plant
[6] have suffered the loss of fingers or suffered burns
[7] to their extremities?
[8]   A: I don't know.
[9]   Q: Are there any?
[10]   A: Not that I'm aware of.
[11]   Q: Now, what were the protections in place for
[12] the members of Sherman-Feinberg, for the plant
[13] closing?
[14]   MR. LICHTEN: Objection to the form.
[15]   (Interruption)
[16]   A: Protection in place? There is no language
[17] in the contract that specifies plant closure.
[18]   Q: Now, how many years have you been in the
[19] Steelworkers union?
[20]   A: Since 1978.
[21]   Q: '70?
[22]   A: '78.
[23]   Q: '78. And have you gone to national
[24] meetings involving the Steelworkers since '78?

Page 12

[1]   A: Yes, I have.
[2]   Q: And have you read the literature that the
[3] Steelworkers sends you as a member and as an officer
[4] and now as a representative?
[5]   A: Yes.
[6]   Q: Is it fair to say that plant closings has
[7] been a very large issue for the Steelworkers in a
[8] nationwide sweep but especially like places like
[9] Cleveland and Pittsburgh?
[10]   A: It's been an issue.
[11]   Q: And the plant closings issue, in the
[12] literature on all of those things that I just
[13] mentioned to you, have you been advised to deal
[14] with the topic of plant closings by the
[15] international union?
[16]   A: We've been advised to do your best to
[17] negotiate as best you can.
[18]   Q: Now, who's on your negotiating team with
[19] Sherman-Feinberg or was? Sorry.
[20]   A: Jose Ortiz, Miguel DeJesus and myself.
[21]   Q: Okay. Now, tell me the process. Did you
[22] go — tell me the process — over the years I guess
[23] you had an agreement that went out another three
[24] years. Tell me the process of getting the latest

**Lowell F. Alexander**
**Vol. 1; February 18, 2005**

Euclides Soto, et al. v.
Sherman-Feinberg Corporation, et al.

Page 13

[1] agreement from this point. Let me explain the
[2] context. Let me just give you a date.
[3]    The agreement was executed November 21,
[4] 2002. Could you tell me what you did before
[5] November 21st in connection with this agreement
[6] between the Steelworkers of America,
[7] Sherman-Feinberg and Farnsworth Fibre? And if you
[8] can, what is it?
[9]    **A:** Met with Jose, met with the company.
[10]    **Q:** How many months before the execution of the
[11] agreement?
[12]    **A:** I really don't remember. I don't know.
[13]    **Q:** A couple months before, three months?
[14] Would that be long?
[15]    **A:** That's usually a long time prior.
[16]    **Q:** Okay. So your first stop was with Jose?
[17]    **A:** My first meeting was with Jose.
[18]    **Q:** Okay. And do you remember what you and
[19] Jose said, what you said and what he said?
[20]    **A:** Talked about proposals and meeting with his
[21] membership and find out what they were going to
[22] request for proposals.
[23]    **Q:** Do you have drafts of those agreements, of
[24] the proposals somewhere?

Page 14

[1]    **A:** I may. I don't know for sure.
[2]    **Q:** Could you look for them through your
[3] counsel?
[4]    **A:** Sure.
[5]    **Q:** Now, were those proposals in English or
[6] Spanish?
[7]    **A:** English.
[8]    **Q:** Now, when you met with Jose, did you bring
[9] along a translator?
[10]    **A:** No, I did not.
[11]    **Q:** Okay. Did you have trouble communicating
[12] with him?
[13]    **A:** No, I did not.
[14]    **Q:** With Jose?
[15]    **A:** No.
[16]    **Q:** How about the other fellow, the other guy?
[17]    **A:** Miguel came in for negotiations.
[18]    **Q:** Miguel's English is good?
[19]    **A:** It's fairly good.
[20]    **Q:** How does it compare to Jose's?
[21]    **A:** Miguel didn't have any trouble
[22] understanding what the proposals were.
[23]    **Q:** Okay. What were you guys trying to get? I
[24] take it you were of one mind about what you wanted

Page 15

[1] to do?
[2]    **A:** Yes, we learned — without proposals in
[3] front of me, I can imagine — without those specific
[4] proposals in front of me, I couldn't tell you
[5] exactly what was requested.
[6]    **Q:** Okay. Let's focus on the things that are
[7] the problems now. What did you have in mind about
[8] plant closings when you were kicking it around?
[9]    **A:** It wasn't an issue.
[10]    **Q:** It wasn't?
[11]    **A:** No.
[12]    **Q:** Had you checked the books of Farnsworth
[13] Fibre and Sherman-Feinberg to find out what their
[14] financial picture was?
[15]    **A:** No, I hadn't.
[16]    **Q:** Have you ever checked the books for that?
[17]    **A:** I believe we made a request.
[18]    **Q:** When was that?
[19]    **A:** I don't know a specific date.
[20]    **Q:** Did you follow up on the request?
[21]    **A:** I believe — I don't remember, to be honest
[22] with you.
[23]    **Q:** You guys have a multi-employer pension
[24] plan, right?

Page 16

[1]    **A:** Yes.
[2]    **Q:** Who's the person who does the collections
[3] for your multi-employer pension plan? Who gets the
[4] money in for defaulting companies?
[5]    **A:** The international.
[6]    **Q:** Who's the local person in that? Where is
[7] your pension fund office? You know, the letter you
[8] get and all that, what does it come out of?
[9]    **A:** It comes out of Pittsburgh.
[10]    **Q:** Out of Pittsburgh, that's right. Is there
[11] a local person for purposes of collections at
[12] meetings and all that stuff?
[13]    **A:** Not that I'm aware of, no.
[14]    **Q:** All right. Where do you meet when you have
[15] pension meetings or meetings just about pensions?
[16]    **A:** I don't attend those, so I don't know.
[17]    **Q:** Well, did you ever get any correspondence
[18] from the union that said that these guys might be
[19] going under? "These guys" being Farnsworth Fibre
[20] and Sherman-Feinberg.
[21]    **A:** I don't recall.
[22]    **Q:** So you don't recall getting something
[23] saying, "Hey, watch out for these guys"?
[24]    **A:** No.