# EXHIBIT 20

Euclides Soto, et al.   v.
Sherman-Feinberg Corporation, et al.

Lowell F. Alexander
Vol. 1, February 18, 2005

Page 9

[1] local at Commonwealth Gas?
[2] A: Three years — two years. No. Two years.
[3] Q: And who did you get your paycheck from, the
[4] international or the local?
[5] A: Now?
[6] Q: Yes, right now.
[7] A: From the international.
[8] Q: Okay. Now, my question involves a safety
[9] problem, okay. What are you supposed to do in your
[10] job when there's an injury in the workplace and the
[11] person who's injured is in the union, in your union?
[12] A: Is it reported to me?
[13] Q: Just tell me what the drill is. What I
[14] mean by drill is the practice, the procedure, the
[15] written policy as you understand it, what you're
[16] supposed to do.
[17] A: The union represents and assists if a
[18] person reports something to us that hasn't been
[19] addressed.
[20] Q: Okay. So the obligation of reporting is
[21] solely on the union member?
[22] A: Yes, from the plant.
[23] Q: What if there's a job place injury in which
[24] someone is killed?

Page 10

[1] A: I don't handle that.
[2] Q: You've never dealt with that problem?
[3] A: No.
[4] Q: Now, have you ever worked with OSHA? Do
[5] you know what OSHA is?
[6] A: Yes.
[7] Q: Have you ever worked with OSHA in your job
[8] now?
[9] A: Never directly with OSHA, no.
[10] Q: In this particular plant, the
[11] Sherman-Feinberg Corporation plant —
[12] A: Okay. Yes.
[13] Q: — do you know the members of the union
[14] there?
[15] A: Not all.
[16] Q: Do you speak Spanish?
[17] A: No, I do not.
[18] Q: Do all of the members speak Spanish?
[19] A: I don't know.
[20] Q: Do any of them speak English?
[21] A: Yes.
[22] Q: Who speaks English?
[23] A: I'm aware that — of one person — I'm
[24] aware that Jose speaks English.

Page 11

[1] Q: You mean Jose Ortiz?
[2] A: Yes, Jose Ortiz. I'm aware that Miguel
[3] speaks some English, and there are other people that
[4] speak English, but I don't know their names.
[5] Q: Now, how many of the members in that plant
[6] have suffered the loss of fingers or suffered burns
[7] to their extremities?
[8] A: I don't know.
[9] Q: Are there any?
[10] A: Not that I'm aware of.
[11] Q: Now, what were the protections in place for
[12] the members of Sherman-Feinberg, for the plant
[13] closing?
[14] MR. LICHTEN: Objection to the form.
[15] (Interruption)
[16] A: Protection in place? There is no language
[17] in the contract that specifies plant closure.
[18] Q: Now, how many years have you been in the
[19] Steelworkers union?
[20] A: Since 1978.
[21] Q: '70?
[22] A: '78.
[23] Q: '78. And have you gone to national
[24] meetings involving the Steelworkers since '78?

Page 12

[1] A: Yes, I have.
[2] Q: And have you read the literature that the
[3] Steelworkers sends you as a member and as an officer
[4] and now as a representative?
[5] A: Yes.
[6] Q: Is it fair to say that plant closings has
[7] been a very large issue for the Steelworkers in a
[8] nationwide sweep but especially like places like
[9] Cleveland and Pittsburgh?
[10] A: It's been an issue.
[11] Q: And the plant closings issue, in the
[12] literature on all of those things that I just
[13] mentioned to you, how have you been advised to deal
[14] with the topic of plant closings by the
[15] international union?
[16] A: We've been advised to do your best to
[17] negotiate as best you can.
[18] Q: Now, who's on your negotiating team with
[19] Sherman-Feinberg or was? Sorry.
[20] A: Jose Ortiz, Miguel DeJesus and myself.
[21] Q: Okay. Now, tell me the process. Did you
[22] go — tell me the process — over the years I guess
[23] you had an agreement that went out another three
[24] years. Tell me the process of getting the latest

Euclides Soto, et al.  v.
Sherman-Feinberg Corporation, et al.

Lowell F. Alexander
Vol. 1, February 18, 2005

[1] local at Commonwealth Gas?

[2] **A:** Three years — two years. No. Two years.

[3] **Q:** And who did you get your paycheck from, the
[4] international or the local?

[5] **A:** Now?

[6] **Q:** Yes, right now.

[7] **A:** From the international.

[8] **Q:** Okay. Now, my question involves a safety
[9] problem, okay. What are you supposed to do in your
[10] job when there's an injury in the workplace and the
[11] person who's injured is in the union, in your union?

[12] **A:** Is it reported to me?

[13] **Q:** Just tell me what the drill is. What I
[14] mean by drill is the practice, the procedure, the
[15] written policy as you understand it, what you're
[16] supposed to do.

[17] **A:** The union represents and assists if a
[18] person reports something to us that hasn't been
[19] addressed.

[20] **Q:** Okay. So the obligation of reporting is
[21] solely on the union member?

[22] **A:** Yes, from the plant.

[23] **Q:** What if there's a job place injury in which
[24] someone is killed?

[1] **A:** I don't handle that.

[2] **Q:** You've never dealt with that problem?

[3] **A:** No.

[4] **Q:** Now, have you ever worked with OSHA? Do
[5] you know what OSHA is?

[6] **A:** Yes.

[7] **Q:** Have you ever worked with OSHA in your job
[8] now?

[9] **A:** Never directly with OSHA, no.

[10] **Q:** In this particular plant, the
[11] Sherman-Feinberg Corporation plant —

[12] **A:** Okay. Yes.

[13] **Q:** — do you know the members of the union
[14] there?

[15] **A:** Not all.

[16] **Q:** Do you speak Spanish?

[17] **A:** No, I do not.

[18] **Q:** Do all of the members speak Spanish?

[19] **A:** I don't know.

[20] **Q:** Do any of them speak English?

[21] **A:** Yes.

[22] **Q:** Who speaks English?

[23] **A:** I'm aware that — of one person — I'm
[24] aware that Jose speaks English.

[1] **Q:** You mean Jose Ortiz?

[2] **A:** Yes, Jose Ortiz. I'm aware that Miguel
[3] speaks some English, and there are other people that
[4] speak English, but I don't know their names.

[5] **Q:** Now, how many of the members in that plant
[6] have suffered the loss of fingers or suffered burns
[7] to their extremities?

[8] **A:** I don't know.

[9] **Q:** Are there any?

[10] **A:** Not that I'm aware of.

[11] **Q:** Now, what were the protections in place for
[12] the members of Sherman-Feinberg, for the plant
[13] closing?

[14] **MR. LICHTEN:** Objection to the form.

[15] (Interruption)

[16] **A:** Protection in place? There is no language
[17] in the contract that specifies plant closure.

[18] **Q:** Now, how many years have you been in the
[19] Steelworkers union?

[20] **A:** Since 1978.

[21] **Q:** '70?

[22] **A:** '78.

[23] **Q:** '78. And have you gone to national
[24] meetings involving the Steelworkers since '78?

[1] **A:** Yes, I have.

[2] **Q:** And have you read the literature that the
[3] Steelworkers sends you as a member and as an officer
[4] and now as a representative?

[5] **A:** Yes.

[6] **Q:** Is it fair to say that plant closings has
[7] been a very large issue for the Steelworkers in a
[8] nationwide sweep but especially like places like
[9] Cleveland and Pittsburgh?

[10] **A:** It's been an issue.

[11] **Q:** And the plant closings issue, in the
[12] literature on all of those things that I just
[13] mentioned to you, how have you been advised to deal
[14] with the topic of plant closings by the
[15] international union?

[16] **A:** We've been advised to do your best to
[17] negotiate as best you can.

[18] **Q:** Now, who's on your negotiating team with
[19] Sherman-Feinberg or was? Sorry.

[20] **A:** Jose Ortiz, Miguel DeJesus and myself.

[21] **Q:** Okay. Now, tell me the process. Did you
[22] go — tell me the process — over the years I guess
[23] you had an agreement that went out another three
[24] years. Tell me the process of getting the latest

# EXHIBIT 21

Lowell F. Alexander
Vol. 1, February 18, 2005

Euclides Soto, et al.    v.
Sherman-Feinberg Corporation, et al.

[1] agreement from this point. Let me explain the
[2] context. Let me just give you a date.
[3]    The agreement was executed November 21,
[4] 2002. Could you tell me what you did before
[5] November 21st in connection with this agreement
[6] between the Steelworkers of America,
[7] Sherman-Feinberg and Farnsworth Fibre? And if you
[8] can, what is it?
[9]    **A:** Met with Jose, met with the company.
[10]    **Q:** How many months before the execution of the
[11] agreement?
[12]    **A:** I really don't remember. I don't know.
[13]    **Q:** A couple months before, three months?
[14] Would that be long?
[15]    **A:** That's usually a long time prior.
[16]    **Q:** Okay. So your first stop was with Jose?
[17]    **A:** My first meeting was with Jose.
[18]    **Q:** Okay. And do you remember what you and
[19] Jose said, what you said and what he said?
[20]    **A:** Talked about proposals and meeting with his
[21] membership and find out what they were going to
[22] request for proposals.
[23]    **Q:** Do you have drafts of those agreements, of
[24] the proposals somewhere?

[1]    **A:** I may. I don't know for sure.
[2]    **Q:** Could you look for them through your
[3] counsel?
[4]    **A:** Sure.
[5]    **Q:** Now, were those proposals in English or
[6] Spanish?
[7]    **A:** English.
[8]    **Q:** Now, when you met with Jose, did you bring
[9] along a translator?
[10]    **A:** No, I did not.
[11]    **Q:** Okay. Did you have trouble communicating
[12] with him?
[13]    **A:** No, I did not.
[14]    **Q:** With Jose?
[15]    **A:** No.
[16]    **Q:** How about the other fellow, the other guy?
[17]    **A:** Miguel came in for negotiations.
[18]    **Q:** Miguel's English is good?
[19]    **A:** It's fairly good.
[20]    **Q:** How does it compare to Jose's?
[21]    **A:** Miguel didn't have any trouble
[22] understanding what the proposals were.
[23]    **Q:** Okay. What were you guys trying to get? I
[24] take it you were of one mind about what you wanted

[1] to do?
[2]    **A:** Yes, we learned — without proposals in
[3] front of me, I can imagine — without those specific
[4] proposals in front of me, I couldn't tell you
[5] exactly what was requested.
[6]    **Q:** Okay. Let's focus on the things that are
[7] the problems now. What did you have in mind about
[8] plant closings when you were kicking it around?
[9]    **A:** It wasn't an issue.
[10]    **Q:** It wasn't?
[11]    **A:** No.
[12]    **Q:** Had you checked the books of Farnsworth
[13] Fibre and Sherman-Feinberg to find out what their
[14] financial picture was?
[15]    **A:** No, I hadn't.
[16]    **Q:** Have you ever checked the books for that?
[17]    **A:** I believe we made a request.
[18]    **Q:** When was that?
[19]    **A:** I don't know a specific date.
[20]    **Q:** Did you follow up on the request?
[21]    **A:** I believe — I don't remember, to be honest
[22] with you.
[23]    **Q:** You guys have a multi-employer pension
[24] plan, right?

[1]    **A:** Yes.
[2]    **Q:** Who's the person who does the collections
[3] for your multi-employer pension plan? Who gets the
[4] money in for defaulting companies?
[5]    **A:** The international.
[6]    **Q:** Who's the local person in that? Where is
[7] your pension fund office? You know, the letter you
[8] get and all that, what does it come out of?
[9]    **A:** It comes out of Pittsburgh.
[10]    **Q:** Out of Pittsburgh, that's right. Is there
[11] a local person for purposes of collections at
[12] meetings and all that stuff?
[13]    **A:** Not that I'm aware of, no.
[14]    **Q:** All right. Where do you meet when you have
[15] pension meetings or meetings just about pensions?
[16]    **A:** I don't attend those, so I don't know.
[17]    **Q:** Well, did you ever get any correspondence
[18] from the union that said that these guys might be
[19] going under? "These guys" being Farnsworth Fibre
[20] and Sherman-Feinberg.
[21]    **A:** I don't recall.
[22]    **Q:** So you don't recall getting something
[23] saying, "Hey, watch out for these guys"?
[24]    **A:** No.

# EXHIBIT 22

Page 22

1  English.
2      Q   Okay.
3          (Exhibit No. 4 marked for
4  identification.)
5  BY MR. LICHTEN:
6      Q   I'm showing you Exhibit No. 4 and ask you
7  if you recall receiving a letter from Mr. Alexander
8  on or about January 30, 2003, enclosing a fully
9  signed copy of the new collective bargaining
10  agreement?
11     A   (Through the Interpreter) What do you
12  mean, with the contract -- after the contract was
13  signed?
14     Q   Yes.
15         MR. LICHTEN: Could you read for him
16  the contents of the letter?
17         THE INTERPRETER: Absolutely.
18         (Document interpreted for the
19  witness.)
20  BY MR. LICHTEN:
21     Q   My question is having been read the
22  letter, do you recall receiving this letter?
23     A   (Through the Interpreter) Yes.
24     Q   Okay.

Page 23

1          Do you recall sometime in early 2003
2  Mr. Alexander telling you that the United
3  Steelworkers of America was going to have a
4  training conference in Spanish for union stewards
5  and inviting you to attend and telling you that the
6  Steelworkers would pay the cost of the conference?
7      A   (Through the Interpreter) Are we talking
8  about some people that came over to the place and
9  they told us to sign a piece of paper or something
10  and then afterwards they closed the factory?
11         Is that what you're talking about?
12     Q   No. Let me do it this way.
13         (Exhibit No. 5 marked for
14  identification.)
15  BY MR. LICHTEN:
16     Q   Showing you Exhibit 5, and first let me
17  ask the interpreter to interpret just the bold
18  section.
19         (Document interpreted for the
20  witness.)
21     A   (Through the Interpreter) This
22  document -- nobody received this document, this
23  letter. This letter, they did it right after they
24  closed the factory in 2003, the same date when they

Page 24

1  closed the factory.
2      Q   Isn't it true that the factory wasn't
3  closed until November of 2003, which would be nine
4  months after January 4th of 2003?
5      A   (Through the Interpreter) Before, but I
6  didn't receive that. I didn't receive this either.
7      Q   Okay.
8          My question -- let me -- my question
9  is do you recall some time in 2003 Mr. Alexander
10  speaking to you and telling you that the
11  Steelworkers were going to have a Spanish -- a
12  steward's training program in Spanish and you were
13  invited to attend?
14     A   (Through the Interpreter) I remember
15  about a meeting or a reunion or something, but I
16  told him that at the time I didn't have a car and
17  that I needed a ride, and he told me that he had
18  another place, some other place to go to.
19     Q   And where did you live at the time -- did
20  you still live in Boston at the time?
21     A   (Through the Interpreter) Yes.
22     Q   And did he tell you that the Steelworkers
23  would pay the -- for the cost of the training
24  itself?

Page 25

1      A   (Through the Interpreter) I don't
2  remember. I don't know. I don't remember.
3      Q   Okay.
4          After you became the union steward,
5  did you understand that in the contract, you were
6  the person that had to file the first step of a
7  grievance?
8      A   (Through the Interpreter) I understood
9  that I was there to help people. Whatever he would
10  tell me, you know, I would say it, I would say to
11  the people.
12     Q   Okay.
13         Did you know that -- about the
14  grievance procedure in the contract?
15     A   (Through the Interpreter) A grievance, in
16  case there was a grievance or something, I would go
17  there and talk to some people first, talk to the
18  owners; and then if I couldn't fix it, I would
19  speak to him.
20     Q   Okay.
21         And did you do that sometimes during
22  the time that you were the union steward?
23     A   (Through the Interpreter) Around that
24  time, there weren't that many grievances. But

7 (Pages 22 to 25)

O'Brien & Levine Court Reporting Services
888.825.DEPO(3376) * www.court-reporting.com
fb8531b1-6b0a-4e58-8542-b159acd0b1a9

# EXHIBIT 23

## Page 22

1  English.
2      Q   Okay.
3          (Exhibit No. 4 marked for
4  identification.)
5  BY MR. LICHTEN:
6      Q   I'm showing you Exhibit No. 4 and ask you
7  if you recall receiving a letter from Mr. Alexander
8  on or about January 30, 2003, enclosing a fully
9  signed copy of the new collective bargaining
10 agreement?
11     A   (Through the Interpreter) What do you
12 mean, with the contract -- after the contract was
13 signed?
14     Q   Yes.
15         MR. LICHTEN:  Could you read for him
16 the contents of the letter?
17         THE INTERPRETER:  Absolutely.
18         (Document interpreted for the
19 witness.)
20 BY MR. LICHTEN:
21     Q   My question is having been read the
22 letter, do you recall receiving this letter?
23     A   (Through the Interpreter) Yes.
24     Q   Okay.

## Page 23

1          Do you recall sometime in early 2003
2  Mr. Alexander telling you that the United
3  Steelworkers of America was going to have a
4  training conference in Spanish for union stewards
5  and inviting you to attend and telling you that the
6  Steelworkers would pay the cost of the conference?
7      A   (Through the Interpreter) Are we talking
8  about some people that came over to the place and
9  they told us to sign a piece of paper or something
10 and then afterwards they closed the factory?
11         Is that what you're talking about?
12     Q   No.  Let me do it this way.
13         (Exhibit No. 5 marked for
14 identification.)
15 BY MR. LICHTEN:
16     Q   Showing you Exhibit 5, and first let me
17 ask the interpreter to interpret just the bold
18 section.
19         (Document interpreted for the
20 witness.)
21     A   (Through the Interpreter) This
22 document -- nobody received this document, this
23 letter.  This letter, they did it right after they
24 closed the factory in 2003, the same date when they

## Page 24

1  closed the factory.
2      Q   Isn't it true that the factory wasn't
3  closed until November of 2003, which would be nine
4  months after January 4th of 2003?
5      A   (Through the Interpreter) Before, but I
6  didn't receive that.  I didn't receive this either.
7      Q   Okay.
8          My question -- let me -- my question
9  is do you recall some time in 2003 Mr. Alexander
10 speaking to you and telling you that the
11 Steelworkers were going to have a Spanish -- a
12 steward's training program in Spanish and you were
13 invited to attend?
14     A   (Through the Interpreter) I remember
15 about a meeting or a reunion or something, but I
16 told him that at the time I didn't have a car and
17 that I needed a ride, and he told me that he had
18 another place, some other place to go to.
19     Q   And where did you live at the time -- did
20 you still live in Boston at the time?
21     A   (Through the Interpreter) Yes.
22     Q   And did he tell you that the Steelworkers
23 would pay the -- for the cost of the training
24 itself?

## Page 25

1      A   (Through the Interpreter) I don't
2  remember.  I don't know.  I don't remember.
3      Q   Okay.
4          After you became the union steward,
5  did you understand that in the contract, you were
6  the person that had to file the first step of a
7  grievance?
8      A   (Through the Interpreter) I understood
9  that I was there to help people.  Whatever he would
10 tell me, you know, I would say it, I would say to
11 the people.
12     Q   Okay.
13         Did you know that -- about the
14 grievance procedure in the contract?
15     A   (Through the Interpreter) A grievance, in
16 case there was a grievance or something, I would go
17 there and talk to some people first, talk to the
18 owners; and then if I couldn't fix it, I would
19 speak to him.
20     Q   Okay.
21         And did you do that sometimes during
22 the time that you were the union steward?
23     A   (Through the Interpreter) Around that
24 time, there weren't that many grievances.  But

7 (Pages 22 to 25)

O'Brien & Levine Court Reporting Services
888.825.DEPO(3376)  *  www.court-reporting.com
fb8531b1-6b0a-4e58-8542-b159acd0b1a9

# EXHIBIT 24

Nelson Acevedo 3-24-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

15

1   about what was said in that first meeting

2   when the Steelworkers' representative and

3   that woman came down.

4           MR. DIAZ:  There might be some

5   confusion as to who said what, whether the

6   company or the union or the co-workers.

7           MR. LICHTEN:  I will make that

8   clear.

9   Q.  My question is, in the first meeting that

10  you were at, do you remember any of the

11  workers at Farnsworth saying that they were

12  unhappy with the union?

13  A.  Yes, everybody said that.

14  Q.  Do you remember what the Steelworkers'

15  representative said in response?

16  A.  That they couldn't do anything.

17  Q.  Do you remember the Steelworkers'

18  representative saying, if anyone had a

19  problem, they should speak to Mr. Ortiz and

20  Mr. Ortiz would contact him?

21  A.  Yes.

22  Q.  In the year 2003, do you recall ever going

23  to Mr. Ortiz or Mr. DeJesus and asking that

24  they file a complaint or a grievance on your

# EXHIBIT 25

Jose D. Ramirez 3-22-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

27

1    hospital.  And if I went there to the hospital for

2    the seven days, they wouldn't pay me for it.

3        Q    Let me ask you this way.

4             Did you ever make a claim for

5    workers' compensation from the company?

6        A    (Through the Interpreter) No, no.

7        Q    During the time that you worked at

8    Farnsworth Fibre, did you ever make a complaint to

9    anyone, that is, the union or managers at the

10   company, about the working conditions at Farnsworth

11   Fibre or about safety conditions?

12       A    (Through the Interpreter) No.

13            Because I'm telling you, you know, it

14   wasn't even worth it, I mean, to complain, you

15   know?

16            We needed -- I needed the job.  You

17   understand?

18       Q    Do you remember what Mr. Alexander said

19   at this meeting that you attended when he was

20   there, what he said to you all through the

21   interpreter?

22       A    (Through the Interpreter) I don't

23   remember.  I don't remember.

24       Q    Do you remember him saying through the

Jose D. Ramirez 3-22-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

28

```
1    interpreter words to the effect that if anyone had
2    a problem or a concern, they could contact him?
3         A    (Through the Interpreter) No.
4         Q    Okay.
5              Were you aware that the Local Union
6    421-U had meetings every three months?
7         A    (Through the Interpreter) No.
8         Q    Okay.
9              Did you ever try to go to any union
10   meeting?
11        A    (Through the Interpreter) No.  But when
12   Martinez was the shop steward, we went to this
13   place, this location, but nobody explained anything
14   to me.
15        Q    Okay.
16             Do you recall -- where was the
17   location you went to?
18        A    (Through the Interpreter) In Brighton
19   where the Lottery is.
20        Q    And do you remember what the meeting is
21   for?
22        A    (Through the Interpreter) I think the
23   meeting was about the raise that we wanted.
24        Q    Okay.
```

# EXHIBIT 26

Euclides Soto, et al.   v.
Sherman-Feinberg Corporation, et al.

Lowell F. Alexander
Vol. 1, February 18, 2005

Page 57

[1] MR. BERGER: Oh, I'm sorry.
[2]  Q: During contract negotiations?
[3]  A: I don't recall whether we did or not.
[4]  Q: How about at any other time?
[5]  A: After we received the notice, yes.
[6]  Q: What did you request after you received the
[7] notice?
[8]  A: I requested severance, vacation, holiday
[9] pay, the medical coverage. A number of things we
[10] requested.
[11]  Q: Okay. Was the house already — was the
[12] horse out of the barn by then?
[13] MR. LICHTEN: Objection to the form.
[14]  A: What do you mean "horse out of the barn"?
[15]  Q: Did you get anywhere on any of that
[16] negotiation?
[17]  A: No.
[18]  Q: Do you have a file for each of the
[19] Plaintiffs in this case?
[20]  A: No, I do not.
[21]  Q: What — how do you organize the information
[22] about the particular people in this plant, and where
[23] is the information about them? Is it in a filing
[24] cabinet somewhere or other that I can look at just

Page 58

[1] about these people, Mr. Soto and the whole group?
[2]  A: I don't have a file on individuals. I have
[3] a file called Farnsworth Fibre.
[4]  Q: Called what?
[5]  A: Farnsworth Fibre.
[6]  Q: And that was not given to me under local
[7] Rule 26.2(a) before your deposition?
[8] MR. LICHTEN: No, I sent you — Mr. Berger,
[9] I sent you a letter giving you the documents that I
[10] thought were relevant, informing you there is a file
[11] and that you're welcome to come and view it, and you
[12] chose not to come and view it, and that's the status
[13] of things.
[14] MR. BERGER: No, it isn't.
[15]  Q: Now, in the files about the individuals,
[16] what information is there?
[17] MR. LICHTEN: Objection. He just testified
[18] there were no files about individuals.
[19]  Q: You can answer my question.
[20]  A: I do not have files on individuals.
[21]  Q: Do you have it organized by company?
[22]  A: Yes.
[23]  Q: Okay. What information is there about the
[24] individuals?

Page 59

[1]  A: I do not have information on individuals
[2] unless there's a grievance filed on their behalf.
[3] That's at the step that I'm involved in.
[4]  Q: Do you have anyplace where you've organized
[5] information about OSHA complaints or workers'
[6] compensation complaints or discrimination
[7] complaints?
[8]  A: For these individuals?
[9]  Q: Uh-huh.
[10]  A: No, because I have no complaints made.
[11]  Q: So there are no complaints? There's no
[12] OSHA records and no workers' comp records about any
[13] of these people?
[14]  A: None that I'm — none that I have.
[15]  Q: And are there any records of grievances in
[16] addition to the ones you turned over to your
[17] counsel?
[18]  A: No.
[19]  Q: Because there haven't been any grievances
[20] from this union, this membership?
[21]  A: None that it reached the level that I've
[22] become involved in.
[23]  Q: Right. Now, the — on January 30, 2003,
[24] you sent a copy of the fully executed collective

Page 60

[1] bargaining agreement to Jose Ortiz, do you remember
[2] that? That's on record.
[3]  A: I don't remember it, but it could be.
[4]  Q: When did he last — well, how can I put
[5] that? When did he — was he the last one to sign
[6] the agreement —
[7]  A: No.
[8]  (Discussion off the record)
[9]  Q: Was he the last one to sign the agreement?
[10]  A: No.
[11]  Q: How was the agreement circulated? Who
[12] signed it first, second and third, et cetera?
[13]  A: The agreement is proofread and signed with
[14] signature pages that come from Jose and the company
[15] to me.
[16]  Q: All right. So it starts there. Now,
[17] what — when did the — when is the Spanish
[18] translation prepared?
[19]  A: That was done out of our office.
[20]  Q: All right. So the first draft comes from
[21] the company, and then it gets translated into
[22] Spanish?
[23]  A: No.
[24]  Q: Okay. So Jose didn't have a Spanish

# EXHIBIT 27

Wilfredo Ortiz 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

23

1                    MR. LICHTEN:   Objection.

2    A.   I thought that well, like I said before, that before

3         the union would speak to him, that first, they would

4         go to their office.

5    Q.   Now, do you think that their going to the office

6         instead of dealing with you was discriminatory with

7         respect to you and with respect to the workforce?

8                    MR. LICHTEN:   Objection.

9    A.   Yes.

10   Q.   Could you explain why.

11                   MR. LICHTEN:   Objection.

12   A.   Because he would go to the office and whatever the

13        office would say, that's what they would tell us

14        that's what -- us do.

15   Q.   Is it safe to say that you and the other Hispanic

16        workers were denied a voice in the process?

17                   MR. LICHTEN:   Objection.

18   A.   Yes.

19   Q.   And do you believe that the motive for doing that

20        was to keep your wages as Hispanics very, very low?

21                   MR. LICHTEN:   Objection.

22   A.   Yes.

23   Q.   And do you see the attorney laughing?

24   A.   Yes.

Wilfredo Ortiz 3-23-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

24

1    Q.   Does that seem insulting to you?

2    A.   Yes.

3    Q.   Is it a form of intimidation or humiliation being

4         expressed --

5                   MR. LICHTEN:  Mr. Berger, you're

6         getting a little out of control here.

7    A.   Yes.

8                   MR. BERGER:  Could I get the last

9         question before the laughter.

10                  (Question read)

11   Q.   Can you answer that, please.

12   A.   No.  I don't think so, but since we all have rights,

13        the fact that we're Hispanics and we didn't speak

14        the language, they would take vengeance on us

15        because of that.

16   Q.   Take advantage of you?

17                  THE INTERPRETER:  Vengeance.

18   Q.   Okay.  But do you mean take advantage of you?

19   A.   Yes, like discriminating me.

20   Q.   Now, did the union similarly act in a way that was

21        motivated to get your union contributions without

22        shaking the boat with the employer at this point?

23                  MR. LICHTEN:  Objection.

24   A.   No.  The first thing they would do is they would go

Wilfredo Ortiz 3-23-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

25

1     to the office first and would talk to the people in

2     the office.  And for instance, we would ask for,

3     like, a dollar raise or something like that, they

4     would say no, no.  We'll give them 15, 20 cents.

5  Q.  Okay.  And do you think this was as a result of the

6     fact that the workforce was entirely Hispanic?

7          MR. LICHTEN:  Objection.

8  A.  Yes.

9  Q.  Now, at any time, did the union invite any of you

10    Hispanic workers to their quarterly -- excuse me.

11         Did the union ever invite you or any

12    of your Spanish coworkers to their quarterly

13    meetings?

14 A.  No.

15 Q.  Why not?

16 A.  That I know of, because they would negotiate amongst

17    themselves.

18 Q.  Now, did the union ever put up bulletin board for

19    you to give you information about anything?

20 A.  No.

21 Q.  Did the union provide any assistance to you about

22    the people who had suffered injuries like loss of

23    fingers, cutting of the face, and this kind of

24    thing?

Wilfredo Ortiz 3-23-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

26

1                    MR. LICHTEN:  Objection.

2    A.   No.

3    Q.   Tell me, is there any doubt in your mind whether

4         they know about people who had lost their fingers

5         and people who had been cut on their face?

6                    MR. LICHTEN:   Objection.

7    A.   Yes, I know I've seen them.   There have been many

8         accidents there.

9                    MR. LICHTEN:  Move to strike.   Not

10        responsive.

11   Q.   So you observed many accidents?

12                   MR. LICHTEN:   Objection.

13   A.   Yes.

14   Q.   Can you tell us about what you observed.

15   A.   There was the accident with Jose Ortiz.   I was

16        present then when the machine cracked [verbatim]

17        his finger.

18   Q.   And did he scream?

19   A.   No.  He didn't scream, but he was, like, holding it

20        in.

21   Q.   In fact, didn't the employer make him work an extra

22        15 minutes before he was relieved?

23                   MR. LICHTEN:   Objection.

24   A.   No, no.

Wilfredo Ortiz 3-23-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

27

1   Q.   How did it work?  What happened?

2   A.   He was cleaning the machine, and afterwards, the

3        machine was still running, and then the machine

4        cracked his finger, cut it.

5   Q.   And how old was that machine?

6                 MR. LICHTEN:  Objection.

7   A.   An antique.

8   Q.   A hundred years; do you think?

9   A.   Yeah.

10  Q.   Did the union ever look at any of machines like this

11       one where this accident happened?

12  A.   No.

13  Q.   You were going to describe other injures that

14       happened there?

15  A.   Yes.  There were people there too.

16  Q.   Now, did the union ever make sure that the plant

17       complied with federal laws like the Occupational

18       Safety Act?

19                 MR. LICHTEN:  Objection.

20  A.   I don't know.  I don't know.

21  Q.   Okay.  Well, did the union make sure that the

22       federal safety laws were complied with?

23                 MR. LICHTEN:  Objection.

24  A.   No.

Wilfredo Ortiz 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

28

```
1    Q.   Did they ever come to see whether any of you were

2         protected from the fires?

3                        MR. LICHTEN:   Objection.

4    A.   No.

5    Q.   And how about for the handling of paints and

6         chemicals?

7    A.   No.

8    Q.   Did, in your opinion, the union care about what

9         happened to the safety of the people in this plant

10        that consisted solely of Hispanics?

11                       MR. LICHTEN:   Objection.

12   A.   No.  They never cared for anything, no.

13   Q.   And you're not a member of the Upholstery Workers

14        Union, are you?  You're a member of the Steelworkers

15        union?

16                       MR. LICHTEN:   Objection.

17   A.   Yes.

18   Q.   You were in the Steelworkers union; right?

19   A.   Yes.

20   Q.   At any time, did the Steelworkers union provide you

21        any training, especially someone like you, who had

22        been the supervisor so that you could have more

23        skills in the workplace?

24                       MR. LICHTEN:   Objection.
```

Wilfredo Ortiz 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

29

1   A.   No.

2   Q.   Now, some individual was cut by a grinder and cut

3        three fingers -- were cut.  I think it was an

4        earlier testimony.  It was Jose Ortiz's uncle?

5             MR. LICHTEN:  Objection.  Move to

6        strike.

7   Q.   Do you know anything about that?

8   A.   No.  I knew of Jose Ortiz, that he cut his finger.

9   Q.   And how about Mr. Baez; did you know about his

10       accident?

11            MR. LICHTEN:  Objection.

12  A.   No.

13  Q.   Were there some grinder machines there?

14  A.   Yes.

15  Q.   How old were they?

16  A.   They're old.  They're antique.  They're so old they

17       don't even have replacement parts or pieces for

18       those machines.

19  Q.   And would you be surprised that somebody cut three

20       of their fingers on a machine like that?

21            MR. LICHTEN:  Objection.

22  Q.   Is this gentleman laughing at you?

23            MR. LICHTEN:  Again, I'm smiling at

24       your question that you would ask someone to engage

Wilfredo Ortiz 3-23-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation, et al.

37

1    A.    Because they would never help us.

2    Q.    Please explain what you mean.

3    A.    Because on certain occasions, I was obligated -- we

4          were obligated to work overtime.  And sometimes,

5          they would make us -- make me extinguish fires by

6          ourselves.  Sometimes I would have to get on top of

7          a room myself to extinguish a fire on top of a

8          machine, and all of that smoke, I was inhaling.

9    Q.    In effect, did the union exploit you the way

10         employers exploit Hispanic workers?

11                    MR. LICHTEN:  Again, I think your

12         questions are completely --

13                    MR. BERGER:  You cannot put the sock

14         in someone's mouth.  Please let the man answer.

15                    MR. LICHTEN:  For the record, I think

16         your questions are inappropriate.  They're out of

17         bounds and sanctionable.

18                    MR. BERGER:  I think everything that

19         you did in the hallway borders on the ridiculous.

20         Screaming at another lawyer in the hallway.  I was

21         embarrassed for you.  So don't preach at me.

22                    THE INTERPRETER:  I'm sorry.  Could

23         you repeat the question, please.

24                    (Question read)

# EXHIBIT 28

Nelson Acevedo 3-24-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

6

| | | |
|---|---|---|
| 1 | A. | 17, 18 years. I don't remember. |
| 2 | Q. | What country did you come from, or where did |
| 3 | | you come from before you lived here? |
| 4 | A. | Puerto Rico. |
| 5 | Q. | How old are you? |
| 6 | A. | 49. |
| 7 | Q. | Do you have a wife or a family? |
| 8 | A. | No. |
| 9 | Q. | Are you working now? |
| 10 | A. | No. |
| 11 | Q. | When was the last time you worked? |
| 12 | A. | November something, where I worked at the |
| 13 | | factory. |
| 14 | Q. | Have you worked at all since you stopped |
| 15 | | working at Farnsworth Fibre? |
| 16 | A. | No. |
| 17 | Q. | How do you live? How do you get by? |
| 18 | A. | I live with an aunt, and also I work, you |
| 19 | | know, as a mechanic sometimes. I do some |
| 20 | | odd jobs and stuff like that. |
| 21 | Q. | What's the address that you live at now? |
| 22 | A. | 8 Magnolia Street, Apartment 2. |
| 23 | Q. | Which town? |
| 24 | A. | Dorchester. |

# EXHIBIT 29

Miriam Caminero 3-24-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

15

```
 1          busy, we did overtime.  We took advantage of

 2          it.

 3    Q.    And did you receive overtime pay when you

 4          worked overtime?

 5    A.    Yes.

 6                    MR. LICHTEN:  That's all I have.

 7

 8          EXAMINATION BY BERGER:

 9

10    Q.    Where are you from originally?

11    A.    Santa Domingo, the Dominican Republic.

12    Q.    What did your father do?

13    A.    He was a master carpenter, construction.

14    Q.    How many brothers and sisters did you have

15          when you were growing up?

16    A.    Four of us.

17    Q.    When did you move north?

18    A.    1988.

19    Q.    Where did you first work?

20    A.    UNICCO

21    Q.    And how many children do you have?

22    A.    Three.

23    Q.    Their names?

24    A.    Carlos Moreno, Rafael Moreno, and Jimmy
```

# EXHIBIT 30

Clemente Hernandez 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

16

```
1                    MR. LICHTEN:  Objection.

2    A.   Yes.

3    Q.   Where did you grow up?

4    A.   Puerto Rico, Rio Grande.

5    Q.   And what did your father do?

6    A.   Construction.

7    Q.   Did he ever tell you about working in a place as

8         dangerous as this place?

9                    MR. LICHTEN:  Objection.

10   A.   No, because he's never been to U.S.

11   Q.   Have you had a chance to tell him about the work

12        conditions you've worked in?

13                   MR. LICHTEN:  Objection.

14   A.   Yes.  I tell him that I worked at a factory, but I

15        wouldn't give him any specifics.

16   Q.   Was this the worst workplace you've ever worked?

17                   MR. LICHTEN:  Objection.

18   A.   Yes.

19   Q.   And did you get anything from the dues you paid to

20        the union to make your life better?

21                   MR. LICHTEN:  Objection.

22   A.   Nothing, nothing.

23   Q.   Let me ask you this question which is hard for me to

24        ask.  Let me try.
```

# EXHIBIT 31

Antonio Martinez 3-23-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

15

1   A.   No.

2   Q.   Now, in the plant were there fires constantly?

3   A.   Oh, yes.

4   Q.   And in the plant, was there dust flying around?

5   A.   Too much, a lot.

6   Q.   In the plant, did people lose fingers?

7   A.   Yes.

8   Q.   And how many fingers were lost in this plant?

9                  MR. LICHTEN:   Objection.

10  A.   I just remember one person that lost two fingers.

11  Q.   And how many faces were cut and scarred?

12                 MR. LICHTEN:   Objection.

13  A.   I don't remember.

14  Q.   Do you have any reason to believe that the union was

15       not aware of the fires or the cuts or the people who

16       lost fingers?

17                 MR. LICHTEN:   Objection.

18  A.   I'm not sure.

19  Q.   Well, what safety -- what did the union -- well,

20       strike that.

21                 Did the union have a bulletin board

22       for posting notices?

23  A.   No.

24  Q.   Did the union ever give you any notices of meetings?

Antonio Martinez 3-23-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

16

1   A.   No.

2   Q.   Did the union -- let me just ask it this way:   Do

3        you believe that the union discriminated against

4        you?

5                    MR. LICHTEN:   Objection.

6   A.   Absolutely.

7   Q.   When and how?

8   A.   I think that they discriminated against us because

9        first of all, they didn't help us.  Also, we were

10       not -- they didn't tell us when the company was

11       going to close.  And every time there was some sort

12       of a -- we had to draw up a contract or some sort of

13       complication, they would always go to the office,

14       their office, and spend a long time there.  And then

15       afterwards when they would come to us, they would

16       say, "Oh, you know what?  Whatever the company

17       says."

18  Q.   Now, where were you born and raised?

19  A.   Puerto Rico.

20  Q.   Where in Puerto Rico?

21  A.   Yabucco, Puerto Rico.

22  Q.   Were you treated differently there than you were in

23       this plant?

24                   MR. LICHTEN:   Objection.

**EXHIBIT 32**

Luis A. Martinez 3-23-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

27

```
 1    A.    No.

 2    Q.    Where are you from?

 3    A.    Santo Domingo.

 4                MR. LICHTEN:  That's all I have.

 5    EXAMINATION BY MR. BERGER:

 6    Q.    You had mentioned that you were hungry.  Can you

 7          tell us what the effects were of being hungry?

 8                MR. LICHTEN:  Objection.

 9    A.    I was very nervous.  First of all, didn't have a

10          job.

11                MR. LICHTEN:  Move to strike.

12    A.    I didn't have a penny to buy food nor pay rent.  I

13          wanted to go back home to sort of do something, but

14          I didn't have any money to buy the ticket to go

15          there.  Someone -- a friend of mine said to me -- he

16          gave me help.  He gave me shelter.  He said to me,

17          Come over here.  He gave me a home, a roof, and he

18          gave me food.  And once in a while, he would just

19          give me, like $10, $5, $20.   And then a friend of

20          mine that I would see on the street said to me,

21          Here.  Here's a couple of bucks.

22                     I didn't have any money to send my

23          children, my sons, or my mother back in Santo

24          Domingo.  I had to borrow money from someone.  It
```

# EXHIBIT 33

Eulogio Ortiz 3-24-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

14



1          union to address with the company?

2    A.    No.

3    Q.    Do you know of anyone, other than you, that

4          went to any of the shop stewards about a

.5         complaint or a grievance or a concern that

6          he wanted addressed with the company?

7    A.    No, I don't know, no.

8    Q.    Do you recall sometime before it was

9          announced that the plant was going to close

10         a black man from the Steelworkers Union

11         coming out with a woman named Masiel to

12         attend a meeting with the workers at the

13         plant?

14   A.    Yes.

15   Q.    And did you attend that meeting?

16   A.    Yes.

17   Q.    And do you remember whether the woman that

18         Mr. Alexander, the black gentleman, was with

19         spoke Spanish?

20   A.    Yes, she spoke Spanish.

21   Q.    What country are you from?

22   A.    Puerto Rico.

23   Q.    Did you know what country she was from?

24   A.    No.

# EXHIBIT 34

Jose D. Ramirez 3-22-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

38

1        A       (Through the Interpreter) Yes, some of

2    the guys that work at night.

3        Q       Okay.

4               Now, when this plant closed, did the

5    union tell you about any other union jobs that were

6    available anywhere in the country?

7        A       (Through the Interpreter) Not at any

8    time.

9               THE INTERPRETER:  Are you all set?

10              MR. BERGER:  No.  Just a moment.

11   BY MR. BERGER:

12       Q       Where were you born?

13       A       (Through the Interpreter) in Santo

14   Domingo.

15       Q       What does your father do?

16       A       (Through the Interpreter) My father, he

17   used to work at an office in Santo Domingo.

18       Q       And how many brothers and sisters do you

19   have?

20       A       (Through the Interpreter) We're seven all

21   together, but some of them have passed on.  There's

22   only four of us remaining.

23       Q       How many of them came to the United

24   States?

# EXHIBIT 35

Euclides Soto 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

28

1              What did you get from the union for

2   your payment?

3        A    (Through the Interpreter) To me, they

4   never gave me anything.

5        Q    To what extent do you feel that they --

6   that the union got to treat you like dogs, as one

7   of the earlier witnesses said, because you were

8   Hispanic?

9              MR. LICHTEN:   Objection.   Move to

10  strike.

11       A    (Through the Interpreter) I feel bad

12  because I was paying the union so they could, you

13  know, back me up, support me all the time; and

14  towards the end when they closed the factory, the

15  union never did anything for us.

16       Q    What's your age?

17       A    (Through the Interpreter) Forty-two years

18  old.

19       Q    What town are you from?

20       A    (Through the Interpreter) In Brockton.

21       Q    And where did you live -- are you

22  originally from Puerto Rico?

23       A    (Through the Interpreter) Yes, I am from

24  Puerto Rico.

# EXHIBIT 36

Rafael Torres 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

30

1      days, we're going to close."  That's when we did it.

2   Q.   I see.  And then it was after that that the union

3        came out and you had that meeting with

4        Mr. Alexander?

5   A.   Exactly.  He was called, and then, like, three to

6        four days later he came out.

7   Q.   After that, did you ever go to Mr. Ortiz or anyone

8        from the union with any other complaint or grievance

9        about the plant closing?

10  A.   No.

11              MR. LICHTEN:  That's all I have.

12       Thank you very much.

13       EXAMINATION BY MR. BERGER:

14  Q.   Where were you born?

15  A.   In Patilla, P-A-T-I-L-L-A, Puerto Rico.

16  Q.   How large of a town is that?

17  A.   Small.

18  Q.   What did your father do?

19  A.   In reality, I don't know because my mother raised

20       me.

21  Q.   And when did you come north?

22  A.   I was raised by my grandmother and my grandfather.

23       Then I went to live with my mother, and then

24       afterwards I came over to live here.

# EXHIBIT 37

Eulogio Ortiz 3-24-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation. et al.

14

1           union to address with the company?

2    A.    No.

3    Q.    Do you know of anyone, other than you, that

4           went to any of the shop stewards about a

5           complaint or a grievance or a concern that

6           he wanted addressed with the company?

7    A.    No, I don't know, no.

8    Q.    Do you recall sometime before it was

9           announced that the plant was going to close

10          a black man from the Steelworkers Union

11          coming out with a woman named Masiel to

12          attend a meeting with the workers at the

13          plant?

14   A.    Yes.

15   Q.    And did you attend that meeting?

16   A.    Yes.

17   Q.    And do you remember whether the woman that

18          Mr. Alexander, the black gentleman, was with

19          spoke Spanish?

20   A.    Yes, she spoke Spanish.

21   Q.    What country are you from?

22   A.    Puerto Rico.

23   Q.    Did you know what country she was from?

24   A.    No.

# EXHIBIT 38

Eulogio Ortiz 3-24-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

8

1    A.    From the government.

2    Q.    Do you know which government, the federal

3          government or the state government?

4    A.    I would imagine it must be from the state.

5    Q.    Have you applied for any type of disability

6          benefits since you stopped work at

7          Farnsworth Fibre?

8    A.    Yes.

9    Q.    What have you applied for?

10   A.    Disability.

11   Q.    And were you granted it?

12   A.    They give me this check twice a week until

13         that is approved.

14   Q.    And have you been notified yet whether it

15         will be approved or not approved?

16   A.    No.

17   Q.    Do you have a lawyer for that?

18   A.    No.

19   Q.    When did you begin work at Farnsworth Fibre?

20   A.    June 12, '78.

21   Q.    When Farnsworth Fibre closed, had you worked

22         in the plant longer than anyone else, or was

23         there anyone else there who worked longer

24         than you?

A. Patillas.
Q. And what level of education did you receive?
A. I got into the sixth grade.
Q. In the Puerto Rican schools?
A. Yes.
Q. And when did you come north, to the north?
A. I came near April of 1978.
Q. So your first job was at Farnsworth at this plant when you came north?
A. Yes.
Q. How did they recruit you to get this job?
MR. LICHTEN: Objection.
A. Through my brother.
Q. And was your brother working there at the time?
A. Yes.
Q. And how much did they pay you when you started?
A. Per hour?
Q. Yes.
A. $3.25.
Q. Do you remember what the minimum wage was then?
MR. LICHTEN: Objection.

**EXHIBIT 39**

Miriam Caminero 3-24-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

8

```
 1   A.   It would include my kids too.

 2   Q.   Did you know Jose Ortiz?

 3   A.   Yes.

 4   Q.   And do you know if he held a position in the

 5        union?

 6   A.   Supposedly, yes, but the union didn't have a

 7        person there, someone to speak to or someone

 8        that would give you any type of help.

 9   Q.   Do you remember Mr. Ortiz being selected to

10        be the union steward at Farnsworth Fibre?

11   A.   Yes.

12   Q.   Did you vote for him to be the union

13        steward?

14   A.   Yes.  What happened, since he spoke better

15        English than the rest of the people, that's

16        how we did it.

17   Q.   Did you ever go to him with a complaint

18        about your wages or benefits or work

19        conditions at Farnsworth Fibre?

20   A.   No.

21   Q.   Do you know anybody else at Farnsworth Fibre

22        who went to Mr. Ortiz about a complaint or a

23        problem they were having at work?

24   A.   Yes.  In a factory with many employees,
```

# EXHIBIT 40

Eulogio Ortiz 3-24-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

12

1      2002?

2   A.   No.

3   Q.   Do you remember a period of time that Miguel

4        DeJesus and Jose Ortiz and someone from the

5        Steelworkers union would go into the office

6        to negotiate a contract?

7   A.   Yes.

8   Q.   Do you remember how often they would go in

9        there?

10  A.   I believe they went over a couple of times.

11  Q.   Did you vote for Mr. Ortiz to become the

12       union steward?

13  A.   No, because they didn't have an election.

14       They said that Riquito was the best

15  Q.   Who is "they"?

16  A.   The people in the office, they said, "Who

17       would be the best person to speak?"  And

18       then all of us came to an agreement that

19       Riquito was the best, so he went there.

20  Q.   Did you agree that he was the best person to

21       be the union steward?

22  A.   Yes.

23  Q.   Do you recall who the union stewards were

24       before Riquito was the steward?

# EXHIBIT 41, 42

Clemente Hernandez 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

13

```
1         where it put up its notices about any union
2         activities?
3    A.   No.
4    Q.   Do you believe Mr. Ortiz tried to help you?
5              MR. LICHTEN:  Objection.
6    A.   Yes.  He tried, but the union didn't do anything.
7    Q.   The union doesn't agree with that, I think it's safe
8         to say.
9              MR. LICHTEN:  Objection.
10   Q.   Can you try to explain why you feel that way?
11             MR. LICHTEN:  Objection.
12   A.   They didn't do anything because they just left us
13        like that, you know, with just the unemployment and
14        that's it.  We left there, everybody, like, around
15        November 14th.  And then a group was thrown out or
16        they took them out a week before, and they didn't
17        even pay them for that week to those guys, either.
18        You know, like me, they have family, they have
19        children.  And they didn't do anything, nothing,
20        nothing.  The medical benefits on the 14th, they
21        canceled everything.
22   Q.   Well the union seems to believe that in connection
23        with these fires, these persistent fires, that it
24        was Ortiz who didn't do what he should do about
```

Clemente Hernandez 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

14

```
 1        them.
 2                    MR. LICHTEN:   Objection.
 3   Q.   Do you agree with that?
 4   A.   No, I'm not in agreement with that at all.
 5   Q.   Why is that?
 6   A.   Because Jose Ortiz would call them for any problem
 7        at all, and they would never come over.  They'd
 8        never show up.
 9   Q.   Now, the union seems to believe that Ortiz could be
10        lying about this, that he didn't actually call them.
11                    MR. LICHTEN:   Objection.  Can you read
12        back the question.
13                    THE INTERPRETER:   I haven't translated.
14   A.   Yes.  He would call them.  They would come down
15        there, but they would go straight to the office.
16        They wouldn't come to talk to us.
17   Q.   Now, is Mr. Ortiz known as a liar?
18                    MR. LICHTEN:   Objection.
19   A.   No.
20   Q.   What is his reputation?
21                    MR. LICHTEN:   Objection.
22   A.   He is a tremendous person, and he's a great work
23        colleague.
24   Q.   So he wouldn't sell you out?
```

# EXHIBIT 43

Wilfredo Ortiz 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

23

1                    MR. LICHTEN:  Objection.

2    A.   I thought that well, like I said before, that before

3         the union would speak to him, that first, they would

4         go to their office.

5    Q.   Now, do you think that their going to the office

6         instead of dealing with you was discriminatory with

7         respect to you and with respect to the workforce?

8                    MR. LICHTEN:  Objection.

9    A.   Yes.

10   Q.   Could you explain why.

11                   MR. LICHTEN:  Objection.

12   A.   Because he would go to the office and whatever the

13        office would say, that's what they would tell us

14        that's what -- us do.

15   Q.   Is it safe to say that you and the other Hispanic

16        workers were denied a voice in the process?

17                   MR. LICHTEN:  Objection.

18   A.   Yes.

19   Q.   And do you believe that the motive for doing that

20        was to keep your wages as Hispanics very, very low?

21                   MR. LICHTEN:  Objection.

22   A.   Yes.

23   Q.   And do you see the attorney laughing?

24   A.   Yes.

Wilfredo Ortiz 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

24

1    Q.    Does that seem insulting to you?

2    A.    Yes.

3    Q.    Is it a form of intimidation or humiliation being

4          expressed --

5                    MR. LICHTEN:  Mr. Berger, you're

6          getting a little out of control here.

7    A.    Yes.

8                    MR. BERGER:  Could I get the last

9          question before the laughter.

10                   (Question read)

11   Q.    Can you answer that, please.

12   A.    No.  I don't think so, but since we all have rights,

13         the fact that we're Hispanics and we didn't speak

14         the language, they would take vengeance on us

15         because of that.

16   Q.    Take advantage of you?

17                   THE INTERPRETER:  Vengeance.

18   Q.    Okay.  But do you mean take advantage of you?

19   A.    Yes, like discriminating me.

20   Q.    Now, did the union similarly act in a way that was

21         motivated to get your union contributions without

22         shaking the boat with the employer at this point?

23                   MR. LICHTEN:  Objection.

24   A.    No.  The first thing they would do is they would go

Wilfredo Ortiz 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

25

```
 1          to the office first and would talk to the people in

 2          the office.  And for instance, we would ask for,

 3          like, a dollar raise or something like that, they

 4          would say no, no.  We'll give them 15, 20 cents.

 5     Q.   Okay.  And do you think this was as a result of the

 6          fact that the workforce was entirely Hispanic?

 7                    MR. LICHTEN:  Objection.

 8     A.   Yes.

 9     Q.   Now, at any time, did the union invite any of you

10          Hispanic workers to their quarterly -- excuse me.

11                    Did the union ever invite you or any

12          of your Spanish coworkers to their quarterly

13          meetings?

14     A.   No.

15     Q.   Why not?

16     A.   That I know of, because they would negotiate amongst

17          themselves.

18     Q.   Now, did the union ever put up bulletin board for

19          you to give you information about anything?

20     A.   No.

21     Q.   Did the union provide any assistance to you about

22          the people who had suffered injuries like loss of

23          fingers, cutting of the face, and this kind of

24          thing?
```

Wilfredo Ortiz 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

26

```
 1                    MR. LICHTEN:  Objection.

 2   A.   No.

 3   Q.   Tell me, is there any doubt in your mind whether

 4        they know about people who had lost their fingers

 5        and people who had been cut on their face?

 6                    MR. LICHTEN:  Objection.

 7   A.   Yes, I know I've seen them.  There have been many

 8        accidents there.

 9                    MR. LICHTEN:  Move to strike.  Not

10        responsive.

11   Q.   So you observed many accidents?

12                    MR. LICHTEN:  Objection.

13   A.   Yes.

14   Q.   Can you tell us about what you observed.

15   A.   There was the accident with Jose Ortiz.  I was

16        present then when the machine cracked [verbatim]

17        his finger.

18   Q.   And did he scream?

19   A.   No.  He didn't scream, but he was, like, holding it

20        in.

21   Q.   In fact, didn't the employer make him work an extra

22        15 minutes before he was relieved?

23                    MR. LICHTEN:  Objection.

24   A.   No, no.
```

Wilfredo Ortiz 3-23-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

27

1    Q.    How did it work?  What happened?

2    A.    He was cleaning the machine, and afterwards, the

3         machine was still running, and then the machine

4         cracked his finger, cut it.

5    Q.    And how old was that machine?

6                MR. LICHTEN:  Objection.

7    A.    An antique.

8    Q.    A hundred years; do you think?

9    A.    Yeah.

10    Q.    Did the union ever look at any of machines like this

11         one where this accident happened?

12    A.    No.

13    Q.    You were going to describe other injures that

14         happened there?

15    A.    Yes.  There were people there too.

16    Q.    Now, did the union ever make sure that the plant

17         complied with federal laws like the Occupational

18         Safety Act?

19                MR. LICHTEN:  Objection.

20    A.    I don't know.  I don't know.

21    Q.    Okay.  Well, did the union make sure that the

22         federal safety laws were complied with?

23                MR. LICHTEN:  Objection.

24    A.    No.

Wilfredo Ortiz 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

28

1  Q.  Did they ever come to see whether any of you were

2      protected from the fires?

3                  MR. LICHTEN:  Objection.

4  A.  No.

5  Q.  And how about for the handling of paints and

6      chemicals?

7  A.  No.

8  Q.  Did, in your opinion, the union care about what

9      happened to the safety of the people in this plant

10     that consisted solely of Hispanics?

11                 MR. LICHTEN:  Objection.

12 A.  No.  They never cared for anything, no.

13 Q.  And you're not a member of the Upholstery Workers

14     Union, are you?  You're a member of the Steelworkers

15     union?

16                 MR. LICHTEN:  Objection.

17 A.  Yes.

18 Q.  You were in the Steelworkers union; right?

19 A.  Yes.

20 Q.  At any time, did the Steelworkers union provide you

21     any training, especially someone like you, who had

22     been the supervisor so that you could have more

23     skills in the workplace?

24                 MR. LICHTEN:  Objection.

Wilfredo Ortiz 3-23-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

29

1   A.   No.

2   Q.   Now, some individual was cut by a grinder and cut

3        three fingers -- were cut.  I think it was an

4        earlier testimony.  It was Jose Ortiz's uncle?

5                 MR. LICHTEN:  Objection.  Move to

6        strike.

7   Q.   Do you know anything about that?

8   A.   No.  I knew of Jose Ortiz, that he cut his finger.

9   Q.   And how about Mr. Baez; did you know about his

10       accident?

11                MR. LICHTEN:  Objection.

12  A.   No.

13  Q.   Were there some grinder machines there?

14  A.   Yes.

15  Q.   How old were they?

16  A.   They're old.  They're antique.  They're so old they

17       don't even have replacement parts or pieces for

18       those machines.

19  Q.   And would you be surprised that somebody cut three

20       of their fingers on a machine like that?

21                MR. LICHTEN:  Objection.

22  Q.   Is this gentleman laughing at you?

23                MR. LICHTEN:  Again, I'm smiling at

24       your question that you would ask someone to engage

Wilfredo Ortiz 3-23-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

37

1    A.    Because they would never help us.

2    Q.    Please explain what you mean.

3    A.    Because on certain occasions, I was obligated -- we

4          were obligated to work overtime.  And sometimes,

5          they would make us -- make me extinguish fires by·

6          ourselves.  Sometimes I would have to get on top of

7          a room myself to extinguish a fire on top of a

8          machine, and all of that smoke, I was inhaling.

9    Q.    In effect, did the union exploit you the way

10         employers exploit Hispanic workers?

11                    MR. LICHTEN:  Again, I think your

12         questions are completely --

13                    MR. BERGER:  You cannot put the sock

14         in someone's mouth.  Please let the man answer.

15                    MR. LICHTEN:  For the record, I think

16         your questions are inappropriate.  They're out of

17         bounds and sanctionable.

18                    MR. BERGER:  I think everything that

19         you did in the hallway borders on the ridiculous.

20         Screaming at another lawyer in the hallway.  I was

21         embarrassed for you.  So don't preach at me.

22                    THE INTERPRETER:  I'm sorry.  Could

23         you repeat the question, please.

24                    (Question read)

# EXHIBIT 44

Luis A. Martinez 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

30

1            MR. BERGER:  Could you repeat the

2       question.  I got an objection that was not

3       responsive.

4                 (Question read back)

5    A.  Well, because I don't speak English.  I don't know

6       any laws about this country.  The only thing that I

7       came to work at this factory and nothing else.

8            MR. LICHTEN:  Objection.  Move to

9       strike as unresponsive.

10   Q.  Were there a lot of fires at the plant?

11   A.  Yes.  There were a lot of fires.  Every time, there

12       was a lot of dust around and a lot of the chemicals.

13       They used a lot of chemicals.

14   Q.  Did the union have a poster board where they stuck

15       notices up for you?

16   A.  No, never.

17   Q.  And did the union ever come to the place where you

18       worked, where you actually worked, or did the union

19       only go to the office where the bosses were?

20   A.  The union, no.  They didn't come to me.  They would

21       go to their office.  They wouldn't go through the

22       main door.  They would go through a door downstairs

23       or something, right next to the door, and they would

24       go into their office.

# EXHIBIT 45

Eulogio Ortiz 3-24-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

20

1      my hand and took my hand away.

2   Q.  And is it fair to say that you are missing

3       one of your digits at a halfway point?

4   A.  Yes, and this one other next to it attached

5       to the side.

6   Q.  It was sewed back on?

7   A.  Yes.

8   Q.  And you wouldn't mind if we took a

9       photograph at some point, would you?

10          MR. LICHTEN:   Objection.

11  A.  Fine.

12  Q.  Now, you had indicated that you liked the

13      job and you wanted to stay.  What did the

14      union do to help you stay at your job?

15  A.  No, they didn't do anything.  And they left

16      other people working there that had been

17      there less time than I was.

18  Q.  Did the union ever let you know they were

19      having meetings of other members of --

20      strike that.  Did the union ever tell you or

21      notify you in any way about quarterly

22      meetings?

23  A.  No.

24  Q.  When you were supervising the ten people,

Eulogio Ortiz 3-24-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

21

1       did the union ever provide you with any

2       information about proper supervision?

3                    MR. LICHTEN:   Objection.

4    A.  No.

5    Q.  Now, there appears to be some disagreement

6        here about whether Riquito Ortiz did his job

7        properly.

8                    MR. LICHTEN:   Objection.

9    Q.  Do you have an opinion about that?

10   A.  He was a good worker.

11   Q.  And did he do the best he could to protect

12       your interests with the union?

13                   MR. LICHTEN:   Objection.

14   A.  Yes, sir.

15   Q.  Do you believe it was because you are

16       Hispanic that the union did not invite you

17       to meetings or otherwise protect you?

18                   MR. LICHTEN:   Objection.

19   A.  Yes.

20   Q.  Now, you have been out of work since the

21       plant closing; is that correct?

22   A.  Yes.

23   Q.  During this period of time, have you been

24       suffering emotionally?

Eulogio Ortiz 3-24-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

22

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | Please explain to us how. |
| 3 | A. | I can't sleep at night.  Things are not the |
| 4 | | same.  I don't feel well. |
| 5 | Q. | Do you feel humiliated about being on |
| 6 | | welfare? |
| 7 | A. | Yes, exactly. |
| 8 | Q. | Now, during, basically, your entire work |
| 9 | | life, you have been a member of the union, |
| 10 | | haven't you? |
| 11 | A. | Yes. |
| 12 | Q. | That union is the Steelworkers; is that |
| 13 | | correct? |
| 14 | A. | Yes. |
| 15 | Q. | And is it your opinion that the union failed |
| 16 | | you because you are Hispanic? |
| 17 | | MR. LICHTEN:  Objection. |
| 18 | A. | Yes. |
| 19 | Q. | And one of your colleagues said that you |
| 20 | | were treated like dogs.  Do you agree with |
| 21 | | that characterization? |
| 22 | | MR. LICHTEN:  Objection. |
| 23 | A. | Yes. |
| 24 | Q. | During the entire period that you worked at |

Eulogio Ortiz 3-24-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

23

```
 1            the plant, did the union ever observe your

 2            workplace?

 3    A.      No, not that I know of.

 4    Q.      They would just go into the headquarters

 5            where the bosses were?

 6                    MR. LICHTEN:  Objection.

 7    A.      Yes, to the office.

 8    Q.      Did you form an opinion as to whether you

 9            thought, to use the parlance, the union was

10            in the pocket of the company?

11                    MR. LICHTEN:  Objection.

12    A.      Yes.

13    Q.      What was your opinion?

14                    MR. LICHTEN:  Objection.

15    A.      Yes, because every time they would come

16            over, they would go straight only to their

17            office.  And then they would send someone to

18            tell us, stop all the machines and make sure

19            that everybody comes down, and then a guy

20            from the union would come down.  They would

21            stop the machines, make us come all the way

22            down.  Then when we went down, the people

23            from the union would go in there, and they

24            would be speaking to them.
```

# EXHIBIT 46

Miriam Caminero 3-24-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

11

1       don't know.

2   Q.  Luis Martinez?

3   A.  Yes.  Luis Martinez had a little problem

4       there.  He spoke to Jose.  And then he was

5       saying, you know, "You are not helping me

6       enough.  Why don't you just talk to the

7       union again so they can help us."  And he

8       would say, "Well, why are we paying the

9       union?  We pay the union so they can help

10      us."  And let me see.  Let me remember what

11      else he said to him.

12              He always would complain and

13      protest and various people would always

14      complain and protest.  Luis would protest

15      and complain all of the time.  And he would

16      say to him, you know, they, the union, they

17      are not in favor with us.  They are in favor

18      of the people at the factory.  They are on

19      the side of them, but not on our side.

20  Q.  My question is, do you remember a time, a

21      specific time, where Mr. Martinez or any

22      other worker at Farnsworth went to Mr. Ortiz

23      and said, "We are having this specific

24      problem.  Would you call the union about

# EXHIBIT 47

Wilfredo Ortiz 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

35

1       they never come to us.  They would always go to the

2       office.  And whatever the office would say to them,

3       that's what they would tell us.

4    Q.  One of the employees, I think it was Cesar, said

5       that they fired people all the time.  Is that true?

6                    MR. LICHTEN:  Objection.

7    A.  Yes.

8    Q.  And the union never did a thing about it?

9                    MR. LICHTEN:  Objection.

10   A.  No.

11   Q.  Well, let's see whether I can capture the essence of

12      this.  Bear with me for one minute.

13                   THE INTERPRETER:  When you say the

14      "essence of this," the essence of what?  In Spanish,

15      I have to explain what this is.

16                   MR. BERGER:  Just wait.  Just a

17      minute.

18                   THE INTERPRETER:  I'm sorry.  I'm not

19      rushing you.  I'm just trying to assist you with the

20      translation.

21                   MR. BERGER:  Please.

22   Q.  Is it fair to call the union and the plant here a

23      makeshift, sadistic anarchy?

24                   MR. LICHTEN:  I object and move to

# EXHIBIT 48

Jose D. Ramirez 3-22-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

16
1    the union steward over the years you were there?

2        A    (Through the Interpreter) Yes.  I met

3    Papo, P-A-P-O, and then another guy's last name was

4    Martinez.

5        Q    During the 21 years that you were at

6    Farnsworth Fibre, did you ever go to any of the

7    union stewards and ask them to file a complaint or

8    grievance on your behalf regarding something at the

9    plant?

10       A    (Through the Interpreter) No, because --

11   no, because at that place if you complain, they

12   will fire you.  They will get rid of you.  And as a

13   person, you would be afraid talking to a

14   representative there.

15       Q    Okay.  So let's just break this down

16   first.

17            Do I understand your answer to be

18   that you never attempted to file a complaint or a

19   grievance?

20            MR. BERGER:  Objection.  Move to

21   strike.  That really is not what the gentleman

22   said.

23            THE INTERPRETER:  I'm sorry.

24            MR. BERGER:  And I'm going to

Jose D. Ramirez 3-22-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

13

1        Did you ever make a complaint like

2   this or any other complaint to Mr. Ortiz?

3        A    (Through the Interpreter) No.  No,

4   because it wasn't worth it.  They weren't going to

5   do anything about it.  At that place, you know, you

6   were under threat.

7        My sister, she died in New York, and

8   for me to be able to get that time off to go see

9   her after she was dead, then I have to bring a

10  death certificate to the boss right there to show

11  him so he would give me a week.  Otherwise, I would

12  be fired.

13       Q    Let me see if I understand.

14       Did you believe that if you made a

15  complaint or filed a grievance, you would be

16  disciplined or fired?

17       A    (Through the Interpreter) Yes.

18       Q    Okay.

19       Did any --

20       A    (Through the Interpreter) That's the way

21  it was.

22       Q    Okay.

23       Did anyone ever tell you that?

24       A    (Through the Interpreter) I would say

Jose D. Ramirez 3-22-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

27

1  hospital.  And if I went there to the hospital for

2  the seven days, they wouldn't pay me for it.

3      Q    Let me ask you this way.

4          Did you ever make a claim for

5  workers' compensation from the company?

6      A    (Through the Interpreter) No, no.

7      Q    During the time that you worked at

8  Farnsworth Fibre, did you ever make a complaint to

9  anyone, that is, the union or managers at the

10  company, about the working conditions at Farnsworth

11  Fibre or about safety conditions?

12      A    (Through the Interpreter) No.

13          Because I'm telling you, you know, it

14  wasn't even worth it, I mean, to complain, you

15  know?

16          We needed -- I needed the job.  You

17  understand?

18      Q    Do you remember what Mr. Alexander said

19  at this meeting that you attended when he was

20  there, what he said to you all through the

21  interpreter?

22      A    (Through the Interpreter) I don't

23  remember.  I don't remember.

24      Q    Do you remember him saying through the

Jose D. Ramirez 3-22-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

30

1    the situation in the plant "that's the way it was"?

2        A    (Through the Interpreter) Yes, exactly.

3        Q    What did that mean?

4            MR. LICHTEN:   Objection.

5        A    (Through the Interpreter) Well, because

6    of the pressure that we had there, that they put on

7    us there, you sort of forgot to complain.

8            And since everyone there needed the

9    job -- because for them at that location, they

10   didn't give a shit about the union.   They would

11   just, like, fire anybody they would want.

12       Q    Now, was there any union presence at the

13   plant?

14       A    (Through the Interpreter) Jose Ortiz, the

15   last one.

16       Q    All right.

17       A    (Through the Interpreter) Yes.   He would

18   do everything possible to try to help us, but, you

19   know, when he spoke to them, you know, it was no

20   use.

21       Q    So is it -- contrary to what you were led

22   to say earlier --

23            MR. LICHTEN:   Objection.

24       Q    -- is it your position that your major

Jose D. Ramirez 3-22-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

31

1  complaint here is with the union and not with Jose

2  Ortiz?

3           MR. LICHTEN:  Objection.

4       A    (Through the Interpreter) Exactly. Yes,

5  exactly, because --

6           Yes, because we were discriminated

7  against there.  Nobody would help us.  Whatever the

8  bosses would say, that's what they do.

9       Q    Okay.

10           Now, what do you mean by you being

11  discriminated against?

12      A    (Through the Interpreter) Well, they

13  would have us there, like, they would treat us like

14  slaves.

15           They would say to you, Look, you got

16  to work tomorrow morning.  You got to do overtime

17  whether you want to or not, and we had to do it.

18      Q    One of the other witnesses agreed with me

19  that the place was like hell.

20           Do you agree with me, and, if so,

21  how?

22           MR. LICHTEN:  Objection.

23      A    (Through the Interpreter) Of course, yes.

24      Q    In what ways was it like hell?

# EXHIBIT 49

Antonio Martinez 3/23/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 16

1   A.  No.

2   Q.  Did the union -- let me just ask it this way:  Do

3       you believe that the union discriminated against

4       you?

5                   MR. LICHTEN:  Objection.

6   A.  Absolutely.

7   Q.  When and how?

8   A.  I think that they discriminated against us because

9       first of all, they didn't help us.  Also, we were

10      not -- they didn't tell us when the company was

11      going to close.  And every time there was some sort

12      of a -- we had to draw up a contract or some sort of

13      complication, they would always go to the office,

14      their office, and spend a long time there.  And then

15      afterwards when they would come to us, they would

16      say, "Oh, you know what?  Whatever the company

17      says."

18  Q.  Now, where were you born and raised?

19  A.  Puerto Rico.

20  Q.  Where in Puerto Rico?

21  A.  Yabucco, Puerto Rico.

22  Q.  Were you treated differently there than you were in

23      this plant?

24                  MR. LICHTEN:  Objection.

O'Brien & Levine
(617) 399-0130 * www.court-reporting.com
3555b337-f2f4-4d13-b8b4-c06211540215

# EXHIBIT 50

Antonio Martinez 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

17

1    A.    Oh, yes.   Oh, yes.

2    Q.    Please explain to us how.

3    A.    Oh yes, of course.   You mean, the way they treated

4          us personally from person to person, or just as we

5          were treated as workers?

6    Q.    As workers and personally.

7    A.    For instance, if you never miss a day or you never

8          got sick, everything was fine, but for some reason,

9          when you got sick and you had to get a day or

10         something to do something, an emergency or some sort

11         of errand, they would treat you completely

12         different.

13   Q.    And the union did nothing to prevent this at any

14         time?

15                    MR. LICHTEN:   Objection.   Move to

16         strike.

17   A.    No.

18   Q.    Now, is this the first time you've been involved in

19         a court proceeding?

20   A.    Yes.

21   Q.    And you certainly don't experience this as a

22         laughing matter; do you?

23                    MR. LICHTEN:   Objection.

24   A.    (No verbal response.)

# EXHIBIT 51

Jose D. Ramirez 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

27

1    hospital.  And if I went there to the hospital for

2    the seven days, they wouldn't pay me for it.

3        Q    Let me ask you this way.

4             Did you ever make a claim for

5    workers' compensation from the company?

6        A    (Through the Interpreter) No, no.

7        Q    During the time that you worked at

8    Farnsworth Fibre, did you ever make a complaint to

9    anyone, that is, the union or managers at the

10   company, about the working conditions at Farnsworth

11   Fibre or about safety conditions?

12       A    (Through the Interpreter) No.

13            Because I'm telling you, you know, it

14   wasn't even worth it, I mean, to complain, you

15   know?

16            We needed -- I needed the job.  You

17   understand?

18       Q    Do you remember what Mr. Alexander said

19   at this meeting that you attended when he was

20   there, what he said to you all through the

21   interpreter?

22       A    (Through the Interpreter) I don't

23   remember.  I don't remember.

24       Q    Do you remember him saying through the

Jose D. Ramirez 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

28

1    interpreter words to the effect that if anyone had

2    a problem or a concern, they could contact him?

3         A    (Through the Interpreter) No.

4         Q    Okay.

5              Were you aware that the Local Union

6    421-U had meetings every three months?

7         A    (Through the Interpreter) No.

8         Q    Okay.

9              Did you ever try to go to any union

10   meeting?

11        A    (Through the Interpreter) No.  But when

12   Martinez was the shop steward, we went to this

13   place, this location, but nobody explained anything

14   to me.

15        Q    Okay.

16             Do you recall -- where was the

17   location you went to?

18        A    (Through the Interpreter) In Brighton

19   where the Lottery is.

20        Q    And do you remember what the meeting is

21   for?

22        A    (Through the Interpreter) I think the

23   meeting was about the raise that we wanted.

24        Q    Okay.

# EXHIBIT 52

Rafael Torres 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

14

```
 1           and there's no time frame so I object to it.

 2    A.     Exactly.

 3    Q.     Okay.

 4                     MR. LICHTEN:  Let the record reflect

 5           that Mr. Berger has called his client out into the

 6           hallway.

 7                     (Brief pause)

 8                     MR. LICHTEN:  Let the record reflect

 9           that the witness is back in the room, having

10           conferred with his legal counsel.

11    Q.     Do you recall what your seniority date was at the

12           company -- what seniority date you were assigned at

13           Farnsworth Fibre?

14    A.     I don't understand the question.

15    Q.     You said that you believed that someone with less

16           seniority than you got a job, a daytime job, that

17           you have should have gotten; is that right?

18    A.     Yes.

19    Q.     Okay.  And do you know what the company was using as

20           your seniority date, that is, you know, what the

21           company was using as your seniority date?

22    A.     The initial date, the first day when I started my

23           job.

24    Q.     Which was in 1990?
```

Rafael Torres 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

21

1        know?

2    A.    Yes.

3    Q.    And did you vote for him to be the union steward?

4    A.    Yes.

5    Q.    Okay.  Did you ever bring any complaints or

6        grievances or concerns to him from the time he

7        became the union steward to the time the plant

8        closed?

9    A.    I don't remember.

10    Q.    Okay.  Did you ever attempt to call the Steelworkers

11        union office about a problem or a concern that you

12        were having at work?

13    A.    No, because they wouldn't allow us to call them

14        personally.  Instead, they would have to hear it

15        from our union representative.

16    Q.    And who told you that?

17    A.    The same president from the union.

18    Q.    Who was that?

19    A.    The president before that and the one that is

20        president now, but I don't remember their names.

21    Q.    Okay.  And when you say "president," do you mean the

22        representative from the Steelworkers union, or -- do

23        you mean the representative?

24    A.    The representative, the person that goes to the

Rafael Torres 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

22

1    company or whatever company. Whenever there's a

2    problem, the person that comes from their office.

3  Q.  I see. And when did they tell you this?

4  A.  The next one, I don't remember, the last one, but

5    the one that is there now.

6  Q.  That is -- he's a black man?

7  A.  Because at that moment, they had switched presidents

8    or representatives. At the time when they switched

9    them, we didn't know who the person was. We only

10    found out that there was another person assigned to

11    that post when they renewed, when there was some

12    sort of renewal. So we called him so we can get to

13    know who he was.

14  Q.  Okay.

15  A.  So that's when he told us that instant that we

16    couldn't call him personally, but instead, we should

17    refer our problem to the person in charge in our

18    factory so that he would call him.

19  Q.  "Him," being the union representative?

20  A.  Exactly.

21  Q.  I see. And were you at a meeting when -- do you

22    understand that the union rep that you're talking to

23    was Mr. Alexander who happens to be black?

24  A.  He's the union representative.

Rafael Torres 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

23

```
1    Q.    Okay.  And if I understand it, you were at a meeting

2          where he said words to the effect, If any of you

3          have a problem, you should contact the union

4          steward, and he'll contact me?

5    A.    Yes.

6                     MR. BERGER:  Can I hear that question

7          again before you answer.  Can I hear the question

8          and answer.

9               (Question and answer read)

10                    MR. BERGER:  Objection.  Move to

11         strike.

12   Q.    And do you recall when that meeting was?

13   A.    I don't remember the date exactly, but I do remember

14         that it might have been the second visit that he

15         made.

16   Q.    Okay.  And did he have someone with him at the time?

17   A.    I don't remember quite well if he came alone.

18   Q.    Do you recall if he had a woman with him that helped

19         him translate?

20   A.    He came over to our place with her on two occasions,

21         but I don't remember the dates, which one of the

22         two.

23   Q.    And do I understand the first time he came over was

24         because he was contacted by the employees and asked
```

# EXHIBIT 53

Nelson Acevedo 3-24-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

15

1    about what was said in that first meeting

2    when the Steelworkers' representative and

3    that woman came down.

4         MR. DIAZ:  There might be some

5    confusion as to who said what, whether the

6    company or the union or the co-workers.

7         MR. LICHTEN:  I will make that

8    clear.

9  Q.  My question is, in the first meeting that

10   you were at, do you remember any of the

11   workers at Farnsworth saying that they were

12   unhappy with the union?

13 A.  Yes, everybody said that.

14 Q.  Do you remember what the Steelworkers'

15   representative said in response?

16 A.  That they couldn't do anything.

17 Q.  Do you remember the Steelworkers'

18   representative saying, if anyone had a

19   problem, they should speak to Mr. Ortiz and

20   Mr. Ortiz would contact him?

21 A.  Yes.

22 Q.  In the year 2003, do you recall ever going

23   to Mr. Ortiz or Mr. DeJesus and asking that

24   they file a complaint or a grievance on your

# EXHIBIT 54

Eulogio Ortiz 3-24-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

19



1    Q.    Do you know what the minimum wage was then?

2    A.    No.

3    Q.    Of that $3.25, how much money went to the

4          union?

5    A.    At that time, it was 7 1/2 for the union.

6    Q.    7 1/2 percent?

7                   MR. LICHTEN:   Objection.

8    A.    I meant to say $7.50 a month.

9    Q.    Between 1978 and 1988, can you tell us what

10         accidents happened at the plant?

11                  MR. LICHTEN:   Objection.

12   A.    I don't remember exactly.

13   Q.    Then let me put the question differently.

14         During the period of time that you were at

15         the plant, can you tell us about all of the

16         accidents you are aware of?

17                  MR. LICHTEN:   Objection.

18   A.    There were various accidents, but I don't

19         remember all of the them exactly.

20   Q.    What happened to you?

21   A.    There was a machine that was covered, and I

22         was cleaning.  The machine was covered, and

23         I was working with a stick.  And when I

24         uncovered the machine, the machine grabbed

Eulogio Ortiz 3-24-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

20

1    my hand and took my hand away.

2  Q.  And is it fair to say that you are missing

3    one of your digits at a halfway point?

4  A.  Yes, and this one other next to it attached

5    to the side.

6  Q.  It was sewed back on?

7  A.  Yes.

8  Q.  And you wouldn't mind if we took a

9    photograph at some point, would you?

10          MR. LICHTEN:  Objection.

11  A.  Fine.

12  Q.  Now, you had indicated that you liked the

13    job and you wanted to stay.  What did the

14    union do to help you stay at your job?

15  A.  No, they didn't do anything.  And they left

16    other people working there that had been

17    there less time than I was.

18  Q.  Did the union ever let you know they were

19    having meetings of other members of --

20    strike that.  Did the union ever tell you or

21    notify you in any way about quarterly

22    meetings?

23  A.  No.

24  Q.  When you were supervising the ten people,

# EXHIBIT 55

Ramon Rodriguez 3-24-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

26

```
 1   A.   When this guy that went out of here just

 2        before me, this guy, Junior, when he cut his

 3        fingers off, after that moment, that's when

 4        they started to just put protection.

 5              Even I fell down with a hose, even

 6        myself, they told me to get a hose and sort

 7        of clean, get on top of a ladder and clean

 8        with a hose and clean the ceiling of the

 9        plant, and I fell down.  I hurt my back.

10        And up to this day I am still suffering from

11        that injury to my back.

12   Q.   When did that occur, if you can recall?

13   A.   This was just prior to the closing of the

14        company, like, four years before.

15   Q.   Were the owners or personnel from the

16        factory notified of it?

17   A.   Yes.  There were a lot of people present in

18        the same area when this happened.

19   Q.   Was the shop steward notified of it?

20   A.   Yes.

21   Q.   Did you miss more than or less than five

22        days of work?

23   A.   Because of the injury more or less four to

24        five days I didn't go to work.
```

Ramon Rodriguez 3-24-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

27



1    Q.    Were you compensated for that?

2    A.    No.

3    Q.    Did anyone from the union ever come to you,

4          or did you ever approach anyone from the

5          union about it?

6    A.    No.

7    Q.    Bad question.  I apologize.  Did you ever

8          notify anyone at the union about what had

9          occurred?

10   A.    If I told them?

11   Q.    Yes, sir.

12   A.    Yes.  Before Ortiz, who was that?  I don't

13         remember his name right now.  Before Jose

14         Ortiz, one of the guys that's coming in here

15         later on.

16              MR. LICHTEN:  Does he want to see a

17   list?  We have a list of the employees.

18              MR. DIAZ:  Do you have a list of

19   the previous shop stewards?

20              MR. LICHTEN:  No.  From the

21   depositions over the last two days, I think

22   we sort of know who they are, if you want me

23   to say anything.  Maybe if he sees a name on

24   a list, it might refresh his memory.

# EXHIBIT 56

Euclides Soto 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

12

1        Q     Okay.

2        A     (Through the Interpreter) And then the

3   supervisor from the factory told me -- I told him

4   that that piece was damaged, but I told him maybe

5   he should sort of strike or hit that piece with a

6   rod so, you know, the machine could keep working.

7              So he told me to do it myself.  And

8   then one day when I hit that piece to put it in

9   place, and then the blade sort of snapped and cut

10  my face, right there (gesturing).

11       Q     Okay.

12             Did --

13             MR. BERGER:  Excuse me.  For the

14  record, are you gesturing to your face?

15             THE WITNESS:   (Through the

16  Interpreter) On the left side of my face.

17  BY MR. LICHTEN:

18       Q     Okay.

19             When did this occur?

20       A     (Through the Interpreter) I don't

21  remember the date.

22       Q     Was it in the first couple of years that

23  you were there or the latter part of the time you

24  were there?

# EXHIBIT 57

Angel Baez 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

15

1        with, like, wire, and sometimes that wasn't really

2        working well.

3   Q.   What was the last job that you had at Farnsworth

4        Fibre?

5   A.   At the end, the last job that I had was to just,

6        like, supposedly like a mechanic, but I was just

7        only working at the machines to make sure chains

8        would not fall out of the gears.

9   Q.   And what was the hourly rate you were getting at the

10       last job?

11   A.   It was for, like, 15 years, and I was still making,

12       like, $10 an hour.

13   Q.   Was that your hourly rate when you left Farnsworth

14       Fibre, $10 an hour?

15   A.   Yes.

16   Q.   And were you working much overtime?

17   A.   Sometimes when a person on the night shift would,

18       you know, wouldn't show up then sometimes I would

19       stay.  I would stay working -- I would stay there

20       working, you know, for that person, instead of that

21       person.

22   Q.   And did they pay you overtime?

23   A.   Yes, the overtime -- that overtime.

24   Q.   When you came to this union meeting that you recall,

# EXHIBIT 58

Angel Baez 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

19

1        said they were supposed to come down, come over, but

2        they would only show up when it was convenient for

3        them, not when anybody would call.

4   Q.   And did Mr. Alexander come down after the company

5        announced it was shutting down and meet with the

6        employees?

7   A.   I didn't see him there because the owner there, all

8        of a sudden, he just made this, like, sudden

9        surprising announcement.  And then after that, they

10       gave me a check.  They gave us a check, and then

11       they said, Well, you have to go to unemployment now,

12       and from there, I didn't see anyone else.

13  Q.   Did you want to stay working at Farnsworth Fibre?

14  A.   I wanted to keep working.

15  Q.   Why?

16  A.   I needed to work.

17  Q.   Why?

18  A.   Because I had been there working for a long time,

19       and they exploited me, working all those years.

20  Q.   Did you like the job or did not like the job?

21  A.   No.  The job was really hard, you know.  You would

22       just, like, work until you burst, and then they

23       exploited you, but jobs are really hard to get, to

24       come by, and I don't speak English, so --

# EXHIBIT 59

Rafael Torres 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

29

1       you did not go on the company's health insurance?

2   A.  No, I didn't take it.

3   Q.  When were you married, what date?

4   A.  September 1st.

5   Q.  Of what year?

6   A.  2001.

7   Q.  When you had health insurance at Farnsworth Fibre,

8       did you pay anything for the health insurance?

9   A.  I don't remember.  All I know is, after I got

10      married, I just quickly removed it, got rid of it.

11  Q.  After you learned that the plant was closing, do you

12      recall asking Mr. Ortiz or anyone else for the union

13      to file a grievance or complaint on your behalf?

14  A.  Yes.  Not as much as a grievance or complaint, but

15      just -- I just asked him to speak to the union so

16      maybe they could just, you know, back us up in this

17      matter.

18  Q.  Who did you ask that of?

19  A.  All of us, we came to an agreement, and then we

20      spoke to the shop steward from the union so then he

21      would call.

22  Q.  And was this before the company actually closed?

23  A.  No.  That same day.  The same day they notified us,

24      they told us, the same day they said to us, "In 21

# EXHIBIT 60

Ramon Rodriguez 3-24-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

30



1      retirement.  People from the Social Security

2      Administration, they would send me my check,

3      but I was working.

4   Q.  So you, basically, enjoyed that job, and you

5      were going to literally be there to the day

6      you died or the day they threw you out?

7   A.  Of course, yes.  I like my job.

8   Q.  When you received two weeks' notice that the

9      plant was closing, and when the African-

10     American and the Spanish lady came down, did

11     you feel from the conversation that they

12     were to trying to save the plant or keep

13     your jobs from being lost?

14         MR. LICHTEN:  Objection.

15  A.  They didn't speak to us about anything,

16     like, look for a job or anything.  They only

17     said to us, "Look, they are going to close

18     the company."

19  Q.  Had the United Steelworkers or Local 421

20     done something and offered you a job

21     somewhere else to relocate, were you willing

22     to do that or not?

23         MR. LICHTEN:  Objection.

24  A.  Yes, it was convenient for me, but, yes.