# EXHIBIT 61

Euclides Soto 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

33

1          Q     Okay.

2                So the job that you had at Farnsworth

3    Fibre, was that better or worse than the job that

4    you have now?

5          A     (Through the Interpreter) When it comes

6    to --

7                Regarding the work conditions,

8    working conditions, the place where I'm now is much

9    better.  But Farnsworth Fibre when I worked there,

10   conditions regarding the hours, the time that I

11   used to put in, it was bad.

12         Q     And the benefits were better?

13         A     (Through the Interpreter) The benefits

14   from the factory were better.

15         Q     Better.

16               You mentioned there was something

17   that you got, the first half was translated and

18   then the second half was translated.

19               What were you referring to?

20         A     (Through the Interpreter) It's like a

21   pamphlet, the rules and regulations, laws regarding

22   the benefits.

23         Q     I see.

24               And did the union pass that out or

# EXHIBIT 62

Clemente Hernandez 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

6

| | | |
|---|---|---|
| 1 | A. | When they closed the factory, I started at that |
| 2 | | place in February, from there until December of |
| 3 | | 2004. |
| 4 | Q. | Did you get unemployment for any time after |
| 5 | | Farnsworth Fibre closed? |
| 6 | A. | Unemployment, yes. |
| 7 | Q. | How many years did you work at Farnsworth Fibre? |
| 8 | A. | I started June 21, 1999 until November 14th of 2003 |
| 9 | | when they closed the place. |
| 10 | Q. | And what were you making there, what was your last |
| 11 | | pay rate at Farnsworth? |
| 12 | A. | 11.05. |
| 13 | Q. | And what was your job, what were you doing? |
| 14 | A. | I used to work on -- setting or putting in order all |
| 15 | | this, like, presses when they came out of the oven. |
| 16 | Q. | I see. Did you ever injure yourself at Farnsworth |
| 17 | | Fibre? |
| 18 | A. | No, no. |
| 19 | Q. | Did you ever see anybody injured while you worked at |
| 20 | | Farnsworth Fibre? |
| 21 | A. | No that the I can remember, no. |
| 22 | Q. | Did you ever see any fires at Farnsworth Fibre while |
| 23 | | you worked there? |
| 24 | A. | A lot, yeah. |

Clemente Hernandez 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

7

1    Q.    And were these fires near where you worked?

2    A.    Right there next to me.

3    Q.    And can you describe what these fires -- strike
   that.

                Did you call the fire department?

6    Did the fire department come for these fires?

7              THE INTERPRETER: If I may. Did he
   personally call the fire department?

9              MR. LICHTEN: Did someone call the
   fire department?

11    A.    No.

12    Q.    How were the fires --

13    A.    We would extinguish it ourselves because they had a
    little water hose there, and they would tell us to
    extinguish it ourselves.

16    Q.    Did the fire department come for any of the fires
    that you saw?

18    A.    From all the fires they had there, they came over
    while I was there once.

20    Q.    I see. And did you ever see anybody injured at one
    of these fires?

22    A.    No, no. But that we inhaled -- we swallowed
    [verbatim] a lot of smoke, yes.

24    Q.    Did you have any masks that they gave you?

# EXHIBIT 63

Wilfredo Ortiz 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

30

1      in sheer speculation about something might have

2      happened to someone he's testified he's not aware

3      of.  I'm smiling at your question.  It's not at the

4      witness.

5                     MR. BERGER:  I may make him an expert

6      witness.  I know you know everything, but I think he

7      could be an expert witness because he's been a

8      supervisor.

9                     MR. LICHTEN:  But now I'm smiling

10     again.

11                    MR. BERGER:  We know you're -- okay.

12     Let's go.

13  Q.  Could you then tell us whether the pumping machines

14     were equally as old and broken down?

15                    MR. LICHTEN:  Objection.

16  A.  They were also antiques too.

17  Q.  How about the stitching machines?

18  A.  All of them antiques.

19  Q.  And do you find this an amusing topic, to hear about

20     pumping machines and stitching machines --

21                    MR. LICHTEN:  Objection.

22  Q.  -- and seeing an attorney laughing about it?

23                    MR. LICHTEN:  Objection.  I'm going

24     to -- if you keep it up, I'm going to suspend the

Wilfredo Ortiz 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

31

1        deposition.

2                        MR. BERGER:  Let him answer my

3        question.

4    A.   This is a serious thing.

5                        THE INTERPRETER:  Are we done here?

6                        MR. BERGER:  No.

7                        INTERPRETER:  Okay.  I'll give you

8        five more minutes.  It's been a long day.  It's been

9        today, and we've been doing this for a long time.

10                       MR. BERGER:  I've got ten minutes

11       then.

12   Q.   Did the ovens catch fire?

13   A.   Yes, yes.

14   Q.   And they kept catching on fire continually until the

15       plant was closed; did they not?

16                       MR. LICHTEN:  Objection.

17   A.   No.  When the ovens were working, sometimes they

18       would catch fire, and we were the ones that we had

19       to extinguish, you know, the fire.

20   Q.   And this tradition continued until the closing of

21       the plant?

22                       MR. LICHTEN:  Objection.

23   A.   Exactly, yes.

24   Q.   And how often were the grease fires?

# EXHIBIT 64

Jose D. Ramirez 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

34

1    they would put stuff up in English, Spanish,

2    Portuguese, German, French, Italian, Polish,

3    German, anything?

4         A    (Through the Interpreter) No, no.

5         Q    Nothing.

6              So you were given no notice of when

7    these --

8              THE INTERPRETER:  Meetings.

9         Q    -- meetings took place?

10             MR. LICHTEN:  Objection.

11        A    (Through the Interpreter) No.

12        Q    Now, was one of the reasons that you

13   crossed yourself before you went into the plant,

14   because there were fires all the time?

15             MR. LICHTEN:  Objection.

16        A    (Through the Interpreter) There were

17   fires.  There were fires.  And also the fact that

18   they attacked us a lot when we worked there.  And,

19   you know, there were fires.

20        Q    And were you worried sometimes that maybe

21   you had taken a wrong turn and you had come to all

22   the fires in hell?

23             THE INTERPRETER:  I'm sorry, I didn't

24   hear the last part.

# EXHIBIT 65

Ramon Rodriguez 3-24-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

33

1   Q.   Now, is it true that there were fires

2       intermittently or constantly until the

3       plant's closing?

4             MR. LICHTEN:  Objection.

5   A.   Yes.

6   Q.   When you say "frequent," do we mean every

7       day there were fires there?

8             MR. LICHTEN:  Objection.

9   A.   Not every day, no.

10   Q.   Every week?

11             MR. LICHTEN:  Objection.

12   A.   Once in a while.

13   Q.   That was until the very day at the end of

14       the plant?

15             MR. LICHTEN:  Objection.

16   A.   Yes.

17   Q.   And when you first worked there, how much

18       did you make an hour?

19   A.   $1.85.

20   Q.   Was that higher than the minimum wage?

21             MR. LICHTEN:  Objection.

22   A.   I don't know how much was the minimum wage.

23   Q.   How did you get recruited for the job?

24   A.   I went there to look for a job, and they put

# EXHIBIT 66

Antonio Martinez 3-23-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

15

1    A.    No.

2    Q.    Now, in the plant were there fires constantly?

3    A.    Oh, yes.

4    Q.    And in the plant, was there dust flying around?

5    A.    Too much, a lot.

6    Q.    In the plant, did people lose fingers?

7    A.    Yes.

8    Q.    And how many fingers were lost in this plant?

9                    MR. LICHTEN:   Objection.

10   A.    I just remember one person that lost two fingers.

11   Q.    And how many faces were cut and scarred?

12                   MR. LICHTEN:   Objection.

13   A.    I don't remember.

14   Q.    Do you have any reason to believe that the union was

15         not aware of the fires or the cuts or the people who

16         lost fingers?

17                   MR. LICHTEN:   Objection.

18   A.    I'm not sure.

19   Q.    Well, what safety -- what did the union -- well,

20         strike that.

21                   Did the union have a bulletin board

22         for posting notices?

23   A.    No.

24   Q.    Did the union ever give you any notices of meetings?

# EXHIBIT 67

Luis A. Martinez 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

30

1          MR. BERGER:  Could you repeat the

2      question.  I got an objection that was not

3      responsive.

4               (Question read back)

5  A.   Well, because I don't speak English.  I don't know

6      any laws about this country.  The only thing that I

7      came to work at this factory and nothing else.

8          MR. LICHTEN:  Objection.  Move to

9      strike as unresponsive.

10 Q.   Were there a lot of fires at the plant?

11 A.   Yes.  There were a lot of fires.  Every time, there

12     was a lot of dust around and a lot of the chemicals.

13     They used a lot of chemicals.

14 Q.   Did the union have a poster board where they stuck

15     notices up for you?

16 A.   No, never.

17 Q.   And did the union ever come to the place where you

18     worked, where you actually worked, or did the union

19     only go to the office where the bosses were?

20 A.   The union, no.  They didn't come to me.  They would

21     go to their office.  They wouldn't go through the

22     main door.  They would go through a door downstairs

23     or something, right next to the door, and they would

24     go into their office.

# EXHIBIT 68

Page 22

```
 1   English.
 2      Q   Okay.
 3         (Exhibit No. 4 marked for
 4   identification.)
 5   BY MR. LICHTEN:
 6      Q   I'm showing you Exhibit No. 4 and ask you
 7   if you recall receiving a letter from Mr. Alexander
 8   on or about January 30, 2003, enclosing a fully
 9   signed copy of the new collective bargaining
10   agreement?
11      A   (Through the Interpreter) What do you
12   mean, with the contract -- after the contract was
13   signed?
14      Q   Yes.
15         MR. LICHTEN:  Could you read for him
16   the contents of the letter?
17         THE INTERPRETER:  Absolutely.
18         (Document interpreted for the
19   witness.)
20   BY MR. LICHTEN:
21      Q   My question is having been read the
22   letter, do you recall receiving this letter?
23      A   (Through the Interpreter) Yes.
24      Q   Okay.
```

Page 23

```
 1         Do you recall sometime in early 2003
 2   Mr. Alexander telling you that the United
 3   Steelworkers of America was going to have a
 4   training conference in Spanish for union stewards
 5   and inviting you to attend and telling you that the
 6   Steelworkers would pay the cost of the conference?
 7      A   (Through the Interpreter) Are we talking
 8   about some people that came over to the place and
 9   they told us to sign a piece of paper or something
10   and then afterwards they closed the factory?
11         Is that what you're talking about?
12      Q   No.  Let me do it this way.
13         (Exhibit No. 5 marked for
14   identification.)
15   BY MR. LICHTEN:
16      Q   Showing you Exhibit 5, and first let me
17   ask the interpreter to interpret just the bold
18   section.
19         (Document interpreted for the
20   witness.)
21      A   (Through the Interpreter) This
22   document -- nobody received this document, this
23   letter.  This letter, they did it right after they
24   closed the factory in 2003, the same date when they
```

Page 24

```
 1   closed the factory.
 2      Q   Isn't it true that the factory wasn't
 3   closed until November of 2003, which would be nine
 4   months after January 4th of 2003?
 5      A   (Through the Interpreter) Before, but I
 6   didn't receive that.  I didn't receive this either.
 7      Q   Okay.
 8         My question -- let me -- my question
 9   is do you recall some time in 2003 Mr. Alexander
10   speaking to you and telling you that the
11   Steelworkers were going to have a Spanish -- a
12   steward's training program in Spanish and you were
13   invited to attend?
14      A   (Through the Interpreter) I remember
15   about a meeting or a reunion or something, but I
16   told him that at the time I didn't have a car and
17   that I needed a ride, and he told me that he had
18   another place, some other place to go to.
19      Q   And where did you live at the time -- did
20   you still live in Boston at the time?
21      A   (Through the Interpreter) Yes.
22      Q   And did he tell you that the Steelworkers
23   would pay the -- for the cost of the training
24   itself?
```

Page 25

```
 1      A   (Through the Interpreter) I don't
 2   remember.  I don't know.  I don't remember.
 3      Q   Okay.
 4         After you became the union steward,
 5   did you understand that in the contract, you were
 6   the person that had to file the first step of a
 7   grievance?
 8      A   (Through the Interpreter) I understood
 9   that I was there to help people.  Whatever he would
10   tell me, you know, I would say it, I would say to
11   the people.
12      Q   Okay.
13         Did you know that -- about the
14   grievance procedure in the contract?
15      A   (Through the Interpreter) A grievance, in
16   case there was a grievance or something, I would go
17   there and talk to some people first, talk to the
18   owners; and then if I couldn't fix it, I would
19   speak to him.
20      Q   Okay.
21         And did you do that sometimes during
22   the time that you were the union steward?
23      A   (Through the Interpreter) Around that
24   time, there weren't that many grievances.  But
```

7 (Pages 22 to 25)

# EXHIBIT 69

Elison Pena 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

55

1             Shortly before that incident, now

2    that we have recalled the facts --

3             THE INTERPRETER:  When you're talking

4    about the incident, the time that they took the

5    cards away?

6             MR. BERGER:  Yes.

7        Q    -- do you remember the fires?

8        A    (Through the Interpreter) Yes.

9        Q    Okay.

10            And that would be within a few weeks

11   before that incident?

12       A    (Through the Interpreter) Yes, a couple

13   of weeks before that.

14       Q    Okay.

15            And that was fires in the ceiling?

16       A    (Through the Interpreter) It wasn't on

17   the ceiling.  It was through the -- the exhaust

18   that would come out, that comes out of the oven.

19       Q    All right.

20            So certainly in the month of November

21   there were fires?

22       A    (Through the Interpreter) There were

23   fires there all the time.

24       Q    Okay.

Elison Peña 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

56

1                    So -- but your answer is yes?

2       A      (Through the Interpreter) Yes.

3       Q      And that's November of 2003?

4       A      (Through the Interpreter) Yes.

5              MR. BERGER:  No further questions.

6              MR. LICHTEN:  Nothing further.

7              MR. DIAZ:  Okay.

8              MR. LICHTEN:  Thank you.

9              (Proceedings adjourned at 1:41 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

# EXHIBIT 70

Clemente Hernandez 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

6

1  A.  When they closed the factory, I started at that

2      place in February, from there until December of

3      2004.

4  Q.  Did you get unemployment for any time after

5      Farnsworth Fibre closed?

6  A.  Unemployment, yes.

7  Q.  How many years did you work at Farnsworth Fibre?

8  A.  I started June 21, 1999 until November 14th of 2003

9      when they closed the place.

10 Q.  And what were you making there, what was your last

11     pay rate at Farnsworth?

12 A.  11.05.

13 Q.  And what was your job, what were you doing?

14 A.  I used to work on -- setting or putting in order all

15     this, like, presses when they came out of the oven.

16 Q.  I see.  Did you ever injure yourself at Farnsworth

17     Fibre?

18 A.  No, no.

19 Q.  Did you ever see anybody injured while you worked at

20     Farnsworth Fibre?

21 A.  No that the I can remember, no.

22 Q.  Did you ever see any fires at Farnsworth Fibre while

23     you worked there?

24 A.  A lot, yeah.

Clemente Hernandez 3-23-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

7

1    Q.    And were these fires near where you worked?

2    A.    Right there next to me.

3    Q.    And can you describe what these fires -- strike

4          that.

5                     Did you call the fire department?

6          Did the fire department come for these fires?

7                     THE INTERPRETER:  If I may.  Did he

8          personally call the fire department?

9                     MR. LICHTEN:  Did someone call the

10         fire department?

11   A.    No.

12   Q.    How were the fires --

13   A.    We would extinguish it ourselves because they had a

14         little water hose there, and they would tell us to

15         extinguish it ourselves.

16   Q.    Did the fire department come for any of the fires

17         that you saw?

18   A.    From all the fires they had there, they came over

19         while I was there once.

20   Q.    I see.  And did you ever see anybody injured at one

21         of these fires?

22   A.    No, no.  But that we inhaled -- we swallowed

23         [verbatim] a lot of smoke, yes.

24   Q.    Did you have any masks that they gave you?

# EXHIBIT 71

Wilfredo Ortiz 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

30

1          in sheer speculation about something might have

2          happened to someone he's testified he's not aware

3          of.  I'm smiling at your question.  It's not at the

4          witness.

5                      MR. BERGER:  I may make him an expert

6          witness.  I know you know everything, but I think he

7          could be an expert witness because he's been a

8          supervisor.

9                      MR. LICHTEN:  But now I'm smiling

10         again.

11                     MR. BERGER:  We know you're -- okay.

12         Let's go.

13    Q.   Could you then tell us whether the pumping machines

14         were equally as old and broken down?

15                     MR. LICHTEN:  Objection.

16    A.   They were also antiques too.

17    Q.   How about the stitching machines?

18    A.   All of them antiques.

19    Q.   And do you find this an amusing topic, to hear about

20         pumping machines and stitching machines --

21                     MR. LICHTEN:  Objection.

22    Q.   -- and seeing an attorney laughing about it?

23                     MR. LICHTEN:  Objection.  I'm going

24         to -- if you keep it up, I'm going to suspend the

Wilfredo Ortiz 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

31

1    deposition.

2                    MR. BERGER:  Let him answer my

3    question.

4    A.   This is a serious thing.

5                    THE INTERPRETER:  Are we done here?

6                    MR. BERGER:  No.

7                    INTERPRETER:  Okay.  I'll give you

8    five more minutes.  It's been a long day.  It's been

9    today, and we've been doing this for a long time.

10                   MR. BERGER:  I've got ten minutes

11   then.

12   Q.   Did the ovens catch fire?

13   A.   Yes, yes.

14   Q.   And they kept catching on fire continually until the

15   plant was closed; did they not?

16                   MR. LICHTEN:  Objection.

17   A.   No.  When the ovens were working, sometimes they

18   would catch fire, and we were the ones that we had

19   to extinguish, you know, the fire.

20   Q.   And this tradition continued until the closing of

21   the plant?

22                   MR. LICHTEN:  Objection.

23   A.   Exactly, yes.

24   Q.   And how often were the grease fires?

# EXHIBIT 72

Elison Pena 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

17

1          MR. LICHTEN:  I'll stick with the

2     question.

3          THE INTERPRETER:  Could you repeat

4     the question, please?

5          MR. LICHTEN:  Yes.  You can repeat

6     the question?

7          MR. BERGER:  In addition, it's asked

8     and answered.  He said he doesn't remember.

9          MR. LICHTEN:  I'll stick with the

10    question.

11         MR. BERGER:  Can you tell him what I

12    said?

13         THE INTERPRETER:  Okay.

14         MR. LICHTEN:  Can you read back the

15    question now?  Thank you.

16              (Record read as requested.)

17         MR. BERGER:  Objection.  Move to

18    strike.

19    A     (Through the Interpreter) They didn't

20    protect me.  They didn't protect us.

21    BY MR. LICHTEN:

22    Q     Okay.  Can you tell me what specifically

23    you believe the union should have done to protect

24    you that they did not do?

Elison Peña 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

18

1      A      (Through the Interpreter) They closed the

2  factory, and we were not -- we were not notified in

3  any way that they were going to close.

4                They didn't do anything to protect

5  us.

6      Q     And are there specific things that you

7  believe the United Steelworkers of America could

8  have done that they did not do to protect you

9  against the closing of this plant?

10               MR. BERGER:  Objection.  Move to

11 strike.

12               Request another question since that

13 really is a very speculative question for him.

14 He's not a union official.

15               MR. LICHTEN:  I'll stay with the

16 question, if you want to read it back.

17               (Record read as requested.)

18               MR. BERGER:  Objection.  Move to

19 strike.

20     A      (Through the Interpreter) They didn't

21 help us in any way.  I would pay the union dues

22 there for nothing.

23     Q      And, again, my question is are there

24 specific things that you believe they should have

Elison Pena 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

23

1    A    (Through the Interpreter) No, I don't

2  remember right now.

3    Q    Okay.

4         Do you remember anything -- did you

5  say anything at the meeting that you attended?

6    A    (Through the Interpreter) No, I would

7  always let myself to hear, to listen.

8    Q    Okay.

9         Are you aware of any instance in

10  which someone -- in which an employee at Farnsworth

11  complained about working conditions or that the

12  workplace was unsafe?

13    A    (Through the Interpreter) No.  Almost at

14  any time, we have to --

15         THE INTERPRETER:  Verbatim.

16    A    -- flee the place, because all of a

17  sudden, something could catch fire often, and all

18  of us would have to just flee the place all the

19  time.

20    Q    My question is do you know or anyone that

21  you know or anyone that you're aware of, did anyone

22  complain to Mr. Ortiz or to the Steelworkers about

23  any of these unsafe conditions?

24    A    (Through the Interpreter) I don't

Elison Pena 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

25

```
1    the last question.

2                    MR. BERGER:  In the view of the

3    threat of sanctions, I feel it's in my client's

4    best interest to withdraw the question.

5                    Any further threats seem to me to be

6    subprofessional.  I would like you to rephrase it.

7                    MR. LICHTEN:  Could you just read

8    back the question, please?

9                    (Record read as requested.)

10       A    (Through the Interpreter) When she spoke,

11   she was sort of like pedantic, repugnant.

12                   MR. DIAZ:  If I may, arrogant?  Is

13   that what you --

14                   THE INTERPRETER:  "Repugnante" is

15   repugnant.

16                   MR. DIAZ:  Obnoxious.

17                   THE INTERPRETER:  "Repugnante" is

18   repugnant.  That's the word, and the synonym is

19   pedantic.  They're both the same word.

20                   MR. DIAZ:  I defer to my brother.

21       A    (Through the Interpreter) She spoke in a

22   bad way.

23       Q    And when you say she spoke in a bad way,

24   what does that mean, she spoke in a bad way?
```

Elison Pena 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

26

1      A      (Through the Interpreter) Like she was

2  like -- like she was in favor of the person she was

3  with, that she didn't --

4              She wouldn't answer our questions

5  properly.  She wouldn't use an appropriate answer,

6  and she was leaning -- she would take their side of

7  it.

8      Q    Just so I'm clear, was she interpreting

9  what others were saying, or was she giving

10  information and making statements on her own and

11  not interpreting?

12             MR. DIAZ:  Let me object to the form,

13  Harold, because -- and if I may just make a

14  commentary, because if you establish that he knew

15  English, then he could know if she's making

16  commentary or interpreting.

17             So with that in mind, he can answer

18  it if he knows --

19             MR. LICHTEN:  Yes, that's right.

20             MR. DIAZ:  If he understands.

21             MR. LICHTEN:  That's a fair

22  statement.

23      A    (Through the Interpreter) No, no.

24      Q    Did she say anything to make you believe

Elison Pena 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

29

1    many times did you meet Mr. Alexander, the person

2    sitting next to me?

3        A    (Through the Interpreter) I don't

4    remember.

5        Q    Do you ever recall him saying or doing

6    anything that made you think that he was biased

7    against Hispanics?

8        A    (Through the Interpreter) Because -- I

9    don't know, because he would never get together

10   with me.

11       Q    When you say he would never get together

12   with you, did you ever ask to meet with him?

13           Did you ever ask to meet with him?

14       A    (Through the Interpreter) I don't

15   remember.

16       Q    Okay.

17           Did you ever ask Mr. Ortiz, the union

18   steward, to arrange a meeting with the Steelworkers

19   so that you could make any complaints or express

20   any grievances?

21       A    (Through the Interpreter) I don't

22   remember.

23       Q    Other than the plant closing, are there

24   any wages or benefits or other monetary things that

Elison Peña 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

36

1   for you?

2      A    (Through the Interpreter) None.

3      Q    What training program did the union have?

4      A    (Through the Interpreter) When the union

5   would go there, first they would go to their office

6   first.

7      Q    Okay.

8           Now, what equipment did the union

9   ensure was available for you?

10      A    (Through the Interpreter) None.

11      Q    So that we can make this clear, did you

12   say there were fires often in the plant?

13      A    (Through the Interpreter) Because of the

14   bad stuff, the conditions, the bad conditions the

15   factory was in.

16      Q    Okay.

17           MR. LICHTEN:  Objection.  Move to

18   strike.  Nonresponsive to the question.

19           MR. BERGER:  What's nonresponsive to

20   the question?

21           MR. LICHTEN:  It was a yes or no

22   question.

23           MR. BERGER:  Okay.  Fair enough.

24   BY MR. BERGER:

Elison Pena 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

37

1      Q      First thing is did you say there were

2   fires often in the plant earlier?

3      A      (Through the Interpreter) Yes.

4      Q      Okay.

5             Describe to us in detail the nature

6   of the fires in the plant.

7      A      (Through the Interpreter) Because there

8   were a lot of machines, machinery that was on, that

9   was turned on.  And because of that, the

10  temperature was very, very hot.

11     Q      And there were fires during the entire

12  time that you were employed at the plant, correct?

13     A      (Through the Interpreter) Yes.

14     Q      Right until November of 2003?

15     A      (Through the Interpreter) Yes.

16     Q      How many people were hurt as a result of

17  these fires?

18     A      (Through the Interpreter) No, because if

19  we didn't call the fire department, we would sort

20  of extinguish the fire with fire extinguishers.

21     Q      Okay.

22            Did they provide any protection for

23  your breathing when there were constant fires at

24  this plant?

Elison Peña 3-22-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

38

1          MR. LICHTEN:  Who is "they"?

2          Objection to the form of the

3     question.

4          MR. BERGER:  Go ahead.  Answer it.

5     Obviously you know what I mean.

6     A     (Through the Interpreter) No.  We had to

7     take the water ourselves with all the smoke and

8     everything, we had to take everything outside.

9     Q     Did the union help you in any way about

10    this continuing fire situation?

11    A     (Through the Interpreter) No.

12    Q     Okay.

13          Could you tell us what you mean when

14    you said that the union left you like dogs?

15          MR. LICHTEN:  Objection to the form.

16          MR. BERGER:  Okay, I'll rephrase it.

17    Q     Did you use the phrase the union "left

18    you like dogs"?

19          MR. LICHTEN:  Objection to the form.

20    A     (Through the Interpreter) Yes.

21    Q     What did you mean?

22          MR. LICHTEN:  Objection.

23          MR. BERGER:  What's your objection

24    now?  It's a term he used.  What does it -- I mean

Elison Pena 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

39

1    this is getting ridiculous.

2              MR. DIAZ:  Let's keep on with the

3    questioning.

4              MR. BERGER:  It's ridiculous.

5        Q    Go ahead.

6              MR. DIAZ:  He objected, but he's not

7    telling him not to answer.  He objected because he

8    wants to preserve his rights.

9              If I misunderstand, let me know.

10             MR. BERGER:  Let me start it again.

11   BY MR. BERGER:

12       Q    Did you use the term that the union "left

13   you like dogs"?

14             MR. LICHTEN:  Objection.

15       A    (Through the Interpreter) Yes.

16       Q    What did you mean?

17             MR. LICHTEN:  Objection.

18       A    (Through the Interpreter) Because they

19   didn't pay attention to whatever was said there.

20       Q    Do you also have strong feelings about

21   the role of the union in the fires?

22             MR. LICHTEN:  Objection.

23       A    (Through the Interpreter) They never did

24   anything about it.

Elison Pena 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

41

1    very irresponsible.

2          Q    Okay.

3                    Well, let me concentrate on during

4    the time that you were at Farnsworth Fibre.

5                    Other than Jose Ortiz, were there

6    any -- was there anything in place for you as a

7    worker to know what process to follow in case

8    Mr. Ortiz was not at the job, was not doing his

9    job, or if you needed to contact someone directly

10   at either Local 421-U and/or United Steelworkers of

11   America?

12         A    (Through the Interpreter) No, they didn't

13   tell me anything.

14         Q    For example, was there a work area where

15   employees could have a posting so that they could

16   have something in Spanish saying contact the

17   Steelworkers at this number, we have a complaint,

18   or contact Local 421-U if you have a complaint,

19   something in Spanish with a phone number so that

20   you can contact someone directly?

21         A    (Through the Interpreter) No.

22         Q    Have you prior to November of 2003 known

23   individuals who are members of other unions?

24         A    (Through the Interpreter) No.

Elison Pena 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

45

1      A      (Through the Interpreter) No.

2      Q      Did they ever offer you at any time prior

3  to your being notified of the plant closings any

4  opportunity for job training, for advancement or to

5  move somewhere else where the union may have had

6  jobs, let's say, Cleveland, Ohio, or any other part

7  of the country?

8      A      (Through the Interpreter) No.

9      Q      Okay.

10             I suppose the next question may not

11  be allowed, but let me ask it anyway.

12             Were you in a position where if the

13  United Steelworkers of America had notified you

14  when the plant was closing that there was work in

15  another place, were you able to relocate?

16      A      (Through the Interpreter) Yes.

17      Q      Okay.

18             MR. DIAZ:  No further questions.

19             MR. LICHTEN:  I have a few more

20  questions, just to follow up.

21

22                    FURTHER EXAMINATION

23  BY MR. LICHTEN:

24      Q      What training are you claiming the

# EXHIBIT 73

Wilfredo Ortiz 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

23

```
 1                    MR. LICHTEN:  Objection.

 2   A.   I thought that well, like I said before, that before

 3        the union would speak to him, that first, they would

 4        go to their office.

 5   Q.   Now, do you think that their going to the office

 6        instead of dealing with you was discriminatory with

 7        respect to you and with respect to the workforce?

 8                    MR. LICHTEN:  Objection.

 9   A.   Yes.

10   Q.   Could you explain why.

11                    MR. LICHTEN:  Objection.

12   A.   Because he would go to the office and whatever the

13        office would say, that's what they would tell us

14        that's what -- us do.

15   Q.   Is it safe to say that you and the other Hispanic

16        workers were denied a voice in the process?

17                    MR. LICHTEN:  Objection.

18   A.   Yes.

19   Q.   And do you believe that the motive for doing that

20        was to keep your wages as Hispanics very, very low?

21                    MR. LICHTEN:  Objection.

22   A.   Yes.

23   Q.   And do you see the attorney laughing?

24   A.   Yes.
```

Wilfredo Ortiz 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

24

1   Q.   Does that seem insulting to you?

2   A.   Yes.

3   Q.   Is it a form of intimidation or humiliation being

4        expressed --

5                  MR. LICHTEN:  Mr. Berger, you're

6        getting a little out of control here.

7   A.   Yes.

8                  MR. BERGER:  Could I get the last

9        question before the laughter.

10                 (Question read)

11  Q.   Can you answer that, please.

12  A.   No.  I don't think so, but since we all have rights,

13       the fact that we're Hispanics and we didn't speak

14       the language, they would take vengeance on us

15       because of that.

16  Q.   Take advantage of you?

17                 THE INTERPRETER:  Vengeance.

18  Q.   Okay.  But do you mean take advantage of you?

19  A.   Yes, like discriminating me.

20  Q.   Now, did the union similarly act in a way that was

21       motivated to get your union contributions without

22       shaking the boat with the employer at this point?

23                 MR. LICHTEN:  Objection.

24  A.   No.  The first thing they would do is they would go

Wilfredo Ortiz 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

25

```
1          to the office first and would talk to the people in

2          the office.  And for instance, we would ask for,

3          like, a dollar raise or something like that, they

4          would say no, no.  We'll give them 15, 20 cents.

5    Q.    Okay.  And do you think this was as a result of the

6          fact that the workforce was entirely Hispanic?

7                    MR. LICHTEN:  Objection.

8    A.    Yes.

9    Q.    Now, at any time, did the union invite any of you

10         Hispanic workers to their quarterly -- excuse me.

11                   Did the union ever invite you or any

12         of your Spanish coworkers to their quarterly

13         meetings?

14   A.    No.

15   Q.    Why not?

16   A.    That I know of, because they would negotiate amongst

17         themselves.

18   Q.    Now, did the union ever put up bulletin board for

19         you to give you information about anything?

20   A.    No.

21   Q.    Did the union provide any assistance to you about

22         the people who had suffered injuries like loss of

23         fingers, cutting of the face, and this kind of

24         thing?
```

Wilfredo Ortiz 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

26

1                    MR. LICHTEN:  Objection.

2    A.   No.

3    Q.   Tell me, is there any doubt in your mind whether

4         they know about people who had lost their fingers

5         and people who had been cut on their face?

6                    MR. LICHTEN:  Objection.

7    A.   Yes, I know I've seen them.  There have been many

8         accidents there.

9                    MR. LICHTEN:  Move to strike.  Not

10        responsive.

11   Q.   So you observed many accidents?

12                   MR. LICHTEN:  Objection.

13   A.   Yes.

14   Q.   Can you tell us about what you observed.

15   A.   There was the accident with Jose Ortiz.  I was

16        present then when the machine cracked [verbatim]

17        his finger.

18   Q.   And did he scream?

19   A.   No.  He didn't scream, but he was, like, holding it

20        in.

21   Q.   In fact, didn't the employer make him work an extra

22        15 minutes before he was relieved?

23                   MR. LICHTEN:  Objection.

24   A.   No, no.

Wilfredo Ortiz 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

27

1    Q.   How did it work?  What happened?

2    A.   He was cleaning the machine, and afterwards, the

3         machine was still running, and then the machine

4         cracked his finger, cut it.

5    Q.   And how old was that machine?

6              MR. LICHTEN:  Objection.

7    A.   An antique.

8    Q.   A hundred years; do you think?

9    A.   Yeah.

10   Q.   Did the union ever look at any of machines like this

11        one where this accident happened?

12   A.   No.

13   Q.   You were going to describe other injures that

14        happened there?

15   A.   Yes.  There were people there too.

16   Q.   Now, did the union ever make sure that the plant

17        complied with federal laws like the Occupational

18        Safety Act?

19             MR. LICHTEN:  Objection.

20   A.   I don't know.  I don't know.

21   Q.   Okay.  Well, did the union make sure that the

22        federal safety laws were complied with?

23             MR. LICHTEN:  Objection.

24   A.   No.

Wilfredo Ortiz 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation. et al.

28

1    Q.    Did they ever come to see whether any of you were

2          protected from the fires?

3                      MR. LICHTEN:   Objection.

4    A.    No.

5    Q.    And how about for the handling of paints and

6          chemicals?

7    A.    No.

8    Q.    Did, in your opinion, the union care about what

9          happened to the safety of the people in this plant

10         that consisted solely of Hispanics?

11                     MR. LICHTEN:   Objection.

12   A.    No.   They never cared for anything, no.

13   Q.    And you're not a member of the Upholstery Workers

14         Union, are you?   You're a member of the Steelworkers

15         union?

16                     MR. LICHTEN:   Objection.

17   A.    Yes.

18   Q.    You were in the Steelworkers union; right?

19   A.    Yes.

20   Q.    At any time, did the Steelworkers union provide you

21         any training, especially someone like you, who had

22         been the supervisor so that you could have more

23         skills in the workplace?

24                     MR. LICHTEN:   Objection.

Wilfredo Ortiz 3-23-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

29

```
1    A.   No.

2    Q.   Now, some individual was cut by a grinder and cut

3         three fingers -- were cut.  I think it was an

4         earlier testimony.  It was Jose Ortiz's uncle?

5                        MR. LICHTEN:  Objection.  Move to

6         strike.

7    Q.   Do you know anything about that?

8    A.   No.  I knew of Jose Ortiz, that he cut his finger.

9    Q.   And how about Mr. Baez; did you know about his

10        accident?

11                       MR. LICHTEN:  Objection.

12   A.   No.

13   Q.   Were there some grinder machines there?

14   A.   Yes.

15   Q.   How old were they?

16   A.   They're old.  They're antique.  They're so old they

17        don't even have replacement parts or pieces for

18        those machines.

19   Q.   And would you be surprised that somebody cut three

20        of their fingers on a machine like that?

21                       MR. LICHTEN:  Objection.

22   Q.   Is this gentleman laughing at you?

23                       MR. LICHTEN:  Again, I'm smiling at

24        your question that you would ask someone to engage
```

Wilfredo Ortiz 3-23-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

37

1    A.    Because they would never help us.

2    Q.    Please explain what you mean.

3    A.    Because on certain occasions, I was obligated -- we

4          were obligated to work overtime.  And sometimes,

5          they would make us -- make me extinguish fires by

6          ourselves.  Sometimes I would have to get on top of

7          a room myself to extinguish a fire on top of a

8          machine, and all of that smoke, I was inhaling.

9    Q.    In effect, did the union exploit you the way

10        employers exploit Hispanic workers?

11                MR. LICHTEN:  Again, I think your

12        questions are completely --

13                MR. BERGER:  You cannot put the sock

14        in someone's mouth.  Please let the man answer.

15                MR. LICHTEN:  For the record, I think

16        your questions are inappropriate.  They're out of

17        bounds and sanctionable.

18                MR. BERGER:  I think everything that

19        you did in the hallway borders on the ridiculous.

20        Screaming at another lawyer in the hallway.  I was

21        embarrassed for you.  So don't preach at me.

22                THE INTERPRETER:  I'm sorry.  Could

23        you repeat the question, please.

24                (Question read)

# EXHIBIT 74

Clemente Hernandez 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

6

1   A.   When they closed the factory, I started at that

2        place in February, from there until December of

3        2004.

4   Q.   Did you get unemployment for any time after

5        Farnsworth Fibre closed?

6   A.   Unemployment, yes.

7   Q.   How many years did you work at Farnsworth Fibre?

8   A.   I started June 21, 1999 until November 14th of 2003

9        when they closed the place.

10  Q.   And what were you making there, what was your last

11       pay rate at Farnsworth?

12  A.   11.05.

13  Q.   And what was your job, what were you doing?

14  A.   I used to work on -- setting or putting in order all

15       this, like, presses when they came out of the oven.

16  Q.   I see.  Did you ever injure yourself at Farnsworth

17       Fibre?

18  A.   No, no.

19  Q.   Did you ever see anybody injured while you worked at

20       Farnsworth Fibre?

21  A.   No that the I can remember, no.

22  Q.   Did you ever see any fires at Farnsworth Fibre while

23       you worked there?

24  A.   A lot, yeah.

Clemente Hernandez 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

7

1    Q.   And were these fires near where you worked?

2    A.   Right there next to me.

3    Q.   And can you describe what these fires -- strike

4        that.

5                 Did you call the fire department?

6        Did the fire department come for these fires?

7              THE INTERPRETER:  If I may.  Did he

8        personally call the fire department?

9              MR. LICHTEN:  Did someone call the

10       fire department?

11   A.   No.

12   Q.   How were the fires --

13   A.   We would extinguish it ourselves because they had a

14      little water hose there, and they would tell us to

15      extinguish it ourselves.

16   Q.   Did the fire department come for any of the fires

17      that you saw?

18   A.   From all the fires they had there, they came over

19      while I was there once.

20   Q.   I see.  And did you ever see anybody injured at one

21      of these fires?

22   A.   No, no.  But that we inhaled -- we swallowed

23      [verbatim] a lot of smoke, yes.

24   Q.   Did you have any masks that they gave you?

# EXHIBIT 75

Clemente Hernandez 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

6

1    A.    When they closed the factory, I started at that

2          place in February, from there until December of

3          2004.

4    Q.    Did you get unemployment for any time after

5          Farnsworth Fibre closed?

6    A.    Unemployment, yes.

7    Q.    How many years did you work at Farnsworth Fibre?

8    A.    I started June 21, 1999 until November 14th of 2003

9          when they closed the place.

10   Q.    And what were you making there, what was your last

11         pay rate at Farnsworth?

12   A.    11.05.

13   Q.    And what was your job, what were you doing?

14   A.    I used to work on -- setting or putting in order all

15         this, like, presses when they came out of the oven.

16   Q.    I see.  Did you ever injure yourself at Farnsworth

17         Fibre?

18   A.    No, no.

19   Q.    Did you ever see anybody injured while you worked at

20         Farnsworth Fibre?

21   A.    No that the I can remember, no.

22   Q.    Did you ever see any fires at Farnsworth Fibre while

23         you worked there?

24   A.    A lot, yeah.

Clemente Hernandez 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

7

1    Q.    And were these fires near where you worked?

2    A.    Right there next to me.

3    Q.    And can you describe what these fires -- strike

4          that.

5                      Did you call the fire department?

6          Did the fire department come for these fires?

7                      THE INTERPRETER:  If I may.  Did he

8          personally call the fire department?

9                      MR. LICHTEN:  Did someone call the

10         fire department?

11   A.    No.

12   Q.    How were the fires --

13   A.    We would extinguish it ourselves because they had a

14         little water hose there, and they would tell us to

15         extinguish it ourselves.

16   Q.    Did the fire department come for any of the fires

17         that you saw?

18   A.    From all the fires they had there, they came over

19         while I was there once.

20   Q.    I see.  And did you ever see anybody injured at one

21         of these fires?

22   A.    No, no.  But that we inhaled -- we swallowed

23         [verbatim] a lot of smoke, yes.

24   Q.    Did you have any masks that they gave you?

# EXHIBIT 76

Clemente Hernandez 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

8

1   A.   No.

2   Q.   Did you know Mr. Ortiz?

3   A.   Yes.  He's the guy from the union.

4   Q.   And did you ever go to him with any problems or

5        complaints or grievances?

6   A.   Yes.  We would tell him about the fires and

7        everything so he would speak to the union, but they

8        didn't do anything.

9   Q.   Okay.  Do you recall yourself speaking to Mr. Ortiz

10       about the fires?

11  A.   The exact date, I don't remember.

12  Q.   But do you remember yourself speaking to Mr. Ortiz

13       and complaining or trying to file a complaint about

14       the fires?

15  A.   Yes, because we worked together.  Four people worked

16       together.  I would say to him, Look.  Why don't you

17       talk to Lario or speak to Kenny and then -- so, you

18       know, and talk to the union because there's just too

19       many fires.

20  Q.   Okay.  And who's Lario?

21  A.   Larry.  He was the owner of the company.

22  Q.   Okay.  And when you would say this to Mr. Ortiz, did

23       he tell you that he would try to do something about

24       it?

# EXHIBIT 77

Elison Pena 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation. et al.

17

1                    MR. LICHTEN:  I'll stick with the

2     question.

3                    THE INTERPRETER:  Could you repeat

4     the question, please?

5                    MR. LICHTEN:  Yes.  You can repeat

6     the question?

7                    MR. BERGER:  In addition, it's asked

8     and answered.  He said he doesn't remember.

9                    MR. LICHTEN:  I'll stick with the

10    question.

11                    MR. BERGER:  Can you tell him what I

12    said?

13                    THE INTERPRETER:  Okay.

14                    MR. LICHTEN:  Can you read back the

15    question now?  Thank you.

16                    (Record read as requested.)

17                    MR. BERGER:  Objection.  Move to

18    strike.

19        A    (Through the Interpreter) They didn't

20    protect me.  They didn't protect us.

21    BY MR. LICHTEN:

22        Q    Okay.  Can you tell me what specifically

23    you believe the union should have done to protect

24    you that they did not do?

Elison Peña 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

18

1        A       (Through the Interpreter) They closed the

2    factory, and we were not -- we were not notified in

3    any way that they were going to close.

4                    They didn't do anything to protect

5    us.

6        Q    And are there specific things that you

7    believe the United Steelworkers of America could

8    have done that they did not do to protect you

9    against the closing of this plant?

10                   MR. BERGER:  Objection.  Move to

11   strike.

12                   Request another question since that

13   really is a very speculative question for him.

14   He's not a union official.

15                   MR. LICHTEN:  I'll stay with the

16   question, if you want to read it back.

17                   (Record read as requested.)

18                   MR. BERGER:  Objection.  Move to

19   strike.

20       A    (Through the Interpreter) They didn't

21   help us in any way.  I would pay the union dues

22   there for nothing.

23       Q    And, again, my question is are there

24   specific things that you believe they should have

Elison Pena 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

23

1      A     (Through the Interpreter) No, I don't

2 remember right now.

3      Q    Okay.

4           Do you remember anything -- did you

5 say anything at the meeting that you attended?

6      A     (Through the Interpreter) No, I would

7 always let myself to hear, to listen.

8      Q    Okay.

9           Are you aware of any instance in

10 which someone -- in which an employee at Farnsworth

11 complained about working conditions or that the

12 workplace was unsafe?

13      A     (Through the Interpreter) No. Almost at

14 any time, we have to --

15           THE INTERPRETER: Verbatim.

16      A    -- flee the place, because all of a

17 sudden, something could catch fire often, and all

18 of us would have to just flee the place all the

19 time.

20      Q    My question is do you know or anyone that

21 you know or anyone that you're aware of, did anyone

22 complain to Mr. Ortiz or to the Steelworkers about

23 any of these unsafe conditions?

24      A     (Through the Interpreter) I don't

Elison Pena 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

25

1    the last question.

2                    MR. BERGER:  In the view of the

3    threat of sanctions, I feel it's in my client's

4    best interest to withdraw the question.

5                    Any further threats seem to me to be

6    subprofessional.  I would like you to rephrase it.

7                    MR. LICHTEN:  Could you just read

8    back the question, please?

9                    (Record read as requested.)

10        A    (Through the Interpreter) When she spoke,

11    she was sort of like pedantic, repugnant.

12                    MR. DIAZ:  If I may, arrogant?  Is

13    that what you --

14                    THE INTERPRETER:  "Repugnante" is

15    repugnant.

16                    MR. DIAZ:  Obnoxious.

17                    THE INTERPRETER:  "Repugnante" is

18    repugnant.  That's the word, and the synonym is

19    pedantic.  They're both the same word.

20                    MR. DIAZ:  I defer to my brother.

21        A    (Through the Interpreter) She spoke in a

22    bad way.

23        Q    And when you say she spoke in a bad way,

24    what does that mean, she spoke in a bad way?

Elison Peña 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

26

1      A      (Through the Interpreter) Like she was

2   like -- like she was in favor of the person she was

3   with, that she didn't --

4           She wouldn't answer our questions

5   properly.  She wouldn't use an appropriate answer,

6   and she was leaning -- she would take their side of

7   it.

8      Q      Just so I'm clear, was she interpreting

9   what others were saying, or was she giving

10  information and making statements on her own and

11  not interpreting?

12          MR. DIAZ:  Let me object to the form,

13  Harold, because -- and if I may just make a

14  commentary, because if you establish that he knew

15  English, then he could know if she's making

16  commentary or interpreting.

17          So with that in mind, he can answer

18  it if he knows --

19          MR. LICHTEN:  Yes, that's right.

20          MR. DIAZ:  If he understands.

21          MR. LICHTEN:  That's a fair

22  statement.

23      A      (Through the Interpreter) No, no.

24      Q      Did she say anything to make you believe

Elison Pena 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

29

1    many times did you meet Mr. Alexander, the person

2    sitting next to me?

3         A    (Through the Interpreter) I don't

4    remember.

5         Q    Do you ever recall him saying or doing

6    anything that made you think that he was biased

7    against Hispanics?

8         A    (Through the Interpreter) Because -- I

9    don't know, because he would never get together

10   with me.

11        Q    When you say he would never get together

12   with you, did you ever ask to meet with him?

13             Did you ever ask to meet with him?

14        A    (Through the Interpreter) I don't

15   remember.

16        Q    Okay.

17             Did you ever ask Mr. Ortiz, the union

18   steward, to arrange a meeting with the Steelworkers

19   so that you could make any complaints or express

20   any grievances?

21        A    (Through the Interpreter) I don't

22   remember.

23        Q    Other than the plant closing, are there

24   any wages or benefits or other monetary things that

Elison Peña 3-22-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

36

1    for you?

2        A    (Through the Interpreter) None.

3        Q    What training program did the union have?

4        A    (Through the Interpreter) When the union

5    would go there, first they would go to their office

6    first.

7        Q    Okay.

8            Now, what equipment did the union

9    ensure was available for you?

10       A    (Through the Interpreter) None.

11       Q    So that we can make this clear, did you

12   say there were fires often in the plant?

13       A    (Through the Interpreter) Because of the

14   bad stuff, the conditions, the bad conditions the

15   factory was in.

16       Q    Okay.

17           MR. LICHTEN:  Objection.  Move to

18   strike.  Nonresponsive to the question.

19           MR. BERGER:  What's nonresponsive to

20   the question?

21           MR. LICHTEN:  It was a yes or no

22   question.

23           MR. BERGER:  Okay.  Fair enough.

24   BY MR. BERGER:

Elison Pena 3-22-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

37

1      Q      First thing is did you say there were

2   fires often in the plant earlier?

3      A      (Through the Interpreter) Yes.

4      Q      Okay.

5             Describe to us in detail the nature

6   of the fires in the plant.

7      A      (Through the Interpreter) Because there

8   were a lot of machines, machinery that was on, that

9   was turned on.  And because of that, the

10  temperature was very, very hot.

11     Q      And there were fires during the entire

12  time that you were employed at the plant, correct?

13     A      (Through the Interpreter) Yes.

14     Q      Right until November of 2003?

15     A      (Through the Interpreter) Yes.

16     Q      How many people were hurt as a result of

17  these fires?

18     A      (Through the Interpreter) No, because if

19  we didn't call the fire department, we would sort

20  of extinguish the fire with fire extinguishers.

21     Q      Okay.

22            Did they provide any protection for

23  your breathing when there were constant fires at

24  this plant?

Elison Peña 3-22-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

38

```
 1              MR. LICHTEN:  Who is "they"?

 2              Objection to the form of the

 3    question.

 4              MR. BERGER:  Go ahead.  Answer it.

 5    Obviously you know what I mean.

 6         A    (Through the Interpreter) No.  We had to

 7    take the water ourselves with all the smoke and

 8    everything, we had to take everything outside.

 9         Q    Did the union help you in any way about

10    this continuing fire situation?

11         A    (Through the Interpreter) No.

12         Q    Okay.

13              Could you tell us what you mean when

14    you said that the union left you like dogs?

15              MR. LICHTEN:  Objection to the form.

16              MR. BERGER:  Okay, I'll rephrase it.

17         Q    Did you use the phrase the union "left

18    you like dogs"?

19              MR. LICHTEN:  Objection to the form.

20         A    (Through the Interpreter) Yes.

21         Q    What did you mean?

22              MR. LICHTEN:  Objection.

23              MR. BERGER:  What's your objection

24    now?  It's a term he used.  What does it -- I mean
```

Elison Pena 3-22-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

39

1    this is getting ridiculous.

2                    MR. DIAZ:  Let's keep on with the

3    questioning.

4                    MR. BERGER:  It's ridiculous.

5        Q    Go ahead.

6                    MR. DIAZ:  He objected, but he's not

7    telling him not to answer.  He objected because he

8    wants to preserve his rights.

9                    If I misunderstand, let me know.

10                   MR. BERGER:  Let me start it again.

11   BY MR. BERGER:

12       Q    Did you use the term that the union "left

13   you like dogs"?

14                   MR. LICHTEN:  Objection.

15       A    (Through the Interpreter) Yes.

16       Q    What did you mean?

17                   MR. LICHTEN:  Objection.

18       A    (Through the Interpreter) Because they

19   didn't pay attention to whatever was said there.

20       Q    Do you also have strong feelings about

21   the role of the union in the fires?

22                   MR. LICHTEN:  Objection.

23       A    (Through the Interpreter) They never did

24   anything about it.

Elison Pena 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

41

1    very irresponsible.

2         Q    Okay.

3              Well, let me concentrate on during

4    the time that you were at Farnsworth Fibre.

5              Other than Jose Ortiz, were there

6    any -- was there anything in place for you as a

7    worker to know what process to follow in case

8    Mr. Ortiz was not at the job, was not doing his

9    job, or if you needed to contact someone directly

10   at either Local 421-U and/or United Steelworkers of

11   America?

12        A    (Through the Interpreter) No, they didn't

13   tell me anything.

14        Q    For example, was there a work area where

15   employees could have a posting so that they could

16   have something in Spanish saying contact the

17   Steelworkers at this number, we have a complaint,

18   or contact Local 421-U if you have a complaint,

19   something in Spanish with a phone number so that

20   you can contact someone directly?

21        A    (Through the Interpreter) No.

22        Q    Have you prior to November of 2003 known

23   individuals who are members of other unions?

24        A    (Through the Interpreter) No.

Elison Pena 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

45

1    A    (Through the Interpreter) No.

2    Q    Did they ever offer you at any time prior

3    to your being notified of the plant closings any

4    opportunity for job training, for advancement or to

5    move somewhere else where the union may have had

6    jobs, let's say, Cleveland, Ohio, or any other part

7    of the country?

8    A    (Through the Interpreter) No.

9    Q    Okay.

10             I suppose the next question may not

11   be allowed, but let me ask it anyway.

12             Were you in a position where if the

13   United Steelworkers of America had notified you

14   when the plant was closing that there was work in

15   another place, were you able to relocate?

16   A    (Through the Interpreter) Yes.

17   Q    Okay.

18             MR. DIAZ:  No further questions.

19             MR. LICHTEN:  I have a few more

20   questions, just to follow up.

21

22             FURTHER EXAMINATION

23   BY MR. LICHTEN:

24   Q    What training are you claiming the

# EXHIBIT 78

Euclides Soto, et al. v.
Sherman-Feinberg Corporation, et al.

Lowell F. Alexander
Vol. 1, February 18, 2005

Page 73

[1] Corporation?
[2] A: I don't know.
[3] Q: What policies and procedures were in place
[4] to coordinate safety with workers' compensation
[5] carriers, workers' compensation insurance carriers?
[6] A: I don't understand the question. Can you
[7] clarify that for me.
[8] Q: Are you aware whether the gas company had
[9] annual workers' compensation audits when you were
[10] president of the union?
[11] A: No, I'm not aware of them.
[12] Q: Well, tell me what is the — when you were
[13] president of the union —
[14] A: Uh-huh.
[15] Q: — what were your obligations with respect
[16] to health issues in the workplace?
[17] A: My obligations with respect to health
[18] issues? Well, if there were policies in place, we
[19] would make sure that those policies were adhered to.
[20] Q: What were they?
[21] A: I don't recall what those policies —
[22] Q: Well, how did you make sure —
[23] A: — were.
[24] Q: — you complied with the policies?

Page 74

[1] A: As a local union president?
[2] Q: Yes.
[3] A: If someone brought up an issue in terms of
[4] something wasn't being done or something was being
[5] done, I'd investigate it and bring it to the
[6] attention of the company and make sure it was
[7] addressed properly.
[8] Q: Did you do that for this company?
[9] A: No.
[10] Q: What was the racial composition of the gas
[11] company?
[12] A: In terms of?
[13] Q: Breakdown of Hispanic, Black, Asian workers
[14] when you were there when you were president of the
[15] union?
[16] A: Very small.
[17] Q: A small group of minority people?
[18] A: Yes.
[19] Q: Less than 10 percent?
[20] A: Yeah.
[21] Q: And what percentage of the work force at
[22] Sherman-Feinberg was Hispanic?
[23] A: I would say — from the people that I
[24] interacted with —

Page 75

[1] Q: Yes.
[2] A: — and the people I saw, a hundred percent.
[3] Q: What did you do to ensure that
[4] Sherman-Feinberg developed a written hazard
[5] communication program?
[6] A: What did I do to ensure that they developed
[7] a written hazard? Nothing specific.
[8] Q: Did you do anything to be sure that they
[9] maintained a written hazard communication program?
[10] A: Nothing specifically, no.
[11] Q: What did you do, if not specifically, then
[12] generally?
[13] (Interruption)
[14] A: Provided an avenue for people to be able to
[15] contact me.
[16] Q: How did you do that?
[17] A: I attended meetings. I attended local
[18] meetings, so if there was an issue that's generally
[19] where it gets brought up.
[20] Q: With whom and where? What are the
[21] circumstances under which you did that?
[22] A: Local meetings were held quarterly.
[23] Q: And who from this plant participated?
[24] A: I don't ever recall any of them showing up.

Page 76

[1] Q: Was there any subgroup composed of Spanish
[2] people at those meetings?
[3] A: Yes.
[4] Q: Who was in charge of that?
[5] A: It's a general membership meeting for the
[6] local.
[7] Q: Okay. And you provided a special portion
[8] of the meeting for people who spoke other languages?
[9] A: No.
[10] Q: Did Sherman-Feinberg Corporation keep
[11] material safety data sheets?
[12] A: I do not know. I don't know.
[13] Q: Did the union keep material safety data
[14] sheets about the heavy equipment or air quality or
[15] anything along those lines?
[16] A: No.
[17] Q: Did Sherman-Feinberg provide employees with
[18] training that included the methods and observations
[19] that may be used to detect the presence or release
[20] of hazardous air quality items in the work area?
[21] A: I don't know.
[22] *Q. Did the union ensure that Sherman-Feinberg
[23] provided employees with training that included at
[24] least the physical and health hazards of the work

Lowell F. Alexander
Vol 1, February 18, 2005

Euclides Soto, et al. v.
Sherman-Feinberg Corporation, et al.

Page 77

[1] area?
[2] **A:** Did the union ensure that the company
[3] provide —
[4] **THE WITNESS:** Can I hear it again.
[5] **MR. BERGER:** Could you just read it.
[6] **A:** You just got me — you lost me on that one.
[7] *(Question read)
[8] **A:** No.
[9] **Q:** Did the union ensure that the employer
[10] provide employees with training that included at
[11] least the measures that employees could take to
[12] protect themselves from the hazards of their work
[13] area?
[14] **A:** Not specifically, no.
[15] **Q:** Now, in connection with that question, did
[16] the union ever provide such assurances?
[17] **A:** I don't know.
[18] **Q:** Well, before you came here, did you review
[19] any documents?
[20] **A:** Before I came here today?
[21] **Q:** Yes.
[22] **A:** Yes.
[23] **Q:** And you've been in the union since 1978?
[24] Is that what you told us?

Page 78

[1] **A:** Yes.
[2] **Q:** So based on your review of your documents
[3] and your personal experience since 1980 — '78, can
[4] you think of any instance that the union ensured
[5] that the employer provided employees with training
[6] that included at least the measures that employees
[7] could take to protect themselves from the hazards of
[8] the work areas?
[9] **A:** When we received a complaint.
[10] **Q:** What complaint?
[11] **A:** If someone complained or someone had an
[12] issue that was brought to our attention, we
[13] addressed it and made sure that it was addressed
[14] appropriately.
[15] **Q:** Okay. When was that that you received it?
[16] **A:** Sometimes as a steward, sometimes as a
[17] vice-president and sometimes as president of the
[18] local.
[19] **Q:** Okay. Did you grieve it?
[20] **A:** Sometimes, yes.
[21] **Q:** How many grievances of that nature did you
[22] file yourself?
[23] **A:** I don't specifically remember filing any
[24] grievances in regards to that.

Page 79

[1] **Q:** Were you aware — but you did do — you did
[2] take those steps when you were at the gas company;
[3] is that correct?
[4] **A:** Yes. Those steps were taken, not
[5] specifically by me, but those steps were taken.
[6] **Q:** I understand. Were those steps ever taken
[7] on behalf of any of the employees at
[8] Sherman-Feinberg Corporation at any time since the
[9] Steelworkers organized the plant?
[10] **MR. LICHTEN:** Objection to the form.
[11] **A:** I don't know.
[12] **Q:** Did you review the — did you review
[13] material, written materials before you came here
[14] today?
[15] **A:** Some, yes.
[16] **Q:** And how many years have you been working as
[17] a rep for the union?
[18] **A:** Since '96.
[19] **Q:** During the course of your employment and
[20] through your review of the documents, did you see
[21] any evidence or have you heard anything indicating
[22] that the Sherman-Feinberg employees had been
[23] provided with training including the measures that
[24] employees could take to protect themselves from the

Page 80

[1] hazards of chemicals in their work areas at any
[2] time?
[3] **A:** No, I didn't review anything like that.
[4] **Q:** Did you ever — strike that. Did the union
[5] ever determine whether the employer had a hazard
[6] communication program?
[7] **A:** I don't know.
[8] **Q:** Was there ever an explanation of what to do
[9] when a finger had been cut off?
[10] **A:** I don't know if there ever was.
[11] **Q:** Was there ever a communication program
[12] about someone suffering from a burn on their bodies?
[13] **A:** I do not know.
[14] *Q. Was there any program in place in regard to
[15] how employees could obtain appropriate hazard
[16] information in regard to Sherman-Feinberg
[17] Corporation?
[18] **THE WITNESS:** Can I hear that — give me
[19] that one again.
[20] *(Question read)
[21] **A:** Obtain it from the company? Obtain it from
[22] the union? Obtain it from who?
[23] **Q:** From the union?
[24] **A:** If a request was made, I'm sure we would —



# EXHIBIT 79

Miriam Caminero 3-24-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

18

1    thing that I always did.

2  Q.  Was the machine very old?

3  A.  Yes.

4  Q.  Do you think it was 100 years old?

5  A.  Maybe not as much as 100.

6  Q.  But close?

7  A.  (No response)

8  Q.  Did you always work on the same machine?

9  A.  Yes.

10  Q.  And what floor was this machine on?

11  A.  I worked on the first floor.

12  Q.  Is that where the ovens were?

13  A.  Yes.

14  Q.  How often were there fires?

15        MR. LICHTEN:  Objection.

16  Q.  I will withdraw that.  Were you aware of

17      fires at this plant?

18  A.  Well, sometimes the machines would be

19      damaged or they would stop working.  When

20      they stopped working, they would send us

21      home.

22  Q.  And were all of the machines in the plant

23      very old?

24  A.  Yes, almost all of them.

# EXHIBIT 80

Euclides Soto 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

26

1    them.  I had told them about the roller, you know,

2    the one that spins -- the material was put on this

3    conveyor.  And then the roller was taking the

4    material down, but when the roller didn't turn for

5    some reason, it got stuck, you know, then the

6    material gets stuck there, and then the blade,

7    okay, was sort of shaking.

8              And then when they told me -- and

9    then when I hit that part with the bar so it would

10   roll again, so it would turn, the blade came down

11   and -- the tool hit the roller and it snapped, and

12   it hit me in the face.

13        Q    How long had you worked on this machine?

14        A    (Through the Interpreter) Approximately

15   for like two years.

16        Q    And you were familiar with the machine?

17        A    (Through the Interpreter) Yes.

18        Q    Was the machine over 100 years old?

19        A    (Through the Interpreter) Approximately.

20        Q    And why do you say that?

21        A    (Through the Interpreter) I don't know

22   the year exactly that it was made, but it looked

23   old, like an old machine.

24        Q    Very, very old?

Euclides Soto 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

27

1       A       (Through the Interpreter) Yes, yes.

2       Q       Now, when Mr. Alexander came to your

3   plant, did he look around?

4       A       (Through the Interpreter) No, no, I never

5   saw him.  I never saw him walking around.

6       Q       And when you worked there, did this place

7   remind you of hell?

8               MR. LICHTEN:  Objection.

9       A       (Through the Interpreter) Yes.

10      Q       Why?

11              MR. LICHTEN:  Objection.

12      A       (Through the Interpreter) Because it was

13  really hot.  There was two ovens that were on all

14  the time, like 300 degrees, each one.

15              There was no ventilation, and there

16  was a lot of -- there was always this smoke all the

17  time, and there was always a lot of dust, a lot of

18  dust.

19      Q       How much of your paycheck went to the

20  union?

21      A       (Through the Interpreter) I don't

22  remember really how much they would deduct from my

23  salary.

24      Q       Okay.

# EXHIBIT 81

Wilfredo Ortiz 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

23

1                    MR. LICHTEN:  Objection.

2    A.   I thought that well, like I said before, that before

3         the union would speak to him, that first, they would

4         go to their office.

5    Q.   Now, do you think that their going to the office

6         instead of dealing with you was discriminatory with

7         respect to you and with respect to the workforce?

8                    MR. LICHTEN:  Objection.

9    A.   Yes.

10   Q.   Could you explain why.

11                   MR. LICHTEN:  Objection.

12   A.   Because he would go to the office and whatever the

13        office would say, that's what they would tell us

14        that's what -- us do.

15   Q.   Is it safe to say that you and the other Hispanic

16        workers were denied a voice in the process?

17                   MR. LICHTEN:  Objection.

18   A.   Yes.

19   Q.   And do you believe that the motive for doing that

20        was to keep your wages as Hispanics very, very low?

21                   MR. LICHTEN:  Objection.

22   A.   Yes.

23   Q.   And do you see the attorney laughing?

24   A.   Yes.

Wilfredo Ortiz 3-23-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

24

1    Q.    Does that seem insulting to you?

2    A.    Yes.

3    Q.    Is it a form of intimidation or humiliation being

4          expressed --

5                    MR. LICHTEN:  Mr. Berger, you're

6          getting a little out of control here.

7    A.    Yes.

8                    MR. BERGER:  Could I get the last

9          question before the laughter.

10                   (Question read)

11   Q.    Can you answer that, please.

12   A.    No.  I don't think so, but since we all have rights,

13         the fact that we're Hispanics and we didn't speak

14         the language, they would take vengeance on us

15         because of that.

16   Q.    Take advantage of you?

17                   THE INTERPRETER:  Vengeance.

18   Q.    Okay.  But do you mean take advantage of you?

19   A.    Yes, like discriminating me.

20   Q.    Now, did the union similarly act in a way that was

21         motivated to get your union contributions without

22         shaking the boat with the employer at this point?

23                   MR. LICHTEN:  Objection.

24   A.    No.  The first thing they would do is they would go

Wilfredo Ortiz 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

25

```
1              to the office first and would talk to the people in

2              the office.  And for instance, we would ask for,

3              like, a dollar raise or something like that, they

4              would say no, no.  We'll give them 15, 20 cents.

5    Q.        Okay.  And do you think this was as a result of the

6              fact that the workforce was entirely Hispanic?

7                        MR. LICHTEN:  Objection.

8    A.        Yes.

9    Q.        Now, at any time, did the union invite any of you

10             Hispanic workers to their quarterly -- excuse me.

11                        Did the union ever invite you or any

12             of your Spanish coworkers to their quarterly

13             meetings?

14   A.        No.

15   Q.        Why not?

16   A.        That I know of, because they would negotiate amongst

17             themselves.

18   Q.        Now, did the union ever put up bulletin board for

19             you to give you information about anything?

20   A.        No.

21   Q.        Did the union provide any assistance to you about

22             the people who had suffered injuries like loss of

23             fingers, cutting of the face, and this kind of

24             thing?
```

Wilfredo Ortiz 3-23-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

26

1                    MR. LICHTEN:  Objection.

2    A.   No.

3    Q.   Tell me, is there any doubt in your mind whether

4         they know about people who had lost their fingers

5         and people who had been cut on their face?

6                    MR. LICHTEN:  Objection.

7    A.   Yes, I know I've seen them.  There have been many

8         accidents there.

9                    MR. LICHTEN:  Move to strike.  Not

10        responsive.

11   Q.   So you observed many accidents?

12                   MR. LICHTEN:  Objection.

13   A.   Yes.

14   Q.   Can you tell us about what you observed.

15   A.   There was the accident with Jose Ortiz.  I was

16        present then when the machine cracked [verbatim]

17        his finger.

18   Q.   And did he scream?

19   A.   No.  He didn't scream, but he was, like, holding it

20        in.

21   Q.   In fact, didn't the employer make him work an extra

22        15 minutes before he was relieved?

23                   MR. LICHTEN:  Objection.

24   A.   No, no.

Wilfredo Ortiz 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation. et al.

27

1    Q.    How did it work?  What happened?

2    A.    He was cleaning the machine, and afterwards, the

3          machine was still running, and then the machine

4          cracked his finger, cut it.

5    Q.    And how old was that machine?

6                    MR. LICHTEN:  Objection.

7    A.    An antique.

8    Q.    A hundred years; do you think?

9    A.    Yeah.

10   Q.    Did the union ever look at any of machines like this

11         one where this accident happened?

12   A.    No.

13   Q.    You were going to describe other injures that

14         happened there?

15   A.    Yes.  There were people there too.

16   Q.    Now, did the union ever make sure that the plant

17         complied with federal laws like the Occupational

18         Safety Act?

19                   MR. LICHTEN:  Objection.

20   A.    I don't know.  I don't know.

21   Q.    Okay.  Well, did the union make sure that the

22         federal safety laws were complied with?

23                   MR. LICHTEN:  Objection.

24   A.    No.

Wilfredo Ortiz 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

28

1    Q.    Did they ever come to see whether any of you were

2          protected from the fires?

3                    MR. LICHTEN:  Objection.

4    A.    No.

5    Q.    And how about for the handling of paints and

6          chemicals?

7    A.    No.

8    Q.    Did, in your opinion, the union care about what

9          happened to the safety of the people in this plant

10         that consisted solely of Hispanics?

11                   MR. LICHTEN:  Objection.

12   A.    No.  They never cared for anything, no.

13   Q.    And you're not a member of the Upholstery Workers

14         Union, are you?  You're a member of the Steelworkers

15         union?

16                   MR. LICHTEN:  Objection.

17   A.    Yes.

18   Q.    You were in the Steelworkers union; right?

19   A.    Yes.

20   Q.    At any time, did the Steelworkers union provide you

21         any training, especially someone like you, who had

22         been the supervisor so that you could have more

23         skills in the workplace?

24                   MR. LICHTEN:  Objection.

Wilfredo Ortiz 3-23-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

29

```
 1   A.   No.

 2   Q.   Now, some individual was cut by a grinder and cut

 3        three fingers -- were cut.  I think it was an

 4        earlier testimony.  It was Jose Ortiz's uncle?

 5             MR. LICHTEN:  Objection.  Move to

 6        strike.

 7   Q.   Do you know anything about that?

 8   A.   No.  I knew of Jose Ortiz, that he cut his finger.

 9   Q.   And how about Mr. Baez; did you know about his

10        accident?

11             MR. LICHTEN:  Objection.

12   A.   No.

13   Q.   Were there some grinder machines there?

14   A.   Yes.

15   Q.   How old were they?

16   A.   They're old.  They're antique.  They're so old they

17        don't even have replacement parts or pieces for

18        those machines.

19   Q.   And would you be surprised that somebody cut three

20        of their fingers on a machine like that?

21             MR. LICHTEN:  Objection.

22   Q.   Is this gentleman laughing at you?

23             MR. LICHTEN:  Again, I'm smiling at

24        your question that you would ask someone to engage
```

Wilfredo Ortiz 3-23-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

37

1  A.  Because they would never help us.

2  Q.  Please explain what you mean.

3  A.  Because on certain occasions, I was obligated -- we

4      were obligated to work overtime.  And sometimes,

5      they would make us -- make me extinguish fires by·

6      ourselves.  Sometimes I would have to get on top of

7      a room myself to extinguish a fire on top of a

8      machine, and all of that smoke, I was inhaling.

9  Q.  In effect, did the union exploit you the way

10     employers exploit Hispanic workers?

11                 MR. LICHTEN:  Again, I think your

12     questions are completely --

13                 MR. BERGER:  You cannot put the sock

14     in someone's mouth.  Please let the man answer.

15                 MR. LICHTEN:  For the record, I think

16     your questions are inappropriate.  They're out of

17     bounds and sanctionable.

18                 MR. BERGER:  I think everything that

19     you did in the hallway borders on the ridiculous.

20     Screaming at another lawyer in the hallway.  I was

21     embarrassed for you.  So don't preach at me.

22                 THE INTERPRETER:  I'm sorry.  Could

23     you repeat the question, please.

24                 (Question read)

# EXHIBIT 82

Euclides Soto, et al. v.
Sherman-Feinberg Corporation, et al.

Lowell F. Alexander
Vol. 1, February 18, 2005

[1] me through your counsel under Rule 26?

[2] **MR. LICHTEN:** Sure.

[3] **A:** Sure.

[4] **Q:** Now, who were you dealing with at Sealy?

[5] **A:** The plant manager and someone from

[6] corporate, Tom Brown.

[7] **Q:** Do you remember the name?

[8] **A:** Tom Brown was the guy from corporate.

[9] **Q:** Is he still around?

[10] **A:** I would imagine. Yes, Tom is still...

[11] **Q:** And then Bee-Bee Rubber, who was your point

[12] person from the company?

[13] **A:** I don't recall, but it was somebody out of

[14] Ohio.

[15] **MR. BERGER:** Excuse me. I need to go to

[16] the bathroom. I'll be back in one minute.

[17] (Recess taken)

[18] **A:** I was thinking of — I thought of Rosboro

[19] Plastics, Schoolhouse Candy. It was place out of

[20] Rhode Island. That closed also.

[21] **BY MR. BERGER:**

[22] **Q:** What's the deal of Rosboro Plastics?

[23] **A:** That's been a few years ago. I honestly

[24] don't remember all the details.

---

[1] **Q:** Did they have a severance clause?

[2] **A:** I don't honestly remember if they did or

[3] not.

[4] **Q:** You want to make that agreement available

[5] through your counsel?

[6] **MR. LICHTEN:** Do you still have it?

[7] **THE WITNESS:** I'm sure we must have one

[8] someplace.

[9] **MR. LICHTEN:** We'll look for it.

[10] **A:** We'll look for it. I'm sure we must have

[11] it.

[12] **Q:** Sure. Understood. Have you ever told a

[13] member who's got a discrimination beef of one sort

[14] or another since you began in '78 to grieve

[15] discrimination, or did you tell them to go to the

[16] MCAD? Let me put it more bluntly. Did you ever

[17] tell them to grieve it instead of going to the MCAD?

[18] **MR. LICHTEN:** Objection to the form.

[19] **A:** I told members to do both.

[20] **Q:** I take it —

[21] **A:** I've told members to do both.

[22] **Q:** To do both?

[23] **A:** Yes.

[24] **Q:** Did you explain to them why?

---

[1] **A:** In some cases, yes. In some cases, no.

[2] **Q:** Okay. What was the deal here? How many

[3] grievances came out of this shop, discriminations,

[4] grievances or whatever?

[5] **A:** In the time I serviced?

[6] **Q:** Yes.

[7] **A:** Prior to shutdown?

[8] **Q:** Yes.

[9] **A:** I had zero.

[10] **Q:** Isn't that unusual?

[11] **A:** No.

[12] **Q:** Okay. Why? I mean, why did this plant

[13] have zero grievances?

[14] **A:** I wouldn't —

[15] **Q:** I mean you've been in the business for a

[16] while?

[17] **A:** I couldn't tell you.

[18] **Q:** That wasn't the way it was when you were a

[19] president with the gas company, right? You had a

[20] lot more than zero grievances. I mean, I know you

[21] had a bigger universe of people, but things were

[22] going on, right?

[23] **MR. LICHTEN:** Objection to the form.

[24] **A:** Yeah, we had a lot more than — we had a

---

[1] lot more people.

[2] **Q:** A lot more people, understood.

[3] **A:** A lot more people.

[4] **Q:** Did you ever talk to this group of people

[5] about, you know, their right to process grievances?

[6] **A:** Me specifically, no.

[7] **Q:** Did you believe that Jose Ortiz, for

[8] example, was sophisticated about the ins and outs of

[9] grievances?

[10] **A:** I don't know if he was or not.

[11] **Q:** How about the other fellow?

[12] **A:** I don't know if he was or not either.

[13] **Q:** Did they ever get any training on

[14] grievances?

[15] **A:** We offered training.

[16] **Q:** Did they follow up?

[17] **A:** I'm not aware of whether they did or

[18] didn't.

[19] **Q:** Do you ever have to play school principal

[20] with people who are shop stewards? It's part of

[21] your job, isn't it, theoretically, anyway? I mean,

[22] you know, to be sure that they follow through on

[23] their training, that they're doing enough

[24] grievances, that they're taking care of the people

---

# EXHIBIT 83

Euclides Soto, et al. v.
Sherman-Feinberg Corporation, et al.

Lowell F. Alexander
Vol. 1, February 18, 2005

**Page 73**

[1] Corporation?

[2] **A:** I don't know.

[3] **Q:** What policies and procedures were in place
[4] to coordinate safety with workers' compensation
[5] carriers, workers' compensation insurance carriers?

[6] **A:** I don't understand the question. Can you
[7] clarify that for me.

[8] **Q:** Are you aware whether the gas company had
[9] annual workers' compensation audits when you were
[10] president of the union?

[11] **A:** No, I'm not aware of them.

[12] **Q:** Well, tell me what is the — when you were
[13] president of the union —

[14] **A:** Uh-huh.

[15] **Q:** — what were your obligations with respect
[16] to health issues in the workplace?

[17] **A:** My obligations with respect to health
[18] issues? Well, if there were policies in place, we
[19] would make sure that those policies were adhered to.

[20] **Q:** What were they?

[21] **A:** I don't recall what those policies —

[22] **Q:** Well, how did you make sure —

[23] **A:** — were.

[24] **Q:** — you complied with the policies?

**Page 74**

[1] **A:** As a local union president?

[2] **Q:** Yes.

[3] **A:** If someone brought up an issue in terms of
[4] something wasn't being done or something was being
[5] done, I'd investigate it and bring it to the
[6] attention of the company and make sure it was
[7] addressed properly.

[8] **Q:** Did you do that for this company?

[9] **A:** No.

[10] **Q:** What was the racial composition of the gas
[11] company?

[12] **A:** In terms of?

[13] **Q:** Breakdown of Hispanic, Black, Asian workers
[14] when you were there when you were president of the
[15] union?

[16] **A:** Very small.

[17] **Q:** A small group of minority people?

[18] **A:** Yes.

[19] **Q:** Less than 10 percent?

[20] **A:** Yeah.

[21] **Q:** And what percentage of the work force at
[22] Sherman-Feinberg was Hispanic?

[23] **A:** I would say — from the people that I
[24] interacted with —

**Page 75**

[1] **Q:** Yes.

[2] **A:** — and the people I saw, a hundred percent.

[3] **Q:** What did you do to ensure that
[4] Sherman-Feinberg developed a written hazard
[5] communication program?

[6] **A:** What did I do to ensure that they developed
[7] a written hazard? Nothing specific.

[8] **Q:** Did you do anything to be sure that they
[9] maintained a written hazard communication program?

[10] **A:** Nothing specifically, no.

[11] **Q:** What did you do, if not specifically, then
[12] generally?

[13]    (Interruption)

[14] **A:** Provided an avenue for people to be able to
[15] contact me.

[16] **Q:** How did you do that?

[17] **A:** I attended meetings. I attended local
[18] meetings, so if there was an issue that's generally
[19] where it gets brought up.

[20] **Q:** With whom and where? What are the
[21] circumstances under which you did that?

[22] **A:** Local meetings were held quarterly.

[23] **Q:** And who from this plant participated?

[24] **A:** I don't ever recall any of them showing up.

**Page 76**

[1] **Q:** Was there any subgroup composed of Spanish
[2] people at those meetings?

[3] **A:** Yes.

[4] **Q:** Who was in charge of that?

[5] **A:** It's a general membership meeting for the
[6] local.

[7] **Q:** Okay. And you provided a special portion
[8] of the meeting for people who spoke other languages?

[9] **A:** No.

[10] **Q:** Did Sherman-Feinberg Corporation keep
[11] material safety data sheets?

[12] **A:** I do not know. I don't know.

[13] **Q:** Did the union keep material safety data
[14] sheets about the heavy equipment or air quality or
[15] anything along those lines?

[16] **A:** No.

[17] **Q:** Did Sherman-Feinberg provide employees with
[18] training that included the methods and observations
[19] that may be used to detect the presence or release
[20] of hazardous air quality items in the work area?

[21] **A:** I don't know.

[22] *Q. Did the union ensure that Sherman-Feinberg
[23] provided employees with training that included at
[24] least the physical and health hazards of the work

Lowell F. Alexander
Vol. 1, February 18, 2005

Euclides Soto, et al. v.
Sherman-Feinberg Corporation, et al.

Page 77

[1] area?

[2] **A:** Did the union ensure that the company

[3] provide —

[4] **THE WITNESS:** Can I hear it again.

[5] **MR. BERGER:** Could you just read it.

[6] **A:** You just got me — you lost me on that one.

[7] *(Question read)

[8] **A:** No.

[9] **Q:** Did the union ensure that the employer

[10] provide employees with training that included at

[11] least the measures that employees could take to

[12] protect themselves from the hazards of their work

[13] area?

[14] **A:** Not specifically, no.

[15] **Q:** Now, in connection with that question, did

[16] the union ever provide such assurances?

[17] **A:** I don't know.

[18] **Q:** Well, before you came here, did you review

[19] any documents?

[20] **A:** Before I came here today?

[21] **Q:** Yes.

[22] **A:** Yes.

[23] **Q:** And you've been in the union since 1978?

[24] Is that what you told us?

Page 78

[1] **A:** Yes.

[2] **Q:** So based on your review of your documents

[3] and your personal experience since 1980 — '78, can

[4] you think of any instance that the union ensured

[5] that the employer provided employees with training

[6] that included at least the measures that employees

[7] could take to protect themselves from the hazards of

[8] the work areas?

[9] **A:** When we received a complaint.

[10] **Q:** What complaint?

[11] **A:** If someone complained or someone had an

[12] issue that was brought to our attention, we

[13] addressed it and made sure that it was addressed

[14] appropriately.

[15] **Q:** Okay. When was that that you received it?

[16] **A:** Sometimes as a steward, sometimes as a

[17] vice-president and sometimes as president of the

[18] local.

[19] **Q:** Okay. Did you grieve it?

[20] **A:** Sometimes, yes.

[21] **Q:** How many grievances of that nature did you

[22] file yourself?

[23] **A:** I don't specifically remember filing any

[24] grievances in regards to that.

Page 79

[1] **Q:** Were you aware — but you did do — you did

[2] take those steps when you were at the gas company;

[3] is that correct?

[4] **A:** Yes. Those steps were taken, not

[5] specifically by me, but those steps were taken.

[6] **Q:** I understand. Were those steps ever taken

[7] on behalf of any of the employees at

[8] Sherman-Feinberg Corporation at any time since the

[9] Steelworkers organized the plant?

[10] **MR. LICHTEN:** Objection to the form.

[11] **A:** I don't know.

[12] **Q:** Did you review the — did you review

[13] material, written materials before you came here

[14] today?

[15] **A:** Some, yes.

[16] **Q:** And how many years have you been working as

[17] a rep for the union?

[18] **A:** Since '96.

[19] **Q:** During the course of your employment and

[20] through your review of the documents, did you see

[21] any evidence or have you heard anything indicating

[22] that the Sherman-Feinberg employees had been

[23] provided with training including the measures that

[24] employees could take to protect themselves from the

Page 80

[1] hazards of chemicals in their work areas at any

[2] time?

[3] **A:** No, I didn't review anything like that.

[4] **Q:** Did you ever — strike that. Did the union

[5] ever determine whether the employer had a hazard

[6] communication program?

[7] **A:** I don't know.

[8] **Q:** Was there ever an explanation of what to do

[9] when a finger had been cut off?

[10] **A:** I don't know if there ever was.

[11] **Q:** Was there ever a communication program

[12] about someone suffering from a burn on their bodies?

[13] **A:** I do not know.

[14] *Q. Was there any program in place in regard to

[15] how employees could obtain appropriate hazard

[16] information in regard to Sherman-Feinberg

[17] Corporation?

[18] **THE WITNESS:** Can I hear that — give me

[19] that one again.

[20] *(Question read)

[21] **A:** Obtain it from the company? Obtain it from

[22] the union? Obtain it from who?

[23] **Q:** From the union?

[24] **A:** If a request was made, I'm sure we would —

# EXHIBIT 84

Euclides Soto, et al.   v.
Sherman-Feinberg Corporation, et al.

Lowell F. Alexander
Vol. 1, February 18, 2005

Page 41

[1] Q: And when did that merger take place?
[2] A: That —
[3] Q: Before '78, before you started?
[4] A: Before '78. I'm not aware of when that
[5] merger — I just know they came through a merger.
[6] They were former upholstery workers.
[7] Q: Hasn't there been a tremendous controversy
[8] about the upholstery workers that's been in the
[9] literature distributed to the membership, about the
[10] work conditions of upholstery workers?
[11] A: I'm not aware of any. Not that I recall.
[12] Q: Well, I mean, compared to other people in
[13] the Steelworkers the wages are very low. Do you
[14] agree with me on that?
[15] A: No.
[16] Q: You don't agree with me?
[17] A: No.
[18] Q: Do you agree with me that compared to other
[19] steelworkers the number, frequency and severity of
[20] injury is very high for the upholstery workers?
[21] A: I'm not aware of that.
[22] Q: You don't agree with it?
[23] A: I'm not aware of it.
[24] Q: All right. Have you ever seen any

Page 42

[1] literature on that kind of a topic?
[2] A: No.
[3] Q: All right. In the literature that's been
[4] distributed by the union to you, has there been any
[5] written policies or procedures or any oral practices
[6] and procedures that have been specifically directed
[7] to people in the upholstery industry?
[8] A: Not that I'm aware of.
[9] Q: Have you ever worked in the upholstery
[10] industry?
[11] A: No.
[12] Q: Have you ever worked on work that is
[13] repetitive with heavy, heavy equipment that tends to
[14] be old?
[15] A: Yes.
[16] Q: Okay. Now, where was that and when?
[17] A: In H&H Brown Shoe Company.
[18] Q: Where was that, in Brockton?
[19] A: No. H&H Brown Shoe Company.
[20] Q: And where was that?
[21] A: That was in Worcester. They're no longer
[22] in existence.
[23] Q: Right. One I happen to know about. So
[24] tell me about it. What was your job like?

Page 43

[1] A: Cutting. It was cutting leather. Cutting
[2] leather for basically for Army shoes, for Army
[3] boots.
[4] Q: Crappy old machinery, right?
[5] A: That's what it was. We worked on a
[6] machine. I operated it. I operated the press.
[7] Q: All right. Now, unless I fell off
[8] the — strike that. Every once in a while one of
[9] your co-workers would get badly hurt there, right?
[10] A: I honestly don't remember.
[11] Q: But you know the scuttlebutt about that
[12] place, right?
[13] A: No, I don't.
[14] Q: Well, you probably know where I'm going
[15] with this. I'm after your experience here. What do
[16] you think the union should do about safety for
[17] people who work with these crappy old machines?
[18] MR. LICHTEN: Objection to the form.
[19] A: What the union should do? I honestly don't
[20] know what's —
[21] Q: Well, you know that —
[22] A: — expected.
[23] Q: Well, let's — you know OSHA is there,
[24] right?

Page 44

[1] A: Yes.
[2] Q: Does OSHA ever do anything?
[3] MR. LICHTEN: Objection to the form.
[4] Q: Realistically?
[5] MR. LICHTEN: Objection to the form.
[6] A: I don't know; they levy fines.
[7] Q: Well, we know that. But do they stop
[8] people from using these crappy old machines like the
[9] ones you saw at H&H Brown?
[10] MR. LICHTEN: Objection to the form.
[11] A: I don't know.
[12] Q: Well, how about workers' comp? Does
[13] workers' comp stop employers from using crappy old
[14] machinery like those you experienced at H&H Brown?
[15] MR. LICHTEN: Objection to the form.
[16] A: I don't know.
[17] Q: Well, they still exist, don't they, these
[18] kinds of shops?
[19] A: H&H Brown is out of business.
[20] Q: I understand. Well, you know, that's
[21] interesting. You and I probably are old enough to
[22] know Yogi Berra with his d j vu all over again.
[23] Tell me, didn't you get a little bit of d j vu all
[24] over again about your H&H Brown experiences when you

Lowell F. Alexander
Vol. 1, February 18, 2005

Euclides Soto, et al.    v.
Sherman-Feinberg Corporation, et al.

Page 45

[1] went into Sherman-Feinberg?

[2] A: No.

[3] Q: Repetitive working, big dangerous machines?

[4] A: No.

[5] Q: What does the Steelworkers union advise you

[6] to do in your job now with respect to safety issues?

[7] A: Address them if you become aware of them.

[8] Q: How did you do that here? How did you

[9] address them here?

[10] A: I wasn't aware of any safety issues.

[11] Q: Did you ever ask for records involving

[12] safety at this plant?

[13] A: No.

[14] Q: Did you ever hear any scuttlebutt about

[15] safety issues in this plant?

[16] A: No.

[17] Q: Did you ever get any reports from the

[18] health and welfare part of the Steelworkers union

[19] about health problems in any plant or region under

[20] any circumstances?

[21] A: Sometimes.

[22] Q: Would you make those available to me

[23] through your counsel —

[24] A: I don't know if I kept —

Page 47

[1] A: I'm sure they do, yeah.

[2] Q: Are you on it?

[3] A: No.

[4] Q: Who's on it?

[5] A: I'm not aware of who's on that committee.

[6] Q: Is there anyplace where I could find a

[7] letterhead with the people who are on that?

[8] A: Maybe, maybe not. I don't attend local

[9] meetings for any of that.

[10] Q: I got a couple of pieces of paper today.

[11] One says — it's a letter to Santiago Perez that

[12] says, "Please be advised that effective immediately

[13] Lowell F. Alexander, Staff Representative will be

[14] assuming all duties and responsibilities relative to

[15] Farnsworth Fibre Corp. Local Union 421U-6."

[16] What does this U thing mean when they say

[17] "U"? Does that mean union?

[18] A: Some are — oh, that's a designation for a

[19] former upholstery worker local.

[20] Q: And why was this letter sent, if you know?

[21] A: To notify the person of record that I was

[22] going to be servicing the local.

[23] Q: Was that your first contact with them, with

[24] the Farnsworth Fibre group, or had you met them

Page 46

[1] Q: — under Rule 26?

[2] A: I don't know if I kept them.

[3] Q: Okay. Where are they issued from?

[4] A: Probably Health.

[5] Q: From Pittsburgh?

[6] A: Yeah.

[7] Q: And who sends them to you?

[8] A: Health and Safety, I believe.

[9] Q: Pardon me?

[10] A: Health and Safety.

[11] Q: Okay. Now, are there health and safety

[12] committees within the union itself?

[13] A: Some locals have them. Some locals don't.

[14] Q: Okay. Do you have one in your local?

[15] MR. LICHTEN: Well, what's "your local"?

[16] MR. BERGER: Pardon me?

[17] MR. LICHTEN: I don't know what "your

[18] local" means.

[19] Q: Are you a member of any local right now?

[20] A: Yes.

[21] Q: Okay. What local is that?

[22] A: 1204.

[23] Q: Do you have a health and safety committee

[24] within your local?

Page 48

[1] before January 30, 2002?

[2] A: I don't believe I met them. They may have

[3] been at a conference or something at that point.

[4] Q: So you were sort of new on the job?

[5] A: I was new servicing them.

[6] Q: Okay. Who had serviced them over the

[7] years?

[8] A: I couldn't tell you.

[9] Q: Was it Louis Thomas?

[10] A: No.

[11] Q: Was it Michael Nixon?

[12] A: No.

[13] Q: Was it Albert Polk?

[14] A: No.

[15] Q: And is your boss Albert Polk?

[16] A: He's the subdistrict director.

[17] Q: And Louis Thomas, is he your boss?

[18] A: He was the director.

[19] Q: And do you take orders from them?

[20] A: Yes, I guess so. I have to say yes.

[21] Q: Do they keep a personnel file for you?

[22] A: I wouldn't — I don't know.

[23] Q: Okay. Well, I'd like to request it through

[24] your counsel, if it's available, your personnel

Lowell F. Alexander
Vol. 1, February 18, 2005

Euclides Soto, et al. v.
Sherman-Feinberg Corporation, et al.

Page 85

[1] **A:** Usually, yes.

[2] **Q:** How would the word get around to you as

[3] union president?

[4] **A:** Depending upon where it was, I would hear

[5] from one of the stewards or you hear it from one of

[6] the co-workers, or if it happened you may hear it at

[7] the local meeting.

[8] **Q:** And I take it once — you know, you

[9] mentioned that occasionally you would follow through

[10] with trying to get to the bottom of the problem?

[11] **A:** Well, to find out what happened and more to

[12] find out if the person was okay and if there was

[13] anything else we could do for them.

[14] **Q:** I'd like you to assume a fact which I

[15] believe to be true. Would you assume the fact that

[16] some people here were badly injured.

[17] **A:** Okay.

[18] **Q:** Do you have any reason that you can think

[19] of that it didn't get back to the union?

[20] **MR. LICHTEN:** I object to that. You can

[21] answer, if you can.

[22] **A:** I don't know.

[23] **Q:** Is that too speculative?

[24] **A:** I don't know why, no.

Page 86

[1] (Mr. Diaz enters the room)

[2] (Discussion off the record)

[3] (Recess taken)

[4]         **BY MR. BERGER:**

[5] **Q:** Did the union develop a fire protection

[6] program for this plant?

[7] **A:** Not during the time that I serviced them.

[8] **Q:** Pardon?

[9] **A:** Not during the time that I serviced them.

[10] **Q:** Did you review the records that were

[11] available to you before this deposition, the written

[12] records of someone who was there before you?

[13] **A:** No.

[14] **Q:** Who serviced this account before you?

[15] Well, who was the union rep for this before you?

[16] **A:** I don't know.

[17] **Q:** Did you determine whether there were fire

[18] extinguishers at the plant?

[19] **A:** No, I did not.

[20] **Q:** Did you — did the union take any steps to

[21] ensure that the employer provided a fire

[22] extinguisher graded not less than 2A?

[23] (Interruption)

[24] **MR. LICHTEN:** Excuse me.

Page 87

[1] **A:** Not that I'm aware of.

[2] **MR. LICHTEN:** Hold on.

[3] (Discussion off the record)

[4] **MR. LICHTEN:** For the record, I've asked my

[5] secretary to check on the PACER system. She checked

[6] yesterday, and she checked today, and they don't

[7] have Mr. Diaz as a counsel of record in the case,

[8] and, therefore, I don't think I'm allowed to agree

[9] to having him ask questions.

[10] **MR. BERGER:** What if we fax over a notice

[11] of appearance right now?

[12] **MR. DIAZ:** Well, what we can do is — this

[13] is on the record. John Diaz, I was present at the

[14] pretrial, and I had filed my appearance, but it

[15] obviously doesn't show up. Until we take corrective

[16] action, I can suspend asking any questions and just

[17] reserve the right to renotice the depo and take it.

[18] **MR. BERGER:** Or we can — I mean, Harold,

[19] you weren't at the pretrial conference, and as a

[20] result of your not being there, I think it's a

[21] little unfair that you're taking advantage of the

[22] situation, and that is the only thing that's going

[23] on here, because I know he filed the appearance,

[24] because I was there. Judge Tauro would be more than

Page 88

[1] interested in this, so I'm going to suspend —

[2] actually, what I suggest is that we talk to Judge

[3] Tauro right now.

[4] **MR. DIAZ:** Attorney Berger, I have no

[5] problem suspending, just making sure of my

[6] appearance and then suspending it and just

[7] renoticing the depo. I have no problem doing that.

[8] **MR. BERGER:** But he's limited the

[9] depositions to only two people.

[10] **MR. DIAZ:** I know, but you can suspend,

[11] okay, and then I can — once I have my appearance,

[12] there is no question that I reserve my right, and

[13] then I'm sure —

[14] **MR. BERGER:** Well, do you think we should

[15] raise it with Judge Tauro now, because I know he's

[16] going to remember that you were there.

[17] **MR. DIAZ:** Yeah.

[18] **MR. BERGER:** And I think he's going to

[19] remember that this other lawyer wasn't there.

[20] **MR. DIAZ:** I'll leave that up to you all to

[21] decide. I have no problems until that's cleared up.

[22] **MR. LICHTEN:** My suggestion would be that

[23] you finish your questions, and we'll see where we

[24] are, Mr. Berger.

Page 81

[1] we provided what we could.
[2] **Q:** What was done for prevention?
[3] **A:** At our district conference and our
[4] educational conference, we also had health and
[5] safety programs —
[6] **Q:** When would this —
[7] **A:** — that are put on.
[8] **Q:** — group have met?
[9] **A:** District conferences are usually held every
[10] year —
[11] **Q:** Tell me —
[12] **A:** — minimum every two years.
[13] **Q:** Tell me about the district conferences.
[14] How do they work?
[15] **A:** Members are invited to the district
[16] conference. People from the locals come to the
[17] district conferences. You put on educational
[18] programs for the financial officers. You put on
[19] educational programs for the health and safety
[20] officers. You put on educational programs for the
[21] civil rights officers.
[22] **Q:** Now, did any of the employees from
[23] Feinberg, from Sherman-Feinberg ever go to any of
[24] those meetings?

Page 82

[1] **A:** I don't know.
[2] **Q:** Did you ever see one of them? I mean, did
[3] you ever see anybody from this plant at any of
[4] those? Just give me a single one of them.
[5] **A:** You're talking about sometimes hundreds of
[6] people. I wouldn't know.
[7] *Q. Now, was the notice of those safety
[8] meetings set out in Spanish?
[9] *A. Not that I'm aware of, no.
[10] **Q:** I'm confused about it.
[11] **MR. BERGER:** Excuse me. I've really got
[12] to — I have to go to the bathroom. Could I just
[13] have one minute.
[14] (Recess taken)
[15] **MR. BERGER:** Could you just read the last
[16] question and answer back.
[17] *(Record read)
[18] **BY MR. BERGER:**
[19] **Q:** Did the union ensure that this employer
[20] provided frequent and regular inspections of the job
[21] site?
[22] **A:** No.
[23] **Q:** How about for the job site materials?
[24] **A:** Not that I'm — no.

Page 83

[1] **Q:** How about for the job site equipment?
[2] **A:** No.
[3] *Q. How about for inspections by competent
[4] persons to fulfill its accident prevention
[5] responsibilities?
[6] **A:** I don't quite understand it. You say
[7] "fulfill its accident prevention" —
[8] **Q:** Yes.
[9] **MR. BERGER:** Could you read that back.
[10] **THE WITNESS:** Yeah, could you.
[11] *(Question read)
[12] **A:** The company's accident or the union's
[13] accident responsibilities?
[14] **Q:** Well, the company for the union members.
[15] **A:** No. I'm just trying to clarify the
[16] question.
[17] **Q:** Yes.
[18] **A:** No.
[19] **Q:** What ventilation systems were in place at
[20] Sherman-Feinberg for the employees who are members
[21] of the union?
[22] **A:** I do not know.
[23] **Q:** Did you ever hear any complaints about

Page 84

[1] them?
[2] **A:** Nope.
[3] **Q:** Now, did Sherman-Feinberg Corporation ever
[4] develop a fire protection program at the behest of
[5] the union?
[6] **A:** I don't know. Not that I'm aware of.
[7] **Q:** Well, was the union unaware of fires at
[8] this plant?
[9] **A:** Yes.
[10] **Q:** Was the union unaware of people who lost
[11] their fingers at this plant?
[12] **A:** Yes.
[13] **Q:** Now, you say that based on your review of
[14] the written materials before this deposition as well
[15] as your own personal experience?
[16] **A:** Based upon — I say that based upon nothing
[17] that was ever reported to me —
[18] **Q:** Okay.
[19] **A:** — in the time that I serviced that unit.
[20] **Q:** And when you worked for the gas company —
[21] **A:** Yes.
[22] **Q:** — if there was a catastrophic injury and
[23] when you were union president, did you hear about
[24] it, somebody having a bad accident?

# EXHIBIT 85

Clemente Hernandez 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

15

1               MR. LICHTEN: Objection.

2               THE INTERPRETER: Sorry?

3               MR. BERGER: So he wouldn't sell you out?

4               THE INTERPRETER: I can't translate "sell

5    you out." That means that you're going to take him

6    and sell him?

7  A.   He wouldn't push you under the bus?

8               MR. LICHTEN: Objection.

9  A.   No, no, no.

10  Q.   Now, one of your colleagues said that you guys were

11    treated by the union like dogs.

12             MR. LICHTEN: Objection.

13  Q.   Do you agree?

14  A.   Yes, right.

15  Q.   Another one of your colleagues said that the place

16    was like hell.

17             MR. LICHTEN: Objection.

18  Q.   Do you agree?

19  A.   Yes. There was a lot of dust and everything.

20  Q.   And you know that a few of the people who worked

21    there have lost fingers?

22             MR. LICHTEN: Objection.

23  A.   Yes.

24  Q.   And some of them have scars on their face?