# EXHIBIT 86

Antonio Martinez 3-23-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

15

```
 1    A.   No.

 2    Q.   Now, in the plant were there fires constantly?

 3    A.   Oh, yes.

 4    Q.   And in the plant, was there dust flying around?

 5    A.   Too much, a lot.

 6    Q.   In the plant, did people lose fingers?

 7    A.   Yes.

 8    Q.   And how many fingers were lost in this plant?

 9              MR. LICHTEN:  Objection.

10    A.   I just remember one person that lost two fingers.

11    Q.   And how many faces were cut and scarred?

12              MR. LICHTEN:  Objection.

13    A.   I don't remember.

14    Q.   Do you have any reason to believe that the union was

15         not aware of the fires or the cuts or the people who

16         lost fingers?

17              MR. LICHTEN:  Objection.

18    A.   I'm not sure.

19    Q.   Well, what safety -- what did the union -- well,

20         strike that.

21              Did the union have a bulletin board

22         for posting notices?

23    A.   No.

24    Q.   Did the union ever give you any notices of meetings?
```

Antonio Martinez 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

16

```
1    A.    No.

2    Q.    Did the union -- let me just ask it this way:  Do

3          you believe that the union discriminated against

4          you?

5                      MR. LICHTEN:  Objection.

6    A.    Absolutely.

7    Q.    When and how?

8    A.    I think that they discriminated against us because

9          first of all, they didn't help us.  Also, we were

10         not -- they didn't tell us when the company was

11         going to close.  And every time there was some sort

12         of a -- we had to draw up a contract or some sort of

13         complication, they would always go to the office,

14         their office, and spend a long time there.  And then

15         afterwards when they would come to us, they would

16         say, "Oh, you know what?  Whatever the company

17         says."

18   Q.    Now, where were you born and raised?

19   A.    Puerto Rico.

20   Q.    Where in Puerto Rico?

21   A.    Yabucco, Puerto Rico.

22   Q.    Were you treated differently there than you were in

23         this plant?

24                      MR. LICHTEN:  Objection.
```

# EXHIBIT 87

Luis A. Martinez 3-23-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

30

```
1            MR. BERGER:  Could you repeat the
2    question.  I got an objection that was not
3    responsive.
4            (Question read back)
5  A. Well, because I don't speak English.  I don't know
6    any laws about this country.  The only thing that I
7    came to work at this factory and nothing else.
8            MR. LICHTEN:  Objection.  Move to
9    strike as unresponsive.
10 Q. Were there a lot of fires at the plant?
11 A. Yes.  There were a lot of fires.  Every time, there
12   was a lot of dust around and a lot of the chemicals.
13   They used a lot of chemicals.
14 Q. Did the union have a poster board where they stuck
15   notices up for you?
16 A. No, never.
17 Q. And did the union ever come to the place where you
18   worked, where you actually worked, or did the union
19   only go to the office where the bosses were?
20 A. The union, no.  They didn't come to me.  They would
21   go to their office.  They wouldn't go through the
22   main door.  They would go through a door downstairs
23   or something, right next to the door, and they would
24   go into their office.
```

# EXHIBIT 88

Euclides Soto, et al.   v.
Sherman-Feinberg Corporation, et al.

Lowell F. Alexander
Vol. 1, February 18, 2005

Page 41

[1] **Q:** And when did that merger take place?
[2] **A:** That —
[3] **Q:** Before '78, before you started?
[4] **A:** Before '78. I'm not aware of when that
[5] merger — I just know they came through a merger.
[6] They were former upholstery workers.
[7] **Q:** Hasn't there been a tremendous controversy
[8] about the upholstery workers that's been in the
[9] literature distributed to the membership, about the
[10] work conditions of upholstery workers?
[11] **A:** I'm not aware of any. Not that I recall.
[12] **Q:** Well, I mean, compared to other people in
[13] the Steelworkers the wages are very low. Do you
[14] agree with me on that?
[15] **A:** No.
[16] **Q:** You don't agree with me?
[17] **A:** No.
[18] **Q:** Do you agree with me that compared to other
[19] steelworkers the number, frequency and severity of
[20] injury is very high for the upholstery workers?
[21] **A:** I'm not aware of that.
[22] **Q:** You don't agree with it?
[23] **A:** I'm not aware of it.
[24] **Q:** All right. Have you ever seen any

Page 42

[1] literature on that kind of a topic?
[2] **A:** No.
[3] **Q:** All right. In the literature that's been
[4] distributed by the union to you, has there been any
[5] written policies or procedures or any oral practices
[6] and procedures that have been specifically directed
[7] to people in the upholstery industry?
[8] **A:** Not that I'm aware of.
[9] **Q:** Have you ever worked in the upholstery
[10] industry?
[11] **A:** No.
[12] **Q:** Have you ever worked on work that is
[13] repetitive with heavy, heavy equipment that tends to
[14] be old?
[15] **A:** Yes.
[16] **Q:** Okay. Now, where was that and when?
[17] **A:** In H&H Brown Shoe Company.
[18] **Q:** Where was that, in Brockton?
[19] **A:** No. H&H Brown Shoe Company.
[20] **Q:** And where was that?
[21] **A:** That was in Worcester. They're no longer
[22] in existence.
[23] **Q:** Right. One I happen to know about. So
[24] tell me about it. What was your job like?

Page 43

[1] **A:** Cutting. It was cutting leather. Cutting
[2] leather for basically for Army shoes, for Army
[3] boots.
[4] **Q:** Crappy old machinery, right?
[5] **A:** That's what it was. We worked on a
[6] machine. I operated it. I operated the press.
[7] **Q:** All right. Now, unless I fell off
[8] the — strike that. Every once in a while one of
[9] your co-workers would get badly hurt there, right?
[10] **A:** I honestly don't remember.
[11] **Q:** But you know the scuttlebutt about that
[12] place, right?
[13] **A:** No, I don't.
[14] **Q:** Well, you probably know where I'm going
[15] with this. I'm after your experience here. What do
[16] you think the union should do about safety for
[17] people who work with these crappy old machines?
[18] **MR. LICHTEN:** Objection to the form.
[19] **A:** What the union should do? I honestly don't
[20] know what's —
[21] **Q:** Well, you know that —
[22] **A:** — expected.
[23] **Q:** Well, let's — you know OSHA is there,
[24] right?

Page 44

[1] **A:** Yes.
[2] **Q:** Does OSHA ever do anything?
[3] **MR. LICHTEN:** Objection to the form.
[4] **Q:** Realistically?
[5] **MR. LICHTEN:** Objection to the form.
[6] **A:** I don't know; they levy fines.
[7] **Q:** Well, we know that. But do they stop
[8] people from using these crappy old machines like the
[9] ones you saw at H&H Brown?
[10] **MR. LICHTEN:** Objection to the form.
[11] **A:** I don't know.
[12] **Q:** Well, how about workers' comp? Does
[13] workers' comp stop employers from using crappy old
[14] machinery like those you experienced at H&H Brown?
[15] **MR. LICHTEN:** Objection to the form.
[16] **A:** I don't know.
[17] **Q:** Well, they still exist, don't they, these
[18] kinds of shops?
[19] **A:** H&H Brown is out of business.
[20] **Q:** I understand. Well, you know, that's
[21] interesting. You and I probably are old enough to
[22] know Yogi Berra with his d j vu all over again.
[23] Tell me, didn't you get a little bit of d j vu all
[24] over again about your H&H Brown experiences when you

Lowell F. Alexander
Vol. 1, February 18, 2005

Euclides Soto, et al.    v.
Sherman-Feinberg Corporation, et al.

Page 45

[1] went into Sherman-Feinberg?

[2]    **A:** No.

[3]    **Q:** Repetitive working, big dangerous machines?

[4]    **A:** No.

[5]    **Q:** What does the Steelworkers union advise you

[6] to do in your job now with respect to safety issues?

[7]    **A:** Address them if you become aware of them.

[8]    **Q:** How did you do that here? How did you

[9] address them here?

[10]    **A:** I wasn't aware of any safety issues.

[11]    **Q:** Did you ever ask for records involving

[12] safety at this plant?

[13]    **A:** No.

[14]    **Q:** Did you ever hear any scuttlebutt about

[15] safety issues in this plant?

[16]    **A:** No.

[17]    **Q:** Did you ever get any reports from the

[18] health and welfare part of the Steelworkers union

[19] about health problems in any plant or region under

[20] any circumstances?

[21]    **A:** Sometimes.

[22]    **Q:** Would you make those available to me

[23] through your counsel —

[24]    **A:** I don't know if I kept —

Page 46

[1]    **Q:** — under Rule 26?

[2]    **A:** I don't know if I kept them.

[3]    **Q:** Okay. Where are they issued from?

[4]    **A:** Probably Health.

[5]    **Q:** From Pittsburgh?

[6]    **A:** Yeah.

[7]    **Q:** And who sends them to you?

[8]    **A:** Health and Safety, I believe.

[9]    **Q:** Pardon me?

[10]    **A:** Health and Safety.

[11]    **Q:** Okay. Now, are there health and safety

[12] committees within the union itself?

[13]    **A:** Some locals have them. Some locals don't.

[14]    **Q:** Okay. Do you have one in your local?

[15]    **MR. LICHTEN:** Well, what's "your local"?

[16]    **MR. BERGER:** Pardon me?

[17]    **MR. LICHTEN:** I don't know what "your

[18] local" means.

[19]    **Q:** Are you a member of any local right now?

[20]    **A:** Yes.

[21]    **Q:** Okay. What local is that?

[22]    **A:** 1204.

[23]    **Q:** Do you have a health and safety committee

[24] within your local?

Page 47

[1]    **A:** I'm sure they do, yeah.

[2]    **Q:** Are you on it?

[3]    **A:** No.

[4]    **Q:** Who's on it?

[5]    **A:** I'm not aware of who's on that committee.

[6]    **Q:** Is there anyplace where I could find a

[7] letterhead with the people who are on that?

[8]    **A:** Maybe, maybe not. I don't attend local

[9] meetings for any of that.

[10]    **Q:** I got a couple of pieces of paper today.

[11] One says — it's a letter to Santiago Perez that

[12] says, "Please be advised that effective immediately

[13] Lowell F. Alexander, Staff Representative will be

[14] assuming all duties and responsibilities relative to

[15] Farnsworth Fibre Corp. Local Union 421U-6."

[16]    What does this U thing mean when they say

[17] "U"? Does that mean union?

[18]    **A:** Some are — oh, that's a designation for a

[19] former upholstery worker local.

[20]    **Q:** And why was this letter sent, if you know?

[21]    **A:** To notify the person of record that I was

[22] going to be servicing the local.

[23]    **Q:** Was that your first contact with them, with

[24] the Farnsworth Fibre group, or had you met them

Page 48

[1] before January 30, 2002?

[2]    **A:** I don't believe I met them. They may have

[3] been at a conference or something at that point.

[4]    **Q:** So you were sort of new on the job?

[5]    **A:** I was new servicing them.

[6]    **Q:** Okay. Who had serviced them over the

[7] years?

[8]    **A:** I couldn't tell you.

[9]    **Q:** Was it Louis Thomas?

[10]    **A:** No.

[11]    **Q:** Was it Michael Nixon?

[12]    **A:** No.

[13]    **Q:** Was it Albert Polk?

[14]    **A:** No.

[15]    **Q:** And is your boss Albert Polk?

[16]    **A:** He's the subdistrict director.

[17]    **Q:** And Louis Thomas, is he your boss?

[18]    **A:** He was the director.

[19]    **Q:** And do you take orders from them?

[20]    **A:** Yes, I guess so. I have to say yes.

[21]    **Q:** Do they keep a personnel file for you?

[22]    **A:** I wouldn't — I don't know.

[23]    **Q:** Okay. Well, I'd like to request it through

[24] your counsel, if it's available, your personnel

Euclides Soto, et al.   v.
Sherman-Feinberg Corporation, et al.

Lowell F. Alexander
Vol. 1, February 18, 2005

Page 81

[1] we provided what we could.
[2]    **Q:** What was done for prevention?
[3]    **A:** At our district conference and our
[4] educational conference, we also had health and
[5] safety programs —
[6]    **Q:** When would this —
[7]    **A:** — that are put on.
[8]    **Q:** — group have met?
[9]    **A:** District conferences are usually held every
[10] year —
[11]    **Q:** Tell me —
[12]    **A:** — minimum every two years.
[13]    **Q:** Tell me about the district conferences.
[14] How do they work?
[15]    **A:** Members are invited to the district
[16] conference. People from the locals come to the
[17] district conferences. You put on educational
[18] programs for the financial officers. You put on
[19] educational programs for the health and safety
[20] officers. You put on educational programs for the
[21] civil rights officers.
[22]    **Q:** Now, did any of the employees from
[23] Feinberg, from Sherman-Feinberg ever go to any of
[24] those meetings?

Page 82

[1]    **A:** I don't know.
[2]    **Q:** Did you ever see one of them? I mean, did
[3] you ever see anybody from this plant at any of
[4] those? Just give me a single one of them.
[5]    **A:** You're talking about sometimes hundreds of
[6] people. I wouldn't know.
[7]    *Q. Now, was the notice of those safety
[8] meetings set out in Spanish?
[9]    *A. Not that I'm aware of, no.
[10]    **Q:** I'm confused about it.
[11]    **MR. BERGER:** Excuse me. I've really got
[12] to — I have to go to the bathroom. Could I just
[13] have one minute.
[14]    (Recess taken)
[15]    **MR. BERGER:** Could you just read the last
[16] question and answer back.
[17]    *(Record read)
[18]            **BY MR. BERGER:**
[19]    **Q:** Did the union ensure that this employer
[20] provided frequent and regular inspections of the job
[21] site?
[22]    **A:** No.
[23]    **Q:** How about for the job site materials?
[24]    **A:** Not that I'm — no.

Page 83

[1]    **Q:** How about for the job site equipment?
[2]    **A:** No.
[3]    *Q. How about for inspections by competent
[4] persons to fulfill its accident prevention
[5] responsibilities?
[6]    **A:** I don't quite understand it. You say
[7] "fulfill its accident prevention" —
[8]    **Q:** Yes.
[9]    **MR. BERGER:** Could you read that back.
[10]    **THE WITNESS:** Yeah, could you.
[11]    *(Question read)
[12]    **A:** The company's accident or the union's
[13] accident responsibilities?
[14]    **Q:** Well, the company for the union members.
[15] That's what I'm trying to get out.
[16]    **A:** No. I'm just trying to clarify the
[17] question.
[18]    **Q:** Yes.
[19]    **A:** No.
[20]    **Q:** What ventilation systems were in place at
[21] Sherman-Feinberg for the employees who are members
[22] of the union?
[23]    **A:** I do not know.
[24]    **Q:** Did you ever hear any complaints about

Page 84

[1] them?
[2]    **A:** Nope.
[3]    **Q:** Now, did Sherman-Feinberg Corporation ever
[4] develop a fire protection program at the behest of
[5] the union?
[6]    **A:** I don't know. Not that I'm aware of.
[7]    **Q:** Well, was the union unaware of fires at
[8] this plant?
[9]    **A:** Yes.
[10]    **Q:** Was the union unaware of people who lost
[11] their fingers at this plant?
[12]    **A:** Yes.
[13]    **Q:** Now, you say that based on your review of
[14] the written materials before this deposition as well
[15] as your own personal experience?
[16]    **A:** Based upon — I say that based upon nothing
[17] that was ever reported to me —
[18]    **Q:** Okay.
[19]    **A:** — in the time that I serviced that unit.
[20]    **Q:** And when you worked for the gas company —
[21]    **A:** Yes.
[22]    **Q:** — if there was a catastrophic injury and
[23] when you were union president, did you hear about
[24] it, somebody having a bad accident?

Lowell F. Alexander
Vol. 1, February 18, 2005

Euclides Soto, et al. v.
Sherman-Feinberg Corporation, et al.

[1]  **A:** Usually, yes.

[2]  **Q:** How would the word get around to you as [3] union president?

[4]  **A:** Depending upon where it was, I would hear [5] from one of the stewards or you hear it from one of [6] the co-workers, or if it happened you may hear it at [7] the local meeting.

[8]  **Q:** And I take it once — you know, you [9] mentioned that occasionally you would follow through [10] with trying to get to the bottom of the problem?

[11]  **A:** Well, to find out what happened and more to [12] find out if the person was okay and if there was [13] anything else we could do for them.

[14]  **Q:** I'd like you to assume a fact which I [15] believe to be true. Would you assume the fact that [16] some people here were badly injured.

[17]  **A:** Okay.

[18]  **Q:** Do you have any reason that you can think [19] of that it didn't get back to the union?

[20]  **MR. LICHTEN:** I object to that. You can [21] answer, if you can.

[22]  **A:** I don't know.

[23]  **Q:** Is that too speculative?

[24]  **A:** I don't know why, no.

[1]  (Mr. Diaz enters the room)

[2]  (Discussion off the record)

[3]  (Recess taken)

[4]      **BY MR. BERGER:**

[5]  **Q:** Did the union develop a fire protection [6] program for this plant?

[7]  **A:** Not during the time that I serviced them.

[8]  **Q:** Pardon?

[9]  **A:** Not during the time that I serviced them.

[10]  **Q:** Did you review the records that were [11] available to you before this deposition, the written [12] records of someone who was there before you?

[13]  **A:** No.

[14]  **Q:** Who serviced this account before you?

[15]  **Q:** Well, who was the union rep for this before you?

[16]  **A:** I don't know.

[17]  **Q:** Did you determine whether there were fire [18] extinguishers at the plant?

[19]  **A:** No, I did not.

[20]  **Q:** Did you — did the union take any steps to [21] ensure that the employer provided a fire [22] extinguisher graded not less than 2A?

[23]  (Interruption)

[24]  **MR. LICHTEN:** Excuse me.

[1]  **A:** Not that I'm aware of.

[2]  **MR. LICHTEN:** Hold on.

[3]  (Discussion off the record)

[4]  **MR. LICHTEN:** For the record, I've asked my [5] secretary to check on the PACER system. She checked [6] yesterday, and she checked today, and they don't [7] have Mr. Diaz as a counsel of record in the case, [8] and, therefore, I don't think I'm allowed to agree [9] to having him ask questions.

[10]  **MR. BERGER:** What if we fax over a notice [11] of appearance right now?

[12]  **MR. DIAZ:** Well, what we can do is — this [13] is on the record. John Diaz. I was present at the [14] pretrial, and I had filed my appearance, but it [15] obviously doesn't show up. Until we take corrective [16] action, I can suspend asking any questions and just [17] reserve the right to renotice the depo and take it.

[18]  **MR. BERGER:** Or we can — I mean, Harold, [19] you weren't at the pretrial conference, and as a [20] result of your not being there, I think it's a [21] little unfair that you're taking advantage of the [22] situation, and that is the only thing that's going [23] on here, because I know he filed the appearance, [24] because I was there. Judge Tauro would be more than

[1]  interested in this, so I'm going to suspend — [2] actually, what I suggest is that we talk to Judge [3] Tauro right now.

[4]  **MR. DIAZ:** Attorney Berger, I have no [5] problem suspending, just making sure of my [6] appearance and then suspending it and just [7] renoticing the depo. I have no problem doing that.

[8]  **MR. BERGER:** But he's limited his [9] depositions to only two people.

[10]  **MR. DIAZ:** I know, but you can suspend, [11] okay, and then I can — once I have my appearance, [12] there is no question that I reserve my right, and [13] then I'm sure —

[14]  **MR. BERGER:** Well, do you think we should [15] raise it with Judge Tauro now, because I know he's [16] going to remember you were there.

[17]  **MR. DIAZ:** Yeah.

[18]  **MR. BERGER:** And I think he's going to [19] remember that this other lawyer wasn't there.

[20]  **MR. DIAZ:** I'll leave that up to you all to [21] decide. I have no problems until that's cleared up.

[22]  **MR. LICHTEN:** My suggestion would be that [23] you finish your questions, and we'll see where we [24] are, Mr. Berger.

# EXHIBIT 89

Wilfredo Ortiz 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

23

```
1                    MR. LICHTEN:  Objection.

2    A.   I thought that well, like I said before, that before

3         the union would speak to him, that first, they would

4         go to their office.

5    Q.   Now, do you think that their going to the office

6         instead of dealing with you was discriminatory with

7         respect to you and with respect to the workforce?

8                    MR. LICHTEN:  Objection.

9    A.   Yes.

10   Q.   Could you explain why.

11                   MR. LICHTEN:  Objection.

12   A.   Because he would go to the office and whatever the

13        office would say, that's what they would tell us

14        that's what -- us do.

15   Q.   Is it safe to say that you and the other Hispanic

16        workers were denied a voice in the process?

17                   MR. LICHTEN:  Objection.

18   A.   Yes.

19   Q.   And do you believe that the motive for doing that

20        was to keep your wages as Hispanics very, very low?

21                   MR. LICHTEN:  Objection.

22   A.   Yes.

23   Q.   And do you see the attorney laughing?

24   A.   Yes.
```

Wilfredo Ortiz 3-23-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

24

1   Q.   Does that seem insulting to you?

2   A.   Yes.

3   Q.   Is it a form of intimidation or humiliation being

4        expressed --

5                    MR. LICHTEN:  Mr. Berger, you're

6        getting a little out of control here.

7   A.   Yes.

8                    MR. BERGER:  Could I get the last

9        question before the laughter.

10                   (Question read)

11  Q.   Can you answer that, please.

12  A.   No.  I don't think so, but since we all have rights,

13       the fact that we're Hispanics and we didn't speak

14       the language, they would take vengeance on us

15       because of that.

16  Q.   Take advantage of you?

17                   THE INTERPRETER:  Vengeance.

18  Q.   Okay.  But do you mean take advantage of you?

19  A.   Yes, like discriminating me.

20  Q.   Now, did the union similarly act in a way that was

21       motivated to get your union contributions without

22       shaking the boat with the employer at this point?

23                   MR. LICHTEN:  Objection.

24  A.   No.  The first thing they would do is they would go

Wilfredo Ortiz 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

25

1          to the office first and would talk to the people in

2          the office.  And for instance, we would ask for,

3          like, a dollar raise or something like that, they

4          would say no, no.  We'll give them 15, 20 cents.

5    Q.    Okay.  And do you think this was as a result of the

6          fact that the workforce was entirely Hispanic?

7                    MR. LICHTEN:  Objection.

8    A.    Yes.

9    Q.    Now, at any time, did the union invite any of you

10         Hispanic workers to their quarterly -- excuse me.

11                   Did the union ever invite you or any

12         of your Spanish coworkers to their quarterly

13         meetings?

14   A.    No.

15   Q.    Why not?

16   A.    That I know of, because they would negotiate amongst

17         themselves.

18   Q.    Now, did the union ever put up bulletin board for

19         you to give you information about anything?

20   A.    No.

21   Q.    Did the union provide any assistance to you about

22         the people who had suffered injuries like loss of

23         fingers, cutting of the face, and this kind of

24         thing?

Wilfredo Ortiz 3-23-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

26

```
 1                    MR. LICHTEN:   Objection.

 2    A.    No.

 3    Q.    Tell me, is there any doubt in your mind whether

 4          they know about people who had lost their fingers

 5          and people who had been cut on their face?

 6                    MR. LICHTEN:   Objection.

 7    A.    Yes, I know I've seen them.   There have been many

 8          accidents there.

 9                    MR. LICHTEN:   Move to strike.   Not

10          responsive.

11    Q.    So you observed many accidents?

12                    MR. LICHTEN:   Objection.

13    A.    Yes.

14    Q.    Can you tell us about what you observed.

15    A.    There was the accident with Jose Ortiz.   I was

16          present then when the machine cracked [verbatim]

17          his finger.

18    Q.    And did he scream?

19    A.    No.   He didn't scream, but he was, like, holding it

20          in.

21    Q.    In fact, didn't the employer make him work an extra

22          15 minutes before he was relieved?

23                    MR. LICHTEN:   Objection.

24    A.    No, no.
```

Wilfredo Ortiz 3-23-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

27

1   Q.  How did it work?  What happened?

2   A.  He was cleaning the machine, and afterwards, the

3       machine was still running, and then the machine

4       cracked his finger, cut it.

5   Q.  And how old was that machine?

6              MR. LICHTEN:  Objection.

7   A.  An antique.

8   Q.  A hundred years; do you think?

9   A.  Yeah.

10  Q.  Did the union ever look at any of machines like this

11      one where this accident happened?

12  A.  No.

13  Q.  You were going to describe other injures that

14      happened there?

15  A.  Yes.  There were people there too.

16  Q.  Now, did the union ever make sure that the plant

17      complied with federal laws like the Occupational

18      Safety Act?

19           MR. LICHTEN:  Objection.

20  A.  I don't know.  I don't know.

21  Q.  Okay.  Well, did the union make sure that the

22      federal safety laws were complied with?

23           MR. LICHTEN:  Objection.

24  A.  No.

Wilfredo Ortiz 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

28

1  Q.  Did they ever come to see whether any of you were

2      protected from the fires?

3                    MR. LICHTEN:  Objection.

4  A.  No.

5  Q.  And how about for the handling of paints and

6      chemicals?

7  A.  No.

8  Q.  Did, in your opinion, the union care about what

9      happened to the safety of the people in this plant

10     that consisted solely of Hispanics?

11                   MR. LICHTEN:  Objection.

12 A.  No.  They never cared for anything, no.

13 Q.  And you're not a member of the Upholstery Workers

14     Union, are you?  You're a member of the Steelworkers

15     union?

16                   MR. LICHTEN:  Objection.

17 A.  Yes.

18 Q.  You were in the Steelworkers union; right?

19 A.  Yes.

20 Q.  At any time, did the Steelworkers union provide you

21     any training, especially someone like you, who had

22     been the supervisor so that you could have more

23     skills in the workplace?

24                   MR. LICHTEN:  Objection.

Wilfredo Ortiz 3-23-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

29

1  A.  No.

2  Q.  Now, some individual was cut by a grinder and cut

3      three fingers -- were cut.  I think it was an

4      earlier testimony.  It was Jose Ortiz's uncle?

5          MR. LICHTEN:  Objection.  Move to

6      strike.

7  Q.  Do you know anything about that?

8  A.  No.  I knew of Jose Ortiz, that he cut his finger.

9  Q.  And how about Mr. Baez; did you know about his

10     accident?

11         MR. LICHTEN:  Objection.

12 A.  No.

13 Q.  Were there some grinder machines there?

14 A.  Yes.

15 Q.  How old were they?

16 A.  They're old.  They're antique.  They're so old they

17     don't even have replacement parts or pieces for

18     those machines.

19 Q.  And would you be surprised that somebody cut three

20     of their fingers on a machine like that?

21         MR. LICHTEN:  Objection.

22 Q.  Is this gentleman laughing at you?

23         MR. LICHTEN:  Again, I'm smiling at

24     your question that you would ask someone to engage

Wilfredo Ortiz 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

37

1  A.  Because they would never help us.

2  Q.  Please explain what you mean.

3  A.  Because on certain occasions, I was obligated -- we

4      were obligated to work overtime.  And sometimes,

5      they would make us -- make me extinguish fires by

6      ourselves.  Sometimes I would have to get on top of

7      a room myself to extinguish a fire on top of a

8      machine, and all of that smoke, I was inhaling.

9  Q.  In effect, did the union exploit you the way

10     employers exploit Hispanic workers?

11                  MR. LICHTEN:  Again, I think your

12     questions are completely --

13                  MR. BERGER:  You cannot put the sock

14     in someone's mouth.  Please let the man answer.

15                  MR. LICHTEN:  For the record, I think

16     your questions are inappropriate.  They're out of

17     bounds and sanctionable.

18                  MR. BERGER:  I think everything that

19     you did in the hallway borders on the ridiculous.

20     Screaming at another lawyer in the hallway.  I was

21     embarrassed for you.  So don't preach at me.

22                  THE INTERPRETER:  I'm sorry.  Could

23     you repeat the question, please.

24                  (Question read)

# EXHIBIT 90

Euclides Soto 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

26

1   them.  I had told them about the roller, you know,

2   the one that spins -- the material was put on this

3   conveyor.  And then the roller was taking the

4   material down, but when the roller didn't turn for

5   some reason, it got stuck, you know, then the

6   material gets stuck there, and then the blade,

7   okay, was sort of shaking.

8             And then when they told me -- and

9   then when I hit that part with the bar so it would

10  roll again, so it would turn, the blade came down

11  and -- the tool hit the roller and it snapped, and

12  it hit me in the face.

13      Q    How long had you worked on this machine?

14      A    (Through the Interpreter) Approximately

15  for like two years.

16      Q    And you were familiar with the machine?

17      A    (Through the Interpreter) Yes.

18      Q    Was the machine over 100 years old?

19      A    (Through the Interpreter) Approximately.

20      Q    And why do you say that?

21      A    (Through the Interpreter) I don't know

22  the year exactly that it was made, but it looked

23  old, like an old machine.

24      Q    Very, very old?

Euclides Soto 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

27

1       A       (Through the Interpreter) Yes, yes.

2       Q       Now, when Mr. Alexander came to your

3       plant, did he look around?

4       A       (Through the Interpreter) No, no, I never

5       saw him.  I never saw him walking around.

6       Q       And when you worked there, did this place

7       remind you of hell?

8                       MR. LICHTEN:  Objection.

9       A       (Through the Interpreter) Yes.

10      Q       Why?

11                      MR. LICHTEN:  Objection.

12      A       (Through the Interpreter) Because it was

13      really hot.  There was two ovens that were on all

14      the time, like 300 degrees, each one.

15                      There was no ventilation, and there

16      was a lot of -- there was always this smoke all the

17      time, and there was always a lot of dust, a lot of

18      dust.

19      Q       How much of your paycheck went to the

20      union?

21      A       (Through the Interpreter) I don't

22      remember really how much they would deduct from my

23      salary.

24      Q       Okay.

# EXHIBIT 91

Euclides Soto, et al. v.
Sherman-Feinberg Corporation, et al.

Lowell F. Alexander
Vol. 1, February 18, 2005

Page 25

[1] Stones?
[2] **MR. LICHTEN:** That's a yes or no question.
[3] **A:** October, no, I don't believe.
[4] **Q:** Okay. What did your union lawyer say, and
[5] what did you say to your union lawyer?
[6] **MR. LICHTEN:** I'm instructing the witness
[7] not to answer that.
[8] **MR. BERGER:** Do you mind putting the basis
[9] on the record.
[10] **MR. LICHTEN:** It's the attorney-client
[11] privilege.
[12] **Q:** What did you seek advice for?
[13] **MR. LICHTEN:** I'm instructing the witness
[14] not to answer that.
[15] **Q:** Did you receive advice from your legal
[16] counsel?
[17] **MR. LICHTEN:** You can answer that yes or
[18] no.
[19] **A:** Yes.
[20] **Q:** And as a result of the advice you received,
[21] what did you do?
[22] **A:** We met with the membership, met with the
[23] company, met with the membership again.
[24] **Q:** Okay. In the meetings what did you say,

Page 26

[1] and what did the membership say?
[2] **A:** The membership was concerned about — they
[3] brought up — one person brought up the conversion
[4] to condominiums.
[5] **Q:** Okay. And what did you do after you heard
[6] about some member's claim about condominium
[7] conversion?
[8] **A:** We would address it with the company.
[9] **Q:** Who did you address it with?
[10] **A:** Mr. Doucette.
[11] **Q:** And what did Mr. Doucette say?
[12] **A:** I don't recall. I don't recall exactly
[13] what he said.
[14] **Q:** Did he deny that there was going to be a
[15] condo conversion in regard to the closing of the
[16] plant?
[17] **A:** I honestly — I do not remember what he
[18] said.
[19] **Q:** Okay. Did Mr. Doucette say that he was
[20] going to — or did you understand that Mr. Doucette
[21] was going to comply with the law in every necessary
[22] way in regard to the closing of Farnsworth Fibre
[23] Corporation and the Sherman-Feinberg Corporation?
[24] **MR. LICHTEN:** Objection to the form.

Page 27

[1] **A:** Yes.
[2] **\*\*Q.** Now, how did you follow up to ensure that
[3] there was full compliance with the law in regard
[4] to — in regard to the closing of Farnsworth Fibre
[5] Corporation and Sherman-Feinberg Corporation?
[6] **A:** I guess I don't quite understand what it is
[7] that you're asking.
[8] **MR. BERGER:** Would you mind repeating the
[9] question to the witness.
[10] **\*(Question read)**
[11] **\*\*A.** Without knowing what Sherman-Feinberg did
[12] or didn't do...
[13] **MR. BERGER:** Could I get the question and
[14] answer back. I'm confused.
[15] **\*\*(Record read)**
[16] **Q:** So you don't know?
[17] **A:** No.
[18] **Q:** Okay. Now, did the union submit any
[19] grievances over the termination of employees?
[20] **A:** Nothing specific on termination, no.
[21] **Q:** Did Sherman-Feinberg — excuse me. Did the
[22] union file any grievances over severance benefits?
[23] **A:** No.
[24] **Q:** Did Sherman union — did the union file

Page 28

[1] grievances over anything other than bumping on the
[2] basis of seniority, report pay and medical insurance
[3] coverage?
[4] **A:** No.
[5] **Q:** Okay. Did you advise Mr. Ortiz to file
[6] grievances in regard to severance at any time after
[7] mid October 2004?
[8] **A:** No.
[9] **Q:** Did you discuss it with him in any way?
[10] **A:** Yes.
[11] **Q:** What did you say?
[12] **A:** It's not in the contract. There was no
[13] provision in the contract for severance.
[14] **Q:** Now, in your education, employment and
[15] experience, do you ever grieve things that are not
[16] within the four corners of the collective bargaining
[17] agreement?
[18] **A:** Tell me what you mean by "four corners."
[19] **Q:** You know, within the terms of the
[20] collective bargaining agreement.
[21] **A:** Yes.
[22] **Q:** When?
[23] **A:** In past practice.
[24] **Q:** So you — should this ever go to somebody

**EXHIBIT 92, 93, 94**

Antonio Martinez 3-23-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

9

1       contract -- in the various contracts it negotiated?

2   A.  No, I wasn't.

3   Q.  And do you recall that every time a contract was

4       negotiated, the members would take a vote whether to

5       accept the contract or to reject the contract?

6   A.  Almost always, the guy from the union would say to

7       us, "Look.  You have to accept it and that's all

8       there is."

9   Q.  Sure.  And my question is --

10              MR. BERGER:  Did you get that "sure"

11      on the record?

12              (Discussion off the record)

13  Q.  My question is:  Did the union members get a chance

14      to vote whether to reject or accept the contract

15      each time a new contract was negotiated?

16  A.  We didn't have any other alternative because the guy

17      from the union would say to us, "Look.  That's all

18      there is and there's no more."

19  Q.  Okay.  So I'm still -- I'm not sure I understand.

20              My question is:  Was there a vote

21      taken to see yes, accept the contract or no, to

22      reject the contract?

23              MR. BERGER:  Objection to the form of

24      the question.

Antonio Martinez 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

10



1    A.    No.   There was no opportunity to do so.   Always, the

2          decision was theirs, and they would say that's all

3          there is.

4    Q.    So your testimony is there was no vote on any of the

5          contracts?

6    A.    No.   We wouldn't.   I would only do what they tell us

7          to do.

8    Q.    Let me talk about the last contract.   Did you get a

9          copy of the last contract in Spanish?

10   A.    I don't remember at this moment.

11   Q.    Okay.   Do you remember that Mr. Ortiz and

12         Mr. DeJesus participated in the negotiating at the

13         last contract that you had at Farnsworth Fibre?

14   A.    Well, yes.   Mr. Ortiz was talking, was with them.

15   Q.    When you were presented with the last contract in

16         the fall of 2002, do you remember if Mr. Ortiz or

17         Mr. DeJesus spoke either for or against the new

18         contract?

19   A.    No.   Almost never, nobody was happy.   Nobody was

20         content with it.

21   Q.    Let me ask my question again.   My question is:   When

22         the last contract was presented to you, do you

23         recall Mr. Ortiz or Mr. DeJesus saying anything, one

24         way or the other, about the contract?

# EXHIBIT 95

Wilfredo Ortiz 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

8

1          needed, what they wanted, and I would just get it.

2                  MR. BERGER:  Can I get that answer

3          back, please.

4                  (Question read)

5   A.   Yes, because we would make the wata.

6                  THE INTERPRETER:  W-A-T-A.  It's a

7          colloquialism for the mattresses.

8                  MR. BERGER:  Can I get that back?

9                  THE INTERPRETER:  Yes, because I

10         would make the wata.  If I may, that's a word that

11         everybody uses, and they made it up.  It's a

12         colloquialism.  W-A-T-A.  That's the way it is --

13         for the mattresses.  Later on, if you like, we can

14         inquire what that is.

15   Q.   When you were the supervisor, did you understand

16         whether you were still in the union and part of the

17         union or not?

18   A.   No.  I was in the union.

19   Q.   And do you recall the last union contract being

20         negotiated in the fall of 2002?

21   A.   Yes.

22   Q.   And do you recall a meeting called to discuss either

23         to accept or reject that union contract?

24   A.   Yes.  I was there at the meeting, but we would only

Wilfredo Ortiz 3-23-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

9

1        have to take exactly what the company would tell us

2        to do.

3    Q.  Do you recall whether there was a vote of some type?

4    A.  No.  When we would vote with the union there, they

5        would tell us we had to take whatever this company

6        is offering.

7    Q.  My question is:  Was there a vote?

8    A.  You mean, take the union or what the union said?

9    Q.  No.  My question is:  Was there a vote whether to

10        accept or reject the contract?

11    A.  We voted.  And then we told them what we wanted, and

12        then when the union come over and spoke to the

13        company, the union told us you have to take what the

14        company is offering you.

15    Q.  Okay.  Do you remember Mr. Alexander, the black man,

16        coming to a meeting in the fall of 2002 to discuss

17        the last contract?

18    A.  Yes.  I believe so, yes.

19    Q.  And do you remember Mr. Ortiz and Mr. DeJesus being

20        at the meeting?

21    A.  DeJesus, I'm not quite sure because he had been

22        fired, Jose Ortiz, yes.

23    Q.  Do you remember anything that Mr. Ortiz said in the

24        meeting about the contract?

# EXHIBIT 96

Clemente Hernandez 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

15

```
1              MR. LICHTEN:  Objection.
2              THE INTERPRETER:  Sorry?
3              MR. BERGER:  So he wouldn't sell you out?
4              THE INTERPRETER:  I can't translate "sell
5       you out."  That means that you're going to take him
6       and sell him?
7   A.  He wouldn't push you under the bus?
8              MR. LICHTEN:  Objection.
9   A.  No, no, no.
10  Q.  Now, one of your colleagues said that you guys were
11      treated by the union like dogs.
12             MR. LICHTEN:  Objection.
13  Q.  Do you agree?
14  A.  Yes, right.
15  Q.  Another one of your colleagues said that the place
16      was like hell.
17             MR. LICHTEN:  Objection.
18  Q.  Do you agree?
19  A.  Yes.  There was a lot of dust and everything.
20  Q.  And you know that a few of the people who worked
21      there have lost fingers?
22             MR. LICHTEN:  Objection.
23  A.  Yes.
24  Q.  And some of them have scars on their face?
```

Clemente Hernandez 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

16

```
1                    MR. LICHTEN:   Objection.
2     A.   Yes.
3     Q.   Where did you grow up?
4     A.   Puerto Rico, Rio Grande.
5     Q.   And what did your father do?
6     A.   Construction.
7     Q.   Did he ever tell you about working in a place as
8          dangerous as this place?
9                    MR. LICHTEN:   Objection.
10    A.   No, because he's never been to U.S.
11    Q.   Have you had a chance to tell him about the work
12         conditions you've worked in?
13                   MR. LICHTEN:   Objection.
14    A.   Yes.  I tell him that I worked at a factory, but I
15         wouldn't give him any specifics.
16    Q.   Was this the worst workplace you've ever worked?
17                   MR. LICHTEN:   Objection.
18    A.   Yes.
19    Q.   And did you get anything from the dues you paid to
20         the union to make your life better?
21                   MR. LICHTEN:   Objection.
22    A.   Nothing, nothing.
23    Q.   Let me ask you this question which is hard for me to
24         ask.  Let me try.
```

# EXHIBIT 97

Euclides Soto 3-22-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

26

1    them.  I had told them about the roller, you know,

2    the one that spins -- the material was put on this

3    conveyor.  And then the roller was taking the

4    material down, but when the roller didn't turn for

5    some reason, it got stuck, you know, then the

6    material gets stuck there, and then the blade,

7    okay, was sort of shaking.

8              And then when they told me -- and

9    then when I hit that part with the bar so it would

10   roll again, so it would turn, the blade came down

11   and -- the tool hit the roller and it snapped, and

12   it hit me in the face.

13        Q    How long had you worked on this machine?

14        A    (Through the Interpreter) Approximately

15   for like two years.

16        Q    And you were familiar with the machine?

17        A    (Through the Interpreter) Yes.

18        Q    Was the machine over 100 years old?

19        A    (Through the Interpreter) Approximately.

20        Q    And why do you say that?

21        A    (Through the Interpreter) I don't know

22   the year exactly that it was made, but it looked

23   old, like an old machine.

24        Q    Very, very old?

Euclides Soto 3-22-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et.al.

27

1      A     (Through the Interpreter) Yes, yes.

2      Q     Now, when Mr. Alexander came to your

3      plant, did he look around?

4      A     (Through the Interpreter) No, no, I never

5      saw him.  I never saw him walking around.

6      Q     And when you worked there, did this place

7      remind you of hell?

8            MR. LICHTEN:  Objection.

9      A     (Through the Interpreter) Yes.

10     Q     Why?

11           MR. LICHTEN:  Objection.

12     A     (Through the Interpreter) Because it was

13     really hot.  There was two ovens that were on all

14     the time, like 300 degrees, each one.

15           There was no ventilation, and there

16     was a lot of -- there was always this smoke all the

17     time, and there was always a lot of dust, a lot of

18     dust.

19     Q     How much of your paycheck went to the

20     union?

21     A     (Through the Interpreter) I don't

22     remember really how much they would deduct from my

23     salary.

24     Q     Okay.

# EXHIBIT 98

Jose D. Ramirez 3-22-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

10

1    the union steward over the years you were there?

2         A    (Through the Interpreter) Yes.  I met

3    Papo, P-A-P-O, and then another guy's last name was

4    Martinez.

5         Q    During the 21 years that you were at

6    Farnsworth Fibre, did you ever go to any of the

7    union stewards and ask them to file a complaint or

8    grievance on your behalf regarding something at the

9    plant?

10        A    (Through the Interpreter) No, because --

11   no, because at that place if you complain, they

12   will fire you.  They will get rid of you.  And as a

13   person, you would be afraid talking to a

14   representative there.

15        Q    Okay.  So let's just break this down

16   first.

17             Do I understand your answer to be

18   that you never attempted to file a complaint or a

19   grievance?

20             MR. BERGER:  Objection.  Move to

21   strike.  That really is not what the gentleman

22   said.

23             THE INTERPRETER:  I'm sorry.

24             MR. BERGER:  And I'm going to

Jose D. Ramirez 3-22-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

13

1           Did you ever make a complaint like

2    this or any other complaint to Mr. Ortiz?

3        A    (Through the Interpreter) No.  No,

4    because it wasn't worth it.  They weren't going to

5    do anything about it.  At that place, you know, you

6    were under threat.

7           My sister, she died in New York, and

8    for me to be able to get that time off to go see

9    her after she was dead, then I have to bring a

10   death certificate to the boss right there to show

11   him so he would give me a week.  Otherwise, I would

12   be fired.

13       Q    Let me see if I understand.

14          Did you believe that if you made a

15   complaint or filed a grievance, you would be

16   disciplined or fired?

17       A    (Through the Interpreter) Yes.

18       Q    Okay.

19          Did any --

20       A    (Through the Interpreter) That's the way

21   it was.

22       Q    Okay.

23          Did anyone ever tell you that?

24       A    (Through the Interpreter) I would say

Jose D. Ramirez 3-22-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

27

1    hospital.  And if I went there to the hospital for

2    the seven days, they wouldn't pay me for it.

3        Q    Let me ask you this way.

4             Did you ever make a claim for

5    workers' compensation from the company?

6        A    (Through the Interpreter) No, no.

7        Q    During the time that you worked at

8    Farnsworth Fibre, did you ever make a complaint to

9    anyone, that is, the union or managers at the

10   company, about the working conditions at Farnsworth

11   Fibre or about safety conditions?

12       A    (Through the Interpreter) No.

13            Because I'm telling you, you know, it

14   wasn't even worth it, I mean, to complain, you

15   know?

16            We needed -- I needed the job.  You

17   understand?

18       Q    Do you remember what Mr. Alexander said

19   at this meeting that you attended when he was

20   there, what he said to you all through the

21   interpreter?

22       A    (Through the Interpreter) I don't

23   remember.  I don't remember.

24       Q    Do you remember him saying through the

Jose D. Ramírez 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

30

1    the situation in the plant "that's the way it was"?

2        A    (Through the Interpreter) Yes, exactly.

3        Q    What did that mean?

4            MR. LICHTEN:   Objection.

5        A    (Through the Interpreter) Well, because

6    of the pressure that we had there, that they put on

7    us there, you sort of forgot to complain.

8            And since everyone there needed the

9    job -- because for them at that location, they

10   didn't give a shit about the union.   They would

11   just, like, fire anybody they would want.

12       Q    Now, was there any union presence at the

13   plant?

14       A    (Through the Interpreter) Jose Ortiz, the

15   last one.

16       Q    All right.

17       A    (Through the Interpreter) Yes.  He would

18   do everything possible to try to help us, but, you

19   know, when he spoke to them, you know, it was no

20   use.

21       Q    So is it -- contrary to what you were led

22   to say earlier --

23           MR. LICHTEN:   Objection.

24       Q    -- is it your position that your major

Jose D. Ramirez 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

31

1    complaint here is with the union and not with Jose

2    Ortiz?

3                    MR. LICHTEN:  Objection.

4        A    (Through the Interpreter) Exactly.  Yes,

5    exactly, because --

6                    Yes, because we were discriminated

7    against there.  Nobody would help us.  Whatever the

8    bosses would say, that's what they do.

9        Q    Okay.

10                   Now, what do you mean by you being

11   discriminated against?

12       A    (Through the Interpreter) Well, they

13   would have us there, like, they would treat us like

14   slaves.

15                   They would say to you, Look, you got

16   to work tomorrow morning.  You got to do overtime

17   whether you want to or not, and we had to do it.

18       Q    One of the other witnesses agreed with me

19   that the place was like hell.

20                   Do you agree with me, and, if so,

21   how?

22                   MR. LICHTEN:  Objection.

23       A    (Through the Interpreter) Of course, yes.

24       Q    In what ways was it like hell?

# EXHIBIT 99

Luis A. Martinez 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

14

1       get your pension money back?

2    A.    Yes, because it triggered us with -- they

3          discriminated us.  They treated us like garbage.

4          They treated us like nobody.  We paid our union dues

5          for so many years, and they never gave us any sort

6          of support, any help, and they didn't represent us

7          in any way.

8    Q.    Now let me get back to the question that I asked.

9          The question was -- you told me that when you were

10          at this meeting, the Steelworker representatives

11          told you that if you wanted to get your pension

12          money back you would have to see an attorney about

13          that.

14                    My question is:  Did you attempt to

15          see an attorney about getting your pension money

16          back?

17    A.    I looked for an attorney so he would defend my

18          rights because they treated us like garbage, and we

19          were discriminated against.

20    Q.    Let me ask it this way:  Do you understand that you

21          have a vested pension with the Steelworkers that you

22          will be able to get at a certain age?

23    A.    What about if I drop dead?

24    Q.    I'm sorry.  I didn't hear that.

# EXHIBIT 100

Euclides Soto 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

9

1        Q     Do you know if he had a position in the

2    union?

3        A     (Through the Interpreter) No, I don't

4    know.  I don't remember.  No, I don't believe so.

5        Q     Okay.

6              During the time that you worked at

7    Farnsworth Fibre, did you ever make a complaint or

8    a grievance to Mr. Ortiz?

9        A     (Through the Interpreter) No.

10       Q     During the time that you worked at

11   Farnsworth Fibre, did you ever attempt to contact

12   the United Steelworkers of America office or Local

13   421-U's office in order to make a complaint or a

14   grievance?

15       A     (Through the Interpreter) No, no.

16       Q     During the time that you were employed at

17   Farnsworth Fibre, was there ever a time that you

18   believe that the company did not pay you any pay or

19   benefits that you were legally entitled to?

20       A     (Through the Interpreter) No.

21       Q     Which shift did you work?

22       A     (Through the Interpreter) From 2:30 until

23   10:30, the second shift.

24       Q     Okay.

# EXHIBIT 101

Miriam Caminero 3-24-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

23

1       plant.

2                   MR. LICHTEN:   Objection.

3   A.  God, can you imagine a person without a job

4       having to pay rent, my children, having to

5       support my children.   It was something

6       strong.   And right now jobs are not very

7       easy to obtain, to get.   What unemployment

8       would give us was not enough, you see.   I

9       was depressed.

10  Q.  What do you mean by "depressed"?

11  A.  Depressed because of the situation without

12      any money, without any job, without nothing.

13                  MR. BERGER:   Could I take a two-

14      minute break.

15                  (Recess taken)

16  Q.  One of your co-workers said that the union

17      treated the members here like dogs.

18  A.  Yes, of course.

19  Q.  Please explain to us why.

20                  MR. LICHTEN:   Move to strike.

21  A.  Because their duty was, when they closed the

22      factory, they didn't give us enough notice,

23      enough time.   They didn't offer us any other

24      job.   The union should have gotten us

# EXHIBIT 102

Luis A. Martinez 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

15

1              THE INTERPRETER:   What about if I

2       drop dead?

3   Q.  My question is again:   Do you understand whether or

4       not you have a vested pension with the Steelworkers

5       that you will be able to draw on at a certain age?

6              THE INTERPRETER:   If I may?

7              MR. LICHTEN:   Yeah.

8              THE INTERPRETER:   He might not

9       understand the translation for the word "vested."

10      Unless you change your word, I couldn't change it,

11      so I just wanted you to --

12  Q.  Do you understand that at a certain -- when you

13      reach a certain age, you will be able to get a

14      pension from the Steelworkers pension fund?

15  A.  On this case, that's why I got this attorney so, you

16      know, you have to tell my attorney what you want

17      because look, after the unemployment money that they

18      gave me was over, I ended up going through a lot of

19      troubles and hunger for almost a year, and I owe all

20      of that to them.

21  Q.  It's very important that you try to answer my

22      questions.

23             My question right now is:  Do you

24      know whether or not you have retirement money that

Luis A. Martinez 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

27

1    A.    No.

2    Q.    Where are you from?

3    A.    Santo Domingo.

4                    MR. LICHTEN:  That's all I have.

5    EXAMINATION BY MR. BERGER:

6    Q.    You had mentioned that you were hungry.  Can you

7          tell us what the effects were of being hungry?

8                    MR. LICHTEN:  Objection.

9    A.    I was very nervous.  First of all,  didn't have a

10         job.

11                   MR. LICHTEN:  Move to strike.

12   A.    I didn't have a penny to buy food nor pay rent.  I

13         wanted to go back home to sort of do something, but

14         I didn't have any money to buy the ticket to go

15         there.  Someone -- a friend of mine said to me -- he

16         gave me help.  He gave me shelter.  He said to me,

17         Come over here.  He gave me a home, a roof, and he

18         gave me food.  And once in a while, he would just

19         give me, like $10, $5, $20.   And then a friend of

20         mine that I would see on the street said to me,

21         Here.  Here's a couple of bucks.

22                   I didn't have any money to send my

23         children, my sons, or my mother back in Santo

24         Domingo.  I had to borrow money from someone.  It

# EXHIBIT 103

Eulogio Ortiz 3-24-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

20

1          my hand and took my hand away.

2    Q.    And is it fair to say that you are missing

3          one of your digits at a halfway point?

4    A.    Yes, and this one other next to it attached

5          to the side.

6    Q.    It was sewed back on?

7    A.    Yes.

8    Q.    And you wouldn't mind if we took a

9          photograph at some point, would you?

10                   MR. LICHTEN:  Objection.

11   A.    Fine.

12   Q.    Now, you had indicated that you liked the

13         job and you wanted to stay.  What did the

14         union do to help you stay at your job?

15   A.    No, they didn't do anything.  And they left

16         other people working there that had been

17         there less time than I was.

18   Q.    Did the union ever let you know they were

19         having meetings of other members of --

20         strike that.  Did the union ever tell you or

21         notify you in any way about quarterly

22         meetings?

23   A.    No.

24   Q.    When you were supervising the ten people,

Eulogio Ortiz 3-24-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

21

1           did the union ever provide you with any

2           information about proper supervision?

3                       MR. LICHTEN:  Objection.

4     A.    No.

5     Q.    Now, there appears to be some disagreement

6           here about whether Riquito Ortiz did his job

7           properly.

8                       MR. LICHTEN:  Objection.

9     Q.    Do you have an opinion about that?

10    A.    He was a good worker.

11    Q.    And did he do the best he could to protect

12          your interests with the union?

13                      MR. LICHTEN:  Objection.

14    A.    Yes, sir.

15    Q.    Do you believe it was because you are

16          Hispanic that the union did not invite you

17          to meetings or otherwise protect you?

18                      MR. LICHTEN:  Objection.

19    A.    Yes.

20    Q.    Now, you have been out of work since the

21          plant closing; is that correct?

22    A.    Yes.

23    Q.    During this period of time, have you been

24          suffering emotionally?

Eulogio Ortiz 3-24-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

22

1   A.   Yes.

2   Q.   Please explain to us how.

3   A.   I can't sleep at night.   Things are not the

4        same.   I don't feel well.

5   Q.   Do you feel humiliated about being on

6        welfare?

7   A.   Yes, exactly.

8   Q.   Now, during, basically, your entire work

9        life, you have been a member of the union,

10       haven't you?

11  A.   Yes.

12  Q.   That union is the Steelworkers; is that

13       correct?

14  A.   Yes.

15  Q.   And is it your opinion that the union failed

16       you because you are Hispanic?

17            MR. LICHTEN:   Objection.

18  A.   Yes.

19  Q.   And one of your colleagues said that you

20       were treated like dogs.   Do you agree with

21       that characterization?

22            MR. LICHTEN:   Objection.

23  A.   Yes.

24  Q.   During the entire period that you worked at

Eulogio Ortiz 3-24-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

23

1    the plant, did the union ever observe your

2    workplace?

3   A.   No, not that I know of.

4   Q.   They would just go into the headquarters

5        where the bosses were?

6             MR. LICHTEN:   Objection.

7   A.   Yes, to the office.

8   Q.   Did you form an opinion as to whether you

9        thought, to use the parlance, the union was

10       in the pocket of the company?

11            MR. LICHTEN:   Objection.

12  A.   Yes.

13  Q.   What was your opinion?

14            MR. LICHTEN:   Objection.

15  A.   Yes, because every time they would come

16       over, they would go straight only to their

17       office.  And then they would send someone to

18       tell us, stop all the machines and make sure

19       that everybody comes down, and then a guy

20       from the union would come down.  They would

21       stop the machines, make us come all the way

22       down.  Then when we went down, the people

23       from the union would go in there, and they

24       would be speaking to them.

# EXHIBIT 104

Ramon Rodriguez 3-24-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

7

| | | |
|---|---|---|
| 1 | | looked for work? |
| 2 | A. | I looked for a job, but no one wants to give |
| 3 | | me a job because of my age. |
| 4 | Q. | How long did you work at Farnsworth Fibre |
| 5 | | for? |
| 6 | A. | 25 years. |
| 7 | Q. | And did you like your job there? |
| 8 | A. | Yes, I liked it. |
| 9 | Q. | And what was your rate of pay when you |
| 10 | | stopped working at Farnsworth Fibre? |
| 11 | A. | $10.25. |
| 12 | Q. | And what was your job?  What did you do? |
| 13 | A. | I did all of the jobs there. |
| 14 | Q. | Did you work much overtime? |
| 15 | A. | Yes. |
| 16 | Q. | When you worked overtime, were you paid |
| 17 | | overtime pay for that? |
| 18 | A. | There were people that would say that they |
| 19 | | would not pay enough. |
| 20 | Q. | Did you ever check your paycheck to see if |
| 21 | | they were paying you the proper amount of |
| 22 | | overtime when you worked overtime? |
| 23 | A. | Yes. |
| 24 | Q. | Did you ever find that there were times when |

Ramon Rodriguez 3-24-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

30

1        retirement.  People from the Social Security

2        Administration, they would send me my check,

3        but I was working.

4   Q.   So you, basically, enjoyed that job, and you

5        were going to literally be there to the day

6        you died or the day they threw you out?

7   A.   Of course, yes.  I like my job.

8   Q.   When you received two weeks' notice that the

9        plant was closing, and when the African-

10       American and the Spanish lady came down, did

11       you feel from the conversation that they

12       were to trying to save the plant or keep

13       your jobs from being lost?

14            MR. LICHTEN:  Objection.

15  A.   They didn't speak to us about anything,

16       like, look for a job or anything.  They only

17       said to us, "Look, they are going to close

18       the company."

19  Q.   Had the United Steelworkers or Local 421

20       done something and offered you a job

21       somewhere else to relocate, were you willing

22       to do that or not?

23            MR. LICHTEN:  Objection.

24  A.   Yes, it was convenient for me, but, yes.

Ramon Rodríguez 3-24-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

31

1      There was like a family there.  I had been

2      working there like 25 years.

3    Q.  You felt that the plant that you were at,

4      Farnsworth Fibre, was a family to you?

5    A.  Yes, in my job.  Yes, in my job the

6      friendships that I had there at the job,

7      yes.

8    Q.  Final question.  Can you explain how you

9      feel that the United Steelworkers of America

10     or Local 421-U did not protect your

11     interests or let you down or affected you

12     with the plant closing when it did?

13            MR. LICHTEN:  Objection.

14   A.  I felt very badly.  Yes, I felt so badly.

15     The last thing I did, I even left there.  I

16     didn't even want to be around.  I didn't

17     want to pass by.  I didn't want to be

18     around.  I live in Miami now.

19            MR. DIAZ:  Thank you.  I have no

20     further questions.

21

22   EXAMINATION BY MR. BERGER:

23

24   Q.  Were you aware that the union had meetings

# EXHIBIT 105

Euclides Soto 3-22-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

28

1          What did you get from the union for

2   your payment?

3          A     (Through the Interpreter) To me, they

4   never gave me anything.

5          Q     To what extent do you feel that they --

6   that the union got to treat you like dogs, as one

7   of the earlier witnesses said, because you were

8   Hispanic?

9               MR. LICHTEN:  Objection.  Move to

10  strike.

11         A     (Through the Interpreter) I feel bad

12  because I was paying the union so they could, you

13  know, back me up, support me all the time; and

14  towards the end when they closed the factory, the

15  union never did anything for us.

16         Q     What's your age?

17         A     (Through the Interpreter) Forty-two years

18  old.

19         Q     What town are you from?

20         A     (Through the Interpreter) In Brockton.

21         Q     And where did you live -- are you

22  originally from Puerto Rico?

23         A     (Through the Interpreter) Yes, I am from

24  Puerto Rico.

Euclides Soto 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

30

1     A    (Through the Interpreter) Because right

2 now, I don't have the job that I had before.  I'm

3 not making the same money.  I'm not making the same

4 thing.

5             I have five kids at home total, and

6 everything, all my bills, are like overdue and

7 everything, and I'm doing really bad now.

8     Q    So has this job loss and the failure of

9 the union to protect you caused you to lose sleep?

10            MR. LICHTEN:  Objection and move to

11 strike.

12            MR. BERGER:  It's one of the elements

13 of our claim.

14            MR. LICHTEN:  It's the fact that

15 every question you ask is a leading question.

16 That's my problem with your questions.

17            MR. BERGER:  We're in discovery.

18 We're not at trial, counsel.

19            THE INTERPRETER:  I'm sorry, could

20 you repeat the question, please?

21            MR. BERGER:  Yes.

22 BY MR. BERGER:

23     Q    Has the failure of the union to protected

24 you caused you to lose sleep?

Euclides Soto 3-22-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation, et al.

31

1          MR. LICHTEN:  Objection.

2      A    (Through the Interpreter) Yes.  Plus I

3  also have a lot of problems in my home.

4      Q    Has it affected -- I mean, do you feel

5  depressed?

6      A    (Through the Interpreter) Yes, I feel

7  depressed.

8      Q    Okay.

9          MR. BERGER:  No further questions.

10

11          FURTHER EXAMINATION

12  BY MR. LICHTEN:

13     Q    What is -- your current job pays what?

14     A    (Through the Interpreter) $9.

15     Q    Okay.

16          So your current job pays a $1.35 an

17  hour less than you were making at Farnsworth Fibre?

18     A    (Through the Interpreter) Yes.

19     Q    Okay.

20          When you were at Farnsworth Fibre,

21  were you aware that the company paid two percent

22  above your salary into a pension fund for you?

23     A    (Through the Interpreter) No.

24     Q    Okay.

# EXHIBIT 106

Clemente Hernandez 3/23/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 12

1      a copy of the union contract in Spanish?

2   A.  I wasn't working when they gave that thing.  I was

3      laid off.

4   Q.  You said you were "laid off."  When were you laid

5      off?

6   A.  When they drew the new contract, the union, the last

7      contract that they did.

8   Q.  Right.  See if I understand.  The last contract was

9      negotiated in the fall around November of 2002.

10      Were you working then or were you on layoff?

11  A.  A group of us were laid off.

12  Q.  And when were you recalled?

13  A.  I don't remember.  Like a month or month and a half

14      later or something.

15  Q.  I see.  And were you aware that there was a -- that

16      the contract had been translated into Spanish and

17      had been given to some of the employees?

18  A.  Yes, yes.

19                  MR. LICHTEN:  That's all I have.

20  EXAMINATION BY MR. BERGER:

21  Q.  Did you know that the union had four meetings a year

22      for the membership?

23  A.  No.

24  Q.  Did you know -- did the union have a bulletin board

O'Brien & Levine
(617) 399-0130 * www.court-reporting.com
c7a37588-5fe3-40f1-b496-6cba088d25e5

Clemente Hernandez 3/23/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 13

1    where it put up its notices about any union

2    activities?

3  A.  No.

4  Q.  Do you believe Mr. Ortiz tried to help you?

5          MR. LICHTEN:  Objection.

6  A.  Yes.  He tried, but the union didn't do anything.

7  Q.  The union doesn't agree with that, I think it's safe

8    to say.

9          MR. LICHTEN:  Objection.

10 Q.  Can you try to explain why you feel that way?

11         MR. LICHTEN:  Objection.

12 A.  They didn't do anything because they just left us

13    like that, you know, with just the unemployment and

14    that's it.  We left there, everybody, like, around

15    November 14th.  And then a group was thrown out or

16    they took them out a week before, and they didn't

17    even pay them for that week to those guys, either.

18    You know, like me, they have family, they have

19    children.  And they didn't do anything, nothing,

20    nothing.  The medical benefits on the 14th, they

21    canceled everything.

22 Q.  Well the union seems to believe that in connection

23    with these fires, these persistent fires, that it

24    was Ortiz who didn't do what he should do about

O'Brien & Levine
(617) 399-0130 * www.court-reporting.com
c7a37588-5fe3-40f1-b496-6cba088d25e5

# EXHIBIT 107

Antonio Martinez 3-23-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

15

1    A.    No.

2    Q.    Now, in the plant were there fires constantly?

3    A.    Oh, yes.

4    Q.    And in the plant, was there dust flying around?

5    A.    Too much, a lot.

6    Q.    In the plant, did people lose fingers?

7    A.    Yes.

8    Q.    And how many fingers were lost in this plant?

9                    MR. LICHTEN:   Objection.

10   A.    I just remember one person that lost two fingers.

11   Q.    And how many faces were cut and scarred?

12                   MR. LICHTEN:   Objection.

13   A.    I don't remember.

14   Q.    Do you have any reason to believe that the union was

15         not aware of the fires or the cuts or the people who

16         lost fingers?

17                   MR. LICHTEN:   Objection.

18   A.    I'm not sure.

19   Q.    Well, what safety -- what did the union -- well,

20         strike that.

21                       Did the union have a bulletin board

22         for posting notices?

23   A.    No.

24   Q.    Did the union ever give you any notices of meetings?

Antonio Martinez 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

16

```
1    A.   No.

2    Q.   Did the union -- let me just ask it this way:  Do

3         you believe that the union discriminated against

4         you?

5                     MR. LICHTEN:   Objection.

6    A.   Absolutely.

7    Q.   When and how?

8    A.   I think that they discriminated against us because

9         first of all, they didn't help us.  Also, we were

10        not -- they didn't tell us when the company was

11        going to close.  And every time there was some sort

12        of a -- we had to draw up a contract or some sort of

13        complication, they would always go to the office,

14        their office, and spend a long time there.  And then

15        afterwards when they would come to us, they would

16        say, "Oh, you know what?  Whatever the company

17        says."

18   Q.   Now, where were you born and raised?

19   A.   Puerto Rico.

20   Q.   Where in Puerto Rico?

21   A.   Yabucco, Puerto Rico.

22   Q.   Were you treated differently there than you were in

23        this plant?

24                     MR. LICHTEN:   Objection.
```

# EXHIBIT 108

Elison Pena 3-22-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

53

1      A      (Through the Interpreter) Each month on

2    the first of the month.

3      Q      So it was $31 a month?

4      A      (Through the Interpreter) Yes.

5      Q      Okay.

6              So about $7 or $8 a week were your

7    union dues?

8      A      (Through the Interpreter) Maybe.

9      Q      Now, was there a union bulletin board at

10   work?

11     A      (Through the Interpreter) No.

12     Q      And do you recall your receiving an extra

13   check after the company closed as a result of the

14   union negotiating a settlement of a grievance that

15   you were involved in where you were laid off on the

16   second shift before the first shift?

17     A      (Through the Interpreter) No.

18             MR. LICHTEN:  That's all I have.

19             MR. BERGER:  I'd like to just stay

20   within the scope of what you were asking.

21

22                 FURTHER EXAMINATION

23   BY MR. BERGER:

24     Q      I'd like to try to refresh your

# EXHIBIT 109

Juan R. Colon Ortiz 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

17

```
 1          Thank you.

 2          EXAMINATION BY MR. BERGER:

 3     Q.   Did the union provide notices at your plant?

 4     A.   I don't understand.

 5     Q.   Okay.  Did the union have a board where they put up

 6          notices?

 7     A.   No.

 8     Q.   Did the company have notices about Worker's Comp

 9          rights?

10     A.   No.

11     Q.   The same for OSHA?

12                         THE INTERPRETER:  If I may, when you

13          say, "The same for Osha" --

14     Q.   Was there any notices about OSHA?

15     A.   No.

16     Q.   Now, you said earlier that the doctors didn't tell

17          you about the injuries being caused by work.  Is

18          that roughly what you said?

19     A.   Well, the only thing the doctor asked me is that if

20          I worked with chemicals, and I said yes.

21     Q.   And the doctor, I take it, wrote a lot of reports?

22     A.   No.

23     Q.   Did he write some reports for you when you applied

24          for social security?
```

# EXHIBIT 110

Wilfredo Ortiz 3/23/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 25

1    to the office first and would talk to the people in

2    the office.  And for instance, we would ask for,

3    like, a dollar raise or something like that, they

4    would say no, no.  We'll give them 15, 20 cents.

5    Q.   Okay.  And do you think this was as a result of the

6         fact that the workforce was entirely Hispanic?

7                        MR. LICHTEN:  Objection.

8    A.   Yes.

9    Q.   Now, at any time, did the union invite any of you

10        Hispanic workers to their quarterly -- excuse me.

11                        Did the union ever invite you or any

12        of your Spanish coworkers to their quarterly

13        meetings?

14   A.   No.

15   Q.   Why not?

16   A.   That I know of, because they would negotiate amongst

17        themselves.

18   Q.   Now, did the union ever put up bulletin board for

19        you to give you information about anything?

20   A.   No.

21   Q.   Did the union provide any assistance to you about

22        the people who had suffered injuries like loss of

23        fingers, cutting of the face, and this kind of

24        thing?

# EXHIBIT 111

Euclides Soto 3/22/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 25

1                    Now, was there a bulletin board for
2    union activities?
3         A    (Through the Interpreter) No.
4         Q    Okay.
5                    Was there anything circulated by the
6    union to you about exercising your rights in the
7    plant?
8         A    (Through the Interpreter) There was
9    something.  There was some sort of pamphlet or some
10   booklet in English, but they didn't give it to us.
11                   They gave us half, the first half
12   first, after it was translated, and then later they
13   gave us the rear, ending.
14        Q    Okay.
15                   Now, when you -- how many inches was
16   the cut on your face?
17        A    (Through the Interpreter) I don't
18   remember, but a mark right here, around there
19   (indicating).
20        Q    Did you bleed extensively when you got
21   cut?
22        A    (Through the Interpreter) Yes.
23        Q    And how did the accident happen?
24        A    (Through the Interpreter) I had informed

O'Brien & Levine Court Reporting Services
888.825.DEPO(3376) * www.court-reporting.com
3daa3530-9d18-428c-b908-f94bdba90a7f

# EXHIBIT 112

Nelson Acevedo 3-24-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

16

1      behalf?

2  A.   No.

3  Q.   Were you friendly with Mr. Ortiz, Jose

4      Ortiz?

5  A.   He was a co-worker.

6  Q.   Did you ever go and do anything with him

7      outside of work?

8  A.   No.

9           MR. LICHTEN:  That's all I have.

10          MR. DIAZ:  No questions for me.

11

12     EXAMINATION BY MR. BERGER:

13

14  Q.   Was there any bulletin board at the plant

15      that you were aware of that posted union

16      notices?

17  A.   Yes.  They put something like a sign, a sign

18      right next to a clock.

19  Q.   What did the sign say?

20  A.   I never read it because I was always

21      working, rushing going back and forth.

22  Q.   What language was it in?

23  A.   It was in English.

24  Q.   And was it labeled "United Steelworkers"?

# EXHIBIT 113

Miriam Caminero 3/24/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 17

1   Q.   Now, did he recruit you?

2   A.   Yes.  He told me that they needed people to

3       work there.

4   Q.   When you first arrived, did you fill out any

5       paperwork for the United Steelworkers?

6   A.   Yes.

7   Q.   Were those pension forms?

8   A.   Yes.  We would fill out, yes.

9   Q.   And do you recall that those pension forms

10      went to Pittsburgh, Pennsylvania?

11   A.   I don't know.

12   Q.   Now, were you ever invited to any meetings

13      of Local 421 of the United Steelworkers of

14      America?

15   A.   No, I never received anything.

16   Q.   Did they have a place where they posted

17      notices at the plant at Sherman-Feinberg?

18   A.   If they put any papers there, I don't know.

19      Since I don't speak English, I never

20      actually checked.

21   Q.   There was nothing in Spanish?

22   A.   No.

23   Q.   In 1995, what kind of work did you do?

24   A.   This thing with the machinery, the same

# EXHIBIT 114

Ramon Rodriguez 3/24/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 23

1      earlier, you were never aware of the fact

2      that Local 421-U had merged or been taken

3      over by the United Steelworkers of America;

4      is that fair to say or not?

5   A.  No, nothing, no.

6   Q.  I want to concentrate on the last five years

7      that you were employed there.  Were there

8      any postings anywhere throughout the plant,

9      be it in Spanish or English, that indicated

10     that you were, in fact, being represented by

11     the United Steelworkers of America?

12  A.  No.

13  Q.  You indicated earlier that you had a number

14     for Local 421-U in Philadelphia; is that

15     correct?

16  A.  Yes.

17  Q.  At any stage prior to Ms. Masiel, who was

18     the representative, came down with Mr.

19     Lowell Alexander, the African-American, or

20     prior to, let's say, September of the year

21     that the plant closed, prior to that, had

22     anyone told you that there was a number you

23     can call the United Steelworkers of America

24     if you had a complaint or wanted to bypass a

O'Brien & Levine
(617) 399-0130 * www.court-reporting.com
c1f6b461-0ce4-48bf-bd77-8d7d73fb3d0d

# EXHIBIT 115

Nelson Acevedo 3/24/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 17

1    A.    I couldn't tell you.  I am not clear on
2          that.
3    Q.    Was it a notice from the workers'
4          compensation board?
5    A.    It was something similar, but I am not clear
6          about it.
7    Q.    Did you ever get invited to the quarterly
8          meetings of the Steelworkers?
9    A.    No, never.
10                   MR. BERGER:  No further questions.
11                   MR. LICHTEN:  Nothing further.
12         Thank you.
13                   (Whereupon the deposition was
14                   concluded at 11:57 a.m.)
15
16
17
18
19
20
21
22
23
24

# EXHIBIT 116

Miriam Caminero 3/24/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 17

1   Q.   Now, did he recruit you?

2   A.   Yes.  He told me that they needed people to
3        work there.

4   Q.   When you first arrived, did you fill out any
5        paperwork for the United Steelworkers?

6   A.   Yes.

7   Q.   Were those pension forms?

8   A.   Yes.  We would fill out, yes.

9   Q.   And do you recall that those pension forms
10       went to Pittsburgh, Pennsylvania?

11  A.   I don't know.

12  Q.   Now, were you ever invited to any meetings
13       of Local 421 of the United Steelworkers of
14       America?

15  A.   No, I never received anything.

16  Q.   Did they have a place where they posted
17       notices at the plant at Sherman-Feinberg?

18  A.   If they put any papers there, I don't know.
19       Since I don't speak English, I never
20       actually checked.

21  Q.   There was nothing in Spanish?

22  A.   No.

23  Q.   In 1995, what kind of work did you do?

24  A.   This thing with the machinery, the same

# EXHIBIT 117

Clemente Hernandez 3/23/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 12

1    a copy of the union contract in Spanish?

2  A.  I wasn't working when they gave that thing.  I was

3    laid off.

4  Q.  You said you were "laid off."  When were you laid

5    off?

6  A.  When they drew the new contract, the union, the last

7    contract that they did.

8  Q.  Right.  See if I understand.  The last contract was

9    negotiated in the fall around November of 2002.

10    Were you working then or were you on layoff?

11  A.  A group of us were laid off.

12  Q.  And when were you recalled?

13  A.  I don't remember.  Like a month or month and a half

14    later or something.

15  Q.  I see.  And were you aware that there was a -- that

16    the contract had been translated into Spanish and

17    had been given to some of the employees?

18  A.  Yes, yes.

19          MR. LICHTEN:  That's all I have.

20    EXAMINATION BY MR. BERGER:

21  Q.  Did you know that the union had four meetings a year

22    for the membership?

23  A.  No.

24  Q.  Did you know -- did the union have a bulletin board

O'Brien & Levine
(617) 399-0130 * www.court-reporting.com
c7a37588-5fe3-40f1-b496-6cba088d25e5

Clemente Hernandez 3/23/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 13

1        where it put up its notices about any union

2        activities?

3   A.   No.

4   Q.   Do you believe Mr. Ortiz tried to help you?

5                  MR. LICHTEN:  Objection.

6   A.   Yes.  He tried, but the union didn't do anything.

7   Q.   The union doesn't agree with that, I think it's safe

8        to say.

9                  MR. LICHTEN:  Objection.

10  Q.   Can you try to explain why you feel that way?

11                 MR. LICHTEN:  Objection.

12  A.   They didn't do anything because they just left us

13       like that, you know, with just the unemployment and

14       that's it.  We left there, everybody, like, around

15       November 14th.  And then a group was thrown out or

16       they took them out a week before, and they didn't

17       even pay them for that week to those guys, either.

18       You know, like me, they have family, they have

19       children.  And they didn't do anything, nothing,

20       nothing.  The medical benefits on the 14th, they

21       canceled everything.

22  Q.   Well the union seems to believe that in connection

23       with these fires, these persistent fires, that it

24       was Ortiz who didn't do what he should do about

O'Brien & Levine
(617) 399-0130 * www.court-reporting.com
c7a37588-5fe3-40f1-b496-6cba088d25e5

# EXHIBIT 118

Rafael Torres 3/23/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 31

1    Q.   When was that?

2    A.   I believe it was in 1999.

3    Q.   And where did you live?

4    A.   I don't remember the address well, but I think it

5         was in Dorchester.

6    Q.   Now, do you feel that the union acted in a

7         discriminatory way when you worked at Farnsworth

8         Fibre?

9                   MR. LICHTEN:   Objection.

10   A.   Would you repeat the question again, please.

11   Q.   Was everybody at Farnsworth Hispanic?

12   A.   Yes.

13   Q.   And did the union do anything for you the entire

14        time you were at Farnsworth?

15                  MR. LICHTEN:   Objection.

16   Q.   Did they post --

17                  THE INTERPRETER:   I'm sorry.   I

18        didn't get to translate the answer.

19   A.   No, that I know of.   They didn't do anything.

20   Q.   Did they tell you about their meetings four times a

21        year?

22   A.   No.

23   Q.   So they didn't invite you to any of them?

24   A.   No.

O'Brien & Levine
(617) 399-0130 * www.court-reporting.com
4e08b02b-bd87-4073-be8c-6122d6d9e3ad

# EXHIBIT 119

Euclides Soto 3/22/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 16

1       Q    Okay.

2                 And do you know, if you know, do you

3    know if Mr. Ortiz ever contacted anyone from the

4    Steelworkers about this problem with this machine?

5       A    (Through the Interpreter) No, I never

6    knew anything about it.

7       Q    All right.

8                 Did you receive any workers'

9    compensation for the injury to your face?

10      A    (Through the Interpreter) No.

11      Q    Were you aware that every several months,

12   there would be a union meeting of Local 421-U?

13      A    (Through the Interpreter) Yes.  I would

14   only see the people from the union every time the

15   contract was renewed.

16      Q    Okay.  I think I'm asking a slightly

17   different question.

18                My question is were you aware that

19   the union, Local 421-U, held union meetings every

20   three months?

21      A    (Through the Interpreter) No, no.

22      Q    Do you recall being at a union meeting --

23   strike that.

24                Do you recall being at a meeting of

O'Brien & Levine Court Reporting Services
888.825.DEPO(3376) * www.court-reporting.com
3daa3530-9d18-428c-b908-f94bdba90a7f

# EXHIBIT 120

taking the pills and I'm not there.
Q. Did you go to the doctor because you were spitting blood?
A. Yes.
Q. And who is your doctor?
A. Manfio, M-A-N-F-I-O.
Q. Now, when you were working there, did the union ever supervise -- did the union even look at where you worked?
A. No.
Q. Were you aware that they had meetings four times a year?
A. No, because I was working the night shift. And if they would come, they would come in the morning at 10.
Q. Do you have any other friends who spit blood?
MR. LICHTEN: Objection.
A. No. On the second floor, they would do some testing for people's lungs with some sort of pump on the second floor. To the people upstairs, they would do this testing, but they wouldn't test me.
Q. Why not?
A. I don't know.
Q. Now, during the entire period you were there, did

# EXHIBIT 121

Eulogio Ortiz 3/24/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 20

1       my hand and took my hand away.
2   Q.  And is it fair to say that you are missing
3       one of your digits at a halfway point?
4   A.  Yes, and this one other next to it attached
5       to the side.
6   Q.  It was sewed back on?
7   A.  Yes.
8   Q.  And you wouldn't mind if we took a
9       photograph at some point, would you?
10              MR. LICHTEN:  Objection.
11  A.  Fine.
12  Q.  Now, you had indicated that you liked the
13      job and you wanted to stay.  What did the
14      union do to help you stay at your job?
15  A.  No, they didn't do anything.  And they left
16      other people working there that had been
17      there less time than I was.
18  Q.  Did the union ever let you know they were
19      having meetings of other members of --
20      strike that.  Did the union ever tell you or
21      notify you in any way about quarterly
22      meetings?
23  A.  No.
24  Q.  When you were supervising the ten people,

# EXHIBIT 122

Wilfredo Ortiz 3/23/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 25

1   to the office first and would talk to the people in

2   the office. And for instance, we would ask for,

3   like, a dollar raise or something like that, they

4   would say no, no. We'll give them 15, 20 cents.

5   Q.   Okay. And do you think this was as a result of the

6        fact that the workforce was entirely Hispanic?

7                    MR. LICHTEN: Objection.

8   A.   Yes.

9   Q.   Now, at any time, did the union invite any of you

10       Hispanic workers to their quarterly -- excuse me.

11                   Did the union ever invite you or any

12       of your Spanish coworkers to their quarterly

13       meetings?

14  A.   No.

15  Q.   Why not?

16  A.   That I know of, because they would negotiate amongst

17       themselves.

18  Q.   Now, did the union ever put up bulletin board for

19       you to give you information about anything?

20  A.   No.

21  Q.   Did the union provide any assistance to you about

22       the people who had suffered injuries like loss of

23       fingers, cutting of the face, and this kind of

24       thing?

# EXHIBIT 123

Page 17

1          MR. LICHTEN:  Objection to the form.

2    A.    None.

3    Q.    And did they offer any programs after the closing of

4          the plant?

5                    THE INTERPRETER:  If I may, when you

6          say "programs," a program is like a TV program.

7                    MR. BERGER:  Okay.  You know,

8          follow-up protections.

9    A.    No.

10   Q.    Now, within the plant, the whole time you were

11         0there, were there notices of union activities or

12         notices of union warnings or anything along those

13         lines?

14   A.    No.

15   Q.    And were you, in any way, aware of meetings four

16         times a year of the local union?

17   A.    You mean with us?

18   Q.    Yeah.

19   A.    No.  I don't remember them doing those.

20                   MR. BERGER:  I have no further

21         questions.

22                   (Deposition concluded at 9:40 a.m.)

23

24

# EXHIBIT 124

Jose D.   Ramirez 3/22/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 28

1    interpreter words to the effect that if anyone had

2    a problem or a concern, they could contact him?

3         A    (Through the Interpreter) No.

4         Q    Okay.

5              Were you aware that the Local Union

6    421-U had meetings every three months?

7         A    (Through the Interpreter) No.

8         Q    Okay.

9              Did you ever try to go to any union

10   meeting?

11        A    (Through the Interpreter) No.   But when

12   Martinez was the shop steward, we went to this

13   place, this location, but nobody explained anything

14   to me.

15        Q    Okay.

16             Do you recall -- where was the

17   location you went to?

18        A    (Through the Interpreter) In Brighton

19   where the Lottery is.

20        Q    And do you remember what the meeting is

21   for?

22        A    (Through the Interpreter) I think the

23   meeting was about the raise that we wanted.

24        Q    Okay.

1  know what was going on, but none of us, we didn't

2  want to know anything about the union there,

3  because the only thing that they took from us was

4  our money.  Money, that's it.

5      Q    Well, let's be nice to the union now.

6           MR. LICHTEN:  Objection.

7      Q    At least with the Catholic Church, you

8  know you had to be there every Sunday?

9           MR. LICHTEN:  Objection.

10     Q    But you didn't have to go to the union

11  hall every Sunday?

12          MR. LICHTEN:  Objection.

13     Q    And, in fact, you had no idea when you --

14          MR. LICHTEN:  Are there going to be

15  answers to these questions or are there just going

16  to be questions?

17          MR. BERGER:  Go ahead.

18     A    (Through the Interpreter) They never told

19  me that I had to go -- where I had to go to these

20  meetings.

21     Q    Did the union ever tell you anything?

22     A    (Through the Interpreter) Regarding what?

23     Q    Okay.

24          Did they have a bulletin board where

# **FACT 125**

Ramon Rodriguez 3/24/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 32

1    for the membership four times a year?

2  A.  No.

3  Q.  So I take it that you never received any

4      literature or invitations to come to these

5      meetings four times a year?

6  A.  No.

7  Q.  Now, you indicated that from 1986 until 2003

8      that you stopped trying to work with the

9      union; is that roughly correct?

10          MR. LICHTEN:  Objection.  He never

11     said anything remotely like that.

12 A.  No, I didn't.

13 Q.  I will rephrase the question.  So from 1986

14     until 2003 you didn't pursue anything to be

15     done by the union; is that correct?

16 A.  No, because I felt they were going to fire

17     me, because before I tried to protect the

18     people there, you know, remember when I told

19     you about the borax thing.

20 Q.  So is it also true, maybe within that idea,

21     that you felt it was futile to contact the

22     union during that long period of time?

23          MR. LICHTEN:  Objection.

24 A.  Of course.

O'Brien & Levine
(617) 399-0130 * www.court-reporting.com
c1f6b461-0ce4-48bf-bd77-8d7d73fb3d0d

# EXHIBIT 126

Eulogio Ortiz 3/24/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 21

1         did the union ever provide you with any

2         information about proper supervision?

3                MR. LICHTEN:  Objection.

4  A.  No.

5  Q.  Now, there appears to be some disagreement

6         here about whether Riquito Ortiz did his job

7         properly.

8                MR. LICHTEN:  Objection.

9  Q.  Do you have an opinion about that?

10  A.  He was a good worker.

11  Q.  And did he do the best he could to protect

12         your interests with the union?

13                MR. LICHTEN:  Objection.

14  A.  Yes, sir.

15  Q.  Do you believe it was because you are

16         Hispanic that the union did not invite you

17         to meetings or otherwise protect you?

18                MR. LICHTEN:  Objection.

19  A.  Yes.

20  Q.  Now, you have been out of work since the

21         plant closing; is that correct?

22  A.  Yes.

23  Q.  During this period of time, have you been

24         suffering emotionally?

# EXHIBIT 127

Page 45

A    (Through the Interpreter) No.

Q    Did they ever offer you at any time prior to your being notified of the plant closings any opportunity for job training, for advancement or to move somewhere else where the union may have had jobs, let's say, Cleveland, Ohio, or any other part of the country?

A    (Through the Interpreter) No.

Q    Okay.

I suppose the next question may not be allowed, but let me ask it anyway.

Were you in a position where if the United Steelworkers of America had notified you when the plant was closing that there was work in another place, were you able to relocate?

A    (Through the Interpreter) Yes.

Q    Okay.

MR. DIAZ:  No further questions.

MR. LICHTEN:  I have a few more questions, just to follow up.

FURTHER EXAMINATION

BY MR. LICHTEN:

Q    What training are you claiming the

O'Brien & Levine Court Reporting Services
888.825.DEPO(3376)  *  www.court-reporting.com
4c41495c-bb14-47c0-b4a7-61eb3ac40f98