# EXHIBIT 128

Miriam Caminero 3/24/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 24

1       another job.  They didn't care about a

2       person's luck or future.  They were supposed

3       to -- if you pay dues to the union, when

4       they were going to close the factory, to try

5       to get other jobs to us, to support us at

6       least and to help us.

7   Q.  Do you know whether the union ever

8       investigated the financial strength of

9       Sherman-Feinberg?

10  A.  Myself, I don't know.

11  Q.  You didn't see anything going wrong before

12      you got this notice?

13              MR. LICHTEN:  Objection.

14  A.  Supposedly everything was normal.

15  Q.  Because there was an objection to that

16      question, let me, perhaps, rephrase it.

17              In the two or three months before

18      the closing of the plant, were there

19      reductions in the number of people working?

20  A.  We had the same people, and for some reason,

21      we were working much faster.

22  Q.  When you were working faster, were there

23      orders coming in?

24  A.  Yes.  The last few days they produced a lot.

# **<u>FACT 129</u>**

Clemente Hernandez 3/23/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 13

1           where it put up its notices about any union

2           activities?

3    A.    No.

4    Q.    Do you believe Mr. Ortiz tried to help you?

5                  MR. LICHTEN:   Objection.

6    A.    Yes.  He tried, but the union didn't do anything.

7    Q.    The union doesn't agree with that, I think it's safe

8           to say.

9                  MR. LICHTEN:   Objection.

10   Q.    Can you try to explain why you feel that way?

11                 MR. LICHTEN:   Objection.

12   A.    They didn't do anything because they just left us

13          like that, you know, with just the unemployment and

14          that's it.  We left there, everybody, like, around

15          November 14th.  And then a group was thrown out or

16          they took them out a week before, and they didn't

17          even pay them for that week to those guys, either.

18          You know, like me, they have family, they have

19          children.  And they didn't do anything, nothing,

20          nothing.  The medical benefits on the 14th, they

21          canceled everything.

22   Q.    Well the union seems to believe that in connection

23          with these fires, these persistent fires, that it

24          was Ortiz who didn't do what he should do about

c7a37588-5fe3-40f1-b496-6cba088d25e5

# EXHIBIT 130

Luis A. Martinez 3-23-2005
Euclides Soto. et al. v. Sherman-Feinberg Corporation. et al.

16

```
 1          you will receive when you reach a certain age that
 2          the Steelworkers pension is holding for you?
 3    A.    I know that.  I know that I have that, but I paid
 4          dues for so many years, and they were supposed to
 5          represent me, represent us, in that situation before
 6          and then afterwards to try to sort of get me a job.
 7                    And then if you pay union dues,
 8          they're supposed to protect you, help you out, and
 9          give you some sort of shelter when we need it,
10          instead of just, like, leaving you alone.
11    Q.    When you were working at Farnsworth Fibre, did you
12          understand that the company had to make
13          contributions every year on your behalf into the
14          Steelworkers pension fund?
15    A.    What a do you mean, a "contribution"?
16    Q.    Did you understand that while you were working at
17          Farnsworth Fibre, every year Farnsworth Fibre would
18          have to take money and pay it to the Steelworkers
19          pension fund so that you would someday have a
20          pension?
21    A.    No.  I didn't know that, but anyhow, anyway you look
22          at it afterwards, if they didn't do anything about
23          it, you ended up without a job, and most guys don't
24          have jobs.  And to this day, most of the guys don't
```

# EXHIBIT 131

Cesar Pizarro 3/23/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 13

1    Q.    Yeah.

2    A.    No.

3                    (Mr. Alexander enters room)

4    Q.    Did you ever complain to any of your supervisors or

5          to any management official at Farnsworth Fibre about

6          any problems you were having with pay, benefits, or

7          working conditions?

8    A.    No.

9    Q.    Do you recall in the fall of 2003 there being a

10         meeting with the Steel Worker representative,

11         Mr. Alexander, who's sitting next to me, and the

12         woman he brought from his office and the employees

13         of Farnsworth Fibre?

14   A.    Yes.  I remember he arrived.  He came early.

15   Q.    Okay.  And was there a meeting that you were at?

16   A.    Yes.

17   Q.    And there were other employees there?

18   A.    Uh-uh, yes.

19   Q.    Was Riquito there?

20   A.    Yes.

21   Q.    And do you recall anything that was said during that

22         meeting?

23   A.    I don't remember much, but I remember that they said

24         that they couldn't do much about it.

Cesar Pizarro 3/23/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 15

1       Worker representatives said at the meeting?

2   A.   I don't remember.

3   Q.   Do you remember -- first of all, Mr. Alexander who's

4        sitting next to me, do you recognize him as the

5        representative who was out at these meetings?

6   A.   Yes.  I remember.

7   Q.   Do you remember he had a woman with him by the name

8        of Masiel DaSilva to act as an interpreter?

9   A.   I do remember her.  I didn't know her name until

10       now, but I know that she was like that dark-skinned

11       woman.

12  Q.   Do you remember anything that she said at any of the

13       meetings?

14  A.   Yes.  That's what I remember, that they said to her

15       that they couldn't do anything else about it.

16  Q.   About the shutdown?

17  A.   Yes.

18  Q.   During the three years you were at Farnsworth Fibre,

19       do you remember anyone being terminated at the

20       company?

21  A.   Yes.  There, they would fire people all the time,

22       but I couldn't tell you their names.

23  Q.   Well, as you sit here today, can you remember the

24       name of any person who you recall being fired?

# EXHIBIT 132

Luis A. Martinez 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

13

```
 1        group, they gave me regarding those questions was --

 2        the answer they gave me was that the owners, the

 3        factory owners, they could do whatever the hell they

 4        wanted because it belonged to them.

 5                    Another question that I asked

 6        them -- another question that I asked was -- I asked

 7        them what was going to happen with my money, the

 8        money that I paid to them for the past 15 years that

 9        I wanted to be -- I wanted them to give me my

10        retirement money.  And then the answer that they

11        gave me was that money was like some sort of

12        retirement plan, but until I was going to turn like

13        56 or something -- and I told them I was going to

14        look for an attorney because I wanted them to return

15        that money, my money, back because I wasn't working

16        there anymore and they -- and then their answer was,

17        Why don't you go ahead and try.  Try to get an

18        attorney to see if you can try to get your

19        retirement from us.

20   Q.   Okay.  And that was what -- Mr. Alexander, the

21        person next to me said?

22   A.   Himself and the woman that was with him.  That's the

23        answer they gave me to those questions.

24   Q.   And did you go to try to get an attorney to try to
```

# EXHIBIT 133

Rafael Torres 3-23-2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

27

```
 1              before he came over to talk to us, before we talked

 2              to him, he had gone to their office to speak to

 3              them.

 4                         After he spoke to us, he told us that

 5              he was going to go see what he could do, and then he

 6              went back and spoke to them.  He went to speak to

 7              the shop steward from the union.  And when he came

 8              back to us, he told us, "There's nothing I can do."

 9    Q.   Do you recall any questions being asked at the

10         meeting when he came back from meeting with the

11         company?

12    A.   We told him that, weren't they supposed to let us

13         know, give us notice, you know, more time before

14         that.

15    Q.   And what did he say?

16    A.   That was a decision they had made already.

17    Q.   Any other questions that you remember employees

18         asking of the union representative at this meeting?

19    A.   We told him if he couldn't do something else, so he

20         could defend us in a much better way.

21                   MR. LICHTEN:  Can you read that back.

22              (Question read back)

23                   THE INTERPRETER:  If I may, "So he

24         could defend us in a better way."
```

# EXHIBIT 134

7/27/2005
Ortiz

Page 97

1        A        (Through the Interpreter) No.  At that

2    time, no, because he was in negotiations with

3    something else, and I let the girl know.

4        Q        And the girl meaning the young lady who

5    was the interpreter?

6        A        (Through the Interpreter) Yes.

7        Q        But then at some point, Mr. Lowell

8    Alexander showed up, correct?

9        A        (Through the Interpreter) Yes.

10        Q        From the time that Lowell Alexander was

11    aware of the plant closing up to the present day,

12    have you and/or any of the other coworkers you had

13    at Farnsworth Fibre ever been offered another

14    position within the union or has the union ever

15    offered to help find you employment within the

16    United Steelworkers of America?

17        A        (Through the Interpreter) No.

18                MR. DIAZ:  No further questions.

19    Thank you.

20                MR. LICHTEN:  I just have one

21    question.

22                        FURTHER EXAMINATION

23    BY MR. LICHTEN:

24        Q        You mentioned a while ago that some union

O'Brien & Levine Court Reporting Services
888.825.DEPO(3376) * www.court-reporting.com
fb8531b1-6b0a-4e58-8542-b159acd0b1a9

# EXHIBIT 135

Cesar Pizarro 3/23/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 17

1                    MR. LICHTEN:  Objection to the form.

2    A.   None.

3    Q.   And did they offer any programs after the closing of

4         the plant?

5                    THE INTERPRETER:  If I may, when you

6         say "programs," a program is like a TV program.

7                    MR. BERGER:  Okay.  You know,

8         follow-up protections.

9    A.   No.

10   Q.   Now, within the plant, the whole time you were

11        0there, were there notices of union activities or

12        notices of union warnings or anything along those

13        lines?

14   A.   No.

15   Q.   And were you, in any way, aware of meetings four

16        times a year of the local union?

17   A.   You mean with us?

18   Q.   Yeah.

19   A.   No.  I don't remember them doing those.

20                   MR. BERGER:  I have no further

21        questions.

22                   (Deposition concluded at 9:40 a.m.)

23

24

# EXHIBIT 136

Page 97

1          A      (Through the Interpreter) No.  At that

2      time, no, because he was in negotiations with

3      something else, and I let the girl know.

4          Q      And the girl meaning the young lady who

5      was the interpreter?

6          A      (Through the Interpreter) Yes.

7          Q      But then at some point, Mr. Lowell

8      Alexander showed up, correct?

9          A      (Through the Interpreter) Yes.

10          Q      From the time that Lowell Alexander was

11      aware of the plant closing up to the present day,

12      have you and/or any of the other coworkers you had

13      at Farnsworth Fibre ever been offered another

14      position within the union or has the union ever

15      offered to help find you employment within the

16      United Steelworkers of America?

17          A      (Through the Interpreter) No.

18                 MR. DIAZ:  No further questions.

19      Thank you.

20                 MR. LICHTEN:  I just have one

21      question.

22                 FURTHER EXAMINATION

23      BY MR. LICHTEN:

24          Q      You mentioned a while ago that some union

O'Brien & Levine Court Reporting Services
888.825.DEPO(3376)  *  www.court-reporting.com
fb8531b1-6b0a-4e58-8542-b159acd0b1a9

# EXHIBIT 137

Miriam Caminero 3/24/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 14

1       bother with that?  It is better to keep

2       working with the pain.

3   Q.  Did you, yourself, ever try to call the

4       Steelworkers' office?

5   A.  No.

6   Q.  Did you like your job at Farnsworth Fibre?

7   A.  Yes.  Well, if you have a job where you make

8       a little money, well, a person, when you

9       make money, a person feels good.

10  Q.  Did you like the people that you worked with

11      at Farnsworth Fibre?

12  A.  Yes.

13  Q.  If the plant had not closed, would you have

14      wanted to continue working there?

15  A.  Yes, because when you spend so much time

16      working at a job place, at least you know

17      the people that you work with, the people

18      that works around you.  But they abandoned

19      us because after they didn't offer us any

20      other job or anything.

21  Q.  Did you have overtime?  When you worked at

22      Farnsworth Fibre, did you work a lot of

23      overtime?

24  A.  When there was a lot of work, when it was

Miriam Caminero 3/24/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 22

1       offer us something, some type of a job in a

2       another state or something.  But, for

3       instance, if they said, we have another job

4       that you can go to, for instance, in

5       Providence, then you go.  Okay.  In

6       Providence there is a job, then I would move

7       there with my family.

8   Q.  Did the union ever tell you that they had

9       gotten protections for people for plant

10      closings in other places?

11              MR. LICHTEN:  Objection.

12  A.  No.

13  Q.  Let me go through some things to refresh

14      your recollection.  They didn't mention to

15      you BB Rubber?

16              MR. LICHTEN:  Objection.

17  A.  No.

18  Q.  Did they mention to you Roseboro Plastics?

19              MR. LICHTEN:  Objection.

20  A.  No.

21  Q.  Did they mention Sealy Mattresses?

22  A.  No.

23  Q.  Now, can you tell us what happened to you

24      emotionally after you lost your job at the

# EXHIBIT 138

Luis A. Martinez 3/23/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 22

1              MR. BERGER:  Objection.

2    A.   No.  I thought that they were supposed to give us

3         some sort of notice, like five or six months before

4         they were going to close.  You know why?  That if

5         you could give them like five or six months notice

6         that this especially what was going on, then that

7         way, a person like me could just try to find another

8         job, just to move on, but on the contrary, they just

9         left us hanging in midair.

10   Q.   And as I understand it, Farnsworth Fibre only gave

11        like two weeks notice?

12   A.   Two weeks.  But of those two weeks that we're

13        talking about, the second shift only got one weeks

14        notice.

15   Q.   Other than trying to keep the company open, was

16        there anything else that you wanted the Steelworkers

17        union to do that they did not do?

18   A.   That they should have gotten us a different job,

19        another job, somewhere else.  They should have given

20        us some sort of support.  They should have given us

21        more because of what we gave to them.

22   Q.   Okay.  When you say "another job," another job

23        where?

24   A.   In another company.  At any moment, they never said

# EXHIBIT 139

Antonio Martinez 3/23/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 14

1    A.   Yes.  However, a month later they told us that there

2         were no funds to start this program, to have this

3         program.

4    Q.   And who told you that?

5    A.   A lady there from that same office, from

6         unemployment.

7    Q.   During the time that you were at Farnsworth Fibre,

8         did you ever suffer any injuries?

9    A.   No, not that I can remember.  Well, sometimes, you

10        know, you get sick and stuff.

11   Q.   Sure.

12                  MR. LICHTEN:  That's all I have.

13        Thank you.

14   EXAMINATION BY MR. BERGER:

15   Q.   Can you just clarify something.  You went to the

16        unemployment office, and somebody that worked at the

17        unemployment office told you that the unemployment

18        training had no funds for training; is that correct?

19   A.   Yes, exactly.

20   Q.   Did the union at any time indicate that it had

21        training available for you?

22   A.   No.

23   Q.   Did the union indicate to you that they would look

24        for other jobs for you in the Steelworker union?

O'Brien & Levine
(617) 399-0130 * www.court-reporting.com
3555b337-f2f4-4d13-b8b4-c06211540215

Antonio Martinez 3/23/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 15

1   A.   No.

2   Q.   Now, in the plant were there fires constantly?

3   A.   Oh, yes.

4   Q.   And in the plant, was there dust flying around?

5   A.   Too much, a lot.

6   Q.   In the plant, did people lose fingers?

7   A.   Yes.

8   Q.   And how many fingers were lost in this plant?

9              MR. LICHTEN:  Objection.

10  A.   I just remember one person that lost two fingers.

11  Q.   And how many faces were cut and scarred?

12             MR. LICHTEN:  Objection.

13  A.   I don't remember.

14  Q.   Do you have any reason to believe that the union was

15       not aware of the fires or the cuts or the people who

16       lost fingers?

17             MR. LICHTEN:  Objection.

18  A.   I'm not sure.

19  Q.   Well, what safety -- what did the union -- well,

20       strike that.

21                 Did the union have a bulletin board

22       for posting notices?

23  A.   No.

24  Q.   Did the union ever give you any notices of meetings?

O'Brien & Levine
(617) 399-0130 * www.court-reporting.com
3555b337-f2f4-4d13-b8b4-c06211540215

# EXHIBIT 140

Miriam Caminero 3/24/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 22

1          offer us something, some type of a job in a
2          another state or something.  But, for
3          instance, if they said, we have another job
4          that you can go to, for instance, in
5          Providence, then you go.  Okay.  In
6          Providence there is a job, then I would move
7          there with my family.
8     Q.   Did the union ever tell you that they had
9          gotten protections for people for plant
10          closings in other places?
11                    MR. LICHTEN:  Objection.
12    A.   No.
13    Q.   Let me go through some things to refresh
14          your recollection.  They didn't mention to
15          you BB Rubber?
16                    MR. LICHTEN:  Objection.
17    A.   No.
18    Q.   Did they mention to you Roseboro Plastics?
19                    MR. LICHTEN:  Objection.
20    A.   No.
21    Q.   Did they mention Sealy Mattresses?
22    A.   No.
23    Q.   Now, can you tell us what happened to you
24          emotionally after you lost your job at the

# EXHIBIT 141

Elison Pena 3/22/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 45

1        A      (Through the Interpreter) No.

2        Q      Did they ever offer you at any time prior

3    to your being notified of the plant closings any

4    opportunity for job training, for advancement or to

5    move somewhere else where the union may have had

6    jobs, let's say, Cleveland, Ohio, or any other part

7    of the country?

8        A      (Through the Interpreter) No.

9        Q      Okay.

10               I suppose the next question may not

11    be allowed, but let me ask it anyway.

12               Were you in a position where if the

13    United Steelworkers of America had notified you

14    when the plant was closing that there was work in

15    another place, were you able to relocate?

16        A      (Through the Interpreter) Yes.

17        Q      Okay.

18               MR. DIAZ:  No further questions.

19               MR. LICHTEN:  I have a few more

20    questions, just to follow up.

21

22                    FURTHER EXAMINATION

23    BY MR. LICHTEN:

24        Q      What training are you claiming the

O'Brien & Levine Court Reporting Services
888.825.DEPO(3376) * www.court-reporting.com
4c41495c-bb14-47c0-b4a7-61eb3ac40f98

# EXHIBIT 142

Luis A. Martinez 3/23/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 23

1    to us, Look.  If this company's closing, maybe

2    there's another company that we have, this company's

3    hiring people or doing something, but they did

4    nothing, nothing.

5   Q.   Do you know of any company where the Steelworkers

6        had a union that was hiring at the time?

7   A.   That, I couldn't tell you.

8   Q.   When you were at the meeting, did you ever ask the

9        Steelworkers if they knew of any companies that

10       might be hiring?

11  A.   We didn't ask them, but in my opinion, the union was

12       supposed to help the employees.

13                   Now I want to tell you something

14       else.  I'm going to leave this subject now and tell

15       you something else.  This is something that he told

16       me, right there.  When they were going to close the

17       factory, Kenny told us we were obligated, required,

18       to work overtime because if we didn't work overtime,

19       they were going to deny us, they weren't going to

20       give us unemployment.

21                   And we told this gentleman right here

22       that we weren't obligated in any way to work any

23       overtime because they were going to close it down.

24       And he responded to us that we were obligated to

# EXHIBIT 143

Euclides Soto 3/22/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 35

1              MR. BERGER:  Could you start that?

2              THE INTERPRETER:  I'm sorry, I

3    thought there was more.

4         Q    -- did the union provide transfer to

5    another union job to you?

6         A    (Through the Interpreter) Never, never.

7         Q    And did they ever tell you they would

8    assist in training you after the plant closed to

9    get another union job or other job with benefits?

10        A    (Through the Interpreter) No.

11             MR. BERGER:  Thank you.

12             MR. LICHTEN:  Nothing further.

13             (Proceedings adjourned at 3:30 p.m.)

14

15

16

17

18

19

20

21

22

23

24

O'Brien & Levine Court Reporting Services
888.825.DEPO(3376) * www.court-reporting.com
3daa3530-9d18-428c-b908-f94bdba90a7f

# EXHIBIT 144

Case 1:04-cv-10892-JLT    Document 50    Filed 09/01/2005    Page 37 of 101

Jose D.   Ramirez 3/22/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 38

1        A     (Through the Interpreter) Yes, some of
2    the guys that work at night.
3        Q     Okay.
4              Now, when this plant closed, did the
5    union tell you about any other union jobs that were
6    available anywhere in the country?
7        A     (Through the Interpreter) Not at any
8    time.
9              THE  INTERPRETER:   Are you all set?
10             MR.  BERGER:   No.   Just a moment.
11   BY MR. BERGER:
12       Q     Where were you born?
13       A     (Through the Interpreter) In Santo
14   Domingo.
15       Q     What does your father do?
16       A     (Through the Interpreter) My father, he
17   used to work at an office in Santo Domingo.
18       Q     And how many brothers and sisters do you
19   have?
20       A     (Through the Interpreter) We're seven all
21   together, but some of them have passed on.   There's
22   only four of us remaining.
23       Q     How many of them came to the United
24   States?

# EXHIBIT 145

Miriam Caminero 3/24/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 19

1   Q.   Now, when you were raising your three
2        children, did the union ever contact you
3        about training for another job besides this
4        one that you have described to us?
5   A.   No, never.
6   Q.   Did the union ever come to supervise where
7        you worked?
8                MR. LICHTEN:  Objection.
9   A.   No.  They should have, at least when they
10       were going to, if they knew they were going
11       to close the place, they should have at
12       least offered some sort of job or any other
13       type of job.  That's what they should have
14       done to help us.
15  Q.   Now, what protections did you have for the
16       closing of the plant?
17  A.   None.
18  Q.   Well, but the union ensured that your
19       pension fund was paid, did it not?
20  A.   Could you repeat the question.
21  Q.   I will withdraw the question.
22               Since 1995, have you gotten various
23       forms from Pittsburgh, pension forms, where
24       they would explain how much your pension

# EXHIBIT 146

Luis A. Martinez 3/23/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 28

1     was really bad because I'm the person that supports

2     all of them.

3  Q.  So were you homeless for a while?

4  A.  No.  If he hadn't given me shelter, I would have

5     lived on the street because he's the one that gave

6     me shelter.

7  Q.  Now, the union -- you used the phrase -- and I hope

8     I got it right -- that the union talked to the

9     bosses or that the union only talked to the bosses.

10     What did you mean by that?

11  A.  They would come over to the factory.  Before we

12     would get to see them that they were there, they

13     would go to the office.  When they were going to

14     come down to the factory, to our factory, we

15     couldn't do anything that we would ask, and they

16     said we didn't have any rights.

17  Q.  Did the union give you any training for another job

18     after you lost your job?

19  A.  From the union -- from the gentleman, I've never

20     seen any of them, and I never heard from them, and I

21     never received any letters.  And this is the first

22     time that I see this gentleman's face again since

23     that day.

24  Q.  Now, one of your colleagues, one of your friends,

# EXHIBIT 147

Antonio Martinez 3/23/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 14

1    A.    Yes.  However, a month later they told us that there

2          were no funds to start this program, to have this

3          program.

4    Q.    And who told you that?

5    A.    A lady there from that same office, from

6          unemployment.

7    Q.    During the time that you were at Farnsworth Fibre,

8          did you ever suffer any injuries?

9    A.    No, not that I can remember.  Well, sometimes, you

10         know, you get sick and stuff.

11   Q.    Sure.

12                   MR. LICHTEN:  That's all I have.

13         Thank you.

14         EXAMINATION BY MR. BERGER:

15   Q.    Can you just clarify something.  You went to the

16         unemployment office, and somebody that worked at the

17         unemployment office told you that the unemployment

18         training had no funds for training; is that correct?

19   A.    Yes, exactly.

20   Q.    Did the union at any time indicate that it had

21         training available for you?

22   A.    No.

23   Q.    Did the union indicate to you that they would look

24         for other jobs for you in the Steelworker union?

O'Brien & Levine
(617) 399-0130 * www.court-reporting.com
3555b337-f2f4-4d13-b8b4-c06211540215

# EXHIBIT 148

Elison Pena 3/22/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 44

1        Q    Was it one more week or one less week?

2        A    (Through the Interpreter) To us, they

3   were going to close supposedly on the 14th; but to

4   us, they stopped us -- they closed on the 7th,

5   before.

6        Q    So in actuality, you had one week's

7   notice?

8        A    (Through the Interpreter) One week

9   before.

10       Q    Once you left that job, how -- did you

11  find another job, and, if so, when did you find

12  another job after that?

13       A    (Through the Interpreter) I filled out a

14  lot of applications at different places, but I

15  couldn't find anything.

16       Q    When did you start working again after

17  that?

18       A    (Through the Interpreter) Like eight to

19  nine months back.

20       Q    Between the time of November 7th and the

21  time you found a job, work again, did the United

22  Steelworkers of America ever contact you to either

23  do any job training or try to gain any employment

24  for you somewhere else?

O'Brien & Levine Court Reporting Services
888.825.DEPO(3376) * www.court-reporting.com
4c41495c-bb14-47c0-b4a7-61eb3ac40f98

# EXHIBIT 149

Lowell F. Alexander
Vol. 1, February 18, 2005

Case 1:04-cv-10892-JLT    Document 50    Filed 09/01/2005    Page 47 of 101

Euclides Soto, et al.   v.
Sherman-Feinberg Corporation, et al.

Page 29

[1] else, and maybe this is something you can explain,
[2] you're not — when there's a problem, you don't go
[3] looking to the collective bargaining agreement? You
[4] try to solve the problem when you're in a leadership
[5] role, right?
[6]   A: I go to the collective bargaining agreement
[7] first.
[8]   Q: And if there's some gray area in the
[9] collective bargaining agreement, you take an
[10] aggressive stance on it, correct?
[11]   A: Depending upon the circumstances.
[12]   Q: Was there an aggressive position that could
[13] have been taken — I recognize hindsight is 20/20 —
[14] for the Farnsworth Fibre, Sherman-Feinberg plant
[15] closing?
[16]   A: I don't fully understand what it is that
[17] you're asking.
[18]   Q: All right. Let me make it simple. Let me
[19] relate to you the facts as I understand it. These
[20] member men that you worked with for a few years, you
[21] know them better than I do, all right. Tell me
[22] where I'm wrong here. There are 14 — with the —
[23] almost — x number — the 14, 15 people who are
[24] involved in this lawsuit, you know them, all right.

Page 30

[1] Generally they're from Puerto Rico or the Dominican
[2] Republic, right? Yes? Do you know?
[3]   A: I don't know where they're from.
[4]   Q: All right. They've suddenly lost their
[5] jobs, you know that, right?
[6]   A: I know the plant closed.
[7]   Q: And have you stayed in touch with them to
[8] find out whether any of them have found work since
[9] the plant closed?
[10]   A: No.
[11]   Q: But you know — well, is it reasonable to
[12] assume that some of these or many of these guys
[13] would have trouble finding new work?
[14]   MR. LICHTEN: Objection to the form.
[15]   A: I don't know.
[16]   Q: Have you ever gone through a plant closing
[17] scenario before, or is this the first?
[18]   A: I've gone through them before.
[19] *Q. Now, is there anything from the past
[20] experience that you did that you didn't do here?
[21]   A: Things that I did —
[22]   THE WITNESS: Can I hear that again.
[23] *(Question read)
[24]   A: No.

Page 31

[1]   Q: No?
[2]   A: No.
[3]   Q: What other plant closings have you been
[4] involved in around here?
[5]   A: Sealy Mattress.
[6]   Q: Pardon?
[7]   A: Sealy Mattress. Bee-Bee Rubber.
[8]   Q: Okay. Sealy. Bee-Bee?
[9]   A: Bee-Bee Rubber.
[10]   Q: Okay. When was Sealy?
[11]   A: Within the past two years.
[12]   Q: And where was the Sealy plant?
[13]   A: Sealy was in Randolph, Mass.
[14]   Q: And was the work force largely or
[15] exclusively Hispanic in the Sealy plant in Randolph,
[16] Mass.?
[17]   A: A large part of the population, yes.
[18]   Q: What percent?
[19]   A: It's probably close to 60 — between 60 and
[20] 70 percent.
[21]   Q: And then what happened in Sealy? What did
[22] you do?
[23]   A: It's contract language.
[24]   Q: Would you be willing to make that contract

Page 32

[1] language available to me through your counsel under
[2] Rule 26?
[3]   MR. LICHTEN: Yes.
[4]   A: Sure.
[5]   Q: And what did that contract language
[6] provide?
[7]   A: It provided severance.
[8]   Q: Okay. How about Bee-Bee Rubber?
[9]   A: Bee-Bee Rubber, I don't recall.
[10]   Q: Okay. Where was that one?
[11]   A: Nashua, New Hampshire.
[12]   Q: And what was the breakdown of people there,
[13] if you remember?
[14]   A: I don't remember.
[15]   Q: I mean, was it a large Hispanic work force?
[16]   A: No.
[17]   Q: Was it largely women, Afro-American,
[18] African? Is there any breakdown on that?
[19]   A: I don't really recall a breakdown.
[20]   Q: And can you tell me what happened there.
[21]   A: I honestly don't remember.
[22]   Q: Did that contract language have severance?
[23]   A: I believe it did. Rosboro Plastics.
[24]   Q: Would you make that contract available to

# EXHIBIT 150

Luis A. Martinez 3/23/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 28

```
 1        was really bad because I'm the person that supports
 2        all of them.
 3   Q.   So were you homeless for a while?
 4   A.   No.  If he hadn't given me shelter, I would have
 5        lived on the street because he's the one that gave
 6        me shelter.
 7   Q.   Now, the union -- you used the phrase -- and I hope
 8        I got it right -- that the union talked to the
 9        bosses or that the union only talked to the bosses.
10        What did you mean by that?
11   A.   They would come over to the factory.  Before we
12        would get to see them that they were there, they
13        would go to the office.  When they were going to
14        come down to the factory, to our factory, we
15        couldn't do anything that we would ask, and they
16        said we didn't have any rights.
17   Q.   Did the union give you any training for another job
18        after you lost your job?
19   A.   From the union -- from the gentleman, I've never
20        seen any of them, and I never heard from them, and I
21        never received any letters.  And this is the first
22        time that I see this gentleman's face again since
23        that day.
24   Q.   Now, one of your colleagues, one of your friends,
```

# EXHIBIT 151

Nelson Acevedo 3/24/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 6

1    A.   17, 18 years.  I don't remember.

2    Q.   What country did you come from, or where did

3         you come from before you lived here?

4    A.   Puerto Rico.

5    Q.   How old are you?

6    A.   49.

7    Q.   Do you have a wife or a family?

8    A.   No.

9    Q.   Are you working now?

10   A.   No.

11   Q.   When was the last time you worked?

12   A.   November something, where I worked at the

13        factory.

14   Q.   Have you worked at all since you stopped

15        working at Farnsworth Fibre?

16   A.   No.

17   Q.   How do you live?  How do you get by?

18   A.   I live with an aunt, and also I work, you

19        know, as a mechanic sometimes.  I do some

20        odd jobs and stuff like that.

21   Q.   What's the address that you live at now?

22   A.   8 Magnolia Street, Apartment 2.

23   Q.   Which town?

24   A.   Dorchester.

# EXHIBIT 152

Antonio Martinez 3/23/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 4

P R O C E E D I N G S

3            ANTONIO MARTINEZ,

4    having been satisfactorily identified by the

5    production of his Massachusetts ID card, and duly

6    sworn through the interpreter by the Notary Public,

7    was examined and testified as follows:

9            MR. BERGER:  Excuse me.  I wanted to

10    talk to the witness for one second.  Pardon me,

11    please.

12            (Brief pause)

13            MR. LICHTEN:  Let the record reflect

14    that after the witness was sworn in, Mr. Berger

15    asked the witness to go out in the hallway to confer

16    with him.

18    EXAMINATION BY MR. LICHTEN:

19    Q.   Can you state your full name for the record, please.

20    A.   Antonio Martinez.

21    Q.   And where do you work, Mr. Martinez?

22    A.   Presently, I'm not working right now.

23    Q.   Where was the last place you worked?

24    A.   I worked at the company, you know, Farnsworth.

O'Brien & Levine
(617) 399-0130 * www.court-reporting.com
3555b337-f2f4-4d13-b8b4-c06211540215

# EXHIBIT 153

Eulogio Ortiz 3/24/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 6

1    A.    Dorchester.

2    Q.    And do you work now?

3    A.    No.

4    Q.    When was the last time you worked?

5    A.    November 7, last year.

6    Q.    So have you worked at all since November of

7          2003?  When was the last time you worked?

8    A.    November 7, last year.

9    Q.    Where was the place you were working until

10         November 7 of last year?

11   A.    Farnsworth Corporation.

12   Q.    The Farnsworth Fibre Company closed in

13         November of 2003, not 2004; is that right?

14   A.    They closed last year, right?  I know that

15         it was November 6.

16   Q.    Did you collect unemployment after the plant

17         closed?

18   A.    Yes, I took unemployment.

19   Q.    How long did you receive unemployment for?

20   A.    I don't remember.  A couple of months.

21   Q.    And after you stopped receiving

22         unemployment, did you work anywhere else

23         after that?

24   A.    No.

# EXHIBIT 154

Nelson Acevedo 3/24/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 6

1    A.    17, 18 years.  I don't remember.

2    Q.    What country did you come from, or where did

3          you come from before you lived here?

4    A.    Puerto Rico.

5    Q.    How old are you?

6    A.    49.

7    Q.    Do you have a wife or a family?

8    A.    No.

9    Q.    Are you working now?

10   A.    No.

11   Q.    When was the last time you worked?

12   A.    November something, where I worked at the

13         factory.

14   Q.    Have you worked at all since you stopped

15         working at Farnsworth Fibre?

16   A.    No.

17   Q.    How do you live?  How do you get by?

18   A.    I live with an aunt, and also I work, you

19         know, as a mechanic sometimes.  I do some

20         odd jobs and stuff like that.

21   Q.    What's the address that you live at now?

22   A.    8 Magnolia Street, Apartment 2.

23   Q.    Which town?

24   A.    Dorchester.

# EXHIBIT 155

Luis A. Martinez 3/23/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 5

1   A.   Up to five weeks ago.  Up until five weeks, I got a

2        job.  It's not a set job for sure.  They call me

3        sometimes.  I am on standby.

4   Q.   Let me see if I understand.  Are you saying that you

5        had a job up until five weeks ago or that you didn't

6        have a job and just got one five weeks ago?

7   A.   Five weeks ago, I got the job.

8   Q.   Okay.  So between the time Farnsworth Fibre closed

9        and five weeks ago, did you work at all?

10  A.   No.  I worked for three months at a restaurant

11       somewhere near Dedham -- Westwood by Dedham,

12       something like that.  It's even further past Dedham.

13       I'm not finished.  All the way to Dedham, and I had

14       to quit the job because I didn't have

15       transportation.  The last bus that went all the way

16       down there, the last bus on the system went all the

17       way to Dedham, and this job was even past, after

18       Dedham.

19                 MR. BERGER:  John said yesterday,

20       every time you don't answer the question, it costs

21       you a dollar.

22  Q.   Other than the job at the restaurant past Westwood,

23       have you worked anywhere else since Farnsworth Fibre

24       closed?

Luis A. Martinez 3/23/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 6

1  A.  Sometimes I was driving a taxi with this gentleman,

2      but he would give me, like, maybe once or two times

3      a week, but sometimes, like, two or three weeks

4      after that, he had nothing for me to do.

5  Q.  Other than driving a taxi and working at this

6      restaurant up until five weeks ago, did you work

7      anywhere else after Farnsworth Fibre closed?

8  A.  No.

9  Q.  Did you collect unemployment after you stopped

10     working at Farnsworth Fibre?

11 A.  Yes.

12 Q.  For how long did you collect unemployment?

13 A.  Like six months, more or less.  It was like $6,000

14     or something that they paid me.

15 Q.  How old are you?

16 A.  I was born in 1958.  I think I'm 47.

17 Q.  And how long did you work at Farnsworth Fibre for?

18 A.  I work there for fifteen years and three months.

19 Q.  And which shift did you work on?

20 A.  My regular shift was from 7 to 3, 7 a.m. to 3 p.m.,

21     but I used to work all the shifts because I used to

22     do a lot of overtime.

23 Q.  Okay.  And up until the time you stopped working at

24     Farnsworth Fibre, did you work overtime?

# EXHIBIT 156

Eulogio Ortiz 3/24/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 7

1  Q.  How have you gotten by?  How have you lived
2      financially since you stopped receiving
3      unemployment?
4  A.  I am living with the help of the government.
5  Q.  And what kind of assistance is this?
6      Disability or welfare?  What is it?
7  A.  Welfare.
8  Q.  Are you able to work now?
9  A.  No, I cannot work, no.
10 Q.  Why is that?
11 A.  Because I am not doing very well
12     health-wise.
13 Q.  Have you applied for social security
14     disability?
15 A.  No.
16 Q.  What is your medical condition that prevents
17     you from working?
18 A.  High blood pressure, and one of my feet --
19     my foot is not good.
20 Q.  How old are you?
21 A.  44.
22 Q.  The check that you currently get from the
23     government, is that from the United States
24     Government or the State of Massachusetts?

Eulogio Ortiz 3/24/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 8

1   A.   From the government.

2   Q.   Do you know which government, the federal

3        government or the state government?

4   A.   I would imagine it must be from the state.

5   Q.   Have you applied for any type of disability

6        benefits since you stopped work at

7        Farnsworth Fibre?

8   A.   Yes.

9   Q.   What have you applied for?

10  A.   Disability.

11  Q.   And were you granted it?

12  A.   They give me this check twice a week until

13       that is approved.

14  Q.   And have you been notified yet whether it

15       will be approved or not approved?

16  A.   No.

17  Q.   Do you have a lawyer for that?

18  A.   No.

19  Q.   When did you begin work at Farnsworth Fibre?

20  A.   June 12, '78.

21  Q.   When Farnsworth Fibre closed, had you worked

22       in the plant longer than anyone else, or was

23       there anyone else there who worked longer

24       than you?

# EXHIBIT 157

Antonio Martinez 3/23/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 5

1   Q.   Since you worked at Farnsworth Fibre, have you

2        worked anywhere else since that time?

3   A.   No, no.  I've only worked with some friends.

4        Sometimes they would call me to once in a while to

5        see if I could help them paint a house.

6   Q.   After you worked for Farnsworth Fibre, did you begin

7        receiving unemployment benefits?

8   A.   Yes.

9   Q.   And after you stopped receiving unemployment

10       benefits, have you done any other work, other than

11       helping friends paint houses?

12  A.   No.

13  Q.   Have you looked for any other work?

14  A.   Well, yes.  I have looked for work, but I haven't

15       found anything.

16  Q.   How old are you?

17  A.   53.

18  Q.   And for how long did you work at Farnsworth Fibre?

19  A.   Around 13 years.

20  Q.   How long have you been in the United States?

21  A.   Like 15, 16.

22  Q.   Did you work anywhere in the United States before

23       you began working at Farnsworth Fibre?

24  A.   That I can remember, no.

O'Brien & Levine
(617) 399-0130 * www.court-reporting.com
3555b337-f2f4-4d13-b8b4-c06211540215

# EXHIBIT 158

Cesar Pizarro 3/23/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 5

1       full answer.

2                       (Answer read back)

3   Q.  So if I understand your testimony, you worked for

4       Farnsworth Fibre almost three years?

5   A.  Exactly.

6   Q.  After you stopped working at Farnsworth Fibre, where

7       did you work after that?

8   A.  I haven't gone back to work.

9   Q.  Okay.  And how have you supported yourself since you

10      stopped working at Farnsworth Fibre?

11  A.  I haven't worked for any companies.  I've been

12      working, doing jobs outside, you know, jobs --

13      independent jobs without having to work for a

14      company.

15  Q.  When you say "jobs outside," what kinds of jobs?

16  A.  Work jobs without having to work with, like, a big

17      place, you know, independent jobs.

18  Q.  Have you been doing that full time or part time?

19  A.  No.  This is sometimes working in different homes,

20      painting houses, working with friends.

21  Q.  Let me do it this way:  Have you filed a tax return

22      for the year 2004?

23  A.  No.

24  Q.  Do you intend to file a tax return for 2004?

# EXHIBIT 159

Miriam Caminero 3/24/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 6

1          children?

2    A.    Yes.

3    Q.    How many children do you have?

4    A.    Three.

5    Q.    Are you working now?

6    A.    I got a little part-time job lately.

7    Q.    Doing what?

8    A.    Cleaning.

9    Q.    Before that, did you have another job?

10   A.    No.

11   Q.    After you stopped working at Farnsworth

12         Fibre, did you collect unemployment

13         benefits?

14   A.    Yes.

15   Q.    And after you stopped collecting

16         unemployment benefits, did you work up until

17         recently when you got this cleaning job?

18   A.    Yes, but before I finished collecting

19         unemployment.  Just before it was going to

20         be over, I got this job.

21   Q.    How many hours a week do you work at that

22         job?

23   A.    25.

24   Q.    Is that the only job you have?

Miriam Caminero 3/24/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 7

1   A.   Yes.  And presently I am looking for another
2        job.
3   Q.   From when to when did you work at Farnsworth
4        Fibre?
5   A.   Since 1995 up until the time they closed.
6   Q.   What was your job there?
7   A.   On the machinery, on the machines.
8   Q.   What did you do on the machines?
9   A.   How do you call it?  Let me see if I can
10       remember the name.  Like, recycling
11       something, but let me remember exactly so I
12       can give you an exact description.
13  Q.   I can withdraw the question.
14  A.   I don't know the word in English or in
15       Spanish either.
16  Q.   What was your rate of pay?
17  A.   I started making $8 and something.  Then
18       after the raise or raises, let me see how
19       much the last was, the last was $9.75.
20  Q.   Did you have health insurance through
21       Farnsworth?
22  A.   Yes.
23  Q.   Was it just for you or for your children
24       also?

# EXHIBIT 160

Euclides Soto 3/22/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 32

1          Have you gotten statements from the

2    Steelworkers pension fund as to what you have in

3    the pension fund?

4        A    (Through the Interpreter) I don't

5    remember having seen any of that.

6        Q    Okay.

7             At your current job, do you have any

8    pension contribution?

9        A    (Through the Interpreter) No, because I

10   don't have a full-time job there.  I -- my position

11   is not permanent.  I don't do that like a couple of

12   days.  It's like a part-time thing.

13       Q    Okay.

14            So as I understand it, there's -- the

15   current place you work, Sav-A-Lot, doesn't have any

16   type of pension plan for you?

17       A    (Through the Interpreter) Not that I know

18   of.

19       Q    Okay.

20            How about health insurance?  When you

21   were working at Sav-A-Lot, did they provide health

22   insurance for you?

23       A    (Through the Interpreter) No, no health

24   insurance.

O'Brien & Levine Court Reporting Services
888.825.DEPO(3376) * www.court-reporting.com
3daa3530-9d18-428c-b908-f94bdba90a7f

# EXHIBIT 161

Juan R. Colon Ortiz 3/23/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 4

1                    P R O C E E D I N G S

2

3                    JUAN R. COLON ORTIZ,

4        having been satisfactorily identified by the

5        production of his Massachusetts driver's license,

6        and duly sworn through the interpreter by the Notary

7        Public, was examined and testified as follows:

8

9        EXAMINATION BY MR. LICHTEN:

10   Q.   Good morning.  Can you state your name for the

11        record.

12   A.   Juan R. Colon Ortiz.

13   Q.   And where do you live?

14   A.   McGreevey Way.

15   Q.   In what town?

16   A.   Boston, Massachusetts.

17   Q.   How old are you?

18   A.   I am 55 years old.

19   Q.   And how long have you lived in the United States?

20   A.   20 years.

21   Q.   How long did you work at Farnsworth Fibre for?

22   A.   I worked there 18, almost 19 years.

23   Q.   And during the time that you worked at Farnsworth

24        Fibre, was that the only job you had, or did you

O'Brien & Levine
(617) 399-0130 * www.court-reporting.com
a92a579c-2cc3-4e9f-b507-e874276b5a79

Juan R. Colon Ortiz 3/23/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 7

1    Q.    So it's your testimony that you have not worked at

2          all since you stopped working at Farnsworth Fibre?

3                    THE INTERPRETER:  I'm sorry.  If I

4          may, he didn't let me translate.  He kept going.

5    A.    Because also, I couldn't work because I was sick.  I

6          was sick because of working there because I used to

7          work with chemicals.  So I went to the hospital, and

8          the doctor, they checked my lungs.  If you want to

9          look at it, I have my prescription and everything

10         that I take for my lungs here.

11   Q.    Well, we've got to take one question at a time.  My

12         first question is whether you worked at all since

13         you stopped working at Farnsworth Fibre?

14   A.    No.

15   Q.    Have you looked for work since you stopped working

16         at Farnsworth Fibre?

17   A.    I've looked.  I've tried, but no, no.

18   Q.    Did you collect unemployment after you stopped

19         working at Farnsworth Fibre?

20   A.    Yes.  Unemployment, yes.  You mean, collect

21         unemployment?

22   Q.    Yes.  For how long did you receive unemployment?

23   A.    Eight months.

24   Q.    Do you currently receive any type of disability pay?

O'Brien & Levine
(617) 399-0130 * www.court-reporting.com
a92a579c-2cc3-4e9f-b507-e874276b5a79

Juan R. Colon Ortiz 3/23/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 8

1    A.    No.

2                        (Brief interruption)

3    Q.    Have you applied for social security?

4    A.    Yes, I applied.

5    Q.    And have you gotten a decision yet on your social

6          security?

7    A.    Yes.  They said that they were going to give me

8          social security, and they gave me, but, you know,

9          they were delayed a little.

10   Q.    Maybe you didn't understand my prior question.  So

11         you are receiving Social Security Disability?

12   A.    Yes.  From social security.

13   Q.    And when did you apply for social security?

14   A.    I don't remember.

15   Q.    Was it after you received the unemployment benefits

16         that you applied for social security?

17   A.    Yes.

18   Q.    And how much do you receive in social security a

19         month?

20   A.    992.

21   Q.    And do you have health insurance through social

22         security?

23   A.    Yes.

24   Q.    And what is your medical condition for which you

O'Brien & Levine
(617) 399-0130 * www.court-reporting.com
a92a579c-2cc3-4e9f-b507-e874276b5a79

# EXHIBIT 162

Jose D.  Ramirez 3/22/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 6

1    Security.

2        Q    And where was the last place that you

3    worked?

4        A    (Through the Interpreter) Farnsworth,

5    there at Farnsworth.

6        Q    Okay.

7            After you stopped working at

8    Farnsworth Fibre, did you work anywhere else after

9    that?

10        A    (Through the Interpreter) No, no.

11        Q    Okay.

12            And for how many years did you work

13    at Farnsworth Fibre?

14        A    (Through the Interpreter) From

15    January 1982 until November 14, 2003.

16        Q    So it looks to me that you worked there

17    21 years; is that right?

18        A    (Through the Interpreter) 31.

19        Q    Thirty-one years.

20            THE INTERPRETER:  Okay.  He's giving

21    me different dates here.

22        A    (Through the Interpreter) From 1982 until

23    2003.

24            MR. BERGER:  Can I help, because I

Jose D.   Ramirez 3/22/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 7

1    think there's a record here, the seniority list,

2    which has Ramon starting August 7, 1979.

3                    Would that be it?

4                    THE WITNESS:   (Through the

5    Interpreter) No, I started January 8th of 1982.

6                    MR. BERGER:   Yes, that's right,

7    that's right -- I'm sorry, you're right.   I'm

8    sorry.

9    BY MR. LICHTEN:

10        Q    So it looks to me that all totaled, you

11   worked for Farnsworth Fibre for 21 years; is that

12   right?

13        A    (Through the Interpreter) Yes.

14        Q    And do you currently receive a pension

15   from the Steelworkers?

16        A    (Through the Interpreter) Yes, I have a

17   pension from the Steelworkers, 291 a month.

18        Q    And do you currently have health

19   insurance, and, if so, what kind of health

20   insurance do you have?

21        A    (Through the Interpreter) Medicare.

22   That's what I have.

23        Q    Okay.

24                    So if I understand it, you receive

# EXHIBIT 163

Ramon Rodriguez 3/24/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 6

1   A.   No.

2   Q.   What do you currently do for income?

3   A.   Social security.

4   Q.   Do you receive any other money other than

5        social security?

6   A.   I have the retirement from the union.

7   Q.   How much do you receive from the union on

8        retirement?

9   A.   From the union, it is 436.

10  Q.   Dollars a month?

11  A.   Yes.

12  Q.   And how much do you receive from social

13       security?

14  A.   $915.

15  Q.   And when the Farnsworth Fibre plant closed,

16       did you go on unemployment, or did you go on

17       retirement?

18  A.   Yes.

19  Q.   And then when did you retire?

20  A.   After the company closed.

21  Q.   And what do you currently do for health

22       insurance?

23  A.   Medicare.

24  Q.   And since Farnsworth Fibre closed, have you

O'Brien & Levine
(617) 399-0130 * www.court-reporting.com
c1f6b461-0ce4-48bf-bd77-8d7d73fb3d0d

Ramon Rodriguez 3/24/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 7

1       looked for work?

2   A.  I looked for a job, but no one wants to give

3       me a job because of my age.

4   Q.  How long did you work at Farnsworth Fibre

5       for?

6   A.  25 years.

7   Q.  And did you like your job there?

8   A.  Yes, I liked it.

9   Q.  And what was your rate of pay when you

10      stopped working at Farnsworth Fibre?

11  A.  $10.25.

12  Q.  And what was your job?  What did you do?

13  A.  I did all of the jobs there.

14  Q.  Did you work much overtime?

15  A.  Yes.

16  Q.  When you worked overtime, were you paid

17      overtime pay for that?

18  A.  There were people that would say that they

19      would not pay enough.

20  Q.  Did you ever check your paycheck to see if

21      they were paying you the proper amount of

22      overtime when you worked overtime?

23  A.  Yes.

24  Q.  Did you ever find that there were times when

O'Brien & Levine
(617) 399-0130 * www.court-reporting.com
c1f6b461-0ce4-48bf-bd77-8d7d73fb3d0d

# EXHIBIT 164

Angel Baez 3/23/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 4

1                    P R O C E E D I N G S

2

3                         ANGEL BAEZ,

4         having been satisfactorily identified by the

5         production of his Massachusetts driver's license,

6         and duly sworn through the interpreter by the Notary

7         Public, was examined and testified as follows:

8

9         EXAMINATION BY MR. LICHTEN:

10   Q.   Can you state your full name, please.

11   A.   Angel Baez, B-A-E-Z.

12   Q.   Where do you work, Mr. Baez?

13   A.   At Marshalls.  I don't know how to pronounce it.

14   Q.   How long have you worked at Marshalls?

15   A.   It's like four months.

16   Q.   Okay.  And where did you work before that?

17   A.   No.  I was collecting from the other job where we

18        were fired.

19   Q.   So you were collecting unemployment before that?

20   A.   Yes.

21   Q.   And are you married and do you have children?

22   A.   I'm not married.  I live with my lady, and we have a

23        daughter, and she is 11 years old.

24   Q.   When you received unemployment, how much were you

O'Brien & Levine
(617) 399-0130 * www.court-reporting.com
a393419b-ed2b-4774-8cd0-bf4e0413df1d

# EXHIBIT 165

Wilfredo Ortiz 3/23/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 5

1   Q.   And what do you get paid at Hampton Inn?

2   A.   I'm making 12.78.

3   Q.   An hour?

4   A.   Yes.

5   Q.   And how long have you had that job?

6   A.   I'll be going on six months.

7   Q.   Okay.  Where did you work before that?

8   A.   I wasn't working.

9   Q.   So from the time the Farnsworth Fibre closed until

10       the time you began working at the Hampton Inn, did

11       you not work anywhere in between that time?

12  A.   No, no, no.  I wasn't working.

13  Q.   Did you receive unemployment after you were working

14       at Farnsworth Fibre?

15  A.   No.

16  Q.   How long did you work at Farnsworth Fibre for?

17  A.   I worked there for, like, almost 24 years.  I

18       started working there in 1980.

19  Q.   How old are you?

20  A.   I am 44.  I was born in 1960.

21  Q.   So you began at Farnsworth Fibre when you were about

22       20 years old?

23  A.   Around 20, yes.

24  Q.   And how long have you lived in the United States?

# EXHIBIT 166

Elison Pena 3/22/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 5

1                    P R O C E E D I N G S

2                    (Interpreter sworn.)

3

4

5                    ELISON PENA, a witness having

6     been duly sworn, on oath deposes and says as

7     follows:

8

9                    EXAMINATION

10    BY MR. LICHTEN:

11        Q    Can you state your full name for the

12    record, please.

13        A    (Through the Interpreter) Elison Pena.

14        Q    And where do you work, Mr. Pena?

15        A    (Through the Interpreter) I'm working at

16    a hardware store in Mattapan.

17        Q    What's the name of the hardware store?

18        A    (Through the Interpreter) I don't

19    remember right now.

20        Q    How long have you been working there?

21        A    (Through the Interpreter) Like eight

22    months.

23        Q    And do you work full time or part time

24    there?

4c41495c-bb14-47c0-b4a7-61eb3ac40f98

Elison Pena 3/22/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 6

1    A    (Through the Interpreter) Forty hours.

2    Q    And what do you receive for pay there?

3    A    (Through the Interpreter) They pay me by

4    the week.

5    Q    How much a week do they pay you?

6    A    (Through the Interpreter) After they take

7    out the child support, I make 227.

8    Q    Okay.

9         Do you know what the gross pay is a

10   week?

11   A    (Through the Interpreter) Right now --

12   right now, I don't have any memory.

13   Q    Okay.

14        When you worked at Farnsworth Fibre,

15   how much money did you make?

16   A    (Through the Interpreter) I used to work

17   40 hours, too.

18   Q    Okay.

19        And how much did you make at

20   Farnsworth Fibre?

21   A    (Through the Interpreter) 269, something

22   like that.

23        MR. LICHTEN:  I'm sorry, what?

24        THE INTERPRETER:  269, something like

O'Brien & Levine Court Reporting Services
888.825.DEPO(3376) * www.court-reporting.com
4c41495c-bb14-47c0-b4a7-61eb3ac40f98

# EXHIBIT 167

Rafael Torres 3/23/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 5

1   A.   Yes.  There's a union.

2   Q.   Before you worked at the Parker House, where did you

3        work?

4   A.   Before this one, I had a part time at night.

5   Q.   Where were you working part time at night?

6   A.   With the company, UNICCO.

7   Q.   You work for UNICCO?

8   A.   I don't work.  I worked.

9   Q.   How long did you work for UNICCO for?

10  A.   Two years.

11  Q.   And did you work at UNICCO while you were working at

12       Farnsworth Fibre?

13  A.   No.

14  Q.   So you began working at UNICCO after you got done at

15       Farnsworth Fibre?

16  A.   No.  A while back, after, like a few months after I

17       left.

18  Q.   I see.  So after you finished working at Farnsworth

19       Fibre, immediately after that, did you begin

20       collecting unemployment benefits?

21  A.   Yes.

22  Q.   And then after you collected unemployment benefits

23       you went to work for UNICCO?

24                 MR. BERGER:  Objection.

O'Brien & Levine
(617) 399-0130 * www.court-reporting.com
4e08b02b-bd87-4073-be8c-6122d6d9e3ad

# EXHIBIT 168

Euclides Soto, et al., v.
Sherman-Feinberg Corporation, et al.

Case 1:04-cv-10892-JLT    Document 50    Filed 09/01/2005    Page 93 of 101

Lowell F. Alexander
Vol. 1, February 18, 2005

Page 25

[1] Stones?
[2]     MR. LICHTEN: That's a yes or no question.
[3]     A: October, no, I don't believe.
[4]     Q: Okay. What did your union lawyer say, and
[5] what did you say to your union lawyer?
[6]     MR. LICHTEN: I'm instructing the witness
[7] not to answer that.
[8]     MR. BERGER: Do you mind putting the basis
[9] on the record.
[10]     MR. LICHTEN: It's the attorney-client
[11] privilege.
[12]     Q: What did you seek advice for?
[13]     MR. LICHTEN: I'm instructing the witness
[14] not to answer that.
[15]     Q: Did you receive advice from your legal
[16] counsel?
[17]     MR. LICHTEN: You can answer that yes or
[18] no.
[19]     A: Yes.
[20]     Q: And as a result of the advice you received,
[21] what did you do?
[22]     A: We met with the membership, met with the
[23] company, met with the membership again.
[24]     Q: Okay. In the meetings what did you say,

Page 26

[1] and what did the membership say?
[2]     A: The membership was concerned about — they
[3] brought up — one person brought up the conversion
[4] to condominiums.
[5]     Q: Okay. And what did you do after you heard
[6] about some member's claim about condominium
[7] conversion?
[8]     A: We would address it with the company.
[9]     Q: Who did you address it with?
[10]     A: Mr. Doucette.
[11]     Q: And what did Mr. Doucette say?
[12]     A: I don't recall. I don't recall exactly
[13] what he said.
[14]     Q: Did he deny that there was going to be a
[15] condo conversion in regard to the closing of the
[16] plant?
[17]     A: I honestly — I do not remember what he
[18] said.
[19]     Q: Okay. Did Mr. Doucette say that he was
[20] going to — or did you understand that Mr. Doucette
[21] was going to comply with the law in every necessary
[22] way in regard to the closing of Farnsworth Fibre
[23] Corporation and the Sherman-Feinberg Corporation?
[24]     MR. LICHTEN: Objection to the form.

Page 27

[1]     A: Yes.
[2] **Q: Now, how did you follow up to ensure that
[3] there was full compliance with the law in regard
[4] to — in regard to the closing of Farnsworth Fibre
[5] Corporation and Sherman-Feinberg Corporation?
[6]     A: I guess I don't quite understand what it is
[7] that you're asking.
[8]     MR. BERGER: Would you mind repeating the
[9] question to the witness.
[10]     *(Question read)
[11] **A. Without knowing what Sherman-Feinberg did
[12] or didn't do...
[13]     MR. BERGER: Could I get the question and
[14] answer back. I'm confused.
[15]     **(Record read)
[16]     Q: So you don't know?
[17]     A: No.
[18]     Q: Okay. Now, did the union submit any
[19] grievances over the termination of employees?
[20]     A: Nothing specific on termination, no.
[21]     Q: Did Sherman-Feinberg — excuse me. Did the
[22] union file any grievances over severance benefits?
[23]     A: No.
[24]     Q: Did Sherman union — did the union file

Page 28

[1] grievances over anything other than bumping on the
[2] basis of seniority, report pay and medical insurance
[3] coverage?
[4]     A: No.
[5]     Q: Okay. Did you advise Mr. Ortiz to file
[6] grievances in regard to severance at any time after
[7] mid October 2004?
[8]     A: No.
[9]     Q: Did you discuss it with him in any way?
[10]     A: Yes.
[11]     Q: What did you say?
[12]     A: It's not in the contract. There was no
[13] provision in the contract for severance.
[14]     Q: Now, in your education, employment and
[15] experience, do you ever grieve things that are not
[16] within the four corners of the collective bargaining
[17] agreement?
[18]     A: Tell me what you mean by "four corners."
[19]     Q: You know, within the terms of the
[20] collective bargaining agreement.
[21]     A: Yes.
[22]     Q: When?
[23]     A: In past practice.
[24]     Q: So you — should this ever go to somebody

# Document Exhibit
# Beebe Severance Agreement with Steelworkers
# for Facts 30-33



**Chardon
Rubber
Company**

QS 9000 - ISO 9001
Registered

*373 Washington Street
Chardon, Ohio 44024-1191
Tel. No. (440) 285-2161
Fax. No. (440) 286-8422
www.chardonrubber.com*

November 5, 2001

To: Beebe Active Hourly Employees

Re: Benefit Continuation Following Plant Shutdown

The Company has every intention of providing you with specific information regarding the benefits payable to you following the closure of the Beebe facility. However, because the actual shutdown of the plant will occur over a period of months, it is not possible at this time to provide each person with an individualized benefits statement. With that in mind, the following general information is being provided to assist you in the short-term.

**Vacation**

You are entitled to the remainder of your 2001 vacation. Any vacation not taken by the end of the year will be paid in a lump sum in the December 31st pay period. If you work into 2002, you will receive your full vacation pay for that year payable in your final paycheck.

**Pension**

All hourly employees with continuing seniority on November 5, 2001 will become vested in their pension benefit under the Beebe Rubber Company, Inc. Union Employee's Pension Plan regardless of their years of service.

If on your termination date you have reached the age of 55 and have ten years of service, you will be eligible for an immediate early retirement benefit. You may defer receipt of your early retirement benefit to the first of any month prior to age 65. The amount of the benefit payable will be adjusted according to your age on your commencement date.

As soon as termination dates are known, the benefit amounts will be calculated and individual statements provided to each employee. If the lump sum value of your pension benefit is less than $5,000 it will automatically be paid in a lump sum in lieu of a deferred vested benefit. If the lump sum value is $5,000 or more, it will be paid as a monthly benefit commencing at age 65, or as early as age 55 if you have 10 or more years of service.

**Severance Benefit**

If on your termination date you have 10 or more years of service, you can elect to receive your pension in the form of a cash severance benefit. The amount of the cash severance benefit you will receive will be equal to $500 times your years of benefit service.

If you elect the cash severance benefit, your pension benefit will be reduced by the actuarial equivalent of your cash severance benefit. If the value of your cash severance benefit is greater than the value of your accrued pension benefit, no further benefits will be payable to you from the pension plan. If the value of the cash severance benefit is less than the value of your accrued pension benefit, the balance will be paid to you in the form of a monthly pension benefit commencing on your early or normal retirement date.

You and your spouse must both consent to the payment of a cash severance benefit. Following your termination date, you will receive specific information regarding your pension and eligibility for a cash severance benefit.

### Life Insurance

Life insurance benefits cease on your termination date. You will have the right to convert all or a portion of your life insurance to an individual policy. The minimum amount that can be converted is $10,000. The conversion application must be received by Sun Life within 31 days of your termination date. It is your responsibility to request a Conversion Application form from the Human Resources Department and to pay any premium due to convert your coverage.

If you are eligible for early retirement on your termination date, you will receive a company-paid retiree life insurance benefit in the amount of $5,000. The life insurance benefit is provided regardless of whether your pension benefit is paid immediately or deferred to some later date.

### Medical, Dental & Vision Insurance

Medical, dental and vision insurance will cease on your termination date. You, your spouse or your dependent children will have 60 days to elect to continue coverage under COBRA. The cost to do so will be $257.91 per month for single coverage and $773.73 per month for family coverage. The maximum continuation period is 18 months. COBRA notification and election forms will be mailed to your home immediately following your termination date.

If on your termination date you are age 55 and have at least 10 years of service, you will be eligible to elect retiree medical coverage as long as you also elect to receive an immediate pension. If you defer your pension benefit, you lose the right to elect retiree medical coverage. Likewise, if you elect an immediate pension, but waive retiree medical coverage, you may not then request medical coverage at a later date. Retiree medical coverage does not include dental or vision coverage. The monthly cost of retiree medical coverage will be determined shortly.

### Short-Term Disability

Your participation in the Company's short-term disability plans will cease on your termination date. If you are receiving short-term disability benefits on the date coverage would terminate, you will continue to receive short-term disability benefits under the terms of the policy until the disability ends or benefits are exhausted, whichever occurs first.

### Employee Assistance Plan

The Company will continue your participation in the Employee Assistance Plan through April 30, 2002. For assistance with stress, legal issues, financial concerns, marital or family stress, alcohol or drug abuse, depression, wellness issues, physician research, relocation support or

# Document Exhibit
# Collective Bargaining Agreement of Sealey and Steelworkers providing severance upon plant closing for Facts 30-33

## ARTICLE 26

### Earned Year End Bonus

Actively employed bargaining unit employees with more than one (1) year of continuous service are eligible for an earned year end bonus. Employees can earn one (1) hour of pay for each week in which they have not missed any scheduled work, up to 48 hours of pay per *fiscal year (Dec 1 – Nov 30)*. Vacation *or Leave of Absence* weeks are not considered weeks worked for the purposes of this provision. *The hourly rate of pay will be calculated by taking the employees straight time average hourly rate from January through September.*

## ARTICLE 27

### Severance Pay

27.1        Entitlement. Employees who are laid off permanently from employment as a result of changes in plant equipment or in processes or methods of operation, as a result of permanent reduction in production, or as a result of change in the Company's production or closing of its plant, or similar causes, shall be entitled to severance pay as hereinafter provided. This clause shall not apply to normal lay-offs resulting from temporary or seasonal variations in production requirements. Compliance with this provision shall constitute the fulfillment of the Company's obligations to bargain over either the decision to take any such action or the effects of such action.

27.2        Amount. *Employees will be paid 20 hours at their straight time average hourly rate for each year of service with a minimum benefit of 80 hours pay.*

30

# Document Exhibit
# Memorandum of Agreement
# between Rosboro Plastics and
# Steelworkers
# for Facts 30-33

## MEMORANDUM OF AGREEMENT

Rosbro Plastics Company (herein the "Company") and United Steelworkers District No. 4 (herein the "Union") hereby agree as follows:

WHEREAS the Company and Union are parties to a collective bargaining agreement herein the "Agreement") and

WHEREAS the Company has notified the Union that it is selling its assets and laying off all bargaining unit members; and

WHEREAS the Company and Union have entered into negotiations regarding the impact on bargaining unit members of the Company's decision to sell;

IN CONSIDERATION of the mutual covenants herein contained the parties agree as follows:

1.   The Company agrees to make severance payments to bargaining unit members in accordance with the schedule attached to this Agreement as Exhibit A provided the employee works satisfactorily as long as requested by the Company, signs a copy of the General Release (General Release) attached hereto as Exhibit B, and provided the Company is able to continue to operate through June 26, 1998:

2.   The Union agrees that bargaining unit employees will fully cooperate with the Company to continue operations and accomplish the asset sale in a smooth and expeditious manner. There shall be no restrictions on the performance of bargaining unit work by individuals outside the bargaining unit for the duration of the Agreement.

3.   The Agreement shall be terminated as of June 28, 1998. The Union agrees that the Company will have no further obligations to the Union or the bargaining units members following that date. The Union reserves its right to file routine grievances that may arise between the date of this Memorandum of Agreement and the date the collective bargaining agreement is terminated.

4.     The Union agrees it will file no action, grievance, charge or claim against the Company, its present and former employees, officers, owners. agents, successors and assigns for any reason, either on behalf of itself or its members, including, but not limited to challenges to sale of the Company's assets or its cessation of business. The Union, on behalf of itself and its members hereby releases and forever

discharges the Company, its present and former officers, employees, agents, attorneys, successors and assigns from any and all manners of action, causes of action, debts, claims and demands, both in law and in equity, known, or unknown, including, but not limited to any claims of breach of the collective bargaining agreement and claims under the National Labor Relations Act.

     5.   The Union agrees that upon compliance with the terms of this Memorandum of Agreement and upon termination of the collective bargaining agreement as specified above, the Company will have satisfied all of its obligations to the Union and bargaining units members under the collective bargaining agreement and under the National Labor Relations Act.


For the Company:                   For the Union


_____       _____

RJ__226239/4%KF03!.DOC