UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| EUCLIDES SOTO, LOUIS A. MARTINEZ, JOSE RAMIREZ, CLEMENTE HERNANDEZ, CESAR PIZARO, ELISON PENA, JUAN COLON, JOSE ORTIZ, RAFAEL TORRES, ANGEL BAEZ, ANTONIO MARTINEZ, WILFREDO ORTIZ, EULOGIO ORTIZ, MIRRAIN MIRANDA, RAFAEL MORENO, NELSON ACEVEDO, and RAMON RODRIGUEZ,<br>　　　　　　　Plaintiffs,<br><br>v.<br><br>SHERMAN-FEINBERG CORPORATION, FARNSWORTH FIBRE CORPORATION, UNITED STEELWORKERS OF AMERICA, LOCAL 421-U, AND UNITED STEELWORKERS OF AMERICA,<br>　　　　　　　Defendants. | CIVIL ACTION<br>NO.: 04-10892-JLT |

## SUR-REPLY TO REPLY TO OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

**A. PROCEDURAL CLAIMS**

The introductory sections of the Opposition to the Motion for Summary Judgment involve things other than the Rule 56.1 materials.[1] The introductory sections involve: An Introduction, discussing, generally, the law and facts (pages 1-5), including, more particularly, the state of mind testimony of the membership (Introduction, Section B, pages 5-14), and, more particularly, the defendants' binding admissions (Introduction, Section C, pages 14-15). Not one of these introductory materials has the least to do with Rule 56.1 and are, expressly, only an introduction. Pursuant to Rule 56.1, the plaintiffs painstakingly disputed the defendants' 47

---

[1] This Sur-Reply is filed within seven days of the filing of the Relpy.

pages of purported undisputed facts in Section D, pages 15-22, of the Opposition to the Motion for Summary Judgment. The claim to the contrary of the defendants is false. Every factual citation refers to specific pages of the deposition or documents or the statement of additional facts. The Rule 56.1 Plaintiffs' Statement of Material Additional Facts appears in Section E, p. 22-39, in the strictest compliance with the rules. If any piece of this case should be stricken, it is the flabby submission of the defendants spanning thousands of pages of the Pacer system. Therefore, pages 1 to 9 of the Reply are not factually supported averments and responding to them has been like tunnel duty for a state trooper.

With respect to the date of fire, physical injury at the plant, no grievances at the plant, plant closing, shop steward, the failure to check the employer's books, the defendants err in saying the defendants did not support the claims.  The defendants claimed there was no record reference to the date of the fire. However, Elison Pena testified to fires at the factory up until November 2003.[2]  Wilfredo Ortiz also recalls that he would have to extinguish the fires himself in November 2003.[3]  As to the witnessing of physical injury, Wilfredo Ortiz testified that he was

---

[2] Deposition of Elison Pena at page 37-38:
    Q    Describe to us in detail the nature of the fires in the plant.
    A    Because there were a lot of machines, machinery that was on, that was turned on.  And because of that, the temperature was very, very hot.
    Q    And there were fires during the entire time that you were employed at the plant, correct?
    A    Yes.
    Q    Right until November of 2003?
    A    Yes.

[3] Deposition of Wilfredo Ortiz at page 37:
    Q    Okay.  And that was fire in the ceiling?
    A    It wasn't on the ceiling.  It was through the -- the exhaust that would come out, that comes out of the oven.
    Q    All right.  So certainly, in the month of November there were fires?
    A    There were fires there all the time.
    A    ...Because on certain occasions, I was obligated -- we were obligated to work overtime.   and sometimes, they would make us -- make me extinguish fires by ourselves.  Sometimes I would have to get on top of a room myself to extinguish a fire on top of a machine, and all of that smoke, I was inhaling.

present when Jose Ortiz was cleaning a machine at the factory that had "cracked" and "cut" his finger.[4] Defendant errs in alleging no record support with respect to the absence of grievances. Lowell Alexander responds that there were no grievances ever filed that he is aware of[5]. Moreover, the mediator scolded Ortiz eighteen times for failing to translate to the 22 plaintiffs. Therefore, the Reply at 7-10 is false.

Corrections.  Undisputed is the correct answer to format questions 1-8.  Obviously, the defendant can say many things that are undisputed but have nothing to do with this case involving the neglect of Latino workers by a national union that seems to have no shame.  No. 9 is corrected as follows.[6]

> Disputed.  The citation as corrected is: The plaintiffs were never educated or informed about the process of filing complaints or grievances.  Elison Pena Deposition at p. 41. The Defendant Union never posted notices informing the plaintiffs of their rights or invited them to meetings in order to be educated as to their rights.  The plaintiffs stated that there was no bulletin board hung where notices could be posted informing workers of union news, worker's compensation, OSHA notices etc.  Clemente Hernandez Deposition at p. 12-13; Antonio Martinez Deposition at p. 15; Elison Pena Deposition at p. 53; Juan Ortiz Deposition at p. 17, Exhibit Wilfredo C. Ortiz Deposition at 25; Euclides Soto Deposition at p. 25.  If any notices were posted, however, they were not noticed, as they never were in Spanish, always in English.  Nelson Acevedo Deposition at p. 16; Miriam Caminero Deposition at p. 17.  In fact, there were no notices anywhere in the plant that indicated that the plaintiffs were represented by the Defendant Union.  Ramon Rodriguez Deposition at 23.

---

[4] Deposition of Wilfredo Ortiz at pages 26-27:
    A    There was the accident with Jose Ortiz.  I was present then when the machine cracked [verbatim] his finger.
         He was cleaning the machine, and afterwards, the machine was still     running, and then the machine cracked his finger, cut it.

[5] Deposition of Lowell Alexander at page 65
    Q    ...No grievances have been generated by this plant ever.  Correct?  We agree about that?
    A    None that I'm aware of.  None during the time that I serviced.

[6] The defendants charges the plaintiffs with: "Rambling, sometimes incomprehensible, vague, self-serving, and do not state explicit facts, hyperbole, argumentative, and self-serving," etc. The defendants could not state the opposite of the truth with more accuracy. However, the defendants were correct in admitting that the conduct described here is nauseating.

No correction is called for on material facts No. 10-32.

### B. LEGAL CLAIMS

The defendants are not correct in their assessments of the evidence. They call statements hearsay that are admissible as admissions by the defendants under Rule 801. See Section B: Admissions of Union. The statements about "discrimination" are state of mind statements admissible under Rule 803 (3)[7]. See Section A. There was no leading of witnesses: plaintiffs' counsel has great latitude about questioning Spanish speaking witnesses. See , as examples, footnotes 1-5 above from five depositions.

The defendants are not correct in their assessments of the prima facie case. After *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003), and *Estades-Negroni v. The Assoc. Group*, 345 F.3d 25, 30 (1st Cir. 2005), the plaintiffs need only show a motivating factor was their national heritage. The plaintiffs are all Latinos. To succeed at this stage of the case, the plaintiffs must show, where every inference is to be read in their favor, that there is material evidence in controversy that defendants took adverse employment action (e.g., no grievances, no safety protections, failure to arbitrate with a viable company about the plant shut down with respect to race which is in the collective bargaining agreement) because of their national origin or that national origin was a motivating factor in deciding to take such an action.

An adverse employment action is one that, standing alone, actually causes damage. Here, the plaintiffs accuse defendants of national origin discrimination in violation of federal and state

---

[7] The defendants properly did not reserve the right to strike, and made objections at the time of the deposition; and, therefore, the parties are bound by their waivers with respect to the testimony taken in eight days of depositions. All parties wanted to preserve the testimony of the Latino parties from Puerto Rico and the Dominican Republic, who could be unavailable for trial.

4

law. The plaintiffs' burden of proof of establishing a prima facie case is de minimis. *Theater of Barbour v. Dynamic Research*, 63 F.3d 32, 38 (1st Cir. 1995). Because employment discrimination cases arise in a variety of contexts, the prima facie elements must be tailored to the given case. *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

In this case, Latino union members were unprotected from bargaining, safety, participation, and negotiation, before and after a plant closing, causing them financial and emotional harm. The causal element is not a but-for one, but instead is one of a motivating factor, and the record supports either type of causation if every material fact is read in favor of the plaintiffs to the extent that the defendants have failed to established no material facts in controversy." *Fernandes v. Costa Brothers Masonry, Inc.* 199 F.3d 572 (1st Cir. 1999) (Judge Selya writing for a unanimous court overturns summary judgment in a national origin case.).

It may only be a "coincidence", as Judge Selya writes, that each Plaintiff is a member of a protected class, industrial fire hazards at the plant were ignored, the plant closed without any negotiations for the protections of effects bargaining, there were no grievance of terminations at any time including when requested by the plaintiffs through their lawyer, no collective bargaining agreement was translated into Spanish until negotiations were over and, thus, the horse was out of the barn, no safety or union rights notices in English or Spanish were placed in the plant, and no audits by the union of the company were done. Moreover, it may only be a coincidence that every other Steelworker plant agreement had severance benefits be a subject of negotiations, and had severance benefits language in the agreement, but not at this plant. All of the plaintiffs originally came to Boston from either Puerto Rico or the Dominican Republic. It is

5

undisputed that most do not speak or read English.   Many have only a grade school education that they received outside the United States.[8]

There are no admissions about the statute of limitations arguments. See Op., 3; 56-63.  Whether the union's actions (or inactions) were sufficient either to make the plaintiff aware of the discrimination, or to enable him to form a reasonable belief thereof, is a factual issue for trial. The membership had no notice of the claim for discrimination until the plant closed, nor were they aware of a claim until then for a duty of fair representation claim.  The Court is to view evidence about the notice of the claim from the entire summary judgment record, in the light most favorable to plaintiffs as the non-moving parties, and give them the benefit of every inference, and avoid credibility determinations, to determine whether any material fact is in controversy with respect to whether the notice of claim occurred prior to the plant closing when they lost their jobs.   It is also consistent with the rule applied in tort cases concerning when the statutorily provided three-year limitations period begins to run. See, e.g., *Olsen v. Bell Tel. Labs., Inc.*, 388 Mass. 171, 175 (1983) ("cause of action [for negligence resulting in an insidious occupational disease] did not accrue before [plaintiff] knew or should reasonably have known that he had contracted [the disease] as a result of conduct of the defendants").  The defendants have not shown, or shown the complete absence of material facts in controversy, that the cause of action for discrimination resulting in an insidious adverse employment situation did not accrue before the plaintiffs knew or should reasonably have known that they had suffered discrimination

---

[8] After *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003), and *Estades-Negroni v. The Assoc. Group*, 345 F.3d 25, 30 (1st Cir. 2005), the plaintiffs need only show a motivating factor was their national heritage. The plaintiffs are all Latinos. To succeed at this stage of the case, the plaintiffs must show, where every inference is to be read in their favor, that there is material evidence in controversy that defendants took adverse employment action (e.g., no grievances, no safety protections, failure to arbitrate with a viable company about the plant shut down with respect to race which is in the collective bargaining agreement) because of their national origin or that national origin was a motivating factor in deciding to take such an action. An adverse employment action is one that, standing alone, actually causes damage.

6

as a result of conduct of the defendants. There simply is no flagging of the claim evident on this summary judgment record, coalescing harm and knowledge of the union's discrimination until the plant closing. See, e.g., *Ocean Spray Cranberries, Inc. v. Massachusetts Commission Against Discrimination*, 441 Mass. 632, 686 N.E. 2d 1303 (2004) (adopts liberal limitations standard requiring harm and awareness of harm for acts to be measured within filing period in an employment discharge case).

Significantly, the First Circuit has ruled that an employer's failure to post statutory notices informing employees of their legal rights provides an affirmative basis for applying equitable tolling in the context of a Title VII suit and established six separate equitable grounds for tolling. *Mercado v. The Ritz Carlton San Juan Hotel, Spa & Casino*, 410 F.3d 41 (1st Cir. 2005) (where the employees have asserted that no informational notices were posted and that they had no knowledge of their legal rights until informed by their attorney, they have met the threshold requirements for avoiding dismissal of their suit). No informational notices were posted by the union or employer so that the precedent is binding and very similar. The union did not bargain for, or even notice, that no informational notices were posted, and that the membership had no knowledge of their legal rights[9]. The First Circuit emphasized that "the doctrine of equitable tolling is ***not*** to be exercised sparingly". Id.

The factual inquiry in this case thus must begin with an examination of the failure of the union to post notices, process grievances, invite the Hispanic membership to meetings and only appearing for contract negotiations. Therefore, there was lack of actual notice of the filing requirement. There is nothing in the way of this overwhelmingly poor and underserved membership suggesting lack of constructive knowledge of the filing requirement. Once the

---

[9] This is the key to the duty of fair representation claim, too. No OSHA notices by either party to some extent created liability for the company and union, but the union is far more liable for all of the reasons stated by the plaintiffs in depositions.

7

membership contacted a labor lawyer with 27 years experience representing trade unions and public sector unions, they showed diligence in pursuing one's rights by demanding bargaining in March 2004, and filing a lawsuit within four months of the plant closing. The union received the demand letter and did nothing to help the membership so there is no prejudice to the union. No court in the nature of equity could fail to entertain case-specific factors expressed in severed fingers, constant plant fires, no discharge negotiations that may counsel in favor of tolling. Eulogio Ortiz lost two fingers at the plant. Ramon Rodriquez fell and hurt his back while at work. He was out 4-5 days and the employer did not pay him for that time. He told the shop steward that he was not paid but nothing came of it. There were no notices posted informing him he could contact the Defendant Union directly about his complaint. Euclides Soto cut his face on a broken machine. Prior to his injury, he had spoken to Jose Ortiz about the broken machine. Jose Ortiz told him he would speak to the owners about it but the machine was not fixed until after his injury. Plaintiffs made between $10 and $14 per hour at the time of the plant's closing, Angel Baez Deposition at p. 15; Most would rather still work under the horrible conditions which they did because it was a job and jobs are hard to get. At the plant, Juan Colon Ortiz worked with the paint which was used on the mattress material. He testified that the paint smelled very strong and he was given only a little mask to wear. He would change his clothes into work clothes at the beginning of his shift although there was no changing station nor were there any showers to use at the end of his shift. While working at the plant he developed a lung problem in which he had trouble breathing and would cough up blood two to three times a week. He had to stop working for a while because of his lung problem. The Defendant Union did nothing to help him with his problem.

In *National Railroad v. Morgan*, 536 U.S. 101 at 115-118 (2002), the Supreme Court defined the continuing violation doctrine. As to serial misconduct, the most significant admission is that the union never grieved any discharges. The membership never was invited to the union meetings. Furthermore, there was no negotiation of the effects of closing the plant, only bumping rights and medical benefits. There was no right to severance negotiated here at the plant closing, but there was at the Sealy Mattress, Bee-Bee Rubber, Rosboro Plastics plants. Alexander heard scuttlebutt about them taking the money and converting the building into a condominium at one of the meetings prior to the company closing. The plant had no apprenticeship or training program. Although there were fires until the closing of the plant, the union was unaware of fires at the plant even though its representative visited the plant. The union did not know whether employer kept material data safety slips. There was no hazard safety program or health and safety officer at the plant. Alexander had been a Steelworker union steward for the gas company; he learned when there was catastrophic injury in his steward capacity; and he simply does not know why he never learned of catastrophic injury at this entirely Latino plant when he was union representative. In March and April 2004, the plaintiffs requested grievances and the defendant unions refused to process them. If this workplace conduct is not measured in isolation, the great frequency of the discriminatory conduct; its palpable severity; where it is physically threatening and humiliating, over and above merely offensive utterances and it unreasonably interferes with an employee's work performance.

This exception for violations of a continuing nature "recognizes that some claims of discrimination involve a series of related events that have to be viewed in their totality in order to assess adequately their discriminatory nature and impact." *Cuddyer v. Stop & Shop Supermarket Co.*, 434 Mass. 521, 531 (2001). For the continuing violation doctrine to apply, a complainant

must ordinarily prove that: "(1) at least one discriminatory act occurred within the 300 day limitations period (here, 1) there was no negotiation about the effects of the plant closing for severance when the plant closed in November, 2003; or 2) there was a fire at the plant in November, 2003; or 3) there was no posting of union notices at the time the plant closed in November, 2003; or 4) the union was unaware of safety hazards at the plant even though its representative visited the plant in November, 2003 ; or 5) or the union did not know whether employer kept material data safety slips in November, 2003; or 6) there was no hazard safety program or health and safety officer at the plant in November, 2003; or, finally, 7) in March and April 2004, the plaintiffs requested grievances and the defendant unions refused to process them.); (2) the alleged timely discriminatory acts have a substantial relationship to the alleged untimely discriminatory acts (the union only points to its long history of neglect to prove that there was discrimination then and now, which is unpleasant and cynical);  (3) earlier violations outside the 300 day limitations period did not trigger each plaintiff's awareness and duty' to assert his rights, i.e., that plaintiff could not have formed a reasonable belief at the time the employment actions occurred that they were discriminatory. Alternatively, as Justice Thomas opined[10] "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the 180- or 300- day time period after the discrete discriminatory act occurred. The existence of past acts and the employee's prior knowledge of their occurrence, however, do not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed. Nor does the statute bar an employee

---

[10] See also the equitable tolling remedies in *Mercado v. The Ritz Carlton San Juan Hotel, Spa & Casino,* 410 F.3d 41 (1st Cir. 2005).

from using the prior acts as background evidence in support of a timely claim. The statute of limitations requirement is still met if at least one act falls within the 300-day period. Here there was at least one independently discriminatory act in the three hundred day period: 1) there was no negotiation about the effects of the plant closing for severance when the plant closed in November, 2003; or 2) there was a fire at the plant in November, 2003; or 3) there was no posting of union notices at the time the plant closed in November, 2003; or 4) the union was unaware of safety hazards at the plant even though its representative visited the plant in November, 2003 ; or 5) or the union did not know whether employer kept material data safety slips in November, 2003; or 6) there was no hazard safety program or health and safety officer at the plant in November, 2003; or, finally, 7) in March and April 2004, the plaintiffs requested grievances and the defendant unions refused to process them. The law of continuing violations is composed of a number of discriminatory acts emanating from the same discriminatory animus, each act constituting a separate wrong actionable under Title VII. In the case at hand, there is at least one allegedly discriminatory material act that occurred within the limitations period of 300 days. In Defendant's Brief in Support of Motion for Summary Judgment, at p. 38, Defendants cite *Goodman v. Lukens Steel Company*, 482 U. S. 656 (1987) to argue that the case applies to this one. The plaintiffs agree. In *Goodman v. Lukens Steel Co.*, 482 U.S. 656 (1987), the Supreme Court adopted a three year statute of limitations for discriminatory practices in failing to process discharges, in failing to assert instances of racial discrimination as grievances, and in tolerating and tacitly encouraging racial harassment.  Here, the claims, after discovery, involve Title II, Title VII and 42 U.S.C. §§ 1981, 1982, 1983, G. L. Ch. 151 B § 4 and 42 U.S.C. § 2000e-2(c) and 2(m) Labor Management Act, § 301, 29 U.S.C. § 185, and defenses under 29 U.S.C. § 159(a) and  29 U.S.C. § 157.  Under the liberal pleadings requirements of the First

11

Circuit, "a complaint need not point to the appropriate statute or law in order to raise a claim for relief… [a] complaint sufficiently raises a claim even if it points to the wrong legal theory as a basis for that claim, as long as relief is possible under any set of facts that could be established consistent with the allegations." *Morales-Vallellanes v. Potter*, 339 F. 3d 9 (2003) (reversing entry of summary judgment).The defendants cited the *Goodman* precedent so it presumably applies to this case; and all of the acts complained of here occurred within three years of discovery of the claims. The court here would be correct in selecting the Massachusetts 3-year limitations period governing personal injury actions or six-year period for contract actions.

Several Plaintiffs stated that the felt that the treatment they received from the Defendant Union was due to their race and the fact that they did not speak English.  First, the union would never get together with members alone. Second, when the union interpreter spoke, she was pedantic, repugnant; and she spoke in a bad way. Third, none of the membership ever was invited to the quarterly meetings of the Steelworkers. Fourth, one worker observed that since all union members have rights, the fact that the plant was all Hispanics, and they did not speak the language, the union would take *"vengeance"* on them because of that. These hardly are "stray comments."

The defendants here did not even negotiate for plant closing language during negotiations or for severance at the plant closing, failing to give the plaintiffs something that is a customary benefit of union membership (There was no right to severance here but there was at the Sealy Mattress, Bee-Bee Rubber, Rosboro Plastics plants so that every other CBA of this union for upholstery workers had either severance or plant closing language, but not this one.) Plaintiffs need not show that the national origin discrimination was the only predominant factor that motivated the defendants.

The plaintiffs' burden of proof in establishing a prima facie case under Title VII is de minimis. See *Theater of Barbour v. Dynamic Research*, 63 F.3d 32, 38 (1st Cir. 1995). It is met here. There was no negotiation about the effects of the plant closing for severance when the plant closed in November, 2003 for the Latino workforce. There was a fire at the plant in November, 2003. There was no posting of union notices at the time the plant closed in November, 2003. The union was unaware of safety hazards at the plant even though its representative visited the plant in November, 2003.

The union did not know whether employer kept material data safety slips in November, 2003. There was no hazard safety program or health and safety officer at the plant in November, 2003. In March and April 2004, the plaintiffs requested national origin grievances, and the defendant unions refused to process them. With respect to other plants, Alexander answered that Sealy Mattress, Bee-Bee Rubber; Roseboro Plastics had plant closing severance language in the collective bargaining agreements.

The instant plant did not, nor was it requested in negotiations. Furthermore, there was no negotiation of the effects of closing the plant, only bumping rights and medical benefits. Bumping rights involve intra-union seniority. Several Plaintiffs stated that the felt that the treatment they received from the employer and the Defendant Union was due to their race and the fact that they did not speak English.  There is no doubt that there was no interpreter available for Jose Ortiz and Miguel DeJesus during the CBA negotiations.  There is no dispute that the Plaintiffs were not provided with copies of the CBA in Spanish prior to the vote.

There is no dispute that the Defendant Union never posted any notices in Spanish or English. Eulogio Ortiz lost two fingers at the plant.  Ramon Rodriquez fell and hurt his back while at work.  He was out 4-5 days and the employer did not pay him for that time.  He told the

13

shop steward that he was not paid but nothing came of it. There were no notices posted informing him he could contact the Defendant Union directly about his complaint.

The non-discriminatory reason proffered by the Unions for not protecting the plaintiffs, i.e., Ortiz was a lousy steward, is untenable. In discovery, the union made the following binding admissions. The most significant admission is that the union never grieved any discharges. The hourly wage at this plant starts off at $7.00. The union dues of all Steelworkers are 1.3% of the wage. There was no bargaining before or after the plant closing for severance here but there was at the Sealy Mattress, Bee-Bee Rubber, Rosboro Plastics plants. The union provided all drafts of the collective bargaining agreement in English and only the binding one was in Spanish. There was no provision for severance or plant closing in this agreement.

The prospect of a plant closing was not even an issue in the collective bargaining at this plant. For, the Union had not checked the books of Farnsworth Fibre and Sherman-Feinberg to find out their financial picture although the union wrote the companies in 2002 to request them. Alexander heard scuttlebutt about them taking the money and converting the building into a condominium at one of the meetings prior to the company closing. The plant had no apprenticeship or training program. Although there were fires until the closing of the plant, the union was unaware of fires at the plant even though its representative visited the plant. The union did not know whether employer kept material data safety slips. There was no hazard safety program or health and safety officer at the plant. Alexander had been a Steelworker union steward for the gas company; he learned when there was catastrophic injury in his steward capacity; and he simply does not know why he never learned of catastrophic injury at this entirely Latino plant when he was union representative.

As the First Circuit has recently held in a "pretext" Title VII case, at this stage in the summary judgment analysis, "an inquiring court does not ask whether the plaintiff has adduced direct evidence of discrimination, but asks instead whether the evidence presented, regardless of its character, suffices to raise a genuine issue about the pretextuality of the employer's explanation for" its challenged acts." *Fernandes v. Costa Brothers Masonry, Inc.* 199 F.3d 572 (1st Cir. 1999). The defendants misconceived the evidentiary burden borne by plaintiffs who attempt to prove discrimination through indirect evidence. In *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 511 (1993), the Court stated that, because the fact finder's disbelief of the reasons put forward by the defendant, together with the elements of the prima facie case, may suffice to show intentional discrimination, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination. Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it can be quite persuasive. See *id.,* at 517. In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the union is dissembling to cover up a discriminatory purpose. See, *e. g., Wright v. West,* 505 U.S. 277, 296 (1992). Moreover, once the union's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the union is in the best position to put forth the actual reason for its decision. Cf. *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577 (1978). Such a showing by the plaintiff will not *always* be adequate to sustain a jury's liability finding but is sufficient to defeat a motion for summary judgment. Certainly there will be instances where, although the plaintiff has established a prima facie case and introduced sufficient evidence to reject the employer's explanation, no rational fact finder could conclude that discrimination had occurred. This Court need not—and could not—resolve

all such circumstances here on the summary judgment record. In this case, it suffices to say that a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated for purposes of judgment. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 141-149 (2000); see also *Seymore v. Shawver & Sons, Inc., 111 F.3d 794, 798* (10th Cir.), cert. denied, *522 U.S. 935, 139 L. Ed. 2d 266, 118 S. Ct. 342 (1997)* (stating that a union "cannot acquiesce in a company's prohibited employment discrimination and expect to evade Title VII liability . . .")[11]. In light of the severe and constant harassment endured by plaintiff, of whom the union was aware, it is reasonable to infer, for purposes of this motion that the Local Union failed to file grievances because of some discriminatory motive or attitude which pervaded the Union, especially as every inference is to be read in favor of the plaintiffs.

In *Goodman v. Lukens Steel Co.*, 482 U.S. 656 (1987), individual employees of Lukens Steel Company (Lukens) brought suit, asserting racial discrimination claims against their collective-bargaining agents, the United Steelworkers of America, which is the same defendant as this defendant, and two of its local unions (Unions). The District Court concluded that the Unions were guilty of discriminatory practices, specifically in failing to challenge discriminatory discharges of probationary employees, failing and refusing to assert instances of racial discrimination as grievances, and in tolerating and tacitly encouraging racial harassment. Here, the claims are very similar, and overlap with respect to failing to assert instances of racial discrimination as grievances despite express requests, and in tolerating and tacitly encouraging racial harassment. Section 1981 asserts, in effect, that competence and capacity to contract shall

---

[11] In *E.E.O.C. v. Regency Architectural Metals Corp., 896 F. Supp. 260, 269 (D.Conn.1995),* despite the union official's stated reason for not processing the grievance, the "contradictory explanations for failing to help her . . . require[d the court] to look deeper for his actual motivation." See also *Durko v. Oi-Neg TV Products, Inc., 870 F. Supp. 1268, 1277 (M.D.Pa.1994.)*

16

not depend upon race. It is thus part of a federal law barring racial discrimination, which, as the Court of Appeals said, is a fundamental injury to the individual rights of a person. That § 1981 has far-reaching economic consequences does not change this conclusion, since such impact flows from guaranteeing the personal right to engage in economically significant activity free

The District Court proceeded found the Unions to have discriminated on racial grounds in violation of both Title VII and § 1981 in certain ways: failing to challenge discriminatory discharges of probationary employees; failure and refusal to assert racial discrimination as a ground for grievances; and toleration and tacit encouragement of racial harassment. Id. at 665.

The Unions contended (in *Goodman* and now) "that any judgment against them rests on the erroneous legal premise that Title VII and § 1981 are violated if a union passively sits by and does not affirmatively oppose the employer's racially discriminatory employment practices." This abstract notion is not at play in this case. It is true, however, that the District Court declared that mere union passivity in the face of employer discrimination renders the union liable under Title VII and, if racial animus is properly inferable, under § 1981 as well.  The evidence in *Goodman* and this case proves 'far more' than mere passivity.

In *Goodman* and this case, the collective-bargaining contract contained an express clause binding both the employer and the Unions not to discriminate on racial grounds; that the employer was discriminating against blacks and Latinos in discharging probationary employees, which the Unions were aware of but refused to do anything about by way of filing proffered grievances or otherwise; that the Unions had ignored grievances based on instances of harassment which were racial in nature; and that the Unions had  refused to include assertions of racial discrimination in grievances that also asserted other contract violations (i.e., bumping and vacation rights while 100% Latino discharge). Id. at 666.

17

In affirming the District Court's findings against the Unions, the Court of Appeals also appeared to hold that the Unions had an affirmative duty to combat employer discrimination in the workplace. But it, too, held that the case against the Unions was much stronger than one of mere acquiescence in that the Unions deliberately chose not to assert claims of racial discrimination by the employer as is the case in the instant action. It was the Court of Appeals' view that these intentional and knowing refusals discriminated against the victims who were entitled to have their grievances heard. The Unions insisted that it was error to hold them liable for not including racial discrimination claims in grievances claiming other violations of the contract. The Unions followed this practice, it was urged, because these grievances could be resolved without making racial allegations and because the employer would "get its back up" if racial bias was charged, thereby making it much more difficult to prevail. The trial judge, although initially impressed by this seemingly neutral reason for failing to press race discrimination claims, ultimately found the explanation "unacceptable" because the Unions also ignored grievances which involved racial harassment violating the contract covenant against racial discrimination but which did not also violate another provision just like the case now before the court.

In the judgment of the District Court, the virtual failure by the Unions to file any race-bias grievances until after this lawsuit started, knowing that the employer was practicing what the contract prevented, rendered the Unions' explanation for their conduct unconvincing. A collective-bargaining agent could not, without violating Title VII and § 1981, follow a policy of refusing to file grievable racial discrimination claims however strong they might be and however sure the agent was that the employer was discriminating against blacks. The Unions, in effect, categorized racial grievances as unworthy of pursuit and, while pursuing other legitimate

grievances, ignored racial discrimination claims on behalf of blacks and Latinos, knowing that the employer was discriminating in violation of the contract.

Such conduct, the courts below concluded, intentionally discriminated against blacks seeking a remedy for disparate treatment based on their race and violated both Title VII and § 1981.

Respectfully submitted,

Dated: September 27, 2005

 /s/ Robert O. Berger
Robert O. Berger
11 Beacon Street, Ste. 1210
Boston, MA 02108
(617) 423-7575 Tel
(617) 275-8000 Fax
BBO #: 038900
Attorney for Plaintiffs

 /s/ John Lee Diaz
John Lee Diaz
801A Tremont Street
Boston, MA 02118
(617) 445-7900 Tel
BBO #: 542819
Attorney for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served by first class mail, postage prepaid on the attorney of record for each party on September 27, 2005.

 /s/ Robert O. Berger
Robert O. Berger