# FOOTNOTE 2

Deposition of Elison Pena

Case 1:04-cv-10892-JLT   Document 56-2   Filed 09/27/2005   Page 2 of 10

Elison Pena 3/22/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 37

1   Q   First thing is did you say there were
2   fires often in the plant earlier?
3   A   (Through the Interpreter) Yes.
4   Q   Okay.
5         Describe to us in detail the nature
6   of the fires in the plant.
7   A   (Through the Interpreter) Because there
8   were a lot of machines, machinery that was on, that
9   was turned on. And because of that, the
10  temperature was very, very hot.
11  Q   And there were fires during the entire
12  time that you were employed at the plant, correct?
13  A   (Through the Interpreter) Yes.
14  Q   Right until November of 2003?
15  A   (Through the Interpreter) Yes.
16  Q   How many people were hurt as a result of
17  these fires?
18  A   (Through the Interpreter) No, because if
19  we didn't call the fire department, we would sort
20  of extinguish the fire with fire extinguishers.
21  Q   Okay.
22        Did they provide any protection for
23  your breathing when there were constant fires at
24  this plant?

Case 1:04-cv-10892-JLT    Document 56-2    Filed 09/27/2005    Page 3 of 10

Elison Pena 3/22/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 38

1          MR. LICHTEN:  Who is "they"?
2          Objection to the form of the
3    question.
4          MR. BERGER:  Go ahead.  Answer it.
5    Obviously you know what I mean.
6      A    (Through the Interpreter) No.  We had to
7    take the water ourselves with all the smoke and
8    everything, we had to take everything outside.
9      Q    Did the union help you in any way about
10   this continuing fire situation?
11     A    (Through the Interpreter) No.
12     Q    Okay.
13          Could you tell us what you mean when
14   you said that the union left you like dogs?
15          MR. LICHTEN:  Objection to the form.
16          MR. BERGER:  Okay, I'll rephrase it.
17     Q    Did you use the phrase the union "left
18   you like dogs"?
19          MR. LICHTEN:  Objection to the form.
20     A    (Through the Interpreter) Yes.
21     Q    What did you mean?
22          MR. LICHTEN:  Objection.
23          MR. BERGER:  What's your objection
24   now?  It's a term he used.  What does it -- I mean

# FOOTNOTE 3

Deposition of Wilfredo Ortiz

Case 1:04-cv-10892-JLT    Document 56-2    Filed 09/27/2005    Page 5 of 10

Wilfredo Ortiz 3/23/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 37

1  A.  Because they would never help us.
2  Q.  Please explain what you mean.
3  A.  Because on certain occasions, I was obligated -- we
4      were obligated to work overtime.  And sometimes,
5      they would make us -- make me extinguish fires by
6      ourselves.  Sometimes I would have to get on top of
7      a room myself to extinguish a fire on top of a
8      machine, and all of that smoke, I was inhaling.
9  Q.  In effect, did the union exploit you the way
10     employers exploit Hispanic workers?
11             MR. LICHTEN:  Again, I think your
12     questions are completely --
13             MR. BERGER:  You cannot put the sock
14     in someone's mouth.  Please let the man answer.
15             MR. LICHTEN:  For the record, I think
16     your questions are inappropriate.  They're out of
17     bounds and sanctionable.
18             MR. BERGER:  I think everything that
19     you did in the hallway borders on the ridiculous.
20     Screaming at another lawyer in the hallway.  I was
21     embarrassed for you.  So don't preach at me.
22             THE INTERPRETER:  I'm sorry.  Could
23     you repeat the question, please.
24             (Question read)

# FOOTNOTE 4

Deposition of Wilfredo Ortiz

Case 1:04-cv-10892-JLT   Document 56-2   Filed 09/27/2005   Page 7 of 10

Wilfredo Ortiz 3/23/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 26

1           MR. LICHTEN: Objection.
2  A.   No.
3  Q.   Tell me, is there any doubt in your mind whether
4       they know about people who had lost their fingers
5       and people who had been cut on their face?
6           MR. LICHTEN: Objection.
7  A.   Yes, I know I've seen them. There have been many
8       accidents there.
9           MR. LICHTEN: Move to strike. Not
10      responsive.
11 Q.   So you observed many accidents?
12          MR. LICHTEN: Objection.
13 A.   Yes.
14 Q.   Can you tell us about what you observed.
15 A.   There was the accident with Jose Ortiz. I was
16      present then when the machine cracked [verbatim]
17      his finger.
18 Q.   And did he scream?
19 A.   No. He didn't scream, but he was, like, holding it
20      in.
21 Q.   In fact, didn't the employer make him work an extra
22      15 minutes before he was relieved?
23          MR. LICHTEN: Objection.
24 A.   No, no.

Case 1:04-cv-10892-JLT   Document 56-2   Filed 09/27/2005   Page 8 of 10

Wilfredo Ortiz 3/23/2005
Euclides Soto, et al. v. Sherman-Feinberg Corporation, et al.

Page 27

1  Q.  How did it work? What happened?
2  A.  He was cleaning the machine, and afterwards, the
3      machine was still running, and then the machine
4      cracked his finger, cut it.
5  Q.  And how old was that machine?
6          MR. LICHTEN: Objection.
7  A.  An antique.
8  Q.  A hundred years; do you think?
9  A.  Yeah.
10 Q.  Did the union ever look at any of machines like this
11     one where this accident happened?
12 A.  No.
13 Q.  You were going to describe other injures that
14     happened there?
15 A.  Yes. There were people there too.
16 Q.  Now, did the union ever make sure that the plant
17     complied with federal laws like the Occupational
18     Safety Act?
19         MR. LICHTEN: Objection.
20 A.  I don't know. I don't know.
21 Q.  Okay. Well, did the union make sure that the
22     federal safety laws were complied with?
23         MR. LICHTEN: Objection.
24 A.  No.

# FOOTNOTE 5

Deposition of Lowell Alexander

00065               DEPOSITION OF LOWELL F. ALEXANDER

```
 1      Q.   -- to these two guys?  I mean, no
 2  grievances have been generated by this plant ever.
 3  Correct?  We agree about that?
 4      A.   None that I'm aware of.  None during the
 5  time that I serviced.
 6      Q.   Understood.  And I suppose we could check
 7  the file to see whether any grievances had ever been
 8  filed, but did you explain to them what arbitration
 9  means?
10      A.   No.
11      Q.   How about authorized agent?
12      A.   No.
13      Q.   How about bulletin board?
14      A.   No.
15      Q.   Check and pay?
16      A.   No.
17      Q.   Check off?
18      A.   No.
19      Q.   Delinquent contributions?
20      A.   No.
21      Q.   Discharge?
22      A.   No.
23      Q.   Employees covered?
24      A.   No.
```