UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| EUCLIDES SOTO, LOUIS A. MARTINEZ, JOSE RAMIREZ, CLEMENTE HERNANDEZ, CESAR PIZARO, ELISON PENA, JUAN COLON, JOSE ORTIZ, RAFAEL TORRES, ANGEL BAEZ, ANTONIO MARTINEZ, WILFREDO ORTIZ, EULOGIO ORTIZ, MIRRAIN MIRANDA, RAFAEL MORENO, NELSON ACEVEDO, and RAMON RODRIGUEZ, Plaintiffs, v. SHERMAN-FEINBERG CORPORATION, FARNSWORTH FIBRE CORPORATION, UNITED STEELWORKERS OF AMERICA, LOCAL 421-U, AND UNITED STEELWORKERS OF AMERICA, Defendants. | CIVIL ACTION NO.: 04-10892-JLT |

## SUPPLEMENTARY SUR-REPLY TO REPLY TO OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

The court permitted an enlargement of time to file a sur-reply after one was filed. This supplement follows.

The defendants wrongfully accuse the plaintiffs of violating Rule 56.1. The format of the Opposition to the Motion for Summary Judgment, however, complies with the Rule. The introductory sections do not involve Rule 56.1 materials. Rather, they provide an Introduction, discussing generally the law and the facts of the case (pages 1-5),[1] and, more particularly, the

---

[1] The Court is to view the evidence from the entire summary judgment record, and not the portions selected by the parties, in the light most favorable to the plaintiffs as the non-moving parties. Further, the Court must give the plaintiffs the benefit of every inference, avoid credibility determinations, and not use summary judgment as a

state of mind testimony of the membership (Introduction, Section B, pages 5-14) and the defendants' binding admissions (Introduction, Section C, pages 14-15).

Pursuant to Rule 56.1, the plaintiffs painstakingly disputed the defendants' 47 pages of purported "undisputed" facts in Section D of the Opposition to the Motion for Summary Judgment starting on p. 15. Every factual citation refers to specific pages of the deposition or documents or the statement of additional facts. The Rule 56.1 Plaintiffs' Statement of Material Additional Facts appears in Section E, p. 22-39. In addition, the plaintiffs filed two booklets of the transcripts and documents of the case.

The defendants are in error about record supports with respect to the date of fire, physical injuries at their plant, no grievances at the plant, plant closing, shop steward, and the failure to check the employer's books. The defendants claim there was no record reference to the date of the fire. However, Elison Pena testified to her knowledge of fires at the factory up until November 2003.[2] Wilfredo Ortiz also recalled that he would have to extinguish the fires himself in November 2003.[3] As to physical injuries at the plant, Wilfredo Ortiz testified that he was

---

docket-clearing device, in determining whether any material fact is in controversy and whether the United Steelworkers of America and its Local 421 U are entitled to judgment as a matter of law.

[2] Deposition of Elison Pena at page 37-38:
    Q    Describe to us in detail the nature of the fires in the plant.
    A    Because there were a lot of machines, machinery that was on, that was
          turned on. And because of that, the temperature was very, very hot.
    Q    And there were fires during the entire time that you were employed at the
          plant, correct?
    A    Yes.
    Q    Right until November of 2003?
    A    Yes.

[3] Deposition of Wilfredo Ortiz at page 37:
    Q    Okay. And that was fire in the ceiling?
    A    It wasn't on the ceiling. It was through the -- the exhaust that would come
          out, that comes out of the oven.
    Q    All right. So certainly, in the month of November there were fires?
    A    There were fires there all the time.
    A    Because on certain occasions, I was obligated -- we were obligated to work overtime. and
          sometimes, they would make us -- make me extinguish fires by ourselves. Sometimes I would

present when Jose Ortiz was cleaning a machine at the factory that had "cracked" and "cut" Ortiz's finger.[4]

Defendant errs in alleging no record support with respect to the absence of grievances. Lowell Alexander stated that he was not aware of any grievances ever filed.[5]  Moreover, the mediator scolded Ortiz eighteen times for failing to translate to the twenty-two plaintiffs. Therefore, the Reply at 7-10 is mistaken.

Corrections.  Given the defendants' insistence that the first eight facts are undisputable, "Undisputed" is the correct answer, as these statements are only format questions 1-8. The defendants' undisputed contentions do not bear on the material facts of the case.

No. 9 is corrected as follows.[6]

Disputed.  The plaintiffs were never educated or informed about the process of filing complaints or grievances.  Elison Pena Deposition at p. 41.  The Defendant Union never posted notices informing the plaintiffs of their rights or invited them to meetings in order to be educated as to their rights.  The plaintiffs stated that there was no bulletin board hung where notices could be posted informing workers of union news, worker's compensation, OSHA notices etc.  Clemente Hernandez Deposition at p. 12-13;  Antonio Martinez Deposition at p. 15; Elison Pena Deposition at p. 53; Juan Ortiz Deposition at p. 17, Exhibit Wilfredo C. Ortiz Deposition at 25; Euclides Soto Deposition at p. 25.  If any notices were posted, however, they were not noticed, as they never were in Spanish, always in English.  Nelson Acevedo Deposition at p. 16; Miriam Caminero Deposition at p. 17.  In fact, there were no notices anywhere in the plant that indicated that the plaintiffs were represented by the Defendant Union.  Ramon Rodriguez Deposition at 23.

---

       have to get on top of a room myself to extinguish a fire on top of a machine, and all of that smoke, I was inhaling.

[4] Deposition of Wilfredo Ortiz at pages 26-27:
    A    There was the accident with Jose Ortiz.  I was present then when the
        machine cracked [verbatim] his finger.
        He was cleaning the machine, and afterwards, the machine was still     running, and then
        the machine cracked his finger, cut it.

[5] Deposition of Lowell Alexander at page 65
    Q    ...No grievances have been generated by this plant ever.  Correct?
        We agree about that?
    A    None that I'm aware of.  None during the time that I serviced.

[6] The defendants call the submission of the plaintiffs "rambling, sometimes incomprehensible, vague, self-serving, not based on explicit facts, hyperbole, argumentative, and self-serving."

3

No correction is required for Disputed Material Facts No. 10-32.

**B. LEGAL CLAIMS**

The defendants are not correct in their assessments of the evidence. They call testimonial statements "hearsay," when in fact they are admissible as admissions by the defendants under Rule 801. See Section B: Admissions of Union. The statements about "discrimination" are state of mind statements admissible under Rule 803 (3). See Section A. There was no leading of witnesses: plaintiffs' counsel has great latitude about questioning Spanish speaking witnesses. The defendants properly did not reserve the right to strike and made objections at the time of the deposition; and, therefore, the parties are bound by their waivers with respect to the testimony taken in eight days of depositions. All parties wanted to preserve the testimony of the Latino parties from Puerto Rico and the Dominican Republic, who could be unavailable for trial.

The defendants repeat their arguments and plaintiffs respond only by relying on the original opposition and adding the following.

The defendants are not correct in their assessments of the prima facie case. The cases they cite uphold a finding of the prima facie case.

After *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003) and *Estades-Negroni v. The Assoc. Group*, 345 F.3d 25, 30 (1st Cir. 2005), the plaintiffs need only show, with every inference to be read in their favor, that there is material evidence in controversy that the defendants took adverse employment actions (e.g., no grievances, no safety protections, failure to arbitrate with a viable company about the plant shut down with respect to race which is in the collective bargaining agreement), and that the plaintiffs' national original was a motivating factor behind these actions. The plaintiffs' burden of proof of establishing a prima facie case is de minimis. *Theater of*

4

*Barbour v. Dynamic Research*, 63 F.3d 32, 38 (1st Cir. 1995). Because employment discrimination cases arise in a variety of contexts, the prima facie elements must be tailored to the given case. *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). *See also Fernandes v. Costa Brothers Masonry, Inc.* 199 F.3d 572 (1st Cir. 1999) (Judge Selya writing for a unanimous court overturned summary judgment in a national origin case).[7] It "may or may not be a coincidence," *Fernandes v. Costa Brothers Masonry, Inc.*, *supra* at 585, that each plaintiff in the instant matter is a member of a protected class, that industrial fire hazards at the plant were ignored, that the plant closed without any negotiations for the protections of effects bargaining, that there were no grievance of terminations at any time including when requested by the plaintiffs through their lawyer, that no collective bargaining agreement was translated into Spanish until negotiations were over and, thus, the horse was out of the barn, that no safety or union rights notices in English or Spanish were placed in the plant, and that no audits by the union of the company were done. Similarly, it may only be a coincidence that **every** other Steelworker plant agreement had severance benefits be a subject of negotiations and had severance benefits language in the agreement. The defendants make the novel argument that they did not discriminate when they failed to negotiate these benefits for these Latinos, but did negotiate these benefits for other Latinos at another plant. Most of all, the

---

[7] In *Fernandes v. Costa Brothers Masonry, Inc.* 199 F.3d 572 (1st Cir. 1999), the First Circuit points out that discrimination is often subtle. These cases turn on the state of mind of the actors, both plaintiffs and defendants, and are not the sort of cases that resolve on summary judgment. In *Fernandes*, the First Circuit vacated the entry of an order awarding summary judgment to the defendants in a national origin discrimination case due to a failure to review the whole record and apply the inferences correctly. In *Cargill v. Harvard University*, 60 Mass. App. Ct. 585 (2004), the Massachusetts Appeals Court rejected the nearly universal practice of using summary judgment as a docket-clearing device for discrimination cases because of the basic problem that "state of mind" is the key consideration in a discrimination case. Nevertheless, the union, two work days before trial, filed a motion for summary judgment, arguing the complete absence of a prima facie case, the total barring of every single claim by the statute of limitations, and the universal inapplicability of the equitable tolling doctrine. Against this backdrop, viewing the evidence in the light most favorable to each plaintiff as the nonmoving party, all material facts have not been established and the moving parties have not shown themselves to be entitled to judgment as a matter of law. Accordingly, the Court should deny the motion for summary judgment and restore the case to the trial list.

defendants did not get severance benefits for this plant after the plant closing, even though they got them for every other upholstery worker whose agreement was disclosed. In this case, Latino union members were unprotected from bargaining, safety, participation, and negotiation, before and after a plant closing, causing them financial and emotional harm. In March and April 2004, the plaintiffs requested national origin grievances and the defendant unions refused to process them. With respect to other plants, Alexander testified that Sealy Mattress, Bee-Bee Rubber, and Roseboro Plastics had plant closing severance language in the collective bargaining agreements. The causation element is not "but for," but rather whether race or any other proscribed factor was a motivating factor for the defendants' conduct. All of the plaintiffs originally came to Boston from either Puerto Rico or the Dominican Republic. It is undisputed that most do not speak or read English. Many have only a grade school education that they received outside the United States.[8] Thus, the plaintiffs properly state a prima facie case taking each of these facts to establish the totality of the circumstances.

---

[8] As the First Circuit has recently held in a "pretext" Title VII case, at this stage in the summary judgment analysis, "an inquiring court does not ask whether the plaintiff has adduced direct evidence of discrimination, but asks instead whether the evidence presented, regardless of its character, suffices to raise a genuine issue about the pretextuality of the employer's explanation for its challenged acts." *Fernandes v. Costa Brothers Masonry, Inc.* 199 F.3d 572 (1st Cir. 1999). The defendants misconceived the evidentiary burden borne by plaintiffs who attempt to prove discrimination through indirect evidence. In *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 511 (1993), the Court stated that, because the fact finder's disbelief of the reasons put forward by the defendant, together with the elements of the prima facie case, may suffice to show intentional discrimination, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination. Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it can be quite persuasive. *See id.,* at 517. In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the union is dissembling to cover up a discriminatory purpose. *See, e. g., Wright v. West,* 505 U.S. 277, 296 (1992). Moreover, once the union's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the union is in the best position to put forth the actual reason for its decision. *Cf. Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577 (1978). Such a showing by the plaintiff will not *always* be adequate to sustain a jury's liability finding, but it is sufficient to defeat a motion for summary judgment. Certainly there will be instances where, although the plaintiff has established a prima facie case and introduced sufficient evidence to reject the employer's explanation, no rational fact finder could conclude that discrimination had occurred. This Court need not—and could not—resolve all such circumstances here on the summary judgment record. In this case, it suffices to say that a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated for purposes of judgment. *Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 141-149 (2000); *see also Seymore v. Shawver & Sons,*

This case also presents a rare instance of "direct" discrimination. Several plaintiffs stated that they felt that the treatment they received from the defendant union was due to their race and the fact that they did not speak English. See Plaintiffs' Statement of Additional Facts No. 68. First, the union would never get together with members alone. Second, when the union interpreter spoke, she was pedantic, repugnant, and she spoke "in a bad way." Third, none of the membership ever was invited to the quarterly meetings of the Steelworkers. Fourth, one worker testified that because the plant workers were exclusively Hispanic and because they did not speak English, he feared that the union would take "vengeance." This testimony is hardly "stray comments."

In *Goodman v. Lukens Steel Co.*, 482 U.S. 656 (1987), individual employees of Lukens Steel Company (Lukens) asserted racial discrimination claims against their collective-bargaining agents, the United Steelworkers of America, the same defendant as this defendant, and two local unions.

The unions contended (in *Goodman* and now) "that any judgment against them rests on the erroneous legal premise that Title VII and § 1981 are violated if a union passively sits by and does not affirmatively oppose the employer's racially discriminatory employment practices." This abstract notion is not at play in this case. It is true, however, that the District Court declared that mere union passivity in the face of employer discrimination renders the union liable under Title VII and, if racial animus is properly inferable, under § 1981 as well. The evidence in *Goodman* and this case proves "far more" than mere passivity. In *Goodman* and in this case, the

---

*Inc.*, 111 F.3d 794, 798 (10th Cir.), cert. denied, *522 U.S. 935, 139 L. Ed. 2d 266, 118 S. Ct. 342 (1997)* (stating that a union "cannot acquiesce in a company's prohibited employment discrimination and expect to evade Title VII liability . . .").[8] In light of the severe and constant harassment endured by the plaintiffs, of which the union was aware, it is reasonable to infer for purposes of this motion that the Local Union failed to file grievances because of some discriminatory motive or attitude which pervaded the Union, especially as every inference is to be read in favor of the plaintiffs.

collective-bargaining contract contained an express clause binding both the employer and the unions not to discriminate on racial grounds; and yet, the employer discriminated against blacks and Latinos in discharging probationary employees, which the unions were aware of but refused to do anything about by way of filing proffered grievances or otherwise. Moreover, the unions ignored grievances based on instances of harassment which were racial in nature, and refused to include assertions of racial discrimination in grievances that also asserted other contract violations (i.e., bumping and vacation rights while 100% Latino discharge). Id. at 666.

In *Goodman*, the case against the unions was much stronger than one of mere acquiescence in that the unions deliberately chose not to assert claims of racial discrimination by the employer. The same is true in the instant action. It was the Court of Appeals' view that these intentional and knowing refusals discriminated against the victims who were entitled to have their grievances heard. The unions insisted that it was error to hold them liable for not including racial discrimination claims in grievances claiming other violations of the contract. The unions followed this practice, it was urged, because these grievances could be resolved without making racial allegations and because the employer would "get its back up" if racial bias was charged, thereby making it much more difficult to prevail. The trial judge, although initially impressed by this seemingly neutral reason for failing to press race discrimination claims, ultimately found the explanation "unacceptable" because the unions also ignored grievances which involved racial harassment violating the contract covenant against racial discrimination but not other provisions. Again, the record in the case now before the court presents similar facts.

Whether the union's actions (or inactions) were sufficient either to make the plaintiff aware of the discrimination, or to enable him to form a reasonable belief thereof, is a factual issue for trial. The membership had no notice of the claim for discrimination until the plant

8

closed, nor were they aware of a claim until then for a duty of fair representation claim. The Court is to view evidence about the notice of the claim from the entire summary judgment record, in the light most favorable to plaintiffs as the non-moving parties, and to give them the benefit of every inference, avoid credibility determinations, and determine whether any material fact is in controversy with respect to whether the notice of claim occurred prior to the plant closing when they lost their jobs. It is also consistent with the rule applied in tort cases concerning when the three-year statute of limitations begins to run. *See, e.g., Olsen v. Bell Tel. Labs., Inc.*, 388 Mass. 171, 175 (1983) ("cause of action [for negligence resulting in an insidious occupational disease] did not accrue before [plaintiff] knew or should reasonably have known that he had contracted [the disease] as a result of conduct of the defendants"). The defendants have not shown the complete absence of material facts in controversy. Nor have they shown that the cause of action for discrimination resulting in an insidious adverse employment situation did not accrue before the plaintiffs knew or should reasonably have known that they had suffered discrimination as a result of conduct of the defendants. There simply is no flagging of the claim evident on this summary judgment record coalescing harm and knowledge of the union's discrimination until the plant closing. *See, e.g., Ocean Spray Cranberries, Inc. v. Massachusetts Commission Against Discrimination*, 441 Mass. 632, 686 N.E. 2d 1303 (2004) (adopting liberal limitations standard requiring harm and awareness of harm for acts to be measured within filing period in an employment discharge case).

In *National Railroad v. Morgan*, 536 U.S. 101, 115-118 (2002), the Supreme Court defined the continuing violation doctrine. As to serial misconduct, the most significant admission is that the union never grieved any discharges. The membership never was invited to the union meetings. Furthermore, there was no negotiation of the effects of closing the plant, only

9

bumping rights and medical benefits. There was no right to severance negotiated here at the plant closing, but there was at the Sealy Mattress, Bee-Bee Rubber, and Rosboro Plastics plants. Alexander heard scuttlebutt about them taking the money and converting the building into a condominium at one of the meetings prior to the company closing. Although there were fires until the closing of the plant, the union was unaware of any fires; this, despite the fact its representative visited the plant. The union did not know whether the employer kept material data safety slips. There was no hazard safety program or health and safety officer at the plant. Alexander had been a Steelworker union steward for the gas company. He learned when there was catastrophic injury in his steward capacity, and yet he simply does not know why he never learned of catastrophic injury at this entirely Latino plant when he was union representative. In March and April 2004, the plaintiffs requested grievances and the defendant unions refused to process them. The great frequency of the discriminatory conduct and its palpable severity (the conduct was physically threatening and humiliating, not merely offensive) unreasonably interfered with the employees' work performance.

      The exception for violations of a continuing nature "recognizes that some claims of discrimination involve a series of related events that have to be viewed in their totality in order to assess adequately their discriminatory nature and impact." *Cuddyer v. Stop & Shop Supermarket Co.*, 434 Mass. 521, 531 (2001). For the continuing violation doctrine to apply, a complainant must ordinarily prove that at least one discriminatory act occurred within the 300-day limitations period. Here, several discriminatory acts occurred within the statute of limitations: 1) there was no negotiation about the effects of the plant closing for severance when the plant closed in November, 2003; 2) there was a fire at the plant in November, 2003; 3) there was no posting of union notices at the time the plant closed in November, 2003; 4) the union was unaware of safety

hazards at the plant even though its representative visited the plant in November, 2003 ;  5) the union did not know whether employer kept material data safety slips in November, 2003; 6) there was no hazard safety program or health and safety officer at the plant in November, 2003; and 7) in March and April 2004, the plaintiffs requested grievances and the defendant unions refused to process them.  The complainant must also prove that the alleged timely discriminatory acts have a substantial relationship to the alleged untimely discriminatory acts (the union only points to its long history of neglect to prove that there was discrimination then and now, which is unpleasant and cynical), and that earlier violations outside the 300-day limitations period did not trigger each plaintiff's awareness and duty to assert his rights (i.e., that plaintiff could not have formed a reasonable belief at the time the employment actions occurred that they were discriminatory).

Alternatively, as Justice Thomas opined,[9] "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.  Each discrete discriminatory act starts a new clock for filing charges alleging that act.  The charge, therefore, must be filed within the 180- or 300-day time period after the discrete discriminatory act occurred.  The existence of past acts and the employee's prior knowledge of their occurrence, however, do not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and the charges addressing those acts are themselves timely filed.  Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim.  The statute of limitations requirement is still met if at least one act falls within the 300-day period.  Here, as discussed *supra*, there was at least one independently discriminatory act in the three hundred day period.  The law of continuing violations is

---

[9] See also the equitable tolling remedies in *Mercado v. The Ritz Carlton San Juan Hotel, Spa & Casino,* 410 F.3d 41 (1st Cir. 2005).

composed of a number of discriminatory acts emanating from the same discriminatory animus, each act constituting a separate wrong actionable under Title VII. In the case at hand, there is at least one allegedly discriminatory material act that occurred within the limitations period of 300 days. In Defendant's Brief in Support of Motion for Summary Judgment, at p. 38, the defendants cite *Goodman v. Lukens Steel Company*, 482 U. S. 656 (1987) as analogous to the instant case. The plaintiffs agree. In *Goodman*, the Supreme Court adopted a three-year statute of limitations for discriminatory practices in failing to process discharges, in failing to assert instances of racial discrimination as grievances, and in tolerating and tacitly encouraging racial harassment. Here, the claims, after discovery, involve the following: Title II; Title VII; 42 U.S.C. §§ 1981, 1982, 1983; G. L. Ch. 151 B § 4; 42 U.S.C. § 2000e-2(c) and 2(m); Labor Management Act, § 301; 29 U.S.C. § 185; and defenses under 29 U.S.C. § 159(a) and 29 U.S.C. § 157. Under the liberal pleadings requirements of the First Circuit, "a complaint need not point to the appropriate statute or law in order to raise a claim for relief . . . . A complaint sufficiently raises a claim even if it points to the wrong legal theory as a basis for that claim, as long as relief is possible under any set of facts that could be established consistent with the allegations." *Morales-Vallellanes v. Potter*, 339 F. 3d 9 (2003) (reversing entry of summary judgment). The defendants cited the *Goodman* precedent so it presumably applies to this case, and all of the acts complained of here occurred within three years of discovery of the claims. The court here would be correct in selecting either the Massachusetts three-year limitations period governing personal injury actions or the six-year limitations period for contract actions.

       Significantly, the First Circuit has ruled that an employer's failure to post statutory notices informing employees of their legal rights provides an affirmative basis for applying equitable tolling in the context of a Title VII suit and establishes six separate equitable grounds

for tolling. *Mercado v. The Ritz Carlton San Juan Hotel, Spa & Casino*, 410 F.3d 41 (1st Cir. 2005) (where the employees have asserted that no informational notices were posted and that they had no knowledge of their legal rights until informed by their attorney, they have met the threshold requirements for avoiding dismissal of their suit).  Here, no informational notices were posted by the union or employer. The union did not bargain for, or even notice, that no informational notices were posted, and that the membership had no knowledge of their legal rights.[10]   The First Circuit emphasized that "the doctrine of equitable tolling is **_not_** to be exercised sparingly."  Id.

      The factual inquiry in this case thus must begin with an examination of the failure of the union to post notices, process grievances, invite the Hispanic membership to meetings, and appear for contract negotiations. Therefore, there was lack of actual notice of the filing requirement. There is nothing in the way of this overwhelmingly poor and underserved membership suggesting lack of constructive knowledge of the filing requirement. Once the membership contacted a labor lawyer with 27 years experience representing trade unions and public sector unions, they showed diligence in pursuing their rights by demanding bargaining in March 2004, and by filing a lawsuit within four months of the plant closing. The union received the demand letter and did nothing to help the membership, so there is no prejudice to the union. No court in the nature of equity could fail to entertain case-specific factors expressed in severed fingers, constant plant fires, and the absence of discharge negotiations, factors which may counsel in favor of tolling.

---

[10] This is also the key to the duty of fair representation claim.  The absence of OSHA notices by either party to some extent created liability for the company and the union, but the union is far more liable for all of the reasons stated by the plaintiffs in their deposition testimony.

                                            Respectfully submitted,

Dated: October 7, 2005                    /s/ Robert O. Berger
                                            Robert O. Berger
                                            11 Beacon Street, Ste. 1210
                                            Boston, MA 02108
                                            (617) 423-7575 Tel
                                            (617) 275-8000 Fax
                                            BBO #: 038900
                                            Attorney for Plaintiffs

                                            /s/ John Lee Diaz
                                            John Lee Diaz
                                            801A Tremont Street
                                            Boston, MA 02118
                                            (617) 445-7900 Tel
                                            BBO #: 542819
                                            Attorney for Plaintiffs

## **CERTIFICATE OF SERVICE**

     I hereby certify that a true copy of the above document was served by first class mail, postage prepaid on the attorney of record for each party on October 7, 2005.

                                            /s/ Robert O. Berger
                                            Robert O. Berger