UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| EUCLIDES SOTO, LOUIS A. MARTINEZ, ) <br> JOSE RAMIREZ, CLEMENTE HERNANDEZ, ) <br> CESAR PIZARO, ELISON PENA, ) <br> JUAN COLON, JOSE ORTIZ, ) <br> RAFAEL TORRES, ANGEL BAEZ, ) <br> ANTONIO MARTINEZ, WILFREDO ORTIZ, ) <br> EULOGIO ORTIZ, MIRRAIN MIRANDA, ) <br> RAFAEL MORENO, NELSON ACEVEDO, ) <br> and RAMON RODRIGUEZ, ) <br>           Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> SHERMAN-FEINBERG CORPORATION, ) <br> FARNSWORTH FIBRE CORPORATION, ) <br> UNITED STEELWORKERS OF AMERICA, ) <br> LOCAL 421-U, AND UNITED STEELWORKERS ) <br> OF AMERICA, ) <br>           Defendants. ) | CIVIL ACTION <br> NO.: 04-10892-JLT |

## MEMORANDUM IN SUPPORT OF MOTION TO ATTACH ASSETS OF THE UNITED STEELWORKERS OF AMERICA (FED.R.CIV.P. 64)

### RELIEF SOUGHT

Pursuant to Rule 64 of the Federal Rules of Civil Procedure, the plaintiffs move this court for an order of attachment of the real estate, goods, chattels, cash, accounts receivable, and other assets of the United Steelworkers of America, most of which are in Las Vegas, Nevada, and Pennsylvania, and the Pension Funds, Health Funds and Welfare Funds in Pennsylvania, to satisfy the judgment for damages and costs, which the plaintiff may recover in the sum of $13,695,000.00 in wage, discrimination and emotional distress damages, and/or $65,000,000.00 punitive damages for discriminatory actions.

## **GROUNDS FOR RELIEF**

1. The pre-judgment remedy of attachment was analyzed in the context of an ERISA case thus in *Peacock v. Thomas*, 516 U.S. 349, 356-57 (1996): "The focus [is the] inherent power to enforce its judgments. Without jurisdiction to enforce a judgment entered by a federal court, "the judicial power would be incomplete and entirely inadequate to the purposes for which it was conferred by the Constitution." *Riggs v. Johnson County,* 6 Wall. 166, 187 (1868). In defining that power, we have approved the exercise of ancillary jurisdiction over a broad range of supplementary proceedings involving third parties to assist in the protection and enforcement of federal judgments— including attachment, mandamus, garnishment, and the prejudgment avoidance of fraudulent conveyances. See, *e. g., Mackey v. Lanier Collection Agency & Service, Inc.,* 486 U.S., at 834, n. 10 (garnishment); *Swift & Co. Packers v. Compania Colombiana Del Caribe, S. A.,* 339 U.S. 684, 690-692 (1950) (prejudgment attachment of property); *Dewey v. West Fairmont Gas Coal Co.,* 123 U.S. 329, 332-333 (1887) (prejudgment voidance of fraudulent transfers); *Krippendorf v. Hyde,* 110 U.S. 276, 282-285(1884) (prejudgment dispute over attached property); *Riggs, supra,* at 187-188 (mandamus to compel public officials in their official capacity to levy tax to enforce judgment against county). Therefore, Rule 64 applies.

2. Plaintiffs supply a summary of damages. See Ex. 1. The plaintiffs are in three classes: 1) unemployed plaintiffs (5 of them); 2) unemployable plaintiffs (2 of them); and 3) employees with some employment since plant closing (5 of them).

2

3. For the first category of five unemployed plaintiffs, past wages are $60,000, future wages are $150,000, emotional distress is $400,000[1], and punitive damages are $200,000.

4. For the two unemployable plaintiffs, past wages are $60,000, future wages are $175,000, emotional distress of $400,000, and punitive damages are $200,000.

5. Finally, for the five mixed employed-unemployed, past wages are $40,000, future wages are $120,000, emotional distress is $400,000, punitive damages are $200,000.

6. Damages are compensatory and punitive, along with emotional distress, under 151B and Title VII – 42 U.S. § 2000e-2-5; Section 301, see *Zeman v. Jones*, 91 F.Supp 2d 1247 (2000). Attorney fees also available under 151B, Title VII – 42 U.S.C. § 2000e-5(k), and the Section 301 claim. Emotional distress damages also available in all claims. *Soto-Segarra v. Sea Land Service, Inc.*, 581 F.2d 291 (1st Cir. 1978).

7. $65,000,000.00 punitive damages for all plaintiffs, taken together if the jury finds the enormity of the actions offensive to their sense of justice. See *BMW of North America, Inc. v. Gore*, 517 U. S. 559 (1996) and *Florida Prepaid Postsecondary Ed. Expense Bd. v. College Savings Bank*, 527 U. S. 627 (1999).

8. As the Affidavit of Robert O. Berger establishes, along with the exhaustive memoranda filed herein, attachment is proper under these facts because, inter alia, with respect to the prima facie case, the plaintiffs' burden of proof in establishing a prima facie case under Title VII is de minimis. Here, each plaintiff establishes that national origin was a motivating factor for an employment practice of the union when the plant

---

[1] In *Tamasy v. Commonwealth*, plaintiff's attorney's client won $400,000 emotional distress, doubled, before a Suffolk County jury, in 1998 dollars.

closed and the union failed to grieve and/or arbitrate discharges and severance, and each is entitled to damages. See *Rainey v. Warren and United Steelworkers of America*, 80 F. Supp. 2d 5 (D.R.I. 2000) (holding in favor of employees against the United Steelworkers Union on very similar facts.). The defendant's nondiscriminatory explanation, i.e. that every single misstep in protecting the employees was the fault of shop steward Jose Ortiz, was false. The Supreme Court has determined that a mixed motive case can proceed on circumstantial evidence alone. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 93-95 (2003). See *Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 429-30 (1st Cir. 2000) ("In fact, one might question whether these bright lines [between direct and indirect evidence] are so helpful in the end... In appeals after trial, this and other courts have recognized the need for flexibility and have sometimes bypassed these approaches and instead looked at whether the totality of the evidence permits a finding of discrimination." [citations omitted]). In any case, this case has much express and circumstantial evidence of discrimination. Second, the factual inquiry in this case as to equitable tolling must begin with an examination of the failure of the union to post notices, process grievances and arbitration about discharge and severance at an all Latino plant, invite the Hispanic membership to meetings, and to address safety issues. *Mercado v. The Ritz Carlton San Juan Hotel, Spa & Casino*, 410 F.3d 41 (1st Cir. 2005). Therefore, there was lack of actual notice of the filing requirement. The record does not suggest that the membership had constructive knowledge of the filing requirement. The plaintiffs showed diligence in pursuing their rights once they hired a lawyer listed in civil rights law and labor law with an AV peer rating by demanding that the union file discharge grievances based on race in March 2004, and filing the instant lawsuit within six months of the plant closing.

*Fernandes v. Costa Brothers Masonry, Inc.,* 199 F.3d 572 (1st Cir. 1999). As the union and local received two demand letters and did nothing to help the membership in March 2004 and April 2004, there is no prejudice to the union and local. The plaintiffs' remaining ignorant of the filing requirement should come as no surprise as none of them was raised in the United States, and few, if any, had more than a grade school education. No court in the nature of equity could fail to entertain case-specific factors: the severed fingers, plant fires, no grievances of discharges, which counsel in favor of tolling. Third, the record indicates that: "(1) at least one discriminatory act occurred within the 300 day limitations period"-- here, a) each of the plaintiffs suffered adverse work impact where there was the failure by the union and its local to negotiate or grieve discharges and severance in an all Latino workforce when the plant closed in November 2003, or b) there was no negotiation about the effects of the plant closing for severance when the plant closed in November, 2003; or c) there was a fire at the plant in November, 2003; or d) there was no posting of union notices at the time the plant closed in November, 2003; or e) the union was unaware of safety hazards at the plant even though its representative visited the plant in November, 2003 ; or f) or the union did not know whether employer kept material data safety slips in November, 2003; or g) there was no hazard safety program or health and safety officer at the plant in November, 2003; or f) in March and April 2004, the plaintiffs (including the union steward) requested the filing of discrimination grievances and the defendant unions refused to do so; (2) "the alleged timely discriminatory acts have a substantial relationship to the alleged untimely discriminatory acts" (the union only points to its long history of neglect to prove that there was discrimination then and now);  (3) earlier violations outside the 300 day

limitations period did not trigger each plaintiff's awareness and duty to assert his rights, i.e., that plaintiffs could not have formed a reasonable belief at the time the employment actions occurred that they were discriminatory until the plant closed. The union defendants failed to establish that no material facts are in controversy or that each defendant is entitled to judgment, where the claims fall within the six month deadline for the duty of fair representation claims and the 300 day deadline. Indeed all of these independent actionable actions (no severance bargaining, no discharge bargaining for a Latino plant, no posting of labor or safety notices, one fire, etc.) occurred within 300 days for the discrimination claim. In addition, the defendants cited a case involving the failure of the United Steelworkers of America to file grievances for minority workers, which gives a state tort statute of limitations, i.e., 3 years in Massachusetts, to the plaintiffs for this kind of claim. See Defendant's Brief in Support of Motion for Summary Judgment, at p. 38, citing *Goodman v. Lukens Steel Company*, 482 U. S. 656 (1987) in which 28 years ago the Steelworkers were found liable for racial discrimination on the same or virtually the same facts..

All this dry legal analysis is relatively meaningless when the United States District Court considers the plant, which makes punitive damages a real consideration.

Testimony of Membership

In discovery, in their own words, the plaintiffs testified:

**Deposition of Eulogio Ortiz of March 23, 2005 (Exhibit 1)**

EXAMINATION BY MR. BERGER:

(P20)   Q   ... Did the union ever tell you or notify you in any way about quarterly meetings?
        A   No.

(P21, 22)   Q   Do you believe it was because you are Hispanic that the union did not invite you to meetings or otherwise protect you?
                    MR. LICHTEN: Objection.
            A   Yes.
            Q   During this period of time, have you been suffering emotionally?
            A   Yes.

(P22)   Q   Do you feel humiliated about being on welfare?
        A   Yes, exactly.

(P23)   A   ...Yes, because every time they [the union] would come over, they would go straight only to their office. And then they would send someone to tell us, stop all the machines and make sure that everybody comes down, and then a guy from the union would come down. They would stop the machines, make us come all the way down. Then when we went down, the people from the union would go in there, and they would be speaking to them.

**Deposition of Antonio Martinez of March 23, 2005 (Exhibit 2)**

(P15, 16)   Q   Now, in the plant were there fires constantly?
            A   Oh, yes.
            Q   And in the plant, was there dust flying around?
            A   Too much, a lot.
            Q   In the plant, did people lose fingers?
            A   Yes.
            Q   Well what safety -- what did the union -- well, strike that.
                Did the union have a bulletin board for posting notices?
            A   No.
            Q   Did the union ever give you any notices of meetings?
            A   No.

7

|       |       |       |
|-------|-------|-------|
| (P16) | A | I think that they discriminated against us because first of all, they didn't help us. Also, we were not -- they didn't tell us when the company was going to close. And every time there was some sort of a-- we had to draw up a contract or some sort of complication, they would always go to the office, their office, and spend a long time there. And then afterwards when they would come to us, they would say, "Oh, you know what? Whatever the company says." |

**Deposition of Wilfredo Ortiz of March 23, 2005 (Exhibit 3)**

| | | |
|---|---|---|
| (P24) | A. | No. I don't think so, but since we all have rights, the fact that we're Hispanics and we didn't speak the language, they would take vengeance on us because of that. |
| | Q | Take advantage of you? |
| | | THE INTERPRETER: Vengeance. |
| | Q | Okay, But do you mean take advantage of you? |
| | A | Yes, like discriminating me. |
| (P25-26) | Q | Now, did the union ever put up bulletin board for you to give you information about anything? |
| | A | No. |
| | Q | Did the union provide any assistance to you about the people who had suffered injuries like loss of fingers, cutting of the face, and this kind thing? |
| | | MR. LICHTEN: Objection. |
| (P26) | A | No. |
| | Q | Tell me, is there any doubt in your mind whether they know about people who had lost their fingers and people who had been cut on their face? |
| | | MR. LICHTEN: Objection. |
| | A | Yes, I know I've seen them. There have been many accidents there. |
| | | MR. LICHTEN: Move to strike. Not responsive. |
| | Q | Can you tell us about what you observed. |
| | A | There was the accident with Jose Ortiz. I was present then when the machine cracked [verbatim] his finger. |

8

| | | | |
|---|---|---|---|
| (P27) | A | | He was cleaning the machine, and afterwards, the machine was still running, and then the machine cracked his finger, cut it. |
| | Q | | And how old was that machine? |
| | | | MR. LICHTEN: Objection. |
| | A | | An antique. |
| | Q | | A hundred years; do you think? |
| | A | | Yeah. |
| | Q | | Did the union ever look at any of machines like this one where this accident happened? |
| | A | | No. |
| | Q | | You were going to describe other injures that happened there? |
| | A | | Yes. There were people there too. |
| | Q | | Now, did the union ever make sure that the plant complied with federal laws like the Occupational Safety Act? |
| | | | MR. LICHTEN: Objection. |
| | A | | I don't know. I don't know. |
| (P28) | Q | | Did they ever come to see whether any of the you were protected from the fires? |
| | | | MR. LICHTEN: Objection. |
| | A | | No. |
| | Q | | And how about for the handling of paints and chemicals? |
| | A | | No. |
| | Q | | Did, in your opinion, the union care about what happened to the safety of the people in this plant that consisted solely of Hispanics? |
| | | | MR. LICHTEN: Objection. |
| | A | | No. They never cared for anything, no. |
| | Q | | And you're not a member of the Upholstery Workers Union, are you? You're a member of the Steelworkers union? |
| | | | MR. LICHTEN: Objection. |
| | A | | Yes. |
| (P29) | Q | | Were there some grinder machines there? |
| | A | | Yes. |
| | Q | | How old were they? |
| | A | | They're old. They're antique. They're so old they don't even have replacement parts or pieces for those machines. |
| (P37) | A | | ...Because on certain occasions, I was obligated -- we were obligated to work overtime. And |

9

sometimes, they would make us -- make me extinguish fires by ourselves. Sometimes I would have to get on top of a room myself to extinguish a fire on top of a machine, and all of that smoke, I was inhaling.

**Deposition of Rafael Torres of March 23, 2005 (Exhibit 4)**

EXAMINATION BY MR. LICHTEN:

(P14)   Q   You said that you believed that someone with less seniority that you got a job, a daytime job, that you have should have gotten; is that right?
        A   Yes.

(P21-22)   Q   Okay. Did you ever attempt to call the Steelworkers union office about a problem or a concern that you were having at work?
           A   No, because they wouldn't allow us to call them personally.

(P22)   A   The representative, the person that goes to the company or whatever company. Whenever there's a problem, the person that comes from their office.

EXAMINATION BY MR. BERGER:

(P31)   Q   Was everybody at Farnsworth Hispanic?
        A   Yes.
        Q   Did they tell you about their [the union and its local] meetings four times a year?
        A   No.
        Q   So they didn't' invite you to any of them?
        A   No.

(P32-33)   A   ...My opinion is that the union didn't back us up, did not give us any support in reality the way they should have done that the moment when we needed them the most.
           Q   And do you think that was connected to the fact that all of the workers were Hispanic?
               MR. LICHTEN: Objection.
           A   I would think that, yes.

10

**Deposition of Nelson Acevedo of March 24, 2005 (Exhibit 5)**

EXAMINATION BY MR. BERGER:
(P17)   Q   Did you ever get invited to the quarterly meetings of the Steelworkers?
        A   No, never.

**Deposition of Juan R. Colon Ortiz of March 23, 2005 (Exhibit 6)**

EXAMINATION BY MR. LICHTEN:
(P10)   A   ...Different tanks, I would take paint from one tank and put it in another tank.
        A   Yes. I left that place for a while because a problem that I have with my lung or my lungs, and they gave me some sort of pills, medication, to see if it would clear them up, but --

(P11)   A   I prepared these tanks.
        A   It's paint, prepare the paint.
        A   To paint the material.

(P19)   Q   No, how many years did you work with the paint?
        A   18 years.
        Q   And what are you problems with your lungs?
        A   Sometimes I don't breathe at all, and I cough or spit blood.
        Q   How much blood do you spit?

(P20)   A   Sometimes two or three times a week. Now, I don't spit as much blood as I used to before because I'm taking the pills and I'm not there.

**Deposition of Miriam Caminero of March 24, 2005 (Exhibit 7)**

(P17)   Q   Now, were you ever invited to any meetings of Local 421 of the United Steelworkers of America?
        A   No, I never received anything.
        Q   Did they have a place where they posted notices at the plant at Sherman-Feinberg?
        Q   Now, what protections did you have for the closing of the plant?
        A.  None.

11

(P21-22)   Q   And do you think that the people who worked there were treated fairly by the union?
              MR. LICHTEN: Objection
          A   No.

**Deposition of Jose Enrique Ortiz of March 22, 2005 (Exhibit 8)**
EXAMINATION BY MR. BERGER
(P70)   Q   Did Kenny [the company representative] ever talk to you about inserting plant-closing language into the agreement?
            THE INTERPRETER: I'm sorry, I didn't hear that. Did Kenny ever talk to you --
        Q   Did Kenny ever talk to you about inserting plant-closing language into the agreement?
        A   (Through the Interpreter) No, he never said anything.
        Q   Never during those 42 hours [of negotiations]?
        A   (Through the Interpreter) No.

(P73)   Q   The very final agreement, was it in English or Spanish?
        A   (Through the Interpreter) In English. Everything was done in English. And then afterwards, translated in Spanish.

EXAMINATION BY MR. DIAZ:
(P95-96)   Q   So is it fair to say you didn't really understand what the proper procedure was, other that what your own interpretation was as to what process to follow; is that correct?
           A   (Through the Interpreter) Yes.
           Q   And is it fair to say that no one from the United Steelworkers of America and/or Local 421-U ever came to you to find out what your proficiency in English was, correct?
           A   (Through the Interpreter) No, they didn't.
           Q   And I'm changing gears to another area. Whenever Mr. Lowell Alexander told you about any meetings and you didn't have a vehicle, was there any other form of transportation or was there any other offer from the union as to how to get you

12

|   |   |   |
|---|---|---|
|   |   | to a meeting or make sure hat you understood where the meetings were in advance so that you could have made appropriate arrangements? |
|   | A | (Through the Interpreter) No. |

**Deposition of Elison Pena March 23, 2005 (Exhibit 9)**

EXAMINATION BY MR. LICHTEN:

|   |   |   |
|---|---|---|
| (P17) | A | (Through the Interpreter) They didn't protect me. They didn't protect us. |
| (P18) | A | (Through the Interpreter) They closed the factory, and we were not -- we were not notified in any way that they were going to close. They didn't do anything to protect us. |
|   | A | (Through the Interpreter) They didn't help us in any way. I would pay the union dues there for nothing. |
| (P23) | Q | Are you aware of any instance in which someone -- in which an employee at Farnsworth complained about working conditions or that the workplace was unsafe? |
|   | A | (Through the Interpreter) No. Almost at any time, we have to -- |
|   |   | THE INTERPRETER: Verbatim. |
|   | A | --flee[t] the place, because all of a sudden, something could catch fire often, and all of us would have to just flee the place all the time. |
| (P25) | A | (Through the Interpreter) When she [the union interpreter] spoke, she was sort of like pedantic, repugnant. |
|   | A | (Through the Interpreter) She spoke in a bad way. |
| (P26) | A | (Through the Interpreter) ...She wouldn't answer our questions properly. She wouldn't use an appropriate answer, and she was leaning -- she would take their side of it. |
| (P29) | Q | Do you ever recall him [the union representative] saying or doing anything that made you think that he was biased against Hispanics? |

13

                    A        (Through the Interpreter) Because -- I don't know, because he would never get together with me.

EXAMINATION BY MR. BERGER:

(P36)        A        (Through the Interpreter) When the union would go there, first they would go to their office first.
                Q        Now, what equipment did the union ensure was available for you?
                A        (Through the Interpreter) None.
                Q        So that we can make this clear, did you say there were fires often in the plant?

(P37-38)    Q        Describe to us in detail the nature of the fires in the plant.
                A        (Through the Interpreter) Because there were a lot of machines, machinery that was on, that was turned on. And because of that, the temperature was very, very hot.
                Q        And there were fires during the entire time that you were employed at the plant, correct?
                A        (Through the Interpreter) Yes.
                Q        Right until November of 2003?
                A        (Through the Interpreter) Yes.
                Q        Did they provide any protection for your breathing when there were constant fires at this plant?

(P38)        A        (Through the Interpreter) No. We had to take the water ourselves with all the smoke and everything, we had to take everything outside.

                Q        Did the Union help you in any way about this continuing fire situation?

                A        (Through the Interpreter) No.

                Q        Okay

(P39)        A        (Through the Interpreter) Because they didn't pay attention to whatever was said there.

EXAMINATION BY MR. DIAZ:
(P41)        Q        For example, was there a work area where employees could have posting so that they could have something in Spanish saying contact the Steelworkers at this number, we have a complaint,

|   |   |   |
|---|---|---|
|   | A | or contact Local 421-U if you have a complaint, something in Spanish with a phone number so that you can contact someone directly?<br>(Through the Interpreter) No. |
|   | Q | Have you prior to November of 2003 known individuals who are members of other unions? |
|   | A | (Through the Interpreter) No. |
| (P45) | Q | Did they ever offer you at any time prior to your being notified of the plant closings any opportunity for job training, for advancement or to move somewhere else where the union may have had jobs, let's say, Cleveland, Ohio, or any other part of the country? |
|   | A | (Through the Interpreter) No. |
|   | Q | --Do you remember the fires? |
|   | A | (Through the Interpreter) Yes. |
|   | Q | Okay. And that would be within a few weeks before that incident? |
|   | A | (Through the Interpreter) Yes, a couple of weeks before that. |
|   | Q | Okay. And that was fire in the ceiling? |
|   | A | (Through the Interpreter) It wasn't on the ceiling. It was through the -- the exhaust that would come out, that comes out of the oven. |
|   | Q | All right. So certainly in the month of November there were fires? |
|   | A | (Through the Interpreter) There were fires there all the time. |

B. THE UNION

*The union's conduct disclosed in discovery.* The union never grieved any discharges. Deposition of Lowell Alexander, p. 24. (Exhibit 10) The hourly wage at this plant starts off at $7.00. The union dues of all Steelworkers are 1.3% of the wage. Id. 21. With respect to other plants, Alexander answered that Sealy Mattress, Bee-Bee Rubber;

15

Rosboro Plastics had plant closing severance language in the collective bargaining agreements. The instant plant did not, nor was it requested in negotiations, Id. 94-95. Furthermore, there was no negotiation of the effects of closing the plant, only bumping rights and medical benefits, id. at 100. (Bumping rights involve intra-union seniority.) There was no right to severance here but there was at the Sealy Mattress, Bee-Bee Rubber, Rosboro Plastics plants. Id. The union provided all drafts of the collective bargaining agreement in English and only the binding one was in Spanish. Id. at 14. There was no provision for severance or plant closing in this agreement. Id. at 11 and 28. The prospect of a plant closing was not even an issue in the collective bargaining at this plant. Id. 15. For, the Union had not checked the books of Farnsworth Fibre and Sherman-Feinberg to find out their financial picture although the union wrote the companies in 2002 to request them. Alexander heard scuttlebutt about them taking the money and converting the building into a condominium at one of the meetings prior to the company closing. Id. at 18. The plant had no apprenticeship or training program. Id. at 54. Although there were fires until the closing of the plant, the union was unaware of fires at the plant even though its representative visited the plant. Id. at 84. The union did not know whether employer kept material data safety slips. Id. at 76. There was no hazard safety program or health and safety officer at the plant. Id. at 77 and 81. Alexander had been a Steelworker union steward for the gas company; he learned when there was catastrophic injury in his steward capacity; and he simply does not know why he never learned of catastrophic injury at this entirely Latino plant when he was union representative. Id. at 85.

Therefore,

a. There is a reasonable likelihood that the plaintiffs will recover judgment, including interest and costs against the United Steelworkers in such amount;

b. The plaintiff knows no liability insurance that is available to satisfy a judgment in this case;

c. There has been no property attached by other writ of attachment.

Respectfully Submitted,

/s/ John Lee Diaz and Robert O. Berger
John Lee Diaz, Esq.
Robert O. Berger, BBO #: 038900
11 Beacon Street, Suite 1210
Boston, MA 02108
Tel (617) 423-7575
Attorney for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail (by hand) on 2/13/06

## Assessment of Damages
*Euclides Soto, et. al. v. Sherman-Feinberg, et. al.*

|  | Lost Wages | Future Wages | Emotional Distress | Punitive | Total Damages |
|---|---|---|---|---|---|
| **Unemployed** |  |  |  |  |  |
| Each Plaintiffs | $60,000 | $150,000 | $400,000 | $200,000 | $810,000 |
| 5 Plaintiffs |  |  |  |  | $4,050,000 |
|  |  |  |  |  |  |
| **Unemployable** |  |  |  |  |  |
| Each Plaintiff | $60,000 | $175,000 | $400,000 | $200,000 | $835,000 |
| 7 Plaintiffs |  |  |  |  | $5,845,000 |
|  |  |  |  |  |  |
| **Mixed** |  |  |  |  |  |
| Each Plaintiff | $40,000 | $120,000 | $400,000 | $200,000 | $760,000 |
| 5 Plaintiffs |  |  |  |  | $3,800,000 |

**Grand Total**     **$13,695,000.00**