UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| EUCLIDES SOTO, LOUIS A. MARTINEZ, ) | |
| JOSE RAMIREZ, CLEMENTE HERNANDEZ, ) | |
| CESAR PIZARO, ELISON PENA, ) | |
| JUAN COLON, JOSE ORTIZ, RAFAEL TORRES, ) | |
| ANGEL BAEZ, ANTONIO MARTINEZ, ) | |
| WILFREDO ORTIZ, EULOGIO ORTIZ, ) | |
| MIRRAIN MIRANDA, RAFAEL MORENO, ) | |
| NELSON ACEVEDO, and ) | |
| RAMON RODRIQUEZ, ) | |
| ) | Civil Action No. |
| Plaintiffs, ) | 04-10892-JLT |
| ) | |
| v. ) | |
| ) | |
| SHERMAN-FEINBERG CORPORATION, ) | |
| FARNSWORTH FIBRE CORPORATION, ) | |
| UNITED STEELWORKERS OF AMERICA, ) | |
| LOCAL 421-U, and UNITED STEELWORKERS ) | |
| OF AMERICA, ) | |
| ) | |
| Defendants. ) | |

_____)

**MEMORANDUM IN SUPPORT OF UNION DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION TO ATTACH**

***Introduction***

Defendants United Steelworkers of America, Local Union 421-U, and United

Steelworkers of America, AFL-CIO/CLC (the "Unions") hereby submit this memorandum

in support of their Opposition to Plaintiffs' Motion to Attach Assets of the United

Steelworkers of America. As set forth below, Plaintiffs' motion is procedurally

insufficient and fails to meet Plaintiffs' burden of establishing a reasonable likelihood of

recovering judgment in the requested amount and should therefore be denied.

*Discussion*

On the eve of trial, the plaintiffs have moved this Court to attach an astronomical amount, more than $78 million, including pension funds held by the United Steelworkers of America for the benefit of its currently retired and future retired members, sums which are specifically exempt from attachment under state and federal law.  As set forth below, the request for an attachment must be denied because the plaintiffs cannot meet either of the two essential grounds for granting an attachment.  First, they point to nothing indicating that they have a likelihood of success on the merits.  Indeed, as demonstrated in the Union Defendants' Motion to Strike Plaintiffs' Motion to Attach, previously filed, the motion should be denied because it has not properly made an evidentiary showing required by state and federal law.  See Memorandum in Support of Union Defendants' Motion to Strike, attached hereto as Exhibit A.

Second, Plaintiffs have made no showing that they have suffered damages approximating $78,000, let alone $78 million.  Indeed, since neither punitive damages nor emotional distress damages are available as a matter of law on Plaintiffs' duty of fair representation claims, and as they are entitled to no more than several weeks of pay at best, under any theory, and because they have pointed to no direct harm caused by the Unions for many of their claims relating to unsafe conditions, the plaintiffs have failed to establish that they are likely to recover damages in the amount that they are requesting, which is the second prerequisite for the granting of an attachment.  For both reasons, this Court should deny the plaintiffs' outrageous motion for a $78 million attachment.

*Argument*

## I.    Plaintiffs' Failure to Submit Affidavits Precludes the Required Findings of a Reasonable Likelihood of Judgment in the Amount Requested

As set forth in further detail in the Memorandum in Support of Union Defendants' Motion to Strike (Exhibit A), Plaintiffs' failure to submit supporting affidavits[1] precludes any possibility of making the findings required for approval of a motion for attachment. Rule 4.1 requires a party moving for attachment to establish (1) "that there is a reasonable likelihood that the plaintiff will recover judgment" and (2) that such judgment is reasonably likely to be "in an amount equal to or greater than the amount of the attachment."  Rodriguez v. Montalvo, 337 F.Supp.2d 212, 215 (D. Mass. 2004) (citing Mass. R. Civ. P. 4.1(c)); see also Johnson v. Koplovsky Foods, Inc., 5 F.Supp.2d at 51 ("the central question on the motion for approval of attachment is whether plaintiffs are likely to prevail on the merits and obtain damages in the necessary amount").  In this case, Plaintiffs have provided no affidavits upon which the Court could make a finding with respect to either of these issues, so their motion to attach should be denied.  See Hamilton v. Arnold, 135 F.Supp.2d at 104 (quoting the two required findings from Rule 4.1(c) and stating that Rule 4.1 "also requires the movant to submit affidavits setting forth 'specific facts sufficient to warrant the required findings'"); accord Johnson v. Koplovsky, 5 F.Supp.2d at 51; Tunicliff v. Motel 6, 178 F.R.D. at 10.

---

[1]    In response to the Unions' motion to strike, the plaintiffs filed an opposition which presented the sole argument that their motion to attach was "supported" by either of two irrelevant affidavits of Plaintiffs' attorney submitted in support of previous filings in this matter.  As set forth in further detail in the Unions' Reply filed on February 23, 2006, neither of these previous affidavits supports Plaintiffs' motion to attach in accordance with Mass. R. Civ. P. 4.1, and Plaintiffs' attempt to argue that their motion is "supported by affidavit" should be disregarded as spurious.

**II.    Plaintiffs Have Failed to Demonstrate a Reasonable Likelihood of Success on the Merits**

As discussed above, the first prerequisite for granting an attachment is that the movant must demonstrate "that there is a reasonable likelihood that the plaintiff will recover judgment." Rodriguez v. Montalvo, 337 F.Supp.2d at 215 (citing Mass. R. Civ. P. 4.1(c)).  Plaintiffs cannot possibly have demonstrated any likelihood of success on the merits, as they have not submitted the affidavits required to make such a showing. Id.  Moreover, even if Plaintiffs had made the required evidentiary showing, the previous record in this case makes clear that Plaintiffs have no likelihood of success on any of their alleged claims.  As set forth below, Plaintiffs' duty of fair representation claims are mostly time barred, and those that are not time barred must fail as a matter of law. Moreover, the state law discrimination claims are preempted by section 301 as well as under the doctrine of Garmon preemption, and any state and/or federal law discrimination claims that are not preempted also either are time-barred or must fail because of a complete lack of direct or circumstantial evidence.

1.    Plaintiffs' Duty Of Fair Representation Claims Are Time-Barred

The company announced it was going out of business in early October, and by early November it had completely shut down.  A six-month statute of limitations bars consideration of any incidents alleged by plaintiffs prior to November 5, 2003,[2] including open-ended allegations that the Unions failed to address safety concerns or failed to provide employees with privileges accorded to non-Hispanic employees.  DelCostello v. Teamsters, 462 U.S. 151 (1983); Goulet v. Carpenters District Council of Boston, 884 F.Supp. 17, 24 (D.Mass. 1994).  Therefore, most of Plaintiffs' allegations are time-

---

[2]    Plaintiffs filed their original complaint on May 5, 2004.

barred because they concern matters that allegedly arose before the plant shutdown in November 2003.

> 2.   The Unions Did Not Breach the Duty of Fair Representation as Alleged

Plaintiffs contend that the Unions breached their duty of fair representation by (1) failing to preserve their jobs upon the closure of Farnsworth Fibre, (2) failing to grieve safety infractions or otherwise maintain the safety of the plant, and (3) failing to offer apprenticeship, educational, and safety programs.  Each argument has no legal basis.

> a.   The Unions Did Not Breach the Duty of Fair Representation by Failing to Prevent Plaintiffs' Terminations Due to the Plant Closure

A union cannot, as a matter of law, prevent a plant closure or cessation of business.  Further, it cannot require payment of severance benefits if none are required under the collective bargaining agreement.  A company has a duty to bargain only over the effects on employees of a shutdown of operations, and not the decision itself.  See First National Maintenance Corp. v. NLRB, 452 U.S. 666, 677, 681-82 (1981); Textile Workers V. Darlington Mg. Co., 380 U.S. 263, 274 (1985) (employer has right to close its entire business, thereby ending employer-employee relationship); Magic Fraser v. Magic Chef-Food Giant Markets, Inc., 324 F.2d 853, 855-56 (6th Cir. 1963) (employer may even shutdown during the life of a collective bargaining agreement).  Similarly, it was not a breach of the Unions' duty in this case to fail to prevent the shutdown when neither the contract nor federal labor law requires the parties to negotiate over the employer's decision to close the plant.

The record makes clear that the Unions fairly and rationally represented Plaintiffs with respect to the closing, including effects bargaining and the resolution of grievances.

In or around October 16, 2003, shortly after Steelworkers Staff Representative Lowell Alexander learned of the planned shutdown, Alexander and Ortiz met with union members to answer their questions about the closing and its effect on their benefits, and met separately with the Company to discuss the pending shutdown. See Statement of Material Facts (SOF) in the Unions' previously filed motion for summary judgment, ¶¶ 21-23. The Unions even provided an interpreter at the meetings with members, which plaintiffs admit in their depositions. Id.

In a meeting with the Company on October 16, 2003, which Ortiz also attended, Alexander inquired about whether the facility would be kept open, requested that employees be paid severance pay, and raised other issues brought to his attention by employees. See SOF ¶¶ 22-24. The Company refused to pay severance, asserting that severance was not required under the contract (which it was not). Yet, as a result of these meetings, Alexander ensured that employees obtained the benefits they were entitled to under the contract. Id.

In order to secure benefits owed under the collective bargaining agreement (CBA), Mr. Alexander and Mr. Ortiz filed three grievances on or about November 14, 2003, regarding issues and events related to the shutdown of the facility. See SOF ¶ 24. The grievances concerned the Company's obligations to abide by provisions of the collective bargaining agreement dealing with bumping rights on the basis of seniority, report pay, and medical insurance coverage.[3] The grievances were signed by Ortiz. Id. The Company and Alexander settled those grievances on November 19, 2003, with the Company agreeing to compensate affected employees as a remedy for bumping, report

---

[3]    The Company laid off first shift employees on November 14, 2003, and second shift employees a week prior to that. One of the grievances dealt with the bumping rights of the second shift employees who had been laid off before the first shift employees with less seniority.

pay, and medical insurance grievances.  <u>See</u> SOF ¶ 26.  Plaintiff Ortiz was scheduled to attend the grievance resolution meeting of November 19, but failed to attend despite Alexander calling him to remind him of the meeting.  SOF ¶ 25.  Significantly, plaintiffs do not contend that the Unions breached their duty in representing them with respect to those grievances.

There is no breach of the duty of fair representation or bad faith conduct where a union does not file grievances of which it is unaware. Significantly, Plaintiffs testified that they did not approach Alexander or a Steelworkers representative with regard to filing additional grievances over the closing or any other matter or that Steelworkers representatives declined to file grievances.  <u>See</u> SOF ¶¶ 18-19.  Plaintiff Jose Ortiz, who was responsible for initiating and filing grievances under the CBA, failed to file any grievances over the shutdown except the three discussed above, and did not ask Alexander to file other grievances or complaints.  <u>See</u> SOF ¶¶ 19, 27.  Thus, the Unions cannot be held liable for failing to file grievances over matters of which they were unaware.

Plaintiffs' allegations that the CBA does not "reflect" or discuss effects bargaining present no liability to the Unions even if true.  (Complaint at ¶ 17).  Effects bargaining is an obligation of an employer under federal labor law, and a CBA need not delineate such duty in order for a union to invoke effects bargaining.  <u>See</u> <u>First National</u> <u>Maintenance Corp. v. NLRB</u>, 452 U.S. 666, 677, 681-82 (1981).

Plaintiffs have also failed to demonstrate a likelihood of success on their claims against the Unions for breach of the duty of fair representation because Plaintiffs do not allege or otherwise demonstrate that Farnsworth Fibre violated the collective bargaining

agreement when it terminated them or otherwise failed to maintain the safety of the facility. To succeed in a hybrid breach of contract and fair representation claim under section 301, Plaintiffs must establish both that the Unions breached a duty of fair representation and that the employer breached the CBA. See Teamsters v. Terry, 494 U.S. 558, 564 (1990); Miller v. U.S. Postal Service, 958 F.2d 9 (1st Cir. 1993). These claims are "inextricably linked," and failure to prove either one results in a failure of the entire action. DelCostello v. Teamsters, 462 U.S. 151, 164-65 (1983); Demars v. General Dynamics Corp., 779 F.2d 95, 97 (1st Cir. 1985).

In this case, Plaintiffs complain that the employer's failure to bargain over the shutdown was "in violation of their fiduciary duty," (Complaint at ¶ 10.), and that the Unions' failure to grieve employees' terminations was "predicated upon racially discriminatory motivation, which is a breach of the duty of fair representation and breach by the Employers of the labor contract." (Complaint at ¶ 15.) Significantly, Plaintiffs fail to identify any provision of the CBA that the employer breached. Indeed, as Plaintiffs admit, the CBA does not include provisions for plant closure or effects bargaining. (Complaint at ¶ 17.) Nor does the failure of a union to grieve a matter constitute a breach of a collective bargaining agreement by an employer.

### b.    The Unions Had No Duty to Ensure the Safety of the Plant

Plaintiffs contend that the Unions breached the duty of fair representation because "two of the members lost two fingers at the Company plant and there have been two fires at the Company plant" and because the Unions "ha[ve] not provided apprenticeship, educational, or safety programs." [Complaint at ¶ 18.]

Since Plaintiffs' safety allegations involve Company conduct, not the Unions' conduct, for that reason alone, Plaintiffs cannot hope to establish a likelihood of succeeding on such claims.  There is no general far-reaching duty of a union to provide employees with a safe working environment.  USWA v. Rawson, 495 U.S. 362 (1990); Condon v. Local 2944, United Steelworkers of America, 683 F.2d 590 (1st Cir. 1982); Goulet v. Carpenters District Council of Boston, 884 F.Supp. 17, 23 (D.Mass. 1994).  To the extent that a union assumes any obligations of care towards its members, they derive from the collective bargaining agreement.  Rawson, 495 U.S. at 368-72 (holding that claims against union for negligent safety inspections were preempted, as they required interpretation of collective bargaining agreement); see Goulet, 884 F.Supp. at 24 (Court dismissed claims that union was negligent in asking to have drywall lift removed from work site); Condon, 683 F.2d at 594-95 (holding that the union could not be "held liable for the negligent performance of a duty it assumed that arose inextricably, as here, from the safety and health provisions of a collective bargaining agreement").

In this case, Plaintiffs allege that the Unions somehow violated the duty of fair representation because two members lost two fingers and there were two fires at the plant.  (Complaint at ¶ 18.)  First, as discussed above, such claims must fail because they are barred by the six-month statute of limitations.  DelCostello v. Teamsters, 462 U.S. 151 (1983).  Second, even if such claims are taken as true, the Unions have no statutory obligation to prevent safety infractions by employers, and no such duty was assumed by the Unions in the CBA.  Rawson, 495 U.S. 362; Condon, 683 F.2d 590; Goulet, 884 F.Supp. 23.

Significantly, there is no allegation that the Unions intentionally failed to grieve safety matters brought to their attention by Plaintiffs.  Indeed, as demonstrated in the deposition testimony of plaintiffs, no bargaining unit member brought safety concerns to the attention of Mr. Alexander, the International's only authorized agent for the unit.  See SOF ¶¶ 18-20.  Mr. Alexander was unaware of any grievable safety violations because none were brought to his attention, and he was personally unaware of them.  SOF ¶ 18.  There can be no discrimination and no duty to file a grievance by a union where employees never requested the union's assistance in filing a grievance.

c.    The Unions Did Not Breach the Duty of Fair Representation Regarding the Remaining Claims

A union does not breach the duty of fair representation if it provides services and publications in English and does not provide a Spanish-speaking interpreter to employees.  Lebron v. International Brotherhood of Electrical Workers, 1992 U.S. Dist. LEXIS 8887 (D. Mass. June 9, 1992) (no breach of duty of fair representation for failure of union to employ interpreter during arbitration hearing).  In that case, the Massachusetts District Court held that the collective bargaining agreement imposed no duty to provide an interpreter and that, at worst, the union acted negligently in a tactical decision to proceed without an interpreter, which is insufficient to create liability.  Id.

Even though a union has no obligation to provide translation services, the Unions did provide such services in this case.  Despite Plaintiffs' allegation that "no client recalls a Spanish interpreter being available," Plaintiffs admit that the Unions did provide a Spanish-speaking interpreter to meetings with employees of Farnsworth Fibre and even translated the 2002 collective bargaining agreement into Spanish and forwarded it to Ortiz.  SOF ¶¶ 15-16.

10

Additional evidence that the Unions provided for the needs of Spanish-speaking members was their provision of steward training in Spanish on January 4, 2003, in Braintree, Massachusetts, available to Ortiz and other representatives of 421-U and paid for by the Unions. <u>See</u> SOF ¶ 13. Notice of that training was distributed to Local 421-U, and Alexander himself invited Ortiz to attend the stewards training, which Ortiz declined because he lacked transportation. <u>Id</u>.

Vague allegations that the Unions "ha[ve] not provided apprenticeship, educational, or safety programs" are also without merit. (Complaint at ¶18.) First, a union has no duty under state or federal law to provide apprenticeship, educational or safety programs. <u>Rawson</u>, 495 U.S. at 376 (union only assumes obligations of care toward members if they derive from the collective bargaining agreement). Nor have Plaintiffs provided evidence identifying programs or privileges withheld from Farnsworth Fibre employees on the basis of their Hispanic heritage that were provided to non-Hispanic Steelworkers members employed at other facilities. As already discussed, the Unions provided stewardship training to their Spanish-speaking representatives in January 2003 and even personally invited Jose Ortiz to such training.[4]

---

[4]     Further, Plaintiffs' attempts to preserve their DFR claims are unavailing. First, a continuing violation theory simply does not apply to a duty of fair representation claim, and no court has ever so held. As described more fully in a separate motion in limine on the discrimination claims, under the Supreme Court's decision in <u>National Railroad Passenger Corporation v. Morgan</u>, 536 U.S. 101 (2002), the continuing violation theory is not applicable to discreet acts of discrimination or, in this case, breaches of the duty of fair representation.

Similarly, the plaintiffs' repeated citation of <u>Mercado v. Ritz Carleton San Juan Hotel</u>, 410 F.3d 41 (1st Cir. 2005) is unavailing. <u>Mercado</u> has nothing to do with a duty of fair representation claim, and there is no doctrine of "equitable tolling" for a duty of fair representation claim and none has been cited by Plaintiffs. Moreover, <u>Mercado</u> relates to the doctrine of equitable tolling where "the employer" has failed to post required EEOC notices. Such a failure to post notices by the employer cannot be held to impose liability on a union (which has no such duty) where the statute of limitations has already run.

<u>d</u>.    <u>USW Treated Plaintiffs Fairly Compared With Other USW Employees</u>

There is no evidence that the Unions discriminated against Hispanic employees of Farnsworth Fibre compared to USW employees at other facilities.  Allegations that Hispanic employees at Farnsworth Fibre were discriminated against because the Unions failed to negotiate severance or other shutdown benefits are without foundation, <u>especially</u> in light of the Unions' negotiation of a severance package for the predominantly Hispanic employees at Sealy Mattress.  SOF ¶ 30.

At Rosboro Plastics, which employed a majority of Hispanic employees, the Unions and the employer bargained a closing agreement in which the Company agreed to make severance payments and pay other benefits.  Mr. Alexander was able to negotiate that severance agreement only because the employer needed to provide an incentive for the employees to remain at work until the plant actually closed.  SOF ¶ 30. Finally, at Beebe Rubber and Cone Blanchard, where there were relatively fewer minorities, the Unions did not negotiate a closing agreement.  SOF ¶ 31.  At the time of closing, employees received no more benefits than those negotiated under the parties' collective bargaining agreement, which did not include benefits for general severance pay.  These examples demonstrate that upon closure of a facility, the Steelworkers ensured that employees – including Farnsworth Fibre employees – received at least those benefits that were negotiated under the CBA, regardless of race or other classification, and that it did not negotiate more favorable severance packages for non-Hispanic employees.

Therefore, the plaintiffs have failed to aver facts which would constitute a breach of the duty of fair representation, contrary to their obligations under <u>Matsushita Electric Industrial Company</u>, 475 U.S. 574 (1986).

In sum, the Unions resolved grievances over the plant shutdown, engaged in effects bargaining, and even provided translation services for employees.  There is no evidence that the contract and its application by the Unions discriminated against plaintiffs or that the Unions treated employees in an arbitrary, discriminatory or bad faith manner by withholding representation on the basis of race or national origin or on any other basis.

3.    <u>Plaintiffs Have Failed to Demonstrate Any Likelihood of Success on Their Discrimination Claims</u>

The plaintiffs make the same discrimination claims under both state law, Mass. Gen. Laws ch.151B, § 4,and federal law, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e).  It is clear, both from the complaint and subsequent discovery, that the plaintiffs do not assert that the Unions ever said anything indicating animosity against employees because they were Hispanic, nor does the complaint allege that the International representative assigned to the local ever did or did not do anything because the bargaining unit employees were Hispanic.  <u>See</u> Complaint, ¶¶ 24-31. Rather, the complaint alleges generally that because all of the employees were Hispanic, the Unions did not assert the rights of the bargaining unit members to the same extent they would in other bargaining units where the employees were not predominantly Hispanic.  <u>Id</u>.  However, as set forth below, there is no evidence to support these claims.

<u>a.</u>    <u>Plaintiffs' Title VII Claims Are Mostly Time-Barred</u>

The plaintiffs allege that the Unions discriminated against them by failing to represent them not only in matters relating to the closing of the Farnsworth Fibre plant, but also in failing to file some unspecified grievances at earlier times and by failing to respond to safety and health issues in the plant.  This Court applies the 300-day statute of limitations prohibiting action on any allegations not filed with the Massachusetts Commission Against Discrimination and/or the Equal Employment Opportunity Commission within 300 days of the action complained of.

Federal law is clear that the 300-day statute of limitations applies to acts of discrimination, and precludes the submission of such acts for trial and findings which are outside the 300-day period.  <u>See</u> <u>National Railroad Passenger Corporation v. Morgan</u>, 536 U.S. 101 (2002); <u>Luciano v. Coca-Cola</u>, 307 F.Supp.2d 308, 318 (D. Mass. 2004).  Here, the plaintiffs' claims are discrimination claims.  They are not claiming harassment by the Unions.  Further, there is no allegation of retaliation.  In <u>National Railroad Passenger Corporation v. Morgan</u>, <u>supra</u>, the Supreme Court held clearly that where a defendant in a Title VII employment discrimination lawsuit alleges various acts of discrimination, the continuing violation doctrine will not apply to such claims, and only those acts actually occurring within the 300-day period are actionable.  The rest may not be the basis for liability.  <u>See</u> <u>Morgan</u>, 536 U.S at 115-117.

In the present case, some of the plaintiffs filed charges of discrimination against the Unions on May 7, 2004, and others filed claims on June 4, 2004.  Thus, any allegations prior to July 11, 2003 are barred by the 300-day statute of limitations.  See M.G.L. ch.151B, § 5; <u>see also</u> <u>Luciano v. Coca-Cola</u>, 307 F.Supp.2d at 318.

As set forth in the complaint and the opposition to the motion for summary judgment, the plaintiffs make a variety of claims which seem to be limitless in time, including failure to train, failure to provide apprenticeship programs, failure to take action to correct safety conditions, etc.  Virtually all of these events predate July 11, 2003, only three months before the plant closed, and many years after the plaintiffs were aware of these alleged problems.  Indeed, it appears that the only discreet act that occurred at all past July 11, 2003, was the announcement that the plant was closing.

Plaintiffs' attempts to rely on the tolling doctrine described in <u>Mercado v. Ritz Carleton San Juan Hotel</u>, 410 F.3d 41 (1st Cir. 2005) are completely without merit. There, the court permitted evidence on the tolling of the 300-day limitation because the "employer" had failed to post notices as required by the EEOC.  Here, the plaintiffs' allegations are against the Unions, and there is no evidence that the Unions failed to post any notice required by the EEOC, and plaintiffs have provided no evidence of any such failure to post.  Absent this predicate, no tolling can be had against the Unions.[5]

---

[5]        Furthermore, as argued in the Unions' summary judgment briefing, because Plaintiffs essentially claim violations of the National Labor Relations Act, their claims are completely preempted under the so-called <u>Garmon</u> preemption doctrine. <u>San Diego Building Trades Council v. Garmon</u>, 359 U.S. 236 (1959) (forbidding state and local regulation of activities that are protected by § 7 of the NLRA or constitute unfair labor practices under § 8 of the Act).  Further, because the claims asserted by the plaintiffs require interpretation of the collective bargaining agreement as an integral part of such claim, such claims are completely preempted under Section 301 of the Labor Management Relations Act.

        In the present case, Plaintiffs assert that the unions failed to properly represent the Farnsworth Fibre employees and that this failure was motivated by the fact that the bargaining unit comprised mostly Hispanic employees.  It is beyond dispute that when a union fails to properly represent a member or group of members for some arbitrary or discriminatory reason, such conduct is a violation of the NLRA, Sections 8(b)(1)(A) and 8(b)(2).  Therefore, if Plaintiffs' allegations are correct, then the Unions' conduct is prohibited under the NLRA, and the state law discrimination claims are therefore preempted.

        Recently, the Third Circuit has held in a preemption context that state law discrimination claims against a union are "presumptively preempted" by the NLRA when they concern conduct that is actually or arguably prohibited under the NLRA.  <u>See Scott v. Graphic Communications Union</u>, 2004 W.L. 516164 (3d Cir. 2004), citing <u>Pennsylvania Nurses Association v. Pennsylvania State Education Association</u>, 90 F.3d 797 (3d Cir. 1996).  Accordingly, to the extent that Plaintiffs have asserted state law claims of discrimination under Mass. Gen. Laws ch.151B, which are so integrally tied to conduct governed by the NLRA, the doctrine of <u>Garmon</u> preemption demands that the state law claims be dismissed, and therefore, the plaintiffs cannot establish any likelihood of succeeding on these claims.

<u>d.</u>    <u>Plaintiffs Have Not Produced Sufficient Evidence to Succeed
on Their Federal and State Discrimination Claims</u>

Where a plaintiff charges his or her union with discrimination based upon race or

ethnic origin, there is essentially no difference between a Title VII claim and a claim of

discrimination in violation of the duty of fair representation.  Several courts have

recognized that the applicable legal standards are essentially the same.  <u>See</u> <u>EEOC v.

Pipe Fitters Assoc., Local Union 597</u>, 334 F.3d 656 (7th Cir. 2003) (<u>Pipe Fitters Assoc.</u>)

(citing <u>McDonald v. Santa Fe Trail Transportation Co.</u>, 421 U.S. 273 (1976); <u>Goodman

v. Lukens Steel Company</u>, 482 U.S. 656 (1987)).  Accordingly, the discussion in this

section as to why the plaintiffs cannot demonstrate a likelihood of success on a claim of

discrimination under Title VII is equally applicable to that part of their claim which

apparently alleges discrimination with respect to the Unions' duty of fair representation.

Section 703(c) of Title VII provides that a "labor organization" may not "exclude

or expel from its membership, or otherwise discriminate against any individual because

of his race, color, or national origin."  <u>See</u> 42 U.S.C. § 2000e-2(c).

While the legal obligations of a union under Title VII are similar to those of an

employer, there are differences in the way Title VII treats each.  As Judge Posner has

stated for the Seventh Circuit:

---

In addition, since the state law claims would require interpretation of the collective bargaining
agreement, they are also completely preempted under Section 301 of the LMRA.  <u>See</u> <u>Martin v. Shaw's
Supermarkets</u>, 105 F.3d 40 (1st Cir. 1997).  Simply stated, when a state law claim requires interpretation
of the contract, it is preempted.  Thus, the first question in such a case is "whether resolution of plaintiffs'
claims would require an interpretation of a collective bargaining agreement."  <u>Id.</u> at 42.  In the present
case, the plaintiffs allege that the union failed, for discriminatory reasons, to pursue a number of
grievances which should have been filed on their behalf.  A grievance is simply a claim that the employer
has violated a provision of the collective bargaining agreement.  Thus, in deciding whether or not
Plaintiffs' assertions have merit, this Court could not avoid interpreting the collective bargaining
agreement to determine whether or not, as the plaintiffs assert, the union failed to pursue meritorious
grievances.  Given these facts, it is clear that the plaintiffs' state law discrimination claims are preempted
under Section 301.  <u>See</u> <u>Reece v. Houston Lighting and Power Company</u>, 79 F.3d 45 (5th Cir. 1996)
(preempting race discrimination claims); <u>Martin</u>, 105 F.3d 40 (preempting handicap discrimination claims).

> The duties of nondiscrimination imposed by Section 703(a) and (c) have reference to the respective roles of company and union in the workplace. The company, not the union controls the workplace. . . . The union is not the company, but the workers' agent in dealing with the company. If it discriminates in the performance of its agency function, it violates Title VII, but not otherwise. Thus, a union that refuses to accept blacks as members, or refuses to press their grievances, is guilty of discrimination. But if it merely fails to effectuate changes in the workplace – if, for example, it urges the company to take steps to prevent harassment and the company fails to do so – the union is not guilty of discrimination, though the company is. . . .

Pipe Fitters Assoc., 334 F.3d at 659.

In Pipe Fitters Assoc., the Seventh Circuit went on to hold that while a union is clearly liable for intentionally refusing to take action on behalf of a group of employees because of their race or ethnic origin, mere passivity, that is not taking action to prevent the employer from discriminating, does not rise to the level of actionable discrimination against a union unless it can be proven that the union intentionally did not take such action specifically because the employees involved were in a protected group. Id. at 658-659. The court held:

> But inaction, unless invidious, is not discrimination in any accepted sense of the term. People don't take active measures to combat discrimination, their inaction does not condemn them as discriminators. Suppose that a union is lackluster, and while it will file a grievance if pressed to do so by a member of the collective bargaining unit, it will do nothing on its own initiative. We do not understand how such passivity, though it means the union will not take measures to prevent racial harassment on its own initiative, could be thought to be a form of racial discrimination.

Id. at 660.

Thus, under the standard for union liability under Section 703(c) of Title VII, a plaintiff "must show that there is evidence in the record that the union intentionally discriminated against her because of her [ethnic origin]." Rainey v. Town of Warren, 80 F.Supp.2d 5, 14-15 (D.R.I. 2000). That burden may be satisfied by either producing

direct or circumstantial evidence which would prove intentional discrimination.  Absent

direct evidence of intentional discrimination, Plaintiffs must demonstrate that the Unions'

asserted reasons for not taking the action complained of in the complaint was a

"pretext" and that the real reason was because of intentional discrimination.  Id. at 16-

17.  The general rules for proving such intentional discrimination are the same for union

liability as they are for establishing discrimination by employers.  At bottom, the plaintiffs

must offer proof that the "defendant acted with the specific intent of discriminating

against the plaintiff."  Barbour v. Dynamics Research Corp., 63 F.3d 32, 39 (1st Cir.

1995).

Of course, the plaintiffs cannot prevail simply by showing that the local union's

decision was wrong or mistaken, since the disputed issue is whether plaintiffs' protected

class status "motivated the local union, not whether it was wise or competent."  Rainey,

80 F.Supp.2d at 16; see also Villanueva v. Wellesley College, 930 F.2d 124, 131 (1st

Cir. 1991).  While the question remains one of intentional conduct, the plaintiffs must

prove that they were subjected to "disparate treatment" by the local in that it failed to

process their grievances while, at the same time, processed the grievances of similar

situated non-protected status members in the union.  Rainey, 80 F.Supp.2d at 14; see

also Woodman v. Haemonetics Corp., 51 F.3d 1087, 1093 (1st Cir. 1995).

In the present case, taking all of the allegations which have at least some factual

support in the record as true, still the plaintiffs cannot satisfy their burden of

demonstrating a reasonable likelihood of succeeding on their discrimination claims.

Certainly, there is no direct evidence of discrimination.  In this regard, a couple of

significant points set the framework.  First, all of the union officials involved in this case

were minorities.  Lowell Alexander, the International representative of the Steelworkers

assigned to service Local 421-U, including Unit 421-6 (the employees at Farnsworth

Fibre), is African-American.  The other representative from the Steelworkers' regional

office, Masiel DaSilva, who acted as an interpreter on several occasions, is herself

Hispanic.  In addition, the employees of Farnsworth Fibre elected their own shop

steward who was responsible for filing grievances and policing the contract, and he, too,

was Hispanic.  The other local union committee representative, Miguel DeJesus, was

also Hispanic.

In this case, after deposing almost all of the plaintiffs, including Mr. Ortiz, the

plaintiffs can point to no direct evidence of discrimination.  That is, nothing was ever

said by any union official or representative suggesting that the defendants were treating

the plaintiffs differently and less favorably because they were Hispanic workers.

In addition, there is not one shred of evidence to suggest that the defendants

ever failed to file a grievance that had contractual support on the plaintiffs' behalf.  All

the plaintiffs were asked in their depositions whether they had ever asked the

Steelworkers or Mr. Alexander to file a grievance on their behalf, and not one employee

indicated that the Steelworkers or Mr. Alexander ever declined to do so.[6]  See SOF ¶¶

18, 27.

In addition, the evidence demonstrates conclusively that Mr. Alexander did take

appropriate non-discriminatory action with respect to the workers.  For example,

beginning in 2002, when he took over representing the workers, he spent at least five or

---

[6]    Certainly, the evidence is unquestioned that within 300 days of their filing with the MCAD/EEOC,
which would be necessary for a timely charge of discrimination, no plaintiff ever sought to file a grievance
which was refused by the Unions or Mr. Alexander.

six days negotiating a new collective bargaining agreement in the fall of 2002. The agreement was also negotiated by Jose Ortiz and Miguel DeJesus who, along with Mr. Alexander, constituted the Unions' negotiating team. After five or six negotiating sessions, the Unions achieved a wage increase. It should be noted that the agreement achieved not only wage increases, but preserved health insurance and the pension contributions on behalf of each employee.[7]

Some time after Mr. Alexander negotiated the contract with Messrs. Ortiz and DeJesus, he attempted to foster good relations with the elected Hispanic union representative at Farnsworth Fibre, Jose Ortiz. For example, encouraged Mr. Ortiz to attend a union steward training session for stewards that was being put on by the Steelworkers in Spanish. Mr. Alexander invited Mr. Ortiz to attend, but Mr. Ortiz declined. At other times, Mr. Alexander invited Mr. Ortiz to come to the unit meetings of Local 421-U, and on each occasion Mr. Ortiz declined to come. When Mr. Ortiz called Mr. Alexander in September 2003 and asked him to come to the plant to speak to the workers, Mr. Alexander did so, and he brought Masiel DaSilva with him as an interpreter. The meeting was an open meeting on the plant floor. The machines were turned off and employees were allowed to address any questions or concerns they had to Mr. Alexander. He heard their concerns and told them that notwithstanding what they may have perceived about their representation in the past, they could expect him to be responsive.

---

[7]    Although not directly at the core of this case, the fact is that the employees at Farnsworth Fibre, while receiving modest wages of between $9.00 and $13.00 per hour, received the dignity of health insurance paid mainly by the employer, as well as a pension plan in which two percent (2%) of an employee's wages were contributed to the Steelworkers' pension fund. Indeed, some of the plaintiffs in this case have retired on Steelworker pensions which supplement their social security by as much as almost $500.00 per month. [See, e.g., Exhibit N to the Unions' motion for summary judgment (Rodriguez Dep.) at 6.]

Notwithstanding all of this, at no time prior to the announcement of the plant closing did Mr. Alexander ever receive one complaint from anyone about the working conditions at Farnsworth Fibre. Specifically, he was never informed by anyone, including Mr. Ortiz, of safety problems at the plant, of injuries, or of grievances that needed to be filed. Mr. Alexander simply could not file grievances of which he was unaware. Indeed, in his testimony, Mr. Ortiz, who ironically is a plaintiff in this case, conceded that he could think of no time that he asked Mr. Alexander to file a grievance or that Mr. Alexander ever declined to do so.

In fact, the testimony reveals just the opposite. When Mr. Ortiz and the other workers learned that the plant was set to close, they contacted Mr. Alexander and Mr. Alexander immediately came to the workplace and held a meeting with all of the workers. He then met with management to see what could be done to stop the plant from closing. Ultimately, it was determined that the Unions could do nothing to stop the plant from closing. As described in the section on duty of fair representation, supra Section II(2)(a), a union has no right or obligation to stop a plant from closing. In addition, the contract had no plant-closing or severance language that would give the employees anything to bargain about. Nevertheless, Mr. Alexander did immediately file three grievances, all of which he believed had merit, relating to the plant closing. First, he grieved the fact that the second shift was laid off before the first shift (a week earlier) without affording the senior employees on the second shift bumping rights to the first. Second, he grieved the fact that health insurance benefits were being cut off mid-month. He also filed a third grievance relating to report pay. On a later date, he met with the company to discuss each of the grievances and he resolved them on a favorable basis.

Thus, Mr. Alexander filed the three grievances that he determined had merit.  He was not asked to file any other grievances and there were, in fact, no other grievances he knows of that could have properly been filed to stop the closing.  While even the Unions' refusal to file grievances would not demonstrate any likelihood of success on a discrimination charge, here, there is no evidence that the Unions ever failed to file a grievance requested to be filed by one of the members, let alone that such decision was made for discriminatory reasons.

The plaintiffs fare no better on their other claims relating to safety.  The plaintiffs have failed to demonstrate that Mr. Alexander or the International were aware of the several injuries that occurred to Farnsworth employees, or the small fires in the plant, nor is there evidence that the Local or International was aware of them.  Of course, even if the Unions had been aware of them, it is not clear exactly what it is that the Unions could have done to address such issues.  But, again, in any event, since there is no evidence that the Unions knew of any of these safety concerns, certainly there is no evidence that the Unions failed to take action because the employees were Hispanic.  Indeed, the main union representative in the plant, Mr. Ortiz, was himself Hispanic.

What small amount of evidence there is in the record relating to how Mr. Alexander and the Steelworkers treated other unionized employees in other small plants where the plants closed provides no evidence to support a claim of discrimination.  Indeed, just the opposite is true.  For example, during Mr. Alexander's term as an International representative, he was involved in four other plant closings.  The first involved Sealy Mattress, which, ironically, was part of Local 421-U.  Sealy Mattress was made up of predominantly Hispanic employees.  SOF ¶ 30.  The contract at issue had a

provision for severance in the event of plant closing. Presumably, Sealy Mattress, as a nation-wide corporation, had the ability to pay severance pay, and the Steelworkers Union did negotiate a severance pay plan in case of plant closure. In another plant closing with a largely Hispanic workforce, Rosboro Plastics, Mr. Alexander was able to negotiate a severance package, despite the lack of contract language, because the employer needed to provide the employees an incentive to stay at work until the plant closed. SOF ¶ 32. Of course, the Unions were unable to stop the plant closing in either case. The point is, however, that to the extent the Court would look at evidence of how similarly situated unionized employees were treated by the Steelworkers and Mr. Alexander, the evidence is that at two other predominantly Hispanic plants, Mr. Alexander negotiated a severance package but was unable to stop the plant from closing. Thus, there is no evidence that he negotiated less favorable deals for employee units that were mainly Hispanic.

The two other plants that closed that Mr. Alexander was involved in, Beebe Rubber and Cone Blanchard, were plants in New Hampshire and Vermont, respectively, where the vast majority of employees were non-minority. There, too, the plants closed, the Steelworkers were unable to prevent the plant closing, and the only separation pay paid to laid-off employees was that which was already contained in the existing collective bargaining agreement and only for some of the workers. Mr. Alexander was unable to negotiate any specific plant-closing benefits other than what was in the contract. Thus, there is simply no evidence that the Unions treated non-minority plants differently than where the employees were predominantly Hispanic.

Moreover, as the Affidavit of Mr. Alexander makes clear, the structure at Sealy Mattress, as well as these other unions, was the same. The workers would get together and elect their shop steward, and the shop steward would bring to Mr. Alexander's attention any grievances which needed to be filed. SOF ¶¶ 15-16. The fact is that Mr. Alexander never refused to file any grievance that had any support in the contract and that was brought to his attention by a steward at any plant for which he was responsible. Accordingly, there is simply no evidence of disparate treatment, that is, that the plaintiffs were treated differently and less favorably in terms of grievance filing or anything else, because they were Hispanic. Compare Rainey v. Town of Warren, 80 F.Supp.2d at 5.

As the courts have made clear, a union cannot be held liable for discrimination simply because of inaction unless and until it is demonstrated that that inaction was the result of intentional discrimination. The intent can be threefold: First, the failure to take a grievance because it involves a minority group is unlawful. See Lukens Steel, 482 U.S. at 667-669. Second, a showing that grievances were filed regularly on behalf of non-minorities, but not on behalf of minorities, can be circumstantial evidence of intentional discrimination. Rainey v. Town of Warren, 80 F.Supp.2d 5. Finally, evidence that the union specifically harbored animus against minorities and, therefore, treated them differently and less favorably is actionable discrimination. But, as Judge Posner has pointed out, mere inaction by a union, or the union's not making strong enough efforts to protect against the loss of rights, does not prove anything unlawful under Title VII, or the corresponding duty of fair representation. See Pipe Fitters Assoc., 334 F.3d 656.

Plaintiffs assert a vague, overarching theory that the Steelworkers permitted Farnsworth Fibre to be a sweatshop because the workers were Hispanic. But the Steelworkers had no ability to stop the fact that the factory at Farnsworth Fibre was old and had to be closed due to outdated production machinery. Small mattress-stuffing plants like Farnsworth Fibre close, and business goes overseas, which is, of course, sad. But the Unions would point out that many employees at Farnsworth Fibre were there for many years, some over 20 years. They received a modest wage, but, still, somewhat higher than one would see at a non-unionized plant. They received health insurance and they received a pension benefit. The Steelworkers brought about all of these benefits. Plaintiffs have failed to show that Defendants acted with specific intent to discriminate against them. There is simply no evidence of discrimination in this case.

### III.    Plaintiffs Have Failed to Establish Any Likelihood That They Will Recover a Judgment in the Requested Amount

Since, as discussed above, Plaintiffs have not established a reasonable likelihood that they will succeed on the merits of their claims, it follows that they cannot have met their burden of establishing that they have a reasonable likelihood of recovering a judgment "in an amount equal to or greater than the amount of the attachment." Mass. R. Civ. P. 4.1(c) sets forth that "[n]o property may be attached unless such attachment *for a specified amount* is approved by order of the court" (emphasis added). In this case, Plaintiffs have moved for an attachment in the specified amount of "$13,695,000.00 in wage, discrimination and emotional distress damages, and $65,000,000.00 punitive damages," i.e., a total attachment of $78,695,000.00. See Plaintiffs' Motion to Attach, p. 1. Rule 4.1(c) further provides that "the order of approval may be entered only after notice to the defendant and hearing and upon a finding by the

court that there is a reasonable likelihood that the plaintiff will recover judgment, including interests and costs, in an amount equal to or greater than the amount of the attachment." <u>See also</u> M.G.L. c. 223 § 42A. Accordingly, Plaintiffs must demonstrate a reasonable likelihood that they will recover a judgment of at least $78,695,000.00, or their motion for attachment in that amount must fail.[8]

Since Plaintiffs have failed to comply with Rule 4.1's requirement that their motion be supported by affidavit, they cannot demonstrate a reasonable likelihood of any recovery in the context of a motion to attach. <u>See, e.g.</u>, <u>Hamilton v. Arnold</u>, 135 F.Supp.2d at 104 (Rule 4.1 "requires the movant to submit affidavits setting forth 'specific facts sufficient to warrant the required findings'"). Moreover, even if Plaintiffs had submitted affidavits supporting their motion and relevant to their claims, they could not have demonstrated a reasonable likelihood of a significant recovery because the vast majority of their claims are time-barred or preempted, as discussed in Section II, <u>supra</u>. Furthermore, Plaintiffs cannot hope to recover the massive sums of punitive and emotional distress damages they claim, as such damages are simply unavailable to them in this case.

---

[8]    In any event, Plaintiffs' attempt to secure an attachment on the Unions' "Pension Funds, Health Funds and Welfare Funds" must be denied, as such an attachment would clearly violate state and federal laws protecting employee benefits from encumbrances. In Massachusetts, "M.G.L.A. c. 235, § 34A, exempts a variety of retirement plans from 'the operation of any law relating to insolvency' and from attachment, execution or other process to satisfy a debt or liability," and "M.G.L.A. c. 246, § 28, … governs trustee process and specifically exempts pensions from attachment." <u>Gibbs v. White</u>, 2003 WL 291892, *2-*3 (Mass. Super. 2003). Similarly, under federal law, "ERISA states very clearly that pensions are not subject to alienation or assignment," <u>Laurenzano v. Blue Cross and Blue Shield of Massachusetts, Inc.</u>, 191 F.Supp.2d 223, 227 (D. Mass. 2002) (<u>citing</u> <u>Guidry v. Sheet Metal Workers National Pension Fund</u>, 493 U.S. 365, 376-77 (1990)), and more specifically, "[c]ourts have combined ERISA § 514(a), 29 USC § 1144(a), the preemption provision of ERISA, with ERISA § 206(d)(1) to conclude that ERISA § 206(d)(1) protects pension plan benefits from state law collection statutes." <u>DeNadai v. Preferred Capital Markets, Inc.</u>, 272 B.R. 21, 40 (D. Mass. 2001). Therefore, to the extent that Plaintiffs seek an attachment of the Unions' pension funds and other employee benefit plans, their motion must be denied as a matter of law.

1.    <u>Punitive and Emotional Distress Damages and Front-Pay Claims Are
      Unavailable in a Duty of Fair Representation Claim</u>

Even if Plaintiffs' duty of fair representation claims were not time barred and

otherwise flawed, as discussed in Section II, <u>supra</u>, their attempts to recover punitive

and emotional distress damages based on such claims must fail as a matter of law.  In

<u>International Brotherhood of Electrical Workers v. Foust</u>, 442 U.S. 42 (1979), the

Supreme Court held squarely that punitive damages may not be assessed against a

union that breaches its duty of fair representation to its members.

> This limitation on union liability thus reflects an attempt to afford individual
> employees redress for injuries caused by union misconduct without
> compromising the collective interests of union members in protecting
> limited funds.  To permit punitive damages, which by definition provide
> monetary relief in excess of actual loss . . . could undermine this careful
> accommodation. . . .  Such awards could deplete union treasuries, thereby
> impairing the effectiveness of unions as collective bargaining agents.
> Inflicting this risk on employees, whose welfare depends upon the strength
> of their union, is simply too great a price for whatever deterrent affect
> punitive damages may have.

<u>Foust</u>, <u>supra</u>, at 50.

Similarly, Plaintiffs would not be able to demonstrate a "reasonable likelihood" of

recovering emotional distress damages.  In <u>Soto Segarra v. Sea-Land Service, Inc.</u>, 581

F.2d 291 (1st Cir. 1978), the First Circuit squarely held that an award of emotional

distress damages will not stand against a union except for egregious misconduct in

circumstances not present here.  The court also held that in a case such as this, where

employees have lost their job because of employer action, the union may not be held

responsible for those "damages attributable . . . to the employer's breach of contract"

and such damages "should not be charged to the union."  Rather, the union is only

charged for increases in damages "caused by the union's refusal to process [a]

grievance." Id. at 298. In this case, the employer shut down its plant and is now

defunct. Even if the Unions somehow could have secured severance pay, the Unions

certainly cannot be held responsible for front pay resulting from the employer's decision

to shut down. As a matter of law, a union cannot prevent a plant from shutting down.

Textile Workers v. Darlington Mfg., 380 U.S. 263, 274 (1985); First National

Maintenance Corp. v. NLRB, 452 U.S. 666, 677-682 (1981).

Further, emotional distress damages are unavailable to the plaintiffs in this type

of DFR claim:

> Even if the union's conduct were so extreme as to warrant compensation
> for mental distress, there was no evidentiary showing or judicial finding
> that the conduct was the proximate cause of all of appellee's mental
> suffering throughout his years of employment. . . .  The union may only be
> held liable for the proportionate amount flowing from its conduct and not
> from the employer's wrongful discharge. . . .  Damages for mental distress
> are only appropriate in cases of extreme misconduct.

Soto-Segarra, supra., at 298 (emphasis supplied).

Since the First Circuit's decision in Soto Segarra, supra, several circuit courts of

appeal have agreed that the union's conduct must be palpably "outrageous" to impose

emotional distress damages, and then only for emotional injuries actually proven at trial.

See Baskin v. Howley, 807 F.2d 1120 (2nd Cir. 1986); Bloom v. International

Brotherhood of Teamsters, 572 F.2d 1312 (1984) (insufficient evidence of "outrageous

conduct").

In this case, the plaintiffs' claims relate only to the Unions' failure to take

affirmative action to protect them from harm caused by the employer. Indeed, each and

all of the allegations by the plaintiffs relate to conduct of the employer, i.e. maintaining

hazardous working conditions, allowing fires in the plant, and, most importantly, closing

the plant without the payment of any severance pay.  Even assuming, *arguendo*, that

the Unions were deficient in taking affirmative action to prevent these things, there is no

allegation whatsoever that the Unions took any action to harm the union members

involved, to retaliate against them, or to intentionally deprive them of rights under the

collective bargaining agreement.  Rather, it is clear that under <u>Soto Segarra</u>, this is not

a case where emotional distress damages could ever be warranted.  Further, there are

no allegations of physical force or violence or actual mental harm intentionally imposed

on the plaintiffs by the defendant.  Thus, there would be no basis for an award of

emotional distress damages under Plaintiffs' duty of fair representation claim.

2.    <u>Plaintiffs' Damages, if Any, Would Be Limited to a Few Weeks'
Backpay at Most</u>

For more than 30 years, federal labor law has provided that a company has no

duty to bargain over a decision to shut down a worksite, and a union has neither a right

nor a corresponding duty to its members to attempt to bargain with an employer over a

shutdown.  <u>See</u> <u>NLRB v. Pan American Grain Co., Inc.</u>, 432 F.2d 69, (1st Cir. 2005)

(<u>citing</u> <u>NLRB v. Transmarine Navigation Corp.</u>, 170 NLRB 389 (1968)).  When an

employer decides to shut down, its duty to bargain is limited to the effects of that

decision, and "<u>Transmarine</u> is the common citation for the view that a limited back pay

remedy is the proper answer where the employer breached only a duty to bargain about

effects."  <u>Id</u>., at 72.  Although this limited back pay remedy is usually awarded against

employers for breaching their duty to engage in "effects bargaining," it is plausible that

such a remedy might be awarded where a union failed in its duty to conduct effects

bargaining on behalf of its members.  In this case, Plaintiffs have not even made the

necessary showing to establish that the Unions failed in any such duty, and even

assuming, *arguendo*, that they had, Plaintiffs could not recover more from the Unions

for a failure to conduct effects bargaining than the limited back pay remedy that would

be available against a breaching employer.  By extension, since the available damages

for a failure to conduct effects bargaining are thusly limited to back pay, Plaintiffs'

request for front pay in the amount of $2,575,000 cannot survive as a matter of law.

Accordingly, to the extent, if any, that Plaintiffs' duty of fair representation claims are not

time-barred and are supported by evidence, Plaintiffs could recover, at most, a few

weeks of back pay for these claims.

> 3.    Plaintiffs Have Failed to Demonstrate That the Unions Engaged in Egregious Conduct and Therefore Cannot Obtain Punitive Damages on Their Discrimination Claims

Under the Civil Rights Act of 1991, Congress provided that Title VII plaintiffs may

obtain punitive and compensatory damages, but only in cases of "intentional

discrimination," and further qualified the availability of punitive damages to cases where

the discriminatory conduct was engaged in "with malice or with reckless indifference to

the federally protected rights of an aggrieved individual." Kolstad v. American Dental

Association, 527 U.S. 526, 534 (1999) (citing 42 USC § 1981a(a)(1)).  Courts in

Massachusetts have held plaintiffs to a similar standard, holding that under Chapter

151B, punitive damages "may be awarded only for conduct that is 'outrageous, because

of the defendant's evil motive or his reckless indifference to the rights of others.'" Smith

v. Bell Atlantic, 63 Mass.App.Ct. 702, 721 (2005) (affirming directed verdict withholding

punitive damages issue from jury where there was no evidence that defendant's

conduct was intentional or evil in motive) (quoting Restatement (Second) of Torts §

908(2) (1979)); see also Abramian v. President and Fellows of Harvard College, 432

Mass. 107, 119 (2000) (punitive damages may not be awarded without a finding of "outrageousness").

In this case, the plaintiffs do not assert that the Unions ever said anything indicating animosity against employees because they were Hispanic, nor does the complaint allege that the International representative assigned to the local ever did or did not do anything because the bargaining unit employees were Hispanic. See Complaint, ¶¶ 24-31. Rather, the complaint alleges generally that because all of the employees were Hispanic, the Unions did not assert the rights of the bargaining unit members to the same extent it would in other bargaining units where the employees were not predominantly Hispanic. Id. However, as discussed above and in the Unions' summary judgment briefing, there is no evidence to support these claims. Since Plaintiffs have not made any showing that the Unions behaved intentionally, outrageously, or with reckless indifference toward their rights, they cannot demonstrate any reasonable likelihood of obtaining punitive damages on their discrimination claims.

Moreover, even if Plaintiffs could establish that the Unions' conduct rose to the egregious level necessary for an award of punitive damages, Plaintiffs could not hope to recover a judgment of $65 million, as they allege in their motion for an attachment, because, as discussed above, their state law claims are completely preempted, and their Title VII compensatory and punitive damages are capped at a maximum of $300,000. See Rodriguez-Torres v. Caribbean Forms Manufacturer, Inc., 399 F.3d 52, 56 (1st Cir. 2005) (citing 42 USC § 1981a(b)(3)(c)).

WHEREFORE, the Defendant Unions respectfully request that the Court deny Plaintiffs' Motion to Attach Assets of the United Steelworkers of America.

Respectfully submitted,


Dated:  February 27, 2006          __s/Harold L. Lichten_____
                                   Harold L. Lichten, BBO # 549689
                                   Alfred Gordon, BBO # 630456
                                   Pyle, Rome, Lichten, Ehrenberg
                                        & Liss-Riordan, P.C.
                                   18 Tremont St., Ste. 500
                                   Boston, MA  02108
                                   (617) 367-7200


## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served by first class mail on the attorney of record for each party on February 27, 2006.


                                   __s/Harold L. Lichten_____
                                   Harold L. Lichten