UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                       )      CIVIL ACTION
EUCLIDES SOTO, LOUIS A. MARTINEZ,      )      NO.: 04-10892-JLT
JOSE RAMIREZ, CLEMENTE HERNANDEZ,      )
CESAR PIZARO, ELISON PENA,             )
JUAN COLON, JOSE ORTIZ,                )
RAFAEL TORRES, ANGEL BAEZ,             )
ANTONIO MARTINEZ, WILFREDO ORTIZ,      )
EULOGIO ORTIZ, MIRRAIN MIRANDA,        )
RAFAEL MORENO, NELSON ACEVEDO,         )
and RAMON RODRIGUEZ,                   )
                    Plaintiffs,        )
                                       )
v.                                     )
                                       )
SHERMAN-FEINBERG CORPORATION,          )
FARNSWORTH FIBRE CORPORATION,          )
UNITED STEELWORKERS OF AMERICA,        )
LOCAL 421-U, AND UNITED STEELWORKERS   )
OF AMERICA,                            )
                    Defendants.        )
_____)
```

## SUPERCEDING MEMORANDUM IN SUPPORT OF MOTION TO ATTACH ASSETS OF THE UNITED STEELWORKERS OF AMERICA (FED.R.CIV.P. 64)

### I. RELIEF SOUGHT

Pursuant to Rule 64 of the Federal Rules of Civil Procedure, the plaintiffs move this court

for an order of attachment of the real estate, goods, chattels, cash, accounts receivable, and other

assets of the United Steelworkers of America, most of which are in Las Vegas, Nevada, and

Pennsylvania, and the Pension Funds, Health Funds and Welfare Funds in Pennsylvania, to

satisfy the judgment for damages and costs, which the plaintiff may recover in the sum of

$13,695,000.00 in wage, discrimination and emotional distress damages, and/or $65,000,000.00

punitive damages for discriminatory actions. This motion addresses the second motion to amend the complaint, which drops duty of fair representation claims, and clarifies discrimination ones.

Rule 64 permits the seizure of person or property "at the commencement of and during the course of an action." The state attachment rule requires the filing of an affidavit; contrary to the claims of the unions, two affidavits were filed herein. The affidavits are: Affidavit of Robert O. Berger With Respect to Appendix A, annexing 16 deposition transcripts; and Affidavit of Robert O. Berger With Respect to Appendix B, annexing demands and collective bargaining agreements.

## II. THE DISCRIMINATION CLAIMS

The evidence shows that the plaintiffs are likely to prevail. The plaintiffs have survived 2,755 pages of summary judgment materials before the Court denied the slab. Hence there are "trial-worthy" matters.

In the amended complaint after discovery and the pretrial conference, the plaintiffs allege that The United Steelworkers of America and its local were guilty of intentional and willful discriminatory practices in failing to process negotiations, maintain safety programs, having participation of the minority membership, asserting instances of racial discrimination as grievances, and in tolerating and tacitly encouraging racial harassment, and neglecting to bargain for plant shut down benefits for the whole Latino workforce.  As a result, the plaintiffs assert their rights under all federal and state discrimination laws, Title VII of the Civil Rights Act of 1964, and 42 U.S.C. § 1981, for  back wages, front wages, punitive damages, interest, costs, and attorneys' fees, as well as Massachusetts General Laws Chapter 151 B.  Under § 703(c) of Title VII, a "labor organization," such as the Union, may not discriminate. See *42 U.S.C. §  2000e-*

*2*(c) and 2(m) ("an unlawful employment practice is established when the complaining party demonstrates that...national origin was a motivating factor for an employment practice, even though other factors also motivated the practice.") See, *e.g.,* 42 U. S. C. § § 2000e-2(k)(1)(A)(i), 2000e-5(g)(2)(B). For instance, § 2000e-5(g)(2)(B) requires an employer to "demonstrat[e] that [it] would have taken the same action in the absence of the impermissible motivating factor" in order to take advantage of the partial affirmative defense.

During the entire course of his employment, each plaintiff was a dues-paying member of Local 421-U (District 4) of the United States Steelworkers of America, making between $10.00 and $13.00 per hour at the time of the plant's closing. Plaintiffs were never invited to the quarterly meetings of the Defendant Unions. In fact, most did not even know that the Defendants conducted such quarterly meetings. Plaintiffs never received any notice, literature or invitation of any sort to attend these meetings. At least one plaintiff believed he was not invited to the meetings because he was Hispanic. The plaintiffs stated that there was no bulletin board hung where notices could be posted informing workers of union news, worker's compensation, OSHA notices etc. In fact, there were no notices anywhere in the plant that indicated that the plaintiffs were represented by the Defendant Unions. Therefore, the Unions willfully discriminated against the plaintiffs.

During the entire course of their employment, the union failed to provide them with the privileges accorded to non-Hispanic union members, such as plant closing protection or any arbitration of any grievance. At no time in 25 years did the union process a single arbitration about any term or condition of the work of the Latino workforce. Therefore, the Unions willfully discriminated against the plaintiffs. Unlike other collective bargaining agreements ("CBA"), the one here lacked plant closing protections. The CBA is a November 1, 2002 - October 31, 2006,

Agreement between Sherman-Feinberg Corporation and the Farnsworth Fibre Corporation ("Employers"), and U.S.W.A. Local 421-U ("Union"). With respect to other plants, Sealy Mattress, Bee-Bee Rubber, and Rosboro Plastics had plant closing severance language in the collective bargaining agreements. The instant plant did not, nor was it requested in negotiations. Therefore, the Unions willfully discriminated against the plaintiffs. The Employers gave notice of termination to second-shift employees on November 7, 2003, and to first-shift employees on November 14, 2003. The union did not bargain over the decision to lay-off the 100% Latino workforce. Therefore, the Unions willfully discriminated against the plaintiffs. Before the terminations, on or about November 12, 2003, Lowell Alexander of the Union met with Kenneth Doucette of the Employers. Upon learning that the plant was closing, Jose Ortiz called Lowell Alexander to inform him of the announcement and asked him to come down. Lowell Alexander met with the plaintiffs. The plaintiffs were upset about the lack of notice by the employer. Lowell Alexander told them there was not much the Defendant Union could do about it because the owners could do whatever they wanted. They also inquired about any benefits the Union could secure for them. Lowell Alexander told them the only benefits they would be getting were unemployment benefits. Alexander told Jose Ortiz that the Union could do nothing, waiving the right to negotiate or grieve the 100% lay off of the Latino workforce. Furthermore, there was no negotiation of the effects of closing the plant, only bumping rights and medical benefits. (Bumping rights involve intra-union seniority.)

Therefore, the plaintiffs engaged a lawyer, and they demanded in writing that a grievance be filed and a complaint lodged about the interpretation, application, or compliance with the terms of the Agreement with respect to the terminations of the 100% Latino workforce. On March 4, 2004, the plaintiffs wrote the defendants requesting,

…under the provisions of the November 1,2002-October 31,2006 Agreement between Sherman-Feinberg Corporation and the Farnsworth Fibre Corporation ("Employers"), and U.S.W.A. Local 421-U ("Union"), the National Labor Relations Act, state and federal antidiscrimination laws, and the constitution of the United Steel Workers of America. All of the above-mentioned individuals in the bargaining unit are Hispanic, employed by said Employers, and members of said Union.

Shop Steward, Jose Ortiz, took up the question of the protection of said individuals under the Agreement with Kenneth J. Doucette, agent of the Employers. No adjustment was reached within forty-eight (48) hours. The Employers gave notice of termination to second-shift employees on November 7, 2003, and to first-shift employees on November 14, 2003.

Before the terminations, on or about November 12, 2003, Lowell Alexander of the Union met with Kenneth Doucette of the Employers. Next, Ortiz met with Alexander; Alexander told him that the Union could do nothing. The dispute was not submitted in writing by the Union or the Employers and presented for adjustments to the company's representative and the Union's representative. Therefore, the individuals hereby demand that a grievance be filed and a complaint lodged about the interpretation, application, or compliance with the terms of the Agreement with respect to the terminations. The failure to do so will be considered an action predicated upon racially discriminatory motivation, which is a breach of the duty of fair representation and breach by the Employers of the labor contract. The above-referenced employees demand that there be adjustment or grievance of the terminations of said employees to the extent that the Agreement provides relief.

The above-referenced individuals also assert that their rights have been violated as set forth under the provisions of M.G.L. c. 151B, §4(2) and the federal laws regarding employment discrimination. The individuals are in a protected class due to their national heritage and have been treated in a disparate manner. They will assert their rights for remedies beyond the scope of the National Labor Relations Act, including but not limited to: front wages, punitive damages, interest, costs, and attorneys' fees. Above all, there is no overlap between the Employers' and Unions' labor practices and discriminatory conduct. For example, the Shop Steward, Jose Ortiz, was not provided with the Union Constitution. Significantly, the Agreement does not provide for the effects of the terminations of said employees. Nor does the Agreement reflect effects bargaining. We submit that the Union and the companies are liable for all remedies available under the state and the federal anti-discrimination laws.

Kindly within fourteen (14) days respond adequately to this demand for relief to the extent that you, and/or your agents, have engaged in unfair labor practices and/or breached the duty of fair representation within the meaning of the National Labor Relations Act. Furthermore, the above-referenced individuals expressly reserve the right to pursue claims under state and federal antidiscrimination laws.

5

Emphasis added.

The union did nothing to grieve or arbitrate the discriminatory lay-off of the complete Latino workforce. Therefore, the Unions willfully discriminated against the plaintiffs.

Plaintiffs did not contact the Defendant Union directly because they had no idea that was their right. No one ever explained to them that they could by-pass the shop steward and call the Union Representative directly. There were no notices posted detailing that right (or any other right). In fact, at one meeting with Lowell Alexander, he told the plaintiffs that they could not call him personally; that they had to contact the shop steward and shop steward would then call him. Plaintiffs were never invited to the quarterly meetings of the Defendant Union. In fact, most did not even know that the Defendant conducted such quarterly meetings. Plaintiffs never received any notice, literature or invitation of any sort to attend these meetings. At least one plaintiff believed he was not invited to the meetings because he was Hispanic. Therefore, the Unions willfully discriminated against the plaintiffs. Each of the plaintiffs suffered adverse work impact where there was the failure by the union and its local to negotiate or grieve discharges and severance in an all Latino workforce when the plant closed in November 2003. Therefore, the Unions willfully discriminated against the plaintiffs. There was no negotiation about the effects of the plant closing for severance when the plant closed in November, 2003 for the entire Latino workforce. Therefore, the Unions willfully discriminated against the plaintiffs. There was a fire at the plant in November, 2003, causing damage to the plaintiffs, even though the union was either conspiring with the employer to avoid maintaining safety measures or obligated to provide safety measures. Despite the fact that the plaintiffs were working with heavy very old machinery, Mr. Alexander never did anything to ensure that the employer developed a

written hazard program.    He never checked if the employer kept material safety data sheets. Therefore, the Unions willfully discriminated against the plaintiffs.  There was no hazard safety program or health and safety officer at the plant in November, 2003 unlike at all Commonwealth Gas locations employing Steelworkers. The conditions of the plant made it such that fires were constantly breaking out right up until the plant's closing.  Elison Pena recalls that the last fire occurred in November, 2003.  Wilfredo Ortiz recalls having to get on top of the machine to put out a fire, all the while inhaling the smoke from the fire. Therefore, the Unions willfully discriminated against the plaintiffs. Whatever else may or may not have been in the collective bargaining agreement, Mr. Alexander acknowledged that he has "in past practice" grieved things that were not within the specific terms of the collective bargaining agreement.  Lowell Alexander Deposition at p. 28 Therefore, the Unions willfully discriminated against the plaintiffs. Lowell Alexander acknowledged that as Union Representative, it was his obligation to make sure that the employer followed health and safety policies although he never checked to determine what, if any, policies were in place. Deposition of Lowell Alexander at p. 73-74. The machinery with which the Plaintiffs worked was heavy and antiquated.  Some machinery was so old that the employer could not get replacement parts in the event a machine broke. Even Mr. Alexander acknowledged that the machinery in the plant was old. Therefore, the Unions willfully discriminated against the plaintiffs. According to Mr. Alexander, the Defendant Union would address safety concerns if they became aware of them, even in the absence of a formal complaint.  Mr. Alexander was on-site of the plant on more than one occasion.  He had the opportunity to see the dust flying all over the place, yet he never took any steps to ensure that the employer had proper ventilation for the plant.  Neither he nor anyone else from the Defendant Union ever walked around the plant to examine whether the plaintiffs were protected from fire,

dust or chemicals. Therefore, the Unions willfully discriminated against the plaintiffs. Eulogio

Ortiz lost two fingers at the plant. Ramon Rodriquez fell and hurt his back while at work. There

were no notices posted informing him he could contact the Defendant Union directly about his

complaint. Euclides Soto cut his face on a broken machine. The machine was not fixed until after

his injury.  As the Steelworkers undertook safety obligations for their white workforce at

Commonwealth Gas, they treated the plaintiffs disparately. Alexander had been a Steelworker

union steward for the gas company; he learned at the gas company when, where and how there

was catastrophic injury in his steward capacity; and he simply does not know why he never

learned of catastrophic injury at this entirely Latino plant when he was union representative.

Therefore, the Unions willfully discriminated against the plaintiffs.  Although the entire work

force at his job site was Hispanic, the union local failed to provide a Spanish collective

bargaining agreement during negotiations until after negotiations. It was not until after the

agreement was signed that the agreement was distributed in Spanish. Therefore, the Unions

willfully discriminated against the plaintiffs. There was no provision for severance or plant

closing in this agreement. The prospect of a plant closing was not even an issue in the collective

bargaining at this plant. For, the Union had not checked the books of Farnsworth Fibre and

Sherman-Feinberg to find out their financial picture although the union wrote the companies in

2002 to request them. Alexander heard scuttlebutt about them taking the money and converting

the building into a condominium at one of the meetings prior to the company closing. Therefore,

the Unions willfully discriminated against the plaintiffs. At least one discriminatory act occurred

within the 300 day limitations period here, 1) there was no negotiation about the effects of the

plant closing for severance when the plant closed in November, 2003; or 2) there was a fire at the

plant in November, 2003; or 3) there was no posting of union notices at the time the plant closed

in November, 2003; or 4) the union was unaware of safety hazards at the plant even though its representative visited the plant in November, 2003 ; or 5) or the union did not know whether employer kept material data safety slips in November, 2003; or 6) there was no hazard safety program or health and safety officer at the plant in November, 2003; or, finally, 7) in March and April 2004, the plaintiffs requested grievances and the defendant unions refused to process them.; (2) the alleged timely discriminatory acts have a substantial relationship to the alleged untimely discriminatory acts (the union only points to its long history of neglect to prove that there was discrimination then and now, which is unpleasant and cynical);  (3) earlier violations outside the 300 day limitations period did not trigger each plaintiff's awareness and duty' to assert his rights, i.e., that plaintiff could not have formed a reasonable belief at the time the employment actions occurred that they were discriminatory. For actions prior to 300 days before filing the claim, the plaintiffs assert that no informational notices were posted and that they had no knowledge of their legal rights until informed by their attorney; the plaintiffs having no education beyond the eighth grade and being from the Dominican Republic and Puerto Rico had a lack of actual notice of the filing requirement; the plaintiffs had a lack of constructive knowledge of the filing requirement; the plaintiffs had diligence in pursuing their rights. Equitable estoppel is not to be sparingly applied hereto.  There is an absence of prejudice to the defendant. The plaintiffs had reasonableness in remaining ignorant of the filing requirement.

### III.  DISCOVERY TO SUPPORT CLAIMS

A.  In discovery, in their own words, the plaintiffs testified:

**Deposition of Eulogio Ortiz of March 23, 2005 (Exhibit 1)**

EXAMINATION BY MR. BERGER:

(P20)          Q       ... Did the union ever tell you or notify you in any
                       way about quarterly meetings?
               A       No.


(P21, 22)      Q       Do you believe it was because you are Hispanic that
                       the union did not invite you to meetings or
               otherwise protect you?
                               MR. LICHTEN: Objection.
               A       Yes.
               Q       During this period of time, have you been suffering
                       emotionally?
               A       Yes.


(P22)          Q       Do you feel humiliated about being on welfare?
               A       Yes, exactly.


(P23)          A       …Yes, because every time they [the union] would come
                       over, they would go straight only to their office.  And then they
                       would send someone to tell us, stop all the machines and make
                       sure that everybody comes down, and then a guy from the union
                       would come down.  They would stop the machines, make us come
                       all the way down.  Then when we went down, the people from the
                       union would go in there, and they would be speaking to them.


**Deposition of Antonio Martinez of March 23, 2005 (Exhibit 2)**

(P15, 16)      Q       Now, in the plant were there fires constantly?
               A       Oh, yes.
               Q       And in the plant, was there dust flying around?
               A       Too much, a lot.
               Q       In the plant, did people lose fingers?
               A       Yes.
               Q       Well what safety -- what did the union -- well,
                       strike that.
                       Did the union have a bulletin board for posting
                       notices?
               A       No.
               Q       Did the union ever give you any notices of
                       meetings?
               A       No.

(P16)  A  I think that they discriminated against us because
    first of all, they didn't help us.  Also, we were not --
they didn't tell us when the company was going to
close.  And every time there was some sort of a--
we had to draw up a contract or some sort of
complication, they would always go to the office,
their office, and spend a long time there.  And then
afterwards when they would come to us, they would
say, "Oh, you know what?  Whatever the company
says."

**Deposition of Wilfredo Ortiz of March 23, 2005 (Exhibit 3)**

(P24)  A.  No.  I don't think so, but since we all have rights,
    the fact that we're Hispanics and we didn't speak the
language, they would take vengeance on us because
of that.
    Q  Take advantage of you?
      THE INTERPRETER:  Vengeance.
    Q  Okay, But do you mean take advantage of you?
    A  Yes, like discriminating me.

(P25-26)  Q  Now, did the union ever put up bulletin board for
    you to give you information about anything?
    A  No.
    Q  Did the union provide any assistance to you about
    the people who had suffered injuries like loss of
fingers, cutting of the face, and this kind thing?
      MR. LICHTEN: Objection.

(P26)  A  No.
    Q  Tell me, is there any doubt in your mind whether
    they know about people who had lost their fingers
and people who had been cut on their face?
      MR. LICHTEN: Objection.
    A  Yes, I know I've seen them.  There have been many
    accidents there.
      MR. LICHTEN: Move to strike.  Not
    responsive.
    Q  Can you tell us about what you observed.
    A  There was the accident with Jose Ortiz.  I was
    present then when the machine cracked [verbatim]
his finger.

(P27)      A     He was cleaning the machine, and afterwards, the machine was still running, and then the machine cracked his finger, cut it.

      Q     And how old was that machine?

            MR. LICHTEN: Objection.

      A     An antique.

      Q     A hundred years; do you think?

      A     Yeah.

      Q     Did the union ever look at any of machines like this one where this accident happened?

      A     No.

      Q     You were going to describe other injures that happened there?

      A     Yes.  There were people there too.

      Q     Now, did the union ever make sure that the plant complied with federal laws like the Occupational Safety Act?

            MR. LICHTEN: Objection.

      A     I don't know.  I don't know.

(P28)      Q     Did they ever come to see whether any of the you were protected from the fires?

            MR. LICHTEN: Objection.

      A     No.

      Q     And how about for the handling of paints and chemicals?

      A     No.

      Q     Did, in your opinion, the union care about what happened to the safety of the people in this plant that consisted solely of Hispanics?

            MR. LICHTEN: Objection.

      A     No.  They never cared for anything, no.

      Q     And you're not a member of the Upholstery Workers Union, are you?  You're a member of the Steelworkers union?

            MR. LICHTEN: Objection.

      A     Yes.

(P29)      Q     Were there some grinder machines there?

      A     Yes.

      Q     How old were they?

      A     They're old. They're antique. They're so old they don't even have replacement parts or pieces for those machines.

(P37)    A    …Because on certain occasions, I was obligated --
we were obligated to work overtime.  And
sometimes, they would make us -- make me
extinguish fires by ourselves.  Sometimes I would
have to get on top of a room myself to extinguish a
fire on top of a machine, and all of that smoke, I
was inhaling.

**Deposition of Rafael Torres of March 23, 2005 (Exhibit 4)**

EXAMINATION BY MR. LICHTEN:
(P14)    Q    You said that you believed that someone with less
seniority that you got a job, a daytime job, that you
have should have gotten; is that right?
         A    Yes.

(P21-22)    Q    Okay.  Did you ever attempt to call the
Steelworkers union office about a problem or a
concern that you were having at work?
            A    No, because they wouldn't allow us to call them
personally.

(P22)    A    The representative, the person that goes to the
company or whatever company.  Whenever there's a
problem, the person that comes from their office.

EXAMINATION BY MR. BERGER:
(P31)    Q    Was everybody at Farnsworth Hispanic?
         A    Yes.
         Q    Did they tell you about their [the union and its
local] meetings four times a year?
         A    No.
         Q    So they didn't' invite you to any of them?
         A    No.

(P32-33)    A    …My opinion is that the union didn't back us up,
did not give us any support in reality the way they
should have done that the moment when we needed
them the most.
            Q    And do you think that was connected to the fact that
all of the workers were Hispanic?
                 MR. LICHTEN: Objection.
            A    I would think that, yes.

13

**Deposition of Nelson Acevedo of March 24, 2005 (Exhibit 5)**

    EXAMINATION BY MR. BERGER:
(P17)       Q     Did you ever get invited to the quarterly meetings of the Steelworkers?
            A     No, never.

**Deposition of Juan R. Colon Ortiz of March 23, 2005 (Exhibit 6)**

    EXAMINATION BY MR. LICHTEN:
(P10)       A     ...Different tanks, I would take paint from one tank and put it in another tank.
            A     Yes.  I left that place for a while because a problem that I have with my lung or my lungs, and    they gave me some sort of pills, medication, to see if it would clear them up, but --

(P11)       A     I prepared these tanks.
            A     It's paint, prepare the paint.
            A     To paint the material.

(P19)       Q     No, how many years did you work with the paint?
            A     18 years.
            Q     And what are you problems with your lungs?
            A     Sometimes I don't breathe at all, and I cough or spit blood.
            Q     How much blood do you spit?

(P20)       A     Sometimes two or three times a week.  Now, I don't spit as much blood as I used to before because I'm taking the pills and I'm not there.

**Deposition of Miriam Caminero of March 24, 2005 (Exhibit 7)**

(P17)       Q     Now, were you ever invited to any meetings of Local 421 of the United Steelworkers of America?
            A     No, I never received anything.
            Q     Did they have a place where they posted notices at the plant at Sherman-Feinberg?
            Q     Now, what protections did you have for the closing of the plant?
            A.     None.

(P21-22)    Q    And do you think that the people who worked there were treated fairly by the union?

                MR. LICHTEN: Objection

A    No.


**Deposition of Jose Enrique Ortiz of March 22, 2005 (Exhibit 8)**

EXAMINATION BY MR. BERGER

(P70)    Q    Did Kenny [the company representative] ever talk to you about inserting plant-closing language into the agreement?

                THE INTERPRETER: I'm sorry, I didn't hear that.  Did Kenny ever talk to you --

Q    Did Kenny ever talk to you about inserting plant-closing language into the agreement?

A    (Through the Interpreter) No, he never said anything.

Q    Never during those 42 hours [of negotiations]?

A    (Through the Interpreter) No.


(P73)    Q    The very final agreement, was it in English or Spanish?

A    (Through the Interpreter) In English.  Everything was done in English.  And then afterwards, translated in Spanish.


EXAMINATION BY MR. DIAZ:

(P95-96)    Q    So is it fair to say you didn't really understand what the proper procedure was, other that what your own interpretation was as to what process to follow; is that correct?

A    (Through the Interpreter) Yes.

Q    And is it fair to say that no one from the United Steelworkers of America and/or Local 421-U ever came to you to find out what your proficiency in English was, correct?

A    (Through the Interpreter) No, they didn't.

Q    And I'm changing gears to another area.

                Whenever Mr. Lowell Alexander told you about any meetings and you didn't have a vehicle, was there any other form of transportation or was there any other offer from the union as to how to get you to a meeting or make sure hat you understood where the meetings were in advance so that you could have made appropriate arrangements?

A        (Through the Interpreter) No.

**Deposition of Elison Pena March 23, 2005 (Exhibit 9)**

EXAMINATION BY MR. LICHTEN:

(P17)        A        (Through the Interpreter) They didn't protect me.
They didn't protect us.

(P18)        A        (Through the Interpreter) They closed the factory,
and we were not -- we were not notified in any way
that they were going to close.  They didn't do
anything to protect us.
               A        (Through the Interpreter) They didn't help us in any
way.  I would pay the union dues there for nothing.

(P23)        Q        Are you aware of any instance in which someone --
in which an employee at Farnsworth complained
about working conditions or that the workplace was
unsafe?
               A        (Through the Interpreter) No. Almost at any time,
we have to --
                              THE INTERPRETER: Verbatim.
               A        --flee[t] the place, because all of a sudden,
something could catch fire often, and all of us
would have to just flee the place all the time.

(P25)        A        (Through the Interpreter) When she [the union
interpreter] spoke, she was sort of like pedantic,
repugnant.
               A        (Through the Interpreter) She spoke in a bad way.

(P26)        A        (Through the Interpreter) ...She wouldn't answer our
questions properly.  She wouldn't use an appropriate
answer, and she was leaning -- she would take their
side of it.

(P29)        Q        Do you ever recall him [the union representative]
saying or doing anything that made you think that
he was biased against Hispanics?
               A        (Through the Interpreter) Because -- I don't know,
because he would never get together with me.

EXAMINATION BY MR. BERGER:

(P36)        A        (Through the Interpreter) When the union would go
there, first they would go to their office first.

16

Q        Now, what equipment did the union ensure was available for you?

A        (Through the Interpreter) None.

Q        So that we can make this clear, did you say there were fires often in the plant?

(P37-38)        Q        Describe to us in detail the nature of the fires in the plant.

A        (Through the Interpreter) Because there were a lot of machines, machinery that was on, that was turned on.  And because of that, the temperature was very, very hot.

Q        And there were fires during the entire time that you were employed at the plant, correct?

A        (Through the Interpreter) Yes.

Q        Right until November of 2003?

A        (Through the Interpreter) Yes.

Q        Did they provide any protection for your breathing when there were constant fires at this plant?

(P38)        A        (Through the Interpreter) No.  We had to take the water ourselves with all the smoke and everything, we had to take everything outside.

Q        Did the Union help you in any way about this continuing fire situation?

A        (Through the Interpreter) No.

Q        Okay

(P39)        A        (Through the Interpreter) Because they didn't pay attention to whatever was said there.


EXAMINATION BY MR. DIAZ:

(P41)        Q        For example, was there a work area where employees could have posting so that they could have something in Spanish saying contact the Steelworkers at this number, we have a complaint, or contact Local 421-U if you have a complaint, something in Spanish with a phone number so that you can contact someone directly?

A        (Through the Interpreter) No.

Q        Have you prior to November of 2003 known individuals who are members of other unions?

          A       (Through the Interpreter) No.

(P45)         Q       Did they ever offer you at any time prior to your
being notified of the plant closings any opportunity
for job training, for advancement or to move
somewhere else where the union may have had
jobs, let's say, Cleveland, Ohio, or any other part of
the country?

          A       (Through the Interpreter) No.
          Q       --Do you remember the fires?
          A       (Through the Interpreter) Yes.
          Q       Okay.  And that would be within a few weeks
before that incident?
          A       (Through the Interpreter) Yes, a couple of weeks
before that.
          Q       Okay.  And that was fire in the ceiling?
          A       (Through the Interpreter) It wasn't on the ceiling.  It
was through the -- the exhaust that would come out,
that comes out of the oven.
          Q       All right.  So certainly in the month of November
there were fires?
          A       (Through the Interpreter) There were fires there all
the time.

## B. THE UNION

The union's conduct disclosed in discovery. The union never grieved any discharges. Deposition of Lowell Alexander, p. 24. (Exhibit 10)  The hourly wage at this plant starts off at $7.00. The union dues of all Steelworkers are 1.3% of the wage. Id. 21. With respect to other plants, Alexander answered that Sealy Mattress, Bee-Bee Rubber; Rosboro Plastics had plant closing severance language in the collective bargaining agreements. The instant plant did not, nor was it requested in negotiations, Id. 94-95. Furthermore, there was no negotiation of the effects of closing the plant, only bumping rights and medical benefits, id. at 100. (Bumping rights involve intra-union seniority.) There was no right to severance here but there was at the Sealy Mattress, Bee-Bee Rubber, Rosboro Plastics plants. Id.  The union provided all drafts of

the collective bargaining agreement in English and only the binding one was in Spanish.  Id. at

14. There was no provision for severance or plant closing in this agreement. Id. at 11 and 28.

The prospect of a plant closing was not even an issue in the collective bargaining at this plant. Id.

15. For, the Union had not checked the books of Farnsworth Fibre and Sherman-Feinberg to find

out their financial picture although the union wrote the companies in 2002 to request them.

Alexander heard scuttlebutt about them taking the money and converting the building into a

condominium at one of the meetings prior to the company closing. Id. at 18. The plant had no

apprenticeship or training program. Id. at 54. Although there were fires until the closing of the

plant, the union was unaware of fires at the plant even though its representative visited the plant.

Id. at 84. The union did not know whether employer kept material data safety slips. Id. at 76.

There was no hazard safety program or health and safety officer at the plant. Id. at 77 and 81.

Alexander had been a Steelworker union steward for the gas company; he learned when there

was catastrophic injury in his steward capacity; and he simply does not know why he never

learned of catastrophic injury at this entirely Latino plant when he was union representative.  Id.

at 85.


**IV.  THE LAW OF THE CLAIM**

First, with respect to the prima facie case, the plaintiffs' burden of proof in establishing a

prima facie case under Title VII is de minimis. Here, each plaintiff established that national

origin was a motivating factor for an employment practice of the union when the plant closed

and the union failed to grieve and/or arbitrate discharges and severance, and each is entitled to

damages. See *Rainey v. Warren and United Steelworkers of America*, 80 F. Supp. 2d 5 (D.R.I.

2000) (holding in favor of employees against the United Steelworkers Union on very similar

facts.). The defendant's nondiscriminatory explanation, i.e. that every single misstep in protecting the employees was the fault of shop steward Jose Ortiz, was false. The Supreme Court has determined that a mixed motive case can proceed on circumstantial evidence alone. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 93-95 (2003). See *Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 429-30 (1st Cir. 2000) ("In fact, one might question whether these bright lines [between direct and indirect evidence] are so helpful in the end… In appeals after trial, this and other courts have recognized the need for flexibility and have sometimes bypassed these approaches and instead looked at whether the totality of the evidence permits a finding of discrimination." [citations omitted]). In any case, this case has much express and circumstantial evidence of discrimination.

Second, the factual inquiry in this case as to equitable tolling must begin with an examination of the failure of the union to post notices, process grievances and arbitration about discharge and severance at an all Latino plant, invite the Hispanic membership to meetings, and to address safety issues. *Mercado v. The Ritz Carlton San Juan Hotel, Spa & Casino*, 410 F.3d 41 (1st Cir. 2005). Therefore, there was lack of actual notice of the filing requirement. The record does not suggest that the membership had constructive knowledge of the filing requirement. The plaintiffs showed diligence in pursuing their rights once they hired a lawyer listed in civil rights law and labor law with an AV peer rating by demanding that the union file discharge grievances based on race in March 2004, and filing the instant lawsuit within six months of the plant closing. *Fernandes v. Costa Brothers Masonry, Inc.*, 199 F.3d 572 (1st Cir. 1999). As the union and local received two demand letters and did nothing to help the membership in March 2004 and April 2004, there is no prejudice to the union and local. The plaintiffs' remaining ignorant of the filing requirement should come as no surprise as none of

them was raised in the United States, and few, if any, had more than a grade school education. No court in the nature of equity could fail to entertain case-specific factors: the severed fingers, plant fires, no grievances of discharges, which counsel in favor of tolling.

Third, the record indicates that: "(1) at least one discriminatory act occurred within the 300 day limitations period"-- here, a) each of the plaintiffs suffered adverse work impact where there was the failure by the union and its local to negotiate or grieve discharges and severance in an all Latino workforce when the plant closed in November 2003, or b) there was no negotiation about the effects of the plant closing for severance when the plant closed in November, 2003; or c) there was a fire at the plant in November, 2003; or d) there was no posting of union notices at the time the plant closed in November, 2003; or e) the union was unaware of safety hazards at the plant even though its representative visited the plant in November, 2003 ; or f) or the union did not know whether employer kept material data safety slips in November, 2003; or g) there was no hazard safety program or health and safety officer at the plant in November, 2003; or f) in March and April 2004, the plaintiffs (including the union steward) requested the filing of discrimination grievances and the defendant unions refused to do so; (2) "the alleged timely discriminatory acts have a substantial relationship to the alleged untimely discriminatory acts" (the union only points to its long history of neglect to prove that there was discrimination then and now);  (3) earlier violations outside the 300 day limitations period did not trigger each plaintiff's awareness and duty to assert his rights, i.e., that plaintiffs could not have formed a reasonable belief at the time the employment actions occurred that they were discriminatory until the plant closed. The union defendants failed to establish that no material facts are in controversy or that each defendant is entitled to judgment, where the claims fall within the six month deadline for the duty of fair representation claims and the 300 day deadline. Indeed all of these

independent actionable actions (no severance bargaining, no discharge bargaining for a Latino plant, no posting of labor or safety notices, one fire, etc.) occurred within 300 days for the discrimination claim. In addition, the defendants cited a case involving the failure of the United Steelworkers of America to file grievances for minority workers, which gives a state tort statute of limitations, i.e., 3 years in Massachusetts, to the plaintiffs for this kind of claim. See Defendant's Brief in Support of Motion for Summary Judgment, at p. 38, citing *Goodman v. Lukens Steel Company*, 482 U. S. 656 (1987).

The key concept of the case is described by the senior judge of the United States District Court in Rhode Island. See *Rainey v. Warren and United Steelworkers of America*, 80 F. Supp. 2d 5 (D.R.I. 2000) (holding in favor of employees against the United Steelworkers Union on very similar facts.) [1]

> To ensure that discrimination and harassment are rooted out of the workplace, Title VII makes both employers and labor organizations accountable for their discriminatory acts. If Title VII only included the former it would often fail in its mission. This is because labor organizations stand as a firewall, as protection for its members, in the face of employer discrimination. Labor organizations therefore occupy a critical battle-line position in fighting discrimination and harassment. As a result, labor organizations can either choose to fight the good fight or tacitly encourage employer discrimination and harassment by intentionally failing to stand their guard. Id. at 8.

Under § 703(c) of Title VII, a "labor organization," such as the Union, may not discriminate. See *42 U.S.C. § 2000e-2*(c) and 2(m) ("an unlawful employment practice is

---

[1] This is not a union bashing case.  As Andrew Stern of the Service Employees International Union stated: "There are problems for manufacturing unions who have to organize industries that are going to stay in this country, but for Steelworkers... [g]oing after *all kinds of workers is not a successful strategy*." See, e.g.,  Janice Fine, ed., "Debating Labor's Future," The Nation, August 1-8, 2005. This is an understatement in the context of this discrimination case. A Steelworker like Mr. Alexander worked at the phone company for $40.00 an hour, and there were protections in place like safety programs and grievances. Mr. Soto, also a Steelworker, worked for $13.00 an hour, and there were no grievances, safety committees, invitations to meetings, etc.

established when the complaining party demonstrates that...national origin was a motivating factor for an employment practice, even though other factors also motivated the practice.") *Fernades*, op cit. 199 F.3d 572,580 (1999). The Supreme Court has determined that a mixed motive case can proceed on circumstantial evidence alone. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 93-95 (2003). See *Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 429-30 (1st Cir. 2000) ("In fact, one might question whether these bright lines [between direct and indirect evidence] are so helpful in the end…   In appeals after trial, this and other courts have recognized the need for flexibility and have sometimes bypassed these approaches and instead looked at whether the totality of the evidence permits a finding of discrimination." (citations omitted)). This case has much express and circumstantial evidence of discrimination.


   1.  There is Material Evidence of Circumstantial Evidence in the Totality of the Evidence

   The plaintiffs easily meet the burden shifting framework set forth in *Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254-256 (1981)* and *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).* It is clear that the disparate treatment claim is a "pretext" claim.  *Hazen Paper Co. v. Biggins, 507 U.S. 604 (1993)..*  In an employer pretext case, a plaintiff will submit evidence which casts doubt on the legitimate reasons offered by the employer, or would allow a fact finder to infer that discrimination was more likely than not a motivating cause for the decision made by the employer.  In other words, because the fact finder may infer from the combination of the plaintiff's prima facie case and its own rejection of the employer's non-discriminatory reasons that it unlawfully discriminated against the plaintiff and was merely trying to conceal its act with the articulated reasons, see id., a plaintiff who has established a prima facie case may defeat a motion for summary judgment by pointing to

circumstantial or direct evidence that discrimination was more likely than not a motivating factor for the action taken. These same rules apply when the defendant is a labor union. Proof patterns for establishing union liability in disparate treatment claims where the union is alleged to have discriminated actively will not differ from the pattern in cases involving an employer's discriminatory hiring or promotion policies. See, e.g., *Lucas v. Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, 741 F. Supp. 136 (N.D.Ohio 1989),* aff'd., *904 F.2d 707 (6th Cir. 1990); Pennsylvania v. Local 542, Int'l Union of Operating Engineers, 469 F. Supp. 329 (E.D.Pa. 1978),* aff'd, *648 F.2d 922* (3rd Cir.), rev'd on other grounds, *458 U.S. 375 (1981);* Larson, 2 *Employment Discrimination, § 37.04* (2nd ed. 1999). *Fuentes v. Perskie, 32 F.3d 759, 764 (3rd Cir. 1994)* ("holding that a plaintiff can avoid summary judgment by pointing to some evidence from which a fact finder could reasonably conclude that defendant's proffered reasons were fabricated"). It may only be a coincidence that each Plaintiff is a member of a protected class, industrial  fire hazards at the plant were ignored, the plant closed without any negotiations for the protections of effects bargaining, there were no grievance of terminations at any time including when requested by the plaintiffs through their lawyer, no collective bargaining agreement was translated into Spanish until negotiations were over and, thus, the horse was out of the barn, no safety or union rights notices in English or Spanish were placed in the plant, and no audits by the union of the company were done. Moreover, it may only be a coincidence that every other Steelworker plant agreement had severance benefits be a subject of negotiations, and had severance benefits language in the agreement, but not at this plant. The plaintiffs' burden of proof in establishing a prima facie case under Title VII is de minimis. *See Theater of Barbour v. Dynamic Research*, 63 F.3d 32, 38(1st Cir. 1995).

It is met here. There was no negotiation about the effects of the plant closing for severance when the plant closed in November, 2003 for the Latino workforce. There was a fire at the plant in November, 2003. There was no posting of union notices at the time the plant closed in November, 2003. The union was unaware of safety hazards at the plant even though its representative visited the plant in November, 2003. The union did not know whether employer kept material data safety slips in November, 2003. There was no hazard safety program or health and safety officer at the plant in November, 2003. In March and April 2004, the plaintiffs requested national origin grievances, and the defendant unions refused to process them. With respect to other plants, Alexander answered that Sealy Mattress, Bee-Bee Rubber; Rosboro Plastics had plant closing severance language in the collective bargaining agreements. The instant plant did not, nor was it requested in negotiations. Furthermore, there was no negotiation of the effects of closing the plant, only bumping rights and medical benefits. (Bumping rights involve intra-union seniority.)

Several plaintiffs stated that the felt that the treatment they received from the employer and the Defendant Union was due to their race and the fact that they did not speak English. There is no doubt that there was no interpreter available for Jose Ortiz and Miguel DeJesus during the CBA negotiations. There is no dispute that the Plaintiffs were not provided with copies of the CBA in Spanish prior to the vote. There is no dispute that the Defendant Union never posted any notices in Spanish or English. Eulogio Ortiz lost two fingers at the plant. Ramon Rodriquez fell and hurt his back while at work. He was out 4-5 days and the employer did not pay him for that time. He told the shop steward that he was not paid but nothing came of it. There were no notices posted informing him he could contact the Defendant Union directly about his complaint. Euclides Soto cut his face on a broken machine. Prior to his injury, he had

spoken to Jose Ortiz about the broken machine.  Jose Ortiz told him he would speak to the owners about it but the machine was not fixed until after his injury.  At the plant, Juan Colon Ortiz worked with the paint which was used on the mattress material.  He testified that the paint smelled very strong and he was given only a little mask to wear.  He would change his clothes into work clothes at the beginning of his shift  although there was no changing station nor were there any showers to use at the end of his shift.  While working at the plant he developed a lung problem in which he had trouble breathing and would cough up blood two to three times a week. He had to stop working for a while because of his lung problem.  The Defendant Union did nothing to help him with his problem.

The conditions of the plant made it such that a fire broke out at the time of the plant's closing.  The plaintiffs were told by the employer to extinguish the fires themselves and that they were not given any protection against the smoke they inhaled and that the fire department was rarely called.  Wilfredo Ortiz recalls having to get on top of the room to put out a fire, all the while inhaling the smoke from the fire.  Clemente Hernandez can only recall one time when the fire department was called to respond to a fire at the plant.  He also recalls that he inhaled a lot of smoke from the fires. Clemente Hernandez asked Jose Ortiz to speak to the Union about the fires but that the Union did nothing about the situation.

Lowell Alexander acknowledged that as Union Representative, it was his obligation to make sure that the employer followed health and safety policies although he never checked to determine what, if any, policies were in place.  The machinery with which the Plaintiffs worked was heavy and antiquated.  Some machinery was so old that the employer could not get replacement parts in the event a machine broke.  Even Mr. Alexander acknowledged that the machinery in the plant was old.  Despite the fact that the plaintiffs were working with heavy very

old machinery, Mr. Alexander never did anything to ensure that the employer developed a written hazard program.  He never checked if the employer kept material safety data sheets.

According to Mr. Alexander, the Defendant Union would address safety concerns if they became aware of them, even in the absence of a formal complaint.  Several plaintiffs stated that dust was flying all over the place all the time.  Mr. Alexander was on-site of the plant on more than one occasion.  He had the opportunity to see the dust flying all over the place, yet he never took any steps to ensure that the employer had proper ventilation for the plant.  He or anyone else from the Defendant Union never walked around the plant to examine whether the plaintiffs were protected from fire, dust or chemicals.   Mr. Alexander acknowledged that he has "in past practice" grieved things that were not within the specific terms of the collective bargaining agreement.   Only studied obtuseness would designate these 26 factors, separate and/or together, to coincidence and not discrimination.

The non-discriminatory reason proffered by the Unions for not protecting the plaintiffs, i.e., Ortiz was a lousy steward, is untenable. In discovery, the union made the following binding admissions. The most significant admission is that the union never grieved any discharges. The hourly wage at this plant starts off at $7.00. The union dues of all Steelworkers are 1.3% of the wage. There was no bargaining before or after the plant closing for severance here but there was at the Sealy Mattress, Bee-Bee Rubber, Rosboro Plastics plants.  The union provided all drafts of the collective bargaining agreement in English and only the binding one was in Spanish. There was no provision for severance or plant closing in this agreement.   The prospect of a plant closing was not even an issue in the collective bargaining at this plant. For, the Union had not checked the books of Farnsworth Fibre and Sherman-Feinberg to find out their financial picture although the union wrote the companies in 2002 to request them. Alexander heard scuttlebutt

about them taking the money and converting the building into a condominium at one of the meetings prior to the company closing.  The plant had no apprenticeship or training program. Although there were fires until the closing of the plant, the union was unaware of fires at the plant even though its representative visited the plant.  The union did not know whether employer kept material data safety slips.  There was no hazard safety program or health and safety officer at the plant. Alexander had been a Steelworker union steward for the gas company; he learned when there was catastrophic injury in his steward capacity; and he simply does not know why he never learned of catastrophic injury at this entirely Latino plant when he was union representative.

As the First Circuit has recently held in a "pretext" Title VII case, at this stage in the summary judgment analysis, "an inquiring court does not ask whether the plaintiff has adduced direct evidence of discrimination, but asks instead whether the evidence presented, regardless of its character, suffices to raise a genuine issue about the pretextuality of the employer's explanation for" its challenged acts." *Fernandes v. Costa Brothers Masonry, Inc.,* 199 F.3d 572 (1st Cir. 1999). See also *Rainey, supra.;* and *Draft[updated 5/12/05] Pattern Jury Instructions for Employment Discrimination for the District Courts of the United States Court of Appeals for the First Circuit.*

The defendants misconceived the evidentiary burden borne by plaintiffs who attempt to prove discrimination through indirect evidence. In *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 511 (1993), the Court stated that, because the fact finder's disbelief of the reasons put forward by the defendant, together with the elements of the prima facie case, may suffice to show intentional discrimination, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination. Proof that the defendant's

explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it can be quite persuasive. See *id.,* at 517. In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the union is dissembling to cover up a discriminatory purpose. See, *e. g., Wright v. West,* 505 U.S. 277, 296 (1992).

Moreover, once the union's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the union is in the best position to put forth the actual reason for its decision. Cf. *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577 (1978). Such a showing by the plaintiff will not *always* be adequate to sustain a jury's liability finding but is sufficient to defeat a motion for summary judgment. Certainly there will be instances where, although the plaintiff has established a prima facie case and introduced sufficient evidence to reject the employer's explanation, no rational fact finder could conclude that discrimination had occurred. This Court need not—and could not—resolve all such circumstances here on the summary judgment record. In this case, it suffices to say that a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated for purposes of judgment. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 141-149 (2000); see also *Seymore v. Shawver & Sons, Inc., 111 F.3d 794, 798* (10th Cir.), cert. denied, *522 U.S. 935, 139 L. Ed. 2d 266, 118 S. Ct. 342 (1997)* (stating that a union "cannot acquiesce in a company's prohibited employment discrimination and expect to evade Title VII liability . . .")[2]. In light of the severe and constant harassment endured by

---

[2] In *E.E.O.C. v. Regency Architectural Metals Corp., 896 F. Supp. 260, 269 (D.Conn.1995),* despite the union official's stated reason for not processing the grievance, the "contradictory

plaintiff, of which the union was aware, it is reasonable to infer, for purposes of this motion, that the Local Union failed to file grievances because of some discriminatory motive or attitude which pervaded the Union, especially as every inference is to be read in favor of the plaintiffs.

### 2. There is Material Evidence of Direct Evidence

Several plaintiffs stated that the felt that the treatment they received from the Defendant Union was due to their race and the fact that they did not speak English. See Plaintiffs' Statement of Additional Facts No. 68. First, the union would never get together with members alone. Second, when the union interpreter spoke, she was pedantic, repugnant; and she spoke in a bad way. Third, none of the membership ever was invited to the quarterly meetings of the Steelworkers. Fourth, one worker observed that since all union members have rights, the fact that the plant was all Hispanics, and they did not speak the language, the union would take "*vengeance*" on them because of that. These hardly are "stray comments." The fact-finder does not have the luxury of simply marginalizing these comments, because these parties are poor, uneducated factory workers. The opposite is more likely to be true: these statements have the ring of truth to them: they show express discrimination. In *Fernandes v. Costa Brothers Masonry, Inc.,* 199 F.3d 572 (1st Cir. 1999), the First Circuit found it difficult in the subtle nuances of discrimination to tell express evidence of discrimination from pretextuality. This is true on this record, too. How can these disturbing observations, four in number, be packaged for legal analysis as the neat boxes of express or circumstantial evidence? On the limited record, however, of a summary judgment motion, reading this record with every inference leant to the plaintiffs, there is at least one material fact in controversy, even on the issue of express evidence of discrimination, making this a mixed-motive case, and nixing the entry of summary judgment.

---

explanations for failing to help . . . require[d the court] to look deeper for actual motivation." See also *Durko v. Oi-Neg TV Products, Inc., 870 F. Supp. 1268, 1277 (M.D.Pa.1994.)*

This also seems to be a case for mixed motive analysis. Here, there is direct evidence of discrimination.

 3. The *Goodman* analysis.

 In *Goodman v. Lukens Steel Co.*, 482 U.S. 656 (1987), individual employees of Lukens Steel Company (Lukens) brought suit , asserting racial discrimination claims against their collective-bargaining agents, the United Steelworkers of America, which is the same defendant as this defendant, and two of its local unions (Unions). The District Court concluded that the Unions were guilty of discriminatory practices, specifically in failing to challenge discriminatory discharges of probationary employees, failing and refusing to assert instances of racial discrimination as grievances, and in tolerating and tacitly encouraging racial harassment. Here, the claims are very similar, and overlap with respect to failing to assert instances of racial discrimination as grievances despite express requests, and in tolerating and tacitly encouraging racial harassment.  Competence and capacity to contract shall not depend upon race. It is thus part of a federal law barring racial discrimination, which, as the Court of Appeals said, is a fundamental injury to the individual rights of a person with far-reaching economic consequences that does not change this conclusion, since such impact flows from guaranteeing the personal right to engage in economically significant activity free from racially discriminatory interference." Id. at 660-662.

 The *Goodman* case was tried for 32 days in 1980 and was not disposed of on summary judgment. One-hundred fifty-seven witnesses testified and over 2,000 exhibits were introduced. The District Court proceeded found the Unions to have discriminated on racial grounds in certain ways: failing to challenge discriminatory discharges of probationary employees; failure and

refusal to assert racial discrimination as a ground for grievances; and toleration and tacit encouragement of racial harassment. Id. at 665.

The Steelworkers Union contended (in *Goodman* and now) "that any judgment against them rests on the erroneous legal premise that discrimination laws are violated if a union passively sits by and does not affirmatively oppose the employer's racially discriminatory employment practices." This abstract notion is not at play in this case. It is true, however, that the District Court in *Goodman* declared that mere union passivity in the face of employer discrimination renders the union liable if racial animus is properly inferable. The evidence in *Goodman* and this case proves 'far more' than mere passivity. In *Goodman* and this case, the collective-bargaining contract contained an express clause binding both the employer and the Unions not to discriminate on racial grounds; that the employer was discriminating against blacks and Latinos in discharging probationary employees, which the Unions were aware of but refused to do anything about by way of filing proffered grievances or otherwise; that the Unions had ignored grievances based on instances of harassment which were racial in nature; and that the Unions had refused to include assertions of racial discrimination in grievances that also asserted other contract violations (i.e., bumping and vacation rights while 100% Latino discharge). Id. at 666. In affirming the District Court's findings against the Unions, the Court of Appeals also appeared to hold that the Unions had an affirmative duty to combat employer discrimination in the workplace. But it, too, held that the case against the Unions was much stronger than one of mere acquiescence in that the Unions deliberately chose not to assert claims of racial discrimination by the employer as is the case in the instant action. It was the Court of Appeals' view that these intentional and knowing refusals discriminated against the victims who were entitled to have their grievances heard. The Unions insisted that it was error to hold them

liable for not including racial discrimination claims in grievances claiming other violations of the contract. The Unions followed this practice, it was urged, because these grievances could be resolved without making racial allegations and because the employer would "get its back up" if racial bias was charged, thereby making it much more difficult to prevail. The trial judge, although initially impressed by this seemingly neutral reason for failing to press race discrimination claims, ultimately found the explanation "unacceptable" because the Unions also ignored grievances which involved racial harassment violating the contract covenant against racial discrimination but which did not also violate another provision just like the case now before the court. In the judgment of the District Court, the virtual failure by the Unions to file any race-bias grievances until after this lawsuit started, knowing that the employer was practicing what the contract prevented, rendered the Unions' explanation for their conduct unconvincing. A collective-bargaining agent could not, without violating discrimination laws, follow a policy of refusing to file grievable racial discrimination claims however strong they might be and however sure the agent was that the employer was discriminating against blacks. The Unions, in effect, categorized racial grievances as unworthy of pursuit and, while pursuing other legitimate grievances, ignored racial discrimination claims on behalf of blacks and Latinos, knowing that the employer was discriminating in violation of the contract. Such conduct, the courts below concluded, intentionally discriminated against blacks seeking a remedy for disparate treatment based on their race and violated the discrimination laws.

## 4. Given the Poverty and Remarkable Suffering, Equitable Tolling Applies

All of the plaintiffs originally came to Boston from either Puerto Rico or the Dominican Republic.  It is undisputed that most do not speak or read English.   Many have only a grade school education that they received outside the United States.

Significantly, the First Circuit has ruled that an employer's failure to post statutory notices informing employees of their legal rights provides an affirmative basis for applying equitable tolling in the context of a Title VII suit and established six separate equitable grounds for tolling. *Mercado v. The Ritz Carlton San Juan Hotel, Spa & Casino*, 410 F.3d 41 (1st Cir. 2005)(where the employees have asserted that no informational notices were posted and that they had no knowledge of their legal rights until informed by their attorney, they have met the threshold requirements for avoiding dismissal of their suit).  No informational notices were posted by the union or employer. The union did not bargain for, or even notice, that no informational notices were posted, and that the membership had no knowledge of their legal rights.

> Here, where appellants have asserted that no informational notices were posted and that they had no knowledge of their legal rights until informed by their attorney, they have met the threshold requirements for avoiding dismissal of their Title VII suit. *See Kale*, 861 F.2d at 753 ("If . . . the employee has no knowledge of his rights and his ignorance is due to misleading conduct by the defendant *or* failure of the defendant to post the required EEOC notices, then an initial case for equitable tolling has been made.") (emphasis added). The viability of their claims beyond that preliminary stage will depend, however, upon facts that have yet to be developed. Courts generally weigh five factors when considering whether to allow equitable tolling in a particular case: "'(1) lack of actual notice of the filing requirement; (2) lack of constructive knowledge of the filing requirement; (3) diligence in pursuing one's rights; (4) absence of prejudice to the defendant; and (5) a plaintiff's reasonableness in remaining ignorant of the [filing] requirement.'" *Kelley v. N.L.R.B.*, 79 F.3d 1238, 1248 (1st Cir. 1996) (quoting *Kale*, 861 F.2d at 752). These factors are not exhaustive, however; "[i]t is in the nature of equity to entertain case-specific factors that may counsel in favor of tolling."

The First Circuit emphasized that "the doctrine of equitable tolling is ___not___ to be exercised sparingly". Id.

The factual inquiry in this case thus must begin with an examination of the failure of the union to post notices, process grievances, invite the Hispanic membership to meetings and only appearing for contract negotiations. Therefore, there was lack of actual notice of the filing requirement. There is nothing in the way of this overwhelmingly poor and underserved membership suggesting lack of constructive knowledge of the filing requirement. Once the membership contacted a labor lawyer with 27 years experience representing trade unions and public sector unions, they showed diligence in pursuing one's rights by demanding bargaining in March 2004, and filing a lawsuit within four months of the plant closing. The union received the demand letter and did nothing to help the membership so there is no prejudice to the union. Even the most callow young lawyer or hardened trial lawyer would see reasonableness in their remaining ignorant of the filing requirement. No court in the nature of equity could fail to entertain case-specific factors expressed in severed fingers, constant plant fires, no discharge negotiations that may counsel in favor of tolling. Eulogio Ortiz lost two fingers at the plant. Ramon Rodriquez fell and hurt his back while at work.  He was out 4-5 days and the employer did not pay him for that time.  He told the shop steward that he was not paid but nothing came of it.  There were no notices posted informing him he could contact the Defendant Union directly about his complaint.  Euclides Soto cut his face on a broken machine.  Prior to his injury, he had spoken to Jose Ortiz about the broken machine.  Jose Ortiz told him he would speak to the owners about it but the machine was not fixed until after his injury.  Plaintiffs made between $10 and $14 per hour at the time of the plant's closing, Angel Baez Deposition at p. 15; Most would rather still work under the horrible conditions which they did because it was a job and jobs are

hard to get.    At the plant, Juan Colon Ortiz worked with the paint which was used on the mattress material.  He testified that the paint smelled very strong and he was given only a little mask to wear.  He would change his clothes into work clothes at the beginning of his shift although there was no changing station nor were there any showers to use at the end of his shift. While working at the plant he developed a lung problem in which he had trouble breathing and would cough up blood two to three times a week. He had to stop working for a while because of his lung problem.  The Defendant Union did nothing to help him with his problem.

The conditions of the plant made it such that fires were constantly breaking out right up until the plant's closing.  Elison Pena recalls that the last fire occurred in November, 2003.  The plaintiffs were told by the employer to extinguish the fires themselves and that they were not given any protection against the smoke they inhaled and that the fire department was rarely called.  Wilfredo Ortiz recalls having to get on top of the room to put out a fire, all the while inhaling the smoke from the fire.  Clemente Hernandez can only recall one time when the fire department was called to respond to a fire at the plant.  He also recalls that he inhaled a lot of smoke from the fires.  Clemente Hernandez asked Jose Ortiz to speak to the Union about the fires but that the Union did nothing about the situation.

Lowell Alexander acknowledged that as Union Representative, it was his obligation to make sure that the employer followed health and safety policies although he never checked to determine what, if any, policies were in place. The machinery with which the Plaintiffs worked was heavy and antiquated.    Some machinery was so old that the employer could not get replacement parts in the event a machine broke. Even Mr. Alexander acknowledged that the machinery in the plant was old.  Despite the fact that the plaintiffs were working with heavy very old machinery, Mr. Alexander never did anything to ensure that the employer developed a

written hazard program.  He never checked if the employer kept material safety data sheets. According to Mr. Alexander, the Defendant Union would address safety concerns if they became aware of them, even in the absence of a formal complaint.  Several plaintiffs stated that dust was flying all over the place all the time.  Mr. Alexander was on-site of the plant on more than one occasion.  He had the opportunity to see the dust flying all over the place, yet he never took any steps to ensure that the employer had proper ventilation for the plant.  He or anyone else from the Defendant Union never walked around the plant to examine whether the plaintiffs were protected from fire, dust or chemicals.  Mr. Alexander acknowledged that he has "in past practice" grieved things that were not within the specific terms of the collective bargaining agreement.  Clemente Hernandez agreed with the description the condition of the plant was "like hell" and that the employer and union treated the workers "like dogs."  It was the worst place he has ever worked in.   Euclides Soto stated that the plant reminded him of hell because it was extremely hot because the ovens were on all the time and there was a lot of smoke and dust and no ventilation. Luis Martinez felt he was discriminated against by the Defendant Union.  He said "[t]hey treated us like garbage. They treated us like nobody.  We paid our union dues for so many years and they never gave us any sort of support, any help, and they didn't represent us in any way." Euclides Soto felt that the union "left us like dogs" when the plant closed because they did nothing to help them.  Since the plant's closing, Miriam Caminero has been depressed because she has had difficulty finding a new job and she has three children to support and to pay rent.  . The unemployment benefits she received was not enough to make ends meet. For Luis Martinez, after the unemployment benefits ran out, he went through "a lot of troubles and hunger for almost a year."   He was very nervous because he did not have money for food or rent.  He wanted to go home to Puerto Rico but he did not have the money.  Additionally, he had no

money to send to his family in Puerto Rico whom he supports.  For Eulogio Ortiz, since the plant's closing, he does not sleep well anymore and he does not feel well.  He feels humiliated because he has to receive welfare benefits.  For Ramon Martinez who is in his sixties and worked at the plant for 25 years liked his job at the plant and wanted to keep working.  Since the plant's closing, he has felt very bad to the extent that he could not bear to pass by the plant so he moved to Florida.  For Euclides Soto, since the plant's closing, he has felt bad because he paid his union dues thinking that the Defendant Union would assist him but in the end, the Defendant Union did nothing for him when the plant closed.  Furthermore, he has lost sleep and is depressed since the plant's closing because he does not make enough money to support his five children and pay his bills which are overdue.

### 5.  The Statute of Limitations Does Not Bar Action

### 1.  Notice of Claim

Whether the union's actions (or inactions) were sufficient either to make the plaintiff aware of the discrimination, or to enable him to form a reasonable belief thereof, is a factual issue for trial. The membership had no notice of the claim for discrimination until the plant closed.  The Court is to view evidence about the notice of the claim from the entire summary judgment record, in the light most favorable to plaintiffs as the non-moving parties, and give them the benefit of every inference, and avoid credibility determinations, to determine whether any material fact is in controversy with respect to whether the notice of claim occurred prior to the plant closing when they lost their jobs.   It is also consistent with the rule applied in tort cases concerning when the statutorily provided three-year limitations period begins to run. See, e.g., *Olsen v. Bell Tel. Labs., Inc*., 388 Mass. 171, 175 (1983) ("cause of action [for negligence

resulting in an insidious occupational disease] did not accrue before [plaintiff] knew or should reasonably have known that he had contracted [the disease] as a result of conduct of the defendants").  The defendants have not shown, or shown the complete absence of material facts in controversy, that the cause of action for discrimination resulting in an insidious adverse employment situation did not accrue before the plaintiffs knew or should reasonably have known that they had suffered discrimination as a result of conduct of the defendants. There simply is no flagging of the claim evident on this summary judgment record, coalescing harm and knowledge of the union's discrimination until the plant closing. See, e.g., *Ocean Spray Cranberries, Inc. v. Massachusetts Commission Against Discrimination*, 441 Mass. 632, 686 N.E. 2d 1303 (2004) (adopts liberal limitations standard requiring harm and awareness of harm for acts to be measured within filing period in an employment discharge case).

### 2. There is Material Evidence of Continuing Violation

In *National Railroad v. Morgan*, 536 U.S. 101 at 115-118 (2002), the Supreme Court defined the continuing violation doctrine.

> The unlawful employment practice therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts… Such claims are based on the cumulative affect of individual acts…Workplace conduct is not measured in isolation . . . . , we look to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. To assess whether a court may, for the purposes of determining liability, review all such conduct, including those acts that occur outside the filing period, we again look to the statute. It provides that a charge must be filed within 180 or 300 days after the alleged unlawful employment practice occurred. A hostile work environment claim is comprised of a series of separate acts that collectively constitute one "unlawful employment practice. The timely filing provision only requires that a plaintiff file a charge within a certain number of days after the unlawful practice happened. It does not matter, for purposes of the statute, that some of the component acts

of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability. That act need not, however, be the last act. As long as the employer has engaged in enough activity to make out an actionable hostile environment claim, an unlawful employment practice has occurred, even if it is still occurring. Subsequent events, however, may still be part of the one hostile work environment claim and a charge may be filed at a later date and still encompass the whole.

It is precisely because the entire hostile work environment encompasses a single unlawful employment practice that we do not hold, as have some of the Circuits, that the plaintiff may not base a suit on individual acts that occurred outside the statute of limitations unless it would have been unreasonable to expect the plaintiff to sue before the statute ran on such conduct. The statute does not separate individual acts that are part of the hostile environment claim from the whole for the purposes of timely filing and liability. And the statute does not contain a requirement that the employee file a charge prior to 180 or 300 days after the single unlawful practice occurred. Given, therefore, that the incidents comprising a hostile work environment are part of one unlawful employment practice, the employer may be liable for all acts that are part of this single claim. In order for the charge to be timely, the employee need only file a charge within 180 or 300 days of any act that is part of the hostile work environment. (Case and statute citations and internal quotations omitted.)[3]

As to serial misconduct, the most significant admission is that the union never grieved any discharges. The membership never was invited to the union meetings. Furthermore, there was no negotiation of the effects of closing the plant, only bumping rights and medical benefits. There was no right to severance negotiated here at the plant closing, but there was at the Sealy

---

[3] This issue was also addressed in *Lynn Teachers Union, Local 1037 v. Massachusetts Commission against Discrimination*, 406 Mass. 515 (1990). That case arose because the school committee of Lynn had a rule in the 1960's and 1970's requiring teachers to resign if they became pregnant. Id. at 517. Several teachers who had become pregnant, had been forced to resign, and subsequently had returned to teaching challenged their union's seniority system, id. at 517-518, which gave credit only for "consecutive years" of experience teaching in Lynn, id. at 518. The teachers who had been forced to resign during pregnancy lost seniority credit for all of the years that they taught before being forced to resign. Id. The court upheld the commission's application of the continuing violation doctrine, reasoning that a "seniority system which is so 'facially neutral' that it ignores prior discriminatory acts against its members, to the detriment of those members, presents a ready vehicle for application of the continuing violation rule." Id. at 522.

Mattress, Bee-Bee Rubber, Rosboro Plastics plants.  Alexander heard scuttlebutt about them taking the money and converting the building into a condominium at one of the meetings prior to the company closing. The plant had no apprenticeship or training program. Although there were fires until the closing of the plant, the union was unaware of fires at the plant even though its representative visited the plant. The union did not know whether employer kept material data safety slips. There was no hazard safety program or health and safety officer at the plant. Alexander had been a Steelworker union steward for the gas company; he learned when there was catastrophic injury in his steward capacity; and he simply does not know why he never learned of catastrophic injury at this entirely Latino plant when he was union representative.   In March and April 2004, the plaintiffs requested grievances and the defendant unions refused to process them. If this workplace conduct is not measured in isolation, the great frequency of the discriminatory conduct; its palpable severity; where it is physically threatening and humiliating, over and above merely offensive utterances and it unreasonably interferes with an employee's work performance.

This exception for violations of a continuing nature "recognizes that some claims of discrimination involve a series of related events that have to be viewed in their totality in order to assess adequately their discriminatory nature and impact." *Cuddyer v. Stop & Shop Supermarket Co.*, 434 Mass. 521, 531 (2001).  For the continuing violation doctrine to apply, a complainant must ordinarily prove that: "(1) at least one discriminatory act occurred within the 300 day limitations period (here, 1) there was no negotiation about the effects of the plant closing for severance when the plant closed in November, 2003; or 2) there was a fire at the plant in November, 2003; or 3) there was no posting of union notices at the time the plant closed in November, 2003; or 4) the union was unaware of safety hazards at the plant even though its

representative visited the plant in November, 2003 ; or 5) or the union did not know whether employer kept material data safety slips in November, 2003; or 6) there was no hazard safety program or health and safety officer at the plant in November, 2003; or, finally, 7) in March and April 2004, the plaintiffs requested grievances and the defendant unions refused to process them.); (2) the alleged timely discriminatory acts have a substantial relationship to the alleged untimely discriminatory acts (the union only points to its long history of neglect to prove that there was discrimination then and now, which is unpleasant and cynical);  (3) earlier violations outside the 300 day limitations period did not trigger each plaintiff's awareness and duty' to assert his rights, i.e., that plaintiff could not have formed a reasonable belief at the time the employment actions occurred that they were discriminatory.


### 3. The *Morgan* Doctrine if there are discreet discriminatory acts

Alternatively, as Justice Thomas opined[4] "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the 180- or 300-day time period after the discrete discriminatory act occurred. The existence of past acts and the employee's prior knowledge of their occurrence, however, do not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed. Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim. The statute of limitations requirement is still met if at least one act falls within the 300-day period. Here there was at least one independently discriminatory act in the

---

[4] See also the equitable tolling remedies in *Mercado v. The Ritz Carlton San Juan Hotel, Spa & Casino,* 410 F.3d 41 (1st Cir. 2005).

three hundred day period: 1) there was no negotiation about the effects of the plant closing for severance when the plant closed in November, 2003; or 2) there was a fire at the plant in November, 2003; or 3) there was no posting of union notices at the time the plant closed in November, 2003; or 4) the union was unaware of safety hazards at the plant even though its representative visited the plant in November, 2003 ; or 5) or the union did not know whether employer kept material data safety slips in November, 2003; or 6) there was no hazard safety program or health and safety officer at the plant in November, 2003; or, finally, 7) in March and April 2004, the plaintiffs requested grievances and the defendant unions refused to process them.[5] The law of continuing violations is composed of a number of discriminatory acts emanating from the same discriminatory animus, each act constituting a separate wrong actionable under Title VII. In the case at hand, there is at least one allegedly discriminatory material act that occurred within the limitations period of 300 days.

### 4. The *Goodman* Doctrine

In Defendant's Brief in Support of Motion for Summary Judgment, at p. 38,  Defendants cite *Goodman v. Lukens Steel Company*, 482 U. S. 656 (1987) to argue that the case applies to this one. The plaintiffs agree. In *Goodman v. Lukens Steel Co.*, 482 U.S. 656 (1987), the Supreme Court adopted  a three year statute of limitations for discriminatory practices in failing to process discharges, in failing to assert instances of racial discrimination as grievances, and in tolerating and tacitly encouraging racial harassment.  Here, the claims, after discovery, involve Title II, Title VII and 42 U.S.C. §§ 1981, 1982, 1983, G. L. Ch. 151 B § 4 and 42 U.S.C. §

---

[5] Combined, this makes 5,040 possible outcomes if these facts are calculated together in geometric or algebraic progression. It really makes it hard to say any one of these facts, or any of them in combination, does not make a material fact in controversy. The other out is that none of these facts is discriminatory, but it would be a great leap in logic to say that none of them are, where the workforce is Latino, and there was, inter alia, no effects bargaining after the plant closing, and no grieving of the lay off of this workforce, and a combination of 5040 possible discriminatory factors.

2000e-2(c) and 2(m) Labor Management Act, § 301, 29 U.S.C. § 185, and defenses under 29 U.S.C. § 159(a) and  29 U.S.C. § 157.   Under the liberal pleadings requirements of the First Circuit, "a complaint need not point to the appropriate statute or law in order to raise a claim for relief…  [a] complaint  sufficiently raises a claim even if it points to the wrong legal theory as a basis for that claim, as long as relief is possible under any set of facts that could be established consistent with the allegations." *Morales-Vallellanes v. Potter*, 339 F. 3d 9 (2003) (reversing entry of summary judgment).The defendants cited the *Goodman* precedent so it presumably applies to this case; and all of the acts complained of here occurred within three years of discovery of the claims. The court here would be correct in selecting the Massachusetts 3-year limitations period governing personal injury actions or six-year period for contract actions.


Therefore: a. there is a reasonable likelihood that the plaintiffs will recover judgment, including interest and costs against the United Steelworkers in such amount; b. the plaintiffs know no liability insurance that is available to satisfy a judgment in this case as no policy was disclosed under Rule 16 and 26; and c. there has been no property attached by other writ of attachment.

### Amount of Attachment

Plaintiffs supply a summary of damages. See Ex. 1. The plaintiffs are in three classes: 1) unemployed plaintiffs (5 of them); 2) unemployable plaintiffs (2 of them); and 3) employees with some employment since plant closing (5 of them).

3. For the first category of five unemployed plaintiffs, past wages are $60,000, future wages are $150,000, emotional distress is $400,000[6], and punitive damages are $200,000.

---

[6] In *Tamasy v. Commonwealth*, plaintiff's attorney's client won $400,000 emotional distress, doubled, before a Suffolk County jury, in 1998 dollars.

4. For the two unemployable plaintiffs, past wages are $60,000, future wages are $175,000, emotional distress of $400,000, and punitive damages are $200,000.

5. Finally, for the five mixed employed-unemployed, past wages are $40,000, future wages are $120,000, emotional distress is $400,000, punitive damages are $200,000.

6. Damages are compensatory and punitive, along with emotional distress, under 151B and Title VII – 42 U.S. § 2000e-2-5.  Attorney fees also available under 151B, Title VII – 42 U.S.C. § 2000e-5(k). Emotional distress damages also available in all claims. *Soto-Segarra v. Sea Land Service, Inc.*, 581 F.2d 291 (1st Cir. 1978).

7. $65,000,000.00 punitive damages for all plaintiffs.

 In *Kolstad v. American Dental Association*, 527 U. S. 526, 535-36 (1999), the Supreme Court held that

> While egregious misconduct is evidence of the requisite mental state, § 1981a does not limit plaintiffs to this form of evidence, and the section does not require a showing of egregious or outrageous discrimination independent of the employer's state of mind. Nor does the statute's structure imply an independent role for "egregiousness" in the face of congressional silence. On the contrary, the view that § 1981a provides for punitive awards based solely on an employer's state of mind is consistent with the 1991 Act's distinction between equitable and compensatory relief. Intent determines which remedies are open to a plaintiff here as well; compensatory awards are available only where the employer has engaged in " *intentional* discrimination." § 1981a(a)(1) (emphasis added). Moreover, § 1981a's focus on the employer's state of mind gives some effect to Congress' apparent intent to narrow the class of cases for which punitive awards are available to a subset of those involving intentional discrimination. The employer must act with "malice or with reckless indifference *to the [plaintiff's] federally protected rights.* " § 1981a(b)(1) (emphasis added). The terms "malice" or "reckless indifference" pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination. We gain an understanding of the meaning of the terms "malice" and "reckless indifference," as used in § 1981a, from this Court's decision in *Smith v. Wade,* 461 U.S. 30 (1983). The parties, as well as both the en banc majority and dissent, recognize that Congress looked to the Court's decision in *Smith* in adopting this language in § 1981a. Employing language similar to what later appeared in § 1981a, the Court concluded in *Smith* that "a jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." 461 U.S., at 56. While the *Smith* Court determined that it was

unnecessary to show actual malice to qualify for a punitive award, *id.,* at 45-48, its intent standard, at a minimum, required recklessness in its subjective form. The Court referred to a "subjective consciousness" of a risk of injury or illegality and a " 'criminal indifference to civil obligations.' " *Id.,* at 37, n. 6, 41 (quoting *Philadelphia, W. & B. R. Co. v. Quigley,* 21 How. 202, 214 (1859)); see also *Farmer v. Brennan,* 511 U.S. 825, 837 (1994) (explaining that criminal law employs a subjective form of recklessness, requiring a finding that the defendant "disregards a risk of harm of which he is aware"); see generally 1 T. Sedgwick, Measure of Damages §§ 366, 368, pp. 528, 529 (8th ed. 1891) (describing "wantonness" in punitive damages context in terms of "criminal indifference" and "gross negligence" in terms of a "conscious indifference to consequences"). The Court thus compared the recklessness standard to the requirement that defendants act with " 'knowledge of falsity or reckless disregard for the truth' " before punitive awards are available in defamation actions, *Smith, supra,* at 50 (quoting *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 349 (1974)), a subjective standard, *Harte-Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 688 (1989).

8.  As the Affidavits of Robert O. Berger establishes, along with the exhaustive memoranda filed herein, attachment is proper under these facts because, inter alia, with respect to the prima facie case, the plaintiffs' burden of proof in establishing a prima facie case under Title VII is de minimis. Here, each plaintiff establishes that national origin was a motivating factor for an employment practice of the union when the plant closed and the union failed to grieve and/or arbitrate discharges and severance, and each is entitled to damages. See *Rainey v. Warren and United Steelworkers of America*, 80 F. Supp. 2d 5 (D.R.I. 2000) (holding in favor of employees against the United Steelworkers Union on very similar facts.). The defendant's nondiscriminatory explanation, i.e. that every single misstep in protecting the employees was the fault of shop steward Jose Ortiz, was false. The Supreme Court has determined that a mixed motive case can proceed on circumstantial evidence alone. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 93-95 (2003). See *Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 429-30 (1st Cir. 2000) ("In fact, one might question whether these bright lines [between direct and indirect evidence] are so helpful in the end…   In appeals after trial, this and other courts have recognized

the need for flexibility and have sometimes bypassed these approaches and instead looked at whether the totality of the evidence permits a finding of discrimination." [citations omitted]).  In any case, this case has much express and circumstantial evidence of discrimination.  Second, the factual inquiry in this case as to equitable tolling must begin with an examination of the failure of the union to post notices, process grievances and arbitration about discharge and severance at an all Latino plant, invite the Hispanic membership to meetings, and to address safety issues. *Mercado v. The Ritz Carlton San Juan Hotel, Spa & Casino*, 410 F.3d 41 (1st Cir. 2005). Therefore, there was lack of actual notice of the filing requirement. The record does not suggest that the membership had constructive knowledge of the filing requirement. The plaintiffs showed diligence in pursuing their rights once they hired a lawyer listed in civil rights law and labor law with an AV peer rating by demanding that the union file discharge grievances based on race in March 2004, and filing the instant lawsuit within six months of the plant closing. *Fernandes v. Costa Brothers Masonry, Inc.,* 199 F.3d 572 (1st Cir. 1999). As the union and local received two demand letters and did nothing to help the membership in March 2004 and April 2004, there is no prejudice to the union and local. The plaintiffs' remaining ignorant of the filing requirement should come as no surprise as none of them was raised in the United States, and few, if any, had more than a grade school education. No court in the nature of equity could fail to entertain case-specific factors: the severed fingers, plant fires, no grievances of discharges, which counsel in favor of tolling. Third, the record indicates that: "(1) at least one discriminatory act occurred within the 300 day limitations period"-- here, a) each of the plaintiffs suffered adverse work impact where there was the failure by the union and its local to negotiate or grieve discharges and severance in an all Latino workforce when the plant closed in November 2003, or b) there was no negotiation about the effects of the plant closing for severance when the plant closed in

November, 2003; or c) there was a fire at the plant in November, 2003; or d) there was no posting of union notices at the time the plant closed in November, 2003; or e) the union was unaware of safety hazards at the plant even though its representative visited the plant in November, 2003 ; or f) or the union did not know whether employer kept material data safety slips in November, 2003; or g) there was no hazard safety program or health and safety officer at the plant in November, 2003; or f) in March and April 2004, the plaintiffs (including the union steward) requested the filing of discrimination grievances and the defendant unions refused to do so; (2) "the alleged timely discriminatory acts have a substantial relationship to the alleged untimely discriminatory acts" (the union only points to its long history of neglect to prove that there was discrimination then and now);  (3) earlier violations outside the 300 day limitations period did not trigger each plaintiff's awareness and duty to assert his rights, i.e., that plaintiffs could not have formed a reasonable belief at the time the employment actions occurred that they were discriminatory until the plant closed. The union defendants failed to establish that no material facts are in controversy or that each defendant is entitled to judgment, where the claims fall within the six month deadline for the duty of fair representation claims and the 300 day deadline. Indeed all of these independent actionable actions (no severance bargaining, no discharge bargaining for a Latino plant, no posting of labor or safety notices, one fire, etc.) occurred within 300 days for the discrimination claim. In addition, the defendants cited a case involving the failure of the United Steelworkers of America to file grievances for minority workers, which gives a state tort statute of limitations, i.e., 3 years in Massachusetts, to the plaintiffs for this kind of claim. See Defendant's Brief in Support of Motion for Summary Judgment, at p. 38, citing *Goodman v. Lukens Steel Company*, 482 U. S. 656 (1987) in which 28

years ago the Steelworkers were found liable for racial discrimination on the same or virtually the same facts.

Respectfully submitted,

Dated: March 8, 2006

/s/ Robert O. Berger
Robert O. Berger (BBO#: 038900)
11 Beacon Street, Ste. 1210
Boston, MA 02108
(617) 423-7575 Tel
(617) 275-8000 Fax
Attorney for Plaintiffs

/s/ John Lee Diaz
John Lee Diaz (BBO#: 542819)
801A Tremont Street
Boston, MA 02118
(617) 445-7900 Tel
Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served by electronic transfer on the attorney of record for each party.

Dated: March 8, 2006

/s/ Robert O. Berger
Robert O. Berger (BBO#: 038900)