UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

"FILED IN OPEN COURT"
1-11- 07
2. a.L.
l. a.L.

|  |  |
|---|---|
| EUCLIDES SOTO, LOUIS A. MARTINEZ, ) | CIVIL ACTION |
| JOSE RAMIREZ, CLEMENTE HERNANDEZ, ) | NO.: 04-10892-JLT |
| CESAR PIZARO, ELISON PENA, ) |  |
| JUAN COLON, JOSE ORTIZ, ) |  |
| RAFAEL TORRES, ANGEL BAEZ, ) |  |
| ANTONIO MARTINEZ, WILFREDO ORTIZ, ) |  |
| EULOGIO ORTIZ, MIRRAIN MIRANDA, ) |  |
| RAFAEL MORENO, NELSON ACEVEDO, ) |  |
| and RAMON RODRIGUEZ, ) |  |
| Plaintiffs, ) |  |
| ) |  |
| v. ) |  |
| ) |  |
| SHERMAN-FEINBERG CORPORATION, ) |  |
| FARNSWORTH FIBRE CORPORATION, ) |  |
| UNITED STEELWORKERS OF AMERICA, ) |  |
| LOCAL 421-U, AND UNITED STEELWORKERS) |  |
| OF AMERICA, ) |  |
| Defendants. ) |  |

## PLAINTIFFS PATTERN JURY INSTRUCTIONS REGARDING DISCRIMINATION COUNTS UNDER FEDERAL LAW

Now come the plaintiffs and provide the enclosed jury instructions in regard to the

discrimination counts of the complaint.

176 Conduct affecting non-parties is relevant to determining reprehensibility only if it is "misconduct of the sort that harmed" the plaintiff. State Farm Mutual Auto Ins. Co. v. Campbell, 538 U.S. 408, 410 (2003). In State Farm, the Supreme Court said that, where the plaintiffs did not present evidence of conduct by the defendant similar to the conduct that harmed them, the conduct that harmed them was "the only conduct relevant to the reprehensibility analysis." Id. Therefore, if the jury has heard evidence of dissimilar conduct affecting non-parties, it should be instructed that it may not consider that conduct in assessing reprehensibility.

177 This list of factors comes directly from State Farm Mutual Auto Ins. Co. v. Campbell, 538 U.S. 408, 418-19 (2003), where the Court reiterates that degree of culpability is the most important factor. State Farm also said: "A jury must be instructed, furthermore, that it may not use evidence of out-of-state conduct to punish a defendant for action that was lawful in the jurisdiction where it occurred." Id. at 421. Such an instruction will ordinarily not be pertinent in a federal law claim. We have not listed the defendant's wealth as a factor. Although the Supreme Court has never actually prohibited consideration of wealth, there are expressions of concern. See id. at 427 ("The wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award."), and 417 ("'the presentation of evidence of a defendant's net worth creates the potential that juries will use their verdicts to express biases against big businesses, particularly those without strong local presences,'" quoting Honda Motors Co. v. Oberg, 512 U.S. 415, 432 (1994)). See also TXO Prod. Corp. v. Alliance Res. Corp., 509 U.S. 443, 489-95 (1993) (O'Connor, J., dissenting).

Respectfully submitted,

Dated: February 27, 2006

/s/ Robert O. Berger
Robert O. Berger (BBO#: 038900)
11 Beacon Street, Ste. 1210
Boston, MA 02108
(617) 423-7575 Tel
(617) 275-8000 Fax
Attorney for Plaintiffs

/s/ John Lee Diaz
John Lee Diaz (BBO#: 542819)
801A Tremont Street
Boston, MA 02118
(617) 445-7900 Tel
Attorney for Plaintiffs

## **CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served by electronic transfer on the attorney of record for each party on February 27, 2006.

Dated: February 27, 2006

/s/ Robert O. Berger
Robert O. Berger (BBO#: 038900)

**General Discrimination: Mixed Motive**

[Updated: 10/17/05]

### Pattern Jury Instruction

The Latino Plaintiff Members accuse United Steelworkers of national origin discrimination in violation of federal law. Specifically, he/she of the Latino Plaintiff Members claim that United Steelworkers took adverse employment action against him/her because of national origin discrimination. To succeed on this claim, Latino Plaintiff Members must prove, by a preponderance of the evidence, that her/his national origin  was a motivating factor in United Steelworkers' decision to refuse to demand "effects bargaining"—that is, to bargain in good faith to provide a soft-landing for the employees, by failing to negotiate or arbitrate for the employee, refusing to take any measures for the health and welfare of the employee; or by failing to give the employee something that is a customary benefit of the labor relationship in which the union is in good faith to protect the employees.

An employer is free to refuse to bargain or arbitrate for any nondiscriminatory reason even if its business judgment seems objectively unwise. But you may consider the believability of an explanation in determining whether it is a cover-up or pretext for discrimination. To prove that national origin was a "motivating factor," Latino Plaintiff Members must show that United Steelworkers used that consideration in deciding to not bargain or arbitrate once in the history of this 100 percent Latino bargaining unit.

Latino Plaintiff Members need not show that national origin discrimination was the only reason United Steelworkers chose not to bargain, arbitrate or provide safety to the membership. But she/he must show that United Steelworkers relied upon national origin discrimination in making its decision.

{The Latino Plaintiff Members is not required to produce direct evidence of unlawful motive. You may infer knowledge and/or motive as a matter of reason and common sense from the existence of other evidence—for example, explanations that you find were really pretextual. "Pretextual" means false or, though true, not the real reason for the action taken.}

{An "adverse employment action" is one that, standing alone, actually causes damage, tangible or intangible, to an employee. The fact that an employee is unhappy with something his or her union did or failed to do is not enough to make that act or omission an adverse employment action. An union takes adverse action against an employee only if it: (1) takes something of consequence away from the employee, for example by failing to negotiate or arbitrate for the employee, refusing to take any measures for the health and welfare of the employee; or (2) fails to give the employee something that is a customary benefit of the labor relationship in which the union is in good faith to protect the employees, for example, by failing to follow a customary practice of providing a soft landing after a plant closing or posting union notices or inviting the Latino membership

to meetings. An adverse employment action by a union representative like Mr. Alexander is an action of the employer.}

If you find that Latino Plaintiff Members has not proven by a preponderance of the evidence that United Steelworkers used Latino Plaintiff Members' national origin in deciding to fail to arbitrate or bargain, your verdict must be for the defendant.

But if you find that Latino Plaintiff Members has proven by a preponderance of the evidence that his/her national origin was a motivating factor in United Steelworkers' decision, then the burden of proof shifts to United Steelworkers to prove by a preponderance of evidence that it would nevertheless have taken the same action even if it had not considered Latino Plaintiff Members' national origin. If you find that United Steelworkers has not met its burden of proof, your verdict will be for the Latino Plaintiff Members and you will proceed to consider damages as I will describe them. But if you find that United Steelworkers has proven that it would have taken the same action regardless of Latino Plaintiff Members' national origin, you will not consider damages.

I have prepared a special verdict form to assist you in addressing these issues.

---

[16] The Supreme Court has determined that that a mixed motive case can proceed on circumstantial evidence alone, Desert Palace, Inc. v. Costa, 539 U.S. 90, 93-95 (2003), thereby overruling previous appellate pronouncements (including the First Circuit). (Although Desert Palace dealt only with Title VII, the First Circuit has suggested that direct evidence is no longer required for a mixed motive instruction in cases arising under other anti-discrimination statutes. Estades-Negroni v. The Assoc. Corp. of N. Am., 345 F.3d 25 (1st Cir. 2003) (ADEA)). Therefore, this instruction does not distinguish between direct and indirect evidence, or give alternative Price Waterhouse / McDonnell Douglas instructions. See Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 429-30 (1st Cir. 2000) ("In fact, one might question whether these bright lines [between direct and indirect evidence] are so helpful in the end. . . . In appeals after trial, this and other courts have recognized the need for flexibility and have sometimes bypassed these approaches and instead looked at whether the totality of the evidence permits a finding of discrimination." (citations omitted)).

If this instruction is used simultaneously with a pretextual instruction, it will need re-working to avoid confusing the jury over the differing standards. It is clear that in the early stages of litigation a plaintiff may proceed simultaneously on both a McDonnell Douglas pretext case and a Price Waterhouse mixed motive case. See, e.g., Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 434 (1st Cir. 2000) (ADEA) (quoting approvingly Fernandes v. Costa Bros. Masonry, Inc., 199 F.3d 572, 581 (1st Cir. 1999) (Title VII)). What happens at the jury instruction stage, however, is problematic.

Compare Fernandes, 199 F.3d at 581 ("the trial court, at an appropriate stage of the litigation, will channel the case into one format or the other"); Dominguez-Cruz, 202 F.3d at 434 (citing Fernandes for the same proposition), with Febres v. Challenger Caribbean Corp., 214 F.3d 57, 64 & n.9 (1st Cir. 2000) (ADEA) ( the trial judge there had instructed on both theories "and we express no opinion on the practice"). Arguably, Desert Palace, 539 U.S. 90 (2003), calls for instructing on both when requested.

[17] This instruction is designed for race, color, national origin, religion, sex,

pregnancy or age discrimination cases. The ADEA's prohibition against age

discrimination is limited to "individuals who are at least 40 years of age." 29 U.S.C. §

631(a) (2001). The Introductory Notes at the beginning of these instructions outline

the statutory basis for each of these claims.

For sexual harassment cases, see Instructions 2.1-2.3. For disability discrimination cases, see Instruction 3.1. For Equal Pay Act cases, see Instruction 4.1. For retaliation cases, see Instruction 5.1.

[18] The following sentence may be used in a pregnancy discrimination case:
Under federal law, employers must treat women affected by pregnancy the same, for all employment-related purposes, as other persons not affected by pregnancy but similar in their ability or inability to work. Concern for their safety or that of their unborn children is no justification for different treatment. Safety is a justification only when pregnancy actually interferes with an employee's ability to perform her job.
See Int'l Union, United Auto., Aerospace and Agric. Implement Workers v. Johnson Controls, Inc., 499 U.S. 187, 204 (1991) (Title VII) ("Our case law, therefore, makes clear that the safety exception is limited to instances in which sex or pregnancy actually interferes with the employee's ability to perform the job.").
In Chevron U.S.A. Inc. v. Echazabal, 536 U.S. 73, 76 (2002), the Supreme Court held that, under the ADA, concern for an employee's own health is a permissible criterion in employee screening. In light of Johnson Controls, any policy seeking the benefit of Chevron would have to be facially neutral, and not single out pregnant women. See also Smith v. F.W. Morse & Co., 76 F.3d 413, 424-25 (1st Cir. 1996) ("At bottom, Title VII requires a causal nexus between the employer's state of mind and the protected trait (here, pregnancy). The mere coincidence between that trait and the employment decision may give rise to an *inference* of discriminatory animus, but it is not enough to establish a per se violation of the statute. . . ." (internal citation omitted)).

[19] 42 U.S.C. § 2000e-2(m) (2001) ("an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice"); Febres v. Challenger Caribbean Corp., 214 F.3d 57, 60 (1st Cir. 2000) (ADEA) ("a proscribed factor . . . played a motivating part in the disputed employment decision"); Fernandes v. Costa Bros. Masonry, Inc., 199 F.3d 572, 580 (1st Cir. 1999) (Title VII) (quoting Price Waterhouse v. Hopkins, 490 U.S. 228, 247 (1989) (Title VII))

(Price Waterhouse standard applies where the challenged employment decision was "the product of a mixture of legitimate and illegitimate motives").

20
It is not necessary that the decisionmaker be biased if someone else was biased and orchestrated the decision. Cariglia v. Hertz Equip. Rental Corp., 363 F.3d 77, 83-84 (1st Cir. 2004) (applying Massachusetts law, but stating that the orchestration argument "has merit under First Circuit precedent and persuasive case law from other circuits" and quoting Conway v. Electro Switch Corp., 825 F.2d 593, 597 (1st Cir. 1987) ("evidence of corporate state-of-mind or discriminatory atmosphere is not rendered irrelevant by its failure to coincide precisely with the particular actors or time frame involved in the specific events that generated a claim of discriminatory treatment") and Freeman v. Package Machinery Co., 865 F.2d 1331, 1342 (1st Cir. 1988) ("the inquiry into a corporation's motives need not artificially be limited to the particular officer who carried out the action.")).

21
The following sentence may be used in age discrimination cases where the defendant argues that the challenged employment decision was based on a factor, other than age, that is often associated with age or is correlated with age, such as seniority or pension status:

A defendant is entitled to base an employment decision on a factor other than age, such as seniority, even if that factor is often correlated with age, as long as the defendant is not using that other factor as a pretext to hide age discrimination.

Hazen Paper Co. v. Biggins, 507 U.S. 604, 611 (1993) (ADEA) ("When the employer's decision *is* wholly motivated by factors other than age, the problem of inaccurate and stigmatizing stereotypes disappears. This is true even if the motivating factor is correlated with age, as pension status typically is."); see also id. ("Yet an employee's age is analytically distinct from his years of service."); Bramble v. American Postal Workers Union, 135 F.3d 21, 26 (1st Cir. 1998) (ADEA) (union that reduced union president's salary based on president's status as a retiree did not discriminate because, although "there is a positive correlation between active pay status and age, ... one is not an exact proxy for the other").

22
Webber v. Int'l Paper Co., 417 F.3d 229, 238 (1st Cir. 2005); Thomas v. Eastman Kodak Co., 183 F.3d 38, 64 (1st Cir. 1999) (Title VII) (citing Smith v. Stratus Computer, Inc., 40 F.3d 11, 16 (1st Cir. 1996)) (Title VII) ("Title VII does not grant relief to a plaintiff who has been discharged unfairly, even by the most irrational of managers, unless facts and circumstances indicate that discriminatory animus was the reason for the decision."); see also Feliciano de la Cruz v. El Conquistador Resort and Country Club, 218 F.3d 1, 8 (1st Cir. 2000) (Title VII) (proof that decision is unfair "is not sufficient to state a claim under Title VII"); Rodriguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15, 22 (1st Cir. 1999) (Title VII) ("Title VII does not stop a company from demoting an employee for any reason—fair or unfair—so long as the decision to demote does not stem from a protected characteristic." (citations omitted)); Mesnick v. General Elec. Co., 950 F.2d 816, 825 (1st Cir. 1991) (ADEA) ("Courts may not sit as super personnel departments, assessing the merits—or even the rationality—of employers' nondiscriminatory business decisions." (citations omitted)). Other circuits have said that subjectivity in an evaluation is not itself grounds for challenging the evaluation as discriminatory. E.g., Vaughan v. The Metrahealth Companies, Inc., 145 F.3d 197, 204

(4th Cir. 1998); Hutson v. McDonnell Douglas Corp., 63 F.3d 771, 780 (8th Cir. 1995); Haskell v. Kaman Corp., 743 F.2d 113, 119 (2d Cir. 1984).

[23] This is the language of Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003). Previously there was debate over whether a plaintiff must show that the protected characteristic played a "substantial" role in the decision. Fernandes v. Costa Bros. Masonry, Inc., 199 F.3d 572, 580 (1st Cir. 1999) (Title VII) (a plaintiff must show that the illegitimate factor played a "substantial role" or "placed substantial negative reliance on an illegitimate criterion").

24 42 U.S.C. § 2000e-2(m) (2001) ("even though other factors also motivated the practice").

25 Fields v. Clark Univ., 966 F.2d 49, 52 (1st Cir. 1992) (Title VII) (citing Price Waterhouse v. Hopkins, 490 U.S. 228, 242 (1989) (Title VII)) ("We conclude, instead, that Congress meant to obligate her to prove that the employer relied upon sex-based considerations in coming to its decision.")

If a defendant requests it and the circumstances justify it, an instruction may be included on the availability of the "same-actor inference." Such an instruction permits a jury to infer a lack of discrimination if the same individual both hired and fired the plaintiff, particularly within a short period of time. See Banks v. Travelers Cos., 180 F.3d 358, 366-67 (2d Cir. 1999) (ADEA); Proud v. Stone, 945 F.2d 796, 797-98 (4th Cir. 1991) (ADEA). The First Circuit stated without discussion that a district court may use the same-actor instruction in appropriate circumstances, citing Buhrmaster v. Overnite Transportation Co., 61 F.3d 461, 463 (6th Cir. 1995) (Title VII: sex), but also held that the absence of the instruction did not "confuse[] or misle[a]d the jury as to the controlling law." Kelley v. Airborne Freight Corp., 140 F.3d 335, 351 (1st Cir. 1998) (ADEA); accord Banks, 180 F.3d at 367 (declining to adopt a rule requiring a same-actor instruction and affirming the district court's refusal to include the instruction where the court allowed the defendant to urge the jurors to draw the inference); Kim v. Dial Serv. Int'l, Inc., 159 F.3d 1347, No. 97-9142, 1998 WL 514297, at **4 (2d Cir. June 11, 1998) (no prejudice from the district court's refusal to give the instruction) (ADEA, Title VII: race and national origin); Menchaca v. Am. Med. Response of Ill., Inc., No. 98 C 547, 2002 WL 48073, at *2 (N.D. Ill. Jan. 14, 2002) (Title VII: sex) (same).

Courts disagree on the strength of the inference. Compare Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal., 31 F.3d 209, 215 (4th Cir. 1994) (ADA) (calling it "a strong presumption of nondiscrimination") with Waldron v. SL Indus., Inc., 56 F.3d 491, 496 n.6 (3d Cir. 1995) (ADEA) (the fact that the same person hired and fired the plaintiff within a short period of time "is simply evidence like any other and should not be accorded any presumptive value") (internal quotation marks omitted); see also Buhrmaster, 61 F.3d at 464 (noting that "the length of time between the hiring and firing of an employee affects the strength of the inference"). The First Circuit has cited approvingly a statement by the Fourth Circuit calling it a "strong inference." See LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 847 (1st Cir. 1993) (ADEA) (citing and quoting Proud, 945 F.2d at 797).

The First Circuit in Kelley seems to approve only limited use of the same-actor instruction ("in appropriate circumstances," without explaining what that means, 140 F.3d at 351). Other courts and commentators warn that the inference is not always appropriate. See, e.g., Waldron, 56 F.3d at 496 n.6 (in ADEA case, the inference was inappropriate because it was plausible that the plaintiff was hired to work for a few years

while the hirer "groomed" a younger person to replace the plaintiff); Susie v. Apple Tree Preschool and Child Care Ctr., Inc., 866 F. Supp. 390, 396-97 (N.D. Iowa 1994) (cautioning that the same-actor inference has little or no force in disability cases because the employer at the time of hiring may not be aware of the extent of the plaintiff's disability and the disability may worsen over time); Anna Laurie Bryant & Richard A. Bales, Using the Same Actor "Inference" in Employment Discrimination Cases, 1999 Utah L. Rev. 255, 272 (inference is not appropriate where the decisionmaker did not know of the plaintiff's protected status at the time of hiring). For a sample same-actor instruction, see Buhrmaster, 61 F.3d at 463.

26 The pretext language used in this bracketed paragraph is permissible and may help the jury understand the issue, but is not required in the First Circuit. Fite v. Digital Equip. Corp., 232 F.3d 3, 7 (1st Cir. 2000) (ADEA and ADA) ("While permitted, we doubt that such an explanation is compulsory, even if properly requested."); White v. N.H. Dept. of Corrections, 221 F.3d 254 (1st Cir. 2000) (Title VII) (finding no error in refusal to give explicit instruction on pretext).

27 In Foley v. Commonwealth Electric Co., 312 F.3d 517, 521 (1st Cir. 2002), the court stated that "this instruction optimally should have been included in the charge."
28 This bracketed paragraph may be used in cases where there is a dispute about whether the action that the defendant allegedly took against the plaintiff constituted an adverse employment action. Although this question, if it arises, is one for the jury, see Melendez-Arroyo v. Cutler-Hammer de P.R. Co., Inc., 273 F.3d 30, 36 (1st Cir. 2001) (ADEA) (jury could find that plaintiff who was given a raise but assigned less challenging, largely menial responsibilities suffered an adverse employment action), in most cases the dispute will be about whether the defendant's challenged conduct was motivated by discriminatory animus, not whether it amounted to an adverse employment action. If there is no dispute about whether the alleged conduct, if proven, would constitute an adverse employment action, the bracketed paragraph may be deleted and the words "took adverse employment action against" in the second sentence of the first paragraph may be replaced by a brief description of the adverse employment action defendant allegedly took.

29 Blackie v. Maine, 75 F.3d 716, 725 (1st Cir. 1996) (FLSA) ("[T]he inquiry must be cast in objective terms. Work places are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action.").

Blackie uses the term "materially adverse employment action," but does not define the term (or, more precisely, the significance of the word "materially") beyond what is included in the text of this instruction. Two
other cases also use the modifier "materially" when discussing adverse employment actions (both cases take the language from Blackie), but neither of these cases indicates that a materially adverse employment action is different from an adverse employment action. Simas v. First Citizens' Federal Credit Union, 170 F.3d 37, 49-50 (1st Cir. 1999) (Federal Credit Union Act; whistleblower retaliation) (applying Title VII definition of adverse employment action); Larou v. Ridlon, 98 F.3d 659, 663 n.6 (1st Cir. 1996) (First Amendment political discrimination) (applying, with reservation, Blackie definition of adverse employment action). Furthermore, none of these three cases uses the term "materially adverse employment action" exclusively; all three cases describe employment

actions as "materially adverse" and "adverse" interchangeably. Other employment discrimination cases decided after Blackie have referred to adverse employment action without the modifier "materially." See, e.g., Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 33 (1st Cir. 2001) (Title VII and section 1981); Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 53-54 (1st Cir. 2000) (ADEA); White v. N.H. Dep't of Corrections, 221 F.3d 254, 262 (1st Cir. 2000) (Title VII).

30 Blackie v. Maine, 75 F.3d 716, 725 (1st Cir. 1996) (FLSA). As the Blackie court noted, this definition is generalized because "[d]etermining whether an action is materially adverse necessarily requires a case-by-case inquiry." Id. Consequently, although there is little explicit guidance in the case law about what constitutes an adverse employment action, there are a number of cases that, by their factual holdings, help define the term. For example, in the majority of cases, the court does not explicitly analyze whether the challenged conduct constitutes an adverse employment action, presumably because certain actions, such as layoffs, salary reductions, and demotions, are generally recognized as adverse employment actions. See, e.g., Straughn v. Delta Air Lines, Inc., 250 F.3d 23 (1st Cir. 2001) (Title VII and section 1981) (termination); Rodriguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15 (1st Cir. 1999) (Title VII) (demotion); Mullin v. Raytheon Co., 164 F.3d 696 (1st Cir. 1999) (salary reduction); see also Welsh v. Derwinski, 14 F.3d 85, 86 (1st Cir. 1994) (ADEA) ("Most cases involving a retaliation claim are based on an employment action which has an adverse impact on the employee, i.e., discharge, demotion, or failure to promote."). More helpful, though, are the cases where the court decided whether a jury could reasonably find that the challenged actions constitute adverse employment actions. In some cases, the court has defined what actions are insufficient to constitute an adverse employment action by upholding a trial court's conclusion that the defendant's conduct was not, as a matter of law, actionable. See, e.g., Hernandez-Torres v. Intercontinental Trading, Inc., 158 F.3d 43, 47 (1st Cir. 1998) (Title VII) (plaintiff was subjected to increased email messages, disadvantageous assignments and "admonition that [he] complete his work within an eight hour [day]"); Blackie, 75 F.3d at 726 (plaintiffs claimed defendants refused to negotiate a "side agreement" to supplement their employment contract); Connell v. Bank of Boston, 924 F.2d 1169, 1179 (1st Cir. 1991) (ADEA) (plaintiff who had already been fired and whose severance package was already calculated was forced to leave office two weeks early). In another useful class of cases, the court held that the challenged employment action could constitute an adverse employment action by either upholding a jury verdict for the plaintiff, see, e.g., White v. N.H. Dep't of Corrections, 221 F.3d 254, 262 (1st Cir. 2000) (Title VII) ("ample evidence" of adverse employment action where plaintiff was harassed, transferred without her consent, not reassigned to another position, "and ultimately constructively discharged"), or holding that the defendant was not entitled to summary judgment on this issue. See, e.g., Melendez-Arroyo v. Cutler-Hammer de P.R. Co., Inc., 273 F.3d 30, 36 (1st Cir. 2001) (ADEA) (plaintiff given standard salary increase but assigned less challenging, largely menial responsibilities); DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997) (Title VII) (plaintiff given five month assignment to job for which he had no experience and deprived of meaningful duties); Randlett v. Shalala, 118 F.3d 857, 862 (1st Cir. 1997) (Title VII) (defendant refused to grant plaintiff a hardship transfer); see also Simas v. First Citizens' Federal Credit Union, 170 F.3d 37, 48, 50 (1st Cir. 1999) (Federal Credit Union Act;

whistleblower retaliation) (plaintiff given negative performance evaluations and deprived of responsibility for major account) (applying Title VII definition of adverse employment action).

31 Febres v. Challenger Caribbean Corp., 214 F.3d 57, 60 (1st Cir. 2000) (ADEA) (evidence of discrimination "shifts the burden of persuasion to the employer, who then must establish that he would have reached the same decision regarding the plaintiff even if he had not taken the proscribed factor into account").

32Another possible defense in cases of age, disability, sex, pregnancy, national origin or religious discrimination would be for the defendant to argue that the challenged characteristic was a "bona fide occupational qualification" ("BFOQ"). See 29 U.S.C. § 623(f)(1) (2001) (allowing BFOQ defense for employment decisions based on age); 42 U.S.C. § 2000e-2(e) (2001) (same for religion, sex, and national origin); 42 U.S.C. § 12113 (2001) (same for disability); see also Int'l Union, United Auto., Aerospace and Agric. Implement Workers v. Johnson Controls, Inc., 499 U.S. 187, 200-201 (1991) (Title VII); Western Air Lines, Inc. v. Criswell, 472 U.S. 400, 402-403 (1985) (ADEA); Gately v. Massachusetts, 2 F.3d 1221, 1225-26 (1st Cir. 1993) (ADEA). In order to use the BFOQ

defense, the defendant must: 1) "show that the qualification at issue is *reasonably necessary* to the essence of [its] business[;]" and 2) "justify [the] use of [the protected characteristic] as a proxy for that qualification." Gately, 2 F.3d at 1225 (internal citations and quotations omitted). The defendant may justify the use of the protected characteristic as a proxy by either: 1) showing that it had "a *factual basis* for believing[] that all or substantially all persons [with the protected characteristic] would be unable to perform the duties of the job involved[;]" or 2) establishing "that it is impossible or highly impractical to deal with the [employees with the protected characteristic] on an individualized basis." Id. at 1225-26 (internal citations and quotations omitted). Because of these elements of a BFOQ defense, this instruction is not appropriate for BFOQ cases. More specifically, this instruction is inappropriate for a BFOQ case because it asks the jury to decide what factor or factors motivated the defendant to take the challenged action, whereas the defendant's reliance on the protected characteristic is generally undisputed in a BFOQ case (instead the focus of the dispute is whether the protected characteristic qualifies as a BFOQ).

33 In Title VII cases, the judge, not the jury, determines the availability of certain remedies when the plaintiff establishes prohibited discrimination and the defendant establishes that it would have taken the same action regardless. See 42 U.S.C. § 2000e-5(g)(2)(B) (2001) ("On a claim in which an individual proves a violation under section 2000e-2(m) of this title and a respondent demonstrates that the respondent would have taken the same action in the absence of the impermissible motivating factor, the court" may grant declaratory relief, injunctive relief, and attorneys fees, but may not "award damages or issue an order requiring any admission, reinstatement, hiring, [or] promotion."). As discussed in Introductory Note 4, in cases other than Title VII mixed motive cases (e.g., ADEA) such a showing by the defendant avoids liability altogether.

**Special Verdict Form: General Discrimination—Mixed Motive Case**

[Updated: 6/14/02]

## Special Verdict Form

1. Have Latino Plaintiff Members proven by a preponderance of the evidence that national origin was a motivating factor in United Steelworkers' decision to not bargain or arbitrate about the plant closing?

Yes____ No____

If "no," answer no further questions. If "yes," proceed to next question.

2. Have United Steelworkers proven by a preponderance of the evidence that it would nevertheless have taken the same action even if it had not considered national origin?

Yes____ No____

If "yes," answer no further questions. If "no," proceed to next question.

3. What damages do you award Latino Plaintiff Members against United Steelworkers?

$_____

**Compensatory Damages**

[Updated: 4/6/04]

## Pattern Jury Instruction

The fact that I instruct you on damages does not represent any view by me that you should or should not find United Steelworkers liable.

Latino Plaintiff Members seek to recover damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other noneconomic losses.

You must not consider any lost wages or fringe benefits. Federal law requires that I as the judge determine the amount of any lost wages and fringe benefits that Latino Plaintiff Members shall recover if you find United Steelworkers liable. Distress arising from this lawsuit, or legal expenses incurred in this lawsuit must also not be included in these damages. You must determine instead what other loss, if any, Latino Plaintiff Members has suffered or will suffer in the future caused by any national origin discrimination that you find United Steelworkers has committed under the instructions I have given you. We call these compensatory damages. You may award compensatory damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other noneconomic losses if you determine that Latino Plaintiff Members has proven by a preponderance of the evidence that she/he has experienced any of these consequences as a result of national origin discrimination. No evidence of the monetary value of intangible things like emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other noneconomic losses is available and there is no standard I can give you for fixing any compensation to be awarded for these injuries. Even though it is obviously difficult to establish a standard of measurement for these damages, that difficulty is not grounds for denying a recovery on this element of damages. You must, therefore, make the best and most reasonable estimate you can, not from a personal point of view, but from a fair and impartial point of view, of the amount of emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other noneconomic losses you find that Latino Plaintiff Members has undergone and can probably be expected to suffer in the future as a result of United Steelworkers' conduct. And you must place a money value on this, attempting to come to a conclusion that will be fair and just to both of the parties. This will be difficult for you to measure in terms of dollars and cents, but there is no other rule I can give you for assessing this element of damages.

If you find that Latino Plaintiff Members is entitled to damages for losses that will occur in the future, you will have to reduce this amount, whatever it may be, to its present worth. The reason for this is that a sum of money that is received today is worth more than the same money paid out in installments over a period of time, since a lump sum today, such as any amount you might award in your verdict, can be invested and earn interest in the years ahead. You have heard testimony concerning the likelihood of future inflation and what rate of interest any lump sum could return. In determining the present lump sum value of any future earnings you conclude Latino Plaintiff Members has lost or

future damages Latino Plaintiff Members will suffer, you should consider only a rate of interest based on the best and safest investments, not the general stock market, and you may set off against it a reasonable rate of inflation.

Each of the Latino Plaintiff Members has the duty to mitigate her/his damages—that is, to take reasonable steps that would reduce the damages. If she/he fails to do so, then she/he is not entitled to recover any damages that she/he could reasonably have avoided incurring. United Steelworkers has the burden of proving by a preponderance of the evidence that Latino Plaintiff Members failed to take such reasonable steps.

---

118 This instruction is for Title VII, Pregnancy Discrimination Act, ADA, Rehabilitation Act, section 1981, and section 1983 cases. Use Instruction 7.2 for ADEA cases and Instruction 7.5 for Equal Pay Act cases.

119 Although the language of section 1981a includes "future pecuniary losses" in the list of compensatory damages available, it has not been included in this instruction because of the possibility that its inclusion might confuse the jury. Moreover, because, as the Supreme Court recently ruled in Pollard v. E.I. du Pont de Nemours & Co., 532 U.S. 843, 852 (2001) (Title VII), front pay is not a "future pecuniary loss," it is not clear what damages might fit within the definition of "future pecuniary losses" in an employment discrimination case. See Hudson v. Reno, 130 F.3d 1193, 1204 (6th Cir. 1997) (Title VII), overruled by Pollard, 532 U.S. at 852 (commenting that "if the term [future pecuniary losses] does not refer to front pay, it is hard to see what it would refer to, as front pay has always been the heart of 'future pecuniary losses' in discrimination suits"); see also Pollard, 532 U.S. at 852 ("The term 'compensatory damages . . . for future pecuniary losses' is not defined in the statute. . . .").

Therefore, unless a plaintiff provides evidence of a type of harm that might reasonably be classified as a "future pecuniary loss," this instruction avoids the problem of asking the jury to distinguish between front pay and a "future pecuniary loss."

120 Back pay and benefits are not jury issues in Title VII or ADA cases. Two statutory sections, sections 1981a and 2000e-5(g) of Title 42, govern the damages available in a Title VII or ADA action. 42 U.S.C. §§ 1981a(b)(2), 2000e-5(g) (2001). Section 2000e-5(g) authorizes recovery of lost benefits, front pay, back pay, and interest on back pay. 42 U.S.C. § 2000e-5(g) (2001); see also Pollard v. E.I. du Pont de Nemours & Co., 532 U.S. 843, 847-48 (2001) (Title VII) (outlining the damages available under sections 1981a and 2000e-5(g)). Section 1981a(b) complements section 2000e-5(g) by authorizing both compensatory and punitive damages in situations where section 2000e-5(g) authorized only equitable remedies. 42 U.S.C. § 1981a (2001); see also Pollard, 532 U.S. at 847-48.

Section 1981a(a) authorizes a plaintiff to recover both: (1) the "compensatory and punitive damages" provided in section 1981a(b); and (2) "any relief authorized by"

section 2000e-5(g). 42 U.S.C. § 1981a(a) (2001). However, section 1981a(b)(2) specifically excludes the relief authorized by section 2000e-5(g) from its definition of "compensatory damages." 42 U.S.C. § 1981a(b)(2) (2001). This distinction between the damages available under section 1981a and 2000e-5(g) is important because section 1981a(c) provides the right to a jury trial, whereas section 2000e-5(g) does not. 42 U.S.C. § 1981a(c) (2001) ("If a complaining party seeks compensatory or punitive damages under this section . . . any party may demand a trial by jury."); 42 U.S.C. § 2000e-5(g) (2001) ("If the court finds that the respondent has intentionally engaged in . . . an unlawful employment practice . . . the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay . . . or any other equitable relief as the court deems appropriate."); see also Ramos v. Roche Prods., Inc., 936 F.2d 43, 49-50 (1st Cir. 1991) (Title VII) ("The First Circuit still adheres to its long-held rule precluding jury trials for equitable remedies under Title VII.").

There is some discussion of whether the enactment of section 1981a changed this rule. See Pollard, 532 U.S. at 847-48; see also Landgraf v. USI Film Prods., 511 U.S. 244, 252 n.4 (1994) (Title VII) ("We have not decided whether a plaintiff seeking backpay under Title VII is entitled to a jury trial."); Braverman v. Penobscot Shoe Co., 859 F. Supp. 596, 606 (D. Me. 1994) (ADA and ADEA) ("Whether a plaintiff who seeks backpay under either the ADA or Title VII is entitled to a jury trial is an open question." (citing Landgraf, 511 U.S. at 252 n.4)). However it is clear that the enactment of section 1981a did not change the remedies available under section 2000e-5(g), but rather provided additional remedies. Pollard, 532 U.S. at 852 ("Congress therefore made clear through the plain language of the statute that the remedies newly authorized under § 1981a were in addition to the relief authorized by [section 2000e-5(g)].") More specifically, the Pollard Court held that even after the enactment of section 1981a, front pay was still an equitable rather than compensatory remedy. See id. at 852-53. Therefore, the well-established rule that the calculation of equitable remedies is within the discretion of the court, rather than subject to jury determination, continues to apply. See Lussier v. Runyon, 50 F.3d 1103, 1107-08 (1st Cir. 1995) (Rehabilitation Act of 1973, 29 U.S.C. § 794a (2001)) (Selya, J.) ("it follows *a fortiori* from the equitable nature of the remedy that the decision to award or withhold front pay is, at the outset, within the equitable discretion of the trial court"); Braverman, 859 F. Supp. at 606 (deciding that "[t]he Court will determine whether [the plaintiff] is entitled to backpay").

The total compensatory and punitive damages available under section 1981a (but not the benefits, front pay, back pay, or interest on back pay available under 42 U.S.C. § 2000e-5(g)) are limited according to the number of employees employed by the defendant. 42 U.S.C. § 1981a(b)(3); Pollard, 532 U.S. at 852 (holding that front pay, like back pay, is excluded from the damages cap in section 1981(b)(3)). However, the section also provides that "the court shall not inform the jury of [these] limitations." 42 U.S.C. § 1981a(c)(2). But, in section 1983 cases, back pay is an issue for the jury as long as the plaintiff seeks some measure of compensatory damages in addition to back pay; if the plaintiff seeks only back pay, or back pay and reinstatement, then the calculation of the back pay award is an issue for the court rather than the jury. Saldana Sanchez v. Vega

Sosa, 175 F.3d 35, 36 (1st Cir. 1999) (Section 1983) (citing Santiago-Negron v. Castro-Davila, 865 F.2d 431, 441 (1st Cir. 1989) (Section 1983)). Although not discussed explicitly in the case law, this same principle would presumably apply to section 1981 cases, and to an award of front pay under either section. See Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 460 (1975) (Title VII and section 1981) ("An individual who establishes a cause of action under s. 1981 is entitled to both equitable and legal relief, including compensatory and, under certain circumstances, punitive damages."); Sinai v. New England Tel. & Tel. Co., 3 F.3d 471, 476 (1st Cir. 1993) (Title VII and section 1981) ("The jury was presented in the § 1981 claim with evidence concerning back pay, front pay, and emotional distress, and instructed to determine the appropriate level of damages for them."); T & S Serv. Assoc., Inc. v. Crenson, 666 F.2d 722, 728 n.7 (1st Cir. 1981) (Section 1981) ("Without deciding the issue, we note that the proper inquiry under § 1983 would likely focus on compensation, as under § 1981."); Hiraldo-Cancel v. Aponte, 925 F.2d 10, 13 (1st Cir. 1991) (Section 1983) (holding that an award of reinstatement is an equitable

remedy, and thus within the discretion of the court). Therefore, it might be necessary to add a back pay component to this instruction in some section 1981 or 1983 cases.
121 See, e.g., Zimmerman v. Direct Fed. Credit Union, 262 F.3d 70, 79 (1st Cir. 2001) (a case under Massachusetts discrimination law, but recognizing that "the heavy weight of authority holds that litigation-induced stress is not ordinarily recoverable as an element of damages") (citing Picogna v. Bd. of Educ. of Cherry Hill, 671 A.2d 1035, 1038 (N.J. 1996); Stoleson v. United States, 708 F.2d 1217, 1223 (7th Cir. 1983)).
122 There is some conflict in the caselaw about whether this is a question for the jury or for the court. In a section 1983 case, "it is the jury that must decide whether prejudgment interest is warranted." Foley v. City of Lowell, Mass., 948 F.2d 10, 17 (1st Cir. 1991) (section 1983); accord Cordero v. De Jesus-Mendez, 922 F.2d 11, 13 (1st Cir. 1990) (section 1983) ("There can be no doubt that in this circuit the decision to award prejudgment interest in a federal question case lies within the sole province and discretion of the jury."); id. ("[I]n an action brought under 42 U.S.C. § 1983, the issue of prejudgment interest is so closely allied with the issue of damages that federal law dictates that the jury should decide whether to assess it.") (citing Furtado v. Bishop, 604 F.2d 80, 97-98 (1st Cir. 1979) (section 1983)). In other types of cases, the First Circuit has generally held that "[t]he decision to award prejudgment interest is within the discretion of the trial court." Criado v. IBM Corp., 145 F.3d 437, 446 (1st Cir. 1998) (ADA); accord Troy v. Bay State Computer Group, Inc., 141 F.3d 378, 383 (1st Cir. 1998) (Title VII); Hogan v. Bangor & Aroostook R.R. Co., 61 F.3d 1034, 1038 (1st Cir. 1995) (ADA); Powers v. Grinnell Corp., 915 F.2d 34, 41 (1st Cir. 1990) (ADEA); Conway v. Electro Switch Corp., 825 F.2d 593, 602 (1st Cir. 1987) (Title VII); cf. Heritage Homes of Attleboro, Inc. v. Seekonk Water Dist., 648 F.2d 761, 763 (1st Cir.) (sections 1981 and 1983) ("we agree" that "prejudgment interest is required to make injured parties whole when the injuries they suffer are not 'intangible'"), rev'd on other grounds by 454 U.S. 807 (1981). However, in at least one case, the court made this statement even though the trial court submitted the question of prejudgment interest to the jury. Scarfo v. Cabletron Sys., Inc., 54 F.3d 931, 960-61 (1st Cir. 1995) (Title VII and EPA). In still another case, the court implied that prejudgment interest is a jury question,

citing the rule that governs prejudgment interest in 1983 cases: "[P]laintiff did not request prejudgment interest from the jury. He was therefore barred from subsequently seeking it from the judge." Kolb v. Goldring, Inc., 694 F.2d 869, 875 (1st Cir. 1982) (ADEA). This confusion likely flows from the language of the court's holding in Earnhardt v. Puerto Rico, 744 F.2d 1 (1st Cir. 1984) (Title VII), language that has been cited in most of the subsequent cases to discuss the issue. In Earnhardt, a bench trial where the plaintiff did not request prejudgment interest until he filed a motion to amend the judgment, the First Circuit held (without citation to any other authority):

The determination of the amount of damages is, absent legal error, a matter for the finder of fact. It cannot be said that either prejudgment interest or an award for lost fringe benefits must, as a matter of law, be part of the damages awarded in a Title VII case. The question of whether they are necessary to make a plaintiff whole is within the discretion of the district court.

Id. at 3.

Considering all of these cases, it appears that the rule in the First Circuit is that prejudgment interest is a jury question in section 1983 cases. (If a section 1983 plaintiff fails to ask the jury for prejudgment interest, he or she may not later ask the judge to award it. Foley, 948 F.2d at 17; Cordero, 922 F.2d at 13.) For employment discrimination cases other than section 1983 cases, an award of prejudgment interest is within the court's discretion, but the court may also exercise that discretion by submitting the question to the jury. This bracketed paragraph may be used in cases where the question of prejudgment interest is submitted to the jury.

123 These bracketed paragraphs may be used in cases where the plaintiff's claimed damages include future losses, such as retirement benefits, that must be reduced to net present value. See Loeb v. Textron, Inc., 600 F.2d 1003, 1021 (1st Cir. 1979) (ADEA) ("any pension benefits due a prevailing plaintiff normally should be liquidated as of the date damages are settled, and should approximate the present discounted value of plaintiff's interest" (internal citation omitted)).

124 "The discount rate should be based on the rate of interest that would be earned on the 'best and safest investments.'" Jones & Laughlin Steel Corp. v. Pfeifer, 462 U.S. 523, 537 (1983) (longshoreman's workers' compensation) (quoting Chesapeake & Ohio Ry. Co. v. Kelly, 241 U.S. 485, 491 (1916) (Federal Employers' Liability Act)). The "best and safest investments" are those which provide a "risk-free stream of future income," not those made by "investors who are willing to accept some risk of default." Pfeifer, 462 U.S. at 537; Kelly, 241 U.S. at 490-91.

125 This bracketed paragraph may be used in cases where the plaintiff's duty to mitigate damages is an issue. See Hazel v. U.S. Postmaster Gen., 7 F.3d 1, 5 (1st Cir. 1993) (ADEA and Title VII) (holding that plaintiff could not recover, even if he proved discrimination, because he failed to mitigate his damages). In cases where a back pay instruction is called for, see *supra* note 120, an additional instruction regarding the plaintiff's duty to seek comparable employment and the "mitigation-defense exception" may also be appropriate. See *infra* ADEA Damages, section 7.2, and note 138.

126 This bracketed paragraph may be used in cases where the defendant argues that it was entitled to take the challenged employment action because of after-acquired information about misconduct by the plaintiff. Although information acquired after the

challenged employment action may not be considered when assessing the defendant's liability, it may be relevant to the amount of the plaintiff's damages. See McKennon v. Nashville Banner Publ'g Co., 513 U.S. 352, 361-63 (1995) (ADEA), cited in Equal Employment Opportunity Comm'n v. Amego, Inc., 110 F.3d 135, 146 n.9 (1st Cir. 1997) (ADA); Serafino v. Hasbro, Inc., 82 F.3d 515, 519 (1st Cir. 1996) (Title VII); see also Sabree v. United Bhd. of Carpenters and Joiners Local No. 33, 921 F.2d 396, 404-05 (1st Cir. 1990) (Title VII). This bracketed paragraph is not appropriate when the defendant knew of the misconduct in question before it took the challenged employment action. See Perkins v. Brigham & Women's Hosp., 78 F.3d 747, 751 (1st Cir. 1996) (Title VII).
127 McKennon v. Nashville Banner Publ'g Co., 513 U.S. 352, 362-63 (1995) (ADEA) ("[A]n employer seek[ing] to rely upon after-acquired evidence of wrongdoing . . . must first establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge.").
128 The effect of after-acquired evidence of misconduct on the calculation of damages is not precisely defined. In McKennon v. Nashville Banner Publ'g Co., 513 U.S. 352, 361-62 (1995) (ADEA), the Court noted that, "as a general rule . . . neither reinstatement nor front pay is an appropriate remedy," and that "[t]he beginning point in the trial court's formulation of a remedy should be calculation of backpay from the date of the unlawful discharge to the date the new information was discovered." The Court added that: "In determining the appropriate order for relief, the court can consider taking into further account extraordinary equitable circumstances that affect the legitimate interests of either party." Id. at 362. We have not resolved how to account for such "extraordinary equitable circumstances" in this jury charge.
129 This instruction does not include language for use in cases where there is a question as to whether the defendant's conduct caused the plaintiff's injury. In a case where the causal link between the challenged conduct and the claimed damages is disputed (e.g., when the plaintiff claims emotional injury and the defendant claims that other factors in the plaintiff's environment caused the emotional distress), it will be necessary to add appropriate causation language.
130 In Kerr-Selgas v. American Airlines, Inc., 69 F.3d 1205, 1214-15 (1st Cir. 1995) (Title VII), the court held that: "Although nominal damages are recoverable in intentional discrimination cases under 42 U.S.C. § 1981a(a)(1), . . . a liability verdict [does not] compel[] such an award absent a timely request." See also Provencher v. CVS Pharmacy, 145 F.3d 5, 11 n.4 (1st Cir. 1998) (Title VII).
131 According to Romano v. U-Haul Int'l, 233 F.3d 655, 671 (1st Cir. 2000) (Title VII), nominal damages are not limited to $1, but $500 is too high. See also Magnett v. Pelletier, 488 F.2d 33, 35 (1st Cir. 1973) (Section 1983).
132 Whether the damages a plaintiff recovers are taxable depends on both the statutory source of the recovery and the type of injury the plaintiff sustained, because the federal tax code excludes from taxable income "any damages . . . received . . . on account of personal physical injuries or physical sickness." 26 U.S.C. § 104; see also, e.g., O'Gilvie v. United States, 519 U.S. 79 (1996) (tax case; medical malpractice) (punitive damages awards are taxable); Commissioner v. Schleier, 515 U.S. 323 (1995) (tax case; ADEA) (back pay and liquidated damages awards in ADEA case are both taxable); United States v. Burke, 504 U.S. 229 (1992) (tax case; Title VII) (before 1991 amendment, Title VII

damages were not "tort-like" and thus were taxable); Dotson v. United States, 87 F.3d 682, 685-86 (5th Cir. 1996) (tax case; ERISA) (applying Schleier and Burke in ERISA case); Wulf v. City of Wichita, 883 F.2d 842, 871-75 (10th Cir. 1989) (section 1983) (examining decisions by the Third, Fourth and Ninth circuits); Johnston v. Harris County Flood Control Dist., 869 F.2d 1565, 1579-80 (5th Cir. 1989) (Title VII and section 1983) ("The distinction between the § 1983 award and the Title VII award is important for federal income tax purposes."); Thompson v. Commissioner, 866 F.2d 709, 712 (4th Cir. 1989) (tax case: Title VII and Equal Pay Act). As a general rule, tort-type damages are non-taxable, even if they include damages based on the plaintiff's lost wages, but an award that more closely resembles contract damages, such as an award of back pay, is taxable.

Even after the tax status of each element of a plaintiff's claimed damages is properly established, it is not clear how the tax status of any particular element should affect the final calculation of damages. For example, consider a case involving lost wages. If those wages had been paid properly, they would have been taxed when earned. Therefore, an argument could be made that any award should be reduced to reflect the after-tax value based on the tax rate the plaintiff was subject to in the year in question. On the other hand, an amount the plaintiff receives for those lost wages may be taxable when the plaintiff receives them; thus an argument could be made that the plaintiff's damages should be enhanced so that the he or she actually receives, after taxes, the amount the jury awarded. As a practical matter, these two factors may offset each other, in which case there is no reason to include a jury instruction about the tax consequences of an award. For an example of the difficulty of resolving this issue, see Wulf, 883 F.2d at 873. See also Johnston, 869 F.2d at 1580 ("We decline to require district courts to act as tax consultants every time they grant back pay awards, speculating as to what deductions and shelters the plaintiff will find, and then calculating the plaintiff's potential tax liability.") This instruction does not attempt to resolve these issue. In a case where the tax consequences of all or part of a damages award are at issue, it will be necessary to supplement the language of this instruction to reflect the particular circumstances of that case.

**Punitive Damages**

[Updated: 2/11/05]

## Pattern Jury Instruction

If you have awarded compensatory or nominal damages, you may also award punitive damages to Latino Plaintiff Members under some circumstances. To obtain punitive damages, Latino Plaintiff Members must prove by a preponderance of the evidence that in national origin discrimination, United Steelworkers either knew that its actions violated federal law or acted with reckless or callous indifference to that risk. If Latino Plaintiff Members satisfies this requirement, it is entirely up to you whether or not to award punitive damages. But it should be presumed that Latino Plaintiff Members has been made whole by compensatory damages, so you should award punitive damages only if United Steelworkers' culpability is so reprehensible as to warrant further sanctions to achieve punishment or deterrence.

If you decide to award punitive damages, the amount to be awarded is within your sound discretion. The purpose of a punitive damage award is to punish a defendant or deter a defendant and others from similar conduct in the future. Factors you may consider include, but are not limited to, the nature of United Steelworkers' conduct (how reprehensible or blameworthy was it), the impact of that conduct on Latino Plaintiff Members, the ratio between the actual compensatory damages and the punitive damages, the relationship between Latino Plaintiff Members and United Steelworkers, the likelihood that United Steelworkers or others would repeat the conduct if the punitive award is not made, and any other circumstances shown by the evidence, including any mitigating or extenuating circumstances that bear on the size of such an award. You may determine reprehensibility by considering whether the harm was physical as opposed to economic; whether the conduct showed indifference to or disregard for the health or safety of others; whether the target of the conduct has financial vulnerability; whether the conduct involved repeated actions or was an isolated instance; and whether the harm was the result of intentional malice, trickery, deceit, or mere accident.

---

163 This instruction is for Title VII, ADA, section 1981, and section 1983 cases. Use Instruction 7.2 for ADEA cases and Instruction 7.5 for Equal Pay Act cases. Punitive damages are available under 42 U.S.C. § 1981 for racial discrimination, under 42 U.S.C. § 1981a for discrimination prohibited under Title VII and Subchapter I of the Americans with Disabilities Act, and under 42 U.S.C. § 1983 for civil rights discrimination. 42 U.S.C. §§ 1981, 1981a(a), 1983 (2001); Iacobucci v. Boulter, 193 F.3d 14, 25-26 & n.7 (1st Cir. 1999) (Section 1983) (holding case law decided under section 1981a applicable to section 1983 punitive damages awards); McKinnon v. Kwong Wah Rest., 83 F.3d 498, 507 (1st Cir. 1996) (Title VII) ("[Section 1981a] permits courts to award damages in cases of intentional discrimination . . . in the same circumstances as such awards are permitted under 42 U.S.C. § 1981 for race discrimination."). Punitive damages are not

available under section 202 of the ADA, 42 U.S.C. § 12132 (public entity discrimination), section 504 of the Rehabilitation Act, 29 U.S. C. § 794(a) (discrimination by entities that receive federal funding), or Title VI of the Civil Rights Act, 42 U.S.C. § 2000d (racial discrimination in federally funded programs and activities). Barnes v. Gorman, 536 U.S. 181, 189-90 (2002).

In any event, punitive damages generally are not available against a government, government agency, or a political subdivision. 42 U.S.C. § 1981a(b)(1) (2001); City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 270-71 (1981) (holding that punitive damages are not available in a section 1983 action against a municipality, and noting that similar immunity applied to "other units of state and local government"); Heritage Homes of Attleboro, Inc. v. Seekonk Water Dist., 670 F.2d 1, 1-4 (1st Cir. 1982) (applying the City of Newport holding to section 1981 actions).

164 In Pacific Mutual Life Insurance Co. v. Haslip, 499 U.S. 1, 23 n.11 (1991), the Supreme Court declined to impose the clear and convincing evidence standard on state punitive damages.

165 This sentence should be modified as appropriate to satisfy the First Circuit's view that "the inquiry should focus on the acting party's state of mind." Romano v. U-Haul Int'l, 233 F.3d 655, 669 (1st Cir. 2000)

166 The propriety of the term "callous indifference" may be debated. The statute refers only to "malice" and "reckless indifference" when authorizing punitive damages. 42 U.S.C. § 1981a(b)(1) (2001) (providing for punitive damages when defendant "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual"); see also Romano v. U-Haul Int'l, 233 F.3d 655, 669 (1st Cir. 2000) (Title VII); Marcano-Rivera v. Pueblo Int'l, Inc., 232 F.3d 245, 253-54 (1st Cir. 2000) (ADA) (discussing only "malice" and "reckless indifference"). However, the Supreme Court and the First Circuit have both stated that Congress modeled the punitive damages language of section 1981a on the language used in Smith v. Wade, 461 U.S. 30 (1983) (Section 1983). See Kolstad v. American Dental Ass'n, 527 U.S. 526, 535-36 (1999) (Title VII); Iacobucci v. Boulter, 193 F.3d 14, 26 n.7 (1st Cir. 1999) (Section 1983); see also McKinnon v. Kwong Wah Rest., 83 F.3d 498, 507 (1st Cir. 1996) (Title VII) ("The legislative history of the Section notes: Plaintiffs must . . . establish[] that the employer acted with malice or reckless or callous indifference to their rights . . . to recover punitive damages." (citations omitted)). Smith used the term "callous" as well as "reckless." Not surprisingly, then, several First Circuit cases have continued to use the "callous indifference" language, despite its absence from the language of section 1981a. Dimarco-Zappa v. Cabanillas, 238 F.3d 25, 37 (1st Cir. 2001) (Section 1983) (citing Smith v. Wade, 461 U.S. 30, 56 (1983)); Iacobucci, 193 F.3d at 26 (same). There is no indication in the language of any of these opinions that the use or omission of the word "callous" was conscious or significant. Instead, the courts all emphasize the importance of finding that the defendant acted in disregard of a "subjective consciousness" of the risk that his or her conduct might violate federal law. Therefore, in order for a party to object to the use (or omission) of the word "callous" from a jury instruction, that party would have to distinguish cases like Smith, Dimarco-Zappa, and Iacobucci that used the words "reckless" and "callous" seemingly interchangeably.

167 This is a subjective standard, focused on the actor's state of mind. Powell v. Alexander, 391 F.3d 1, 15 (1st Cir. 2004). Moreover, the federal law in question must be the one on which the plaintiff obtained a liability verdict, not some other federal law. Id. at 18 (where claim was for a First Amendment violation, a defendant's knowledge that her actions might violate the ADA not enough). Evidence of egregious or outrageous acts is not sufficient, but it may be probative if it demonstrates awareness of the risk that the conduct would violate federal law. Id. at 19.

168 This language comes from State Farm Mutual Auto Ins. Co. v. Campbell, 538 U.S. 408, 419 (2003).

169 The next two bracketed paragraphs of this instruction are for vicarious liability cases. Romano v. U-Haul Int'l, 233 F.3d 655 (1st Cir. 2000) (Title VII), describes Kolstad v. American Dental Ass'n, 527 U.S. 526 (1999) (Title VII), as permitting vicarious liability for punitive damages in four situations:

(1) when the agent has been authorized by the principal to commit the misconduct in question; (2) when the principal recklessly employed the unfit agent; (3) when the agent, acting in a managerial capacity, committed the misconduct within the scope of employment; or, (4) when the agent's bad act was subsequently approved the by principal.

233 F.3d at 669. The instruction deals only with situations (3) and (4), the ones most likely to arise. It also reflects the Romano description of a Kolstad limitation: "absolving an employer from liability for punitive damages if a good-faith effort to comply with the requirements of Title VII is made." Id. According to Romano, this is an affirmative defense where the defendant bears the burden of proof: "We hold that a written non-discrimination policy is one indication of an employer's efforts to comply with Title VII. But a written statement, without more, is insufficient to insulate an employer from liability. A defendant must also show that efforts have been made to implement its policy, through education of its employees and active enforcement of its mandate." Id. at 670; see also Kolstad, 527 U.S. at 544-46 (outlining the justification for the "good faith effort" safe harbor).

170 Kolstad v. American Dental Ass'n, 527 U.S. 526 (1999) (Title VII), said that there is "no good definition" of this term, that it involves "a fact-intensive inquiry," quotes a treatise that "[i]n making this determination, the court should review the type of authority that the employer has given to the employee, the amount of discretion that the employee has in what is done and how it is accomplished" and concludes by saying: "Suffice it to say here that the examples provided in the Restatement of Torts suggest that an employee must be 'important,' but perhaps need not be the employer's 'top management, officers, or directors,' to be acting 'in a managerial capacity.'" Id. at 543 (discussing the problem of trying to define "managerial capacity"); see also 1 L. Schlueter & K. Redden, Punitive Damages, § 4.4(B)(2)(a), at 183-89 (4th ed. 2000); 2 J. Kircher & C. Wiseman, Punitive Damages: Law and Practice, § 24:05, at 24-19 to 24-24 (2000) (formerly edited by, and cited in Kolstad as, J. Ghiardi & J. Kircher); Restatement (Second) of Torts § 909 (1977); Restatement (Second) of Agency § 217C (1957). We have used the Kolstad language, along with language from In re Exxon Valdez, 270 F.3d 1215, 1233, 1235-36 (9th Cir. 2001), involving punitive damages for a federal maritime tort, concluding that Kolstad

has overcome the First Circuit's earlier diffidence about this portion of the Restatement. See CEH, Inc. v. F/V Seafarer, 70 F.3d 694, 705 (1st Cir. 1995).

171 This definition comes from Kolstad v. American Dental Ass'n, 527 U.S. 526, 543-44 (1999) (Title VII) (approving Restatement formulation).

172 This bracketed paragraph should only be used in cases where the employee who committed the wrongful conduct was serving in a managerial capacity. In cases where the employer ratified or authorized the discriminatory actions, this defense is not available. See Kolstad v. American Dental Ass'n, 527 U.S. 526, 542-45 (1999) (Title VII).

173 Under section 1981a, the total damages available (including both punitive and other damages) are limited according to the number of employees employed by the defendant. 42 U.S.C. § 1981a(b)(3). However, the section also provides that "the court shall not inform the jury of [these] limitations." Id. § 1981a(c)(2).

174 State Farm Mutual Auto Ins. Co. v. Campbell, 538 U.S. 408, 425 (2003), states that few awards exceeding a single-digit ratio will satisfy due process and that anything over 4 to 1 "might be close to the line of constitutional impropriety."

175 With all the attention the Supreme Court has given to the constitutionality of punitive damages under state law, apart from Kolstad v. American Dental Ass'n, 527 U.S. 526 (1999), it has had little to say about the standards used in federal law cases either as a matter of constitutional law or under its supervisory powers. The general focus of recent Supreme Court cases on the topic of punitive damages, State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408 (2003); Cooper Industries, Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424 (2001); BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996); Honda Motors Co. v. Oberg, 512 U.S. 415 (1994); TXO Production Corp. v. Alliance Resources Corp., 509 U.S. 443 (1993); Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1 (1991); Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc., 492 U.S. 257 (1989); Bankers Life & Casualty Co. v. Crenshaw, 486 U.S. 71 (1988), has been on the standards of *appellate* review for punitive damage awards, not the standards (if any) that should guide jurors. Appellate courts are instructed to consider "(1) the degree of the defendant's reprehensibility or culpability; (2) the relationship between the penalty and the harm to the victim caused by the defendant's actions; and (3) the sanctions imposed in other cases for comparable misconduct." Leatherman, 532 U.S. at 425 (citations omitted); accord BMW, 517 U.S. at 574-75. As the First Circuit noted in

Zimmerman v. Direct Federal Credit Union, 262 F.3d 70 (1st Cir. 2001) (Title VII): BMW furnishes three general guideposts for conducting such a review: (1) What is the degree of reprehensibility of the defendant's conduct? (2) What is the ratio between the compensatory and punitive damages? (3) What is the difference between the punitive damage award and the civil penalties imposed for comparable conduct? Id. at 81 (citing BMW, 517 U.S. at 575). The first two standards are reflected in the jury instruction. We have not incorporated the third—the sanctions imposed in other cases— on the reasoning that it is more a subject for judicial, not jury, determination. In theory, however, evidence could be introduced concerning other sanctions for a jury to consider. The instruction also directs the jury to consider "other mitigating or extenuating circumstances" bearing on the appropriate size of a punitive damage award. The Supreme Court implicitly approved such an instruction in TXO Prod. Corp., Inc. v. Alliance Resources Corp., 509 U.S. 443, 463-64 n.29 (1993).

176 Conduct affecting non-parties is relevant to determining reprehensibility only if it is "misconduct of the sort that harmed" the plaintiff. State Farm Mutual Auto Ins. Co. v. Campbell, 538 U.S. 408, 410 (2003). In State Farm, the Supreme Court said that, where the plaintiffs did not present evidence of conduct by the defendant similar to the conduct that harmed them, the conduct that harmed them was "the only conduct relevant to the reprehensibility analysis." Id. Therefore, if the jury has heard evidence of dissimilar conduct affecting non-parties, it should be instructed that it may not consider that conduct in assessing reprehensibility.

177 This list of factors comes directly from State Farm Mutual Auto Ins. Co. v. Campbell, 538 U.S. 408, 418-19 (2003), where the Court reiterates that degree of culpability is the most important factor. State Farm also said: "A jury must be instructed, furthermore, that it may not use evidence of out-of-state conduct to punish a defendant for action that was lawful in the jurisdiction where it occurred." Id. at 421. Such an instruction will ordinarily not be pertinent in a federal law claim. We have not listed the defendant's wealth as a factor. Although the Supreme Court has never actually prohibited consideration of wealth, there are expressions of concern. See id. at 427 ("The wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award."), and 417 ("'the presentation of evidence of a defendant's net worth creates the potential that juries will use their verdicts to express biases against big businesses, particularly those without strong local presences,'" quoting Honda Motors Co. v. Oberg, 512 U.S. 415, 432 (1994)). See also TXO Prod. Corp. v. Alliance Res. Corp., 509 U.S. 443, 489-95 (1993) (O'Connor, J., dissenting).

Respectfully submitted,

Dated: February 27, 2006

/s/ Robert O. Berger
Robert O. Berger (BBO#: 038900)
11 Beacon Street, Ste. 1210
Boston, MA 02108
(617) 423-7575 Tel
(617) 275-8000 Fax
Attorney for Plaintiffs

/s/ John Lee Diaz
John Lee Diaz (BBO#: 542819)
801A Tremont Street
Boston, MA 02118
(617) 445-7900 Tel
Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served by electronic transfer on the attorney of record for each party on February 27, 2006.

Dated: February 27, 2006

/s/ Robert O. Berger
Robert O. Berger (BBO#: 038900)